UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

ZIA AGRICULTURAL CONSULTING, LLC,

    Plaintiff,

        v.                                CASE NO.  1:20-cv-445

TYSON FOODS, INC. and TYSON FRESH
MEATS, INC.,

    Defendants.

### ZIA AGRICULTURAL CONSULTING, LLC'S COMPLAINT FOR BREACH OF CONTRACT, BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING, QUANTUM MERUIT, FRAUDULENT MISREPRESENTATION, AND VIOLATION OF THE <u>NEW MEXICO UNFAIR PRACTICES ACT</u>

Plaintiff Zia Agricultural Consulting, LLC, for its Complaint against Defendants Tyson Foods, Inc. and Tyson Fresh Meats, Inc., hereby alleges the following facts and claims:

### THE PARTIES

1.    Zia Agricultural Consulting, LLC ("Zia") is a Limited Liability Company registered in New Mexico with its principal place of business in Albuquerque, New Mexico.

2.    Zia is a commodity consulting business that specializes in investments, sourcing, and production of cattle for the commercial beef market.

3.    Upon information and belief, Tyson Foods, Inc. ("Tyson") is a corporation registered in Delaware with its principal place of business in Springdale, Arkansas.

4.    Tyson is a large food production, processing, sales, and marketing company.

5.    Upon information and belief, Tyson Fresh Meats, Inc. ("Tyson Fresh Meats") is a corporation registered in Delaware with its principal place of business in Dakota Dunes, South Dakota.

6. Upon information and belief, Tyson Fresh Meats is an affiliate, subsidiary, department, division, and/or brand name of Tyson.

7. As alleged herein, Tyson and Tyson Fresh Meats will be referred to collectively as the "Tyson Defendants". Each allegation against the Tyson Defendants is alleged fully and completely as against either individual entity.

## JURISDICTION AND VENUE

8. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are diverse and more than $75,000, exclusive of interest and costs, is in dispute.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the underlying claims in the Complaint occurred in this District, because the Tyson Defendants' acts or omissions in this District caused Zia's damages, and because the Tyson Defendants are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### Overview

10. For many years, Zia has sourced and sold cattle to the Tyson Defendants for processing and re-sale in the commercial market.

11. Increasingly, retail sellers in the grocery industry, including the Tyson Defendants' customers, seek out high-quality, natural beef sourced to specific standards of production.

12. Zia has a good reputation in the cattle industry for producing Global Animal Partnership-certified Cattle and Non-Hormone Treated Cattle (collectively, "Premium Cattle").

13. Based on Zia's reputation, the Tyson Defendants approached Zia to source Premium Cattle as they expanded their business beyond conventional cattle.

14. Zia sold this Premium Cattle to the Tyson Defendants for processing and sale to Whole Foods, which created the Global Animal Partnership-certified program and is the only viable purchaser for the finished product.

15. In or about February of 2019, Zia and the Tyson Defendants entered into a contract for the sale of Premium Cattle over the coming months.

16. Zia delivered the Premium cattle to the Tyson Defendants and performed all terms of the contract.

17. The Tyson Defendants breached the contract, have failed to pay Zia the agreed upon price for Premium Cattle, and have only remitted payment for a lesser amount.

18. As set forth in more detail below, Zia has been damaged in an amount of not less than $2,488,000 or such other amount to be determined at trial, based upon the Tyson Defendants' breach of the contract.

## The Cost Plus Contract

19. In or about December of 2018 and January of 2019, Robert Scherer, an employee of the Tyson Defendants, initiated multiple telephone calls with Zia to discuss a potential list of Premium Cattle and their cost for purchase during 2019.

20. Based on production requirements and finishing timelines, parties in the cattle industry typically reach agreements regarding the sale of cattle between six and twelve months in advance of delivery.

21. The entire production process – from the time the Premium Cattle are programmed and born at the ranch of origin, to their finishing, to their eventual sale to the packer – typically takes twelve to twenty-four months.

22. Scherer requested that Zia identify as many Premium Cattle as possible for eventual sale to Whole Foods.

23. On February 4, 2019, in response to Scherer's requests, Zia emailed Scherer a "Cost Plus Model" for Premium Cattle. The February 4, 2019 email and a response from the Tyson Defendants are attached as Exhibit 1. The Cost Plus Model is attached as Exhibit 2.

