### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

**ZIA AGRICULTURAL
CONSULTING, LLC,**

      **Plaintiff,**

**v.**                                                          **Case No. 1:20-cv-00445-MIS-JHR**

**TYSON FOODS, INC. and TYSON
FRESH MEATS, INC.,**

      **Defendants.**

### DEFENDANTS TYSON FOODS, INC. AND TYSON FRESH MEATS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendants, Tyson Foods, Inc., and Tyson Fresh Meats, Inc. (hereinafter, collectively, "Tyson"), by and through their counsel of record, Mayer LLP (Brian J. Fisher and Nicholas J. Rimmer), file this Memorandum in Support of Motion for Summary Judgment. Tyson certifies that it has determined that the Motion for Summary Judgment is opposed as required by LR-CV 7.1(a).

## TABLE OF CONTENTS

DEFENDANTS TYSON FOODS, INC AND TYSON FRESH MEATS, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR ................................... i

MOTION FOR SUMMARY JUDGMENT ................................... i

TABLE OF CONTENTS ................................... ii

TABLE OF AUTHORITIES ................................... iii

TABLE OF EXHIBITS ................................... v

INTRODUCTION ................................... 1

STATEMENT OF UNDISPUTED FACTS ................................... 3

    Contracting in the Beef Procurement Industry ................................... 3

    Tyson and Zia's Long-Established Business Dealing ................................... 5

    Zia and Tyson's Dealings Mirrored the Industry Standard ................................... 5

    Tyson and Zia Had a History of Disagreeing About the Quantity, and Quality
    of the Cattle Procured by Zia ................................... 6

    Zia Sends Tyson a Spreadsheet on February 4, 2019 and Bob Scherer
    Responds by Telling Zia to Send the Cattle to the Feed Yard ................................... 6

    Zia Knew the February 4, 2019 Was Not a Binding Contract ................................... 8

    Tyson Clearly Communicated That It Did Not Believe the February 4, 2019
    Spreadsheet Was a Binding Contract ................................... 10

LEGAL STANDARD ................................... 10

    Applicable Law ................................... 11

ARGUMENT ................................... 12

    The Alleged Contract Does Not Satisfy the Statute of Frauds Because it is
    Not Signed and Does not Specify a Quantity Term ................................... 19

    New Mexico Does Not Recognize A Duty of Good Faith And Fair Dealing
    Absent a Special Relationship, Which Does Not Exist Here ................................... 21

    Zia's Quantum Meruit Claim Should be Denied Because Zia Was Fairly
    Compensated for the Cattle at Issue in this Case ................................... 22

    Zia Has Added No Evidence Suggesting That Tyson Acted with Scienter, and
    Therefore Its New Mexico Unfait Practices Act and Fraud Claims Must be
    Dismissed ................................... 22

CONCLUSION ................................... 25

# TABLE OF AUTHORITIES

## Cases

*American Nat'l Prop. & Casualty Co. v. United Specialty Ins. Co.*, No. CIV 11-1137 LFG/RHS (D. N.M. Sept. 24, 2012)................................................................ 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ............................................................................................................. 10

*Back v. ConocoPhillips Co.*, 2012 WL 6846397, at *22 (D.N.M. Aug. 31, 2012) (citing *Armijo v. N.M. Dep't of Transp.*, 2009 WL 1329192, at *7 (D.N.M. Apr. 6, 2009)) 21

*Bell Fuels, Inc. v. Chevron U.S.A., Inc.*, 2000 WL 305955 (N.D. Ill. 2000) .............. 20

*Bourgeous* 872 P.2d at 857 ........................................................................................ 22

*Bourgeous v. Horizon Healthcare Corp.*, 1994-NMSC-038, ¶ 16, 872 P.2d 852, 857 21

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).......................................................................................... 11

*Diversey Corp. v. ChemSource Corp.*, 1998-NMCA-112, ¶ 17, 965 P.2d 332, 338..... 24

*Elephant Butte Marina, Inc. v. Woolridge*, 694 P.2d 1351, 1354 (N.M. 1985) .......... 21

*First Nat'l Bank in Albuquerque v. Benson*, 1976-NMCA-072, 89 N.M. 481, 553 P.2d 1288............................................................................................................................ 11

*Grisham v. Allstate Ins. Co.*, 1999-NMCA-153 ¶ 2, 128 N.M. 340, 992 P.2d 891 ..... 11

*Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, No. IV 08-1101 JB/RLP, 2009 US Dist. LEXIS 134449 (D. N.M. Sept. 11, 2009) ......................................................... 13

*Heimann v. Kinder-Morgan CO2 Co.*, 2006-NMCA-127, ¶ 18, 144 P.3d 111, 117.... 22

*Industries, Inc. v. Fiesta Park Healthcare, LLC*, Civ. No. 19-971 MV/GBW, 2020 U.S. Dist. LEXIS 28307 (D. N.M. Jan. 16, 2020) .................................................... 21

*J.B.B. Investment Partners, Ltd. v. R. Thomas Fair*, 2014 WL 6852097 (Cal. App. Dec. 5, 2014)............................................................................................................. 20

*Johnson v. Associated Milk Producers, Inc.*, 886 N.W.2d 384 at n. 2 (Iowa 2016).... 13

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)) ............................... 11

*LLC v. Dentsply Intern., Inc.*, 633 F.Supp.2d 1257, 1273 (D.N.M. 2008) .................. 19

*Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 5, 166 P.3d at 1093 (citing N.M. Stat. Ann. § 57-12-12(D) .................................................................................. 23

*Nelson v. Prod. Credit Ass'n of the Midlands*, 729 F.Supp. 677 (D. Neb. 1989)........ 13

*Nygaard v. Sioux Valley Hosps. & Health Syst.*, 731 N.W.2d 184 (S.D. 2006) ......... 13

*Ontiveros Insulation Co. v. Sanchez*, 2000-NMCA-051, 3 P.3d 695 (N.M. Ct. App. 2000)........................................................................................................................... 22

*Ouynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 22, 147 N.M. 583, 590, 227 P.3d 73, 80)) ............................................................................................................... 23

*Par. Transp. LLC v. Jordan Carriers Inc.*, No. 2019-CT-01109-SCT (Miss. Aug. 5, 2021)........................................................................................................................... 20

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985) ....................................... 12

*Regan-Touhy v. Walgreen Co.*, 526 F.3d 641 (10th Cir. 2008) ................................... 10

*Regan-Touhy*, 526 F.3d at 652 ............................................................................ 25

Restatement (Second) of Contracts § 33 (1981) ........................................... 13

