1            UNITED STATES DISTRICT COURT

2              DISTRICT OF NEW MEXICO

3    -------------------------------------------------

4    ZIA AGRICULTURAL CONSULTING, LLC,

5            Plaintiff,

6    vs.                Case No. 1:20-cv-445-SCY-JHR

7    TYSON FOODS, INC. and

8    TYSON FRESH MEATS, INC.,

9            Defendants.

10   -------------------------------------------------

11                  *    *    *

12       CONFIDENTIAL - ATTORNEYS' EYES ONLY

13                  *    *    *

14      30(b)(6) VIDEO DEPOSITION TESTIMONY OF

15     TYSON FOODS, INC. and TYSON FRESH MEATS, INC.

16        TAKEN THROUGH ITS REPRESENTATIVE

17               ROBERT A. SCHERER

18           ON WEDNESDAY, MAY 12, 2021

19          IN DAKOTA DUNES, SOUTH DAKOTA

20                  *    *    *

21

22   Reported by:

23   Rebecca Klanderud

24   North Dakota

25   Job No. 10081764

EXHIBIT B

Robert A. Scherer

**Confidential
Attorneys' Eyes Only**

**Zia Agricultural Consulting, LLC vs.
Tyson Foods, Inc.**

1              *    *    *

2

3           30(b)(6) Video Deposition Transcript of

4    Tyson Foods, Inc. and Tyson Fresh Meats, Inc.,

5    taken through its representative ROBERT A.

6    SCHERER via remote communication with the

7    witness and counsel at the Holiday Inn Express &

8    Suites, 885 Cottonwood Lane, Dakota Dunes, South

9    Dakota on Wednesday, May 12, 2021, commencing at

10   8:37 a.m. before Rebecca L. Klanderud, a

11   Certified Shorthand Reporter.

12

13

14

15

16              *    *    *

17

18

19

20

21

22

23

24

25

25

Robert A. Scherer

**Confidential
Attorneys' Eyes Only**

**Zia Agricultural Consulting, LLC vs.
Tyson Foods, Inc.**

```
 1   APPEARANCES:

 2            VENABLE, LLP

 3            BY:   JOHN S. WORDEN, ESQUIRE

 4                  jsworden@venable.com

 5                  Suite 3800

 6                  101 California Street

 7                  San Francisco, California  94111

 8                  415.653.3750

 9                  Counsel for Plaintiff

10

11            MAYER, LLP

12            BY:   BRIAN J. FISHER, ESQUIRE

13                  bfisher@mayerllp.com

14                  Building 3B

15                  9400 Holly Avenue Northeast

16                  Albuquerque, New Mexico  87122

17                  505.595.5175

18                  Counsel for Defendants

19   ALSO PRESENT:

20            Lisa Bertrand, Esquire, Tyson

21            Narciso Perez (via telephone)

22            Daniel Gomez, Esquire, Tyson

23            (via telephone)

24            Jason Davis, videographer

25                      *    *    *
```

26

Robert A. Scherer                **Confidential**              Zia Agricultural Consulting, LLC vs.
                            **Attorneys' Eyes Only**                        Tyson Foods, Inc.

1    INDEX:

2    EXAMINATION:                                         PAGE

3    By Mr. Worden . . . . . . . . . . . . . . .      6

4                          *    *    *

5    EXHIBITS:

6    SCHERER EXHIBITS:                        PAGE MARKED

7    Exhibit  1  Complaint                          53

8    Exhibit  2  Bates Zia 0000120 - 128            76

9    Exhibit  3  Bates Tyson 000001 - 27            79

10   Exhibit  4  Defendants' Answers and Objections

11               to Plaintiff's First Set of

12               Interrogatories                    90

13   Exhibit  5  Bates Zia_0000007 - 12             98

14   Exhibit  6  Bates Zia_0000070 - 78             98

15   Exhibit  7  Bates Zia_0000034 - 42             98

16   Exhibit  8  Bates Tyson_000028 - 000235       114

17                          *    *    *

18

19

20

21

22

23

24

25
                                                        27

**www.aptusCR.com**

1    Q.    In any way, shape, or form, did you

2    ever tell anyone from Zia "I do not agree with

3    the costs" that you received on May 4th and

4    subsequently three times between then and May of

5    2019?

