IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ZIA AGRICULTURAL CONSULTING,
LLC,

    Plaintiff,

v.                                                                                            Civ. No. 1:20-cv-00445 MIS/JHR

TYSON FOODS, INC. and
TYSON FRESH MEATS, INC.,

    Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendants Tyson Foods, Inc., and Tyson Fresh Meats, Inc.'s (collectively, "Tyson") Motion for Summary Judgment (ECF No. 55) and Plaintiff Zia Agricultural Consulting, LLC's ("Zia") Motion for Partial Summary Judgment (ECF No. 60). Having considered the parties' briefing, the record, and the applicable law, the Court will grant Tyson's motion in part and deny Zia's motion in its entirety.

## BACKGROUND

**UNDISPUTED FACTS**

Zia is a New Mexico company that specializes in the investment, sourcing, and production of cattle for the commercial beef market. ECF No. 61-2 at ¶ 3. For many years, Zia has sourced and sold cattle to Tyson[1] for processing and resale in the commercial market. *Id*. at ¶ 4; ECF No. 66-4 at 10, 22:15–21. Zia's role in the business relationship

---

[1] In their briefing, both parties refer collectively to "Tyson" without differentiating between the two Defendants. The Court therefore does likewise.

was to source the desired number and type of cattle, send them to various "feedlots" or "feedyards," and "finish" them to the desired weight. *See id*. at 1; ECF No. 56-2 at 3, 78:1–79:10. Tyson, which operates in the "processing" or "packing" sector of the beef industry, would then slaughter the finished cattle and create beef products. ECF No. 56-1 at 1–2. Zia provided Tyson with Premium cattle, which—as compared with "conventional" cattle—are more expensive to produce and cannot be injected with steroids and hormones. ECF No. 61-2 at ¶ 3, 6. The Premium cattle were further divided into Non-Hormone Treated Cattle ("NHTC") and Global Animal Partnership ("GAP")-certified cattle, the latter of which is a more stringent classification used only by Whole Foods.[2] ECF No. 66-4 at 26–27, 42:23–43:4.

Around December 2018 or January 2019, Robert Scherer, Tyson's Associate Director of Cattle Procurement, began contacting Zia to request that they identify as many Premium cattle as possible for eventual sale to Whole Foods. ECF No. 66-4 at 31, 57:9–14. On January 23, 2019, Mr. Scherer sent several messages to Narciso Perez, Zia's Chief of Cattle Feeding Operations, asking when the cattle would be moved to the feedlot and stating that he "need[ed] them in the yard to put them on the books." ECF No. 61-5 at 1–3. He sent another message on January 28, 2019, asking if there was "[a]ny movement on the cattle heading north." *Id*. at 4.

On February 4, 2019, Narciso Perez sent Mr. Scherer an email with the subject "Show list" and an attachment titled "Cost Plus Model (2.04.19).pdf." ECF No. 56-9 at 1.

---

[2] It appears from the record that "Premium" cattle may sometimes have included additional classifications. *See* ECF Nos. 56-4 at 1; 66-4 at 21, 37:15–19. However, these are not relevant to the parties' dispute. The Court therefore follows the parties' lead in using the term "Premium cattle" to refer only to NHTC and GAP-certified cattle.

2

The text of the email said: "Look this over and let's talk." *Id*. The Cost Plus Model attachment comprised a single spreadsheet with the column headers "Cattle Name & Source," "After Death Loss," "Estimated Weight at Lean Months," "Total Costs," "Total Costs Per HD," and "Total Cost Per LB." *Id*. at 2. At the bottom of the spreadsheet was a box entitled "Totals," which listed, inter alia, "Total lbs" of 10,079,327 and "Total Costs" of $16,308,996.44. *Id*. Within an hour, Mr. Scherer responded: "This looks good get them in a finish yard, asap please." ECF No. 56-10.

Over the next few months Narciso Perez continued to send Mr. Scherer periodic "Cost Plus Updates," each time attaching a new version of the spreadsheet with updated estimates and totals. ECF Nos. 56-12 (dated February 18, 2019); 56-13 (March 4, 2019); 56-14 (May 10, 2019); 56-11 (June 7, 2019). Mr. Scherer indicated no disagreement or confusion with respect to any of the Cost Plus Updates. ECF No. 66-4 at 9–10, 21:22–22:7. From approximately January through March of 2019, either Mr. Scherer or another Tyson representative visited each of the feedlots listed on the spreadsheet to inspect Zia's Premium cattle. *Id*. at 36–40.

