1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF NEW MEXICO

3

4
     ZIA AGRICULTURAL CONSULTING,  )
5    LLC.,                         )
                                   )
6                   Plaintiff,     )
                                   )
7              vs.                 )  NO: 20-CV-445 MIS-JHR
                                   )
8    TYSON FRESH MEATS, INC.,      )
                                   )
9                   Defendant.     )

10

11

12                   TRANSCRIPT OF PROCEEDINGS
                            JURY TRIAL
13                       VOLUME I OF IV
         BEFORE THE HONORABLE MARGARET I. STRICKLAND
14            UNITED STATES DISTRICT JUDGE
                   MONDAY, JULY 11, 2022
15                      12:38 P.M.
          LAS CRUCES, DOÑA ANA COUNTY, NEW MEXICO
16

17

18

19

20

21        (Proceedings recorded by machine shorthand and
     transcript produced by Computer-Aided Transcription.)
22
     REPORTED BY:    VANESSA I. ALYCE CHAVEZ, CRR, RPR, NMCCR
23                   Federal Official Court Reporter
                     100 N. Church Street
24                   Las Cruces, NM  88001
                     Phone:  (575) 528-1430
25                   E-mail:  Vanessa_Alyce@nmd.uscourts.gov

```
 1    Appearances of Counsel:

 2
         FOR THE PLAINTIFF:
 3
                   VENABLE, LLP
 4                 101 California St., Ste. 3800
                   San Francisco, CA 94111
 5                 (415) 653-3750
                   BY:  JOHN S. WORDEN, ESQ.
 6                      SARAH E. DIAMOND, ESQ.

 7    Also Present:  Sean Perez, Zia Agricultural Consulting
                      Narciso Perez, Zia Agricultural Consulting
 8                    Zoe Gallagher, Venable, LLP, staff

 9
         FOR THE DEFENDANT:
10
                   MAYER, LLP
11                 9400 Holly Ave. NE, Bldg. 3 St.
                   Albuquerque, NM  87122
12                 (505) 483-1840
                   BY:  BRIAN J. FISHER, ESQ.
13
                   and
14
                   TYSON FOODS
15                 Law Department
                   Global Litigation and Investigations
16                 2200 Don Tyson Pkwy.
                   Springdale, AR  72762
17                 (479) 290-4120
                   BY:  DANIEL GOMEZ, ESQ.
18

19    Also Present:  Robert Scherer, Tyson representative
                      Norma Oliver, Mayer, LLP, staff
20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3   WITNESSES FOR THE PLAINTIFF:              PAGE

 4   NARCISO PEREZ

 5        Direct Examination by Ms. Diamond      54

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (In Open Court at 12:38 P.M.)

2          THE COURT:  Is there anything else you want to

3    bring up before we bring the jurors in?

4          From Zia?

5          MR. WORDEN:  (Indicating.)

6          THE COURT:  Tyson?

7          MR. FISHER:  I have -- I was seeking

8    clarification on the Court's ruling on the invocation of the

9    rule.  Earlier, Mr. Worden indicated he did not want to

10   invoke the rule; I indicated that we did.  And my

11   understanding was the agreement was that the rule was not

12   going to be invoked.  Is that a correct --

13         THE COURT:  I'm sorry.  Zia said they weren't

14   invoking the rule, but Tyson said they were, so the rule is

15   invoked.  I don't have to have consent from both sides, I

16   don't believe.  Just one side can invoke the rule, so yes.

17         MR. FISHER:  I wanted to be sure we were all on

18   the same page.

19         I've got Mr. Hueser here, who is a witness who

20   will be testifying later.  So, with the rule invoked, he

21   would not be able to --

22         THE COURT:  That's right.  All witnesses, other

23   than the party representative, if they are a witness, must

24   wait outside.  If there was an expert witness that was going

25   to listen to testimony and offer opinions about somebody

1    else's testimony, I might allow that, too.  But nobody's

2    brought that up, so I'm assuming that's not true, right?

3              MR. FISHER:  That's correct.  I just wanted to

4    make sure everybody was on the same page.

5              MR. WORDEN:  So Mr. Hueser should wait outside.

6              THE COURT:  Talk in the microphone.  Always.

7              Okay.  Then everybody is on the same page.  And

8    if either side notices anybody here or has questions about

9    who all these people are, I'm happy to inquire if there are

10   people here that somebody thinks might be a witness.

11             MR. FISHER:  The gentleman in the back.

12             MR. WORDEN:  He's not a witness.

13             THE COURT:  Okay.  All right.  He's from -- with

14   Zia and he's not a witness.  Anything else?

15             MR. WORDEN:  Your Honor, since we only have eight

16   jurors, it is possible -- and I'm sure you've thought of

17   this before -- to move the screens in front of the eight.

18   Since we have eight screens...

19             THE COURT:  We're having them sit every other

20   person.

21             COURT CLERK:  We can have them move them.

22             MR. WORDEN:  Yes, but, for example, this screen

23   right here, we can put it right here (indicating).

24             THE COURT:  Oh, so right in front of the person?

25             MR. WORDEN:  And this one is pretty close.

1          THE COURT:  That's above -- I don't know the

2   answer to that question.

3          COURT CLERK:  I can just let them know that they

4   can turn the screen as they come in.  I'm not sure how long

5   the cords are to each one, so....

6          MR. WORDEN:  Very well.  Thank you.

7          THE COURT:  Will that work for you?

8          MR. WORDEN:  Yes.  Thank you.

9          THE COURT:  Okay.  I'm sorry I didn't know the

10  answer to it.

11          I don't know if that whiteboard will be blocking

12  some of the jurors' view of the witness, but...

13          MR. WORDEN:  Yes, I'm putting it there for

14  opening and then we'll move it.

15          THE COURT:  All right.  Sounds good.

16          Anything else from Zia?

17          MR. WORDEN:  No, Your Honor.

18          THE COURT:  Tyson?

19          MR. FISHER:  No, Your Honor.

20          THE COURT:  All right.  Then let's call in the

21  jury.

22          (Discussion off the record.)

23          Mr. Worden, I'm going to give those preliminary

24  instructions first, just so you know.

25          MR. WORDEN:  All right.  I'll have a seat.

1            THE COURT:  Okay.

2                    (Jury present.)

3            Thank you.  You may be seated.

4            Members of the jury, you have now been sworn in

5    as the jury to try this case.  As the judge, I will decide

6    all questions of law and procedure.  As the jury, you are

7    the judges of the facts.

8            At the end of the trial, I will give you guidance

9    on the law and how you will go about reaching your decision,

10   but for now I am going to generally explain how the trial

11   will proceed.

12           First, each side will make an opening statement.

13   Opening statements are not evidence.  They are an outline to

14   help you understand what that party expects the evidence

15   will show.

16           After the opening statements, the plaintiff will

17   present its case through witness testimony and other

18   evidence.  Next, the defendant will have an opportunity to

19   present its case.  The plaintiff may then present rebuttal

20   evidence.

21           After all the evidence is introduced, I will

22   instruct you on the law that applies to this case.  And the

23   attorneys will make closing arguments.

24           Finally, you will go to the jury room to

25   deliberate on your verdict.

1    If you would like to take notes during the trial,
2    you may.  On the other hand, you are not required to take
3    notes.  If you decide to take notes, your notes should be
4    used only as memory aids.  You should first rely on your
5    independent recollection of the evidence.  If you do take
6    notes, leave them in the jury room at night and do not
7    discuss the contents of your notes until you begin
8    deliberations.

9    The court reporter is making a record of
10   everything that is said; however, a typewritten copy of the
11   testimony will not be available for your use during
12   deliberations.  Any exhibits introduced will be available to
13   you during your deliberations.

14   Until this trial is over, do not discuss this
15   case with anyone and do not permit anyone to discuss this
16   case in your presence.  This includes your family and
17   friends.  During your jury service, you must not communicate
18   any information about this case until I accept your verdict
19   or excuse you as a juror.  This includes all forms of
20   communication, in person or otherwise.  Do not even discuss
21   the case with the other jurors until the end of the case
22   when you go into the jury room to deliberate.

23   Do not make any independent investigation of this
24   case.  You must rely solely on what you see and hear in this
25   courtroom.  Do not try to learn anything about the case from

1    any other source.  In particular, you may not use any

2    electronic device or media to research any issue in this

3    case.  Do not visit or view any place discussed in this case

4    and do not use the internet or any other means to search for

5    or view any place discussed in the testimony.

6           You may not research any information about this

7    case, the law, or the people involved until after you have

8    been excused as jurors.  Each of the parties is entitled to

9    a fair trial by an impartial jury.  And if you decide the

10   case based on information not presented in court, you will

11   have denied the parties a fair trial.  In addition, you

12   could cause a mistrial that would require the entire trial

13   to start over.

14          From time to time during the trial, it may become

15   necessary for me to talk with the attorneys out of the

16   hearing of the jury, either by having a conference at the

17   bench while you are still present in the courtroom or by

18   having you leave the courtroom.  I will try to keep these

19   interruptions as few and as brief as possible.  The purpose

20   of these conferences is not to keep relevant information

21   from you, but to decide how certain evidence is to be

22   treated under the rules of evidence and to avoid confusion

23   and error.

24          During the trial, the attorneys may make

25   objections to testimony and evidence.  There are rules of

1   evidence that control what can be received into evidence.

2   If I overrule an objection, the question may be answered or

3   the exhibit received.  If I sustain the objection, the

4   question cannot be answered and the exhibit cannot be

5   received.  Whenever I sustain an objection to a question,

6   you must ignore the question and must not guess at what the

7   answer might have been.  Sometimes I may order that evidence

8   be stricken from the record and that you disregard or ignore

9   that evidence.  That means that when you are deciding the

10  case, you may not consider the evidence for any purpose.

11          It is your duty to find the facts from all the

12  evidence in this case, and you will apply the law I give you

13  to those facts.  You must follow the law, whether you agree

14  with it or not.  And you must not be influenced by any

15  personal likes or dislikes, opinions, prejudices, or

16  sympathy.  That means you must decide this case solely on

17  the evidence before you in court.

18          Please do not read into these instructions or

19  anything that I may say or do to indicate I have any opinion

20  regarding the evidence or what your verdict should be.

21          With that introduction, Zia's attorney may

22  present the opening statement for plaintiff.

23          MR. WORDEN:  Thank you, Your Honor.

24          Doesn't anyone keep their word anymore?

25  Actually, the answer is "yes."  A lot of people keep their

1    word.  Zia does.  And Zia did here.  But the reason you're

2    here this week is because two parties made a promise and

3    only one of them kept it.  This is actually a very simple

4    case.

5            Zia had lost $4 million the last transaction it

6    did with Tyson and it determined it might get out of the

7    cattle business altogether.  They're a family business.  Two

8    of the three employees are sitting here at the table.

9            In the fall of 2018, Bob Scherer of Tyson -- and

10   Mr. Scherer is the gentlemen at the end of the table, of the

11   Tyson table, with a blue blazer, blue tie -- Bob Scherer

12   calls Zia and says, "I've got a big deal lined up with Whole

13   Foods," the specialty and expensive grocer, "but I need

14   natural cattle."  And we'll talk about that a little bit

15   later:  Special kind of cattle; not just conventional

16   cattle, your natural cattle.

17           Narciso Perez here with the glasses, sitting

18   here, he's been working with Tyson for 20 years.  He says,

19   "We can try to help you out on this, but we've got to have a

20   different deal.  We're a small business.  We can't keep

21   losing $4 million.  It wiped us out."  So they have a

22   meeting in Happy, Texas, which is about an hour south of

23   Amarillo, in the middle of the Happy Pastures where Zia has

24   cattle.  During that meeting, Narciso tells Mr. Scherer,

25   "We've got to have a different deal instead of the old deal

1   where we grow the cattle and we turn them over to you.

2   You're going to have to pay the cost going forward for this

3   cattle," and gives him a very detailed proposal.  And I'm

4   going to show you that proposal in a minute.  Mr. Scherer

5   says, "Looks good."  He shakes on it and says, "We have a

6   deal."

7           Narciso says, "All right.  Let me take this and

8   put a fine point on all the numbers."  Zia has never put

9   anything like this together before, down to the head of

10  cattle all over the West.  They send it in an e-mail on

11  February 4th, an e-mail Mr. Scherer has been texting for

12  and e-mailing for:  "Where is it?  Where are the cattle?"

13  And I'm going to show you all those.  Tyson keeps asking,

14  "Where are the cattle?  Hurry up.  We've got this deal."

15  Zia sends the proposal, a very detailed proposal, to

16  Mr. Scherer on February 4th of 2019.  Mr. Scherer

17  responds, "Looks good.  Get it done ASAP..."

18          That's your case.  As you had probably guessed,

19  when the cattle were done months later, Tyson paid a

20  different amount that it wanted to pay, completely ignoring

21  the proposal it accepted when it said, "Looks good," and

22  completely ignoring six different updates that had gone to

23  Mr. Scherer from Zia, updating the movement of the cattle

24  from the pastureland to the feedlot, their growth, their

25  weight, et cetera.

1          After all these natural cattle have reached

2     almost the end of the line, there's nowhere to go.  Tyson is

3     the only business buying this kind of cattle.  After

4     Mr. Scherer is getting the cattle and he gets the first

5     bill, for the first time, he says, and I quote, "I'm not

6     paying."  That's the first time he ever said he's not paying

7     the amount.  He said, "Looks good; get it done ASAP," when

8     he responded to the proposal in writing.

9          There's your case for breach of contract and for

10    a fraudulent promise.  When he knew -- and he'll be the

11    first to testify, when he gets on the witness stand, that he

12    knew all along he was never going to pay that amount.  He

13    said, "Looks good, get it done ASAP," but he knew he

14    wouldn't get the cattle if he didn't say, "Looks good, get

15    it done ASAP."  There's the case.

16          What is Zia?  So Zia is a family-owned business

17    based here in New Mexico; father-and-son business; Narciso

18    here with the glasses and Sean at the end of the table.  At

19    the time of this, they had seven employees.  They only have

20    three now, for reasons that will become apparent as we talk

21    about it for the next three days.  Narciso was born to a

22    cattle family in New Mexico.  He was on the -- he was a

23    rancher as soon as he could walk, growing up on a farm

24    between Ft. Sumner and Vaughn.  He then went to the New

25    Mexico military academy for high school, then went to school

1    here at New Mexico State, where he studied animal science.

2    Narciso's family has been cattle ranching since 1904.  He

3    personally has developed and fed and raised cattle, not just

4    all over the West, all over the world.  In the 1990s, the

5    Mexican government had Narciso personally come live in

6    Mexico to help the Mexican Government help reestablish and

7    repopulate their cattle resources.

8         At the end of the table is his only son, Sean.

9    Narciso always dreamed he would keep this business going for

10   his son, Sean, and his grandson.  Sean grew up here in Las

11   Cruces.  He went to Mesilla Christian High School.  Then he

12   went to school at New Mexico State; studied computer

13   science.  He's more of the numbers and data guy with the

14   business.  His family, cattle ranchers from the area, go

15   back generations.  So both sides of his family are long-time

16   cattle ranchers.

17        Who is Mr. Scherer?  You're going to hear a lot

18   about Mr. Scherer; again, the gentleman at the Tyson table

19   with the blue blazer on.  "Looks good, get it done ASAP."

20   He doesn't just work for Tyson.  He was the director of

21   cattle procurement for Tyson at the relevant times here.

22        You're probably all familiar with Tyson.  Many of

23   the people talked about it earlier this morning.  Tyson is

24   one of the four largest beef producers in the world.  Those

25   four control over 80 percent of the market.  But, in early

1    2019, only Tyson was buying this kind of natural cattle.

2    Tyson people come up generally through two sides of the

3    business:  There is the cattle side, rancher side.

4    Mr. Scherer's predecessors, a gentleman named Bruce Bass and

5    Brad Brandenburg, are some of the best friends Narciso has

6    ever had.  One of them he calls his mentor; taught him all

7    about the cattle industry decades ago.  These people came

8    out through the cattle side, out in the fields, out on the

9    pastures, out on the ranch, looking at cattle.  Mr. Scherer

10   came up through the different side, the carcass or plant

11   side.  Once the cattle are sent to the facility to be

12   processed, that's the side that takes the meat and sends it

13   out to Whole Foods, Albertson's, Sprouts.

14            Right before the relevant time period here,

15   though, Mr. Scherer was demoted from that position.  And I

16   took his deposition in South Dakota.  Depositions are where

17   lawyers get to ask the witnesses questions under oath.  And

18   Mr. Fisher did the same of Sean and Narciso.  And when I was

19   in South Dakota, I asked him a number of questions about

20   this.  Very nice gentleman.  I think we had a good time, but

21   the way this transaction was handled was wrong.

22            Mr. Scherer, just before this, in the year before

23   this transaction we're going to talk about, was demoted from

24   his position and, he's the first to admit, for mismanagement

25   of cattle numbers; too many, too few.  So he's demoted for

1    ten months, right up until October of 2018.

2              (Discussion off the record.)

3              So, as I said, this is actually a pretty simple

4    case.  The whole thing takes place from late 2018 until Bob

5    Scherer says "I'm not paying" in late 2019.

6              In late 2018, prior to this, Zia loses $4 million

7    in the last transaction they have with Mr. Scherer.  He's

8    demoted from his position until October of 2018.  So he's

9    back on the job two months in late 2018 when he calls,

10   texts, e-mails repeatedly Narciso, saying, "I need the

11   cattle.  I need it fast.  I've got a big deal with Whole

12   Foods."  And we now know they did get the cattle.  They did

13   sell the cattle.  They sold it to Whole Foods and they made

14   a nice profit on it.

15             What's special about this cattle is they are

16   natural cattle.  So 98.5 percent of the cattle out there are

17   what's sometimes referred to as "conventional cattle."  The

18   regular old cattle that we're all used to.  Hamburgers,

19   cheeseburgers, steaks are usually the conventional type.

20   But there's this growing market of natural cattle.  The

21   natural cattle have to be raised a certain way.  They have

22   to be fed a vegetarian diet.  They cannot be implanted.  The

23   conventional cattle, at an early age, are implanted with

24   steroids, hormones, and antibiotics that make the growth of

25   this cattle much more predictable and faster and cheaper.

1    The natural cattle, they can't be moved a certain way.  They

2    can't be treated poorly.  There's 25 different requirements.

3    But, if you do it that way, Whole Foods will pay extra for

4    it and they'll charge extra.  And there's no Whole Foods

5    here in town, but it's kind of like a Sprouts, maybe, except

6    even more expensive.  There's one in El Paso.  I don't know

7    if you've ever shopped there, but everything is more

8    expensive, including the natural cattle.  But there's a

9    growing market for that.

10            Here's the problem:  They have to be natural

11   their whole lives.  You can't take a cow that lives for 12

12   to 18 months and implant them and inject them with the

13   antibiotics and steroids and feed them a certain diet and

14   then decide later, "Well, we're going to take the implant

15   out and we're going to call these 'natural.'"  They have to

16   be certified.  It's very technical.  You can't go back.

17            So that's the backdrop of this.  These are cows.

18   All the cows in question -- and there are 9,000 in question,

19   $16 million worth of cattle in question here -- 9,000 head,

20   they all could have been just grown as conventional by Zia.

21   And we now know they would have made more money -- not just

22   more than they were paid, more money than they should have

23   been paid -- but their old friend from Tyson, Mr. Scherer,

24   is begging for the cattle.  No good deed goes unpunished.

25            So, for the last 20 years, Narciso has been doing

1    business with Tyson.  And there are some great people there,

2    people of their word.  They shake their hand, they give

3    their word, that's a deal.  You don't need to have all these

4    charts I'm going to show you and all these proposals.  But

5    those people are retired or left the company.  When

6    Mr. Scherer took over the position, the last transaction

7    they had with Mr. Scherer, the cattle were ready to go to

8    the feedlot where, you know, they grow even further for

9    four months.  Mr. Scherer promised to take them in

10   four months.  He left them there for a year.  He left them

11   there for 12 months.

12           And there's no place else to send these cows.

13   Tyson is the market.  You heard earlier this morning that

14   Tyson contends in this case they paid fair market value.

15   They're the market.  They're the entire natural cattle

16   market in 2019.  When they say "fair market value," they

17   mean the amount Tyson is willing to pay.

18           So, anyway, that last deal, the cattle sit there

19   for months.  Who cares?  What difference does it make?

20   Here's what matters:  First of all, it matters for those who

21   consume beef because cattle just get fatter and fatter.  It

22   tastes bad.  Nobody wants to buy it.  Nobody wants to pay

23   for it.  They have a higher fat content.  Two, somebody's

24   got to pay for that.  Under the old arrangements, Zia was

25   paying $5 to $10 a day per head for feed, water.  And it's a

1    lot.  It's not a little bit.  It's a lot of water for these

2    cattle.  Zia had a margin of about $100 a head.  So if you

3    spend eight months longer than you're supposed to, raising

4    cattle, you can lose a lot of money.

5            Now, the predecessors of Mr. Scherer, if they

6    said they were going to take cattle in four months, they

7    took the cattle in four months, whether they needed cattle

8    in four months or not.  Why?  Because they gave him their

9    word.  But things have changed.

10           So we reach the fall of 2018.  Narciso is very

11   clear when Mr. Scherer reaching out to him, "We're not going

12   to do the old deal where we raise the cattle, we take care

13   of them for 12 to 18 months or however long it takes, and

14   then you decide to take them whenever you want and pay us

15   whatever you want.  We've got to have a deal up front where

16   you pay the cost of the feeding of the cattle."  So they

17   proposed -- Zia proposed what's called a "cost plus

18   arrangement."  And the title is appropriate.  Tyson will pay

19   the cost, plus a premium of $125 a head, for certain types

20   of natural cattle.  And we'll spend a whole lot of time on

21   what the differences were.

22           Where does Narciso get the idea to do a cost

23   plus?  He gets it from Tyson, a gentleman who I think is

24   going to testify for Tyson later this week, a gentleman

25   named Kevin Hueser, old friend of Narciso's.  Narciso spends

1    three nights at Kevin Hueser's house in South Dakota, right

2    before this.  And Mr. Hueser of Tyson tells him -- Narciso

3    shares, "We're having a lot of difficulty.  We're raising

4    the cattle.  If Tyson doesn't pick it up, we're losing our

5    shirts on this."  Mr. Hueser says, "You ought to go to a

6    cost plus.  We're doing a lot of the cost pluses these days,

7    especially for the natural cattle going to Whole Foods."

8         So Narciso comes back, he gets with Sean -- they

9    have seven or eight employees at the time -- everybody

10   mobilizes for weeks to put together a proposal.  And I'll

11   show you, here it is (indicating).  I don't expect y'all to

12   read this right now, but we will go over this in great

13   detail.  They have a draft of this proposal, but Narciso

14   says, "Mr. Scherer, we've got to meet where some of the cows

15   are.  We've got to talk about this."

16        Now, Narciso spends his entire life out on the

17   ranch.  These predecessors, Bruce Bass, Brad Brandenburg,

18   like Narciso, those type of people, were out on the ranch.

19   That was not Mr. Scherer's thing.  He was not one who would

20   normally go out and visit the cattle.  Those other names I

21   mentioned?  They've been in Zia's offices, in New Mexico, a

22   hundred times.  Mr. Scherer never has been.  But Narciso

23   insists, "We've got to spend the day talking about this."

24        So they meet in Happy, Texas.  It's really not

25   easy to get to.  It's maybe an hour south of Amarillo.  And

1    then, from there, you drive to the Happy Pastures where some

2    of the -- some -- some of the cattle are located.  And they

3    spend a day together going over this proposal.  They meet at

4    a particular meeting spot, and Narciso hands this chart to

5    Bob Scherer, who puts it on his lap and it sits there for

6    the next several hours.  They drive around; they look at

7    cattle, while Narciso goes through this.  Here's how it

8    works.  The name of the ranch here -- we're not going to

9    look at all of this yet, but we will at some point -- the

10   location, the gender, the number of head, the estimated

11   weight; whether the cows are picked up in April, May, or

12   June.  So, if Tyson, like the last time, wants to let them

13   sit longer or get them earlier, okay, it's their call;

14   they're paying the costs.  The last nine columns are the

15   costs, estimated costs, for the cattle.  It's really just

16   three different sets of costs, the same costs put

17   differently.

18            So -- and, again, in Happy, Texas, it was a draft

19   of this, but it had the cost based on total costs, net --

20   gross costs.  The next three columns were total cost per

21   head calculated.  And then the last three were total cost

22   per pound.  Same cattle, same numbers, same location, but

23   depending on whether it was easier for Tyson to read it

24   based on head, pound, et cetera, they put it together.

25            Now, they put together a draft.  And they spent

1    the day traveling around the Happy Pastures in Happy, Texas,

2    together.  They decide to go to lunch.  Well, Narciso knows

3    that Bob Scherer likes chicken fried steak.  And Narciso

4    knows that the best chicken fried steak around is in that

5    area.  So they go to lunch.  They're in lunch for an hour

6    and a half.  What does Mr. Scherer bring in to lunch with

7    him?  A notebook and that proposal.

8         They drive around more.  They meet back at the

9    pickups at the end of the day, and Narciso says, "If you

10   don't want to do this, that's fine.  We'll just implant them

11   or do something else with them.  But we can't grow these

12   cows for months and then have you decide not to take them

13   and have you decide to pay what you want to pay.  We've got

14   to have a proposal, and you've got to agree to it."  So then

15   they meet at the end of the day.  Narciso and Bob are

16   standing by their trucks, and he says to him, "Do we have a

17   deal?"  And Bob says, "We have a deal."  And they shake on

18   it.

19        Now, that would have been good enough with the

20   old people in that position.  But having gone through what

21   they went through the last couple deals they did with

22   Mr. Scherer, they wanted to go one step further and have a

23   specific proposal.

24        So, Ms. Gallagher, can you please put up

25   Exhibit 10.


UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1          So for the next three weeks, they fine-tune every

2    one of those numbers.  So here's Number 10.  And this is on

3    January 16 where Mr. Scherer thanks Narciso for showing him

4    the cattle two days earlier on January 14th.

5          And then Number 12, please, Ms. Gallagher.

6          And Mr. Scherer continues to send e-mails like

7    this.  "Did you start moving cattle off wheat?  Need them in

8    the feedyard."

9          How about Number 13?

10          "Let me know when they start delivering."

11          Number 14.

12          Narciso keeps responding, "Hold on, hold on,

13    we're not going to just go down this road until we get you

14    to sign off on this proposal.  We're just finalizing, just

15    putting a fine point on each of these numbers."

16          In response to that, Mr. Scherer says, "I would

17    agree" -- he's already said he agreed in principle; he shook

18    on it in Happy, Texas.  "I would agree.  Just need them in

19    the yard to put them on the books."

20          And then, on January 28th, the next one,

21    Number 16, "Any movement of the cattle heading north?"

22          All right.  So now, please go to Number 17.  So

23    this agreement right here is finally finalized.  This is the

24    version sent in an e-mail on February 4th.

25          I'm having trouble with this today.  There we go.

1    Thank you.

2            So, on February 4th, again this is Gmail.  I

3    know we're used to seeing the more recent one up above, but,

4    in Gmail, sometimes it's the other way around.  On

5    February 4th, Narciso e-mails exactly this chart, the

6    draft of which they had seen and shook on in Happy, Texas.

7    And Narciso says, "Bob, look this over and let's talk.

8    Sorry, I have a busy day.  It's Tony's birthday and he went

9    snowboarding."

10           Mr. Scherer's response, the entirety of his

11   response:  "This looks good.  Get them in a finish yard

12   ASAP..."

13           And if you look:  "Cost plus model."  It's called

14   "cost plus model."  And you're going to see that seven more

15   times.  This is the cost plus model that Mr. Scherer admits

16   was attached, which he reviewed, and which he looked at on

17   February 4th when he responded, "This looks good.  Get

18   them in a finish yard ASAP..."

19           So, Ms. Gallagher, can you put the chart on,

20   please.  Let's just blow up the top line.

21           Again, I'm not going to put everyone completely

22   to sleep by going over the whole chart, but I just want to

23   give you a flavor for the detail here.  And it should be

24   blown up in front of you.

25           For all the cattle, every single one of them, the

1   top line:  Stormy Burch Ranch.  Location, Bullinger.  Sex:

2   Steer.  Estimated remaining head:  97.  And then, for each

3   one, the estimated weight, when they'll be ready for Tyson

4   to pick up.  Now, keep in mind, they're not the conventional

5   cattle.  These are not robots.  There's not centuries of

6   science and research.  This is a new breed.  They don't

7   grow, necessarily, like the conventional cattle do.  And

8   then, in the blue, total cost; total cost if they pick them

9   up in April or if they pick them up in May or if they pick

10  them up in June.  That's the total gross cost.  But, if

11  you'd rather see cost per head, we've got the same chart:

12  April, May, June.  If you'd rather see cost per pound, same

13  chart:  April, May, June.  That's for every one of these

14  cows at every one of these ranches, every location.

15          He responds, as I said, to this proposal, "Looks

16  good.  Get it done ASAP."  He knows full well, if he doesn't

17  say "Looks good, get it done ASAP," he's not getting any of

18  these cattle.  And that would have been fine.  Zia would

19  have made more money doing something else with them, we now

20  know.  He could have said, "No."  He could have said, "The

21  numbers look good.  I don't like the price," in which case

22  he either wouldn't have got the cattle or they could have

23  talked about it.  But he knows full well, if he doesn't

24  agree on it, he's not getting any of these cattle.

25          I asked him in his deposition, "What did you mean

1    when you said 'looks good'"?  And here's what he said:  He

2    said he meant Column 5 looks good, the numbers.  Zia's seven

3    or eight employees spend weeks putting this together, all

4    hands on deck and, according to Mr. Scherer, all he looked

5    at in Happy, Texas, and when he said "looks good" was this

6    one column.  All the rest of this work that's -- "Zia can

7    worry about that.  We're Tyson.  We need these cattle.

8    We'll take them now and we'll worry about it later."  Tyson

9    could afford for this to go south.  Zia couldn't.

10          So what happens then?  Now, we have a deal.

11   They've got a proposal in writing.  They've responded in

12   writing.  So either Mr. Scherer or a representative of his

13   visited every single location on that chart to take a look

14   at the cattle.  Doesn't sound like somebody who doesn't

15   think there's a deal.  Personally visits every single one of

16   them, or its representative does.  Two weeks later --

17   Ms. Gallagher, can you put up 33, please.

18          Two weeks later and every two weeks, an e-mail

19   from Zia entitled "cost plus model updated" or "corrected,"

20   is sent to Mr. Scherer.

21          And next page, please.

22          In the next page, we have our chart again,

23   updated, only based on movement of the cattle.  There might

24   be cattle that have moved from a ranch to a feedlot.  So

25   does Mr. Scherer respond, "Wait a minute.  I just noticed

1    this says 'cost plus agreement'"?  Mr. Scherer told me in

2    his deposition he never would agree to a cost plus.  Did he

3    respond or call Narciso, "Wait a minute.  There's been a

4    misunderstanding.  I didn't agree to any cost plus"?  Did he

5    text?  Did he e-mail?  No, he didn't do any of those things.

6    He admits he read it and he responded with questions about

7    where some of the cattle are located.

8         Ms. Gallagher, can we go to 135.  I'm not going

9    to make you look at all of these right now.  We'll just look

10   at some of them.

11        Now we're into March.  Narciso e-mails Bob

12   Scherer March 4th, cost plus update, chart updated.  Again,

13   Mr. Scherer admitted in his deposition, and I'm sure he'll

14   admit today under oath, he got them; he reviewed them.  How

15   does he respond?  Does he say, "Wait a minute.

16   Misunderstanding"?

17        Exhibit 28, please.

18        He responds later that day, after he looks at

19   some of the cattle, saying, "Damn good cattle."  He doesn't

20   say, "Damn good cattle, but we need to talk about the

21   price."  You're not going to see one e-mail from Mr. Scherer

22   disputing the price or talking about the price other than

23   him saying "Looks good, get it done ASAP."

24        Let's see Exhibit 146, please.  This is the

25   April 18th update to Mr. Scherer and his boss.

1           Let's look at Exhibit 31.  This is on

2    March 10th.  The e-mail attached is the updated cost plus

3    model, attaching cost plus model updates, which Narciso

4    forwards to Mr. Scherer.  Do we get an objection?  No.  We

5    don't get anything like that.  Just yet.  But there's a big

6    plot twist coming.

7           Let's see the next one, please.  This is the cost

8    plus update on May 22nd.  This is the sixth or

9    seventh cost plus update, attaching the same cost plus model

10   sent to Mr. Scherer, but here's what's different about this:

11   In the first line, Mike Rogers of Zia says, "Attached is the

12   cost plus model," but he also says -- starts talking about

13   cattle being ready to be sacrificed.  "The cattle are ready

14   to go."  At least some of them are, if Tyson wants to pick

15   them up.  They also attach the first bill for the care and

16   feeding of the cows.

17          So, at this point, imagine -- imagine a landowner

18   reaches out to someone and says, "I'd like you to build a

19   house on my property."  And then they do and, when the house

20   is constructed, then the owner pays $4 million less than

21   they promised to pay.  And then imagine the homeowner -- the

22   property owner comes back to the builder and says, "I'd like