24. The Cost Plus Model identified the projected costs to finish the cattle (i.e. feeding, bringing up to weight, providing medical care, and otherwise preparing the cattle for market) and

then set the sale price to the Tyson Defendants at that cost of finishing plus an additional premium per head.

25. The Cost Plus Model set a price per head for Global Animal Partnership-certified cattle at $125 per head over the cost of finishing the cattle.

26. The Cost Plus Model set a price per head for Non-Hormone Treated Cattle at $100 per head over the cost of finishing the cattle.

27. On February 4, 2019, Scherer responded to the offer with an email accepting the offer by stating the following: "This looks good get them in a finish yard, asap please." *See* Exhibit 1.

28. Zia and the Tyson Defendants thus entered into a contract (the "Cost Plus Contract"), which included consideration.

29. Based on the Cost Plus Contract, Zia sent several thousand Premium Cattle to four feedlots for finishing.

30. Zia provided the Tyson Defendants with regular updates throughout the spring of 2019 regarding head of cattle moved from pasture to feedyard under the Cost Plus Contract for delivery dates throughout 2019.

31. Beginning with the first email in February, Zia began sending Cost Plus Model spreadsheets to the Tyson Defendants on a monthly basis.

32. Zia emailed Scherer the March Update of Premium Cattle moved from pasture to feedyard under the Cost Plus Contract on March 4, 2019.  The email attaching the March Update is attached as Exhibit 3.

33. Zia emailed Scherer the April Update of Premium Cattle moved from pasture to feedyard under the Cost Plus Contract on May 10, 2019.  The email attaching the April Update is attached as Exhibit 4.

34. Zia emailed Scherer the May Update of Premium Cattle moved from pasture to feedyard under the Cost Plus Contract on May 22, 2019.  The email attaching the May Update is attached as Exhibit 5.

35. Zia invested substantially in the Premium Cattle based on the high standards required to bring them to market.

36. Premium Cattle must remain with their mothers for an average of 180 days before weaning.

37. Premium Cattle must receive certain medications, vaccinations, and feed while in the process of finishing.

38. Due to these and other high standards, Zia invested an amount in the Premium Cattle for the Cost Plus Contract far above what a producer would invest in the finishing of conventional cattle.

39. In or about March of 2019, Zia called Scherer and Justin Nelson, another employee of the Tyson Defendants, wherein Scherer and Nelson reconfirmed the Cost Plus Contract and asked to adjust the delivery dates to give the cattle more time for finishing prior to being harvested.

40. Following entry into the Cost Plus Contract, the Tyson Defendants' buyers inspected the Premium Cattle on a weekly basis.

41. In or about May of 2019, Zia left multiple voicemail messages for Scherer to reconfirm details before shipping the first set of Premium Cattle to the Tyson Defendants' facility in Lexington, Nebraska for harvesting.

42. On or about June 7, 2019, Scherer and Nelson called Zia and stated the Tyson Defendants would not pay the prices agreed to in the Cost Plus Contract.

43. On or about July 20, 2019, the Tyson Defendants breached the Cost Plus Contract by refusing to pay the agreed upon prices.

44. The Tyson Defendants have continued to breach the Cost Plus Contract by continuing to refuse to pay the agreed upon prices.

45. The Tyson Defendants also declined to purchase certain lots of Premium Cattle that were part of the Cost Plus Contract.

46. In one instance, the Tyson Defendants first declined to purchase a certain lot of Premium Cattle that was part of the Cost Plus Contract and later changed their mind and purchased the lot after additional time in the feedyard at additional cost to Zia.

47. In other instances, the Tyson Defendants delayed purchase and delivery, which required additional time for the Premium Cattle to be kept on feed at significant cost to Zia.

48. The Tyson Defendants overall mismanagement of its supply chain and the timing of delivery resulted in both significant costs for feed and care, as well as increased death loss of the Premium Cattle that were part of the Cost Plus Contract.