*Sel-Lab Marketing, Inc. v. Dial Corp.*, 48 U.C.C. Rep. Serv. 2d 482 (S.D. N.Y. 2002) ................................................................................................................ 20

*Sheppard v. Allstate Ins. Co.*, 21 F.3d 1010, 1012 (10th Cir. 1994) ......................... 11

*Shope v. State Farm Ins. Co.*, 1996-NMSC-052 ¶ 7, 122 N.M. 398, 925 P.2d 515 .... 11

*Smith v. Maschner*, 899 F.2d 940, 949 (10th Cir. 1990) ............................................. 10

*State Farm Mut. Ins. Co. v. Conyers*, 1989-NMSC-071 ¶ 12, 109 N.M. 243, 784 P.2d 986 ................................................................................................................ 11

*Stevenson v. Louis Dreyfus Corp.*, 1991-NMSC-051, ¶ 13, 811 P.2d 1308, 1311)) .... 23

*Telman v. Galles*, 1936-NMSC-073, ¶ 15, 41 N.M. 56, 63 P.2d 1049, 1052 (N.M. 1936) .............................................................................................................. 23

*Terrazas v. Garland & Loman, Inc.*, 2006-NMCA-111, ¶ 12, 142 P.3d 374,377 ....... 11

*Toghiyany v. AmeriGas Propane, Inc.,* 309 F.3d 1088 (8th Cir. 2002) ...................... 20

*Valdez v. Metro. Prop. & Cas. Ins. Co.*, No. 11-0507, 2012 WL 1132414, at *19 (D.N.M. Mar. 31, 2012) ................................................................................ 23

*Valencia v. Colorado Cas. Ins. Co.*, 560 F. Supp. 2d 1080, 1085 (D.N.M. 2007) ....... 11

*Watson Truck & Supply Co., Inc. v. Males*, 1990-NMSC-105, ¶ 12, 801 P.2d 639, 642 ................................................................................................................ 21

*Zamora v. Smalley*, 1961-NMSC-004, ¶ 8, 68 N.M. 45, 47, 358 P.2d 362, 363 ......... 11

**Statutes**

N.M. Stat. § 55-2-201 ................................................................................................. 20

N.M. Stat. § 55-2-201 (1). ........................................................................................ 19

**Treatises**

Restatement (First) of Conflicts of Law § 377 & cmt. a (1934) ................................. 11

Restatement (Second) of Contracts § 33 .................................................................... 13

UCC § 2-204 comment ............................................................................................... 13

## TABLE OF EXHIBITS

**Exhibit A:**      Justin Benavidez, Ph.D. Expert Report

**Exhibit B:**      Deposition of Narciso Perez

**Exhibit C:**      Deposition of Robert Scherer

**Exhibit D:**      Sample price variances sent via e-mail: [ZIA-0001031; 1029; 1026-7]

**Exhibit E:**      Email from V. Bennett to R. Holman "RE: ZIA NHTC", [ZIA-0000414]

**Exhibit F:**      Email from V. Bennett to C. Bills et al. "Re: 100 vs 120 days NHTC", [ZIA-0000391]

**Exhibit G:**      Email from V. Bennett to R. Holman et al "RE: ZIA May fats move to NHTC", [ZIA-0000343]

**Exhibit H:**      Email from B. Bennett to C. Bills et al "RE: 100 vs. 120 days NHTC", [ZIA-00008383, 8397]

**Exhibit I:**      February 4, 2019, Email from N. Perez to R. Scherer [ZIA-0002890-2891]

**Exhibit J:**      February 4, 2019, Email from R. Scherer to N. Perez, [ZIA-0002889]

**Exhibit K:**      Zia Agricultural Consulting, LLC's Complaint for Breach of Contract, Breach of Implied Duty of Good Faith and Fair Dealing, Quantum Meruit, Fraudulent Misrepresentation, and Violation of the New Mexico Unfair Practices Act, Case 1:20-cv-00445, Document 1, Filed 05/08/20

**Exhibit L:**      February 15, 2019, update sent by Zia [ZIA-0002772-2773]

**Exhibit M:**      February 18, 2019, update sent by Zia [ZIA-0002883-2884]

**Exhibit N:**      March 4, 2019, update sent by Zia [ZIA-0002876-2877]

**Exhibit O:**      May 10, 2019, update sent by Zia [ZIA-0002807-2810]

**Exhibit P:**      March 25, 2019, Email from S. Perez to M. Dancey "Re: Follow Up", [ZIA-0006003-6006; 6009]

**Exhibit Q:**      April 4, 2019, Email from S. Perez to M. Dancey "Re: Cost Plus Model", [ZIA-0005906]

**Exhibit R:**      June 7, 2019, Email from R. Scherer to N. Perez [ZIA-0002776]

## I.    INTRODUCTION

On February 4, 2019, Narciso Perez, Zia Agricultural Consulting LLC's (hereinafter, "Zia") Chief of Cattle Feeding Operations, sent Robert Scherer, Tyson's Associate Director of Cattle Procurement, an email attaching a single spreadsheet listing Zia's then current cattle inventory along with information about Zia's estimated cost to raise the noted cattle. Zia claims that Mr. Scherer's follow-up, which requested that Perez send the cattle to a feedlot for finishing, constituted a binding agreement not simply to purchase cattle at prevailing market prices, as had been the parties' past practice, but which also required Tyson to: (1) purchase cattle that varied vastly in quantity and composition from the list sent on February 4, 2019; (2) reimburse Zia's costs in procuring and raising the cattle, which were determined solely by Zia; (3) pay Zia a premium mentioned nowhere in the spreadsheet; and (4) do so with no other terms that one would expect to be included in a multi-million dollar contract.

Zia makes this claim despite the fact that this type of transaction would radically alter Zia and Tyson's prior dealings, which previously were consistent with widely-accepted industry practice. *First*, the company that sourced the cattle procures cattle to varying specifications and sends Tyson estimated headcounts for potential purchase. *Second,* Tyson determines how many cattle it wants to schedule for processing, which is then communicated to Zia. *Third,* Zia sends the cattle it has ready to a "finish" or "feed" yard. *Fourth,* the finish yard, at Zia's cost, provides fodder for the cattle until it is ready to be processed. During that process, cattle may be lost

to disease, or rescheduled based on Tyson's need, or the cattle's readiness. *Finally*, and only after the cattle have been finished, is the cattle purchased from the finish yards by Tyson. Zia is paid based on an agreed-upon commodity benchmark price, the Nebraska Weighted Average, after processing along with an additional negotiated premium. This process allows the parties to distribute risk—Tyson bears the risk of changes in finished beef prices, while Zia bears the risk of animal loss and changes in feed costs. Indeed, this is how Tyson and Zia conducted business for years and how a vast number of transactions occur in the cattle industry.