6        A.    No, because I did not have a deal for

7    a cost-plus.

8        Q.    Why do you say you didn't?

9        A.    Because I've always dealt in

10   inventories and it is -- we purchase the fat

11   cattle, we pay a premium per head, and

12   everything is based on the Nebraska weighted

13   average, just as it is today, as it was the day

14   I took over this position in 2015.

15       Q.    When was the first time you had any

16   dealings with Zia?

17       A.    I believe it was in April or May,

18   when Brad Brandenburg left, and I took over the

19   job.

20       Q.    In May of what year?

21       A.    2015, I believe.

22       Q.    Where is Brad Brandenburg now?

23       A.    Retired.

24       Q.    Do you know where he lives?

25       A.    Uh, last I heard, he was somewhere

28

1  stack of these as we go, then Jason's going to

2  take it and send it to our court reporter when

3  the day is done.

4          MR. WORDEN:  Here's another one just

5  in case.

6  BY MR. WORDEN:

7      Q.    Mr. Scherer, please look at this

8  lawsuit, and tell me if you've seen it before.

9      A.    Yes.

10     Q.    All right.  Have you seen the

11 attachments as well?

12     A.    Yes.

13     Q.    When did Tyson begin -- let me phrase

14 that differently.

15          Was there a time when Tyson only

16 bought conventional cattle?

17     A.    I've got to go back in history.  We

18 started EU or NHTC cattle in 1991 in Lexington,

19 Nebraska.  Other than that, we never purchased a

20 non-conventional animal up until we started our

21 actual program in 2008.

22     Q.    And generally, why did Tyson expand

23 into the natural program in 2008?

24     A.    A growing desire by consumers for

25 clean meat.

29

**Confidential**        **Zia Agricultural Consulting, LLC vs.**
                                  **Attorneys' Eyes Only**        **Tyson Foods, Inc.**

1       Q.    Okay.  And has that desire at least

2    in the marketplace continued to grow since then

3    in your opinion?

4       A.    Yes, sir.

5       Q.    All right.  Do you know when Tyson

6    started working with Zia with the natural

7    cattle?

8       A.    Not prior to 2015 --

9       Q.    Okay.

10      A.    -- to my knowledge.

11      Q.    I'm sorry.

12            Meaning it wasn't prior to 2015, or

13   you don't know when it was?

14      A.    I do not know when it was.

15      Q.    Okay.  It was prior to 2015, correct,

16   as far as you know?

17      A.    I have no recollection.

18      Q.    Very well.

19            Please turn to page three of Exhibit

20   1, and please turn to paragraph 19.

21            Mr. Scherer, it's -- um, I think

22   you're -- you've gone a little too far.  Just

23   the third -- the third page from the

24   beginning --

25      A.    Okay.

                                                        30

1        Q.     -- paragraph 19.

2               Thank you.

3        A.     And which number?

4        Q.     Paragraph 19.

5               MS. BERTRAND:  I think we have two

6    copies of Exhibit 1 in there.  I think that's

7    what the issue is.

8               MR. FISHER:  I think he's talking

9    about the notice --

10              MR. WORDEN:  Yeah.  Yes.  I'm sorry.

11   Yes.  I'm -- that's right.

12              MR. FISHER:  I made that mistake as

13   well.

14   BY MR. WORDEN:

15       Q.     So we're talking about the beginning

16   of the lawsuit, third page of the lawsuit,

17   paragraph 19.