Around this time, in March 2019, Zia's Manager Sean Perez prepared a memorandum for Larue Road Capital LLC ("Larue Road"), an investment firm, with the subject "Tyson Fresh Meats—Cost Plus Purchase Arrangement," which purported to set forth "[o]ur understanding of Tyson Fresh Meat's verbal agreement." ECF No. 56-15 at 5. The memorandum stated, inter alia, that "Tyson has agreed to purchase all of these calves under a 'cost plus' model" and that payment would comprise costs "plus an additional $125.00 per delivered GAP Natural calf and $100.00 per delivered NHTC calf." *Id*. In another email to Larue Road, Sean Perez explained that the Cost Plus Model was

3

"merely an estimation of the number of head and approximate cost to create expectations for Tyson" and that Zia could not "prescribe how Tyson is going to consider 'cost' or calculate payment on these cattle." ECF No. 56-16. The memorandum was prepared by Sean Perez for Larue Road in lieu of Tyson's "writ[ing]-up the overall deal." ECF No. 56-15 at 3.

On May 24, 2019, Narciso Perez sent Mr. Scherer a finalized "Cattle Invoice," which included Zia's costs in the total price. ECF No. 56-17. Mr. Scherer responded: "I'm not paying for the cost of calves. That's not what we do. What are you trying to do here?" *Id*. Shortly thereafter,[3] Mr. Scherer and Justin Nelson, Tyson's Vice President of Cattle Procurement, called Narciso Perez to discuss their concerns and make it clear that they would not pay the amount on the invoice. ECF Nos. 61-2 at ¶ 22; 66-4 at 14, 30:7–17.

Tyson's representatives denied that they had ever agreed to pay Zia's costs, either by the emails sent on February 4, 2019, or pursuant to any verbal arrangement. Instead, when Zia's Premium cattle were delivered to Tyson over the subsequent several months, Tyson paid Zia according to an alternate formula and refused to purchase certain lots of the Premium cattle that had been identified in the Cost Plus Model. ECF No. 61-2 at ¶ 24. Zia invoiced Tyson for a total amount of $16,220,198.00, which included Zia's actual costs pertaining to the 9,153 cattle identified in the Cost Plus Model plus a premium per head

---

[3] The Declaration of Narciso Perez indicates that he spoke with Mr. Scherer and Mr. Nelson on or about June 7, 2019, ECF No. 61-2 at ¶ 22, while Mr. Scherer's deposition testimony indicates that the conversation took place "in approximately May of 2019," ECF No. 66-4 at 14, 30:15–16. The parties agree on the general timeframe of the conversation(s) between Zia and Tyson and the Court finds that the precise date(s) are not material to the case.

of $125 for GAP cattle and $100 for NHTC. *Id.* at ¶ 30. Tyson purchased 7,654 cattle and paid Zia a total of $12,595,753.13. ECF No. *Id.* at ¶ 31.

**FACTUAL DISPUTES**

While the parties agree to the general outline of events described above, they disagree substantially about many other material facts. The crux of their dispute is the substance of the verbal negotiations that took place before the February 4, 2019 email exchange.

Zia contends that in or around January 2019, Narciso Perez represented to Mr. Scherer that Zia would only agree to sell the Premium cattle if Tyson agreed to pay Zia's costs plus a small margin. ECF No. 56-2 at 4, 98:8–99:8. In a "cost-plus model," the packer (i.e., Tyson) pays for the original cost of the feeder cattle, the cost to feed those cattle, and "plus" payments to the entity feeding the cattle and the entity that sourced the cattle. ECF No. 56-1 at 4. Because of the additional expense inherent in finishing Premium cattle, Narciso Perez was not authorized to proceed with the sale except under this kind of agreement. ECF Nos. 56-2 at 4, 98:8–11, 101:14–16; 61-2 at ¶ 11. According to Narciso Perez, at the time of their conversation in January, Mr. Scherer was aware of Zia's inventory (i.e., the number of Premium cattle available for sale) but wanted to see the "dollar amounts" before agreeing to the sale. ECF No. 56-2 at 4, 99:22–25. Zia therefore prepared the cost estimates contained in the Cost Plus Model spreadsheet sent on February 4, 2019. ECF Nos. 61-2 at ¶¶ 12–16; 66-3 at ¶ 6–7. Zia maintains that the Cost Plus Model clearly identified Zia's costs and set the "plus" premiums at $125 per head of GAP cattle and $100 per head of NHTC; therefore, Mr. Scherer's response ("get them in a finish yard, asap") created a binding contract. ECF Nos. 61-2 at ¶ 16; 66-3

5

at ¶ 7. Narciso Perez also avers that Tyson "reconfirmed the Cost Plus Contract" during a March 2019 phone call with Mr. Scherer and Mr. Nelson. ECF No. 61-2 at ¶ 20.