23   you to build another one for me."  And the builder says,

24   "Okay.  This time, we've got to have a proposal in writing."

25   And the builder gives a proposal and the landowner says,

1    "Good."  And every two weeks gives an update, "We just

2    finished the basement; first floor; finished the outside of

3    the first floor; we just finished the second floor."  To

4    every one of them, the landowner gets the proposal and

5    responds encouragingly, "Hurry up."  And then, finally, the

6    builder says, "The house is done.  Here's the bill."

7              And that's where we are.  Long history:  Happy,

8    Texas; e-mail saying "I'll agree"; February 4th, "Looks

9    good, get it done ASAP"; update; update; update; update;

10   e-mail, "The cattle are about ready.  Here's the bill"; big

11   plot twist coming here.

12             Please put Exhibit 51 up.

13             And to that, for the first time, when the cattle

14   are almost done and there's no market elsewhere, they can

15   only go to Zia [sic], they've only been raised -- excuse me,

16   they can only go to Tyson, they've only been raised as

17   natural for Tyson, Mr. Scherer's response is, "I'm not

18   paying the cost of your calves.  I'm not paying to raise

19   your calves.  That's not what we do."  He could have said

20   that in Texas when they spent the day driving around with

21   this proposal on his lap and at lunch taking notes about it.

22   He could have said it in February.  He could have said that

23   in response to any of these updates, but he waits until the

24   cattle are done.  Despite everything you've seen, Tyson

25   contends that's not a contract.  They contend there's a

1    different contract.

2         So I asked Mr. Scherer, "What was the contract?"

3    He says, "We were agreeing to pay pursuant to the Nebraska

4    weighted average," which is one of multiple different ways

5    to calculate the cost of conventional -- not premium, not

6    natural -- conventional cattle.  He said, "We always pay

7    everyone exactly the same and we pay it off in Nebraska

8    weighted average."  And that's not even close to being true.

9    They have 200 different Zias they do business with.  And I

10   hope not to put everyone to sleep during this trial, but I

11   might show it anyway:  There's a chart, and he keeps track

12   of everyone, and they're all different.  Sometimes it's

13   Nebraska weighted average, sometimes it's 150, sometimes

14   it's 200, sometimes it's 300, sometimes it's the Chicago

15   Mercantile Exchange, and sometimes it's a cost plus

16   agreement.  But the theory that this contract that wasn't

17   discussed at any of these, that's somehow the contract

18   controlling; that's what his testimony was.

19        So I asked him, "How did Zia ever agree to that?"

20   And he says he telephoned Narciso in April of 2018 and he

21   had a call with Narciso saying, "If we do business in the

22   future, I'm going to pay you according to the Nebraska

23   weighted average."  And that phone call never took place.

24   We've asked for records of all these phone calls, e-mails,

25   texts.  You're not going to see any of them.  Moreover, he

1    was demoted during that period.  He wasn't head of

2    procurement at that time.  If he did have that call in

3    April, what about all this?  This call that nobody has a

4    record of that wouldn't have taken place anyway, that's your

5    contract?  And this isn't?  (Indicating.)  Well, you'll get

6    to decide which version of that makes sense.

7            So the cattle are ready.  Now, you might be led

8    to believe that since they don't agree with any of this,

9    they didn't take the cattle.  They took almost all of it.

10   They only stopped briefly when Mr. Scherer, since Narciso

11   was making a stink about not getting paid correctly, stopped

12   taking cattle.  And he only started taking it again after

13   someone at the Tyson legal department told him, "If you keep

14   retaliating, it's just going to make it worse."  Other than

15   that, they took almost all the cattle.  And then they turned

16   around and sold it to Whole Foods.  For how much of a

17   markup?  I don't know.  They hired an expert witness who is

18   coming to testify, that they're paying to testify; they

19   wouldn't tell him, either.

20           Assuming we're Tyson:  "The last deals we've done

21   with Zia, the last couple deals, they just took it.  They

22   just put up with it.  We bullied them and they just put up

23   with it," expecting never would a little New Mexico family

24   business push back against one of the biggest companies in

25   the world.  But here we are.

1        So who will testify?  So, first, you're going to

2   hear from Narciso Perez.  As soon as Mr. Fisher finishes his

3   opening, he's going to testify.  And then I'm going to call

4   Mr. Scherer.  I want you to hear, immediately after Narciso,

5   Mr. Scherer explain how none of this is a contract but, some

6   phone call a year beforehand, that was the binding contract.

7        And then you're going to hear from Sean Perez at

8   the end of the table.

9        And then you may hear -- it's up to Mr. Fisher.

10  You may hear from Kevin Hueser, who is the Tyson person who

11  Narciso has known forever.  Mr. Hueser's son -- nephew,

12  Narciso gave him an internship at Zia.

13        And then you're going to hear from a guy named

14  Dr. Benavidez.  I don't know at this point -- we'll ask how

15  much, but I'm estimating they've paid him in excess of

16  $20,000 to testify.  He's the only one being paid to

17  testify.  He's had nothing to do with the underlying issues.

18  He had nothing to do with this transaction; never even heard

19  of Zia before this.  But I really like Dr. Benavidez and I'm

20  going to question him a lot.  And he's going to say a lot of

21  things I think you're going to like about how the business

22  works.

23        THE COURT:  Mr. Worden, you have about

24  five minutes left.

25        MR. WORDEN:  Okay.  Good.  Thank you.

1           Dr. Benavidez' primary opinion:  First, he's not

2    going to give an opinion on what the contract was in this

3    case.  He wasn't allowed to do that.  He's going to give an

4    opinion that it would have been in Tyson's best interest not

5    to do a cost plus.  It would have been in their best

6    interest to pay some other better number for them.  Which I

7    really like Dr. Benavidez, but, this particular opinion, I'm

8    not sure we need that.

9           If I go down and try to sell my car on Boutz

10   Road, the car dealer -- we don't need an expert to tell us

11   that it's in the dealer's best interest to pay me as little

12   as possible and it's in their best interest to turn around

13   and sell it for as much as possible.  So when he testifies

14   it would have been in Tyson's best interest to pay us as

15   little as possible and sell our cattle to Whole Foods for as

16   much as possible, I think we can all figure that out.  But I

17   think he's great with the other things he has to say.

18          He's going to say natural cattle are much more

19   unpredictable.  He's going to say, when they're ready to go,

20   they've got to be picked up.  If they're not picked up,

21   overfeeding the cattle, like happened the last time, is the

22   worst thing you can do.  You can't just not feed the cattle.

23   So you keep feeding them; they get fatter and fatter and too

24   fat.  The beef tastes lousy for the consumer, and it costs

25   money for someone like Zia.  He's going to confirm that

1   Mr. Scherer desperately needed the cattle for Whole Foods

2   and chased Narciso all around the Southwest to get the

3   cattle for Whole Foods.  He's going to say the parties in

4   the industry, the Zias and Tysons, are fully within their

5   rights to enter whatever contracts they want to make,

6   including a cost plus agreement.

7           He's not a cattleman, other than when, literally,

8   as a young child, he had a few head on a family property.

9   But he's very knowledgeable about the economics.  And so,

10  when I asked him in his deposition, "What was the market

11  like in early 2019?" he's going to say that, for the Big

12  Four -- Tyson, Cargill, the others -- the market was as good

13  as it had been in years; kept going up and up.  Their

14  margins, what they were getting paid by Whole Foods,

15  Albertson's, et cetera, was as good as it had been, but, for

16  the ranchers, the Zias, it was as bad as it had been

17  in years.

18          So you have a mark like this (indicating).  So if

19  you're Zia and you're down here, or the other 200 ranchers

20  Tyson works with, Dr. Benavidez will be the first one to say

21  they're either going to stop raising cattle or they have to

22  have an incentive.  And he's going to say -- what's the

23  incentive?  It's obviously price.  Otherwise, the Tysons of

24  the world have all the control and the Zias have none.

25          So I know I'm getting close on time and I promise

1    I will finish on time.

2              Ms. Gallagher, can you put this up, please.

3              So here's what the case is about:  The actual

4    cost, out-of-pocket costs, were $15,270,173 to Zia.  They

5    were supposed to get premiums of $125 per head or $100 per

6    head depending on the different kind of natural cattle.

7    We'll talk about that more later.  They should have received

8    16.2 million.  At the bottom of the box, at the bottom of

9    this, (indicating), the estimated total costs for 9,000 head

10   is 16.3.  Zia beat the estimate by 100,000 and saved that

11   money for Tyson.  They should have been paid $16,220,000.

12   The amount Tyson paid:  $12,595,000.

13             Now, Zia turned around, when Mr. Scherer stopped

14   taking cattle for a while to teach Zia a lesson, they sold

15   some of those cattle as conventional elsewhere.  So they

16   actually retained $13,647,000 total.  You compare that

17   against the 16.2 million, it's $2,573,000 they should have

18   been paid, if Zia [sic] had just paid them the amount they

19   promised to pay when they said, "It looks good."

20             So part of this case is breach of contract.  And

21   you'll have to decide whether all of that makes sense.

22   That's the contract (indicating) or this phone call that

23   supposedly took place a year before.

24             But it's not just that.  This is also a fraud

25   case.  Tyson and Mr. Scherer knew full well he was not going

1    to get the cattle from Zia unless he agreed.  And he could

2    have said "no," but he knew, if he said "yes," he'd get the

3    cattle, and Zia would be stuck.  And he told Zia three days

4    after Zia said the cattle are ready and sent the first bill.

5    That is devastating for this 118-year-old ranching family.

6         So I'm not just going to ask for the $2,543,000

7    [sic].  At the end of this case, I'm going to ask several

8    times that for punitive damages, so that this doesn't happen

9    to Zia or the other 200 ranchers that work with Tyson or

10   anyone else again.

11        Thank you.

12        THE COURT:  All right.  Thank you, Mr. Worden.

13        And Mr. Fisher, or whoever for Tyson.

14        MR. FISHER:  Thank you, Your Honor.

15        THE COURT:  Go ahead.

16            (Discussion off the record.)

17        MR. FISHER:  Good afternoon, ladies and

18   gentlemen.  We are here today -- as you've gathered from

19   jury selection, from Mr. Worden's comments, we're here over

20   a dispute.  We're here over a business dispute.  You are

21   here in a very special role today.  You're here to listen to

22   the testimony of the witnesses that are going to speak.

23   You're here to review the documents that are available here

24   for you to look over that these witnesses are going to talk

25   about.  You're here to consider the evidence that's going to

1   be presented both when Zia puts on their case, as well as

2   when my client puts on their case.

3           On behalf of my client, on behalf of myself and

4   my co-counsel, we appreciate the sacrifices that all eight

5   of you have undertaken to be here to serve as jurors in this

6   trial.  And I want to make you a promise.  I want to make

7   you a promise right now:  I'm aware of your sacrifices.  I'm

8   aware you have jobs and I'm aware you have families.  I'm

9   aware you've got other things to do besides being here.  But

10  we're asking you to be here to finally put an end to this

11  dispute that's been going on for years.  And so my promise

12  to you is, on behalf of Tyson, I'm going to present the

13  evidence to you as quickly and as efficiently as I can.  I'm

14  not going to waste your time, and I'm going to start right

15  here in this opening statement.

16          Ladies and gentlemen, my client has asked me to

17  get up there, be succinct, get the point out.  I'm not going

18  to spend 45 minutes with you, telling you what I expect that

19  you're going to see in evidence.  I don't have

20  demonstratives to go over with you.  I don't have a

21  whiteboard to use with you.  I'm going to ask you to

22  remember four things as you hear the testimony today.  I

23  intend to fulfill that promise to you, to put on, on behalf

24  of Tyson, a succinct case that gives you the information

25  that you need to make a decision on this business dispute.

38

1    Zia's counsel has spent 45 minutes explaining to you what he

2    believes that the evidence is going to show here.  Tyson has

3    asked me to get through that.  Let's start with that

4    evidence, let's get Mr. Perez on the stand, and let's get

5    going.  And that's what I intend to do today.

6           There are two sides to every story.  You might

7    remember I brought that up when we were in jury selection

8    when y'all were sitting over there (indicating).  I told you

9    that you are going to hear from the plaintiffs first every

10   time.  No different here in opening.  I'm going to ask you

11   again, in exchange for my promise to you to put on this

12   evidence as efficiently as possible, that I have your

13   complete attention.  I asked you during jury selection, you

14   know, were there any of you who couldn't wait to hear both

15   sides of the story before you came to a decision.  Nobody

16   raised their hand.  Everybody said, "Yes, this is something

17   that we can do."  I want you to hold me to the promise of

18   getting this evidence to you as quickly and as efficiently

19   as possible and, in turn, I'm going to ask the same of you;

20   that you listen to Zia's case, because they're going to come

21   first but, before you make any decisions, before you hold

22   any judgments, that you give my client, Tyson, an

23   opportunity to respond.  Because they have a response.  They

24   have a lot of responses.  Like I said, there's two sides to

25   every story, and you're going to hear that.

100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

 1              One thing we can agree on is that we are here

 2    about cattle, and these are special cattle that we're here

 3    about.  My client, Tyson, is in the business of processing,

 4    packing, and supplying consumers in the United States with

 5    the products they're looking for.  They're supplying them

 6    with the steaks that are in your freezer.  And, to do that,

 7    they have to rely on companies, companies such as Zia

 8    Consulting, to follow through on what they promise.  They

 9    have to rely on Zia Consulting to make sure that when they

10    say "I'm going to have a thousand head to you on this date"

11    that those cattle come on that date and they come at the

12    weight promised and that they come in the number promised.

13    And I think the evidence will show you-all that that was

14    something that wasn't happening time and time and time

15    again.

16              You're going to hear some terminology over the

17    next couple of days here at this trial.  You're going to

18    hear some terms that you probably haven't heard before.  I

19    hadn't heard them before this litigation.  You're going to

20    hear terms like "NHTC," which refers to "Non-Hormone Treated

21    Cattle."  You're going to hear terms like "GAP," which

22    refers to the "Global Animal Partnership."  You're going to

23    hear about "natural beef."  You're going to hear about

24    "premium cattle."  I want you to be aware that you're not

25    hearing these terms from us because we're trying to confuse

1    the issue.  We're not throwing these terms out there to

2    trick you.  These are simply terms of art in the cattle

3    industry.  These are simply terms of art in the world of

4    beef.  We ask that you listen carefully to the witnesses

5    that are talking about these and other terms to you as they

6    explain to you Zia's side of the story.  And then, again, I

7    ask that you wait and listen to my client's side of the

8    story.

9           I know Mr. Worden went through quite a few

10   demonstratives with you, he went through some e-mails with

11   you, he went through some charts, a time line that they came

12   up with, but there's one thing that I would like for you to

13   focus on during this trial, and it's this right here:  This

14   is what you'll hear referred to as the "cost plus mandate,"

15   the "cost plus model," the "cost plus deal."  One thing you

16   will never hear or see anyone from Zia Consulting refer to

17   it to Tyson as -- as the "cost plus contract."  And that's

18   because the evidence is going to show, when it comes out,

19   that this isn't a contract, not by a long shot.

20          What's been put together here -- and I'll tell

21   you just from the opening statement that Tyson has severe

22   disagreements with what was represented to you in the

23   opening statements regarding this spreadsheet right here.

24   What this spreadsheet represents is a massive deviation from

25   the way business had been conducted between my client,

1    Tyson, and Zia Consulting over the course of almost

2    20 years.  These companies have done work together for two

3    decades before this contract, this alleged agreement, this

4    alleged cost plus deal, came about.  20 years, two decades,

5    of work between these two parties.  This one document

6    represents something that had never even been considered by

7    the parties before.  This document -- you will hear no

8    testimony from Tyson that this document was something that

9    had ever been considered before.  You will hear no testimony

10   from Tyson that this document represents any deal that they

11   have with any of their other suppliers.  And we're talking

12   hundreds of other suppliers.  This is a significant

13   deviation and it's certainly not a contract.  And we believe

14   the evidence, once you hear the testimony from the

15   witnesses, once you have a look at all the documents, once

16   we go through a lot of these e-mails -- and, again, you've

17   seen a couple of the e-mails, you've seen a couple of the

18   texts, but there's a lot more, there's a lot bigger picture

19   that needs to unfold here.

20          I told you there were four things I wanted you to

21   remember.  These are four easy things I want you to remember

22   as you're hearing the evidence, as you're hearing these

23   witnesses, as you're reviewing these documents.

24          The burden is on Zia Consulting to prove to you,

25   as the jury, that a contract existed here.  This isn't

1    Tyson's burden to disprove the existence of a contract.

2    It's Zia's burden to convince you that they entered into a

3    contract.  We don't believe they can do it.

4            Making a contract is like baking a cake.  You

5    need ingredients.  If you don't have all the ingredients,

6    your cake's not going to come together.  It's the same thing

7    with a contract.  If you don't have the elements of that

8    contract, if you don't have the ingredients, that contract's

9    not going to come together; it's not enforceable and it's

10   not legal.

11           In New Mexico, for a contract to exist, there are

12   specifically four things that you need to be looking for.

13   And as you're listening to this witness testimony, as you're

14   reviewing these documents, as you're looking at these

15   e-mails, I want you to keep those four things in the back of

16   your minds, and I want you to be listening for what evidence

17   either supports or doesn't support the existence of those

18   four elements.  And I predict that, after you've heard the

19   testimony, after you've reviewed the documents, after you've

20   looked at these e-mails, you're not going to see those.

21   You're not going to see those elements.  You're not going to

22   see those ingredients.

23           Number 1 -- and this is -- this is law school,

24   first semester of law school:  Contracts.  To have a

25   contract, the first thing you've got to have is you have to

1    have an offer.  And to have an offer, under New Mexico law,

2    the terms of that offer have to be reasonably certain.

3            Here, my client expects that, once you hear the

4    evidence, once you hear the testimony, you're going to hear

5    that over three years have passed since that e-mail that

6    Mr. Worden popped up on the screen for you from

7    February 4th of 2019 where Mr. Narciso Perez sent an

8    e-mail to Mr. Scherer with this spreadsheet attached.  Tyson

9    believes that many of the terms that Zia is now here trying

10   to convince you, ladies and gentlemen of the jury, are in

11   existence and Tyson should be held accountable for are

12   actually still uncertain.

13           We expect the evidence will be presented from Zia

14   Consulting that an offer was presented to Tyson in the form

15   of this e-mail spreadsheet attachment.  We further expect

16   that you will be shown and you'll hear testimony about this

17   spreadsheet time and time again.  As I mentioned, it will be

18   called different things -- "cost plus mandate, cost plus

19   model, cost plus deal" -- but, again, you won't see any

20   e-mail from Zia to Tyson with the term "cost plus contract."

21           You can expect to hear testimony from

22   Mr. Scherer, the gentleman in the sport coat at the end of

23   the table where I'm sitting.  You were introduced to him

24   during jury selection.  He's the Associate Director of

25   Cattle Procurement for Tyson.  Mr. Scherer will go through

1    each and every column and each and every -- discuss with you

2    the rows on the spreadsheet and what those represent.  And

3    he will explain to you, during his testimony, what's missing

4    here.  There's a lot of numbers that Zia threw up on this

5    spreadsheet with the assistance of a third party who wasn't

6    Tyson.  There's a lot of numbers there; Tyson admits that.

7    However, Mr. Scherer's going to explain to you why the vast

8    majority of those numbers are completely irrelevant.

9           You're going to hear testimony as well from

10   Mr. Scherer's boss, Kevin Hueser, from Tyson Fresh Meats.

11   Mr. Hueser is going to testify further to the lack of

12   clarity of exactly what in the world Zia is offering here,

13   because it's certainly not clear from this spreadsheet and

14   it's even less clear from the e-mail that it was attached

15   to.

16          Finally, we expect that you will hear from

17   Dr. Justin Benavidez.  Dr. Benavidez is a rancher.  That's

18   his family business.  He grew up on a ranch.  He went to

19   Texas A&M University and got his doctorate degree.  And now

20   he goes around West Texas and helps other ranchers with

21   issues that they're having in their business.  We asked

22   Dr. Benavidez to discuss this with us.  Zia's counsel has

23   already indicated the questions he's going to ask of him,

24   but I'm going to ask you to wait to hear from Dr. Benavidez,

25   himself.  He's likely going to be the last witness you hear

1    from at trial.

2            So, again, I can't stress this enough, there's

3    two sides to every story.  We're going to ask you to listen

4    to all of these witnesses before you reach a conclusion.

5            In addition to the three witnesses I've just

6    talked to you about, we believe you're going to hear

7    evidence and you're going to see evidence in the form of

8    e-mails and other documents over the course of the next

9    few days that Zia Consulting wasn't even sure what they were

10   offering.  We expect to see e-mail communications from Zia

11   Consulting.  They're completely rife with uncertainty as to

12   the terms of what they're alleging now that they offered to

13   Tyson.  We believe that once you see those e-mails, once you

14   hear the testimony, it will be abundantly clear that Zia

15   Consulting, the supposedly offering party here to this

16   alleged contract, didn't even have the most basic

17   understanding of some of the essential terms that they are

18   now going to ask you, as the ladies and gentlemen of the

19   jury, to hold Tyson accountable to.

20           As I mentioned when I first started talking to

21   you about Ingredient Number 1 of a contract, that offer, the

22   terms have to be certain for a valid offer to exist.  With

23   the level uncertainty of the terms of this alleged offer

24   that Zia stuck in an e-mail to Bob on February 4th of

25   2019, we believe the evidence will clearly demonstrate that

1    a valid offer was never made.

2              Element 2, the second element you have to have,

3    once you have an offer, you have to have an acceptance.

4    Again, this is very basic contracts.  For a valid acceptance

5    to have occurred, in New Mexico, a party has to express

6    acceptance of all of the terms of an offer.  So the

7    intention of the party to accept the offer and every part

8    thereof have to be set and have to be definite.  On Element

9    Number 2, we believe the evidence will show that -- you

10   know, first of all, as I've gone over with you on the offer,

11   we believe the evidence is going to show that the terms of

12   that offer are anything but definite.  How can you have a

13   valid acceptance to an offer when the terms aren't there?

14   It simply can't occur.

15             Over the next few days, you're going to hear

16   testimony, again, from Mr. Scherer that literally none of

17   the terms of this cost plus spreadsheet were ever accepted

18   by him, much less anybody else at Tyson.  We further expect

19   you'll hear testimony and view e-mails from Zia's own

20   representatives, including Narciso Perez and Sean Perez,

21   suggesting a complete lack of acceptance.  And you'll see

22   those both directly and indirectly.  We believe that this

23   evidence will include e-mail communications between

24   representatives of Zia Consulting and both representatives

25   of Tyson, as well as the representatives of the third party

1    who helped Zia put this together.  We believe these e-mails

2    will leave you with little doubt, at all, that not only did

3    Tyson never accept whatever this spreadsheet was that was

4    sent over by Zia, but that Zia's own representatives were

5    also very unaware of this at all times relevant to the

6    litigation.

7              Number 3, the third of four elements:  That third

8    ingredient necessary for the formation of a contract is

9    consideration.  Now, when something of value is promised in

10   exchange for a specific action, that's consideration.  Here

11   we expect that the evidence will show that nothing of value

12   was actually promised here by Zia, certainly not in this

13   cost plus spreadsheet, so no consideration could have

14   possibly existed.

15             When you look at this cost plus spreadsheet,

16   Mr. Worden went with you -- went over some of the columns

17   with you, some of the information that was in there, let you

18   know how much time that Zia spent populating these cells in

19   the spreadsheet, but there's a lot of information missing.

20   Most importantly, you're going to hear testimony, again,

21   from Mr. Scherer, the person who offered the slots for these

22   cattle to Zia Consulting, that the cattle that are contained

23   in this cost plus spreadsheet had actually been offered to

24   Tyson and placed with Tyson months before this ever came

25   out.  These weren't new cattle.  Mr. Scherer, you'll hear

1    his testimony that he was aware of all of these cattle.  As

2    Mr. Worden explained in his opening, he went through with

3    you about these Happy Pasture cattle.  These cattle had been

4    in the pasture for some time before this was put together.

5    These cattle preexisted the creation of this spreadsheet.

6    These cattle were already placed with Tyson.

7            Tyson, in their normal course of business --

8    you'll hear this from Mr. Scherer; you'll hear it from

9    Mr. Hueser -- would offer slots for cattle to be placed into

10   their premium beef program.  Slots were offered to Zia

11   Consulting.  Zia routinely took those slots and placed the

12   beef in there.  These cattle -- and when you're putting

13   cattle in this premium beef program, this is a months- to

14   year-long process.  This isn't something that you get

15   together in January and say, "Hey, give me some premium

16   cattle 60 days from now."  It doesn't work like that.  These

17   cattle have to be raised for months before they're ready to

18   be finished, before they're ready to be processed.  This is

19   a long process.  This isn't something that you slap on a

20   spreadsheet and say, "We're done."

21           So there's nothing new here in the way of the

22   cattle.  These cattle had already been placed with Tyson.

23   So, by putting this spreadsheet together with cattle that

24   had already been placed with Tyson, with these costs that

25   you'll hear testimony were never explained to Mr. Scherer or

1    anyone else at Tyson, there's nothing of value being offered

2    here.  And if there's nothing of value being offered, you

3    can't have consideration.

4           But even if something of value was offered there

5    and promised by Zia in that spreadsheet, there's no specific

6    action on the part of Tyson that's identified here.  You've

7    been shown these columns.  You've got the cattle.  You've

8    got the pastures.  You've got the feedlots.  You've got the

9    weights.  You've got numbers representing unexplained costs.

10   There's nothing on here indicating any duty of Tyson with

11   respect to any of those numbers.  The Word "Tyson" is not

12   even on this spreadsheet.  So trying to establish

13   consideration when, one, nothing of value has actually been

14   offered on the spreadsheet, and, two, no action has been

15   requested from Tyson on the spreadsheet, there's no

16   consideration, ladies and gentlemen.  And without

17   consideration, the contract doesn't exist.

18          Finally, the last element you've got to have for

19   a contract.  If you want a contract, you have that offer,

20   you have that acceptance, you have that consideration.  The

21   last element is mutual assent.  "Mutual assent" is a legal

22   term for what is essentially a meeting of the minds.  To

23   have a contract, both parties have to have an understanding

24   of what's going on; both parties have to be on the same

25   page.  Information has to be disclosed so that everybody

1    knows what's going on.

2            What happened here with respect to this

3    spreadsheet couldn't be anything further from a

4    demonstration of mutual assent.  We believe the evidence

5    will demonstrate and -- upon -- you were shown an e-mail

6    from Mr. Scherer back to Mr. Perez in May of 2019

7    essentially saying, "Hey, what are you trying to pull here?

8    This isn't how we do business."  Because that's not how

9    business had been conducted between Tyson and Zia for two

10   decades.  Instead of going to Tyson and attempting to work

11   that out, you're going to be shown e-mails that show that,

12   instead of trying to reach that mutual agreement with Tyson,

13   once this -- obviously, there was not a meeting of the

14   minds.  Once Zia knew it wasn't there, they didn't attempt

15   to work it out with Tyson.  They doubled down.  You're going

16   to see e-mails from Zia to feedyards instructing those

17   feedyards on how they needed to bill Tyson under this

18   spreadsheet.  You're going to see e-mails from Zia

19   instructing those feeds yards, "We're not even going to

20   explain it to you.  We're actually going to send you a copy

21   of what we want you to send to Tyson."

22           After all of this and taking into consideration

23   these elements, the evidence will show that, upon receipt of

24   that third-party invoice attached to the May 25th e-mail

25   that Mr. Scherer [sic] put up for you, Mr. Scherer

1    immediately conveyed his unwillingness to pay those costs.

2    And the reason he -- you'll hear his testimony.  The reason

3    that he was unwilling to pay those costs was because that's

4    not how business had been done for 20 years.  And it was not

5    anything that Mr. Scherer had agreed to.

6              Ladies and gentlemen, please remember, as you're

7    listening to the testimony, as you're viewing the evidence,

8    that, in order to establish that creation of a contract, Zia

9    Consulting must prove the presence of all four of those

10   ingredients.  They've got to prove that offer, they've got

11   to prove that acceptance, they've got to prove that

12   consideration, and they've got to prove that mutual assent;

13   that there was a meeting of the minds between the parties.

14   Again, it's just like making a cake.  We don't think Zia had

15   the eggs.  We don't think Zia had the butter.  We don't

16   think Zia had the milk.  Zia didn't even have the flour.

17   This isn't going to be a close case:  "Well, it looks like

18   they've got three of the four elements and we're not sure

19   about one."  It's not that, "Well, maybe they've got half of

20   them."  We believe that, after you've heard the evidence,

21   after you've heard the testimony, after you've looked at the

22   documents, after you've looked at the e-mails, you're going

23   to see Zia didn't have any of the elements.  This isn't even

24   a close call.  There was no contract here, ladies and

25   gentlemen.

1          When I began speaking you with, I promised not to

2     waste your time.  Instead of me telling you what the

3     evidence is all going to show, we want to go ahead and allow

4     plaintiff to start their case and get Mr. Perez on the

5     stand, so you-all can start hearing the testimony, so you

6     can all start seeing these documents and you can hear both

7     sides; you can hear Mr. Worden ask those questions and you

8     can hear me ask questions.  So, during the jury selection

9     process, each of you promised to listen.  You promised to

10    wait to hear from both sides before making a decision in the

11    case.

12         You promised to follow Judge Strickland's

13    instructions.  And, so far, you've done an exemplary job,

14    and we all appreciate that.  In the end, we believe that,

15    after you consider the testimony, after you consider the

16    documents in existence, after you consider the e-mails that

17    we're going to go through with you over the next few days,

18    that there could not possibly have been a contract that was

19    created by this spreadsheet.

20         Again, on behalf of myself, on behalf of Tyson,

21    we appreciate your service as jurors in the case.  And we'll

22    do our very best to present this evidence to you efficiently

23    and quickly.  And we have confidence that, at the end of the

24    day, you will be convinced that no contract was ever created

25    here.

1          Thank you.

2          THE COURT:  Thank you, Mr. Fisher.

3          Can I have both counsel approach before we call

4     the first witness briefly?

5               (Bench conference.)

6          Counsel, during opening, you talked about

7     exhibits as if they have been admitted.  I wanted to make

8     sure you understood no exhibits have been admitted.  If you

9     have demonstratives, mark them as 1, 2, and 3, so we have

10    them for the record, but they won't go back to the jury.

11         MR. FISHER:  We were working under the impression

12    that all had been pre-admitted, with the exception of

13    relevance objections.

14         THE COURT:  I don't know how to admit something

15    if there's an outstanding objection as to relevance.  So

16    nothing's been admitted.  We foundationally -- everything

17    has been stipulated to foundationally.  If you-all want to

18    get together and agree to them, that's fine.  I just wanted

19    to make sure we were all on the same page.

20         MR. WORDEN:  What I would suggest is that we do

21    that as a housekeeping matter at the end of the day so the

22    jury doesn't get bored.

23         THE COURT:  Okay.  That's fine.  Thank you.

24              (Bench conference concluded.)

25         All right.  Zia may call its first witness.

1              (Discussion off the record.)

2              THE COURT:  Counsel, you may call your first

3    witness.

4              MS. DIAMOND:  Your Honor, I'd like to call

5    Narciso Perez.

6              THE COURT:  All right.  Mr. Perez, just come have

7    a seat here.

8                        **NARCISO PEREZ**,

9         After having been first duly sworn, did make the

10   following answers:

11                    **DIRECT EXAMINATION**

12             THE COURT:  State and spell your name for the

13   record, please.

14             THE WITNESS:  My name is Narciso, N-A-R-C-I-S-O.

15   Last name Perez, P-E-R-E-Z.

16             THE COURT:  Go ahead, Counsel.

17   Q.  (BY MS. DIAMOND):  Mr. Perez, in what city do

18   you currently live?

19   A.  Los Ranchos, New Mexico.

20   Q.  And where were you born?

21   A.  Albuquerque, New Mexico.

22   Q.  Where did you grow up?

23   A.  I grew up on a ranch halfway in between Ft. Sumner and

24   Vaughn, New Mexico.

25   Q.  Was your family in ranching?