49. Due to the long production schedule and limited number of purchasers for Premium Cattle, Zia had to continue finishing the cattle on the feedlots in an effort to mitigate any damages caused by the Tyson Defendants' breach and recover costs as best it could.

50. Indeed, Whole Foods is the sole-marketer and retailer of Global Animal Partnership-certified Cattle. The Tyson Defendants are the packer for the majority of this cattle sold by Whole Foods.

51. The Tyson Defendants held significant leverage over Zia since the market for Premium Cattle is smaller than and not as fluid as the market for conventional cattle.

52. Zia was forced to continue delivery of the Premium Cattle despite the Tyson Defendants' breach to be able to recover as much of its costs as possible for finishing the cattle under the Cost Plus Contract.

53. Upon information and belief, the Tyson Defendants intentionally misled Zia and induced it to enter into the Cost Plus Contract based upon the limited market for Premium Cattle and the Tyson Defendants' understanding that Zia would have to sell the finished cattle to them regardless of the price Zia was paid.

54. Upon information and belief, the Tyson Defendants intentionally induced Zia to invest significant amounts of money into the finishing of the Premium Cattle knowing that Zia had little to no opportunity to identify an alternative buyer for the Premium Cattle and would be forced to deliver them to the Tyson Defendants regardless of what price Zia was paid.

55. The Tyson Defendants contacted Zia in New Mexico by telephone, email, or other means on numerous occasions and had actual knowledge that Zia was located in New Mexico.

56. The Tyson Defendants expressly aimed their fraudulent conduct at Zia in New Mexico.

57. The Tyson Defendants had actual knowledge that the injury to Zia would occur in New Mexico.

58. Upon information and belief, the Tyson Defendants also interfered with Zia's business by contacting ranchers, feedyards, and competitors of Zia in New Mexico in an attempt to cut Zia out of deals or to purchase calves from these companies that were intended to be sold to Zia during the term of the Cost Plus Contract.

59. Zia performed all of its obligations under the Cost Plus Contract and delivered all of the Premium Cattle to the Tyson Defendants by October of 2019.

60. The Tyson Defendants have refused, and continue to refuse, to pay the agreed-upon price under the Cost Plus Contract, but have rather remitted a substantially smaller amount.

61. Zia has been damaged by the Tyson Defendants in an amount to be determined at trial, but not less than $2,488,000.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract**
**(against all Defendants)**

62. Zia incorporates by reference paragraphs 1 through 61 as though fully set forth herein.

63. Zia and the Tyson Defendants entered into the Cost Plus Contract.

64. Zia had a valid and enforceable agreement with the Tyson Defendants with respect to the Cost Plus Contract.

65. Zia has performed all of its obligations under the Cost Plus Contract.

66. The Tyson Defendants materially breached their agreement with Zia by refusing to pay, and continuing to refuse to pay, the full amounts due and owing pursuant to the Cost Plus Contract.

67. As a direct and proximate result of the Tyson Defendants' breach, Zia has been damaged in an amount not less than $2,488,000.

### SECOND CLAIM FOR RELIEF
### Breach of The Implied Duty of Good Faith and Fair Dealing
### (against all Defendants)

68. Zia incorporates by reference paragraphs 1 through 67 as though fully set forth herein.

69. The Tyson Defendants owe Zia a duty of good faith and fair dealing in their dealings with Zia.

70. The Tyson Defendants breached their duty of good faith and fair dealing to Zia by refusing to pay, and continuing to refuse to pay, the amounts due and owing pursuant to the Cost Plus Contract.

71. As a direct and proximate result of the Tyson Defendants' conduct, Zia has been damaged in an amount not less than $2,488,000.

### THIRD CLAIM FOR RELIEF
### Quantum Meruit
### (against all Defendants)

72. Zia incorporates by reference paragraphs 1 through 71 as though fully set forth herein.

73. The work performed and/or goods provided by Zia benefited the Tyson Defendants in that they were able to sell the Premium Cattle to their customers at the full price anticipated by those customers for Premium Cattle.

74. Upon information and belief, the Tyson Defendants have received substantial payments from their customers for the processed Premium Cattle that were sold to them under the Cost Plus Contract.