Zia now seeks to completely upend this past practice and industry standard by making a contract claim based on Zia sending a single spreadsheet to Mr. Scherer. The spreadsheet in question contained estimated headcounts, as was standard according to Zia's and Tyson's prior dealing, and so Mr. Scherer approved them to be sent to the finish yard. While the spreadsheet also contained information about Zia's costs, those costs were, to Scherer, completely irrelevant because Tyson had no agreement to pay Zia's costs for feeding cattle.

Zia now claims that, by virtue of receiving the spreadsheet containing Zia's costs, the relationship was transformed into one where Tyson agreed to pay for all of Zia's costs, plus a premium—even though **neither the premium nor the actual cost appear on the spreadsheet sent to Mr. Scherer.** The terms that Zia now suggest, but which are not contained in the spreadsheet or email, would constitute a "heads I win, tails you lose" arrangement whereby Tyson would guarantee Zia a profit

at Tyson's sole risk. Unsurprisingly, this is not the way the beef industry operates, and it is not the way a contract like the one Zia is claiming is formed.

Under New Mexico law, a court can grant summary judgment on a contract claim where the contract is so vague that adequate relief cannot be fashioned. Here, there is no way for a factfinder to adequately evaluate the terms of this alleged contract. Moreover, the alleged contract fails to satisfy the statute of frauds because it was not signed and failed to contain a quantity term. Zia's complaint also contains a count seeking recovery based on a breach of the duty of good faith and fair dealing, but such claims are not viable claims independent of a breach of contract, which did not occur here. Likewise, Zia's quantum meruit claim fails because Zia was adequately compensated for the cattle it sold to Tyson, based on the parties' prior dealing. Finally, Zia's fraud and New Mexico Unfair Practices Act claims require evidence that Tyson intended to enter into a contract with Zia with the intent break that contract. Here, Zia has not met its burden as a matter of law because there was no contract for Tyson to breach, but, even if there was a contract, there is simply no evidence that Tyson entered into it with an intent to breach.

Zia's attempt to create a contract by ambush should be soundly rejected by this Court, and summary judgment should be granted.

## II.     STATEMENT OF UNDISPUTED FACTS

### a.  Contracting in the Beef Procurement Industry

1.      The beef industry is divided into four separate stages: the cow-calf sector (where cows originate), the stocker sector (companies that buy calves at the lowest

3

price possible, add weight to them through providing forage), the feedlot sector (companies that buy cows of sufficient weight from the cow-calf sector and the stock sector) and the packer sector (companies that process the cattle). Exhibit A at 1. One entity may own a calf through one or more stages of production, and ownership may change hands at different times depending on the arrangements between the parties. *Id*. at 2.

2.     Cattle are primarily marketed through two types of arrangements— alternative marketing arrangements ("AMAs") and negotiated trades. *Id*. at 2. AMAs are trades in which the price of a product is set in advance through an agreed upon formula using a reported or benchmark price as a starting point. *Id*. This is by far the most common selling arrangement, representing the sale of 87% of fed cattle through 2010, and was used by Tyson and Zia during the relevant time frame. *Id*. This type of arrangement is meant to decrease volatility and minimize some elements of risk, though some risk remains and it is possible for either party to lose money in this type of arrangement. *Id*. at 3. In particular, the packer (in this case, Tyson) retains the risk that the demand for cattle will fall after the price has been set. *Id*. This allocation of risk incentivizes beef production and provides some level of profit for both the seller and the buyer. *Id*. at 4.

3.     A "cost plus" model, by contrast, shifts the majority, if not all, of the risk onto the packing sector because it dictates that the packer pay all of the cost to feed the cattle plus a guaranteed margin. *Id*. at 4. Such arrangements make no economic sense for the packer because they are taking all of the risk and do not make sense for

suppliers because if this arrangement were common packers would simply raise the cattle themselves. *Id.* The "cost plus" arrangement is not the norm in the industry. *Id.*

**b. Tyson and Zia's Long-Established Business Dealing**

**i. Zia and Tyson's Dealings Mirrored the Industry Standard**

4.    Tyson and Zia have done business with each other for approximately twenty-one years. Exhibit B at 50. In all that time, Tyson and Zia consistently transacted business using the industry standard model—the AMA. Exhibit A at 3. The price that Tyson would pay for cattle would depend on two factors. *First*, Tyson paid Zia based on a benchmark price. *Id.* at 3. Specifically, during the relevant period, Tyson agreed to pay Zia based on the Nebraska Weighted Average, which was a public figure derived by the United States Department of Agriculture and which is based on the cattle purchased in Nebraska. Exhibit C at 34.

5.    *Second,* Tyson would pay Zia a premium based on negotiations that would take place around April or May each year. *Id.* at 34. While these agreements were largely oral, sometimes modifications would be requested and communicated over email. *Id.* at 42, Exhibit D (sample instances where prices were discussed over email).

6.    Premiums were based, in part, on the type of cattle that were being purchased and whether the same met certain treatment certifications, thereby receiving a higher premium based on their extended feeding time along with other factors. Exhibit C at 39. Thus the cattle at issue in this case, which were either Non-

Hormone Treated Cattle ("NHTC") or Global Animal Partnership cattle ("GAP"), were given a premium based on the additional cost Zia would incur in raising the animals. Exhibit C at 39-40 (discussing GAP), and 46 (discussing NHTC).

7.    After the cattle were ready for further processing, Tyson paid the feed yards directly for the cattle. *Id.* at 51. The feed lot would then pay Zia presumably after deducting any fees that have been incurred. *Id.*

### ii.  Tyson and Zia Had a History of Disagreeing About the Quantity, and Quality of the Cattle Procured by Zia

8.    Zia and Tyson had a number of disputes about the quantity and quality of cattle made available by Zia. Exhibit C at 49-50 (describing the issues as "Cattle not being finished, not weighing properly to the targets that we put forth" and noting that "[i]t had been a recurring factor year over year" that has "not changed a bit."); *see also* Exhibits E-H (examples of disputes over quantity or quality of Zia cattle). Some cattle listed on the February 4, 2019 spreadsheet looked "light" or "short on weight", and thus would not have been ready for Tyson to process them on their projected dates. Exhibit C at 66, 86.