18              Do you see that, sir?

19              It starts with:  "In or about . . ."

20       A.     Yes.

21       Q.     Okay.  It says:  "In or about

22   December of 2018 and January of 2019, Robert

23   Scherer, an employee of the Tyson Defendants,

24   initiated multiple telephone calls with Zia to

25   discuss a potential list of Premium Cattle and

                                                          31

Robert A. Scherer

Confidential
Attorneys' Eyes Only

Zia Agricultural Consulting, LLC vs.
Tyson Foods, Inc.

1    their cost for purchase during 2019."

2            Is that true statement?

3       A.    Yes, sir.

4       Q.    It is true that at the December of

5    2018 and January of 2019 you personally

6    initiated multiple telephone calls to Zia to

7    discuss premium cattle, correct?

8       A.    Yes.

9       Q.    All right.  Let's please move to

10   paragraph 22.  It says:  "Scherer requested that

11   Zia identify as many Premium Cattle as possible

12   for eventual sale to Whole Foods."

13           Is that a true statement?

14      A.    To the best of my knowledge.

15      Q.    Please go now, and it's a little

16   confusing.

17           Please go to Exhibit 1 of Exhibit 1.

18   It's the one you have in front of you but a few

19   pages back, there's an Exhibit 1.

20           All right.  There's a page and if you

21   look at the top, it says page 2 of 7 of Exhibit

22   1.

23           Do you see that, sir?

24           Is that the page you're on?

25      A.    Yes, sir.

32

1        Q.    At the bottom of that page, there's

2   an email from you dated February 4th of 2019.

3              Am I correct so far?

4        A.    Yes, sir.

5        Q.    All right.  It says:  "This looks

6   good get them at a finish yard, asap please."

7              You typed that and sent that on

8   February 4, 2019, correct?

9        A.    Yes, sir.

10       Q.    All right.  Was there an attachment

11  to that -- and let's scroll a little bit

12  further.  Please go to Exhibit 2, Exhibit 2 to

13  Exhibit 1.

14       A.    Yep.

15       Q.    All right.  Now, do you see there's a

16  chart there, a multicolored chart?

17             Do you have that in front of you?

18       A.    Yes, sir.

19       Q.    Was that attached to the email that

20  you responded to saying "looks good" on February

21  4th of 2019?

22       A.    I believe so.

23       Q.    All right.  So when you said "looks

24  good," what specifically did you mean looks

25  good?

                                                    33

 1      A.    The inventory itself.

 2      Q.    All right.  So where do I go here to

 3  look to find the part that you were saying looks

 4  good?

 5            Which -- which column would I look

 6  at?

 7      A.    So it would be the orange column, the

 8  Ranch.

 9      Q.    All right.

10      A.    And the projected volumes by month.

11      Q.    Is that the pink part, Estimated

12  Weight at Lean Months or am I looking at the

13  wrong --

14      A.    Correct.

15      Q.    Okay.  All right.  So let's just make

16  sure we're both reading this correctly.

17            This was -- this was prepared by Zia,

18  correct?

19      A.    Yes, sir.

20      Q.    And then there were updates of this

21  prepared and sent to you in the spring of 2019

22  as well, correct?

23      A.    Yes, sir.

24      Q.    All right.  So the Ranch, let's start

25  with the first one.

                                                      34

1    Did you personally visit Bullinger to

2    look at theses cattle?

3         A.    I did not.

4         Q.    Did you send a representative?

5         A.    I believe we had a buyer in the area.

6         Q.    Okay.  How about Happy Pasture?

7               Did you go to that personally?

8         A.    I did personally in January of --

9         Q.    What --

10        A.    -- '19.

11        Q.    Excuse me.  Go ahead.  I'm sorry.  Go

12   ahead, please.

13              I think you -- I interrupted you.  I

14   think your answer was you went there in January

15   of 2019.

16              Did I hear that correctly?

17        A.    Yes, sir.

18        Q.    Did you go there with Mr. Perez?

19        A.    Yes, sir.

20        Q.    All right.  How'd the cattle look

21   when you saw them?