Zia's version of events is flatly contradicted by the deposition testimony of Mr. Scherer. Mr. Scherer stated that in April or May of 2018, long before the February 4, 2019 email exchange, Zia and Tyson verbally agreed on the price for the next year's Premium cattle. ECF No. 66-4 at 18, 34:8–14. This was, according to their usual course of dealings,[4] the "Nebraska Weighted Average" plus a price per head premium. *Id*. The Nebraska Weighted Average is a regional weighted average price, disseminated by the United States Department of Agriculture and calculated the week prior to slaughter. ECF No. 56-1 at 3. The price per head premium was calculated weekly by Tyson and was communicated to Zia via a "verbal commitment" by Mr. Scherer. ECF No. 66-4 at 24–25, 40:24–41:12. Therefore, Mr. Scherer interpreted the Cost Plus Model sent on February 4, 2019, as merely an inventory of Zia's available Premium cattle. *Id*. at 8–9, 20:18–21:6. He contends that the email he sent in response was assenting to "[t]he numbers that [Narciso Perez] had projected for outdates going into a finish yard" rather than to a cost-plus model of payment. *Id*. at 9, 21:5–6. In sum, Tyson denies that a cost-plus model was ever agreed to.

Zia brought suit in this Court on May 8, 2020, alleging claims of breach of contract; breach of the implied duty of good faith and fair dealing; quantum meruit; fraudulent misrepresentation; and violations of the New Mexico Unfair Practices Act, N.M. Stat. Ann.

---

[4] Although Zia disputes that Tyson agreed to pay Zia based on the Nebraska Weighted Average "during the relevant period," it appears to concede that this was the way Tyson and Zia had historically done business. ECF No. 66 at 6. At his deposition, Narciso Perez testified that "some" previous transactions between Zia and Tyson were based on the Nebraska Weighted Average, ECF No. 56-2 at 4, 101:21–25, and Tyson has presented evidence showing that it was used to calculate costs in 2015, *see* ECF No. 56-4.

§§ 57-12-1, *et seq*. ECF No. 1. The parties' cross-motions for summary judgment are now before the Court.

## LEGAL STANDARD

**SUMMARY JUDGMENT**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once that threshold is met, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Id*. at 324. In applying the summary judgment standard, the court "view[s] the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017).

**CHOICE OF LAW**

Federal courts sitting in diversity apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In its briefing, Tyson acknowledges considerable difficulty determining which state's laws apply to Zia's

7

claims.[5] ECF No. 56 at 16–17. Tyson urges the Court, however, to decide its motion without resolving the choice of law question because Zia's claims are deficient pursuant to "black letter contract and tort law." *Id*. at 17.

The Court finds it cannot proceed without a determination on choice of law. Absent a comprehensive nationwide review, the Court cannot state with certainty that the applicable contract and tort law would not differ between states. However, the Court finds that the parties have effectively waived their choice of law arguments and consented to the application of New Mexico law by making legal arguments with reference to New Mexico law and by citing only New Mexico authority. *See Mauldin v. Worldcom, Inc.*, 263 F.3d 1205, 1212 (10th Cir. 2001) (holding that "parties may waive choice of law arguments by failing to adequately brief them"). In *Mauldin*, the Tenth Circuit held the choice of law argument was waived where a party stated in a footnote that Nebraska law "arguably" applied but then proceeded to "rel[y] substantially more" on Texas precedent in its brief. *Id*. at 1211–12. Here, although Tyson raised the choice of law issue and stated