```
 1    A.    Yes, ma'am.

 2    Q.    Can you talk a little about your family's background?

 3    A.    My grandfather migrated from Spain, arrived in New

 4    Mexico at the age of 16, started sheepherding/homesteading,

 5    ended up at what we call the "home ranch" in between Vaughn

 6    and Ft. Sumner, and eventually ended up putting together a

 7    little more than a hundred thousand acres there; raised a

 8    family there.  My father was the oldest one.

 9          And when I -- I was the littlest of four kids.

10    When I was born, my grandfather had prostate cancer really

11    bad.  And so my parents moved me in with my grandparents so

12    my grandma would have a support system.  So, at a very small

13    age, at the ranch, I lived with grandma and my grandpa.  My

14    grandfather died when I was three, and I became my

15    grandmother's sidekick.  And my grandmother, who came from

16    Spain, as well, was always scared to stay by herself at the

17    ranch, so, you know, I just kind of hung out with her and --

18    through the time I was growing up, helping her garden and

19    gather eggs up and milk cows and make food for all the

20    employees.  We had -- we usually had a couple dozen

21    employees.  And I didn't realize it, but I was child labor

22    at the time.

23          We had a beautiful life, growing up on the ranch.

24    And my -- I started school in Vaughn, New Mexico, and had

25    the opportunity to go to New Mexico Military Institute, to
```

1   high school.  And so I jumped at the chance, went to

2   Roswell; graduated there.  And, luckily, I made good enough

3   grades to come to New Mexico State and go to school here and

4   earned a degree in animal science.

5   Q.   And what did you do after college?

6   A.   Right after college, I took a job in Texas as a

7   technical field rep for American Cyanamid and started my own

8   cow herd.  And I've always been into really good genetics.

9   So we started an embryo transplant facility and a very

10   high-end cow herd.  And I stayed there for a few years

11   before coming back to New Mexico, because I liked it.  I

12   loved New Mexico so much I couldn't be gone more than four

13   or five years.

14   Q.   What did you mean by the "genetics" with your cow

15   herd?

16   A.   You know, I've always been into upgrading genetics.

17   Q.   What does that mean?

18   A.   In the beef business, there's -- there are genetics

19   that cater to really high-quality beef and -- you know, like

20   prime and upper choice.  And, you know, my love was to

21   create a greater percentage of cattle that could give you a

22   more valuable calf crop than just normal calves.

23   Q.   What is your current occupation, Mr. Perez?

24   A.   I am Director of Cattle Feeding for Zia Ag Consulting.

25   Q.   And what's Zia Ag Consulting?

1    A.    Zia Ag Consulting is a company that owns cattle.  As

2    they say in the business, we take positions on the physical

3    side; meaning, instead of a paper position in cattle, we

4    actually go out and take positions on real cattle.  And that

5    can start at any phase along the beef cycle, cattle cycle,

6    or else it can start at the cow-calf stage.

7    Q.    What does that mean, "take positions"?

8    A.    We actually take ownership of cattle at different

9    stages along the beef life cycle.

10   Q.    And what types of parties do you deal with for Zia Ag?

11   A.    We deal with a lot of ranchers, people that own cows.

12   We deal with a few -- quite a few backgrounders.

13   Q.    What's a "backgrounder"?

14   A.    A "backgrounder" is someone that takes calves from the

15   cow-calf operation into a grow phase.

16   Q.    Who is the president of Zia?

17   A.    My son, Sean Perez.

18   Q.    So is Zia Ag a family business?

19   A.    It is a family business, yes.

20   Q.    Does your son also have a background in ranching?

21   A.    My son comes from the heritage of ranching, but his

22   academics have been in computer science and mathematics.

23   Q.    What do you mean by "the heritage of ranching"?

24   A.    His mother's side of the family comes from here in Las

25   Cruces; arrived here sometime in the 1800s, the Cox family.

 1   And, of course, my family, as I said, arrived into New

 2   Mexico in the early 1900s.

 3   Q.   When was Zia Ag founded?

 4   A.   You know, my father, who I took care of for a long

 5   time, because he was very ill, passed away in 2009.   Shortly

 6   after he passed away, Sean decided to create Zia Commodities

 7   and, shortly after, Zia Ag, and moved to Albuquerque.   He

 8   was living here in Las Cruces.   And so I'm saying that the

 9   companies, both of them, probably were started in 2010.

10   Q.   And were you selling these cattle before 2010?

11   A.   I'm sorry?

12   Q.   Were you selling cattle, these cattle, before 2010?

13   Can you talk a little bit about your earlier career before

14   Zia Ag and Zia Commodities was founded?

15   A.   Well, I've always been in the ranching business and

16   cattle-feeding business, commodity trading.   And I've run

17   cattle all over the place.   I mean, I have a run -- I like

18   to buy calves and background them and turn them out on

19   grass.   So kind of my career has been in backgrounding

20   cattle on grass, growing cattle on grass.   And, you know,

21   that's what I've done my whole career and that's how I came

22   to meet people from IBP Tyson.

23   Q.   What types of cattle does Zia Ag raise?

24   A.   Our -- you know, we have a brood cow herd.   And it's

25   going to be a very high percentage of prime and high choice

1    Angus.  And we try to also procure those kind of cattle, as

2    well.  So all the cattle we put our hands on we try to, you

3    know, take on in our inventory cattle that are very similar

4    in quality.

5    Q.   How do you feel about Zia Ag's cattle?

6    A.   I feel -- the only thing I'm more proud of is my

7    family.  I'm very proud of our genetics.  And people from

8    all over the world come and visit us.  People from all over

9    the United States come and get genetics from us.  We have a

10   beautiful legacy going with our cattle management in

11   genetics, so I feel very, very good about them.

12   Q.   Can you talk a little bit more about some of the

13   feedback Zia Ag has gotten on its cattle?

14   A.   Well, it's just fun, because people will be driving

15   down the highway somewhere that we have cattle -- and we run

16   a lot of red-hided cattle --

17   Q.   What's that?

18   A.   Red Angus cattle.  So not a lot of people in New

19   Mexico have red cattle.  So, say, somebody I know from

20   Nebraska is going to Arizona for the summer or something --

21   or for the winter, will be driving down the highway and say,

22   "You must have some cattle near Santa Rosa because they're

23   some of the most beautiful cows I've seen and they're red."

24   And it's just nice because we enjoy a nice reputation for

25   good genetics.

1     Q.   So you're proud of Zia Ag's cattle?

2     A.   I am.

3     Q.   What's "conventional cattle"?

4     A.   "Conventional cattle," a high percentage of the cattle

5     that are raised in the United States and/or imported from

6     other countries to the United States, they are cattle that

7     have -- they're raised with pretty much "no holds barred."

8     You can implant the cattle --

9     Q.   What's "implant" again?

10    A.   An "implant" is a small tablet that has perhaps, you

11    know, steroids that the animal can produce itself naturally,

12    but maybe it's just a higher dose; or they can have chemical

13    hormones or steroids that are created and put into a

14    time-release tablet that you put into the base of the

15    animal's ear.  And it helps them convert grass or corn at a

16    much more efficient rate than they would otherwise, which

17    helps them get to market quicker.  It helps them get bigger

18    faster.  I liken it to even on -- I'm not trying to say it's

19    lockstep, but I liken it to I go to the gym three times a

20    week and work out.  Clearly, whatever I'm doing isn't

21    working as well as somebody that's taking creatine and, you

22    know, they have a very low body fat versus muscle.  I have a

23    very high body fat versus muscle.  And that's exactly, you

24    know, what implants do.  Implants help the body to burn fat

25    and convert lean muscle tissue more efficiently than

1    otherwise.

2    Q.   If a cow is implanted, could it be natural?

3    A.   No, ma'am.

4    Q.   And why is that?

5    A.   Well, we are in a program called "Never Ever 3," which

6    is no hormones, no antibiotics, and no animal byproducts.

7    So in order to be a Never Ever 3 animal, you cannot feed

8    them any of those three things anywhere in their life; not

9    even to the mother when she is prenatal stages or otherwise.

10   They can't exist on your operation.

11   Q.   So you'd have to know that these cattle were going to

12   be raised as natural cattle at birth or even before?

13   A.   Well, there's -- actually, you know, early in my

14   career, we helped get some money put together for a company

15   called "IMI Global" so that they could become a relevant

16   company.  Because we felt that, in the livestock industry,

17   we needed a third-party verifier to audit the processes so

18   that, instead of people like me saying, "Hey, these cattle

19   don't have all these weird things," we actually have a

20   company, a couple of companies, in the industry that run

21   around and they audit people's cow herds, write farm plans

22   for them and things like that.  So that when a buyer comes

23   to look at the cattle, you know, we know that these

24   companies have been there and audited them for the various

25   attributes that need to exist if you're going to have

1    natural cattle.  Or NHTC cattle, as was mentioned earlier.

2    Q.    What is "NHTC" cattle?

3    A.    "Non-Hormone Treated Cattle," which specifically means

4    that they don't have those implants.  But also the compounds

5    in these implants can be found in feed-grade equivalents.

6    So, you know, it's not only having an implant; they could

7    have a feed-grade hormone, as well.  So there are certain

8    markets in the world that do not allow the animals to have

9    those things.

10   Q.    And what's "GAP cattle"?

11   A.    So GAP is different than Never Ever 3.  "GAP" is a --

12   an organization that was established by Whole Foods.  They

13   created a board, they created an organization, and they put

14   some consumers on the board, a veterinarian, and various

15   people on the board.  The idea was "Let's find the

16   attributes that we want the beef to possess that are coming

17   from the cattle that we're going to procure."  And they put

18   a number of attributes in their -- they don't like the

19   cattle to be -- so this is all about animal handling and

20   sustainability.  It really has nothing do with what they

21   eat; it really has more to do with how the person handles

22   the animal.  He's got to have a farm plan or a ranch plan.

23   He's got to marshal all of his compounds, vaccines; anything

24   that you might give an animal has to be kept under lock and

25   key.  There has to be a written record of everything.  And

1    it has to be a more protracted requirement for

2    record-keeping.

3    Q.   So there's a lot of rules for GAP cattle?

4    A.   That is correct.

5    Q.   And there's a lot of rules for NHTC cattle?

6    A.   There are a number of rules for both.  Quite a few

7    more than if you go conventional.

8    Q.   Can you talk a little bit about the differences

9    between raising GAP cattle versus conventional cattle?  Give

10   us a few more examples of things you couldn't do with GAP

11   cattle that you can do with conventional cattle.

12   A.   You know, I don't know if it's possible to use the

13   whiteboard, but it would just be easier to illustrate.

14           MS. DIAMOND:  Yeah.  Is that all right, Your

15   Honor?

16           THE COURT:  Yes, that's fine.

17              (Discussion off the record.)

18   Q.   (BY MS. DIAMOND):  So you were talking about

19   the difference in the rules between raising GAP

20   cattle and raising conventional cattle.

21   A.   So if you think about cattle that are on a journey,

22   and you start out with the cow-calf.  This is the guy who

23   usually owns a ranch, who owns the cow.  The cow has a

24   gestation period very much like a human being, 270 days.

25   And this man predominantly takes this cow and tries to get

1   one calf per year out of the cow.

2           So, if the animal was conventional...or if the

3   animal was, let's just say, GAP to compare it to something,

4   what would he have to do to keep the animal conventional?

5   And the answer is nothing.  He can grow them the way he

6   wants.  He can breed them the way he wants.  He can do

7   whatever he wants.

8           What does he have to do to keep them GAP?  He has

9   to get his cow-calf herd audited.  He has to feed an

10  all-vegetarian diet.  And he has to keep really good

11  records.  And if he doesn't do all of these things, he can

12  get audited, but he may not pass the audit.

13  Q.   And what happens if he doesn't pass the audit?

14  A.    If he doesn't pass the audit, then he's got to sell

15  his cattle for conventional prices.

16  Q.   What would be the problem with that?

17  A.    Well, I think that some of the big auction companies,

18  if you pull data from them, I think you see that the GAP

19  calves are bringing anywhere from 10 cents a pound to 20

20  cents a pound more than conventional cattle.  So the

21  advantage for the rancher is that he can get more money, but

22  the disadvantage for the rancher -- you know, there's a lot

23  of ranchers.  The average rancher is 68 years old today in

24  America.  And he and his wife, or maybe one of them is

25  widowed or whatever, you know, they're not great at keeping

1    records because they're not efficient and proficient with a

2    computer and things like that.  So the bottom line is, is

3    that they may just not have a choice and might have to go

4    conventional.  But if they don't pass the audit, then

5    they're conventional, unless there's something that they did

6    that they can correct the process and, you know, correct the

7    infraction.

8    Q.    So the idea with GAP is that the rancher has to pay

9    more to follow through with all these rules, but then they

10   can ultimately make more money?

11   A.    Yes, ma'am.  You know, honestly, at this stage, making

12   GAP cattle isn't that hard.  If you go to the next stage,

13   which is the backgrounding stage, now a calf is born and it

14   usually weighs 70 to 100 pounds.  It goes six months,

15   180 days, and it gets weaned, and let's just say it weighs

16   approximately 500 pounds.

17   Q.    What's "weaned"?

18   A.    "Weaning" is kind of like sending your kids to

19   college:  You take the calves away from their mothers.  And

20   you try to do it as delicately as you can so that the mother

21   doesn't get really upset and the calf doesn't get really

22   upset, too, and stress out and die.  Most cattle die in the

23   United States from a common cold and a flu like we get, but

24   they're so naíve to these types of things that it's easy for

25   them to die.

1          So that's what we call "weaning," since, months

2     later, they weigh 500 pounds and you're taking them away

3     from their mothers.  And that can happen at the ranch, that

4     can happen at another facility, but they eventually go to a

5     backgrounder.  And, for some reason or another here in the

6     United States, you would think that one rancher would do

7     everything, but, again, because the average rancher is

8     68 years old, there's a lot of different levels by which

9     these cattle travel.

10         So the backgrounder will take the cattle from,

11    say, 700 pounds to 1,000 pounds.

12    Q.   And just tell us again, is a backgrounder -- it's a

13    separate facility?

14    A.   A backgrounder -- like, there's a lot of backgrounders

15    in the Midwest.  There's a lot of ranches in the West.  A

16    lot of the calves in the West come to the Midwest and get

17    backgrounded.  A backgrounder is going to -- you know, this

18    is an interesting process.  The backgrounder, again, has to

19    be GAP audited.  So he has to go through the same things, so

20    that the calves have traceability from this ranch to the

21    backgrounder.

22         But the backgrounder has to be audited; same

23    thing.  He's got to go through all the same things that the

24    ranch does.  He has to pay the audit fees and everything

25    else.  And this is a process where these people are really

1    good craftsmen.  They take really good care of the cattle.

2    They know how to gently get the calf to start becoming an

3    adult and start eating on its own and, you know, coping with

4    life without their mother.  And this is a process that is

5    high in forage.  So they're growing these cattle; they're

6    putting on 200 to 500 pounds.  It's done with a high-forage

7    diet.  It doesn't have a lot of grain in it.  It has a lot

8    of hay and alfalfa and things like that.  Then the animal,

9    when it gets to 700 to 1,000 pounds, it is then ready to go

10   to the finisher.

11   Q.   Are there any rules between transporting conventional

12   versus GAP cattle?

13   A.   Yes, there is.  One of the rules with GAP cattle is,

14   first of all, we cannot use electric prods, unless the

15   animal is -- like, the animal's life is in danger.  If it

16   falls down in between a gate or something and you're trying

17   to get them up so it won't suffocate, that's the only time

18   with GAP that you can use a hotshot.  And there's people

19   that buy cattle in Florida and ship them all the way to

20   Texas or even California, and they don't have to stop.  With

21   GAP cattle, they can't be on the truck more than 24 hours.

22   So GAP wants to make sure that these cattle are comfortable.

23   They want to make sure that they're not getting stressed

24   out.  And so everybody in the layer with GAP cattle, they

25   have to adhere to the same thing.  So the rancher has these

1    rules, the backgrounder has the very same rules, and the

2    finisher has the very same rules.

3    Q.    And what's the "finisher"?

4    A.    The "finisher" -- so this person has a high-fiber diet

5    (indicating).  In this operation, the finisher, has low

6    fiber and high grain.  The animals -- these feedlots are

7    located near grain, near corn.  Iowa, Nebraska.  They feed a

8    ration that can be anywhere from 65 to 85 percent corn and

9    the balance is fiber, hay.  So you've gone from high protein

10   to low protein; low energy to high energy.  And because

11   you're going into a process that is so powerful in their

12   diet, they can only stay on that diet for so long before

13   their genetic potential is met, surpassed, and then crazy

14   things start to happen.

15   Q.    So what's the weight range for the finisher?

16   A.    The finishing stage, I'm going to say, with a GAP

17   animal, can run from 1,100 to 1,350 pounds.  And with a

18   conventional animal, they can run from 1,250 pounds to 1,500

19   pounds.  So you can see that the conventional animal, when

20   you start putting implants in them and using hormones, you

21   can get the cattle way bigger; you can push the animal

22   beyond their genetic normalcy.

23   Q.    Would genetic cattle stay at the finisher for less

24   time?

25   A.    Yes.  Conventional cattle have the ability to gain

1    3 pounds a day.  And GAP cattle, even though they're better

2    quality, have the -- you know, they're going to be at about

3    2.4 pounds a day.

4    Q.   And that's because of the implant?

5    A.   That's because of the implant, yes.

6    Q.   So you talked about the difference in the rules for

7    GAP cattle or, you know, similar natural cattle.  How much

8    more does the process of raising this GAP cattle from

9    cow-calf to finish yard differ from conventional cattle?

10   A.   You know, this is -- is where the cattle business gets

11   crazy.  Because, if you don't spend money on implants and

12   hormones and things like that, you save money.  But it costs

13   money to get audited.  It costs money -- all these cattle

14   have a very program-compliant, very specific tag.  It's like

15   an earring that a lady wears.  But imagine if that earring

16   had a barcode on it so that it's put in at branding, it's

17   scanned when the animal leaves from the backgrounder and

18   scanned from the backgrounder to the finisher.  These tags

19   are expensive.

20        The auditing process is expensive.  But what's

21   going on is, when gasoline was $3.50, ranching was

22   interesting; when gasoline got to $6 a gallon, ranching is

23   frightening.  And the same with cattle.  When corn was $3 a

24   bushel, it was interesting.  And now that corn is $7 a

25   bushel, you know, it's frightening.  And so the name of the

1   game is that we have changed the whole contour for what's

2   going on in the cattle business these days.  It's too

3   expensive to do things that don't pay you.  You really have

4   to pay attention to costs or else, you know, you'll get your

5   head cut off.

6   Q.   Why would anyone want to raise GAP cattle, if it's so

7   much more trouble than conventional cattle?

8   A.   Well, you know, there's a lot of reasons why people do

9   things.  One of the reasons they do things is because they

10  think it's what's right for the cattle and right for the

11  planet and right for the people that eat beef.  Other

12  reasons are because they feel like if they can get a big

13  enough premium for the cattle that it's worth all the extra

14  headache.

15  Q.   You mean, if consumers will pay more for the premium

16  cattle?

17  A.   All the way through.  If you -- if you're a beef

18  consumer, you're going to college, you probably don't care

19  where you buy your beef.  All of a sudden, you stumble into

20  somebody, you fall in love, you get married and have

21  children, and you don't care what you eat, but you care what

22  they eat.  And now all of a sudden, people are careful about

23  what they feed their children.  They don't want to feed

24  their children with things that have hormones and

25  antibiotics in them.

UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1    Q.   What kind of stores or what are some stores where a

2    customer could buy natural beef?

3    A.   You know, here in Las Cruces, I don't live here, but

4    it looks like you have a Sprouts; they would sell natural

5    beef, they'd sell natural milk, they'd sell organic milk,

6    you know, natural products, organic produce.  You know, if

7    you go to Walmart, they have very, very good products.  They

8    might have an organic or natural offering, but they probably

9    won't.  And things like that.

10         There are stores that, within the store, they

11   have a little, tiny section of natural or organic products,

12   but, by and large, these GAP cattle -- well, first of all,

13   GAP is something that's only endemic to Whole Foods.  It's a

14   Whole Foods program.  So if you want GAP cattle, you have to

15   go to Whole Foods.  If you want natural cattle, you can go

16   to a few other stores.

17   Q.   And Whole Foods will charge customers more for GAP

18   beef?

19   A.   They cost about 20 to 30 percent more.

20   Q.   Who takes the -- these cattle from the finish yard?

21   A.   So the next stage is the finisher.  From the finisher

22   is going to be a processor -- a packer, a processer.

23   Q.   And what's a packer?

24   A.   The "packer" is a company that buys the cattle, takes

25   them to their facility -- and a lot of these packers have

1    multiple facilities across the United States -- they

2    sacrifice the animal, they chill the animal down, they

3    disassemble the animal, process it out, put it into

4    manageable sizes and into packages and ship them out to

5    retailers.

6    Q.   Is Tyson a packer?

7    A.   Yes, Tyson is a packer.

8    Q.   How many large packers are in the U.S. right now?

9    A.   You know, everybody talks about "the Big Four."

10   There's four major companies that handle somewhere around

11   80 percent of the livestock, cattle, in the United States.

12   Q.   And what are those?

13   A.   Did you ask me the names?

14   Q.   Yeah, what are the names of Big Four?

15   A.   Well, we're here with Tyson, that's one.  Cargill is

16   two.  JBS, probably about as big as Tyson, is three.  And

17   National Beef is four.

18   Q.   And there's no other ones in the U.S. that size?

19   A.   You know, if you depart that size, you go to another

20   level of packers.  They're smaller.

21   Q.   But the big ones --

22   A.   Those are the big guys --

23   Q.   -- the Big Four?

24   A.   -- right there.

25   Q.   Do you think grocery stores like Whole Foods pay

UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1    packers like Tyson more for natural cattle or for GAP

2    cattle?  So Whole Foods is selling the natural cattle or the

3    GAP cattle to its customers for more money.  Do you think

4    that the packers are also getting more money from Whole

5    Foods?

6    A.    Theoretically, they --

7                MR. FISHER:  Objection, Your Honor.

8                THE COURT:  What's the objection?

9                MR. FISHER:  Calling for speculation, and it's a

10    compound question.

11                MS. DIAMOND:  I can separate it out, but he's

12    testifying -- this is directly in line with the scope of his

13    knowledge.

14                THE COURT:  I think you need to lay more of a

15    foundation for your question, if it's not speculation.  So

16    sustained, and you can rephrase it.

17                MS. DIAMOND:  Very well.

18    Q.   (BY MS. DIAMOND):  In your opinion, do packers

19    get paid more money for supplying stores like Whole

20    Foods with GAP beef?  So Whole Foods is selling the

21    GAP beef to its consumers for more money.  Does that

22    mean that the entities bringing it to Whole Foods

23    are also getting paid more?

24                MR. FISHER:  Objection, Your Honor.

25                THE COURT:  Is it the same premise?

1          MR. FISHER:  Yes, Your Honor.

2          THE COURT:  So, Ms. Diamond, we would need more

3    foundation about why Mr. Perez would know something like

4    this, as opposed to asking him to speculate.  So I'll

5    sustain it, and you can ask other questions or try again.

6          MS. DIAMOND:  Okay.

7    Q.  (BY MS. DIAMOND):  Can you describe your

8    knowledge of pricing in the beef industry?

9    A.   Yes, ma'am.  We enjoy a grading system in the United

10   States.  And the grading system pays a premium for people

11   that can produce prime beef.  So you have a few layers.  The

12   top layer is prime.  The next layer is upper choice.  The

13   next layer is lower choice.  And then it's select.

14          So if I'm selling cattle on the yield and grade

15   to a company like Tyson or anybody that's in the business,

16   they're going to pay me more money for cattle that have a

17   higher percentage of prime than -- you know, the national

18   average is probably -- I don't even know what it is anymore

19   because it's getting better all the time, but let's say it's

20   10 or 12 percent.  The cattle that Zia sells are 30, 40, 50,

21   60 percent prime, and so we get a much higher price because

22   we have focused on prime.  But prime doesn't have anything

23   to do with GAP.  It can be prime and be conventional.  But

24   the problem is, is when you use implants, it's antagonistic

25   with marbling and prime.  So you might get some prime, but,

1   when you use an implant, you don't get as much prime.

2   Q.   What's "marbling"?

3   A.   The fat specs within the ribeye that's measured at the

4   plant by the USDA.  But the bottom line is, is there is four

5   grades of cattle.  The more prime you have, the more you get

6   paid.  The more choice you have, upper choice, the more you

7   get paid.  The more lower choice you have, you usually don't

8   get a discount.  And, if you have select, it's usually a

9   discount.

10   Q.   And that goes down the supply chain all the way to the

11   grocery store --

12   A.   That is correct --

13   Q.   -- where a customer is then paying more?

14   A.   -- that is correct.

15   Q.   The better the quality, the better the certifications,

16   the more it can sell for --

17   A.   That's correct --

18   Q.   -- for all the parties along the line?

19   A.   -- that is correct.

20   Q.   Thank you, Mr. Perez.

21        Can you describe or explain the lifespan of a

22   cow?  You've kind of laid out these four stages, but you

23   know, in terms of where the cow starts and where it ends up.

24   I know you've done that now to break it up between

25   conventional or GAP, but just kind of go through those.

1   A.   Well, let's put a time on this, and maybe it will be a

2   little easier to kind of understand.  A cow gets pregnant.

3   270 days later, which is about nine months, she has a baby.

4   That baby stays with the mother for six months.  So we're

5   going to put six months right here (indicating).

6           Then the calf goes to the backgrounder.  The calf