75. The Tyson Defendants would be unjustly enriched if they are allowed to retain the benefits resulting from the services performed and/or good provided by Zia without having to pay for those benefits.

76. Zia is entitled to the reasonable value of the services rendered and/or goods provided to The Tyson Defendants.

77. As a direct and proximate result of The Tyson Defendants' conduct, Zia has been damaged in an amount not less than $2,488,000.

### FOURTH CLAIM FOR RELIEF
### Fraudulent Misrepresentation
### (against all Defendants)

78. Zia incorporates by reference paragraphs 1 through 77 as though fully set forth herein.

79. The Tyson Defendants entered into the Cost Plus Contract with Zia.

80. The Tyson Defendants represented that they would pay the agreed upon price for Premium Cattle under the Cost Plus Contract.

81. The Tyson Defendants falsely represented that they would pay the agreed upon price for Premium Cattle under the Cost Plus Contract.

82. The Tyson Defendants either knew this representation to be false or recklessly made this representation without knowledge of its truth.

83. The Tyson Defendants made this representation with the intention that Zia rely on it.

84. Zia did, in fact, rely on the representation that the Tyson Defendants would pay the agreed-upon price under the Cost Plus Contract.

85. As a direct and proximate result of The Tyson Defendants' conduct, Zia has been damaged in an amount not less than $2,488,000.

86. The acts and omissions of the Tyson Defendants as set forth in this Complaint and under this cause of action were malicious, oppressive, or undertaken with reckless disregard to the rights and interests of Zia.

87. Zia is entitled to the maximum award of punitive damages allowed by law.

## FIFTH CLAIM FOR RELIEF
### Violations of the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq.*
(against all Defendants)

88. Zia incorporates by reference paragraphs 1 through 87 as though fully set forth herein.

89. Zia and the Tyson Defendants are or were "person[s]" under the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-2.

90. The Tyson Defendants' actions as set forth in this Complaint occurred in the conduct of trade or commerce as defined under the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-2.

91. The Unfair Practices Act makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. Stat. Ann. § 57-12-2(D).

92. The Tyson Defendants' acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. Stat. Ann. § 57-12-2(D).

93. The Tyson Defendants' misrepresentations and false, deceptive, and misleading statements with respect to the Cost Plus Contract constitute deceptive acts or practices.

94.	The Tyson Defendants also engaged in unlawful trade practices by willfully and knowingly employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, and/or omission of material facts with intent that others rely upon such concealment, suppression, and/or omission, in connection with the Cost Plus Contract.

95.	Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive Zia.

96.	The Tyson Defendants knew or should have known that its conduct violated the Unfair Practices Act.

97.	As a consequence of The Tyson Defendants' wrongful actions, Zia has been damaged in an amount not less than $2,488,000.

98.	Zia seeks recovery of compensatory, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. Stat. Ann. § 57-12-10

99.	 Zia seeks punitive damages against Defendants because the Tyson Defendants' conduct was malicious, willful, reckless, wanton, fraudulent, and in bad faith.

100.	Zia is entitled to the maximum amount of punitive damages as allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Zia Agricultural Consulting, LLC respectfully requests that this Court grant judgment in its favor and against Defendants Tyson Foods, Inc. and Tyson Fresh Meats, Inc. as follows:

1.	Damages in an amount to be proven at trial, but not less than $2,488,000;

2.	Punitive damages in an amount to be proven at trial;

3.	Attorneys' fees and costs;

4.	Pre-judgment interest; and

5.	Any other appropriate legal, equitable, injunctive or declaratory relief.

Respectfully submitted,

MARRS GRIEBEL LAW, LTD.

By      /s/ Matthew J. Bouillon      
       Clinton W. Marrs
       Matthew J. Bouillon
       1000 Gold Avenue, SW
       Albuquerque, NM 87102
       (505) 433-3926
       clinton@marrslegal.com
       matt@marrslegal.com


SCHIFF HARDIN LLP

John S. Worden (*Pro Hac Vice* Forthcoming)
4 Embarcadero Center
Suite 1350
San Francisco, CA 94111
(415) 901-8700

*Attorneys for Plaintiff*
*Zia Agricultural Consulting, LLC*