### c.  Zia Sends Tyson a Spreadsheet on February 4, 2019, and Bob Scherer Responds by Telling Zia to Send the Cattle to the Feed Yard

8.    On February 4, 2019, Narciso Perez sent Mr. Scherer an email titled "Show list." Exhibit I. Beneath his signature, Narciso Perez asked Scherer to "[l]ook this over" and asked to speak with him. *Id.* Attached to the email was a spreadsheet listing information including: (a) location of the cattle; (b) *estimated* quantity; (c) *estimated* weight; (d) costs modeled out through various dates; and (e) the number of

steers and heifers by month. As Narciso Perez testified, the quantity term was not set because "there is no way to predict exactly when they're going to come out." Exhibit B at 79. While Perez believes that the parties had agreed to a contract (which Tyson denies), he admitted that the parties had also not agreed on the cost because it could be modified if Zia did not "hit our projections like we're supposed to." *Id.* at 118. He did not explain how the parties would make this determination, nor is such a clause contained in the February 4, 2019 spreadsheet. While the Complaint alleges that the parties had discussed a cost plus arrangement prior to this February 4, 2019 email, even Narciso Perez admitted that there was no agreement on price or quantity, and that what the parties had allegedly agreed to was "kind of a tricky question." *Id.* at 99-101. Shortly after Perez sent this spreadsheet, Mr. Scherer responded by stating "This looks good get them in a finish yard, asap please." Exhibit J.

9. In this lawsuit, Zia claims that the spreadsheet, together with Mr. Scherer's response, was an agreement which bound Tyson to: (1) purchase all of the cattle listed on the spreadsheet despite the fact that cattle were listed as an estimate; (2) at a price consisting of the actual cost Zia incurred in raising the cattle; and (3) with a $100 premium for NHTC cattle and a $125 premium for GAP cattle (despite the fact that such premiums do not appear anywhere on the spreadsheet). Exhibit K, Compl. ¶¶ 24-28. This purported arrangement differs substantially from both the industry standard and the parties' prior dealings. *See* Statement of Undisputed Facts ("SUF") at ¶¶ 2-3.

10.     Accordingly, Mr. Scherer testified that, consistent with the prior dealing between Tyson and Zia, he "look[ed] at it as an inventory. That is how I deal when I purchase cattle." Exhibit C at 20. He testified that his statement that the spreadsheet "looks good" therefore referred to Zia's inventory, rather than to any sort of contractual arrangement. *Id.* at 21. This is consistent with the fact that the spreadsheet sent by Zia did, in fact, contain an estimated inventory. Exhibit I. Tyson also paid Zia for the cattle at the price the parties actually agreed to for that year, in accordance with their prior dealing. Exhibit B at 120.

11.     Over the course of the next four months, Zia sent a handful of what it labeled as "updates." The updates were similar in appearance to the February 4, 2019 spreadsheet, though the cost and quantity values included in the spreadsheets varied substantially. Exhibits L-O. As with the February 4, 2019 spreadsheet, when Mr. Scherer received these "updates", he viewed them as updates about Zia's inventory and acted according to the parties' established prior dealing. Exhibit C at 22.

### d.  Zia Knew the February 4, 2019, Was Not a Binding Contract

12.     Between March 13 and March 25, 2019—more than a month after mailing the February 4 spreadsheet—in discussions with a financing company (Larue Road Capital LLC ("Larue")), Zia admitted that the February 4 exchange was not a binding agreement. Exhibit P. In particular, after Larue refused to provide financing to Zia unless Zia was able to get a "cost plus" contract in writing, Sean Perez stated that Tyson and Zia had entered into a "verbal agreement" (at some unspecified date and time). Accordingly, in lieu of providing Larue with a written contract (which Zia could not do), Zia sent Larue a memorandum (signed by Sean Perez) which included

details of the alleged verbal agreement which were absent from the February 4, 2019

spreadsheet including:

- An alleged agreement that "costs for the calves shall be tabulated to date upon entry to their final finish feedyard marking their 'in cost.'"

- Total cost would be transmitted to Tyson for each lot upon the animals' delivery to Tyson inclusive of costs for each lot associated with morbidity and mortality.

- An alleged agreement that Tyson would call for the cattle to be delivered when the feedyard manager believes is most commercially appropriate (as opposed to when delivery would make sense for Tyson's business).

- That the cost for the calves would be fully reimbursed with a $125 per head premium for GAP Natural calves and $100 per head for NHTC calves, inclusive of calves which died at the finish feedyard or which were disqualified from premium programs as a result of the treatment of illness.

It is telling that in an attempt to substantiate the existence of a binding contract, Zia

drafted the memorandum found at Exhibit P instead of simply sending Larue the

February 4, 2019 spreadsheet—indeed in his cover email, Sean Perez states that the

source of his memorandum was not the February 4, 2019 spreadsheet but was instead

Narciso Perez's "notes". Exhibit P. Now that Zia has presumably obtained their

financing, they are changing positions and are asking this Court to construct a

contract out of the February 4, 2019 email exchange.

13.     On April 4, 2019, Sean Perez sent Mike Dancey at Larue an email with

the subject line "Re: Cost Plus Model." Exhibit Q. In that email, Sean Perez

contradicted his March memorandum and admitted that the "cost plus model" he sent

to Tyson was "merely an estimation of the number of head" and included an

"approximate cost." He further admitted that there was no agreement with Tyson as

to cost because Zia could not "prescribe how Tyson is going to consider 'cost' or calculate payment on these cattle . . . truthfully we don't have any idea how Tyson is planning to calculate cost on these cattle, or how they'll want to consider revenue for outside sales against total cost of lots."

### e. Tyson Clearly Communicated That It Did Not Believe the February 4, 2019, Spreadsheet Was a Binding Contract

14.     As soon as Mr. Scherer began receiving invoices for the cost of finishing the cattle, he asked Narciso Perez why he was receiving those invoices. When Narciso Perez informed him that he believed Zia and Tyson had entered into an agreement, Scherer communicated to him in no uncertain terms that there was no agreement, and that was not the way Tyson conducts business. Exhibit R.

## III.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment "shall be granted if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An adverse party may not rest upon the mere allegations or denials of the adverse party's pleading but rather must cite to particular parts of materials in the record, or show that the materials cited to do not establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). The summary judgment standard requires the nonmoving party to come forward with evidence sufficient for "a fair-minded jury to return a verdict" in their favor. *Regan-Touhy v. Walgreen Co.*, 526 F.3d 641 (10th Cir. 2008), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Smith v. Maschner*, 899 F.2d 940, 949 (10th Cir. 1990).

Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

### a. Applicable Law

In making a choice of law determination, a federal court sitting in diversity must apply the substantive law, including the choice of law provisions, of the forum state. *Valencia v. Colorado Cas. Ins. Co.*, 560 F. Supp. 2d 1080, 1085 (D.N.M. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Applying New Mexico choice of law provisions, it is unclear whether New Mexico, South Dakota, or some other law would apply to this case.[1]

---

[1] As a general matter, the policy of New Mexico is to interpret contracts under the law of the state in which the contract was made. *Sheppard v. Allstate Ins. Co.*, 21 F.3d 1010, 1012 (10th Cir. 1994); *Grisham v. Allstate Ins. Co.*, 1999-NMCA-153 ¶ 2, 128 N.M. 340, 992 P.2d 891; *Shope v. State Farm Ins. Co.*, 1996-NMSC-052 ¶ 7, 122 N.M. 398, 925 P.2d 515; *State Farm Mut. Ins. Co. v. Conyers*, 1989-NMSC-071 ¶ 12, 109 N.M. 243, 784 P.2d 986. New Mexico law is unclear, however, in determining where a contract is made when, as Zia alleges here, the alleged contract was entirely formed by a single email and there is no evidence establishing where: (1) Perez was located when he sent his email; or (2) Scherer was when he sent his alleged acceptance. (Perez testified that Zia sources its cattle from "all over the United States," and so he travels frequently to those ranches, though Zia's principal place of business is in New Mexico. **Exhibit B at 22-23, Exhibit J at ¶ 1**. Whereas Scherer works out of Tyson Fresh Meats headquarters in Dakota Dunes, South Dakota though he travels to visit feed yards outside of the state and the Tyson Fresh Meats building in Dakota Dunes is less than two miles from the both the Iowa and Nebraska borders. **Exhibit C at 66-68 (discussing travel to the ranches).**

On the other hand, if the underlying claim is categorized as a tort, "New Mexico courts follow the doctrine of *lex loci delicti commissi* -- that is, the substantive rights of the parties are governed by the law of the place where the wrong occurred." *Terrazas v. Garland & Loman, Inc.*, 2006-NMCA-111, ¶ 12, 142 P.3d 374,377, citing *First Nat'l Bank in Albuquerque v. Benson*, 1976-NMCA-072, 89 N.M. 481, 553 P.2d 1288. The *lex loci delicti rule* defines the state where the wrong occurred as "the state where the last event necessary to make an actor liable for an alleged tort takes place." *Id.* at ¶¶ 2-4, citing *Zamora v. Smalley*, 1961-NMSC-004, ¶ 8, 68 N.M. 45, 47, 358 P.2d 362, 363. *See also* Restatement (First) of Conflicts of Law § 377 & cmt. a (1934). Here, a *lex loci delicti* analysis is just as unclear as the *lex loci contractus* analysis—it is unclear whether Zia's alleged damages took place in New Mexico (where Zia is located) or in the various states where the feed lots are located (where the payments for Zia's cattle were made).

However, because Zia's claims are deficient pursuant to black letter contract and tort law, the result in this case would be the same under New Mexico, South Dakota, or any other state's law, and therefore there is no actual conflict of law to resolve. *See generally Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985) (finding that there "can be no injury" in applying one state's laws if it is not in conflict with the laws of another jurisdiction). While it strains credulity to believe that Tyson and Zia (both sophisticated parties) would enter into a multi-million-dollar procurement contract without specifying the applicable law, in this instance, the Court need not decide at this stage exactly what law to apply and for the convenience of the parties and this Court, and consistent with *Shutts*, this brief will cite to New Mexico law where appropriate.

## IV.   ARGUMENT

### a.  The Alleged Contract Is Too Vague To Fashion Relief

A court may grant summary judgment in a contract case where the terms are uncertain in a way that makes it impossible to determine an appropriate remedy.[2] *American Nat'l Prop. & Casualty Co. v. United Specialty Ins. Co.*, No. CIV 11-1137 LFG/RHS (D.N.M. Sept. 24, 2012) (noting in the summary judgment context that "the terms of a contract must be reasonably certain if they are to provide a basis for determining the existence of a breach and the opportunity for deciding on an appropriate remedy"), overruled on other grounds by *American Nat. Prop and Cas.*

---

[2] This case should be dismissed for other reasons, including the fact that there was no meeting of the minds sufficient to form a contract. Because that is treated as an issue of fact, however, Tyson does not raise it in this motion, but also does not intend to waive any such defense by not raising it in this motion.

*Co. v. United Specialty Ins. Co.*, 592 Fed.Appx. 730 (10th Cir. 2014); *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, No. IV 08-1101 JB/RLP, 2009 US Dist. LEXIS 134449 (D. N.M. Sept. 11, 2009) (granting summary judgment where there was no evidence that the parties were actually bargaining and noting that while a court may fill in missing terms with default UCC provisions, courts cannot "construct[] contracts out of whole cloth.").

This concept is borrowed directly from the Restatement (Second) of Contracts § 33[3] which notes that a contract cannot be formed unless the terms of the contract are reasonably certain. "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Id.* While indefiniteness of one particular term (even price or quantity) may not be enough to find that a contract is indefinite "[t]he more important the uncertainty, the stronger the indication is that the parties do not intend to be bound . . . [e]ven when the parties intend to enter into a contract, uncertainty may be so great as to frustrate their intention." *Id.* at Comment f. In the analogous provision of the Uniform Commercial Code, which applies to livestock contracts, the commentary states that "[t]he more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement." *See* UCC § 2-204 comment.

---

[3] This very section of the Restatement has been approvingly cited in other jurisdictions whose laws may apply here. *See supra* at Restatement (Second) of Contracts § 33 (1981). *See Nygaard v. Sioux Valley Hosps. & Health Syst.*, 731 N.W.2d 184 (S.D. 2006); *Nelson v. Prod. Credit Ass'n of the Midlands*, 729 F.Supp. 677 (D. Neb. 1989); *Johnson v. Associated Milk Producers, Inc.*, 886 N.W.2d 384 at n. 2 (Iowa 2016) ("We find the Restatement (Second) of Contracts instructive").

In this case, the alleged contract does not just contain *some* vague terms; the *entire contract* is vague. With respect to the price, for example, Zia's complaint describes the alleged contract as a "cost plus" contract—meaning that Zia is contending that Tyson agreed to pay: (1) Zia's actual "cost" for raising the cattle; (2) "plus" a premium. But neither the "cost" nor the "plus" were established in the spreadsheet sent to Mr. Scherer.