22        A.    Light, meaning not of weight.

23        Q.    Let's look at the next one, High

24   Choice.

25              Did you visit that personally?

                                                        35

1       A.    Yes, sir.

2       Q.    And did you go there with someone?

3       A.    I was with Doug Shepherd on my way

4    back from New Mexico.

5       Q.    Where is High Choice located?

6       A.    Scott -- just south of Scott City

7    Kansas.

8       Q.    Okay.  Happy Pasture is in Texas,

9    correct?

10      A.    Yes, sir.

11      Q.    Where is Bullinger?

12      A.    I couldn't tell you.

13      Q.    Where is Cuervo Creek?

14      A.    New Mexico.

15      Q.    Do you recall when you made the visit

16   to Cuervo Creek at the invitation of Mr.

17   Barrett?

18      A.    Yeah.  It would have been, um, tail

19   end of March or mid-March of 2019.

20      Q.    Where in New Mexico is it?

21      A.    South of -- southwest of Las Vegas,

22   New Mexico.

23      Q.    All right.  Do you know where Valley

24   View is?

25      A.    Yes, sir.

36

Robert A. Scherer

Confidential
Attorneys' Eyes Only

Zia Agricultural Consulting, LLC vs.
Tyson Foods, Inc.

1      Q.    And where is that, sir?

2      A.    Sidney, Montana.

3      Q.    Is that Rod Prewitt's property?

4      A.    Yes, sir, I believe.

5      Q.    Did you personally visit there to

6   look at the cattle listed here?

7      A.    No.  I had a buyer go there.

8      Q.    Did you have any or hear any

9   complaints when your buyer visited?

10     A.    No, sir.

11     Q.    No, sir.  All right.

12           The visits that we just discussed

13   either by you personally or by a buyer or a

14   representative, did those all take place before

15   the email of February 4th, after, or otherwise?

16           Well, I think you just told me that

17   Cuervo Creek was in March, so at least that one

18   was after.

19           Happy Pasture was in January?

20           That's what you think?

21     A.    Yes, sir.

22     Q.    How about the other ones?

23           Do you have a recollection of when

24   they were?

25     A.    I believe it would have been late

37

1    spring.

2         Q.    All right.  Other than Happy Pasture,

3    were any of these visits by you or a buyer

4    before the February 4th, 2019 email?

5         A.    Could you restate the question?

6         Q.    Yes.  So you mentioned that the Happy

7    Pasture visit was in January of 2019, correct?

8         A.    Yes, sir.

9         Q.    Were any of the others prior to your

10   February 4th email other than Happy Pasture?

11        A.    No, sir.

12        Q.    Please scroll a little bit further.

13   We're still -- we're still in the main Exhibit

14   1, but now it's going to be Exhibit 3 to Exhibit

15   1.  And this is an email from Mike Rogers to

16   Narciso, at least the main email.

17             Do you know who Mike Rogers is?

18        A.    Just talked to him on the phone, an

19   individual that worked for Zia.

20        Q.    Okay.  Do you recall when you last

21   talked to him?

22        A.    Oh, not specifically --

23        Q.    Do you recall --

24        A.    -- but we generally talked every

25   week.

38

1   with -- Creek -- Cuervo Creek with?

2          Excuse me.

3      A.    Doug Shepherd and I.

4      Q.    **How do you know Doug Shepherd?**

5      A.    He's a finish feeder on the natural

6   side for us.

7      Q.    **Why did he go to Cuervo Creek with**

8   **you?**

9      A.    Because his interest was looking at

10  other cattle that he had done prior business

11  with in the past in New Mexico.

12     Q.    **Is he a competitor of Zia's?**

13     A.    Yes.

14     Q.    **You went with Mr. Shepherd to look at**

15  **the Zia cattle at Cuervo Creek?**

16     A.    No, no.  We went to Texas, Kansas,

17  and New Mexico to look at cattle that Doug had

18  purchased prior.