---

[5] The difficulty as to Zia's contract claims arises because Mr. Scherer's location on February 4, 2019, when he sent the email allegedly accepting Zia's cost-plus offer, is unknown. In the absence of a contractual choice-of-law provision, New Mexico's Uniform Commercial Code ("UCC") applies to transactions bearing an "appropriate relation" to this state. N.M. Stat. § 55-1-301(B); *In re Estate of Voight*, 624 P.2d 1022, 1024 (N.M. Ct. App. 1981) (finding no appropriate relation to New Mexico where the notes at issue were signed in Illinois, to be paid in Illinois and Pennsylvania). New Mexico courts have not given a precise definition of "appropriate relation" in this context, and courts in other jurisdictions have reached varying conclusions. Generally, however, New Mexico courts follow the principle that "[t]he validity of a contract executed in a sister state is determined according to the laws of that state." *Voight*, 624 P.2d at 1024. This approach suggests, though it does not conclusively determine, that New Mexico courts might define "appropriate relation" according to the state in which the contract was formed.

The choice of law question as to Zia's tort claims presents similar difficulties. New Mexico courts apply the rule of *lex loci delicti*, according to which the law of the state "where the wrong occurred" governs the parties' substantive rights. *Freeman v. Fairchild*, 416 P.3d 264, 274 (N.M. 2018) (quotation omitted). Tyson points out that it is unclear whether the alleged wrong in this case occurred in New Mexico, where Zia is located, or in the various states where the feedlots are located and where the payments for Zia's Premium cattle were actually made. ECF No. 56 at 16 n.1.

8

that "it is unclear whether New Mexico, South Dakota, or some other law would apply to this case," ECF No. 56 at 16, it provided no strong argument in favor of another state's law and relied only on New Mexico authority in its brief. Zia made no choice of law argument at all, and likewise cited only New Mexico authority.[6] Accordingly, the Court will apply New Mexico law to Zia's claims.

## DISCUSSION

I. **BREACH OF CONTRACT**

Both parties move for summary judgment on Zia's breach of contract claim. Tyson moves for summary judgment on the basis that (1) the alleged contract is too vague to fashion a remedy and (2) it is rendered unenforceable by failure to comply with the statute of frauds. ECF No. 56 at 12–21. Zia asserts that summary judgment is warranted in its favor because Tyson breached a valid, enforceable contract. ECF No. 61.

   a. **Contract Formation**

Tyson argues that the alleged contract, as set forth in the Cost Plus Model sent on February 4, 2019, was too vague to be enforced because the cost and quantity terms were insufficiently defined. The Court disagrees.

Pursuant to New Mexico law, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." N.M. Stat. § 55-2-204(1) (2020). Although there must be some indication of an agreement, "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a

---

[6] Zia's only mention of choice of law was a footnote stating that "[b]ecause Zia's claims arise under state law, New Mexico law applies[.]" ECF No. 61 at 15 n.4.

contract and there is a reasonably certain basis for giving an appropriate remedy." N.M. Stat. § 55-2-204(3) (2020). The extent to which parol or extrinsic evidence may be considered in construing a written contract is statutorily defined as follows:

> Terms with respect to which the confirmatory memoranda of the parties agree or that are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
>
> (a)   by course of performance, course of dealing or usage of trade (Section 55-1-303 NMSA 1978); and
>
> (b)   by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

N.M. Stat. § 55-2-202 (2018).

Tyson does not dispute that the Cost Plus Model listed Zia's "estimated costs." ECF No. 56 at 19. However, Tyson argues that the Cost Plus Model spreadsheet "does not explain or suggest that Tyson should pay" the listed costs and does not "explain what components went into determining 'cost,' how exactly 'cost' was to be calculated, or who was to calculate 'cost.'" *Id*. In addition, Tyson argues that the "plus" component of the price (the additional premiums of $125 per head of GAP cattle and $100 per head of NHTC) does not appear anywhere on the face of the spreadsheet. Finally, Tyson argues that because the quantity term was only an "estimate," which changed over the next several months, it was too indefinite to permit of a contractual remedy.

The Court acknowledges that the Cost Plus Model spreadsheet, if viewed independently, yields considerable uncertainty about the terms of the agreement between

Zia and Tyson. However, the Court does not find that the Cost Plus Model was "intended . . . as a complete and exclusive statement of the terms of the agreement." N.M. Stat. § 55-2-202(b). On the contrary, both Narciso Perez and Mr. Scherer clearly viewed the February 4, 2019 email exchange as an extension of their prior verbal negotiations. According to Mr. Scherer, the spreadsheet represented a certain quantity of cattle (the "inventory" of Premium cattle being moved to the feedlot at Tyson's behest) at the previously negotiated price. ECF Nos. 66-4 at 9, 21:5–6. According to Narciso Perez, the spreadsheet set out Zia's costs pursuant to a prior verbal understanding that, in order to purchase Zia's cattle, Tyson would have to pay Zia's costs. ECF No. 56-2 at 4, 98:8–99:8.