7   is going to grow two, two and a half pounds there; they're

8   going to put on 250 pounds.  So the calf is going to be

9   there three or four months.

10          Then the finisher, if the calf is backgrounded

11  correctly and it weighs near 900 or 1,000 pounds, it's going

12  to be at the feedlot for four to five months --

13  Q.   And --

14  A.   -- and then it's going to the packer.

15  Q.   -- when is the right time to harvest these cattle to

16  take them from the finish yard?

17  A.   Well, first of all, we're dealing with living

18  organisms.  So we're not talking about a box of tennis shoes

19  or something like that.  Every animal is different.  It

20  depends on how good of genetics you started with here

21  (indicating).  It depends on how good the backgrounder did

22  growing the cattle.  And it depends on how smart the

23  finisher is with the cattle he's received and what he can do

24  with them.

25  Q.   Is there a general range?

1    A.    By and large, an animal should walk in the feedyard

2    weighing 900 to 1,000 pounds to the finisher yard.  If it's

3    an Angus-based animal, it should be leaving the feedyard in

4    four or five months --

5    Q.    And can you show us maybe --

6    A.    -- three to four months.

7    Q.    -- in the way -- maybe another drawing about how you

8    would show when these cattle would be ready to be harvested?

9          You can flip it around, if you want to.

10   A.    Yes, ma'am.  But let me just close these numbers out,

11   so everybody understands where we are.

12         Six months with four months is ten months, and

13   another five months is 15 months.  It takes 15 months to get

14   an animal from birth to the packing house.

15   Q.    And so you're demonstrating when the approximate best

16   time to harvest these cattle would be from the feedyard?

17   A.    Well, I look at it like this:  If an animal starts

18   from the backgrounder at 1,000 pounds and it's, say, a

19   conventional animal and we're going to put a time period

20   right here of 125 days, the conventional animal, in

21   125 days, will weigh 1,400 pounds and it's going to take

22   2,250 pounds of feed to get the animal to 1,400 --

23   Q.    For one cow?

24   A.    -- pounds.

25         Yes, ma'am, if the animal is implanted.

1            If that same animal is natural GAP and he's there

2      for 125 days and he starts at 1,000 pounds, he's going to

3      weigh 1,300 pounds.  So what you have here -- and he's going

4      to have eaten 2,250 pounds of feed.  So what you have here

5      is unimplanted and implanted, so chemical-induced and all

6      natural, there's a difference right there (indicating).

7      Q.   And the two numbers, 1,300 and 1,400, that you've

8      drawn squares around, that represents the best time or the

9      optimal time --

10     A.   That's for --

11     Q.   -- for the cattle to be harvested?

12     A.   -- those are the targets for their outweight.

13     "Outweight" is what the animal weighs when it leaves the

14     finishing feedyard.

15     Q.   And what happens if these cattle stay at the feedyard

16     too long?

17     A.   Well, this is what I would call the "window of most

18     efficiency."  And the conventional animal can actually be

19     pushed bigger because it's got that extraordinary

20     intervention of chemicals into its body.  But the

21     unimplanted animal, at these levels, will start to struggle.

22     Q.   What does that mean?

23     A.   Well, you know, here, it gained 300 pounds in

24     125 days.  And the line would look something more like this

25     (indicating).  If you wanted to get it to 1,400 pounds just

1    to be where the conventional animal was, it would be another

2    50 to 60 days here and it would take another 1,000 pounds of

3    feed.  So the longer it stays there, the more inefficient it

4    gets, the harder it is to put weight on it.

5    Q.   Isn't it better, though, to have these cattle weigh

6    more?  Doesn't that make it more valuable?

7    A.   Sometimes that can be more valuable, but not with

8    natural cattle.  With conventional cattle, you still get

9    some ability to make the animal bigger with a very efficient

10   conversion.

11   Q.   What does that mean?

12   A.   A conversion of a natural animal means that, if you

13   have a pile of 8 pounds of corn right here, it can -- it has

14   the ability to make 1 pound of natural cattle.  If you have

15   an implanted animal, you could have 5.75 pounds of corn here

16   and it will make 1 pound of cattle.  So it takes way more

17   feed to make 1 pound of cattle, well, like 25, 30 percent

18   more feed.

19   Q.   More feed and more water?

20   A.   Yeah.  You know, and I get asked this question a lot:

21   A feedlot steer will drink about 75 liters of water --

22   Q.   That's one cow?

23   A.   -- per day.

24        Yes.  I don't know, my doctor tells me to drink

25   3 liters of water every day.  I have a hard time getting

1    that done.  But the bottom line is, if you divide 75 by 3,

2    that's enough water for 25 normal human beings to drink

3    water in one day.  So you've got to be smart about your

4    resource usage because, obviously, they drink a lot of

5    water, they eat a lot of feed; there's no reason to have

6    them there any longer than they need to be there.

7    Q.   Are there any other effects of overfeeding cattle?

8    A.   You know, they just get so expensive and so overfat.

9    And, you know, today, a plant like -- you know, all the

10   plants and anybody who has a lot of people working there,

11   they're struggling with labor.  So there's no reason to

12   overfeed cattle just to have human beings turn around and

13   take the fat off with a knife.  That's what it amounts to.

14           But the way I like to look at it is you have an

15   apple tree in your backyard and, the next thing you know,

16   they start to turning red and, boom, they're beautiful,

17   they're red.  That's right here (indicating).  And you go

18   out the next day and the apples are falling on the ground

19   and the worms are eating them because nature has provided

20   perfectly for living organisms to grow and flourish, and

21   then they're past their prime and they're done.  So, yeah, I

22   mean, that's -- that apple is that feedlot steer.

23   Q.   So a GAP cattle that was overfed got to the 1,400

24   pounds, that's not necessarily a more valuable animal?

25   A.   The value that it brings will not offset the extra

1    cost to get there.

2    Q.   Any other issues, other than the cost of having them

3    there?

4    A.   Again, they just get overfat.  A human being with a

5    knife has to take that fat off of the carcass.

6    Q.   Because you can't use it or process it?

7    A.   And, you know, lots of times, packers, they'll

8    discount you because the cattle have too much.  So there's

9    quality grade, which I just talked about.  And this is a

10   yield grade.  A "yield grade" is leanest carcass.  And

11   sometimes you get a premium for that.  Yield Grade 2 is a

12   lean carcass still, Yield Grade 3 is a normal, and Yield

13   Grade 4 is starting to be fat, and Yield Grade 5 is what

14   they call "overfat."

15          And, you know, sometimes a packer will say, "I

16   don't care how fat you make them because I want prime."  But

17   the truth of the matter is, is it's not good for the calf;

18   it's not healthy for the calf.  It's not good.  It's not

19   humane for the calf, it's not good for the guy who is

20   feeding them and, with the cost of labor these days, it's

21   not great for the packer, either.  Nobody wins on this one.

22   And you know what?  The consumer doesn't want to buy fat.

23   He wants to buy lean tissue.  He wants to buy muscle.

24   Q.   Who decides when the cattle will be harvested?

25   A.   Well, if you have conventional cattle -- and this is

1    kind of where the two types of cattle, they really start to
2    define kind of what I would call a very specialized, you
3    know, section of beef production -- a conventional animal,
4    you don't have to know anybody's name or who buys fat
5    cattle, whatever feedlot they're being fed.  At every week,
6    there's a show list that's created by feedlots in the United
7    States and most packers go buy their --
8    Q.    What's a "show list"?
9    A.    Pardon me?
10   Q.    What's a "show list"?
11   A.    A "show list" is a list of cattle that are available
12   for sale and purchased at each feedlot in the United States.
13   And, normally, if it's a normal week, most of the major
14   packers have people drive into those feedyards once a week
15   and get their show list.  For conventional cattle.  And you
16   know, a feedlot that has 50,000 cattle inside might sell
17   5,000 cattle a week or something like that.
18          And so, basically, these guys come look at the
19   show list.  And it's kind of like a musical chairs game.
20   There are so many chairs.  There are so many packers.  And
21   the music turns on, everybody starts moving around.  The
22   music turns off, everybody sits down, and usually somebody
23   is left without a seat; they don't get any cattle bought.
24   So usually, you know, we don't have a -- we have a very
25   unusual way of selling fat cattle in the United States.  For

1    conventional, everybody pays $1.40 and that's it.  100,000

2    head of cattle trade a week in a matter of, you know, hours.

3    Q.    So conventional cattle are easier to get?

4    A.    Yeah.  You don't have to know anybody.  You don't have

5    to know anybody's name.  You don't have to know anything

6    about anything.  You just put them in the feedlot, put them

7    on feed.  Sooner or later, they get fat, and the feedlot

8    manager offers them for sale.

9              However, unimplanted cattle, that's a whole

10   different --

11   Q.    Those are -- that's natural cattle?

12   A.    Natural cattle, whether they're NHTC, whether they're

13   GAP, natural, whether they're just natural, those are

14   dangerous cattle to have on feed, if you don't have a

15   destination for them.

16   Q.    Why so?

17   A.    Because we live in a world of "one too many and one

18   too few."

19   Q.    What does that mean?

20   A.    It means that, if there's one too many animals for

21   that week, you're in trouble because the price is going to

22   cave in.  If there's one too few, you're going to have a

23   great windfall because people will pay whatever they have to

24   get them.  And that's just the nature of our business right

25   there.

1              So this is a relationship-based business.  This

2    is not (indicating).  Two and a half percent of the cattle,

3    3 percent, 4 percent, maximum, in the whole United States

4    are in this category, and 96, -7, 97½ percent are in this

5    category (indicating).

6    Q.    And so natural cattle are harder to get?

7    A.    You know what?  Some days, there's an overabundant

8    amount of them.  But that only happens when somebody doesn't

9    have a destination for them.

10   Q.    And you testified earlier that you need to know if

11   a -- if these cattle are going to be natural cattle right

12   from birth.  So how do you account for the supply issue?

13   A.    Well, like I said, 15 months, the Zias of the world

14   has to be -- if somebody wants a fat animal, the Zias of the

15   world have to be flying to Montana, getting in a pickup and

16   going to see some guy in Billings, Montana, and looking at

17   his cattle and saying, "Hey, whenever your calves are born,

18   I want to try to get them audited and I want them to be a

19   part of a program that I have with X-Y-Z packer two years

20   from now."  And it takes a long time to coordinate all that.

21   If you do that with 12 ranches, it takes a long time.  If

22   you do it with 120 ranches, it takes a long time.

23   Q.    Were all the Big Four packers buying natural cattle?

24   A.    I don't know if all the Big Four packers -- if all the

25   Big Four packers buy natural cattle.  What I can tell you is

1     Tyson is the largest provider of GAP natural cattle in the

2     United States, as far as I know.  Again, as far as I know.

3     Q.    So in terms of the scale of selling, you know,

4     thousands of these natural cattle, Tyson was the main

5     planter -- or the main plant?

6     A.    The main processor, you mean?

7     Q.    The main processor.

8     A.    That's correct.  I mean, there are other packers that

9     are in that business, but, to my knowledge, to Whole Foods,

10    they are the largest.

11    Q.    So you testified the way that conventional cattle are

12    sold from the feedyards, a supplier can just show up that

13    day.  Who decides when natural cattle are harvested?

14    A.    You know, usually there's somebody within one of these

15    packers that's the anointed one that has the program cattle

16    under his purview or her purview.

17          At Tyson, for some of the time that I've been

18    doing business at Tyson, that person is Bob Scherer.

19    Q.    Bob Scherer sitting at that table (indicating)?

20    A.    Yes, ma'am.

21    Q.    And so, for the period that you're referring to, it

22    was Bob -- Mr. Scherer's decision, alone, when to pick up

23    these natural cattle?

24    A.    Solely his decision, yes, ma'am.

25    Q.    So it's not the cow-calf operator who decides?

1    A.    No.   The cow-calf operator is out of it.  You know,

2    usually, we buy these calves weighing 500 pounds from this

3    guy.

4    Q.    And it's not the backgrounder who decides?

5    A.    He usually gets the cattle to 900 or 1,000 pounds.

6    And it's, you know, the finisher is -- the finisher, most of

7    the time, is busy feeding conventional cattle.  And he finds

8    the natural cattle to be just kind of a, you know, pain in

9    the neck.

10   Q.    So the feedyard -- when you say "finisher," can we say

11   "feedyard" or "feedlot"?  Is that all correct?

12   A.    There's a lot of jargon thrown around in our

13   business -- "feedlot, feedyard, feedlot, finisher" -- but

14   the most important thing to understand is that when these

15   animals go into the final stage of their life as beef

16   animals, you know, they eat a high-concentrate diet for a

17   few months, and that is in the finisher.  The reason it's

18   call the "finisher" is it's kind of like an assembly line

19   for a car.  The last thing that's done is they paint the

20   car.  The last thing we do in the cattle business is that we

21   feed the animal a high-quality-enough diet for enough time

22   to be able to let the genetics of these animals that came

23   from this guy (indicating) enhance themselves.

24   Q.    But would the difference in your analogy be that a

25   finished car could just sit in a garage, but the cattle that

1   stay too long in the finish yard, you have to keep giving

2   them water and food and deteriorating the product?

3   A.   A finished car can sit in a garage.  Finished cattle

4   cannot sit anywhere.  They have to be eating, drinking, or

5   at the packing house.  Period.  They can't -- especially

6   today, I mean, with fuel, labor, and feed the way it is,

7   it's insane how much more expensive.  It's almost twice as

8   much to feed animals as it was 12, 15 months ago.  So yes.

9   Q.   So the feedyard owner, they don't decide when the

10  natural cattle are harvested?

11  A.   You know, the feedyard managers -- you know, here's

12  what it kind of is like:  Feedyard manager calls and says,

13  "Hey, these cattle are getting big.  We've showed them to

14  the buyers and they're trying to, like, figure out how to

15  get them in."  And so the feedyard manager doesn't have any

16  pull what to do --

17  Q.   What about Zia Ag?  Does Zia Ag decide when the

18  finished cattle --

19  A.   You know, one of the reasons I've always had a good

20  relationship with the people at Tyson is because I talk to

21  them a lot about this topic right here.

22  Q.   What topic?

23  A.   They talk to me a lot about this topic right here, as

24  well.  And the topic of, you know, "Hold on a little bit.

25  We'll get to you and we'll get them."  Or, "Hey, why aren't

1    they big enough?"

2            And so, for me -- remember, I'm in the cattle

3    business.  I'm not in a -- I don't build a box of tennis

4    shoes.  Every animal is different.  They're all created with

5    very specific genetics.  And the cattle are ready when

6    they're ready.  You know, they're not -- again, this is a

7    natural process.  And, for people at the packing house, you

8    know, the most important thing they care about is having

9    enough head count each today, each month, each week, so that

10   they can create the products they sell.  So we have kind of

11   an antagonistic kind of thing going on like, you know,

12   push-and-pull going on.

13           That's why it's hard.  These relationships are

14   difficult.  And they have to be maintained so that both

15   people kind of are able to survive through this whole kind

16   of delicate dance.

17    Q.   So you testified that it would be Tyson, as the

18   packer, that would decide when the natural -- these natural

19   cattle are harvested?

20    A.   Correct.  If we go back to this illustration, the

21   animals get here (indicating); seldom can you pick up the

22   phone -- if it's conventional, you can pick up the phone any

23   time and they'll come get them.  Normally.  If it's not

24   implanted, you're just kind of hostage.  You have to wait

25   until the one person at the company says, "I'll get them

1    in."

2      Q.    Well, what happens if Tyson leaves these cattle in the

3    feedyard for months beyond their kind of "sweet spot," as

4    you call it?

5      A.    Well, you have two choices.

6      Q.    What are those?

7      A.    You can just say, "The heck with it," and just take a

8    loss on them and sell them and make the person that you're

9    married to get upset because they needed the cattle, but

10   they need them in three months; they don't need them today.

11   Or you can just sit there and pay the extra cost to, you

12   know, wait until the slots open up.

13     Q.    And would those extra costs eat away your margins?

14     A.    Well, I think our whole discussion is, not only does

15   it eat away the margin, but it wastes money and the cattle

16   lose money.  We're talking about cattle, when you're lucky,

17   you make $75, $100, $125 a head.

18     Q.    Profit?

19     A.    Net profit, after all expenses.  So if the cattle cost

20   $5 a day to feed, it doesn't take very long before you've

21   eaten all your profit up.

22     Q.    So between the packer and, you know, someone like Zia,

23   which party has more power, in terms of picking up the

24   cattle or how much profit Zia would make on these cattle?

25            MR. FISHER:  Objection, Your Honor.

1          THE COURT:  What are the grounds for the

2   objection?

3          MR. FISHER:  Calls for speculation.

4          THE COURT:  Overruled.  Go ahead.

5   A.   There's one person in Tyson that decides when these

6   cattle are going to be sacrificed.  And he's the guy in the

7   blue coat behind you.  Mr. Scherer.  He's the only guy.

8   Q.  (BY MS. DIAMOND):  And is that the only guy --

9   based on the model that you just described, is he

10  the only guy who can decide how much profit Zia will

11  make on these cattle?

12  A.   You know, ultimately, yes.  He doesn't tell us what to

13  buy the cattle for.  But if he always has control of when

14  they leave the feedlot, he always has control of how much

15  we're going to have to spend to grow the cattle.

16  Q.   And if Zia wants to sell -- wants to feed natural

17  cattle at the levels that we've discussed where it's

18  thousands a head, does Zia have to work with Tyson or sell

19  to Tyson?  For natural cattle.

20  A.   If Zia wants to sell GAP cattle, they're finished,

21  they have to sell them to Tyson; they don't have a choice.

22  If we want to do more than a couple of thousand.

23          There are other places that sell Whole Foods

24  beef.

25  Q.   But not at the level that Tyson does?

1    A.   No, ma'am.

2    Q.   Mr. Perez, when did you first start doing business

3    with Tyson?

4    A.   In the year 2000.

5    Q.   And can you describe those early dealings.

6    A.   Well, I became familiar with a man who was the head of

7    procurement for -- or in some capacity in procurement for

8    over 39 years.  His name is Bruce Bass, God rest his soul.

9    He passed away.  He was my mentor.  He's the one that taught

10   me how to go from being a cow-calf guy over here in New

11   Mexico, and maybe a backgrounder.  He taught me how to be a

12   finisher.  How to create something at this level that, when

13   it got to the processor, it's something they really want.

14   He said, "Hey, you know what, Narciso?  If you want to learn

15   to really make money feeding cattle, just feed the cattle

16   that we want you to feed, don't feed a bunch of weird stuff,

17   Mexican cattle and other things; feed cattle with

18   specificity."

19           And so I said, "Okay.  Well, how do we do that?"

20           And he said, "You go find out what we've got to

21   do to buy a bunch of these calves and bring the costs to me.

22   And we'll look it over and I'll tell you whether I want

23   them, 'yes' or 'no.'"

24           So that's what we did.  We started out, in the

25   early years, Tyson and myself ran a lot of cattle in grass

1    together in New Mexico.  And then we ended up -- when they

2    closed -- they closed a packing house in the Pacific

3    Northwest -- I think it was in Idaho.  When they closed that

4    packing house, then the things we did together changed --

5    and I think the packing house was in Boise -- but, anyway,

6    and when that changed, then we started, you know, growing

7    cattle and feeding them for other programs to go to Amarillo

8    and other places.

9              And, in the year 2008, he and Brad Brandenburg

10   approached me about putting together natural cattle and

11   feeding natural cattle because they had the first deal with

12   Wild Oats.  And I don't even know --

13   Q.   Who is Mr. Brandenburg?

14   A.   Mr. Brandenburg was a gentleman that was kind of the

15   predecessor.  I'm sorry, he was the gentleman that followed

16   up Mr. Bass.  He was working in the Pacific Northwest and in

17   Canada.  And Mr. Bass brought him in on some of the dealings

18   we had sometime a couple of years before Mr. Bass left.  I

19   think he left about 2007 or 2008 or something like that.

20   Q.   So going back to those early years when you first

21   started making deals with Tyson, did you ever visit any of

22   their offices?

23   A.   You know, the first office that I visited was this

24   office in Dakota Dunes.  I think it's the headquarters for

25   Tyson Fresh Meats or something like that.  It's got -- I

1    think it houses the pork and the beef divisions.  But I've

2    been to the offices in Dakota Dunes --

3      Q.   What was that office like?

4      A.   -- a few dozen times.

5      Q.   What was that office like?

6      A.   Their office is several floors and, you know, a few

7    hundred people and -- but the offices are -- while they're

8    impressive, they've got a big campus and everything, what's

9    really impressive are the packing houses.

10     Q.   What are those like?

11     A.   You walk in the Garden City plant --

12     Q.   Garden City is where?

13     A.   Kansas.  You go in and meet the plant manager.  He

14   comes and talks to you and tells you that he's got several

15   thousand people working there, and they speak 40 to 60

16   languages; they're from all over the world and -- very

17   impressive.  Lot of people working there.  The

18   material-handling division for the Garden City plant looks

19   like George Jetson's, you know, vision of a packing house.

20   There's robots going all over the place and many stories

21   high.  Very impressive.  Thousands of people work there.

22   And that's only one plant.  I think they have six plants.

23     Q.   Can you describe your initial deals that you did with

24   Mr. Bass?

25     A.    Mr. Bass and I would sit down and, really, he would

1    say, "Go look at the calves.  See what you can buy them for.

2    See what it would take to get them to a certain size and

3    tally up what it will cost, and I'll tell you if I'll do it

4    or not."  And, you know, most of the time -- so he taught me

5    how to run a break-even.

6    Q.   What's a "break-even"?

7    A.   A "break-even" is when you take and put the cost of

8    the cattle in, the perceived rate, the -- to get them

9    wherever you're going to -- from where they are to where

10   they're going, the interest on the money for the cattle and

11   the feed, the cost of the feed, and the death loss, you come

12   up with a number, and that's called a "break-even."  And he

13   taught me how to run break-evens.  And he went on to show me

14   how to run break-evens to get cattle up to the finish side.

15   Because, remember, I was always a rancher or a backgrounder,

16   I started feeding a few cattle, but the bottom line is

17   Mr. Bass taught me how to create cattle for IBP Tyson that

18   the plant could use, that they could pay higher money for.

19   And he taught me how to make a business out of it by showing

20   me how to run the numbers on the cattle.

21           THE COURT:  Ms. Diamond, I'm going to take our

22   mid-afternoon break soon.  If you have a few more questions

23   at this time --

24           MS. DIAMOND:  We can stop now, that's fine.

25           THE COURT:  Okay.  We're going to take a

1    15-minute recess, and then we'll continue with Mr. Perez'

2    testimony.

3                    (Discussion off the record.)

4                All rise for the jury.

5                    (Jury not present.)

6                You may be seated.

7                Is either counsel going to want to preserve

8    these -- this chart Mr. Perez is drawing, the demonstrative

9    evidence?

10               MR. WORDEN:  I don't think it's going to the jury

11   room.

12               THE COURT:  No, but do you want to preserve it

13   for the record?

14               MR. WORDEN:  We have the testimony.  It's not a

15   significant issue.

16               THE COURT:  So no?

17               MR. WORDEN:  No.

18               THE COURT:  Tyson?

19               MR. FISHER:  No, Your Honor.

20               THE COURT:  All right.  Thank you.

21               We talked about doing exhibits at the end of the

22   day, which is fine.  But I just want to make clear we won't

23   show the jury any exhibits unless they've actually been

24   admitted.  So if you want to show them exhibits before

25   they're admitted, that's not going to work.  We can just

1    admit them through the witness, if you want to.

2               MR. WORDEN:  Just so I'm clear, Your Honor, I

3    thought the agreement was we could -- unless someone objects

4    for relevance -- and I'm sorry, I'm a little slow here -- if

5    Ms. Diamond starts showing Mr. Perez, should we get them

6    admitted per document, or -- I would suggest just wait until

7    the end of the day, since I don't think there will be many

8    relevance objections and it just slows the jury down.

9               THE COURT:  Here's my concern:  I don't want to

10   show the jury anything and then have there be a relevance

11   objection at the end of the day.  And then I agree with the

12   objection, and now the jury has seen something I've deemed

13   irrelevant.  But everything is foundationally fine.  You

14   don't even have to show them to the witness, so just say,

15   "We move to admit Exhibit Number 'X,'" and I'll hear from

16   Tyson.

17              MR. FISHER:  Perhaps Mr. Worden and I could

18   discuss and present a proposal to the Court?

19              THE COURT:  You can do that during the break, and

20   then I'll admit them all right after the break.

21              MS. DIAMOND:  Your Honor, I don't think the

22   exhibits for today would be what were in Mr. Worden's

23   opening --

24              MR. WORDEN:  Here's what I would suggest:  If

25   there's a relevance objection, someone make it when the

1    exhibit first comes out.  So, if Ms. Diamond says, "I'd like

2    you to look at Exhibit 12," Mr. Fisher will say, "Objection,

3    relevance" --

4                THE COURT:  Well, that's the normal way to do it,

5    and I'm happy to do it that way as well.  So we can do it

6    that way, or you-all can talk right now during the 15-minute

7    recess and give me a list of stuff that's admitted and we'll

8    do it that way.

9                Let me know.  Okay.  We'll take 15 minutes.

10   Thank you.

11               MR. WORDEN:  And, Your Honor, we are going until

12   5:00; is that right?

13               THE COURT:  Yeah.

14               MR. WORDEN:  Okay.  Thank you.

15                      (A recess was taken.)

16               THE COURT:  You may be seated.  Thank you.

17               All right.  Counsel, do we know what we want to

18   do in regard to the exhibits?

19               MS. DIAMOND:  Your Honor --

20               MR. WORDEN:  Hold on one second.

21               I think, when someone says they want to show an

22   exhibit, the other side will object if there's a relevance

23   objection --

24               THE COURT:  Okay.

25               MR. WORDEN:  -- if not...