With respect to "cost," Zia alleges that Tyson agreed to pay Zia the "cost of finishing" the cattle. *See* Exhibit K, Compl., ¶ 24. But the actual spreadsheet at issue does not explain or suggest that Tyson should pay these costs—it just lists estimated cost. Moreover, neither the Complaint nor the spreadsheet sent to Mr. Scherer explain what components went into determining "cost", how exactly "cost" was to be calculated, or who was to calculate "cost." The Complaint itself identifies numerous components that *could* be used to determine the cost of finishing cattle—"feeding, bringing up to weight, providing medical care, and otherwise preparing the cattle for market"—but it is not at all obvious which of these components are preferable to the parties much less that these costs would be charged to Tyson. Exhibit K**,** Compl. ¶ 24. Indeed, before filing this case, Sean Perez himself admitted to Larue that the cost included in the February 4, 2019 spreadsheet was an "approximate cost" and that he could not "prescribe how Tyson is going to consider 'cost' or calculate payment on these cattle . . . truthfully we don't have any idea how Tyson is planning to calculate cost on these cattle, or how they'll want to consider revenue for outside sales against total cost of lots." SUF 13.

14

Nor is there any evidence that the parties had agreed on the "plus" component of the price. The spreadsheet sent to Mr. Scherer *contains no information about a premium at all*. Indeed, the Complaint alleges that the contract "set a price per head for Global Animal Partnership-certified cattle at $125 per head over the cost of finishing the cattle" and "set a price per head for Non-Hormone Treated Cattle at $100 per head over the cost of finishing the cattle". Exhibit K, Compl. ¶¶ 25-26. However, even a cursory review of the spreadsheet demonstrates that there is no mention anywhere on the document of (1) a $125 premium; (2) a $100 premium; (3) "Global Animal Partnership-certified cattle"; or (4) "Non-Hormone Treated Cattle." Exhibits H and I. Nor has Zia been able to generate any evidence in discovery showing that the parties ever agreed to such terms.

The quantity term of Zia's alleged contract was also ambiguous—the spreadsheet only details *estimated* cattle and, based on Tyson's past dealings with Zia, Zia was not always accurate in estimating how many cattle it would be able to deliver. SUF ¶ 7. Given this history, it is unsurprising that each estimate Zia sent to Tyson under the alleged "cost plus" contract varied materially. Indeed, after just two weeks, the quantity and cost estimates sent by Zia changed substantially:

| Estimate | Difference Between 2/4/19 Estimate and 2/15/19 Estimate |
|---|---|
| Total June Cattle | 368 head |
| Total June poundage | 411,592 pounds |
| Total Cost to 6/15 | $2,075,810.14 |

*Compare* Exhibit I *with* Exhibit L.

Three days later there was another "update" which substantially changed both the cost and quantity included in the alleged contract:

| Estimate | Difference Between 2/15/19 Estimate and 2/18/19 Estimate |
|---|---|
| Total June Cattle | 649 cattle |
| Total June poundage | 768,292 pounds |
| Total Cost to 6/15 | $315,735.08 |

*Compare* Exhibit L *with* Exhibit M.

This update lasted a whole two weeks before the quantity and cost estimates

changed yet again:

| Estimate | Difference Between 2/18/19 Estimate and 3/4/19 Estimate |
|---|---|
| Total June Cattle | 821 head |
| June poundage | 1,095,796 pounds |
| Total Cost to 6/15 | $1,260,212.26 |

*Compare* Exhibit M *with* Exhibit N.

By May, the quantity, composition, and cost estimates were virtually

unrecognizable from where the alleged contract initially started:

| Estimate | Difference Between 3/4/19 Estimate and 5/10/19 Estimate |
|---|---|
| Total June Cattle | 732 steers, 780 heifers |
| June poundage | 359,333 pounds |
| Total Cost to 6/15 | $208,522.61 |

Compare Exhibit N *with* Exhibit O.

Under the existing Zia-Tyson relationship, repeated changes in total head of

cattle and weight may be inconvenient, but it would not be material. Zia would not

be paid for cattle it failed to deliver or that it delivered in unsatisfactory condition.

Even putting aside that a cost plus arrangement would be economically unfeasible,

*see* SUF ¶ 3, under the alleged "cost plus" contract, failures to deliver would be

material because Tyson would be required to pay cost for cattle never delivered to

Tyson. Of course, it is possible Tyson could audit Zika's records, but such audit rights

16

(which would be material to any cost plus agreement) were not negotiated by the parties and appear nowhere in the spreadsheet or transmitting email that Zia contends created a contract. Zia's proposed contract would also change how Tyson scheduled cattle for further processing—under the existing arrangement Tyson could move cattle backward or forward in the process as necessary given Tyson's processing capacity. Under Zia's proposed arrangement, Tyson would need to know exactly how many cattle are being procured so they could schedule cattle processing to avoid excess costs under a cost plus arrangement. In this type of agreement, *exact* numbers (not merely estimates) are crucial for forming an agreement so that the parties could understand the risks involved in entering the contract.

While price and quantity are two of the most important terms for any contract, it is worth noting that the spreadsheet Mr. Perez sent to Mr. Scherer also failed to discuss other important terms that one would expect in a multi-million-dollar contract that radically altered the industry standard and the parties prior dealing including, but not limited to:

- Tyson's right to inspect Zia's cattle. Given Zia's history of attempting to sell Tyson underweight cattle, this right would be central to any "cost plus" arrangement. Under the existing arrangement, if Zia sent Tyson underweight cattle, Zia would pay to get the cattle to a proper weight. Under Zia's proposed arrangement such burden would fall exclusively on Tyson. It would be impossible for a finder of fact to determine which cattle (if any) Tyson would have rejected if it understood that it was on the hook for the costs of getting cattle to the proper weight.

- Tyson's right to reject cattle. Under Zia's alleged contract, it is entirely unclear whether Tyson would even have the right to reject cattle that were unfit for delivery. Again, it would be impossible for a finder of fact to determine whether Tyson had such a right and, if so, how it would have exercised that right if it had known about the alleged contract.

17

- Requirement provisions. Nor does the purported contract contain any provisions relating to how many head of cattle Tyson is required to source or how many head Zia is required to provide. Under Zia's purported contract, whether and how many head of cattle Zia makes available to Tyson is apparently left to Zia's whims. Again, this makes no economic sense in a cost plus arrangement because, when the market demand for cattle is strong, Zia would be free to sell its cattle elsewhere, but when the market for cattle is soft, Zia could force Tyson to buy cattle that is economically disadvantageous.

- How to account for the death of any cattle. It is entirely unclear from the spreadsheet sent by Mr. Perez whether dead cattle would be charged to Tyson or to Zia. As discussed, *supra*, the number of cattle included in the alleged contract varied wildly, sometimes within a matter of a couple of days. It would be impossible to disaggregate what costs were associated with cattle that (for reasons unexplained by Zia) were added or removed from the estimates.