19                    *   *   *

20          (Whereupon, Deposition Exhibit 2 was

21          marked for identification.)

22                    *   *   *

23  BY MR. WORDEN:

24     Q.    **Here is Exhibit 2, a new exhibit, not**

25  **to be confused with Exhibit 2 to Exhibit 1.**

                                                        39

Robert A. Scherer

Confidential
Attorneys' Eyes Only

Zia Agricultural Consulting, LLC vs.
Tyson Foods, Inc.

1    BY MR. WORDEN:

2        Q.    Did you have a contract with Zia in

3    early 2019?

4        A.    We had a commitment sheet and a

5    verbal agreement on price per head premium.

6        Q.    All right.  Did you believe that that

7    constituted a contract?

8        A.    The commitment sheet filled out by

9    the feed yard would constitute that, yes.

10       Q.    All right.  Do you know in February

11   of 2019, were there commitment sheets filled out

12   by, for example, Happy Pasture?

13       A.    No, sir.

14       Q.    How about High Choice?

15       A.    Yes, sir.

16       Q.    How about Valley View?

17       A.    I'd be speculating, but there should

18   have been, yes.

19       Q.    How about Bullinger?

20       A.    No, sir.

21       Q.    Okay.  So I'm sorry.

22             I believe you said High Choice did

23   not have one?

24       A.    High Choice did.

25       Q.    Which one did not have one?

40

Robert A. Scherer

Confidential
Attorneys' Eyes Only

Zia Agricultural Consulting, LLC vs.
Tyson Foods, Inc.

1          I -- I asked you which ones had them

2     and I didn't -- I missed which one you told me

3     did not have one.

4          A.     Bullinger would not because those

5     were ranch cattle.

6          Q.     Okay.

7          A.     Happy Texas would have been ranch

8     cattle.  So until they come into the finish yard

9     of who we do business with, they would not have

10    a commitment sheet filled out.

11         Q.     All right.  Um, there's some

12    objections and -- and legal statements.  Let me

13    move to the middle of the answer at the top of

14    page 11 of Exhibit 4.

15          In the middle of the page, it says:

16    "The long-standing course of dealing between

17    Tyson and Zia was that Zia would offer cattle

18    for sale, and Tyson would choose which cattle to

19    purchase based on its business needs."

20          Is that an accurate statement?

21         A.     Yes, sir.

22         Q.     That's an accurate statement prior to

23    February of 2019, correct?

24         A.     Yes, sir.

25         Q.     All right.  You never had in any of

41

Robert A. Scherer

Confidential
Attorneys' Eyes Only

Zia Agricultural Consulting, LLC vs.
Tyson Foods, Inc.

1   those prior dealings though Zia send you a

2   cost-plus model chart of the type it sent you on

3   February 4th, 2019, correct?

4       A.    Correct.

5       Q.    It next says that, ". . .in exchange,

6   Tyson would pay the Nebraska weighted price plus

7   a standard premium for each head of cattle it

8   agreed to purchase."

9             Is that an accurate statement?

10      A.    Yes, sir.

11      Q.    "In some documents, Zia seemingly

12  contends that an email attaching an Excel

13  spreadsheet titled 'cost-plus Model' somehow

14  constituted an offer that superceded this course

15  of dealing.  The Excel spreadsheet is not a

16  contract, because it does not contain any of the

17  key terms that would be expected in a contract."

18            Do you see that, sir?

19      A.    I do.

20      Q.    The cost-plus chart that we looked at

21  attached as Exhibit 1 to Exhibit 1, were there

22  any terms that you thought were missing from

23  that for you to determine how much Zia would be

24  paid for the cattle?

25      A.    It was never an agreed-upon contract,

42

**Confidential**
**Attorneys' Eyes Only**

1   period.

2        Q.    Were there any terms missing for you

3   to calculate when you read Exhibit 1 to Exhibit

4   1 as to how much to pay Zia?