The fact that the parties' written agreement is susceptible of two different constructions is not fatal to either its formation or its enforceability. In construing the parties' writing, the Court may consider the "course of performance, course of dealing or usage of trade" as well as other "evidence of consistent additional terms." N.M. Stat. § 55-2-202. The parties' arguments are based largely on competing declarations and deposition testimony about the nature of their prior verbal negotiations. Zia claims that a cost-plus arrangement was previously discussed and that Mr. Scherer's assent to the email constituted clear acceptance of that offer. This is supported by Narciso Perez's testimony, by the clearly labeled "Cost Plus Model" attachment,[7] and by Zia's internal emails with Larue Road regarding the existence of a verbal agreement.[8] Tyson claims

---

[7] Tyson's own expert explained that a "cost-plus model" in the beef industry means the packer will pay the seller's costs. ECF No. 56-1 at 4.

[8] Tyson argues that Zia's internal emails and memoranda demonstrate the opposite: that no agreement was formed. To be sure, Zia's internal communications represent some confusion about whether the contract was verbal or written and how Tyson would "consider 'cost' or calculate payment." ECF

that the parties had previously agreed to the Nebraska Weighted Average and that no cost-plus model was ever discussed, which is supported by Mr. Scherer's testimony and evidence of the parties' usual course of dealings. In general terms, therefore, the indefiniteness of the written Cost Plus Model attachment does not preclude enforcement of the alleged cost-plus contract if the disputed facts are resolved in Zia's favor.

Nor was the Cost Plus Model fatally deficient with respect to its individual terms of cost or quantity. Zia asserts that based on prior verbal negotiations, it was clear Zia expected Tyson to pay the costs listed on the spreadsheet. Tyson denies that a cost-plus model was ever discussed. Their genuine disagreement cannot be resolved except by a series of factual determinations within the purview of the jury. Furthermore, although Zia's internal emails referred to the listed cost as an "approximate cost," ECF No. 56-16, there is no reason to believe the figure was not reasonably capable of calculation. *See* N.M. Stat. § 55-2-204(3) (contract does not fail for indefiniteness if there is a "reasonably certain basis for giving an appropriate remedy"). In short, the fact that the costs were "estimated" does not indicate that the agreement was illusory or that the parties did not agree on a viable method of calculation.[9]

As to quantity, the fact that the number of cattle listed on the spreadsheet was only an "estimate" is likewise no barrier to enforcement of a contract. Again, the relevant question is not whether a term was fixed but whether it was reasonably capable of

---

No. 56-16. But they also tend to show Zia's genuine belief that Tyson agreed to a cost-plus model and the alleged per-head premium of $125 for GAP cattle and $100 for NHTC. *See* ECF No. 56-15 at 5.

[9] In fact, pursuant to New Mexico law, it was not strictly necessary for the parties to agree on a price at all. "[U]nder the Uniform Commercial Code, the price of goods is set as 'a reasonable price at the time for delivery if . . . the price is left to be agreed by the parties and they fail to agree.'" *Padilla v. RRA, Inc.*, 946 P.2d 1122, 1125 (N.M. Ct. App. 1997) (quoting N.M. Stat. § 55-2-305(1)(b)).

calculation by the parties and the Court. Both Narciso Perez and Mr. Scherer understood the Cost Plus Model attachment to represent a meaningful, calculable quantity of Premium cattle. *See* ECF No. 66-4 at 9, 21:5–6. It was obviously understood between the parties that some cattle might die or otherwise become ineligible for sale. Indeed, the nature of the parties' business meant that all quantities were necessarily estimates. This did not preclude their ability to form or enforce contractual agreements.