```
 1                MR. FISHER:  We're in agreement on that.

 2                THE COURT:  Sounds like a plan.  Thanks.

 3                Ms. Diamond, do you have anything?

 4                MS. DIAMOND:  I think Juror Number 5 is texting

 5       on her watch, or it seems like she may have a watch or

 6       something...

 7                THE COURT:  I'm just getting my chart out to

 8       figure out who you're talking about.

 9                MS. DIAMOND:  It's the young lady in this top

10       back corner (indicating).

11                COURT CLERK:  Juror Number 12.

12                THE COURT:  You think she's doing what?

13                MS. DIAMOND:  I think she might be texting on her

14       watch.

15                THE COURT:  Do you want me to have Ms. Chavez

16       admonish them before they come back in the room?

17                MS. DIAMOND:  Or maybe just reiterate they can't

18       text on their watches, either.

19                THE COURT:  Okay.  Do you want me to have

20       Ms. Chavez do that when she goes back and discusses it with

21       them, or you want me to do it on the record with them here

22       in front of everybody?

23                MR. WORDEN:  It doesn't need to be on the record;

24       just a friendly reminder that people should not be texting

25       during testimony.
```

 1            THE COURT:  Yes.  My question is do you want

 2    Ms. Chavez to do that when she goes back to get them, or do

 3    you want me to do that when they come back?

 4            MR. WORDEN:  Either way is fine.

 5            THE COURT:  I'll have Ms. Chavez do that, then.

 6    Thank you.

 7            Anything else?

 8            MR. FISHER:  Nothing further.

 9            THE COURT:  All right.  We'll wait for the jury.

10            Mr. Perez, you can come back up to the stand for

11    when the jury comes in.

12                        (Jury present.)

13            Thank you.  You may be seated.

14            Ms. Diamond, you may continue your direct

15    examination.

16            MS. DIAMOND:  Thank you, Your Honor.

17     Q.  (BY MS. DIAMOND):  Mr. Perez, you were saying

18    that you were speaking -- testifying about the

19    people, the individuals at Tyson that you initially

20    dealt with when you first started doing business

21    with Tyson in the year 2000.

22            Can you just remind us, who was Bruce Bass?

23     A.  Yes, ma'am.  Bruce Bass was the head of procurement.

24    And he was in procurement for some amount of time, but he

25    worked at Tyson for 39 years.  But, when we were doing

1    things together, he was -- he was the head of procurement.

2    Q.   And you were describing your relationship with

3    Mr. Bass as more of a mentorship?

4    A.   Yes, ma'am.  Mr. Bass came to visit me in New Mexico,

5    stayed at my family home, went out to the ranches, looked at

6    our cattle.  At our dining room table at the ranch, he said,

7    "You know, you're a pretty smart kid from New Mexico.  If

8    you really want to learn this business, I'd be willing to

9    take you and show you how it's done because I really like

10   your cattle and I think there's a lot more for you in the

11   business than just being a rancher here in New Mexico."  And

12   he kind of took me by the hand and taught me the business.

13   Q.   And then, after Bruce Bass, you worked with Mr. Brad

14   Brandenburg at Tyson?

15   A.   Yes, ma'am.  Mr. Brandenburg was in some capacity in

16   the Pacific Northwest.  I think he lived in Washington

17   State.  And there was a time where Mr. Bass sent me several

18   million dollars, and we bought cattle and turned them out on

19   grass.  And it was kind of a joke amongst us because he sent

20   Mr. Brandenburg out to look at the cattle.  And everybody

21   that works at Tyson in the procurement division knows that

22   Mr. Brandenburg has eye problems, so he has had multiple

23   surgeries through his time at Tyson.  And, for a couple

24   of years, he was coming out to look at cattle, but the poor

25   guy couldn't even see and -- but we really developed a great

```
 1    friendship.  And he helped steward my relationship with
 2    Tyson.  A very pragmatic guy.  And, you know, I can't
 3    remember what year he retired, whether it was 2014 or '15,
 4    but sometime in that time period, I worked with either
 5    Mr. Bass or Mr. Brandenburg.
 6              Today, I'm still excellent friends with
 7    Mr. Brandenburg.  And Mr. Bass has since passed away, but
 8    Mr. Bass was -- we talked six times a day until he passed
 9    away.
10    Q.   And you, or Zia, sold Tyson cattle.  I mean, when you
11    were working with Mr. Bass and Mr. Brandenburg, either you,
12    yourself, or after Zia Ag was founded you were selling Tyson
13    cattle?
14    A.   Yes, ma'am.
15    Q.   Can you describe the types of contracts that you would
16    have in those cattle sales with Mr. Brandenburg and
17    Mr. Bass.
18    A.   Yes, ma'am.  Interesting.  I think that a contract
19    must mean something different in the cattle business because
20    few times have I had anything that anybody could go put a
21    hand on a piece of paper to verify I have some kind of a
22    deal with Tyson.  Few times.  And Tyson -- Mr. Bass and
23    Mr. Brandenburg both -- again, they taught me how to run a
24    break-even.  They would sit down and say, "Okay, listen, you
25    know, let's walk through the numbers.  We can pay $1,500 for
```

1    a finished animal.  Can we make one of those for less?"  And

2    they literally taught me how to do it.  And we would look at

3    the numbers and they would say, "You know what?  You're --

4    these cattle are too high.  We can't do anything.  Let's

5    don't buy them."  Or they'd say, "You know what?  These

6    cattle are really valuable.  I think we can both make a lot

7    of money."  In the early years, I would buy all the cattle,

8    and they would send the money to me.  I didn't put any money

9    into it.

10   Q.    And this was millions of dollars?

11   A.    Millions of dollars.

12   Q.    Without a formal written contract?

13   A.    That is correct.

14   Q.    So, obviously, you, you know, have had contracts in

15   your life.  How would this differ between like a contract

16   you would make for insurance or a contract you'd make to

17   buy -- you know, to lease a car or something?

18   A.    How is it different?

19   Q.    Yeah, from the kind of agreements that you've reached

20   with Tyson with Mr. Bass and Mr. Brandenburg.

21   A.    Well, if you walk up to Hertz and you're going to rent

22   a car that you reserved, you're going to get a contract

23   that's spit out that's, you know, I don't even know how many

24   pages it is, but it's, you know, 20 inches long and printed

25   on both sides.  And I'm guessing that the four elements for

```
 1    a contract must be in those hundreds of words because that's
 2    what Hertz wants you to sign.  But I never had anything like
 3    that with Mr. Bass because I didn't need it.
 4    Q.   Why not?
 5    A.   Because we looked at the cattle.  He saw what they
 6    were going to cost.  He told me how many of them he wanted.
 7    And he never wanted less than 15-, 20,000 cattle.  And he'd
 8    say, "Okay, you know what?  I'm going to pay you this amount
 9    of money for these cattle because, if you do that, you
10    should be able to make you know 5, 6, 7, 10 percent on your
11    money," and -- and away we go.
12              And so, like I said, in the early years, he would
13    send the money to me.  I'd buy the cattle, I'd send him the
14    invoices, and they would pay them.  And we'd get the cattle,
15    run them on grass, feed them, and send them to the packing
16    house.  And then we'd split the money that they made and
17    things like that.  Because they were looking for cattle, so
18    he was willing to do some things.
19              Then, when we started getting into things with
20    Brad Brandenburg, we got off on this tangent of working on
21    cattle to go to the UK and Japan and other countries like
22    that.  And so we kind of got off on this tangent of
23    supplying really high-quality cattle that were conventional
24    to supplying cattle that were in programs, cattle with
25    specificity.  And when we opened up Zia Commodities, we used
```

1    to hedge cattle.  And there is a gentleman named Mark Lytle

2    that works at Tyson in the risk management division.  I'm

3    not sure that's his title, but he handles their hedging and

4    things like that.  And it was really cool because there was

5    something called an "ex-pit trade" --

6    Q.   Mr. Perez, I'm just going to stop you for a second

7    because I want to get some clarification.

8              What's "hedging" a cow?

9    A.   Basically, let's call it "insurance."  You go down

10   here to some auto place and buy a car and you arrange for

11   financing.  And, before you drive out of the lot, you call

12   All State or Farm Bureau or something, GEICO, and you get an

13   insurance policy.  Because, if you pull out onto the street

14   and somebody hits you or you go get a hamburger and somebody

15   steals the car or it starts on fire, you can't pay the bank

16   back because you lost the car.  You're protecting your

17   investment in the car, so you buy a policy.

18             With hedging, you can use products from the

19   Chicago Mercantile Exchange --

20   Q.   And what's that?

21   A.   Chicago Mercantile Exchange is a clearinghouse in

22   Chicago that's the commodity version of the New York Stock

23   Exchange.  You don't actually have to have the animals; you

24   can buy and sell on paper.

25             And so the cool thing was, because Tyson had

UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1    trading accounts and Zia had trading accounts, we could

2    hedge our cattle on the Chicago Mercantile Exchange.  That

3    allows you to hedge them into the future.  And then, when we

4    delivered the cattle to Mr. Brandenburg, we could actually

5    get the clearing -- the CME to hand our hedge positions over

6    and stick them into the account of Tyson.  And it was really

7    a beautiful way, without any price slippage, to price the

8    cattle and to remove our hedges.  And at the same time,

9    Tyson, ostensibly, would take our hedges and they would have

10   the cattle hedged, too.

11            So it worked really well because, in the futures

12   market, you can work way in the future.  And, you know, we'd

13   work on a deal in January and we could hedge cattle in

14   October of that same year.  And Tyson had, you know, the

15   risk protected with this hedge and so did Zia.  We just

16   handed it to them, and there was no commissions or anything

17   else.  And, really, it -- it really just embodied what the

18   Chicago Mercantile Exchange is all about, which is removing

19   price risk for both parties.  In this case, it was Tyson

20   removing price risk for paying too high a price and Zia

21   getting -- receiving too low of a price.  So it was what I

22   called a "symbiotic relationship."  And we continued that

23   arrangement for a couple of years.

24   Q.   Did you always have the same pricing structure?

25   A.   Never.  We never had the same pricing structure and --

1    Q.   In your deals with Tyson, it's always been different?

2    A.   Never.

3    Q.   Different structure, different pricing?

4    A.   Always.

5    Q.   And what were some of the other pricing structures

6    you've used over the last two decades?

7    A.   Prior to that time period, we would just flat look

8    into the futures market and say, "You can hedge these cattle

9    for a $1.25; I'll give you $1.25."  Because Mr. Bass always

10   wanted us to hedge our cattle.  He wanted to make sure that

11   we weren't taking a price risk, ever.  And so I came up from

12   that school.  I bought the grain; we sold the cattle.

13          And, you know, then, when Mr. Brandenburg was

14   either going to leave or he had already left, Mr. Scherer

15   rolled in.  And he and Jay Holmes, who I believe he was

16   working under at the time, and John Gerber, who I believe

17   Jay Holmes probably reported to, some -- you know, between

18   one of those people -- but Bob's talking to me, saying,

19   "Hey, why don't we change this from the CME close to the

20   Nebraska weighted average"?

21   Q.   So, Mr. Perez, I just want to go back and talk a

22   little bit more about these early dealings.

23          When you were working with Mr. Bass and

24   Mr. Brandenburg, was there ever an issue where Tyson failed

25   to uphold its promise or uphold its obligations to your

UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1   agreement?

2   A.   No.

3   Q.   Did they --

4   A.   Tyson treated me like someone that they were trying to

5   teach the business to.  And they had a watchful eye out for

6   me.  They wanted to make sure that I could make money

7   because, if I didn't make money, I wouldn't be able to

8   create cattle for them, so they never took advantage of me.

9   They always wanted to make sure that they got the product

10  they were looking for; that was the tradeoff.  And I got to

11  make, you know, a reasonable margin on the cattle.

12  Q.   So your understanding was that Tyson valued Zia's

13  cattle?

14  A.   Whether they were -- this could have been pre-Zia or

15  it could be after Zia, but, yes, they -- you know, today,

16  the grading, as I've gone through here on the board --

17  prime, upper choice, lower choice, select -- today, the

18  grading has changed in the United States a great deal.  But,

19  when we started this relationship, the grading was really

20  bad.  It was poor as can be.  You know, probably, the

21  percentage of prime was somewhere around 5 percent in the

22  United States.  3 percent, 6 percent, very small.  And they

23  valued the fact that I knew how to create the right kind of

24  genetics.  I knew how to go to other ranchers and get

25  them -- that's always been kind of my strong suit, is going

1    to a rancher and getting them on board to do something

2    specific with their cow herd.  And so you get 10 -- 10, 15

3    20, 100 of these ranchers doing all of the same thing, all

4    of a sudden, you're talking about some real numbers that can

5    come out of it.  And that's what Tyson, you know, back then,

6    was looking for.  They were looking for a larger amount of

7    cattle that could be sacrificed that had a higher percentage

8    of prime and upper choice.

9              And I think, still today, that's important, but

10   the population of the cattle in the United States, they're

11   just a higher quality than they used to be.

12   Q.   So Tyson valued the product that you were providing?

13   A.    Tyson has always valued -- even Mr. Scherer has told

14   me many times that he really appreciated the quality of our

15   cattle.

16   Q.   And, again, you just testified you never had any

17   formal contract with Tyson where it has your name or Zia's

18   name and Tyson's name on a piece of paper that you both

19   signed?

20   A.   No, ma'am.

21   Q.   And have you heard of those type of contracts with

22   Tyson even between other parties?  Regarding, you know,

23   buying cattle.

24   A.   No, ma'am.

25   Q.   Is this typical in the cattle industry, formal written

1    contracts?

2     A.    You know, the cattle industry has some written

3    contracts.

4     Q.    Who would have contracts?

5     A.    You know, we do business -- I don't think it's going

6    to make any change in the outcome of these proceedings to

7    tell you who I do business with, but I do business with a

8    couple of folks, packers.  They write contracts.  They're

9    happy to write them.  It's just that my relationship with

10   Tyson has not been that way.

11            It's been -- and it hasn't been perfect, either.

12   So this is just like a marriage.  You know it hasn't been

13   20 years of a beautiful marriage.  It's been 20 years of

14   work-in-progress.  When we have a problem, we sit down and

15   we talk about it.  And, you know, sometimes there's a

16   problem on their side, sometimes it's a problem on my side.

17   And we sit down and talk about it.  We always work it out.

18    Q.    Until this case?

19    A.    This time, we didn't work it out.  I saw there was a

20   problem.  I made a number of phone calls to Kevin Hueser.

21   He was always ready on the spot to grab my call.  He did not

22   return my call.  He kept telling me he was going to return

23   my phone calls; he never did.  I called Justin Nelson, who

24   told me, if there was ever a problem, to call him.  I called

25   him a bunch of times; he never returned my phone call.  I

1    called Bob a couple of times, and he didn't return my phone

2    call, either.

3              So I called up Bruce and I said, "Bruce, what do

4    I do?"

5              And he said, "The company will do what they're

6    supposed to do; just keep trying to get ahold of them."

7              And so I called Kevin a couple more times,

8    because I knew that Kevin was over Justin and over Bob.  And

9    he did text me a couple times saying, "Hey, I'll call you on

10   Saturday; I'll call you later; I'll call you..."  He never

11   did call me.  I haven't spoken to him since, until today

12   when I said "hello" to him when I walked in.

13             So Mr. Bass when I told him what happened --

14   because Mr. Bass is from the same little tiny town in Iowa

15   that Kevin Hueser is.  So he said, "You call Kevin and you

16   tell him that you're going to come see him."  You know, I

17   can't go see somebody that won't take my phone calls.  So

18   Mr. Bass said, "Well, why don't you call your attorney and

19   see what he says?"

20             So I had my attorney get hold of -- if I'm not

21   mistaken, I think it was Mr. Gomez, who's sitting over

22   there.  I said, "John, please call Mr. Gomez.  Tell him

23   we've had 20 years of doing business.  And tell him I don't

24   want that relationship to go away.  And there's obviously a

25   very, very -- a very bad thing has happened here.  And we