- Tyson's right to audit or inspect Zia's cost documentation or any discussion at all of what types of documents Zia needed to maintain or submit. As it stands, Zia simply sent Tyson updated spreadsheets without any backup showing how the numbers were derived. Only after Zia filed suit and was subject to discovery did they produce thousands of pages of backup for their costs. But these costs do not attribute costs to specific cattle which would be necessary to properly calculate costs. Again, given that Zia arbitrarily changed the number of cattle included in the alleged contract, this type of information would be critical to accurately assessing damages under Zia's proposed contract.

- Dispute resolution provisions. Disputes over a number of issues are likely to arise in any cost plus agreement and sophisticated parties would inevitably negotiate how any such disputes should be resolved. This is especially true in a contract like the one Zia is claiming, because the parties would not want to find themselves embroiled in costly litigation every time there was a disagreement over issues like the proper accounting for various costs.

- Choice of law provisions. As discussed above, and as this Court is aware, choice of law analyses are complex and fact-dependent. It is simply beyond belief that parties would negotiate a multi-million dollar contract without determining what law would apply to that contract. Moreover, while it is possible for a court to grant summary judgment in this instance in light of the vagueness of the alleged contract, at trial it would be impossible for any fact finder to fashion adequate relief without a clear understanding of what law applies to the contract.

18

These are all crucial and common-sense provisions that are entirely absent from the February 4, 2019 spreadsheet.

In some cases, in the event of an ambiguous contract, courts will "gap fill" by using terms the parties had used in prior business dealings. But this would be entirely arbitrary here where the "cost plus" contract is an entirely different type of arrangement than Tyson and Zia ever had before. *See Guidance Endodontics, LLC v. Dentsply Intern., Inc.*, 633 F.Supp.2d 1257, 1273 (D.N.M. 2008) (Issuance of temporary restraining order justified due to the existing contractual performance between the parties).. Indeed, instead of allocating the risk evenly between Tyson and Zia (as the prior arrangement had done), the cost plus arrangement *forces Tyson to guarantee Zia a profit*. With such radically different paradigms, there is no appropriate precedent that can be used to fill the gaps in this alleged contract and therefore Zia's contract claims must be dismissed.

### b. The Alleged Contract Does Not Satisfy the Statute of Frauds Because it is Not Signed and Does not Specify a Quantity Term

According to the New Mexico Statute of Frauds, "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and *signed by the party against whom enforcement is sought* or by his authorized agent or broker." N.M. Stat. § 55-2-201 (1). The alleged contract at issue here involved the sale of millions of dollars of cattle, and therefore falls squarely within the ambit of the Statute of Frauds. Because the alleged contract at issue was

not signed, it fails to meet the requirements of N.M. Stat. § 55-2-201 and therefore is not enforceable.

Here, the email that Bob Scherer sent to Narcisco Perez did not contain Scherer's signature either in handwritten or typewritten format. While New Mexico courts have not spoken on this specific issue, courts in other states have found that unsigned emails are not sufficient to satisfy the statute of frauds. *Par. Transp. LLC v. Jordan Carriers Inc.*, No. 2019-CT-01109-SCT (Miss. Aug. 5, 2021) (finding that an unsigned email saying "OK. Let's do it" was not sufficient to meet the Mississippi Statute of Frauds). *See also Toghiyany v. AmeriGas Propane, Inc.,* 309 F.3d 1088 (8th Cir. 2002) (finding that unsigned email messages did not meet the requirements of the Missouri Statute of Frauds*); Sel-Lab Marketing, Inc. v. Dial Corp.*, 48 U.C.C. Rep. Serv. 2d 482 (S.D. N.Y. 2002), (a series of unsigned e-mail messages purportedly memorializing an oral agreement was not sufficient to satisfy the statute of frauds); *Bell Fuels, Inc. v. Chevron U.S.A., Inc.,* 2000 WL 305955 (N.D. Ill. 2000) (unsigned emails insufficient under the Illinois statute of frauds); *J.B.B. Investment Partners, Ltd. v. R. Thomas Fair*, 2014 WL 6852097 (Cal. App. Dec. 5, 2014) (finding that unsigned emails were not sufficient to form a contract where, *inter alia*, the court did not find that the parties intended the emails to constitute a signature). New Mexico should follow this precedent and therefore Zia's alleged contract should be ruled unenforceable.

Additionally, under the New Mexico Statute of Frauds, "a contract for the sale of goods must specify a quantity term." *Medline Industries, Inc. v. Fiesta Park*

*Healthcare, LLC*, Civ. No. 19-971 MV/GBW, 2020 U.S. Dist. LEXIS 28307 (D. N.M. Jan. 16, 2020) (citing *Elephant Butte Marina, Inc. v. Woolridge*, 694 P.2d 1351, 1354 (N.M. 1985). Because the February 4, 2019 spreadsheet does not contain a set quantity term, only an estimated quantity, it cannot be enforced under the New Mexico Statute of frauds.

### c. New Mexico Does Not Recognize A Duty of Good Faith And Fair Dealing Absent a Special Relationship, Which Does Not Exist Here

In this lawsuit, Zia seeks to recover based on a breach of the duty of good faith and fair dealing, but New Mexico courts have recognized that such claims are derivative of breach of contract claims and cannot be sustained as an independent cause of action. "Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement." *Watson Truck & Supply Co., Inc. v. Males*, 1990-NMSC-105, ¶ 12, 801 P.2d 639, 642 (citations omitted). "Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement." *Id.* At 642 (internal quotation marks omitted). New Mexico has recognized that a cause of action for breach of the covenant of good faith and fair dealing sounds in contract. *See Bourgeous v. Horizon Healthcare Corp.*, 1994-NMSC-038, ¶ 16, 872 P.2d 852, 857. This Court has previously held that a "claim for the breach of the covenant of good faith and fair dealing is derivative of the breach-of-contract claim." *Back v. ConocoPhillips Co.*, 2012 WL 6846397, at *22 (D.N.M. Aug. 31, 2012) (citing *Armijo v. N.M. Dep't of Transp.*, 2009 WL 1329192, at *7 (D.N.M. Apr. 6, 2009)). The Supreme Court of New Mexico has also explained that tort recovery for breach of the covenant of good faith

and fair dealing is permissible only where a special relationship exists, such as between an insurer and its insured. See *Bourgeous* 872 P.2d at 857. Similarly, the Court of Appeals of New Mexico has held that "[t]he claim of breach of good faith and fair dealing sounds in contract, at least when no 'special relationship' such as that between an insured and insurer exists." *Heimann v. Kinder-Morgan CO2 Co.*, 2006-NMCA-127, ¶ 18, 144 P.3d 111, 117. There is no such special relationship in this case. Accordingly, the claim should be dismissed because there was no enforceable contract in this case. Moreover, even assuming that this court finds there is a triable issue of fact about the existence of a contract, this claim remains subject to dismissal as duplicative of Zia's contract claim.