5             MR. FISHER:  Objection, asked and

6   answered.

7   BY MR. WORDEN:

8        Q.    Mr. Scherer?

9        A.    I would say there is no constituted

10  offer that I agreed upon.

11       Q.    Okay.  I know you've said that.

12  That's not the question.

13            When you looked at the chart that we

14  went over, Exhibit 1 to Exhibit 1, what term

15  would you expect to be there that you did not

16  find in order to determine how much you would

17  pay Zia?

18            MR. FISHER:  Objection, asked and

19  answered, calls for speculation.

20  BY MR. WORDEN:

21       Q.    Are you aware of any term that's

22  missing for you to determine how much Zia

23  expected to be paid based on the cost-plus model

24  it sent you on February 4th of 2019?

25            MR. FISHER:  Same objection.

43

1        Q.    All right.  Program, what does that

2   mean, CER?

3        A.    CER went to -- these might have been

4   into the China run.  I would have to go back and

5   look at the qualification for the program.

6        Q.    The next page there's some other

7   abbreviations.

8              BMA, what does that stand for?

9        A.    BMA is -- um, I believe that is a

10  lean color.

11       Q.    Well, then how about CER?

12       A.    CER would be another --

13       Q.    That's what we just discussed, right?

14       A.    Correct.

15       Q.    All right.  How about CEP?

16       A.    That would still be another program,

17  and I believe these are all codes for China

18  export.

19       Q.    Okay.  When you had the meeting with

20  Mr. Nelson, Mr. Perez, and yourself by telephone

21  in I think we established it was sometime around

22  May 25th of 2019, was there a determination made

23  at that to stop buying from Zia going forward?

24       A.    The cattle that we had on the blocks

25  we said we would honor and finish out.

44

Robert A. Scherer

Confidential
Attorneys' Eyes Only

Zia Agricultural Consulting, LLC vs.
Tyson Foods, Inc.

1     Q.     And then what?

2     A.     And then I and Justin discussed it

3  amongst ourselves and at that point, we were

4  basically done doing business until we got

5  information from our counsel in-house that we

6  could not discriminate, but all of our business

7  would go through the finish feed yards.

8     Q.     Do you know who John Wubbenhorst is?

9     A.     John Wubbenhorst?

10    Q.     Yes.  Did I mispronounce that?

11    A.     Yeah.  It's W-u-b-b-e-n-h-o-r-s-t.

12           He's the owner of KCC feed yard,

13  Minden, Nebraska.

14    Q.     All right.  Did you go to Cuervo

15  Creek ranch with him?

16    A.     No, sir.

17    Q.     Okay.  Did you go look at any of

18  these Zia cattle with him?

19    A.     No, sir.

20    Q.     Let me do this.  I'm going to take

21  five minutes and scroll through the rest of my

22  notes and try to wrap it up, all right?

23    A.     Sounds good.

24    Q.     Thank you.

25           THE VIDEO TECHNICIAN:  This is the

45

Robert A. Scherer

**Confidential
Attorneys' Eyes Only**

**Zia Agricultural Consulting, LLC vs.
Tyson Foods, Inc.**

1        C E R T I F I C A T I O N

2

3

4        I hereby certify that the proceedings and

5    evidence noted are contained fully and

6    accurately in the notes taken by me in the

7    deposition of the above matter, and that this

8    is a correct transcript of the same.

9          Further, that if the foregoing pertains to

10   the original transcript of a deposition in a federal

11   case, before completion of the proceedings, review of

12   the transcript [  ] was [ X ] was not requested.

13   Dated: May 19, 2021

14

15              *Rebecca J. Klanderud, CSR*

16   _____

17              Rebecca L. Klanderud

18              Certified Shorthand Reporter

19

20

21        (The foregoing certification of this

22   transcript does not apply to any reproduction of

23   the same by any means unless under the direct

24   control and/or supervision of the certifying

25   reporter.)

                                                    46