Because the competing evidence presents numerous genuine disputes of material fact, Tyson's motion for summary judgment cannot be granted on the basis that no contract was formed. *See Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co.*, 592 F. App'x 730, 734 n.3 (10th Cir. 2014) ("[W]hen the terms of a contract are in controversy, it is for the jury to determine the terms[.]" (quoting *Segura v. Molycorp, Inc.*, 636 P.2d 284, 289 (N.M. 1981))). By the same token, because there is a genuine dispute about whether a contract was formed, Zia's motion for partial summary judgment must also be denied.

   b. **Statute of Frauds**

Tyson next argues that the alleged cost-plus contract, even if properly formed, is unenforceable for failure to comply with the statute of frauds. Pursuant to New Mexico's statutory law:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

N.M. Stat. § 55-2-201(1) (2019). However, "[a] contract which does not satisfy the requirements of Subsection (1) but which is valid in other respects is enforceable . . . with

13

respect to goods for which payment has been made and accepted or which have been received and accepted." *Id*. § 55-2-201(3)(c).

Based on the plain language of the statute and in accordance with persuasive authority from other jurisdictions, the Court finds that Mr. Scherer did not "sign" the February 4, 2019 email because nothing construable as an electronic signature followed his message. *See*, *e.g.*, *Toghiyany v. AmeriGas Propane, Inc.*, 309 F.3d 1088, 1091 (8th Cir. 2002) (finding, without discussion, that emails without signatures were not "signed" for purposes of Missouri's statute of frauds). If no exception applied, § 55-2-201 would therefore bar the enforcement of any contract to which Mr. Scherer's email operated as an acceptance. However, it is undisputed that Tyson made payment for the Premium cattle; that the payment was accepted by Zia; and that Tyson received and accepted the Premium cattle. These facts appear, on their face, to invoke both of the exceptions listed in § 55-2-201(3)(c).

Tyson argues that the exceptions do not apply because it did not "agree[] to purchase the cattle under the so-called 'cost plus' arrangement." ECF No. 73 at 12. In other words, although Tyson received, accepted, and paid for the Premium cattle, it did so not according to a cost-plus contract but according to its preexisting arrangement with Zia. Of course, it is axiomatic that—regardless of the statute of frauds—Zia cannot recover for breach of a contract to which the parties never agreed. But, as described in the previous section, there exists a genuine dispute of material fact with respect to contract formation. If, as Zia alleges, the parties entered into a cost-plus contract, Tyson's ad hoc argument that it accepted and paid for the Premium cattle according to some other arrangement will be unavailing. If, as Tyson alleges, the parties did not enter into a

14

cost-plus contract, Zia's breach of contract claim will fail without reference to the statute of frauds. Tyson's motion for summary judgment on this basis is therefore denied.

## II.    IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

Tyson moves for summary judgment on Zia's second claim for relief, breach of the implied duty of good faith and fair dealing, on the basis that (1) there was no contract between the parties and (2) in the absence of a contract, there was no special relationship. Because, as set forth above, the parties' factual dispute regarding the existence and terms of a contract cannot be resolved on summary judgment, the Court rejects the premise of Tyson's argument and denies Tyson's motion with respect to Zia's second claim.[10]

## III.   QUANTUM MERUIT

As its third claim for relief, Zia alleges that Tyson was unjustly enriched when it received the Premium cattle without paying the full invoiced amount. ECF No. 1 at ¶¶ 72–77. Tyson moves for summary judgment on the basis that Zia cannot establish unjust enrichment where "Tyson paid Zia for the value of the cattle in accordance with both the parties' prior dealing and long-standing industry practice." ECF No. 56 at 27.

---

[10] Tyson also asserts that "even assuming that this court finds there is a triable issue of fact about the existence of a contract, this claim remains subject to dismissal as duplicative of Zia's contract claim." ECF No. 56 at 27. This conclusory statement is undeveloped in the briefing and unsupported by legal citation; the Court therefore declines to consider it at this time. *See Encinas v. Sanders*, 2022 U.S. Dist. LEXIS 14139, at *19 (D.N.M. Jan. 25, 2022) (courts will not consider undeveloped arguments that are merely mentioned); D.N.M.LR-Civ. 7.3(a) (motions "must cite authority in support of the legal positions advanced").

To prevail on a claim of quantum meruit or unjust enrichment[11] under New Mexico law, a party must show that "(1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust." *Ontiveros Insulation Co. v. Sanchez*, 3 P.3d 695, 698 (N.M. Ct. App. 2000). Quantum meruit is a quasi-contractual remedy, and the presence of an enforceable contract bars a claim for unjust enrichment. *Elliott Indus. v. BP Am. Prod. Co.*, 407 F.3d 1091, 1117 (10th Cir. 2005); *see also Ontiveros*, 3 P.3d at 203–04. Recovery in quantum meruit is based on the reasonable value of the goods or services rendered. *E.g.*, *Armijo v. Cebolleta Land Grant*, 732 P.2d 426, 429 (N.M. 1987); *Kaiser v. Thompson*, 232 P.2d 142, 143–44 (N.M. 1951).