```
1    need to sit down and talk."  And, according to John -- I
2    don't think this is any kind of a secret -- he said that
3    Mr. Gomez told that if we didn't like what we got paid, we
4    could just sue them.
5    Q.   Mr. Perez, who is Jay Holmes?
6    A.   You know, Jay Holmes is a guy that I met in 2011 with
7    Mr. Scherer.  But I knew he was around because I'd talked to
8    him on the phone a few times.  Mr. Holmes worked for
9    Mr. Bass and for Brad Brandenburg and later became -- I
10   believe he was the head of procurement for like the
11   Northwestern side of the United States for Tyson.  And I do
12   remember that, for some period of time, he was Bob's boss,
13   because I was talking to Mr. Holmes about -- about some
14   stuff with some natural cattle.  And I think Bob even asked
15   me to call him, you know.  So he was -- and I believe until,
16   you know, I heard through -- you know, this is a very small
17   industry.  I heard that Mr. Holmes lost his job recently.
18   But, until he lost his job, I'm pretty sure he was still in
19   the Pacific Northwest running the procurement over there on
20   that side of the United States for Tyson.  Really nice guy;
21   knows a lot about cattle; been in the business a long time.
22   I think his dad used to be an employee of IBP or something.
23   I really don't know, but I know -- I know that -- I do
24   remember that, a couple of times, Bruce -- Jay sent messages
25   to me to give to Bruce to give to his father.
```

1    Q.   What's IBP?

2    A.   IBP Producers.

3    Q.   And what's that connection to Tyson?

4    A.   I don't know what year Tyson acquired IBP.  Somewhere

5    along the line, they acquired them.  I really don't know.

6    Not very long ago, Bob and I got together to go look at some

7    cattle.  And he had a car that had "IBP" on it still.  So

8    I'm guessing it happened in the last 10, 12 years or

9    something.

10    Q.   So you testified that Mr. Holmes was fired from Tyson?

11    He doesn't work there anymore?

12    A.   That's hearsay.  That's what the industry says.

13    People in the business are saying that -- well, let me put

14    it to you this way:  He works for another packer.  Because

15    some cattle that we've had out there that are available,

16    somehow or another, he found out about them, so he made an

17    inquiry about them.  So I know he works for another packer.

18    Whether he quit and went over there or was relieved of his

19    duties or what, I don't know, but he was also with Tyson for

20    a long time.

21         Mr. Brandenburg and Mr. Bass were at Tyson for

22    just almost 40 years.  And I'm going to say that Jay, he was

23    way younger than those guys, but I bet you Jay has put in

24    20 years or something.

25    Q.   Who is John Gerber?

1    A.    John Gerber was a gentleman that worked for Bruce

2    Bass.  And, when Bruce Bass retired, Mr. Gerber took the

3    position from him.  And the way that Mr. Brandenburg

4    described it to me is that him and John were basically

5    taking on the job that Bruce was doing.  Mr. Brandenburg

6    moved from Washington to Dakota Dunes, and those two folks

7    were working out of the headquarters there at Dakota Dunes.

8    And, you know, I didn't really deal with Mr. Gerber a lot

9    because Mr. Gerber was working on the conventional side of

10   the cattle, and Mr. Brandenburg was working on the premium

11   side of the cattle.  "Premium cattle" being natural,

12   NHTC-sourced, and age-verified cattle, something with

13   specificity.

14   Q.    And who is Justin Nelson?

15   A.    You know, I don't know where Justin Nelson came from.

16   I think he was a buyer that was hanging around in the

17   stratosphere; next thing, he was up at -- in the corporate

18   office.  I didn't know him very well.  I just knew, you

19   know, I'd call up there to talk to Bob or John Gerber or

20   something, and Justin would answer the phone.  Especially

21   like after hours.  Justin, I think he was a hard worker.  I

22   think he started early and stayed late.  And so I got to

23   know him a little bit.  And then, the next thing I know, he

24   is taking John Gerber's place.

25            So we heard through -- well, I heard from Kevin

1   Hueser.  Kevin Hueser told me that John Gerber wanted to

2   retire and that he was thinking about hiring somebody from

3   CattleFax.  And then, the next thing I know, he didn't hire

4   the guy from CattleFax, he hired Justin Nelson.  So, you

5   know, from one day to the next, Mr. Gerber is retired and

6   Justin Nelson is the head of procurement.

7   Q.   Does Mr. Nelson still work for Tyson, to your

8   knowledge?

9   A.   Mr. Nelson is an order buyer.  Again, I don't know why

10  he doesn't work for Tyson.  But he's an order buyer because,

11  you know, we talked somewhere along the way.

12            (Reporter interruption for clarification.)

13  Q.   So you testified from all the people that you dealt

14  with at Tyson, from 2000 till about 2015 or '16, everyone

15  who has been in the Tyson procurement that you were dealing

16  with or had crossed paths with has either passed away,

17  retired, or presumably been fired?

18  A.   They're not there anymore.  I don't know what

19  happened.  But I'm also -- you know, I also own some Tyson

20  stock.  And I know they've also changed CEOs.  From 2018 to

21  2021, I think they've had three CEOs, as well.  So there's a

22  lot of new folks at Tyson.

23  Q.   When did Tyson first buy Zia's natural cattle?

24  A.   Well, whether they were natural or NHTC, I can't

25  remember, because we started Zia in 2010.  But I'm going to

1    say, in 2010, Mr. Brandenburg started buying cattle from

2    Zia.

3       Q.    You testified earlier that the process of even buying

4    or selling natural cattle or NHTC cattle differs from

5    conventional cattle.  And so you also testified that, in the

6    early days with Tyson, you had no written formal contracts,

7    but that was presumably for the sale of conventional cattle.

8    When you were testifying with regard to selling Tyson Zia's

9    natural cattle, what kind of contracts did you have?

10      A.    Most of the stuff that we've done has all been on a

11   handshake.

12      Q.    And so what does that mean?

13      A.    That means that I say, "Mr. Brandenburg, I've got

14   5,000 Holsteins that are NHTC-certified.  And I won't

15   implant them, if you give me some number for them and give

16   me a premium for NHTC."

17      Q.    And when you say you won't "implant" them, you mean

18   you won't turn them into conventional cattle or let -- raise

19   them as conventional cattle?

20      A.    That's correct.  On the other side of the board

21   there -- do you mind if I just turn the board around?

22              THE COURT:  Your attorney has to ask me.  I'm

23   sorry.

24              THE WITNESS:  I'm sorry.

25              THE COURT:  Do you want me to allow the witness

1    to turn the board around?

2              MS. DIAMOND:  Sure.  Please.

3     A.   So whether they're NHTC or natural or whether

4    they're --

5              THE COURT:  Sir -- let's give you a microphone

6    real quick, Mr. Perez.  There you go.

7     A.   Whether the cattle are NHTC, natural, or some program

8    without an implant, they're here (indicating), within

9    reason, about the same numbers.  And, down here, the

10   implanted cattle, they're down here (indicating).

11             So those cattle I'm talking about with

12   Mr. Brandenburg, they were these kind of cattle

13   (indicating).  And there was no way, no place, and no how to

14   sell these cattle, unless Mr. Brandenburg bought them.  But,

15   by the same token, he was the guy that was asking me to

16   create the cattle.  So he knew that there would be no

17   other -- that's been kind of, you know, Zia's MO with Tyson,

18   we've gone to dairy people, to ranchers, to the source

19   people that own the cows, and we built the program from the

20   cow herd all the way forward.

21    Q.   (BY MS. DIAMOND):  And just to confirm:  That

22   top line, would that be natural cattle and the lower

23   line is conventional cattle?  Maybe you can clarify

24   that on your chart.

25    A.   That is correct.  The top line I'm going to call them

1   "program cattle," whether NHTC, GAP, natural, straight

2   natural.  And these cattle are implanted, conventional

3   cattle (indicating).

4   Q.   And you testified that you never had a set pricing

5   structure that you were going to use?

6   A.   No.  I testified that we never had the same deal.  I

7   mean, everybody insinuates that we just have a

8   rinse-and-repeat kind of relationship, and that is

9   absolutely not the truth.  Because I have sold Mexican

10  cattle, Holstein cattle, Holstein NHTCs.  I've sold Black

11  Angus cattle, black Holstein crosses.  I've sold the best

12  natural cattle in the world that are Angus-Angus.  We hardly

13  ever had the same deal.  And, most of the time, it's, "Go

14  create a white unicorn for us and we will pay you a really

15  nice price."

16  Q.   Is it harder to find natural cattle than conventional

17  cattle?  Again, can you talk a little bit more about the

18  process of finding natural cattle?

19  A.   It used to be very hard to find natural cattle.  It's

20  not hard to find natural cattle now.  It's hard to find

21  natural cattle that are fat that have a destination.  So

22  what's hard now is -- I mean, anybody can have natural

23  cattle, but when you start feeding them, it costs way more

24  money to feed them.  So if you let yourself fall asleep and

25  don't have -- I mean, with natural cattle, what you do is,

1    you sell them and then you create them.  You don't create

2    them and then look for a place to sell them.

3    Q.    Right.  So you start them at the -- it's easier to

4    find natural cattle at the cow-calf stage, the first stage

5    that you illustrated in your other chart?

6    A.    Yes, ma'am.  And, in fact, today, in the cattle

7    industry, Zia is known for, "Tell me what you need and we'll

8    create it.  Tell me and I'll tell you what it costs us, and

9    we want to make a 6 to 7 percent margin."  That's our

10   business today.

11   Q.    And so how would you describe the standard agreement

12   with Tyson and either you, individually, or Zia in the last

13   20 years?

14   A.    I think I can sit back down, if you don't mind?

15   Q.    Please.

16   A.    Well, I think we're all old enough in this courtroom

17   to have had a relationship of some kind, even if it was just

18   a pet.  Relationships take work.  Relationships aren't

19   perfect.  They have give and take.  And my relationship with

20   IBP Tyson has been a very, very good relationship, but it's

21   been a relationship of learning, of trusting, of meeting

22   people halfway; saying "I'm sorry," just like any other

23   relationship would be.  We at Zia, you know -- the

24   difference between Zia and me is that I work for Zia.  And

25   Zia's owned by a man who's got impeccable integrity, and he

1   is based in the sciences and math.  And he is not interested

2   in doing things that are crazy, like shaking hands and

3   selling somebody 20,000 head of cattle and expecting for

4   them to do what they say they're going to do.  He doesn't

5   come from that school of thought anymore.  He comes from the

6   school of thought of "Let's get the numbers right, get them

7   on a piece of paper; let's show them to them."  The

8   heartbreaking part of this, when we get into this cost plus

9   contract, is that if you knew the man-hours and the money

10  spent to get the numbers in there and get them right, it

11  would -- it would be -- it's just sad because many people

12  worked very hard to do a very good job to make sure that

13  Tyson had some set metrics so that they would know four,

14  five, six months down the road what their cattle were going

15  to cost.  Period.  We tried really hard.  And, today, I'm

16  sitting here saying, gosh, you know, the things that

17  Mr. Bass and I did with a handshake over a glass of whiskey,

18  don't tell me that they had more integrity than trying to

19  lay out numbers and time periods and...that's how I feel.  I

20  feel sad.  I feel disappointed.  I feel like I was married

21  for 20 years and I find out that, you know, the partner that

22  I had was cheating on me or something.  It's disappointing

23  to me to invest 20 years of my life.  That's a third of my

24  life that I invested into this relationship.  And, on one

25  deal, that's how valuable I am to Tyson.  One deal.  One and

1    done.

2    Q.    Who is Kevin Hueser?

3    A.    Kevin Hueser is, again, a guy that -- I was looking at

4    his business card last week.  And his business card that he

5    gave me a long time ago says "Senior VP of Margin

6    Management."  And I have no idea what his title is today,

7    but, apparently, he still works at Tyson.

8    Q.    So after you worked with Mr. Nelson at Tyson, who did

9    you work with next?  Would that be Mr. Scherer?

10   A.    Mr. Nelson -- you know, I didn't work with Mr. Nelson

11   very long.  I mean, he was around two or three months.  You

12   know, like John Gerber left, he was there.  Bob was, you

13   know, part of all that, too, so I was talking to Bob a lot.

14   That's probably the most Bob and I have like really -- you

15   know, we've spoken a lot, but that was probably the most

16   kind of that Bob was playing a more prominent role in

17   procuring the cattle.

18   Q.    Can you describe your first dealings with Mr. Scherer

19   regarding the sale of Zia's cattle?

20   A.    You know, I don't know when Mr. Brandenburg left.  He

21   left 2014, '15, '16, somewhere in there.  But when he was

22   about to leave, he -- we had a couple of deals that were

23   already in motion.  And, again, they were program cattle,

24   and Bob already was kind of like partnered up with Brad on

25   the program cattle and --

1    Q.    And that's the natural cattle, just to clarify?

2    A.    Maybe it was NHTC cattle back then.

3    Q.    It's not the conventional, though?

4    A.    No.  So Bob -- you know, Bob kind of took the tail end

5    of Brad's business with me, with Zia, and kind of finished

6    it up.  And then he said, "Hey, I'm over the naturals."

7    What I believe happened is he took the tail end of the NHTC

8    stuff and said, "Hey, I'm over the naturals now, and I need

9    'X' amount of cattle."  And I said, "Okay.  Well, we'll get

10   them -- we'll get them going."  And, you know, we might have

11   talked about price, we might not have talked about price;

12   not really relevant at the time.  But what happened in the

13   next couple of months is -- and, you know, this is something

14   that Brad used to just get stirred up about.  Brad would

15   call me and say, "Hey, I just had Rhol Andreson [phonetic]

16   here.  He's from International.  We have a customer in

17   Amsterdam.  He wants like 2,000 of these NHTC in a month.

18   And I've got to get them put together.  So I'm flying out to

19   look at some cattle.  Let's get some cattle put together;

20   let's get going."

21          And so, a couple of times, we put a bunch of

22   cattle together.  And then, all of a sudden, Rohl Andreson's

23   deal didn't go through.  You know, maybe there was some

24   final sanitary problem between the UK and -- or Holland and

25   the United States or whatever, I don't know.  And Brad would

1    say, "Can you believe all the work we've put into this deal,
2    and now they're telling me they don't want the cattle?  But
3    don't you worry about it, because that's their problem.  I'm
4    taking the cattle.  I'm paying you the premium I said, but
5    it's just frustrating because we worked so hard to put the
6    cattle together, right?"  And, you know, I think the same
7    thing happened when Bob took over the naturals.

8    Q.   What happened?

9    A.   Bob came in aggressive.  And, you know, we started
10   talking numbers.  And I said, "Okay.  Let's get going."  And
11   so we're talking, everything is going good, we're working on
12   numbers, when and where and what.  And I believe that,
13   during that time period, Sean and I had a meeting just out
14   of Big Hole, Montana, where we had, I don't know, a hundred
15   ranchers right next to this beautiful setting, right next to
16   a guy named Todd Garrison's house.  And I called Bob and I
17   said, "Bob, I want you to come speak at this meeting."  And
18   him and Jay came; they spoke at the meeting.  It was really
19   cool.  We had all these ranchers there.  The packers just --
20   you know, back then, packers don't go and sit and talk to
21   ranchers.  And the ranchers really appreciated it.  And it
22   was a real, like, picture of, you know, synergy of what we
23   could do together.

24          I'm good at getting all these ranchers together
25   and getting them excited.  And these guys came and talked

1    about what Tyson was going to be looking for down the road.

2    And, as a result, Bob and I made a deal for a lot of cattle.

3    And a couple months go by and, all of a sudden, you know,

4    Bob is starting to get frustrated.

5    Q.   I'm sorry, Mr. Perez, you made a deal for a lot of

6    cattle.  Did you have a formal contract?

7    A.   No.  Bob said, "I'm doing the naturals and I'm going

8    to need a couple thousand."

9    Q.   Nothing was in writing?

10   A.   No, zero in writing.  In fact, we've thrown all these

11   e-mails backwards and forwards.  I've never seen one e-mail

12   that talks about the meeting we had and the things we did.

13   Not one.

14   Q.   It was just all over the phone and in person?

15   A.   Mostly in person and some on the phone.

16              After we got started into the deal, you know, Bob

17   started, like, showing a lot of signs of frustration.  And

18   he said, you know, "I don't know, you know?  These guys told

19   me to get out there and get these cattle, and now I've got a

20   lot of them tied up and, you know" --

21   Q.   What does that mean, "tied up"?

22   A.   You know, let's say he calls me and says, "I need

23   2,000 natural cattle per month for the next 12 months."  And

24   I say, "Well, I mean, I think I can get them.  I mean, what

25   are you kind of thinking on price?"  And he might say, you

1    know, "I'm thinking I'll give you Nebraska weighted average

2    and $300," or he might say, "I don't know.  What are they

3    going to kind of cost?"  I mean --

4    Q.   What's the "Nebraska weighted average"?

5    A.   "Nebraska weighted average" is a composite price

6    index.  The USDA takes all the cattle that are traded in

7    Nebraska each week and they create an average for the whole

8    state.  And, you know, the good cattle, the bad cattle, and

9    everything in between gets priced.  Those would be for

10   conventional cattle, by the way.

11   Q.   And so now you've mentioned two pricing structures:

12   The CME and now the Nebraska weighted average.  So you have

13   done both with Tyson?

14   A.   Yes.  You know, most of the stuff I did with Bruce

15   Bass was, "Tell me what you have to have for the cattle"

16   price structure.  "Tell me what you've got to have for them,

17   and I'll take them or leave them."

18   Q.   So you were testifying that -- what it would mean for

19   certain of your natural cattle to be tied up from

20   Mr. Scherer asking for a certain amount a month.

21   A.   Mr. Scherer got pretty excited about the naturals and

22   asked me to create so many of them for him.  And we probably

23   already had some because we always had some.  And, you know,

24   a few months in, he started to show a lot of frustration.

25   He said, you know, "I tied a bunch of cattle up and, you

1    know, these guys are not telling me, you know, what we can

2    do with them or what we" --

3    Q.    "These guys" meaning his bosses at Tyson?

4    A.    Right.  You know, he's always been very diplomatic, so

5    he wasn't going to say anything bad about anybody, but, you

6    know, he just said, you know, "I don't know what to tell

7    you.  I'm doing my best to try to get these cattle

8    sacrificed and digested somehow."  And, you know, somewhere

9    along the line, I think he asked me to call Jay Holmes.  At

10   the time, Jay Holmes was his boss.  And, you know, I called

11   Jay up and I said, "Hey, Jay, what's going on?  Bob and I

12   talked about these cattle.  I've got them sitting here."

13   And he's like, "Ah, we've got too many natural cattle.  I

14   don't know what the heck Bob was thinking.  He bought this

15   cattle and demand is not as good as it was."

16          And this would have been -- in my opinion, this

17   is the first time that Bob and I went on a date.  The first

18   time him and I tried to do something together without a Brad

19   or a Jay or a Bruce or somebody, like, in the middle of our

20   business.  And we had a pretty good go at finishing out what

21   Brad had set up, but this thing, like -- you know, it was --

22   it was cumbersome.  And, again, you know, the cattle lose

23   money when you don't have a home for them.

24          And, sooner or later, we finally kind of worked

25   our way through them.  And I don't know if that was 2017 or

1    something like that.  But that was -- you asked the

2    question, "When was the first time you did a deal with Bob?"

3    It was then, right after Brad Brandenburg left.

4    Q.    Did Mr. Scherer ever visit your cattle?  In person.

5    A.    Mr. Scherer will definitely be the guy that has spent

6    less time looking at my cattle with me than any of the

7    people I've ever done business with at Tyson.  So he might

8    have looked at them once.  But there was a period of time

9    where he got -- they took him away from the natural

10   business, so I kind of had to, like, matriculate those

11   cattle part or parcel through other people in the company

12   and things like that.

13   Q.    What do you mean they took him away from the natural

14   cattle business?

15   A.    They left him running the NHTCs, and they put -- they

16   didn't really put anybody in his place.  They just --

17   Mr. Gerber tried to kind of step in and sort things out

18   and -- you know, which is kind of funny because Bob was

19   pretty much involved the whole time, anyway; he just kind of

20   got his hand slapped or something.

21   Q.    Because he tied up too much natural cattle?

22   A.    That's -- you know, that's the insinuation of

23   Mr. Gerber and Mr. Holmes.  According to Bob, you know, Bob

24   did what they told him to do.

25   Q.    Why is it important for a packer to visit the cattle

1      like Zia's cattle, cattle that it is going to buy?

2      A.   Do you mind if I turn this board around one more time?

3      Q.   Please.

4      A.   So when you have cattle that don't have implants in

5      them, natural cattle, NHTC cattle, whatever kind of cattle

6      that aren't implanted, if you don't look at them all the

7      time, like periodically, they can change a lot.  If you get

8      a lot of snow, they slow down.  If you have perfect weather

9      like in the shoulder months, fall and spring, they can

10     really get going, like they can gain a lot of weight faster

11     than you think.  And during the summer, it's kind of like

12     during the winter.  You get these extremities and, when you

13     do, the cattle slow down again.

14           So, because of that, it takes a very bright

15     individual to understand what's going on with these cattle.

16     You have to look at them all the time.  And not everybody

17     can look at natural cattle and really know what's going on

18     with them.  It takes somebody that really, really has a

19     trained eye.

20     Q.   Like someone with a background in ranching?

21     A.   Well, somebody that has a background in cattle, for

22     sure.  They're living organisms.  Again, they're all like

23     snowflakes.  Every one of them is different.  So that's why

24     Brad, even though he had vision problems for almost the

25     whole time I knew him, which was kind of whimsical, Brad was

1    at my house, he was with me in a pickup, he was with me in

2    an airplane.  We were traveling all over the place looking

3    at cattle because you really need to go -- if you're going

4    to build these program cattle, you really need to start

5    right here at the rancher (indicating).  And so it takes

6    going to see them and seeing the calves here (indicating).

7    And then they get weaned, so you're looking at calves here

8    (indicating).  Then they go to a backgrounder, so you're

9    going back and looking at them here (indicating).  But

10    looking at them here (indicating) -- think about this:  This

11    is a Happy, Texas, kind of situation where Bob Scherer is

12    looking at these cattle saying, "Well, if they weigh this

13    now, then if you ship them in 30 days, they'll be at my

14    place sometime later."  But that is a process that is not a

15    hit-and-run.  That's a process that you have to do every

16    month, all the time; same set of cattle over and over again;

17    lots of sets of cattle around the United States.  It's just

18    the business.

19           I mean, the cattle business is a business of

20    looking at the cattle and shaking a man's hand.  It's not a

21    business of going to Hertz and spitting out a giant contract

22    and signing it.  It's a business of two people looking at

23    the cattle together and shaking each other's hands, looking

24    each other in the eye.  That's the kind of business it is

25    still today.

1    Q.    And looking at the lifespan or the stages that you've

2    illustrated, one and two, can the cattle still be implanted,

3    but -- I think you testified that, when they get to the

4    feedyard, you have to have them contracted or they're going

5    to be implanted; is that correct?

6    A.    Right.  So you can implant a calf during this stage of

7    its life (indicating) and you can -- but, really, what you

8    want as a cow-calf operator is you want optionality.  I want

9    to be able to choose Door Number 1 or Door Number 2 or Door

10   Number 3 if I have these calves because, literally, you're

11   trying to survive.  You literally work all year long at the

12   cow-calf stage.  And if you're lucky, you get your money

13   back.  If you're lucky, you don't lose a lot of money.  It's

14   a really hard business.  So leaving your options open is a

15   really good idea.

16          So, yes, you can implant them here (indicating).

17   But if you implant them here, you're done.  They're not

18   program cattle anymore.  They can't go to Whole Foods.  They

19   might go to Walmart, Sam's Club, or Costco, but they're not

20   going to Whole Foods.  Or you can leave them GAP natural and

21   they can come in here (indicating) at the backgrounder.  And

22   Bob and I always had a deal that, before they left grass, we

23   always had a deal --

24   Q.    "Grass" means the backgrounder?

25   A.    Yes, ma'am.

1          We always said, "Hey, Bob, if you don't want the

2    cattle, before they leave grass, tell me, and I'll feed them

3    conventionally."  We've had that -- if there's been one deal

4    that we've had that's been consistent, that's it.  He said,

5    "I gave you my word.  I won't make you feed these cattle if

6    I don't need them."  And I say, "Hey, man, I don't want to

7    feed them unless you need them.  If you don't need them, I

8    won't feed them."  I mean, imagine you've got the best

9    quality of cattle in the United States, you put an implant

10   in there, you know what they do?  Everything.  They perform

11   so well.

12         So you've already gone to Montana, Wyoming, North

13   Dakota to buy all these calves.  You've already drug them

14   halfway through the United States to a backgrounder or wheat

15   or grass.  I mean, they're already next to the feedlots.

16   Just tell me if you want them or not.  That's all you've got

17   to do.  And he knows that.

18   Q.   So would you give Bob some latitude until it was time

19   for the finish yard?

20   A.   That is correct.  And here's why:  Because Bob kills

21   these -- Bob sacrifices these cattle in Lexington, Nebraska.

22   And someone else can testify where Lexington, Nebraska, is

23   because I'm not from Nebraska.  But if you're going to feed

24   these cattle for the purpose of finishing them for GAP

25   processes, you want to try to get them fed where they're in

1    some kind of pathway to Lexington, Nebraska.  And if you're

2    not going to do that, you can feed them in Texas, you can

3    feed them in Colorado, you can feed them in Kansas.  There's

4    a lot of options if you are going to implant the cattle.

5    There are very, very few options if you're not going to

6    implant the cattle.

7                So, yeah.  I mean, this is kind of what I would

8    call, you know, fish-or-cut-bait moment is right here

9    (indicating).  They can come right to here with no implants

10   and be GAP-certified natural, but when they leave here

11   (indicating), it's either no implant and get after it and

12   get them in and out and done, or its implant them and you

13   better have a good relationship with somebody like Bob.

14   Because, if you do that and you don't have a home for them,

15   you're in a lot of trouble.  You're going to have a bunch of

16   those red apples laying on the ground at your farm with the