### d. Zia's Quantum Meruit Claim Should be Denied Because Zia Was Fairly Compensated for the Cattle at Issue in this Case

Under New Mexico law, a claim for quantum meruit can only be sustained where the plaintiff shows that the defendant would be unjustly enriched in the absence of a judicial remedy. "It is axiomatic, however, that courts provide remedy in quantum meruit to prevent *unjust* enrichment. As a general matter, the limitations are premised on the bedrock principle that it makes little sense to remedy one wrong by inflicting another." *Ontiveros Insulation Co. v. Sanchez*, 2000-NMCA-051, 3 P.3d 695 (N.M. Ct. App. 2000). But here, Zia cannot establish that Tyson was unjustly enriched where Tyson paid Zia for the value of the cattle in accordance with both the parties' prior dealings and long-standing industry practice. SUF ¶¶ 1-6; 10. Indeed, it would be unjust to force Tyson to guarantee Zia a profit, which is what Zia is seeking in this suit.

### e.  Zia Has Adduced No Evidence Suggesting That Tyson Acted with Scienter, and Therefore Its New Mexico Unfair Practices Act and Fraud Claims Must Be Dismissed

Under New Mexico law, a plaintiff can sustain a fraud claim related to a breach of contract only where they establish that the allegedly breaching party entered into the alleged contract with a present intent to breach the contract. *Telman v. Galles*, 1936-NMSC-073, ¶ 15, 41 N.M. 56, 63 P.2d 1049, 1052 (N.M. 1936), *see also Primus v. Clark*, 1944-NMSC-030, ¶ 45, 48 N.M. 240, 149 P.2d 535, 542 ("If the defendant had the present fraudulent intent to not keep his agreements at the time he made them, then such agreements were fraudulent") (internal citations omitted). Similarly, the New Mexico Unfair Practices Act claim requires a false statement that was knowingly made. "The UPA provides individual and class action remedies for unfair, deceptive, or unconscionable trade practices." *Valdez v. Metro. Prop. & Cas. Ins. Co.*, No. 11-0507, 2012 WL 1132414, at *19 (D.N.M. Mar. 31, 2012) (citing *Ouynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 22, 147 N.M. 583, 590, 227 P.3d 73, 80)). To state a claim under the UPA, a complaint must allege: (1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person. *Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 5, 166 P.3d at 1093 (citing N.M. Stat. Ann. § 57-12-12(D); *Stevenson v. Louis Dreyfus Corp.*, 1991-NMSC-051, ¶ 13, 811 P.2d 1308, 1311)). "The gravamen of an unfair trade practice is a misleading, false, or deceptive

23

statement made knowingly in connection with the sale of goods or services." *Diversey Corp. v. ChemSource Corp.*, 1998-NMCA-112, ¶ 17, 965 P.2d 332, 338.

Here, all the evidence is consistent with Tyson not entering into a contract at all, and this Court should grant summary judgment in favor of Tyson on that ground alone. To the extent that this Court disagrees, however, and finds that it is possible that a finder of fact could find that a contract was formed between the parties, then this Court should still grant summary judgment in Tyson's favor on the fraud and UPA claims because there is simply no evidence that Tyson made any statement to Zia that was false at the time it was made.

Indeed, the uncontroverted evidence demonstrates that there was no intent to form a contract. In addition to the vagueness of the contract, described in detail above, the circumstances surrounding the sending of the spreadsheet support this view. *First*, the spreadsheet did not, on its face, have the appearance of a formal contract. See Exhibit I. It was not labeled as a contract, the email transmitting the spreadsheet did not label it a contract, and there were no written terms contained within the body of the spreadsheet. *See id.* Mr. Scherer also testified that he believed that the February 4, 2019 email was simply Zia communicating information about its inventory, which is entirely consistent with the actual content of the spreadsheet or the email transmitting it. *See id., see also* SUF ¶ 10

*Second*, all of the evidence demonstrates that neither Tyson nor Zia believed that they had entered into a binding contract. Zia was evidently informing third parties that Tyson and Zia had entered into an unspecified oral agreement. SUF 12.

24

Zia also informed that same party that it had yet to agree with Tyson about how the "cost" part of the "cost plus" agreement would be calculated. SUF 13. For its part, Tyson was operating at all times under the existing arrangement, and as soon as it realized that Zia was claiming to be operating under a new contract, Tyson disclaimed any agreement. SUF 14. Accordingly, there is simply no basis to conclude that Tyson acted with any intent to defraud Zia. The uncontroverted evidence in this case demonstrates that neither Tyson nor Zia believed that the spreadsheet was a formal, binding agreement. For these reasons, Zia's fraud claim should be dismissed.

Under these circumstances, where Zia is without evidence sufficient for a fair-minded jury to return a verdict in its favor, summary judgment must be granted and its claims dismissed. *Regan-Touhy*, 526 F.3d at 652.

## V. CONCLUSION

An unsigned spreadsheet, with vague estimates of cost and quantity, is not enough to establish a contractual arrangement. It is certainly not enough to overturn long-standing practice, both in the industry and between Zia and Tyson specifically. For these and the reasons detailed above, Tyson's motion for summary judgment should be granted and Zia's claims should be dismissed with prejudice.

Respectfully submitted,

**MAYER LLP**

By:   */s/ Brian J. Fisher*
      Brian J. Fisher
      David C. Larsen
      Nicholas J. Rimmer

9400 Holly Avenue NE, Building 3B
Albuquerque, New Mexico 87122
Telephone: 505.595.1414
Facsimile: 505.595.1415
Email:     bfisher@mayerllp.com
            dlarsen@mayerllp.com
            nrimmer@mayerllp.com

*Attorneys for Defendants Tyson Foods, Inc.*
*and Tyson Fresh Meats, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 15, 2021, I electronically filed the above and foregoing with the Clerk of the Court using the CM/ECF system, which will send Notice of Electronic Filing to all counsel of record.

| | |
|---|---|
| Clinton W. Marrs | John S. Worden |
| Matthew J. Bouillon | Sarah Diamond |
| MARRS GRIEBEL LAW, LTD. | SCHIFF HARDIN LLP |
| 1000 Gold Avenue SW | 4 Embarcadero Center, Suite 1350 |
| Albuquerque, New Mexico 87102 | San Francisco, California 94111 |

By:  */s/ Brian J. Fisher*
Brian J. Fisher