Tyson's argument is premised on the assumption that the pricing formula previously used by the parties, the Nebraska Weighted Average plus Tyson's self-determined premium, represented the fair value of the Premium cattle it received from Zia. However, Tyson adduces no evidence regarding the reasonable value of NHTC and GAP-certified cattle at the time of sale, such as, for example, the average sale price of Premium cattle sold in 2019. The Court therefore finds that Tyson has not met its initial burden to demonstrate there is no genuine issue of material fact in connection with Zia's claim for quantum meruit, and summary judgment is denied.[12] *See Celotex*, 477 U.S. at 322.

---

[11] New Mexico courts treat these two concepts interchangeably. *See Hydro Conduit Corp. v. Kemble*, 793 P.2d 855, 861 (N.M. 1990) ("Actions brought upon theories of unjust enrichment, quasi contract, contract implied in law, and quantum meruit are essentially the same.").

[12] The Court notes, however, that the factual basis of Zia's quantum meruit claim is somewhat unclear. To the extent Zia intends to invoke quantum meruit to recover the value of the Premium cattle *according to the Cost Plus Model*, this usage is unsupported by New Mexico law. Quantum meruit is a quasi-contractual remedy under which recovery is not based on the parties' alleged agreement. *See*, *e.g.*,

IV.     **FRAUDULENT MISREPRESENTATION**

Zia's fourth claim is that Tyson engaged in fraudulent misrepresentation with respect to the cost-plus contract. ECF No. 1 at ¶¶ 78–87. Specifically, Zia alleges Tyson "falsely represented that they would pay the agreed upon price for Premium cattle" and that the misrepresentation was either knowing or reckless. *Id*. at ¶ 81–82. Tyson moves for summary judgment on the basis that there is no evidence it acted with intent to defraud.

The required elements of a fraud claim are that (1) a party made a representation as a statement of fact; (2) the representation was either knowingly untrue or recklessly made; (3) the representation was made with the intent to deceive and for the purpose of inducing another party to act on it; and (4) the other party relied on the misrepresentation to its detriment. *Kaveny v. MDA Enters.*, 120 P.3d 854, 856 (N.M. Ct. App. 2005) (citing *Sauter v. St. Michael's Coll.*, 374 P.2d 134, 138 (N.M. 1962)). Tyson contends that it was operating under its previous arrangement with Zia when Mr. Scherer responded to the February 4, 2019 email, and that it neither intended to be bound by nor recognized the existence of any cost-plus contract. ECF No. 56 at 30. Therefore, Tyson argues, it did not enter the alleged contract with a "present fraudulent intent not to keep [its] agreements." *Id*. (quoting Primus *v. Clark*, 149 P.2d 535, 542 (N.M. 1944)).

Setting aside the argument that Tyson did not enter into a cost-plus contract at all, which has been previously addressed and disposed of, the Court does not find summary

---

*Calderon v. Navarette*, 800 P.2d 1058, 1059 (N.M. 1990) ("[R]ecovery is grounded on a quantum meruit theory, not on the terms of the voided contract."). Unless Zia can establish at trial that (1) no enforceable contract existed between the parties and (2) the payment rendered by Tyson did not represent the reasonable value of the Premium cattle, it will not prevail on a quantum meruit theory.

17

judgment is warranted on the basis that Tyson lacked the requisite scienter. If the finder of fact is inclined to credit Narciso Perez's testimony that Zia represented to Tyson it would only sell Premium cattle under a cost-plus contract; that Zia was asked by Mr. Scherer to compile a cost estimate; and that Zia then sent a spreadsheet titled "Cost Plus Model" listing estimates of Zia's costs, to which Mr. Scherer agreed, a reasonable juror might well determine that Tyson entered into the cost-plus contract with the intent to defraud Zia and induce its reliance. The Court therefore denies Tyson's motion as it relates to Zia's fourth cause of action.