17   worms eating them.

18   Q.   As the director of procurement, like, Mr. Scherer

19   would have all of the power in terms of when they are

20   harvested; is that what you testified?

21   A.   I think Mr. Scherer has got a lot of power when they

22   let him use his power.

23   Q.   And, again, if you weren't visiting the feedyards in

24   person, you might not even know how overfed these cattle

25   were getting?

1     A.    That is correct.

2             In order for an operation of our size to do a

3     good job with it, you have to visit it at least once a

4     month.  And worst-case scenario, once every 60 days.

5     Because cattle -- cattle that have fought their way through

6     the winter, you can go visit them, say, in the month of

7     March and look at them and say, "Oh, my God, these cattle

8     aren't anywhere near being finished."  And then, all of a

9     sudden, for 30 days, it's beautiful and you come back in 30

10    days and they're all finished, they're all fat.  Because

11    they're living organisms.  They're all different.

12    Q.    Mr. Perez, what happened in 2018 with Tyson and Zia's

13    natural cattle?

14    A.    Well, the first thing is, is in 2018, we learned how

15    to lose some real numbers, some real amounts of money

16    feeding natural cattle.

17    Q.    By "we," you mean Zia Ag?

18    A.    Yes, ma'am.  That's the first thing.  Very

19    disappointing year.  The second thing is we had --

20    Q.    How much money?  What does that mean?

21    A.    North of $4 million.

22            The second thing is, is that we had one set of

23    cattle that we bought, we backgrounded, we turned them out

24    on grass, and we got them to 1,000 pounds.  This is -- this

25    is Bob's, like, dream:  To get cattle on grass to 1,000

1   pounds.  Then they go in the feedyard.  And, for the life of

2   me, I don't know what happened, but the cattle stayed there

3   three times longer than they should have.  They should have

4   only been there three or four months.

5   Q.   How long were they there?

6   A.   They were there 10, 12 months.

7   Q.   Is that because Mr. Scherer didn't pick them up?

8   A.   I imagine that the demand tailed off or there was too

9   many cattle or, you know, I don't know what happened, but I

10   can tell you that what happened to me and Zia is that we

11   lost a lot of money on those cattle.  But there's nothing we

12   could do with them.

13   Q.   Why?

14   A.   Because no one else buys GAP cattle.  No one else buys

15   GAP cattle.  And I guarantee you nobody was driving around,

16   handing out Kleenex or anything or saying they were sorry or

17   anything.  It was just, *"Tómale."*

18   Q.   Can you walk us through how you would have lost so

19   many millions of dollars because they left the cattle there

20   for so long?

21   A.   Well, I saved a small piece of the whiteboard because

22   I wanted to be able to show everyone that, when you start at

23   1,000 pounds and you go up here, 125 days.  And let's just

24   go out to 50, 60 days more, so that's 180 days right here

25   (indicating).  Imagine -- let's just take them to 300 days.

1    But the problem with these natural cattle is maybe they gain

2    50 more pounds.  Because they won't get any bigger; they

3    just get fatter, and then they finally don't even get fat.

4    But when I show everybody here, this is the amount of feed

5    it takes in 125 days:  It takes 2,250 pounds of feed to get

6    a natural animal from 1,000 pounds to 1,300 pounds.  If you

7    keep him 50, 60 more days, it takes 1,000 more pounds of

8    feed because they get less and less and less efficient.  If

9    you leave them there 300 days, it will take 6,000 pounds of

10   feed.

11           It's just -- you know, it's sad to know you

12   worked so hard and put these cattle on feed and then they

13   just don't go.  And there's nobody to call and ask or tell

14   or complain to because, more than likely, Bob probably had

15   plenty of cattle at other feedlots that were getting big,

16   too.

17           And -- but here's the thing I want to point out

18   here:  The wonderful thing about Zia is Zia, as time goes

19   on, is becoming more and more an ag tech company.  We

20   decided -- we took the Philpott cattle and the Max Burch

21   cattle the next -- during -- I mean, almost at the same time

22   as these cattle.  We DNA-tested them all.  And I'll tell you

23   what we were going to do is we said, "Hey, let's DNA-test

24   these cattle," kind of like a 23andMe kind of deal --

25   Q.   And why did you want to do that?

1    A.   Because we said, you know, surely, there's got to be a

2    more intelligent way to embrace this business than to just,

3    you know, be gullible and blind.  And so we DNA-tested all

4    the cattle at the 500-pound stage.  And so we used the same

5    DNA test that people use to find a prize bull or something

6    like that, a prize horse.  But we wanted to find the bottom

7    one-third of the cattle, genetically.  Remember, the

8    phenotype is what we look like, what an animal looks like.

9    And the genotype is what a living organism's genes look

10   like.

11             So we wanted to see the genes on these cattle.

12   We bought two really nice sets the cattle, over 2,000 of

13   them, but instead of trying to find of prize animal in

14   there -- and the DNA company said, "Why are you testing

15   steers?  This is for bulls."  And we said, "No, sir.  We're

16   going to find of the cattle that lose money for us."  And we

17   are -- so we wanted to kind of bottom one-third of the

18   cattle.  And the upper two-thirds of the cattle, we're going

19   to let Bob have those cattle and feed them natural.

20   Q.   The best cattle?

21   A.   The best cattle.  So we took this bottom one-third,

22   because they're pretty much, you know, the bottom end of the

23   deal -- and, again, you buy 2,000 cattle, you would think

24   they're all going to be like ice cubes.  They are not.

25   They're like snowflakes.  Both frozen water; completely

1    different; they're all unique.

2              We tested these cattle.  We shipped them to Ford

3    County Feeders and put an implant in their ear, the bottom

4    one-third.

5    Q.   So you made the worst genetic animals conventional?

6    A.   That is correct.

7              So the worst one-third are right here, and the

8    best two-thirds are right here (indicating).  I'm sorry, you

9    can't see that.

10             The bottom one-third cattle were fed at Danny

11   Herman's Ford County Feeders.  Cargill and National came and

12   looked at those cattle; they fought over them, they were so

13   beautiful.

14   Q.   So even your conventional cattle are beautiful?

15   A.   Right.  We sold them.  They were hedged.  They

16   made $82 a head.

17   Q.   Is this is your profit on them after your costs?

18   A.   This would be our margin after feed, freight, cattle

19   feed, death loss.  And the two-thirds, the very, very *la*

20   *creme de la creme*, we fed them -- we sold this on this

21   Nebraska weighted average, plus a premium for GAP.  Those

22   cattle lost $300 a head.

23   Q.   Losses on each of them?

24   A.   And then, in 2018 -- pardon me, ma'am?

25   Q.   These were losses on each of those cattle --

1    A.   Yes, ma'am --

2    Q.   -- you lost $300 on each?

3    A.   -- it was then -- and they were hedged.  It was then

4    that my boss came in, because he had the scientific data and

5    he laid it on my desk, and he said, "We're done.  We're not

6    doing this anymore."

7    Q.   What's "this"?

8    A.   We're not feeding natural cattle unless we have a

9    different way of selling those cattle.  Because, as long

10   as -- Whole Foods has 470 or -80 stores in the United

11   States.  And there is only one man walking the planet Earth

12   that has all the control over when those animals are going

13   to be sacrificed.  And he's sitting at the head of that

14   table over there (indicating).  That's Bob.  Whenever Bob

15   says they're going to go, that's when they go.  And if Bob

16   likes you, they'll probably die here (indicating).  And if

17   Bob may not like you as much, they might die here

18   (indicating).  And if Bob dislikes you a lot, they might die

19   here (indicating).

20           But the bottom line is, is that this isn't

21   business.  You can't take people and take advantage of them

22   like that.  You know, you have to -- you have to foster

23   relationships and take care of people.  And so the bottom

24   line is my boss told me, my son told me, "No more.  This

25   isn't business."

1    Q.   And that was in 2018 --

2    A.   Yes, ma'am.

3    Q.   -- that it all happened, with your deal with

4    Mr. Scherer?

5    A.   That's correct.

6    Q.   And what type of agreement did you have on this deal

7    with Mr. Scherer?

8    A.   It was Nebraska weighted average, plus some premium.

9    It doesn't really matter.

10   Q.   Was it in writing, signed by you?

11   A.   No.

12   Q.   Was it signed by Mr. Scherer?

13   A.   No.

14   Q.   How did you decide that pricing?

15   A.   Because we -- see, what we're trying to do here

16   (indicating) is that we were trying to take the cattle that

17   supposedly will lose money -- we're still gullible, okay?

18   We're still rising to the top of the water to, like, grab

19   this flashy lure that's on top of the water.  We think, if

20   we take these bottom cattle off and feed the best cattle and

21   don't require that Bob take these cattle right here

22   (indicating) in the natural program, that these cattle are

23   going to probably knock it out of the park.

24   Q.   So how did you decide on the deal with Tyson on those

25   natural cattle?  How did you decide that pricing?

1    A.    You know this -- again, Bob comes back into the fold

2    now.  He bought naturals after Brad Brandenburg.  Then he

3    kind of -- he kind of took a step back, and I did a deal

4    with John Gerber.  I did one deal with John Gerber.  And

5    then kind of what happened when Brad Brandenburg left, Bob

6    kind of finished out his deal when he left.  Bob kind of

7    stepped back in on the naturals again somewhere along the

8    way after John Gerber.  And, you know, he kind of did the

9    same thing again:  He kind of picked up the back end of

10   something.  And I had actually made this deal with John

11   Gerber and it was -- this was like a continuum of that deal.

12          So the time I told you that Bob tied a bunch of

13   naturals up and we were like, ugh, and it got super

14   cumbersome?  When we finally digested all of that, some time

15   went by and John Gerber made another deal with me.  This is

16   the only deal I ever made with John Gerber for natural

17   cattle.  And it was a Nebraska weighted average.  It was his

18   idea.  And, you know, he made me an offer and I told him I

19   would take it.  We made a very specific deal, though.  We

20   made a very specific deal on "X" amount of cattle for "X"

21   amount of time period.

22   Q.    Did Mr. Gerber pick up those cattle on time?

23   A.    Pardon me?

24   Q.    Did Mr. Gerber pick up these cattle on time?

25   A.    You know, here's the problem:  Is they did get picked

1   up on time for quite a while.  And then I don't know what

2   happened, but they started kind of getting off schedule

3   again.  And, you know, when you're a person like me that

4   runs cattle on pasture, and you're buying the calves over

5   here from the cow-calf guy, and then they're going to

6   backgrounding, and the backgrounding is your grass, I mean,

7   this takes some real skill to get done.  Where these guys

8   are worried about, "I want so many a day; I want so many a

9   month; I want so many a week."  And what I'm trying to

10  figure out is I've got all these snowflakes at these

11  different stages and I'm trying to feed them through a

12  system to get to a certain end.

13          So, you think about it, while we both want the

14  same thing, we don't have the same objectives.  And that's

15  why this relationship is very difficult.

16  Q.   You testified that Zia lost about $4 million with the

17  deal with Tyson in 2018.

18  A.   Correct.

19  Q.   That's because of having to pay for the extra days of

20  feed and water for these cattle?  Is that the reason?

21  A.   It was a year of a lot of weather and, yes, none of

22  the cattle really were taken when they were supposed to, so

23  they stayed longer; the weather was bad.  And -- you know,

24  here's the deal, though:  The cattle business has, you know,

25  licks like this.  And that's why you have to have a good

1   relationship, because you won't survive if you have a

2   mediocre relationship.

3   Q.   So can you talk a little bit about your conversation

4   with your son, the president of Zia Ag, about the future of

5   Zia natural cattle before losing $4 million in 2018.

6   A.   Well, again, my son is a graduate of the Computer

7   Science Department of New Mexico State.  And I don't know if

8   anybody knows how much math you have to take to be in

9   computer science, but you have to take a lot of math.  He's

10   good at math.  And he just said, "Look, it's real simple.

11   These good cattle that we have are proving to us that we

12   need to implant them, not feed them naturally."  And so --

13   and I'm like, "No, no, no.  We've got 20 years with Tyson.

14   I cannot, like -- Bob and -- you know, Bob's counting on me

15   to provide some cattle for this Whole Foods deal.  You know,

16   I can't -- I can't do that.  I've got to give him at least a

17   chance to buy these cattle."  And he said, "Well, you can

18   give him a chance, but we've got to approach this some other

19   way."

20        And you know, I went to Mr. Hueser's house and

21   spent three days there.  I think I saw Bob when I was there

22   that weekend.  I mean, we went to the office on a Thursday

23   or Friday and he invited me to stay at his house, Mr. Hueser

24   did.  And we were there.  Mr. Hueser has got a beautiful

25   home on the golf course; a garage full of fancy cars.  And

1    I'm saying, Mr. Bass didn't have a garage full of fancy

2    cars.  Mr. Brandenburg doesn't have a garage full of fancy

3    cars.  How is it that this gentleman has such a nice house?

4    I said, how in the world --

5              MR. FISHER:  Objection, Your Honor.  This is

6    getting into irrelevant material.

7              THE COURT:  Sustained.  Unless you have some

8    offer of why that's relevant.

9              MS. DIAMOND:  No, that's fine.

10   Q.  (BY MS. DIAMOND):  Mr. Perez, you can just kind

11   of get to the discussion regarding my question.

12   A.   Would you like me to finish my statement or would you

13   like for me to sit down or what would you like me to do?

14             THE COURT:  Just allow your attorney to ask the

15   question.

16   Q.   So the next question is how did you decide -- or how

17   did you have an idea about an alternative contract,

18   agreement, deal with Tyson that would make it viable for you

19   to continue to raise natural cattle for Tyson?

20   A.   Okay.  Well, that weekend I stayed at Mr. Hueser's, I

21   said, "Gosh, you've done well for yourself.  How did you get

22   from here to here?"  And he said, "Well, thanks for asking.

23   We're pretty proud of what happened here.  When I was a

24   younger man, I went to the Lakeside packing house in Canada

25   when we bought it, and I learned a very valuable lesson from

1    the guy we bought the packing house from.  He taught me that

2    you can always have the best quality.  And I learned how to

3    price beef in a way that was always good for the customer,

4    and that was a cost plus.  Most of our good customers, we

5    price beef off a cost plus.  That way, no matter what Tyson

6    pays for the cattle, we always" -- "we," the company --

7    "always makes a nice margin."

8             And I said, "Well, is that the way you do it with

9    Whole Foods?"

10            And he said, "That's absolutely the way we do it

11   with Whole Foods.  We sell Whole Foods meat on a cost plus

12   basis."

13            And I said, "Well, gosh, you know, it's so hard

14   to feed cattle and make money."

15            And he said, "Narciso, the vision you have for

16   the cattle business, the world is your oyster.  Just price

17   things like you need to price them, and we'll let you know

18   if we can take them or not."

19            And I said, "Okay."

20            So about a month went by, and Bruce Bass and I

21   traveled to Kevin Hueser's farm and -- which is north of

22   where he lives somewhere in South Dakota, and spent the

23   weekend there.  We had a really nice weekend because those

24   two had not spoken since Bruce left the company.  And,

25   remember, they're both from Marcus, Iowa, so they're

1    childhood friends.  Bruce is way older than -- than Kevin,

2    but very, very good friends; families are good friends.

3    And, you know, we had a discussion.  And Bruce thought it

4    was a really, really good idea for me to -- you know, he

5    said, "Get Sean and get his team, get the numbers down, make

6    it a good deal for Tyson and a good deal for you guys, and

7    present it.  What the hell?  All they can say is 'no.'"

8    Q.    What is a cost plus agreement or a cost plus model?

9    A.    You know, a cost plus model is super simple.  And

10   what's not simple about it is that you can't do this if you

11   don't know what you're doing; meaning, you've got to be good

12   at the business or you can't do something like this.

13          And that's that you go back to the old days of

14   Bruce Bass and you take your cattle cost -- and by that, I

15   mean, you go to Montana, you talk to 10, 15, two dozen

16   ranchers and find out what you can buy their calves for; you

17   figure the freight --

18   Q.    That's the shipping?

19   A.    The shipping to get them from wherever they are in

20   Montana to wherever you want them to be for a backgrounder.

21   And we know all the stages of that.

22          And you figure their feed.  You know, you

23   physically -- you call the backgrounder and say, "Hey, how

24   much are you going to charge me to get this animal from 500

25   pounds to 1,000 pounds?  Just give me a set number."  And

1    you book that.

2              You call the finisher --

3    Q.    That's the feedyard?

4    A.    Yeah -- and you say -- so you've got backgrounder and

5    finisher.  And you say, "What will you finish these cattle

6    for me for?"  And you buy the feed at the feedlot, so you

7    have a set number there.  So think about it:  You've got the

8    cattle cost, you've got the freight, you've got the set cost

9    for feed at both places, and you have your interest.  And

10   there's only -- you know, one other thing is death loss

11   because you're going to always lose 1 to 3 percent.  And

12   when you're working with a death loss, that helps, because

13   if you're talking about 20,000 cattle and you have a

14   3 percent death loss, that's a lot of cattle.  So if you're

15   trying to turn numbers in to a guy like Bob, you have to

16   take the death loss off, to begin with, because he's

17   counting cattle that are going to die.

18             And, believe it or not -- nobody believes

19   something like this -- but, you know, a 6 to 7 percent

20   return on investment for a cattle investment is a tiny

21   number and -- you know, if you're trading crypto or

22   whatever, but, in the cattle business, that's a good return.

23   Q.    So that's premium --

24   A.    $125 a head.

25   Q.    So those are actual costs, plus a 6 to 7 percent

1   premium?

2   A.   Yes.  So you're talking about six simple things:

3   Cattle cost, freight, feed, interest, death loss, and a

4   margin.

5   Q.   And so that would be pricing on a cost plus agreement?

6   A.   That's what it is.  So you say, "Okay, Bob, my crystal

7   ball says that, in five months or whatever, I'm going to

8   deliver you an animal that weighs around 1,200 pounds.  And

9   he's going to cost you about $1,825 and that's about a $1.60

10  a pound.  Can you make something like that work?"

11        Now, I'll say this:  A lot of people will come in

12  and out of this courthouse; nobody will know more about how

13  to take an animal apart better than Bob because Bob has come

14  up in the plant.

15  Q.   Rather than from the ranching side?

16  A.   As far as I know he's not come up from the cattle

17  side, but he can look at an animal that is 1,200 pounds that

18  he knows the quality of, and he can tell you how to price

19  the ribeye, how to price a fillet, how to price a New York,

20  how to price ground beef; he knows how to do that.  That's

21  one thing he is very good at.  And that is exactly why we

22  built this model, so that we could give him some metrics

23  that were very predictable.

24  Q.   So he seemed to be better at the packaging side, the

25  beef side, rather than the cattle side?

1    A.   He cut his teeth taking animals apart and selling the

2    parts.  So, yeah, he's going to be a lot smarter than some

3    green tinhorn like me who spends all of his life in cattle.

4    Q.   Had Zia ever done a cost plus deal with a packer?

5    A.   We have some cost plus deals now.

6    Q.   But before 2018.

7    A.   We were in the process of doing one when this all came

8    up.  And, ironically, it was the packer's idea, not ours.

9    So it all like -- the lights went off, everything happened

10   about the same time.  But, really, the most important thing

11   that happened is that we figured out that, if you implant

12   these really good cattle, even if it's the bottom end of

13   them, that they really do well.  And, because of that, you

14   have to have -- and the guy who takes the cattle, if he

15   doesn't take them exactly when we're finished, you're dead.

16   You're in big trouble.

17         So if you do this other thing where you implant

18   the cattle, it doesn't matter if you know anybody at Tyson

19   because there's a bunch of people who will show up at the

20   feedlot and buy the cattle anyway.  So...

21   Q.   Because the implanted or the conventional cattle are

22   sold for cheaper than the natural cattle?

23   A.   Cheaper per pound.  But it might be more dollars per

24   head because they gain weight faster and they're very

25   predictable.  When you put the implant in their ear, the

1    weather has less to do with their fluctuation in

2    weight-gaining and growth than it does when you don't.

3     Q.   What else happens when cattle feed longer than they

4    need to?

5     A.   You know, they just put on -- they put on so much

6    weight that they can't move around.  Their feet hurt.  They

7    have hip problems.  They have shoulder problems.  They lay

8    down and they can't get back up.  They die more because they

9    can't breathe.  You know, here's an animal that's supposed

10   to weigh 1,300 pounds and he weighs 14-, 1,500 pounds.  It's

11   very hard to breathe.

12    Q.   What did a loss of like $4 million do to Zia Ag in

13   2018?

14    A.   Decimated us.  We couldn't afford to go a second

15   go-round and lose money.

16    Q.   Or you were at risk of bankruptcy or going under?

17    A.   It's -- I mean, what is the difference when you don't

18   have money anymore to pay your bills, whatever you want to

19   call it?  I mean, we took a lick and then we knew that we

20   couldn't take another lick, and look what happened.

21    Q.   Were you worried -- okay.  So I just have a few final

22   questions for Mr. Perez today.

23         So you can have a seat, Mr. Perez.  We heard

24   Mr. Fisher say a few things in his opening statement.  I

25   just wanted to get your reaction.

1           So Mr. Fisher said that Tyson has had issues with

2    Zia's cattle that didn't come out on time or at weight.

3           What's your response to this?

4    A.   Well, I think I testified that, number one, I'm not a

5    packer buyer.  My job isn't to fill hooks or slots.  My job

6    is to take a 500-pound calf all the way to finish weight.

7    And I'm going to do that whenever I can, as fast as I can.

8    You can see that.  You can see that I'm someone that knows

9    the numbers; I know the business; I know how to do it.  If

10   that doesn't happen to be the day that it makes someone else

11   happy, that's not my problem.  My problem is that I've got

12   to get them from 500 pounds to finish weight.

13          I'm not a packer buyer.  I'm not a feedlot.  So

14   I'm sure that you can produce e-mails that say that someone

15   was unhappy about something.  And I'm sure that we can go

16   produce a bunch of e-mails that show that someone was

17   unhappy about something.  Collating good news and giving it

18   to everybody or collating bad news and giving it to

19   everybody isn't how you find the truth.

20   Q.   Mr. Fisher also said in his opening statement that the

21   cost plus agreement would have been a massive deviation of

22   what the parties have done the last 20 years.

23          What's your response to that?

24   A.   I don't know how a statement like that could be

25   supported unless we look at the history of 20 years and look

1    at every deal.  And there's been literally hundreds of

2    deals.  So, you know, excuse me, but it's real simple:  If

3    Bob didn't want the cattle, he could have said, "I don't

4    want the cattle."  Or he could have said, "I'll give you a

5    Nebraska weighted average plus $16 a head," and we wouldn't

6    have been sitting here today because he wouldn't have got

7    the cattle.  The question I have is, on February the 4th why

8    didn't he say, "Looks good; just put them in the feedlot as

9    soon as possible; I'm going to pay you Nebraska weighted

10   average plus whatever."

11    Q.   Mr. Fisher also stated that there was no consideration

12   in this deal and that Zia already had the cattle committed

13   to Tyson.

14            What's your response to that?

15    A.   I'd like to see the document that shows that we

16   committed these cattle to Tyson.

17    Q.   Did you commit them to Tyson?

18    A.   As far as I know, we didn't, but I'm ready to see the

19   documents that prove that.

20    Q.   And he also said that Tyson doesn't have a cost plus

21   agreement with anyone else.  I think you already touched on

22   that a little in your prior testimony.

23    A.   And I think that Tyson and I both know that there are

24   people in the United States that, in the last couple

25   of years, got some very interesting deals.  They know who

1    they are.

2    Q.   Did Mr. Scherer ever say what ingredients were missing

3    or uncertain from your cost plus model?

4    A.   Mr. Scherer and I have never spoken about baking a

5    cake.

6    Q.   And you were at Mr. Scherer's deposition where your

7    attorney, John Worden, asked him that.  Did he mention any

8    missing ingredients to the cost plus model?

9    A.   No, ma'am.  I gave him the cost plus contract.  It's

10   got $16 million on it.  If you divide that by a normal home

11   for an American of $200,000, that's -- we were making a deal

12   on 75 houses that are worth $200,000.  It was a very, very

13   serious deal.  You can bet your bottom dollar that I made an

14   offer to him.  And you can bet your bottom dollar that he

15   accepted it, or else he wouldn't have taken the cattle.

16   That's $16 million.

17   Q.   And, finally, Mr. Fisher also stated in his opening

18   that Zia was not offering anything of value with the cost

19   plus proposal.

20           What's your response to that?

21   A.   I'm pretty sure that Mr. Scherer would not agree with

22   his attorney.  That is preposterous.  It's $16 million worth

23   of cattle.  That requires a tremendous amount of skill to

24   create.  Scattered all over the United States.

25   Q.   And was Mr. Scherer asking you for these cattle before

1    February 4th?

2    A.    Mr. Scherer, very simply, called me up more than once

3    and said, "We're going to sit down with Whole Foods.  We

4    need your numbers if we're going to do a deal with them

5    because, if we don't have a certain amount of cattle, we

6    won't get the deal done with them."  And I said, "Come look

7    at some of the cattle.  Let's sit and talk."

8             MS. DIAMOND:  Your Honor, we can stop for the

9    day, unless you'd like to go further.  I can continue his...

10            THE COURT:  No, that's all right.  It's 5:03.

11            All right.  Ladies and gentlemen, we are going to

12   stop for the day.

13            You can just wait there, Mr. Perez.

14            Ladies and gentlemen, when you leave here,

15   friends or family may ask you about your day of jury duty.

16   As I mentioned earlier today, you may not discuss any of the

17   evidence in this case with anyone until the trial is

18   concluded and I dismiss you as jurors.  This includes family

19   and friends.

20            Also, you must not hear or read about this trial

21   or do any sort of your own research.  The reason for this is

22   that your decision, again, must be made solely on the

23   evidence presented in trial.

24            With that, I'll dismiss you.  And we'll see you

25   at 8:30 tomorrow morning.


                    UNITED STATES DISTRICT COURT
            100 N. Church Street, Las Cruces, NM  88001
                         (575) 528-1430