V.  **UNFAIR PRACTICES ACT**

Zia's fifth and final claim for relief is that Tyson violated the New Mexico Unfair Practices Act ("UPA") by making false representations with respect to the alleged cost-plus contract. ECF No. 1 at ¶¶ 88–100. The UPA prohibits "unfair or deceptive trade practices," defined as false or misleading representations that are made in connection with the sale of goods by a person in the regular course of his trade or commerce. N.M. Stat. Ann. § 57-12-2(D) (2019); *Diversey Corp. v. Chem-Source Corp.*, 965 P.2d 332, 338 (N.M. Ct. App. 1998) ("The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services."). Tyson moved for summary judgment on this claim solely on the basis that there is no evidence Tyson acted with intent. ECF No. 56 at 28. For the reasons given above, in connection with Zia's quantum meruit claim, the Court will not enter summary judgment in Tyson's favor on this basis.

However, the Court identified another legal issue during its review and sought additional briefing from the parties. *See* ECF No. 79; Fed. R. Civ. P. 56(f)(2) ("After giving

18

notice and a reasonable time to respond, the court may . . . grant the motion on grounds not raised by a party[.]"). The Court asked each party to address whether Zia, as a seller of goods, could bring a claim under the UPA against Tyson, the buyer. ECF No. 79. The parties timely responded. ECF Nos. 80, 81. Having carefully considered the parties' supplemental briefs, the Court will grant summary judgment in Tyson's favor on this alternate ground.

"Consistent with its purpose as consumer protection legislation, the UPA gives standing only to buyers of goods or services." *GandyDancer, LLC v. Rock House CGM, LLC*, 453 P.3d 434, 443 (N.M. 2019) (quoting *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 113 P.3d 347, 353 (N.M. Ct. App. 2005)). Therefore, in order to sustain a cause of action under the UPA, "the plaintiff must have sought or acquired goods or services and the defendant must have provided goods or services." *Id*. (quoting *Hicks v. Eller*, 280 P.3d 304, 309 (N.M. Ct. App. 2012)). There is no genuine dispute in the present case that, in their commercial transactions, Zia was not the purchaser of goods or services from Tyson. Moreover, Zia's claims are based on its direct commercial transaction with Tyson; there is neither allegation nor evidence that Zia was injured by "downstream" sales of Tyson's products to its consumers. *C.f. Lohman v. Daimler-Chrysler Corp.*, 166 P.3d 1091, 1097–98 (N.M. Ct. App. 2007) (holding that "the pertinent language does not require the plaintiff to acquire goods or services *from* the defendant").

Zia suggests, citing *First Nat'l Bancorp, Inc. v. Alley*, 76 F. Supp. 3d 1261 (D.N.M. 2014), that Zia has the standing of a "competitor-plaintiff" against a "competitor-defendant." The *Bancorp* court concluded, relying in part on the New Mexico

Supreme Court's dicta in *Page & Wirtz v. Solomon*, 794 P.2d 349 (N.M. 1990), that New Mexico would recognize competitor standing under the UPA. *Bancorp*, 76 F. Supp. 3d at 1266. This line of reasoning was foreclosed by the New Mexico Supreme Court's decision in *GandyDancer*, which plainly held that "the UPA does not provide a cause of action for competitive injury claims."[13] 453 P.3d at 438. *GandyDancer* referenced *Bancorp* and "formally disavow[ed] reliance on *Page & Wirtz* or prior New Mexico case law that conflicts with this opinion." *Id*. at 436. This Court therefore concludes that, in the absence of particular exceptions not here at issue, Zia may not bring a competitive injury claim under the UPA. Summary judgment is granted in Tyson's favor on the fifth claim for relief.

### CONCLUSION

For the reasons stated above, Defendants Tyson Foods, Inc., and Tyson Fresh Meats, Inc.'s Motion for Summary Judgment (ECF No. 55) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted with respect to Zia's fifth claim for relief ("Violations of the New Mexico Unfair Practices Act") and denied with respect to all other claims. Summary judgment is hereby **ENTERED** in Defendants' favor on the fifth claim for relief.

Plaintiff Zia Agricultural Consulting, LLC's Motion for Partial Summary Judgment (ECF No. 60) is **DENIED**.

*[signature: Margaret Strickland]*

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE

---

[13] New Mexico's Supreme Court "has determined that there is no significant difference between having standing to sue and having a cause of action under the UPA." *GandyDancer*, 453 P.3d at 438.