```
 1                    (Jury not present.)

 2              You can go back and sit with your lawyers, if you

 3    want.

 4              All right.  Counsel, Mr. Perez has been on the

 5    stand for three hours now, and we have not gotten to the

 6    contract.  When does the plaintiff anticipate actually

 7    discussing the contract in this case?

 8              MS. DIAMOND:  First thing in the morning.

 9              THE COURT:  Okay.  How long will that take?

10              MS. DIAMOND:  So I would say another maybe,

11    like --

12              THE COURT:  Approach the microphone, so we can

13    get this on the record.

14              MS. DIAMOND:  Well, I will say that Mr. Sean

15    Perez' direct will be much, much shorter.  This is, you

16    know, going to be the longest direct examination, by far.

17              THE COURT:  I hope so.  And I haven't heard any

18    objections on "cumulative" or "asked and answered," but I

19    would normally expect there to be some objections with a

20    direct like that.  And I expect us to get to the contract,

21    the issue in this case, first thing tomorrow with every

22    other witness faster than we did today, okay?

23              MS. DIAMOND:  Yes, Your Honor.

24              THE COURT:  Same goes for defense.  Although, you

25    haven't done anything yet today, but I'll give you the same
```

1    warning.

2              MR. FISHER:  I understand, Your Honor.

3              THE COURT:  Anything else from the plaintiff

4    before we go?

5              MS. DIAMOND:  No, Your Honor.

6              THE COURT:  From Tyson?

7              MR. FISHER:  No, Your Honor.

8              THE COURT:  And if you feel comfortable, you

9    don't have to, but you can leave all your documents here,

10   and we'll lock the doors.

11             MS. DIAMOND:  Thank you, Your Honor.

12             THE COURT:  Okay.  Thank you.

13             MS. DIAMOND:  Oh, Your Honor.  Be here at 8:00 or

14   8:30?

15             THE COURT:  We're going to start at 8:30, so I'd

16   be here a few minutes early, especially if you want to take

17   anything up.  I'll be here early, too, and the clerk can

18   tell me and I'll come down, especially if there's any kind

19   of agreement on exhibits.  Although I'm fine with the

20   process we have now.  I don't want to throw a wrench into

21   it.  If you have any agreement on that, let me know.

22             MS. DIAMOND:  Okay.  Thank you, Your Honor.

23    (The proceedings adjourned at 5:06 P.M. and reconvened on

24             Tuesday, July 12, 2022, at 8:37 A.M.)

25

1                    UNITED STATES OF AMERICA

2                    DISTRICT OF NEW MEXICO

3

4               CERTIFICATE OF OFFICIAL REPORTER

5        I, Vanessa I. Alyce Chavez, CRR, RPR, NMCCR, and

6    Federal Official Court Reporter in and for the United States

7    District Court for the District of New Mexico, do hereby

8    certify that pursuant to Section 753, Title 28, United

9    States Code, that I did report in stenographic shorthand to

10   the best of my skill and ability the foregoing pages 1-154

11   of Volume I of IV of the proceedings set forth herein, that

12   the foregoing is a true and correct transcript of the

13   stenographically recorded proceedings held in the

14   above-entitled matter and that the transcript page format is

15   in conformance with the regulations of the Judicial

16   Conference of the United States.

17

18   Dated this 2nd day of August 2022.

19

20   S/Electronically Filed
     Vanessa I. Alyce Chavez, CRR, RPR, NMCCR
21   Federal Official Court Reporter
     100 N. Church Street
22   Las Cruces, NM 88001
     Phone: (575) 528-1430
23   E-mail:  Vanessa_Alyce@nmd.uscourts.gov

24

25