1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEW MEXICO

3

4
    ZIA AGRICULTURAL CONSULTING,   )
5   LLC.,                          )
                                   )
6                   Plaintiff,     )
                                   )
7            vs.                   )  NO: 20-CV-445 MIS-JHR
                                   )
8   TYSON FRESH MEATS, INC.,       )
                                   )
9                   Defendant.     )

10

11

12                   TRANSCRIPT OF PROCEEDINGS
                            JURY TRIAL
13                       VOLUME II OF IV
          BEFORE THE HONORABLE MARGARET I. STRICKLAND
14              UNITED STATES DISTRICT JUDGE
                    TUESDAY, JULY 12, 2022
15                         8:37 A.M.
           LAS CRUCES, DOÑA ANA COUNTY, NEW MEXICO
16

17

18

19

20

21        (Proceedings recorded by machine shorthand and
      transcript produced by Computer-Aided Transcription.)
22
      REPORTED BY:    VANESSA I. ALYCE CHAVEZ, CRR, RPR, NMCCR
23                    Federal Official Court Reporter
                      100 N. Church Street
24                    Las Cruces, NM  88001
                      Phone:  (575) 528-1430
25                    E-mail:  Vanessa_Alyce@nmd.uscourts.gov

```
 1     Appearances of Counsel:

 2
           FOR THE PLAINTIFF:
 3
                       VENABLE, LLP
 4                     101 California St., Ste. 3800
                       San Francisco, CA 94111
 5                     (415) 653-3750
                       BY:  JOHN S. WORDEN, ESQ.
 6                          SARAH E. DIAMOND, ESQ.

 7     Also Present:  Sean Perez, Zia Agricultural Consulting
                       Narciso Perez, Zia Agricultural Consulting
 8                     Zoe Gallagher, Venable, LLP, staff

 9
           FOR THE DEFENDANT:
10
                       MAYER, LLP
11                     9400 Holly Ave. NE, Bldg. 3 St.
                       Albuquerque, NM  87122
12                     (505) 483-1840
                       BY:  BRIAN J. FISHER, ESQ.
13
                       and
14
                       TYSON FOODS
15                     Law Department
                       Global Litigation and Investigations
16                     2200 Don Tyson Pkwy.
                       Springdale, AR  72762
17                     (479) 290-4120
                       BY:  DANIEL GOMEZ, ESQ.
18
19     Also Present:  Robert Scherer, Tyson representative
                       Norma Oliver, Mayer, LLP, staff
20

21

22

23

24

25
```

1                          I N D E X

2    WITNESSES FOR THE PLAINTIFF:                    PAGE

3    NARCISO PEREZ

4         Direct Examination Cont.'d by Ms. Diamond      7
          Cross-Examination by Mr. Fisher               77
5         Redirect Examination by Ms. Diamond          171

6    ROBERT SCHERER

7         Direct Examination by Mr. Worden             179

8

9

10                      E X H I B I T S

11   JOINT EXHIBITS:                    IDENTIFIED   RECEIVED

12   10 1-16-19 Text message from Robert    21          20
            Scherer to Narciso Perez
13   12 1-23-19 Text message from Robert    30          30
            Scherer to Narciso Perez
14   13 1-23-19 Text message number two     31          31
            from Robert Scherer to Narciso
15          Perez
     14 1-23-19 Text message number three   32          32
16          from Robert Scherer to Narciso
            Perez
17   16 1-28-19 Text message from Robert    33          33
            Scherer to Narciso Perez
18   17 2-4-19 E-mail between Robert        36          36
            Scherer and Narciso Perez
19   18 2-4-19 Zia's Cost Plus model         9           8
     19 2-4-19 E-mail from Narciso Perez    94          93
20          to Robert Scherer, Subject:
            "Show list"
21   20 2-5-19 Text message from Robert     47          47
            Scherer to Narciso Perez
22   21 Not identified                                 237
     22 2-15-22 Text message from Robert    48          48
23          Scherer to Narciso Perez
     26 3-4-19 Text message from Robert    242         241
24          Scherer to Narciso Perez

25

                    UNITED STATES DISTRICT COURT
           100 N. Church Street, Las Cruces, NM  88001
                          (575) 528-1430

```
 1                E X H I B I T S (continued)

 2    JOINT EXHIBITS:                    IDENTIFIED    RECEIVED

 3       27 3-14-19 Text message from Narciso  242           242
            Perez to Robert Scherer
 4          stating "Ty said you were
            happy with his cattle."
 5       28 3-14-19 Text message from Robert    50            50
            Scherer to Narciso Perez
 6       29 4-26-19 E-mail from Narciso Perez   245           245
            to Justin Nelson, Robert
 7          Scherer, and Sean Perez,
            Subject: "Checking back in"
 8          and regarding Cattle in
            question (Meyers Ranch Cattle,
 9          Mogus Cattle at High Choice,
            Bullinger)
10       31 5-10-19 E-mail exchange between    246           246
            Mike Rogers, Narciso Perez,
11          Sean Perez, Justing Nelson and
            Phil Chavez re: "2019.05.10
12          Cost Plus Update" attaching
            "Cost Plus Model (05.10.19)
13          July - Sept." and "Cost Plus
            Model (05.10.19) April - June"
14       36 5-22-19 E-mail exchange between     60            58
            Narciso Perez, Robert Scherer,
15          Mike Rogers, Sean Perez re:
            "2019.05.22 - Cost Plus
16          Update"
         39 6-6-19 E-mail from Robert Scherer   68            68
17          to Richard Hoff, Jacob Bach,
            Kevin Allison, Mike Weir,
18          Melvin Bishop, Justin Nelson
            re: receipt of an e-mail from
19          Tyson's suppliers stating,
            "send all of the feed bills,
20          cost of the cattle, and all
            incremental to Tyson in an
21          invoice form."
         60 Open Prairie Natural Angus         266           265
22          marketing materials
        114 1-5-19 E-mail from Narciso Perez    85            85
23          to Jason Turnipseed
        119 1-17-19 E-mail thread from Narciso  88            87
24          Perez to Jason Turnipseed
        124 1-30-19 E-mail thread from Phil     91            91
25          Chavez to Jason Turnipseed
```

```
 1                    E X H I B I T S  (continued)

 2     JOINT EXHIBITS:                      IDENTIFIED    RECEIVED

 3        125 2-1-19 E-mail thread from Phil    123          122
              Chavez to Narciso Perez
 4        129 2-5-19 E-mail thread from         110          110
              Jason Turnipseed to Mike
 5            Rogers
          130 2-13-19 E-mail thread from        126          125
 6            Narciso Perez to Jason
              Turnipseed
 7        132 2-14-19 E-mail thread from        128          128
              Narciso Perez to Jason
 8            Turnipseed
          133 2-18-19 E-mail thread from Robert  52           51
 9            Scherer to Narciso Perez
          134 2-21-19 E-mail thread from Robert 240          239
10            Scherer to Narciso Perez
          135 3-4-19 E-mail thread from Narciso  55           54
11            Perez to Robert Scherer
          140 3-21-19 E-mail thread from Sean   137          137
12            Perez to Mike Dancey
          142 3-27-19 E-mail from Sean Perez to 144          144
13            Mike Dancey
          146 4-18-19 E-mail thread from        245          244
14            Narciso Perez to Justin
              Nelson
15        149 5-10-19 E-mail thread from Narciso 57           57
              Perez to Robert Scherer
16        151 5-25-19 E-mail from Robert         62           61
              Scherer to Narciso Perez
17        152 6-3-19 E-mail from Doug Penner to 157          156
              Kendall Martens
18        153 6-3-19 E-mail from Doug Penner to 160          160
              Ty Rumford
19        154 6-3-10 E-mail from Narciso Perez  162          161
              to Doug Penner
20        155 6-5-19 E-mail thread from Phil    163          162
              Chavez to Diana Garcia
21        158 6-7-19 E-mail from Phil Chavez to 164          164
              Danny Hermann
22        159 6-7-19 E-mail from Phil Chavez to 167          167
              Ty Rumford
23        156 6-6-19 E-mail from Mike Rogers to 169          168
              Mike Dancey
24     (* Reporter's Note: All exhibit identifications listed
       herein have been duplicated from the parties' Joint Exhibit
25     List, Document 102.)
```

```
 1                    (In Open Court at 8:37 A.M.)
 2                         (Jury not present.)
 3           THE COURT:  Counsel, are we ready for the jury?
 4           For plaintiff?
 5           MS. DIAMOND:  Yes, Your Honor.
 6           THE COURT:  Are we ready for the jury?
 7           MR. FISHER:  Yes, Your Honor.
 8           THE COURT:  I just wanted to let the parties
 9  know, I was watching Juror in Seat Number 5, after you
10  brought that to my attention.  I think she's writing.  I
11  don't know if you can see it from your angle, but she has a
12  pencil and I think she's taking notes.  I don't think she's
13  texting on her phone.  But if you see something else, bring
14  it to my attention.
15           MR. WORDEN:  We noticed that after you gave the
16  instruction, but she was doing something different before.
17  But I think we solved it.
18           THE COURT:  All right.  That's fine.  Thanks for
19  bringing that up.  We'll keep an eye on her.  As long as
20  everybody's okay, we can bring in the jury.
21                    (Discussion off the record.)
22                         (Jury present.)
23           Thank you.  You may be seated.
24           Ms. Diamond, you may continue with your direct
25  exam of Mr. Perez.
```

1          MS. DIAMOND:  Thank you, good morning.

2                          **NARCISO PEREZ,**

3          After having been previously duly sworn, did make

4     the following answers:

5                  **DIRECT EXAMINATION (Continued)**

6     Q.   (BY MS. DIAMOND):  When we left off yesterday,

7     you were testifying that, in the fall of 2018,

8     Mr. Scherer contacted you about some natural cattle.

9          What happened next?

10    A.   Yes, ma'am.  Mr. Scherer and I had various discussions

11    in the fall.  We agreed that a couple of things would

12    happen:  The first thing is we needed to set a time up to

13    look at some of the cattle.  Number two, he was pressing me

14    for exactly, you know, what we had, what we wanted to do;

15    you know, what our plans were.

16          And it had been a tumultuous year, to say the

17    least, between us.  So our team was working -- because the

18    fall is when we receive a lot of these cattle.  Our team was

19    working really hard because there was a lot of cattle moving

20    around from ranch of origin, the cow-calf operator, they're

21    weighing about 500, 600, 700 pounds coming to different

22    backgrounders to go into the next stage of the operation.

23    And then there was a tremendous amount of paperwork for each

24    of these cattle to trace them back to the ranch of origin.

25          So we were building out our proposal for

```
 1    Mr. Scherer, and I told Mr. Scherer that we were building

 2    out our proposal; that we can't continue doing things the

 3    way we had done them the previous year because it just

 4    didn't work for us.  We lost too much money.

 5              MS. DIAMOND:  I'd like to enter Exhibit 18.

 6              THE COURT:  From Tyson?

 7              MS. DIAMOND:  Counsel, Exhibit 18 is

 8    (indicating)...

 9              MR. FISHER:  Oh, yes.  No objection.

10              THE COURT:  Does Tyson stipulate to the

11    admission?

12              MR. FISHER:  Yes, Your Honor, we do.

13              THE COURT:  Okay.  Exhibit 18 is admitted.

14    (Joint Exhibit 18 was admitted into evidence.)

15    Q.  (BY MS. DIAMOND):  Mr. Perez, is this

16    Exhibit 18 about the same exhibit that's on this

17    board next to you?

18    A.  Yes, ma'am.  If you don't mind, I would like to -- if

19    you're going to ask me questions about it, can I stand in

20    front of this big one?  It has big numbers, for somebody

21    that has --

22              THE COURT:  That's fine.  This one is pretty

23    small, the paper one.

24              MS. DIAMOND:  Can we zoom in on it, as well?

25              MS. GALLAGHER:  (Indicating.)
```

1    Q.   (BY MS. DIAMOND):  Yes, you can approach it.

2                And if we can zoom in on it as well --

3                THE COURT:  Just be sure to use the microphone,

4    Mr. Perez.

5                THE WITNESS:  Yes, ma'am.

6    Q.   (BY MS. DIAMOND):  Mr. Perez, what is this

7    document?

8    A.   Ms. Diamond, this is a document that is a cost plus

9    proposal, that, on January the 14th, 2019, I had a copy of

10   this document with me in Happy, Texas.

11   Q.   There's a lot of numbers on here.  It's pretty

12   confusing.  Can you explain what this bottom box represents?

13   A.   Yes, ma'am.  First of all, we were very excited about

14   this body of work.  The bottom box -- if you want me to

15   start at the bottom box, I will.  If you want me to start at

16   the far left, I will.  Whatever you'd like for me to do.

17   Q.   Can you pick up that box and maybe put it up on the

18   board so the jurors can see better?

19   A.   (Complying.)

20                So knowing that Mr. Scherer works for a packing

21   house and knowing that they want to buy cattle in

22   certain months, what we did is, is we tried to make this as

23   simplified as we could, by, again, taking the cattle cost,

24   the freight for the cattle, the feed cost, the interest on

25   both, a death loss of 3 percent, and a small margin of 7 --

1    6 to 7 percent and model out what would happen with very

2    specific ranch cattle, if we would start from the point we

3    received them, grow them, feed them, finish them, deliver

4    them for beef production.  And so those numbers are here

5    (indicating).

6              And this box at the bottom basically was meant to

7    be extremely easy to understand.  Which the yellow tells you

8    that if you take certain cattle and you feed them "X" amount

9    of pounds of feed and give them "X" amount of time, as we

10   discussed yesterday with the little chart, when the cattle

11   go from one stage to the next and go from 1,000 pounds to

12   1,300 -- 1,300, 1,400 pounds, we created a flowchart here

13   that has very specific costs.  So that we knew that, for

14   example, in the month of April, we were going to have

15   1.6 million pounds of cattle.  Our cost in those cattle

16   would be 2.5 million-and-change dollars.  Our price per

17   pound would be 1.5593.  And the cost per head for those

18   cattle would be $1,836.  We knew how many steers there would

19   be:  There would be 1,176.  We knew how many heifers there

20   would be:  187 heifers.  So, in the month of April, there'd

21   be 1,363 head.

22             Now, we have to remember that the only man on

23   planet Earth that can decide when any of these cattle go to

24   the packing house is Bob Scherer.  It's not the Zia team.

25   It's not the feedlot owner.  It's Bob Scherer.  If Bob

1    Scherer wants to take them in April, this is what they're

2    going to cost; this is how many of them there's going to be;

3    this is what they're going to weigh, et cetera, et cetera.

4             So, if you go down to the bottom, you know, it

5    gives you an average weight for all the cattle.  And then

6    the green boxes are May.  It does exactly the same thing.

7    It takes the cattle that can get to May with a reasonable

8    amount of time, and it tells you there's going to be

9    3,160,521 pounds of cattle.

10            (Reporter interruption for clarification.)

11            And the total costs for May are $5,213,567.29.

12   The average price per pound for those cattle in May is going

13   to be 1.6496 per pound.  The average cost per head is going

14   to be $1,883.51.  You take the amount of steers that were

15   there for that month, 2,248, the amount of heifers, 520, for

16   an estimated 2,768.

17            The orange boxes, we do the same exact thing for

18   June.  For June, we have 5,313,053.35 pounds.  The cost:

19   $8,591,650.02.  The cost per pound is $1.61, $1.6171 per

20   pound.  And the total head for June -- the total cost per

21   head, sorry, is $1,894.52.  In the month of June, we project

22   that we have 2,887 steers, 1,648 heifers, for a total of

23   4,535 cattle.  And then, if you keep working your way right,

24   you finally get to a total pounds to be shipped of

25   10,079,327 pounds; total cost, $16,308,996.44; an average

1   price per pound of 1.6181; and an average price per head of

2   1,881.95.  And if you work your way down to this box here on

3   the bottom right corner, it's a total of 8,666 cattle.

4   Q.   Mr. Perez, this is natural cattle?  Is this GAP or

5   NHTC?

6   A.   These cattle, they start -- they all start out as GAP,

7   natural, NE3 cattle.

8   Q.   And you said this is a cost plus proposal, so those

9   totals that you just went through, the total cost of the

10   $16,306,996.44, that represents all the costs, plus your

11   "plus," which is your premium, right?

12   A.   Remember that this document has six elements:  The

13   cattle cost from the ranch, the freight to get them from the

14   ranch to a backgrounder, and the freight to get them from

15   the backgrounder to a finisher; it has all the feed costs at

16   the backgrounder, and then, when they move to the finish

17   feedyard, it has all the costs at the finisher yard.  Then

18   we put a small interest charge on that.  And then we took

19   all of the numbers that we received from the ranches and we

20   deducted 3 percent off of their head count.  So, in the

21   cattle business, an accepted death loss in a process like

22   this is 2 to 5 percent.

23   Q.   Of the total cattle?

24   A.   If you buy 100 cattle from Stormy Burch in Gillette,

25   Wyoming, you can expect to lose three to five head of those

1    cattle from the time that you buy them till the time that

2    they go to Tyson.

3    Q.    And why would you expect to lose those?

4    A.    Because these cattle get stressed out when you move

5    them around.  They get stressed out with weather.  They get

6    stressed out if you overfeed them for too long of a time.

7    They're very much subject to stress.

8           So in our head count, what we did is, is that we

9    went ahead and took away a 3 percent number off of all of

10    our received head counts so that we were dividing out all of

11    our costs by what we perceived to be the cattle that were

12    left alive.  And the last thing that we did is that we added

13    a margin of 6 to 7 percent, which was about $125 a head.  If

14    you take $1,881 and you multiply that times 6 or 7 percent,

15    you're going to see that comes out to about 121.30.  So we

16    put $125 margin on these cattle.

17           The idea with this document on this day, this was

18    a proposal.  The idea is, is that you know where every calf

19    came from; you know exactly where they are; you know what

20    sex they are, steers or heifers; you know what the estimated

21    remaining head count after a 3 percent death loss deduction

22    is.  If you want to take the cattle out on April the 15th,

23    this tells you which cattle are going to weigh what.  And it

24    tells you which cattle could potentially be taken out on

25    April the 15th.  And if you follow that over to this

1    category that's light blue, this tells us what the cattle

2    are going to cost if you take those cattle from these

3    ranches out on these dates.  It tells you what they cost

4    here (indicating) and on and on.

5              If you do the May cattle the same way, the cattle

6    that could potentially hit May, they're here.  It tells you

7    what they're going to weigh.  It tells you what all their

8    costs are going to be, total.  If you keep going over to the

9    green side, it gives you their cost per pound.

10             So what we were thinking here is, let's encompass

11   these six items and make it really easy for Bob Scherer to

12   look down at this document and say, "I like the cost.  I

13   have looked at the cattle.  I like the cattle.  The price

14   per pound is not out of line.  We can use this many cattle."

15   We know he can figure up how many pounds of different types

16   of cuts and stuff he can get out of these cattle because

17   that's what he's good at.  We felt like this cost plus

18   proposal had all kinds of optionality for Tyson.  And for

19   us, we do our job, we don't have excessive death loss, and

20   we're going to make $125.

21   Q.   Per head?

22   A.   Per head.

23   Q.   Of the GAP cattle?

24   A.   Yes, ma'am.

25   Q.   Had Zia ever put something like this together for

1    Tyson before?

2    A.   You know, I put something like this together for Tyson

3    before, but I've never put something like this together for

4    Bob Scherer.  This was the first time.

5    Q.   So there's a lot of numbers.  And, obviously, it's

6    clear for you, but I think, looking at it, we don't know

7    what these numbers and words mean.  Can you talk about the

8    process of filling in all of these columns and getting all

9    of this information for Zia?

10   A.   Yes.  So, when we buy the calves from a ranch, the

11   rancher weighs the calves and we go to the ranch and receive

12   the calves.  And when we weigh them and count them and know

13   how many steers and heifers there are, we create a document.

14   That's our receiving document and that's our invoice when we

15   bought those calves from say, Stormy Burch.

16          Then -- so that begins the process.  The next

17   thing is, if we hire Turpin Trucking to take them from

18   Gillette, Wyoming, to Happy, Texas, they invoice us for the

19   freight.  And we take that invoice and put it together with

20   the cattle invoice, and there you have your freight.  And

21   everything that we did in the way of feed and feeding, we

22   tried really hard to lock down as many of the variables as

23   we could.  For example, at Happy, we lease all the wheat

24   pasture, but we put in a set number.  And we lease the wheat

25   pasture in a way that it doesn't have a lot of variability

1    in cost.

2    Q.    Is Happy one of the ranches that's in Happy, Texas?

3    A.    You know, we're talking about Happy all the time, and

4    what it is, is, over near the Texas/New Mexico line, a lot

5    of farmers plant dryland wheat.  And what they do is they

6    try to -- they try to get some revenue by grazing it.  And

7    then they take the cattle off and they harvest it.  So it's

8    a short-term grazing solution.

9         So we lease that pasture by the pound to gain.

10   So we don't own it.  And so we lease it basically from just

11   a couple of different families there, but there's enough

12   pasture in between Canyon and Happy to run upwards of 10,000

13   cattle, if we want to put them there.

14        So Happy is a compendium of maybe 30 different

15   plots of land.  Every one of them is fenced off separately.

16   Some of them have different owners.  Lots of them belong to

17   like a family, but a granddaughter has a section and the

18   daughter has two sections, and the son has three sections

19   and things like that.  So these things have lots of fences

20   around them.  But we like that because it gives us lots of

21   places to take these ranches and keep the calves separately

22   while we're trying to grow them.  So we're not co-mingling

23   cattle from different ranches and things like that.  Helps

24   reduce on disease; increases the gain.

25        But, anyway, the process is put actual cattle

1    cost, put actual freight cost, have the invoices in there;

2    the actual feed cost, put it in there.  And you calculate an

3    interest charge to get them to this point or to this point

4    or to this point (indicating).  You just calculate simple

5    interest, and then you take the 3 percent off the head

6    count, so you're not having to worry about that anymore.

7    And you add $125 to it and you total it up.  And you're

8    going to get numbers like $1,836.96 for April.  Or like

9    $1,883.51 for May.  Or like $1,894.52 for June.

10    Q.   Were the three months included so that, if Tyson

11    decided to pick up these cattle early or late, Zia would be

12    covered?

13    A.   The reason we designed this is so that Bob Scherer

14    would have a tool to be able to manage a large amount of

15    cattle at a glance.  And it's also set up so that, instead

16    of us having an antagonistic relationship where he's pushing

17    us to give him the cattle in a certain month, he can take

18    them whenever he wants.  It's up to him.  He's going to do

19    it anyway, so instead of us going backwards and forwards,

20    pushing and pulling and fighting each other, just let him

21    take them any time he wants.  We'll make our $125; he'll get

22    the cattle.  He can have them whenever he wants.

23          And the idea was this was a proven concept.

24    There's 8- or 9,000 cattle on this document.  The idea was

25    to grow this document to 20-, 30-, 50-, 100,000 cattle.

```
 1   That's what the idea was.  It wasn't to, you know, come up
 2   with a bright idea and try and catch him asleep.  We were
 3   trying to help the man manage his needs.
 4   Q.   So under this proposal that you gave to Mr. Scherer,
 5   Tyson would be paying for all the costs, you said, of the --
 6   A.   That's what's they'd be --
 7   Q.   -- cattle, of the feed, of the freight, of the
 8   interest, the death loss; that was your proposal?
 9   A.   Feed -- cattle; freight; feed; interest on the money;
10   death loss, 3 percent deducted from the head count; and add
11   $125.  That's what they'd be paying.
12   Q.   When did you first give a copy of this proposal to
13   Mr. Scherer?
14   A.   Well, Mr. Scherer and I had various conversations in
15   the fall of 2018.  And we had gone back and forth about when
16   we could get together, eye to eye.  I thought it was
17   important to show him some of the cattle.  He thought it was
18   important to come down and see the cattle.
19   Q.   In person?
20   A.   Yes, ma'am.  So, in the fall, that's when we received
21   all these cattle.  So let's say they started coming in
22   September, October, November.  And, you know, there's like a
23   lot of documents.  Think about documents for almost 9,000
24   cattle when you're talking about their cost, all the
25   documentation for GAP, and the audit process.  Happy
```

1  cattle -- Happy Pastures have to be audited.  All these

2  ranches have to be audited.  You know, the freight has to be

3  set up.  All the freight bills for each and every one of

4  these things.  Because, when we sent these bills to Tyson,

5  we wanted them to be on the money, tight, solid.  We wanted

6  Tyson to be able to pick the phone up and call Turpin

7  Trucking and say, "The guys from Zia sent us a bill to move

8  the cattle from Gillette to Happy, Texas.  What did you guys

9  charge?" and know that all of these things tied out, so that

10  they would feel good about how we went about putting these

11  costs together.

12   Q.   Were these cattle already promised to Tyson in the

13  fall of 2018?

14   A.   What I can tell you is that we'd had discussions about

15  these cattle, but they were not sold to anyone.  Period.

16   Q.   Zia had a right to do whatever it wanted with these

17  cattle in the fall of 2017 [sic]?

18   A.   We own the cattle.  We can do whatever we want with

19  them.

20          And Mr. Scherer knew that it was a bloody 2018

21  for us.  And I'm guessing it wasn't a bloody '18 for only

22  us, but it was a bloody '18 for us.  And he knew that we

23  needed to make a little bit of money if we were going to

24  continue this process.

25          And, again, really, the only reason that we were

1    excited about selling any more cattle to Tyson is that we

2    know that Tyson is constantly looking for really

3    high-quality cattle.

4    Q.    Natural cattle or GAP cattle?

5    A.    Whether they're GAP, natural, NHTC, or whatever, they

6    look for quality cattle.  And we felt like we had a solution

7    to a lot of problems that procurement might have.

8              MS. DIAMOND:  I'm going to enter Exhibit

9    Number 10.  If we can pull that up.

10              And, if I'm not mistaken, Mr. Fisher, are you

11   stipulating to the exhibit?

12              THE COURT:  Mr. Fisher, what's your position on

13   Exhibit 10?

14              MR. FISHER:  (Indicating.)

15              THE COURT:  It's admitted.

16   (Joint Exhibit 10 was admitted into evidence.)

17                   (Discussion off the record.)

18              MR. FISHER:  Your Honor, I do stipulate or agree

19   to the admission of the exhibits that Ms. Diamond -- if the

20   Court would prefer to do it one by one --

21              THE COURT:  That's fine.  How about she will

22   propose them, and then, if you have an objection, you let me

23   know.  Otherwise, I'll assume they're stipulated.

24              Go ahead, Ms. Diamond.

25              10 is admitted.

1    Q.   (BY MS. DIAMOND):  If you can look at Exhibit

2    Number 10.

3         You can go back to the witness box, Mr. Perez.

4    A.   (Complying.)

5         Yes, ma'am.

6    Q.   What is this document, Mr. Perez?

7    A.   This looks like a text message because there's

8    telephone numbers by it.  It happened on 1-16-2019.

9    January 16th, 2019, at 3:54 in the afternoon.

10        It reads (reading), "Thanks for taking the time

11   to look at the calves with me.  Let's get the feedlot

12   inventory up to date, get these calves in for May and June,

13   and we will go forward.  Thanks, again."

14   Q.   What meeting is Mr. Scherer referring to in this text

15   message?

16   A.   He's talking about the meeting in Happy, Texas, where

17   I drove from Albuquerque early that morning and met him in

18   between Happy and Canyon, Texas, where we spent three,

19   four hours driving around.  And that was on the 14th, on a

20   Monday.

21   Q.   January 14th?

22   A.   Yes, ma'am.  And then we went to lunch for an hour or

23   two.  And then I took him to his vehicle.  The whole day, we

24   spent perusing over the document that's enlarged right there

25   (indicating), going over the specificity in the document and

1    the fine points.  And, at the end of that day, after having

2    a very pleasant day together looking at cattle, discussing

3    the cost plus proposal -- at the end of that day, I took him

4    to his vehicle, he thanked me for spending the day with him

5    and showing him the cattle.  He thanked me for giving him

6    our proposal and he said, "Things look really good."  We

7    shook hands.  He said, "I'm going to get on down the road

8    because I'm headed to some other operations."  And I told

9    him that we would -- as soon as I got back, we would try

10   really hard to finish updating this document, the cost plus

11   proposal, so that he'd have 100 percent of everything that

12   we felt we could put into the document.

13          This document -- because we're moving cattle all

14   the time, everything is changing on the document because

15   it's fall and we're moving cattle.  So we have our team.

16   Sean and his team is feverishly trying to update this

17   document because we want to give him something that's

18   accurate as possible.  We want to give him something that he

19   can sink his teeth into and count on.

20   Q.   So who set up the meeting with Mr. Scherer in Happy,

21   Texas?

22   A.   I set the meeting up with Mr. Scherer.  I don't know

23   if he called me, I called him, you know, for the final

24   meeting setting up, but the first time that we started

25   talking about these cattle in the fall is -- when he called

1   me, he said, "We have an impending meeting with Whole Foods

2   and we need to talk about your cattle, what you're going to

3   have, how many you're going to have, what's going on,

4   because we can't go do a deal with Whole Foods, if we don't

5   have enough cattle.  And so we're kind of counting on your

6   cattle to do this."

7   Q.   Did Mr. Scherer tell you how many of the natural

8   cattle it needed from Zia?

9   A.   No.  As a matter of fact, he said -- at the time he

10   insinuated that they would take all the cattle that we could

11   put together, but he was -- he had lots of availability open

12   if we wanted to embrace it.

13   Q.   So he said that Tyson would take as much of Zia's GAP

14   cattle as it could source?

15   A.   Yes, ma'am.

16   Q.   And so where, specifically, did you meet Mr. Scherer

17   in Happy, Texas, on January 14th?

18   A.   Where did I meet him?

19   Q.   Yeah, where did you guys first meet up?

20   A.   If my mind serves me correctly, we met in a wide spot

21   in the road between Happy, Texas, and Canyon.  There's some

22   grain silos there in a wide spot in the road.

23   Q.   And what happened next?

24   A.   This place is right in the middle of all this pasture

25   that we have.  So what happened next?  We -- like I said, I

1    drove up.  And he -- I don't know if he got there first or I

2    got there, but he jumped in my vehicle.

3    Q.    So you guys drove around together?

4    A.    Pardon me?

5    Q.    You drove around in the same vehicle?

6    A.    Yes, ma'am, we did.

7    Q.    And when did you give him a copy of this document --

8    this proposal, Exhibit 18?

9    A.    Before I left Albuquerque, Sean gave me two copies of

10   this document.

11   Q.    Hard copies printed out?

12   A.    Yes, ma'am.  And I had one of those copies sitting on

13   the console of my pickup.  I have a pickup that has two

14   seats and a console in the middle.  And I had this document

15   sitting there because we were going to use this document to

16   discuss our proposal, and also we were going to talk about

17   the cattle we were looking at.

18   Q.    Did Mr. Scherer look at this proposal?

19   A.    I'm sorry?

20   Q.    Did Mr. Scherer look at this proposal in your pickup

21   that day?

22   A.    Sure he did.  We were looking at cattle and we were

23   talking about the proposal, talking about the cattle, and

24   how big they might be, how small they might be, or whatever.

25   And we -- we went over this document from stem to stern.

1  And we went over all the cattle that we looked at in those

2  three or four hours.

3  Q.   Did you explain what this document was to Mr. Scherer?

4  A.   I did, yes.

5  Q.   Did Mr. Scherer ask any questions about what this

6  document was?

7  A.   He asked a few questions, but really, by and large,

8  what Mr. Scherer -- I saw no dissatisfaction or any

9  confusion or anything from Mr. Scherer.  He was stoked when

10  he looked at the cattle.

11  Q.   Can you describe your discussions with Mr. Scherer

12  about how this proposal would be something different than

13  what you had done with Mr. Scherer before?

14  A.   Again, Mr. Scherer knew that we had a really rough

15  2018 financially.  And he was trying to accomplish his goals

16  and objectives, which were he was trying to get cattle that

17  were very high quality into the program so that he would

18  have enough bodies to cover whatever he had for commitments

19  to his retailer.  And we walked through the document from

20  right to left and left to right and up and down.  And, you

21  know, I think he was fairly impressed with the fact that,

22  you know, we had put down some numbers that make it very

23  easy to see what these cattle are going to cost.

24  Q.   Did you discuss the Nebraska weighted average when you

25  were in your pickup truck at Happy, Texas?

1     A.    The only thing we discussed about the Nebraska

2     weighted average is I told him I couldn't do that anymore;

3     that that kind of deal would not work for us.

4     Q.    And how did Mr. Scherer respond to that?

5     A.    You know, Mr. Scherer told me that, you know, for me

6     to get this final version of this proposal to him with the

7     numbers and he'd look it over and either give me a "yes" or

8     "no."  And that's what I asked him for.  Mr. Scherer and I

9     had few deals, but the one deal we had with each other as

10    gentlemen is he has always told me that if he can't do what

11    needs to be done or can't use the cattle that we have on

12    grass or pasture that he will let us know so we can

13    immediately implant them and just move on; sell them to

14    Cargill, National, JBS, somebody else, or even sell them to

15    them as an implanted animal.  He knows that.  And he has

16    been kind enough to tell me, "Hey, I'm not going to have you

17    go put these cattle on feed before they leave pasture if we

18    can't put our heads together and figure something out.

19    You're welcome to implant them."  That's all I asked him

20    for.  And that's what I've asked him for year over year.  He

21    seldom has let any cattle go to get implanted, but he has a

22    couple of times.

23    Q.    So you were ready to let these cattle be implanted if

24    Mr. Scherer was not willing to agree to this cost plus

25    proposal?

 1   A.   Absolutely.  The key element here is, when -- we were

 2   talking about removing the risk for owning these cattle.

 3   When they go onto feed, that's -- when I use the analogy of

 4   buying a car and buying an insurance policy for that car

 5   before you drive out of the car lot.  When they leave grass

 6   or wheat or backgrounding and they go into the feedyard,

 7   somebody needs to take on the risk.  Zia can take on the

 8   risk by implanting the cattle and hedging them with the CME,

 9   Chicago Mercantile Exchange, so that we don't have any

10   downside risk to the market.  Tyson can do the same thing.

11   If they buy them, they can take on the risk.  With this cost

12   plus proposal, Tyson's taking on the risk, so they should be

13   registering the cattle, not Zia.

14   Q.   They're taking the risk because they're paying for the

15   cost of the calves --

16   A.   Right.

17   Q.   -- the feed, the freight?

18   A.   They're taking on the risk to cover their downside

19   potential loss in market value.  And this is a very

20   difficult thing to explain to people, but the most important

21   thing to understand is, is that Bob Scherer and I are

22   standing there at the car lot.  And, if he's going to buy

23   the car, he's going to buy the insurance.  It's like when

24   you first go to college and your parents say, "We're going

25   to pay the first semester of insurance for your car," but

1   they forget to do it and you don't pay it, either, and you

2   have a car wreck; you're in big trouble.  So unbeknownst to

3   me, if Bob Scherer is shifting his feet around and has not

4   taken the risk on for these cattle, he has put Zia at great

5   danger.  And this is something to always keep in

6   consideration, is that, you know, these are large contracts

7   for a lot of cattle, and any kind of movement in the market

8   can make catastrophe present itself at your doorstep.

9   Q.   When Mr. Scherer was looking at a hard copy of this

10  proposal in your pickup in Happy, Texas, on January 14th,

11  did he say he didn't understand any of these columns?

12  A.   No.

13  Q.   Did he say he didn't agree with any of these columns?

14  A.   No.  No, ma'am.

15  Q.   Did he say Tyson would never approve an agreement like

16  this?

17  A.   No, ma'am.  What he said is, is for me to send him the

18  final proposal.  He wanted the cattle.  He wanted me to say

19  yes.  He wanted me to say I was going to ship them to him.

20  He wanted them to be gone off wheat pasture a hundred

21  percent.

22          Now, I'll point out to you that there was only

23  about 3,000 cattle on wheat pasture, the ones that say

24  "Happy Pasture" there, but all the rest of these cattle were

25  already set up.  They weren't in the finish phase yet, but

1   these cattle were set up to basically just shift gears.  Go

2   from backgrounding to finisher immediately and implant them

3   or don't implant them.  It was set up that way on purpose.

4   Q.   And in your pickup, on January 14th, in Happy,

5   Texas, did you tell Mr. Scherer that this was the only way

6   you could move these natural cattle into the feedyard?

7   A.   I told Mr. Scherer that if we could not make a

8   guaranteed margin on these cattle that we wanted to implant

9   them.  We didn't want to feed them natural anymore.

10  Q.   On January 14th, in Happy, Texas, did Zia have to

11  sell these GAP cattle to Tyson?

12  A.   No.

13  Q.   Why is that?

14  A.   Because we already had a plan in place to implant the

15  cattle and feed them as conventional cattle.

16  Q.   Going back to Exhibit 10, so Mr. Scherer texts you

17  two days after your meeting.  And what was your

18  understanding of "let's get the feedlot inventory up to

19  date, get these cattle in for May and June, and we'll go

20  forward.  Thanks, again"?

21  A.   He's asking me for our final proposal.  And he is

22  insisting that we pick the cattle up and move them to the

23  feedyard.

24  Q.   When Mr. Scherer and you parted ways on

25  January 14th, did he keep a copy of this proposal?

1    A.    Yes, ma'am.

2    Q.    How did your meeting end?

3    A.    Very happy.  Again, he looked at me and he said,

4    "Thank you so much for showing me these cattle.  I

5    appreciate your time.  And get me that final proposal.  Get

6    it to me, get it to me as soon as you can, so I can approve

7    it."

8    Q.    Did you shake hands?

9    A.    We shook hands.  We always shake hands when we say

10   hello and say goodbye.  I shook hands with him yesterday

11   when I saw him.

12   Q.    Next, I'd like to see Exhibit 12.

13             Mr. Perez, what's this document?

14             THE COURT:  Did you want to admit Exhibit 12?

15   Ms. Diamond, do you want to admit it?

16             MS. DIAMOND:  Yes.  Yes.

17             THE COURT:  Exhibit 12 is admitted with no

18   objection.  Go ahead.

19   (Joint Exhibit 12 was admitted into evidence.)

20   A.    It appears to be another text, but the numbers are

21   blacked out; meaning, I don't know if it's an e-mail or a

22   text, but it's probably a text.  It says (reading), "Did

23   start moving calves off wheat?  Need them in a feedyard."

24             This communication happened 1-23-2019, at

25   6:40 P.M.  So that is nine days after we were in Happy,

1    Texas.

2    Q.   And what does that mean?

3    A.   He's still insisting that I move the cattle off wheat

4    and get them into a feedyard.  Again, most of the cattle on

5    this cost plus contract are already in the feedlot.  The

6    only ones that aren't in the feedyard are the cattle in

7    Happy, Texas, and it's about plus or minus 3,000 of them.

8              MS. DIAMOND:  I'd like to enter Exhibit 13.

9              THE COURT:  Exhibit 13 is admitted, without an

10   objection from Tyson.

11             MR. FISHER:  That's correct, Your Honor.

12   (Joint Exhibit 13 was admitted into evidence.)

13   Q.   (BY MS. DIAMOND):  What's this text message,

14   Mr. Scherer [sic]?

15   A.   It looks like a text message from Mr. Scherer to me,

16   again, on 1-23-2019, 7:26 in the evening, maybe about an

17   hour later.  And it says (reading), "Let me know when they

18   start delivering."

19   Q.   So he sent you two text messages so far asking when

20   these cattle will be delivered?

21   A.   Yes, almost back to back.

22   Q.   And what does that mean, "start delivering"?

23   A.   I'm pretty sure he's just continuing to ask me to

24   please load them off the pasture and send them to a

25   feedyard.

1    Q.   Twice in one day?

2    A.   I'm sorry?

3    Q.   Twice in one day?

4    A.   Yes, ma'am.

5         MS. DIAMOND:  I'd like to admit Exhibit 14.

6         THE COURT:  Exhibit 14 is admitted, without

7    objection.

8    (Joint Exhibit 14 was admitted into evidence.)

9    A.   Thanks so much, whatever you just did.  It's nicer if

10   they're bigger.

11   Q.   (BY MS. DIAMOND):  What's this text message?

12   A.   This happened, again, on the 23rd of January of 2019

13   at 7:31 P.M.  It reads (reading), "I would agree.  Just need

14   them in the record to put them on the books."

15   Q.   So what's your understanding of what he's asking in

16   this third text message on January 23rd?

17   A.   Apparently, I must have said something to him and he

18   agreed to it.

19   Q.   What about the second sentence?

20   A.   The second sentence, what it means, plain and simple,

21   to me is "just need them in the yard to put them on the

22   books."  So, apparently, Mr. Scherer didn't have these

23   cattle in the books up to that point.  Apparently, they

24   weren't anywhere.

25        MR. FISHER:  Objection, Your Honor.  The witness

1    is speculating at this point as to what Mr. Scherer's

2    agencies thoughts --

3                THE COURT:  Right.

4                MS. DIAMOND:  I'll rephrase.

5                THE COURT:  Okay.  I'll sustain.  You can

6    rephrase.  Go ahead.

7    Q.  (BY MS. DIAMOND):  What did you interpret this

8    text message to mean?

9    A.   I interpret this message to mean, "Hey, if you don't

10   get them in the feedyard, you're not going to get them

11   sold."

12   Q.  (BY MS. DIAMOND):  I'd like to admit

13   Exhibit 16.

14               THE COURT:  Exhibit 16 is admitted, without

15   objection from Tyson.

16   (Joint Exhibit 16 was admitted into evidence.)

17   Q.  (BY MS. DIAMOND):  Mr. Perez, what's this text

18   message?

19   A.   This is a text message -- I guess it's a text message.

20   It's a communication, for sure, from Bob Scherer to me on

21   the 28th of January, 2019.  This is five days later.  This

22   would be five days later, at 6:45 P.M.  And he says

23   (reading), "Any movement on the cattle heading north?"

24               So Happy, Texas, is located in the Texas

25   Panhandle.  And we had plans to send these cattle to a

1    feedyard or two in Kansas.  And I'm sure that's why he is

2    insinuating -- he's asking if the cattle are going north.

3    Q.   So we've now gone through five text messages from

4    Mr. Scherer to you after your meeting in Happy, Texas.  What

5    was your thinking in terms of whether or not Bob wanted

6    Zia's natural cattle, Mr. Scherer wanted Zia's natural

7    cattle?

8              MR. FISHER:  Objection, Your Honor.  I believe

9    Counsel is leading the witness and has been for some time.

10             THE COURT:  Your objection is leading?

11             MR. FISHER:  Leading her own witness, yes.

12             THE COURT:  Okay.  I'll overrule that.  Go ahead.

13   A.   Would you repeat the question, please, ma'am?

14   Q.   (BY MS. DIAMOND):  We've gone through five text

15   messages from Mr. Scherer to you following your

16   meeting in Happy, Texas.  What was your

17   understanding of Tyson's desire for Zia's GAP cattle

18   at this time?

19   A.   I think he's turning the gas up and, like, putting

20   pressure on me to get the cattle from Happy to a feedyard.

21   Again, most of the cattle on this list are already in

22   feedyards, but the cattle in Happy are not in feedyards;

23   they're on pasture.

24   Q.   What was Zia doing at this time after your meeting in

25   Happy, Texas, in the last part of January?

1    A.    Sean and his team were working really hard to get

2   Mr. Scherer a final document on our cost plus contract.

3   Because Sean is a man of very high integrity, and he wanted

4   to make sure that if we told Mr. Scherer that we could do

5   what was on that document that we could, indeed, do what was

6   on that document.  So he did not want to waste...any

7   watchful eye on this document.  So he had three guys in our

8   office working really hard to make sure that we put this

9   together in a way that he could feel good about it.

10  Because, when we lay this document down, it's all in.  And

11  we know that, somewhere down the line, somebody's going to

12  look at these numbers in their finality and say, "You guys

13  are amazing," or "You guys are un-amazing."  So the Team Zia

14  was working really hard.  All of those days Mr. Scherer was

15  text messaging me, e-mailing me, calling me, Team Zia was

16  working really hard on the numbers.

17   Q.    When did you next send Mr. Scherer an updated version

18  of this proposal?

19   A.    The cost plus proposal was updated and converted into

20  a contract and sent to Mr. Scherer on February 4, 2019, at

21  11:04 in the morning.

22          MS. DIAMOND:  I'd like to enter Exhibit 17,

23  please.

24          THE COURT:  Exhibit 17 is admitted, without

25  objection from Tyson.

1    (Joint Exhibit 17 was admitted into evidence.)

2    Q.   (BY MS. DIAMOND):  Now, the top part of this

3    document is an e-mail from you.  Can you tell the

4    jury what you were doing when you wrote to Bob

5    February 4th -- Mr. Scherer, February 4th at

6    11:02?

7    A.   Yes, ma'am.  Bob had continued to call me and text me

8    daily, weekly, a few times a week, because he really wanted

9    to get these cattle from Happy, Texas, into feedyards.  And

10   I told him that until we sent the final version of our cost

11   plus contract that -- and he approved it that we couldn't

12   move any more cattle towards feedyards.  Because we were

13   just waiting for that or else we were going to implant the

14   cattle.

15           And so you see there's an attachment here at the

16   bottom and along with a message, "Bob, look this over and

17   let's talk.  Sorry, I've had a busy day.  It's Tony's

18   birthday.  He went snowboarding."  Bob knows Tony.  Tony is

19   a guy that works in our office that hedges cattle.  And when

20   he's gone, it's usually very busy because we spend a

21   tremendous amount of time hedging a lot of those cattle and

22   things like that.

23   Q.   What did you mean by "look this over"?

24   A.   He told me to send him a final version of our cost

25   plus proposal and that he would approve it.  He'd either

1    approve it or not approve it.

2    Q.   And this attachment icon that you can see, is this the

3    proposal that we have blown up here (indicating) that is

4    Exhibit 18?

5    A.   It is.

6    Q.   And so you e-mailed a version of that document to

7    Mr. Scherer on February 4th?

8    A.   I did.

9    Q.   At 11:02 A.M.?

10   A.   Yes, ma'am.

11   Q.   And did Mr. Scherer respond to your e-mail?

12   A.   Yes, ma'am.

13   Q.   Can we zoom in at the bottom of this e-mail?

14   A.   Do you --

15   Q.   And how did he respond?

16   A.   Ms. Diamond, do you want to put this on the ground and

17   show the exhibit (indicating)?

18   Q.   That's okay.

19          MS. DIAMOND:  If I can approach?

20          THE COURT:  That's fine.

21   Q.   (BY MS. DIAMOND):  How did Mr. Scherer respond

22   to your e-mail?

23   A.   He said (reading), "This looks good, get them in a

24   finish yard ASAP, please."  And what I thought was

25   comforting is that I sent him the e-mail on February the 4th

1    at 11:02 or 11:04.  And Mr. Scherer apparently had a good

2    enough comprehension of what we went over in Happy that,

3    approximately 45 minutes, 47 minutes later, he sent this

4    e-mail right back.

5          So it was very comforting to me that he

6    understood the document well enough to shoot it back to me

7    within 45 minutes and accepting it.  And I felt like the

8    contract proposal just got converted into a contract that's

9    consummated.

10   Q.   "This looks good," you interpreted to mean Mr. Scherer

11   accepted your proposal?

12   A.   Yes, ma'am.

13   Q.   What does -- what did "get them in a finish yard" mean

14   to you?

15   A.   Yesterday, when I went through the stages of what

16   cattle have to do to work their way on their journey to a

17   packing house, I showed that, from the backgrounder, they

18   need to move into a finishing yard.  They have to go through

19   the finishing yard before they can ever get to the processor

20   or packer, in this case, Tyson.  So, again, I believe what

21   Mr. Scherer really is saying here is, "I accept your

22   contract.  Get the cattle off of wheat pasture and into the

23   feedlot so we can get them finished."

24   Q.   Was there any doubt in your mind as to whether

25   Mr. Scherer was accepting Zia's proposal in this e-mail?

1    A.   Absolutely not.

2    Q.   Was there any uncertainty regarding whether or not Zia

3    and Tyson entered into a binding agreement?

4    A.   No, ma'am.  I made them an offer of what we wanted to

5    do.  And I feel like he accepted that offer verbally in

6    Happy and in writing on this e-mail.

7    Q.   How did this cost plus proposal that we've been

8    discussing compare with other proposals or contracts that

9    you've done with Tyson in the past?

10   A.   With Bob Scherer, specifically, I've never done

11   anything that looks like this or smells like this or tastes

12   like this.

13   Q.   And so would this be more formal or more detailed than

14   other contracts you've done with Mr. Scherer?

15   A.   Yes, ma'am.

16   Q.   How so?

17   A.   Because we seldom have anything except a handshake and

18   some type of agreement between each other.  Never in

19   writing.  Cryptic pieces of information.  Every time I've

20   tried to get a formal contract with Tyson, I run into fierce

21   resistance from Tyson.

22   Q.   Why do you think that is?

23   A.   I think that any time you have a relationship and you

24   don't have to put anything in writing I think it serves as a

25   beautiful way, if you have to find your way into a

1  courtroom, you find your way into a situation where it's "he

2  said and she said," even though I never dreamt I'd be in a

3  courtroom with Tyson after 20 years of being married to

4  them.

5  Q.   Did you ever have a formal written contract with

6  anyone at Tyson?

7  A.   No, ma'am.

8  Q.   How does this cost plus proposal compare with the

9  agreements you've had with anyone at Tyson in the past

10  20 years?

11  A.   This is a quantum leap towards transparency, towards

12  authenticity, towards trying to make it very clear what we

13  have to offer to them and whether they want what we have to

14  offer.  And really, what we're trying to do in this document

15  is add more formality to what we do.  And you can see by

16  these proceedings that they're kicking and screaming all the

17  way, because they don't want formality.

18          And the point here is, is that in a world where

19  grain is $7 a bushel and gasoline is $6 a gallon and beef is

20  very hard for people to afford in the store, it's time for

21  us, as an industry, to be accountable for taking these

22  resources and putting them to good use.  And we feel we have

23  a duty to do what's right with these resources when there's

24  people that are starving to death in other parts of the

25  world.

1          So this document really embodied the whole idea

2   of making sure that we put it on Tyson's back and, if they

3   want to mismanage cattle and fall asleep on scheduling and

4   things like that, it's up to them.  If they want to

5   mismanage it, they can mismanage it.  Because when I go to

6   Whole Foods to buy things -- because there's two of them

7   right by my house -- I walk in -- I walk in there because I

8   want to buy organic apples, organic bananas.  I want to buy

9   pork that's been raised under the GAP label or beef that's

10  been raised under the GAP label.  I'm doing that, I'm paying

11  those extra costs, because I want to feel good about the

12  food that I buy that I'm putting into my body.  I want to

13  feel good about how that food is being raised; if it's

14  healthy for the planet, if it's not healthy for the planet.

15  And most of the people I see in the parking lot have a

16  hybrid car or an electric car.  These are people that are

17  individually trying really hard to do what they can to be

18  friendly to the planet.  And that's just something, a really

19  yucky feeling, about knowing that all these consumers are

20  going into Whole Foods because they think this is a

21  feel-good thing and they can feel good about eating this

22  food, only to find out that my good friend, Bob Scherer,

23  takes the cattle out of the feedlot whenever he feels like

24  it.  And I don't think that's right.

25  Q.  After you got this e-mail on February 4th from

1    Mr. Scherer saying, "This looks good, get them in a finish

2    yard," did you move your GAP cattle into a feedyard?

3    A.   We started moving cattle from Happy, Texas, towards

4    feedyards to finish.

5    Q.   Did you implant these cattle?

6    A.   We didn't implant these cattle because Mr. Scherer had

7    to have them.  He wanted them.  He couldn't live without

8    them.

9    Q.   After Mr. Scherer sent you this e-mail on

10   February 4th, did you speak with him by phone?

11   A.   Yes, ma'am.

12   Q.   That day?

13   A.   Whether we spoke that day -- you know, we spoke on the

14   phone often.  That's really the major mode of us talking was

15   actually on the phone, not through text or e-mail or

16   anything else.

17   Q.   Do you recall the first phone conversation you had

18   with Mr. Scherer after he sent this e-mail on

19   February 4th?

20   A.   Yes, ma'am.

21   Q.   And what happened on that call?

22   A.   Mr. Scherer said, "Get the cattle off wheat pasture

23   and into the feedyard.  I need them badly.  Please move them

24   from wheat; get them into the feedyard."

25   Q.   Now, in this e-mail, in his response on

1   February 4^(th), is there anything where Mr. Scherer says

2   he's only going to pay Nebraska weighted average?

3   A.   No.

4   Q.   Is there anything in this e-mail saying that only one

5   or two of these columns looks good?

6   A.   No, ma'am.  Mr. Scherer, to this date, has never told

7   me that anything about this document looks good or bad.

8   He -- we went through the document in Happy.  He got the

9   document again here on February the 4^(th).  Obviously, he has

10  no problem with it.  And this document -- I'm sure we'll

11  talk about it at some point -- was sent to him many times.

12  Q.   Is there anything in this e-mail from Mr. Scherer on

13  February 4^(th) that says Tyson would never enter into a cost

14  plus agreement with Zia?

15  A.   No.

16  Q.   When you spoke with him soon after this e-mail was

17  sent, did Mr. Scherer tell you Tyson would never agree to a

18  cost plus agreement with Zia?

19  A.   I'm sorry, ma'am?

20  Q.   When you spoke on the phone, the first conversation

21  after you got this e-mail from Mr. Scherer, did Mr. Scherer

22  tell you Zia and Tyson could never enter into a cost plus

23  agreement?

24  A.   No, ma'am.

25  Q.   Did Mr. Scherer tell you Tyson would never pay for the

1    cost of calves?

2    A.   Not then, he didn't.

3    Q.   Did Mr. Scherer tell you he would only pay you the

4    Nebraska weighted average?

5            MR. FISHER:  Objection, Your Honor.  Counsel is

6    leading the witness.

7            THE COURT:  Overruled.

8    A.   Mr. Scherer did not say anything about the Nebraska

9    weighted average to me or anything else about any other kind

10   of deal, any other kind of way of sorting this out.  He

11   didn't say a word.  As a matter of fact, the longer that we

12   went into the spring -- we started out in January, in Happy;

13   then, in February, Mr. Scherer, as you can see has no

14   problem sending me e-mails, no problem sending me text

15   messages, and he had no problem talking to me on the phone,

16   but for the first time since I've known him in five years,

17   crickets.

18   Q.   (BY MS. DIAMOND):  On February 4, 2019, when

19   you received this response from Mr. Scherer, "This

20   looks good, get them into the feedyard," if he had

21   told you he was only going to pay Nebraska weighted

22   average, would you have not implanted your -- would

23   you have not implanted your cattle?

24   A.   We had a plan in place to implant the cattle.  We had

25   already spoken to a couple of other packers.  We had a

1    couple of feedyards that we feed a lot of conventional

2    cattle in, and they were ready to go, they had space.  And,

3    basically, we were just waiting for Bob to decide if he

4    wanted the cattle, needed the cattle, was going to take the

5    cattle under our terms.  Because, if he was, we weren't

6    going to send them to any other feedyards.  We weren't going

7    to make arrangements with any other packers.  They were his

8    to turn down.

9    Q.   And what would you have done on February 4th if

10   Mr. Scherer said he would not agree to a cost plus

11   agreement?

12   A.   I would have taken the cattle and implanted them and

13   moved on.

14   Q.   What would you have done if Mr. Scherer said these

15   terms were too uncertain to be a binding proposal and

16   agreement?

17   A.   I would have taken the cattle and I would have

18   implanted them, and we would have hedged them.  Very

19   important.  We wouldn't be at the car lot driving out with a

20   $60,000 pickup and no insurance on them.  That's not

21   somebody -- that's not something an intelligent person does.

22   Q.   On February 4th, when you received this e-mail,

23   could Zia still have done that without a loss?  You could

24   have still made these natural cattle conventional cattle?

25   A.   If we would have hedged the cattle on February the

1    4th, the cattle would have made money.  They would have

2    made more money than messing around over here trying to make

3    sure that Bob is happy and has cattle.

4    Q.    But you didn't take that course?

5    A.    Ms. Diamond, in the cattle business, you have one

6    thing:  You have your reputation.  And Bob had counted on

7    these cattle, and we didn't want to let him down.  But we

8    couldn't do that by taking our own life and our own survival

9    to help him.  But if we could make a little margin and help

10   him do what he's trying to accomplish, then we both win.  It

11   may not be a grand-slam win, but it's a win.  So we wanted

12   to honor the 20-year relationship and try to get the cattle

13   to him.

14   Q.    On February 4th, 2019, when you received this

15   response from Mr. Scherer, "This looks good," were you

16   surprised that Tyson agreed to a cost plus agreement?

17   A.    Not at all.

18   Q.    Why is that?

19   A.    Because we went over it in Happy, Texas, and he --

20   after I was in Happy, he saw -- you saw that he really

21   wanted me to get the cattle moving into feedyards, so, you

22   know, there should be no reason in the world why he changes

23   his mind.  But, if he does, he still had one more chance to

24   do what he could do and needed to do and wanted to do

25   without really doing any harm to us.

1    Q.   Was that when you sent this updated proposal on

2    February 4th?

3    A.   Yes, ma'am.

4    Q.   And did he take that last chance to refuse your

5    proposal?

6    A.   On the contrary.  It looks to me like he was very

7    happy to have them.

8         MS. DIAMOND:  I'd like to next admit Exhibit 20.

9         THE COURT:  Exhibit 20 is admitted, without

10   objection from Tyson.

11   (Joint Exhibit 20 was admitted into evidence.)

12   Q.   (BY MS. DIAMOND):  Mr. Perez, what is this text

13   message?

14   A.   It is a text message because I see the phone numbers.

15   It happened on the 5th of February.  This would be the

16   next day, at two o'clock in the afternoon.  It says

17   (reading), "The cattle have got to be placed in feedyards or

18   I can't take them.  As of today, May 15 harvest is only

19   99 days on Bovamine Defend at a finish yard.  Please get

20   them placed."

21   Q.   What did you understand this text message to mean with

22   regard to the urgency that Tyson needed Zia's GAP cattle?

23   A.   It meant, now that we have a contract in place, he's

24   going to start turning the gas up under me really hot to get

25   the cattle moving.  And you know what Mr. Scherer doesn't

1    remember is that, when he starts talking about Bovamine

2    Defend, Bovamine Defend is a probiotic that helps the

3    digestive system create lactic acid, which, in turn, reduces

4    the amount of E. coli that you find on the beef that's in

5    these cattle.  We feed Bovamine Defend to all of our cattle

6    all the time.  So there is no restriction of how many days

7    they need to have Bovamine Defend because all of those

8    cattle that are in all these other locations have it.  And

9    even the Happy Pasture cattle have it on pasture.

10    Q.   Was Zia already performing under the cost plus

11    agreement?

12    A.   Absolutely.

13           MS. DIAMOND:  I'd like to next enter Exhibit 22.

14           THE COURT:  Exhibit 22 is admitted, without

15    objection from Tyson.

16    (Joint Exhibit 22 was admitted into evidence.)

17    Q.   (BY MS. DIAMOND):  Mr. Scherer, what's this

18    text message -- I'm sorry.  Mr. Perez, what's this

19    text message?

20    A.   The text message is from Mr. Scherer on the 15th of

21    February.  And it says -- at 4:06 in the afternoon.  And it

22    says, (reading), "We need the bulk in May."

23    Q.   What does that mean?

24    A.   It means to me that he rolled out of bed, looked at

25    his schedule and said, "Oh, my God, we don't have enough

1   cattle for May.  We need to pull all the cattle to May."

2              And again, as I testified yesterday, the whole

3   reason we created the cost plus contract is because we are

4   handling snowflakes.  We're not handling boxes of tennis

5   shoes.  A snowflake is going to do what it's going to do

6   because it's a living, breathing organism.  And there's no

7   way to see if we can get a hundred percent of all these

8   cattle into the May category.  But if we're making $125 a

9   head, Bob Scherer can do whatever his heart desires.  He

10  can --

11  Q.   So if he wants to pick them up early?

12  A.   If he wants to pick them up early, if he wants to pick

13  them up late, it's on him, not us.

14  Q.   Is that because Tyson would be paying for the cost?

15  A.   That's correct.

16  Q.   For the cost of the calves?

17  A.   That's correct.  And this is exactly why we created

18  the cost plus model, because we know how Bob Scherer is.

19  And we know that regardless of when the snowflakes are ready

20  to be consumed happens that Bob Scherer is going to do

21  whatever he feels like he's got to do to keep the kill

22  going.  That's his job.  He has to get so many boxes of

23  tennis shoes in the door every day.

24              And we do something different:  We take

25  snowflakes and we create them and develop them into

1    beautiful beef animals for the purposes of food.

2              MS. DIAMOND:  I'd like to next admit Exhibit 28.

3              THE COURT:  Exhibit 28 is admitted, without

4    objection from Tyson.

5    (Joint Exhibit 28 was admitted into evidence.)

6    Q.   (BY MS. DIAMOND):  Mr. Perez, what is this text

7    message?

8    A.   The text message says (reading), "Damn good-looking

9    cattle, even on a rainy, crappy day."

10   Q.   And what did this mean?

11   A.   Well, it sounds like Mr. Scherer had a real fun day in

12   Kansas.  And that happened on the 14th of March of 2019,

13   at six o'clock in the evening.

14   Q.   What was in Kansas?

15   A.   I am sure he went to High Choice Feeders or

16   someplace -- no, I think he went to High Choice that day,

17   but, regardless, when somebody says, "Damn good-looking

18   cattle," damn good-looking cattle.

19   Q.   Is that Zia's cattle he's referring to?

20   A.   Yes, ma'am.

21   Q.   This is the cattle that Zia was feeding under the cost

22   plus agreement?

23   A.   More than likely, some of these cattle came from Happy

24   and, more than likely, some of these cattle that he looked

25   at are some of the ones you see at High Choice on this

1    board.  But, as a cattle person, I guess you're not going to

2    get a much higher compliment from a guy like Bob Scherer.  I

3    think Bob loved the cattle.  I think he loved them at Happy.

4    I think he loved them this day in Kansas.

5    Q.   And you told us yesterday how proud you are of Zia's

6    cattle.

7    A.   I am so proud of my family and proud of our cattle.

8    We work very hard to have a very transparent, authentic

9    process when it comes to beef production.

10   Q.   Did you send further updates to the cost plus proposal

11   after Bob, Mr. Scherer, accepted it on February 4th?

12   A.   Yes, ma'am.

13   Q.   I'd like to --

14   A.   Sean and his team were constantly -- this was a 24/7,

15   365 "let's make sure that we keep Bob very aware of

16   everything that's going on."

17   Q.   And why did you want to do that?

18   A.   Because we want to do what's right by Bob.

19            MS. DIAMOND:  I'd like to admit Exhibit 133,

20   please.

21            THE COURT:  Exhibit 133 is admitted, without

22   objection from Tyson.

23   (Joint Exhibit 133 was admitted into evidence.)?

24   A.   Oh, thanks for blowing it up.

25   Q.   (BY MS. DIAMOND):  It looks like this is an

1    e-mail and an attachment.

2              Can you tell us what this e-mail is, Mr. Perez?

3    A.    It's an e-mail from me on 2018 -- 2019, so

4    February 18, 2019, at 4:39 in the afternoon.  And the

5    subject is (reading), "cattle in highlighted have moved to

6    High Choice, forward, corrected cost plus model 2018-19."

7    Q.    That's the attachment?

8    A.    (Reading), "Cost plus model attachment, corrected PDF,

9    untitled attachment 00013.htm."  The body of the e-mail

10   says, "Circle B's moved this week to Beef City."

11   Q.    What's Beef City?

12   A.    Beef City is a feedlot that we finish cattle in.

13   Q.    So Zia was moving its GAP cattle to the feedlot, and

14   you're telling Mr. Scherer; is that correct?

15   A.    Ma'am, the Circle B cattle are some of the most famous

16   cattle in the world.  And they are out of Custer, Montana.

17   The Borman family.  Astronaut Borman owns this ranch.  And

18   to be able to buy these cattle and have them in our stream

19   of cattle is absolutely an honor, to buy these cattle from a

20   great American hero.  And Bob knows the cattle because I've

21   sent the cattle to him many times.  And he'd know that there

22   was a couple of thousand of these cattle, more than likely,

23   headed towards Beef City.  And this would be significant

24   because it's a large percentage of the cattle that are here.

25   Q.    So Zia was getting its cattle --

1    A.    Yes, ma'am.

2    Q.    -- in the feedyard?

3           Can we go to the second page and zoom in on the

4    bottom box, please.

5           So, Mr. Perez, what is this document here?

6    A.    You know, honestly, I believe this is the attachment

7    that was in that e-mail that we just talked about, but I

8    really can't tell.

9    Q.    And why would you be sending updated...

10   A.    Do you mind scrolling down a little bit?  That's

11   actually up.  Thank you.

12          Can you scroll just a little bit over to the

13   left?  Thank you.  Please and thank you.

14   Q.    Why were you sending updates to this cost plus

15   document?

16   A.    Because we wanted to make sure that Bob could see what

17   was happening, like the articulation of the cattle movement

18   from a ranch to a grower, a backgrounder, a wheat pasture,

19   or into a finish yard.

20   Q.    Did this make the cost plus proposal that you sent

21   Mr. Scherer on February 4th any less certain?

22   A.    It actually makes it more certain.  And all costs are

23   updated, all -- all manner of metrics in this document are

24   updated.  But if you go to the bottom of the document, the

25   reason that this square is at the bottom is it, again,

1   always aggregates everything so that we properly reflect

2   what he can count on for cattle coming out in certain time

3   periods, if he takes them out in certain time periods, and

4   how many head and what their size might be, what their cost

5   is per pound, and what their cost is per head.

6   Q.   Do you recall if Mr. Scherer responded to this e-mail

7   saying that there was no cost plus agreement with Tyson?

8   A.   I recall that it was crickets.  No response.

9   Q.   And this is on February 18th?

10   A.   I believe so.  I don't remember, honestly, whether he

11   responded or not.  He certainly didn't respond negatively.

12   Q.   What was your understanding with regard to whether or

13   not Tyson was honoring the cost plus agreement Mr. Scherer

14   had made on February 4th?

15   A.   I never worried about it again.  Bob looked at it.  We

16   talked about it till we were blue in the face.  He looked at

17   the cattle, and I understood very clearly that he wanted me

18   to get the cattle from Happy into a feedyard.

19   Q.   And that's what Zia did?

20   A.   Yes, ma'am.

21        MS. DIAMOND:  I'd like to next admit Exhibit 135,

22   please.

23        THE COURT:  Exhibit 135 is admitted, without

24   objection from Tyson.

25   (Joint Exhibit 135 was admitted into evidence.)

1    Q.   (BY MS. DIAMOND):  Mr. Perez, what is this

2    document starting with the e-mail on the first page?

3    A.   It's an e-mail March 4, 2019, at 2:15 in the

4    afternoon.

5    Q.   What was the subject?

6    A.   It was myself to Bob Scherer.  Subject is (reading),

7    "Updated list, forward, 2019, March 4, cost plus update,

8    cost plus model, attachment 3-4-19 PDF."  And this was

9    forwarded to me from Mike Rogers.  He's our cattle inventory

10   manager.  And he says, "Narciso, attached is the updated

11   cost plus model.  The yellow highlighted cattle are the

12   movements from pasture to feedyard.  Thanks, Mike."

13   Q.   And you were sending that to Mr. Scherer?

14   A.   That's what Mike Rogers is telling me.

15   Q.   And you forwarded that e-mail to Mr. Scherer?

16   A.   I believe so, yes.  I can only see that I forwarded

17   it.  I can't say that he actually got it or anything here.

18   So it must be lower in the e-mail.

19        MS. DIAMOND:  Ms. Gallagher, can you zoom in to

20   the second page, the highlighted columns?

21   Q.   And, Mr. Perez, do you know what these highlights

22   refer to?

23   A.   These are -- if you look to the far right, it has a

24   "ranch name."  And if you work your way from the right --

25   sorry, far left.  If you work your way from the far left

UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1    column, right, the next column tells you -- so the first

2    column tells you the ranch of origin; again, going back to

3    this, the cow-calf operation.  The next column tells you

4    which feedlot they went to.  The next column tells you, to

5    the right, whether they were steers or heifers.  And the

6    next column tells you what head count went.

7    Q.    Did Mr. Scherer respond that there was no cost plus

8    agreement with Tyson when you sent this update on

9    March 4th?

10   A.    If my mind serves me correctly, he didn't respond, at

11   all.  He didn't respond about a Nebraska weighted average.

12   He didn't respond about anything.

13   Q.    Was there any doubt that Zia and Tyson had entered

14   into a binding cost plus agreement on March 4th?

15   A.    Absolutely not.  And the reason we keep sending

16   updates is, just like your credit card statements, we want

17   to make sure we always keep Bob knowing what's going on so

18   he doesn't get out of bed one day and freak out because the

19   cattle are here instead of there or there instead of here.

20   He shouldn't have to wonder what's happening with the cattle

21   he bought.  We wanted to be very transparent about that.

22   Q.    Because Tyson was paying the costs?

23   A.    That's correct.

24   Q.    Does this March 4th cost plus update make the

25   February 4th cost plus agreement any less certain?

1    A.   No.   The further you march down the road of time, the

2    more exact this document gets; the more comfort it should

3    give a buyer, unless the buyer doesn't want to be

4    comfortable.

5              MS. DIAMOND:   I'd like to enter Exhibit 149.

6              THE COURT:   Exhibit 149 is entered without

7    objection from Tyson.

8    (Joint Exhibit 149 was admitted into evidence.)

9    Q.   (BY MS. DIAMOND):   Mr. Perez, what is this

10   document?

11   A.   May 10th, 2019, I send him an e-mail.   Looks like I

12   copied his boss.   The subject was (reading), "Forward

13   2019-05-10 cost plus update; attachments:   Cost plus model

14   5-10-19, Jul-Sept.pdf, cost plus model April."   It looks

15   like I might have sent all of the cost plus models that we

16   sent, like all of the updates.   I might have included them

17   on this e-mail.

18             (Reading), "Bob, here is our short list after

19   your buyers have scheduled the majority of the cattle.

20   Thanks, Narciso."

21   Q.   What does that mean, "scheduled the majority of the

22   cattle"?

23   A.   This means that his buyers have visited every facility

24   where we have these cattle.   And they were working with

25   feedyard managers to try to get the cattle scheduled in to

1   harvest them.

2   Q.   So this is May 10, 2019.  Do you think that Tyson had

3   started talking some of these GAP cattle yet?

4   A.   I feel pretty certain that some of these cattle were

5   already moving, yes.

6   Q.   Because Mr. Scherer told you they needed the bulk in

7   May?

8   A.   Again, the reason that I feel pretty confident that

9   some of these cattle were moving is because his buyers

10  started looking at the cattle as soon as we consummated the

11  deal on February the 4th.

12  Q.   Did Mr. Scherer respond to this e-mail saying, "There

13  is no cost plus agreement with Tyson"?

14  A.   I can't see the rest of the e-mail, but I'm assuming

15  that...

16  Q.   Just based on your knowledge, Mr. Perez.

17  A.   I don't think him or his boss, Justin Nelson,

18  responded to anything.

19          MS. DIAMOND:  I'd like to next enter Exhibit 36,

20  please.

21          THE COURT:  Exhibit 36 is admitted, without

22  objection from Tyson.

23  (Joint Exhibit 36 was admitted into evidence.)

24  Q.   (BY MS. DIAMOND):  Mr. Perez, what is this

25  document?

1    A.    I've got a blue screen, so...

2    Q.    How often around -- approximately, based on your

3    recollection, would you be sending Mr. Scherer these

4    updates?

5    A.    Every few weeks.  Once a month, on the outside.  Every

6    two to three weeks.  The idea was to keep all updates

7    happening and keep Mr. Scherer informed in real small

8    increments of time, so that he knew where we were at all

9    times.

10   Q.    And can you describe the responses from Mr. Scherer

11   between February and May?

12   A.    Through e-mail or telephone?

13   Q.    In any -- in any form.

14   A.    We talked on the phone a few times about, you know,

15   "Is Jake Bach going to look at the cattle at Prewitt's?  Is

16   Rich Hoff going down to High Choice?"  So, you know, we had

17   a few discussions that are going to be discussions that were

18   relating to his buyers.

19   Q.    And at any time during those discussions, did

20   Mr. Scherer say he can't pay the costs?

21   A.    No, ma'am.

22   Q.    At any time during these discussions, did he say that

23   Tyson would not ever agree to a cost plus arrangement with

24   Zia?

25   A.    No.

1    Q.   Or a cost plus agreement with Zia?

2    A.   No, ma'am, he never said that.

3    Q.   Did he ever say that Tyson would only pay you the

4    Nebraska weighted average?

5    A.   The Nebraska weighted average never came up.

6    Q.   So what is this Exhibit 36, Mr. Perez?

7    A.   This is a 5-22 e-mail from me to Bob (reading), "Cost

8    plus model Jul-Sept.pdf, cost plus model, April-June.pdf,

9    lot Zia 215, invoice 11777 redone.pdf."  This is an e-mail

10   sent from Mike Roger, one of our people, to me.  (Reading)

11   "Narciso, attached is the updated cost plus model and the

12   Prewitt Land and Livestock invoice for 83 head sacrificed on

13   5-18-19.  There is now a second page on the April-June

14   model.  The second page is a comparison for the cattle that

15   have already shipped.  On the comparison page, the yellow

16   highlighted ranch names are the two sets projected for May

17   shipping."

18   Q.   Can you explain to us what's going on in this e-mail

19   from Mike Rogers that you forwarded to Mr. Scherer on

20   May 22nd?

21   A.   It looks like, in May, we were shipping cattle

22   probably out of Fairview Feeders, which is owned by Prewitt

23   Land and Livestock.  And so we had the invoices, the cost

24   plus invoices here, and then it's talking about a

25   highlighted -- an updated cost plus model.

1    Q.   And what would the Prewitt Land and Livestock invoices

2    refer to?

3    A.   The Prewitt Land and Livestock invoices would have --

4    I'm sure the attachments are somewhere, but they would have

5    had, again, the cattle cost, the freight, the feed, the

6    interest; the death loss would have been taken out -- and,

7    if my mind serves me correctly, at Prewitt Land and

8    Livestock, we only had a 1½ percent death loss, so we

9    actually beat our projections -- and then our margin.

10   That's what should have been on that invoice.

11   Q.   And that invoice, that would be needed to be paid by

12   Tyson under the cost plus agreement?

13   A.   Yes, ma'am.

14   Q.   Because those are the costs?

15   A.   Yes, ma'am.

16   Q.   So in May, by May 22nd, Tyson was already picking up

17   or taking some of these GAP cattle that are listed in the

18   cost plus agreement?

19   A.   Yes, ma'am.

20   Q.   And in May, Zia started invoicing Tyson for the cattle

21   picked up under the cost plus agreement?

22   A.   That is correct.

23        MS. DIAMOND:  I'd like to next enter Exhibit 151,

24   please.

25        THE COURT:  Exhibit 151 is admitted, without

1    objection from Tyson.

2    (Joint Exhibit 151 was admitted into evidence.)

3    Q.   (BY MS. DIAMOND):  Mr. Perez, who is this

4    e-mail from?

5    A.   This is from Robert Scherer.

6    Q.   What is the date of this e-mail?

7    A.   5-24-19 -- 5-25-2019.

8    Q.   And what day of the week is that?

9    A.   That is Saturday.

10   Q.   And what's the subject of this e-mail?

11   A.   (Reading) "Subject, cattle invoice 5-24-19."

12   Q.   And what about attachments?

13   A.   The attachments (reading), "Cattle invoice

14   5-24-19.pdf."

15   Q.   What does that invoice refer to, or what do you think

16   that refers to?

17   A.   It's definitely a cattle invoice.  Again, it's going

18   to have cattle feed, freight, it's going to have death loss,

19   it's going to have our margin.  And it's probably referring

20   to the cattle that we just talked about in the previous

21   e-mail.

22   Q.   So this is an invoice for cattle that was sent to

23   Tyson?

24   A.   Correct.

25   Q.   Including cost of cattle under the cost plus

1   agreement?

2   A.   Yes, ma'am.  And in there would have been, you know,

3   all the exact freight bills and all the feed bills, exact

4   everything.

5   Q.   And this would have been invoiced after Zia delivered

6   its GAP cattle, or at least some of its GAP cattle to Tyson?

7   A.   Correct.

8   Q.   After Zia already performed under the cost plus

9   agreement?

10   A.   That is correct.

11   Q.   After Zia fed these cattle as natural cattle or GAP

12   cattle instead of implanting them?

13   A.   Yes, ma'am, that's correct.

14   Q.   And what does the text of this e-mail from Mr. Scherer

15   say?

16   A.   The text from Mr. Scherer?

17   Q.   The writing of it, what does he write?  What does the

18   e-mail say?

19   A.   Yes, ma'am.  (Reading) "I'm not paying for the cost of

20   calves.  That's not what we do.  What are you trying to do

21   here?"

22   Q.   What's going on in this e-mail?

23   A.   I'm dying a thousand deaths because we have turned

24   handsprings trying to be transparent, keep Mr. Scherer

25   updated, keep Mr. Scherer aware of everything that's going

1    on.  Now, we start to send in invoices for the cattle that

2    we grew under this contract and we're super transparent.

3    All of the invoices from all of the vendors that did work

4    for us, we put in there, so that Tyson wouldn't think that

5    we worked the invoices up or had an extreme death loss or

6    something that somebody that you can't trust would do.

7              And the other thing that's going on is, is that

8    this entire inventory of cattle that we could have implanted

9    in January or February, they're now in the web of Tyson.  So

10   them being the only person that buy GAP cattle in these

11   quantities, the only person in the United States that buys

12   these kind of cattle, we're stuck.  And Mr. Scherer is

13   refusing to pay for them.

14             THE COURT:  Would this be a good time to take a

15   break for our midmorning break?

16             MS. DIAMOND:  Yes, Your Honor.

17             THE COURT:  All right.  We're going to take a

18   15-minute recess and then we'll continue with the direct

19   testimony of Mr. Perez.

20             All rise for the jury.

21                  (Jury not present.)

22             All right.  We'll be back in 15 minutes.

23             Mr. Fisher, I'm just admitting the exhibits

24   unless you say something.

25             MR. FISHER:  That's fine, Your Honor.

1            THE COURT:  If you don't want something, say

2    something.

3            MS. DIAMOND:  Your Honor, Mr. Fisher, why don't

4    we make an agreement each morning that we'll give each other

5    a copy of the exhibits for that day and stipulate to it to

6    make it easier, if that would be okay?

7            THE COURT:  Yes.  Give me the numbers you

8    stipulate to, and I'll admit them all.  But if we're having

9    to do it in live court, we have to put something on the

10   record that Tyson or that Zia is not objecting.

11           MS. DIAMOND:  Thank you, Your Honor.

12           THE COURT:  Okay.

13           MR. FISHER:  Thank you.

14                   (A recess was taken.)

15           THE COURT:  Thank you.  You may be seated.

16           Are you ready for the jury?

17           MS. DIAMOND:  Yes, Your Honor.

18               (Discussion off the record.)

19                   (Jury present.)

20           THE COURT:  Thank you.  You may be seated.

21           Ms. Diamond, you may continue your direct exam.

22           MS. DIAMOND:  Thank you, Your Honor.

23   Q.  (BY MS. DIAMOND):  Mr. Perez, we were speaking

24   about Exhibit 151.  Can you just tell us again your

25   reaction once you saw this e-mail.

1    A.    Yes, ma'am.  Again, it's an e-mail from Bob Scherer to

2    me on May 25th, 2019, at 6:37 in the morning.  He says

3    (reading), "I'm not paying the cost of calves.  That's not

4    what we do.  What are you trying to do here?"

5    Q.    And what did you do in response to this e-mail?

6    A.    I'm pretty sure I called him on the telephone.  But

7    the bottom line is, is that, at the end of a long journey of

8    trying to create -- thousands of hours of people keeping

9    track of costs and making a mammoth effort to be transparent

10   and communicating fluidly and amply, what I see is, is that,

11   all of a sudden, the game shifted and all of our cattle are

12   stuck, $16 million worth of cattle are stuck in some

13   situation that is not going to be pretty.

14   Q.    And why couldn't you just sell the rest of the cattle

15   to other suppliers?

16   A.    So, to start with, we have a commitment to send these

17   cattle to Tyson because they bought them on the cost plus

18   contract.  So, yes, could we sell the cattle to someone

19   else?  Yes.  What type of person would buy these cattle?  A

20   normal conventional packer would be happy to buy these

21   cattle.  They'd love these cattle, but they would pay

22   several hundred dollars a head less because they are a GAP

23   natural cattle, audited program, third-party verified cattle

24   that in this case the largest supplier of GAP cattle in the

25   United States to Whole Foods is Tyson.  And there's not

1      really any other place to go with them.

2              So, after trying to get ahold of Mr. Hueser,

3      Mr. Nelson, and Mr. Scherer, I reached out to the folks that

4      I had a previous relationship and asked them what to do.

5      Q.   That's Mr. Brandenburg and Mr. Bass?

6      A.   Yes.  And Mr. Bass said, "Well, two wrongs don't make

7      a right, but two Wrights designed, built, and flew the first

8      airplane.  You stand up to your side of the contract.  You

9      deliver the cattle and Tyson will do what's right.  And if

10     they don't do what's right, then sue them.  But it's not

11     going to fix anything by two people not honoring the

12     contract.  Call Kevin Hueser, get him on the phone, talk to

13     him, work it out."

14     Q.   And you testified about that yesterday, but were you

15     able to work it out with Tyson?

16     A.   I called Kevin Hueser many times.  I called Justin

17     Nelson many times.  I called Bob a couple of times.  And it

18     was pretty clear on what Bob was thinking with his e-mail.

19     Q.   And after you got this e-mail from Mr. Scherer on

20     May 25th, did Tyson still deliver some of the GAP

21     cattle -- did Zia still deliver some GAP cattle to Tyson?

22     A.   Yes, ma'am, Zia delivered a number of cattle to Tyson

23     and Tyson received a number of cattle.  As a matter of fact,

24     Zia tried to deliver the entire contract, and Mr. Scherer

25     started turning cattle down and not taking cattle even

1    though they were on that document that was our contract.

2    Q.   Did Tyson ever pay you the full amount owed under the

3    cost plus agreement?

4    A.   No, ma'am, they did not.

5            MS. DIAMOND:  I'd like to next enter Exhibit 39.

6            THE COURT:  Exhibit 39 is admitted, without

7    objection from Tyson.

8    (Joint Exhibit 39 was admitted into evidence.)

9    Q.   (BY MS. DIAMOND):  Mr. Perez, are you copied on

10   this June 6th, 2019, e-mail, subject: Zia Ag?

11   A.   No, ma'am.  It's an e-mail written from Bob Scherer to

12   all of his buyers everywhere we have cattle, and his boss.

13   Q.   So --

14   A.   And this is happening on June the 6th.  So, February

15   the 4th, we made a deal, and he agreed to it.  January the

16   14th, we looked at cattle, and he agreed to it.  And we're

17   talking February, March, April, May, June, 5 times 30,

18   150 days later, all of a sudden, Mr. Scherer is going to

19   pull a CYA move.  And he says to his buyers (reading),

20   "Yesterday, I received an e-mail from one of our suppliers

21   who finish cattle for Zia Ag stating to send all feed bills,

22   cost of cattle, all incremental to Tyson in an invoice form.

23   We do not have any such agreement with Zia Ag.  Let me

24   repeat this, we do not have any such agreement.  We will

25   continue to pay for the cattle as we always have using the

1    Nebraska weighted average and the agreed-upon premiums.  I

2    want to make sure the checks go directly to the finish yards

3    so they have complete payment for all their costs.  Any

4    questions, please feel free to call me on my cell."

5    Q.   What's your understanding of what is going on in this

6    e-mail?

7    A.   Super easy:  Mr. Scherer is trying to cover his

8    tracks.  If he would have written an e-mail like this on

9    February the 4th, I might understand it, but -- and -- but

10   to write it on June the 6th -- and why didn't he include

11   Zia in this?  The one entity that is impacted the most is

12   Zia and it's not on the e-mail.  Why?  Then everybody could

13   get on the same page.  But, clearly, he has woven his way

14   around either Tyson's employees or Zia's team to suit his

15   needs.

16        Zia -- in the first line, he says (reading),

17   "Yesterday, I received an e-mail from one of our

18   suppliers" -- big surprise -- "cattle for Zia Ag sending all

19   feed bills" -- again, transparency, exact poof,

20   authentication that we spent this money.  These feed bills

21   do not have anything in them for markup.  We added $125.

22   Transparent.

23        "We do not have any such agreement with Zia Ag."

24   I'm pretty sure he didn't attach the cost plus document that

25   is our contract that was sent on February the 4th to those

1   guys.  Why didn't he do that?

2            "Let me repeat this:  We do not have any such

3   agreement."  Okay.  I heard you the first time.  You're

4   backing out of a contract.

5            "We will continue to pay for cattle as we always

6   do using Nebraska weighted average" -- "as we always do"?

7   As we've determined here, I have made so many deals with

8   Tyson, I don't even remember all the deals I made with them.

9   One of them was Nebraska weighted average, and that's a deal

10  I made not with Mr. Scherer but with Mr. Gerber.

11           "...and the agreed-upon premiums."  I didn't

12  agree to any premiums.  Anywhere.

13           "I want to make sure the checks go directly to

14  the finish yards, so we have complete payment for all their

15  costs."  What's going on here is, is that he is like kissing

16  people's posterior, because Zia didn't ask for anyone to get

17  the money except for the finishing feedyards.  That's who we

18  requested that Tyson pay:  The finishing feedyard.  Very

19  disrespectful and really just heart-crushing.

20           "Any questions, please feel free to call my

21  cell."  I love it.  They can get him on the cell phone, but

22  I can't.

23  Q.   What would you have done if you saw this e-mail on

24  January 14th, 2019?

25  A.   So simple:  I would have implanted the cattle and sold

1   them somewhere else.  We're talking about a $16 million

2   deal.  Again, that's 75 houses in Las Cruces that cost

3   $200,000 each.  That's a huge amount of money.

4   Q.   What if you had seen this e-mail on February 4th,

5   2019?

6   A.   The cattle would have been implanted.  Other packers

7   would have been happy to have the cattle as implanted

8   cattle.  The cattle would have done just fine.  We would

9   have bought the insurance policy for that car in the parking

10   lot that we bought.  We would have hedged the cattle, we

11   would have implanted them.  Bob and us would have still been

12   friends.  That would have been no problem.

13   Q.   You testified yesterday that Zia's involvement in the

14   natural cattle business has been decreased.  What's the

15   state of the beef industry now?

16   A.   Well, I'd like to think that, no matter what kind of

17   spat is going on between the Tysons of the world and the

18   Zias of the world, that beef is still one of the most

19   wholesome and healthy and safe products for us to feed our

20   families.  It's a really, really high source of protein

21   that's a very high-quality source of protein.  And the

22   beautiful thing about cattle is they have a rumen.  The

23   rumen is designed to take forage on hillsides that have

24   cactus and rocks and convert it into tissue that's

25   delicious.

1          However, with the virus, we saw that there was

2     problems in supply.  And ranchers -- with the war in Ukraine

3     and global climate problems, the cost of grain has gone up;

4     the cost of fuel has gone up; our food system is in --

5     really stressed out.  It doesn't mean that the food isn't a

6     better quality than it's ever been and you can count on it.

7     The only thing is it's expensive, you know, because it

8     consists of labor, fuel, feed.  These are all things that

9     have gone up.  And the beef industry is in a critical state.

10    We are coming around the corner where companies like Tyson

11    and the other people that kill cattle that harvest cattle,

12    they're going to struggle to find enough cattle to keep

13    their packing houses going because the drought has consumed

14    a large percentage of our brood cow herd, that first

15    category that we were talking about.

16          And while we're in this courtroom, talking about

17    *toe-may-tow* versus *toe-mah-tow* and a few other things around

18    this contract that we had, the sad thing is, is that Tyson's

19    out trying to procure supply for the next year and the next

20    year.  And Zia has managed to put together a model that --

21    it's a prototype for beef supply that brings the rancher

22    closer to the consumer and sticks Tyson in the middle of it.

23    And we feel like we were offering everybody in the chain a

24    win-win-win situation, so that the rancher would have a good

25    market for his cattle, so that the consumers have a

1  high-quality product they can count on, so that Tyson has a

2  good supply of dependable cattle that are very high quality.

3  Everybody in the chain makes a little margin, and it seems

4  like a win-win-win-win all the way across.  But instead of

5  embracing the big picture, Tyson has decided to put

6  their feet in the ground -- their heels in the ground and

7  see if they can get around the outside of us for two and a

8  half million dollars instead of thinking about the big

9  picture.

10         Because, when we get done here, we're going to

11  see that Zia can handle a large capacity of high-quality

12  cattle.  We are a relevant supplier, could be a relevant

13  supplier of beef in a beef supply chain.

14  Q.   So you said prices have gone up for consumers for

15  beef.  And what about the prices -- or the profits, rather,

16  for the packers?

17  A.   Well, again, I'm a shareholder in Tyson Foods, so I

18  can tell you that my stock has increased.  I don't have a

19  lot of stock, I have a little bit of stock, but my stock has

20  increased exponentially.  Tyson, over the last five years,

21  has managed to enjoy revenues that range from 4 billion to

22  seven and a half --

23         MR. FISHER:  Objection, Your Honor, relevance and

24  speculation on the part of the witness.

25         THE COURT:  I'll overrule it as to relevance, but

1    I'll sustain it as to speculation without some more

2    foundation.

3    Q.   (BY MS. DIAMOND):  As a stockholder of Tyson

4    Foods, do you receive publicly available information

5    regarding their profit reports?

6    A.   Yes, ma'am.

7    Q.   And so what have you observed of those profit reports

8    in the last five years?

9    A.   Tyson has made more money in the last few years --

10   through the pandemic and after the pandemic, they have made

11   more money than they have ever made on a percentage basis in

12   the history of the company.  While consumers have gone into

13   the stores to buy animal-based protein products, and they

14   have doubled and tripled in price.

15              MR. FISHER:  Objection, Your Honor.  May we

16   approach?

17              THE COURT:  Sure.

18              MS. DIAMOND:  I have no further questions, Your

19   Honor.

20              THE COURT:  That's fine.  We're going to approach

21   about that.

22                   (Bench conference.)

23              MR. FISHER:  Your Honor, the witness is

24   testifying as to annual reports, public information, I

25   understand that, but he's not clarifying as to whether it's

1    to Tyson Fresh Meats or Tyson Foods, Inc.  These are two

2    very different companies.  Tyson Fresh Meats is only dealing

3    with meat, and Tyson Foods, Inc.'s main food is poultry.

4    They deal with prepared foods and all kinds of things, so --

5              MS. DIAMOND:  We have a stipulation that you

6    can't make any representations that one entity doesn't make

7    as much as the other entity --

8              MR. FISHER:  Well, that doesn't allow you to

9    attempt to bring in evidence about Tyson Foods, Inc., when

10   they're not a party.  And I'm bringing this to the judge,

11   outside of the presence of the jury.

12             THE COURT:  So we told the jury, pursuant to your

13   joint statement of the case, that "Tyson" meant "Tyson Fresh

14   Meats."

15             MS. DIAMOND:  And he said "Tyson Foods."

16             THE COURT:  Okay.  So was he not talking about

17   Tyson Fresh Meats?

18             MS. DIAMOND:  No.  He said he's talking about

19   Tyson Foods.

20             He's talking about Tyson Foods.

21             THE COURT:  So do we have an agreement

22   regarding --

23             MR. FISHER:  We do not have an agreement.  The

24   only agreement that we have is that I would not bring up, in

25   the presence of the jury, that you had any differentiation

1    between Foods and Fresh Meats.  If you're talking to

2    Mr. Scherer, I wouldn't say, "Oh, you've got the wrong

3    person."  We do not have an agreement, but -- evidence or

4    testimony, again, from someone who's not even an expert in

5    this about Tyson Foods, Inc., it's not relevant, at all,

6    because Tyson Foods, Inc., has been dismissed from the case.

7              THE COURT:  Do you want to bring me the

8    agreement?

9              (Reporter interruption for clarification.)

10             (Discussion off the record.)

11             MS. DIAMOND:  I mean, it doesn't matter.  It's a

12   moot point.  It's publicly available information as a

13   stockholder.

14             MR. FISHER:  Well, the revenues of Tyson Foods,

15   Inc., is irrelevant here because they're not a party.

16             THE COURT:  Let me show you the stipulation.

17             MS. DIAMOND:  I'm not going to argue or suggest

18   that Tyson Foods is a small company --

19             THE COURT:  Let me just look at it.

20             So it's Document 134.

21             (Discussion off the record.)

22             (Reporter interruption for clarification.)

23             I don't see that this -- I don't see that this

24   stipulation allows your witness to talk about the stock

25   price of Tyson Foods.  I don't see -- I don't draw that from

1    this; however, your objection was made after the testimony

2    was already in, so I'll find that it's untimely.  But don't

3    talk anymore about this.

4              MS. DIAMOND:  I'm finished.

5              THE COURT:  All right.

6              MR. FISHER:  Thank you.

7                   (Bench conference concluded.)

8              THE COURT:  All right.  Ms. Diamond, any more

9    questions?

10             MS. DIAMOND:  No further questions.  Thank you,

11   Your Honor.

12             THE COURT:  All right.

13             Mr. Fisher, it's your witness -- or Mr. Gomez,

14   whoever is going to do it.

15             MR. FISHER:  Thank you, Your Honor.  If I could

16   have just one minute to get set up?

17             THE COURT:  Of course.

18             MR. FISHER:  Thank you.

19                   (Discussion off the record.)

20                   **CROSS-EXAMINATION**

21   Q.  (BY MR. FISHER):  Good morning, Mr. Perez.

22   A.   Good morning, Mr. Fisher.

23   Q.   I've got some follow-up questions I'd like to go over

24   with you, some questions based on your testimony after

25   questioning from Ms. Diamond and some other topics.

1          I'd like to start off with a couple of questions.

2    Zia Consulting, the company that you work for, is a

3    commodity consulting business, correct?

4    A.   Mr. Fisher, there's two companies:  One is called Zia

5    Commodities.  It is a company that Sean owns that is a

6    commodity-based company; meaning, it deals with products

7    from the Chicago Mercantile Exchange.  And Zia Ag

8    Consulting, another company that he owns, is a company

9    that's principally put in place to do consulting work and to

10   create beef supply for packers and retailers.

11   Q.   Do you recall that, in August of last year, we got

12   together in Albuquerque and I took your deposition?

13   A.   Yes.

14   Q.   At that time, I asked you about how long Zia

15   Consulting had been registered as a company with the State,

16   and your testimony was that you weren't sure about that; is

17   that correct?

18   A.   That is correct.

19   Q.   You also testified -- I asked if there were any other

20   businesses associated with Zia Ag.  And, at the time, you

21   told me that there were no others that you're aware of,

22   correct?

23   A.   Yes.

24   Q.   And at that time of your deposition, you told me you

25   weren't aware whether there were any principals in Zia

1    Consulting other than your son, Sean; do you recall?  Is

2    that correct?

3    A.   Yes, sir.

4    Q.   And you testified, in that deposition last August, you

5    didn't know anything about the ownership of Zia Consulting

6    other than your son is a principal, correct?

7    A.   Yes, sir.

8    Q.   At that time of your deposition, you didn't know how

9    many people Zia Consulting employed, correct?

10   A.   I didn't -- at the time of my deposition?

11   Q.   Yes, Mr. Perez.  Last August, when I took your

12   deposition, you testified and told me that you did not know

13   how many people Zia Consulting employed; isn't that correct?

14   A.   That's probably correct, yeah.

15   Q.   But you did know at the time Zia Consulting did not

16   employ any ranchers, correct?

17   A.   Employ any ranchers?

18   Q.   Yes.

19   A.   We have a lot of ranch employees.

20   Q.   Your testimony today is that Zia Consulting has

21   ranch -- you do employ ranchers?

22   A.   So a ranch employee is different than a rancher.  A

23   rancher is someone who owns a ranch.  A ranch employee is

24   somebody that works on a ranch.

25   Q.   Mr. Perez, my question is -- and my question at the

1    deposition -- I'd be happy to put it up for you, if it would

2    help refresh your memory -- (reading) "Are there any

3    ranchers that Zia employs?"

4                Your response was, "Ranchers?  No."

5                Is that still accurate today?

6    A.    Correct.

7    Q.    And you also testified that Zia Consulting did not own

8    any cattle feedlots, correct?

9    A.    Zia Ag Consulting, as far as I know, does not own any

10   feedlots.

11   Q.    You've already testified today that, for Zia

12   Consulting, your role is director of cattle feed, correct?

13   A.    Yes.

14   Q.    You told me at your deposition that you've been

15   employed for five to ten years, somewhere in that

16   neighborhood; is that accurate?

17   A.    Yes, sir.

18   Q.    But you weren't able to remember exactly how

19   many years; is that right?

20   A.    Yes, sir.

21   Q.    And the role that you're in now at Zia Consulting is

22   the only role that you've had with them, correct?

23   A.    Yes, sir.

24   Q.    And in your role for Zia Consulting, you buy the

25   cattle that Zia Consulting acquires; isn't that right?

1    A.   Yes, sir.

2    Q.   Tyson is not involved in any way with the sale of the

3    cattle that are purchased by Zia Consulting, correct?

4    A.   Tyson is not involved in the sale of cattle?

5    Q.   Bob Scherer is not involved when Zia Consulting

6    purchases cattle, correct?

7    A.   I don't understand the question.

8    Q.   Zia Consulting is in the business of purchasing

9    cattle --

10   A.   Yes.

11   Q.   -- correct?

12        Bob Scherer is not present when Zia Consulting is

13   purchasing cattle; isn't that correct?

14   A.   Not all the time.  Sometimes they are.  Sometimes he

15   is.  He's been with me to ranches.

16   Q.   Okay.  Bob Scherer is not involved with your

17   negotiations in the purchase of cattle, correct?

18   A.   With a rancher?  No.

19   Q.   You handle that, correct?

20   A.   Yes, sir.

21   Q.   You decide what is a fair price for the cattle that

22   Zia Consulting purchases, correct?

23   A.   In my relationship with Tyson, I have shared with

24   various people what the cattle are going to cost.  And I

25   have talked to --

1    Q.   Mr. Perez, I don't mean to interrupt you, but that's

2    not what I'm asking.

3         My question is that you were the one who decides

4    what is a fair price for the cattle that Zia Consulting

5    purchases; isn't that correct?

6    A.   That is correct.

7    Q.   Okay.  Tyson --

8              MR. WORDEN:  Your Honor, I'm sorry, the last

9    question, Mr. Perez was in the middle of an answer.  If

10   there is a motion to strike or something, the appropriate

11   time is after the answer.  Thank you.

12             THE COURT:  I'm sorry, what...

13             MR. WORDEN:  The last question?

14             THE COURT:  Yes.

15             MR. WORDEN:  Mr. Fisher asked, "Is Tyson involved

16   with deciding how much to price the cattle?"

17             THE COURT:  Yes.

18             MR. WORDEN:  Mr. Perez answered half of it, and

19   then he was interrupted.  I'm sure it was unintentional, but

20   we should let the witness finish.

21             MR. FISHER:  Your Honor, Mr. Perez was not

22   answering my question.  He was answering a different

23   question.

24             THE COURT:  Okay.  Go ahead.

25             MR. FISHER:  Thank you, Your Honor.

1    Q.  (BY MR. FISHER):  Mr. Perez, I'm sorry, are you

2    ready?

3    A.  Yes, sir.

4    Q.  Tyson does not tell you what you should purchase

5    cattle for, for Zia, correct?  The price that you should

6    purchase them for.

7    A.  Mr. Fisher, Mr. Scherer has told me on more than one

8    occasion, "Get out there and buy cattle."

9    Q.  Mr. Perez, my question is Tyson does not come to you

10   and say, "Mr. Perez, you need to purchase cattle for this

11   price," correct?

12   A.  They may not -- the answer is "no," but they might

13   say --

14   Q.  Thank you, Mr. Perez --

15   A.  -- "we need 20,000 head or 10,000 head of cattle."

16   Q.  -- Mr. Perez -- thank you.  It was a simple "yes" or

17   "no" question.

18          Again, that's a decision that's made by you,

19   correct?

20   A.  Yes, sir.

21   Q.  In your job, you also negotiate with the feedyards

22   that the cattle go to, correct?

23   A.  That is correct.

24   Q.  And your negotiations with the feedyards are for what?

25   A.  My negotiations with the feedyards are for what?

1    Q.    Yes.  What are you negotiating with the feedyards, in

2    your role with Zia Consulting?

3    A.    We negotiate the price per ton for feed.  We negotiate

4    the process that we're going to go through with whatever set

5    of cattle; if they need special needs or considerations.

6    And we negotiate a yardage that we will pay the feedyard for

7    housing the cattle.

8    Q.    And those are -- those terms you're negotiating are

9    the costs associated with that feedyard, correct?

10   A.    The cost associated with feeding the cattle that we

11   plan to put in there.

12   Q.    You've been doing business with Tyson since around the

13   year 2000, correct?

14   A.    Yes, sir.

15   Q.    Over two decades now.

16             I'd like to talk to you a little bit now about

17   the cost plus spreadsheet.  You were not the individual who

18   developed that; is that correct?

19   A.    I had a hand in the implementation, but my son and his

20   team, his accounting team, are the folks that put this

21   together.

22   Q.    Okay.

23             MR. FISHER:  Your Honor, I'd like to seek to

24   admit Exhibit Number 114 at this time.

25             MR. WORDEN:  No objection, Your Honor.

1            THE COURT:  Sorry.  Exhibit 114 is admitted,

2    without objection from Zia.

3    (Joint Exhibit 114 was admitted into evidence.)

4    Q.  (BY MR. FISHER):  Mr. Perez, do you recognize

5    this e-mail from January 5th of 2019?

6    A.   Yes, I do.

7    Q.   And this e-mail is from you, correct?

8    A.   Yes, it is.

9    Q.   And it's sent to your son, Sean; is that right?

10   A.   Yes, it is.

11   Q.   As well as a man named Jason Turnipseed, correct?

12   A.   Yes, sir.

13   Q.   Who is Jason Turnipseed?

14   A.   He's our bank.

15   Q.   He runs a company called Larue Road Capital, correct?

16   A.   He owns Larue Road Capital, but I don't know if he

17   runs it.

18   Q.   I asked you about Mr. Turnipseed, do you recall, in

19   your deposition last August?

20   A.   I don't recall, no.

21   Q.   You told me Larue Road Capital is a hedge fund; is

22   that right?

23   A.   I think Larue Road Capital is a hedge fund.  It's

24   structured like a hedge fund, but it's our bank.  They

25   are -- in this case, they are our bank.


UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1    Q.   And Zia Consulting works with Larue Road to raise

2    capital, to raise money, correct?

3    A.   Zia Consulting works with Larue Capital to provide

4    projects for Larue Road Capital to put money into.  Larue

5    Road Capital has the capital.  They don't have to raise it.

6    They're looking for projects that have merit to put money

7    into.

8    Q.   And in this e-mail on January 5th of 2019, you

9    represented to Mr. Turnipseed -- do you see what I've

10   underlined there? -- (reading), "These guys are willing to

11   do a cost plus deal for May and June."

12            Did I read that correctly?

13   A.   You did read it correctly.

14   Q.   And when was that willingness on the part of Tyson to

15   do a cost plus deal expressed to you?

16   A.   When was it expressed to me by Tyson?

17   Q.   Yes, sir.

18   A.   In the fall of 2018.

19   Q.   Okay.

20   A.   When I was talking to Bob Scherer and I told him that

21   we would not continue forward on the journey that we had

22   been on, selling cattle the way we were selling them.  And

23   this e-mail talks about Whole Foods.  We went to visit with

24   Whole Foods directly --

25   Q.   Mr. Perez, I appreciate that, but my question is not

1   about Whole Foods, so...

2            MR. FISHER:  Your Honor, may I approach the

3   board?

4            THE COURT:  Yes.

5            MR. FISHER:  Thank you.

6   Q.  (BY MR. FISHER):  Mr. Perez, you testified

7   earlier that the blowup there, which is Exhibit

8   Number 18, which has already been admitted into

9   evidence, that is the cost plus spreadsheet or cost

10  plus model, correct?

11  A.  Yes, sir.

12  Q.  Exhibit Number 18 that's blown up there, I want to be

13  clear on this, when was the date that you provided that

14  spreadsheet to Bob Scherer?

15  A.  First of all, this is a copy of the cost plus

16  proposal.  And this proposal was provided to Bob Scherer on

17  the 14th of January, 2019.

18  Q.  That proposal, right there?

19  A.  Yes, sir.

20            MR. FISHER:  And, Your Honor, I would like at

21  this time to admit Exhibit 119.

22            THE COURT:  Zia's position?

23            MR. WORDEN:  No objection.

24            THE COURT:  Exhibit 119 is admitted, without

25  objection.

1    (Joint Exhibit 119 was admitted into evidence.)

2              MR. FISHER:  Thank you, Your Honor.

3    Q.  (BY MR. FISHER):  Okay.  Mr. Perez, do you

4    recognize this e-mail from January 17th of 2019?

5    A.  Yes, sir.

6    Q.  Okay.  And was this e-mail sent the day after you met

7    Mr. Scherer at Happy Pastures in Texas?

8    A.  Yes, sir.

9    Q.  Okay.

10   A.  It was sent -- I'm sorry, it was sent three days

11   after.

12   Q.  After you met Mr. Scherer at Happy Pastures, correct?

13   A.  We met on the 14th.  So it was sent after, but

14   three days.  Sorry.

15   Q.  Okay.  And this string of e-mails, it includes

16   correspondence between you and Mr. Turnipseed with Larue

17   Road, correct?

18   A.  That is correct.

19   Q.  And Zia Consulting was working with Mr. Turnipseed and

20   Larue Road to put together that cost plus spreadsheet; isn't

21   that correct?

22   A.  No, sir.

23   Q.  How is that incorrect?

24   A.  Zia owned all these cattle and they put the

25   spreadsheet together because we had all the costs.  And we

1    were contemplating letting Larue participate on these cattle

2    and other cattle we had available, so -- but, no, Larue Road

3    didn't put this spreadsheet together.  Larue Road did not

4    put the cost plus proposal together.  Zia and Zia's team

5    did.

6    Q.   And you were looking to restart asset-gathering.  Is

7    that something that you represented to Mr. Turnipseed?

8    A.   That's what Mr. Turnipseed says here.

9    Q.   And is that an accurate statement?

10   A.   As far as I know, Mr. Turnipseed has the assets

11   gathered up, and it's just a matter of him selecting

12   different things to put those assets to work in.

13   Q.   And then down here in this paragraph (indicating) --

14   I'm circling it -- there's some discussion about -- that

15   first sentence -- or, I'm sorry, the second sentence

16   (reading), "Let's get the specifics of the longer-term cost

17   plus hammered out."

18           Am I reading that correctly?

19   A.   May I read it out loud?

20   Q.   Of course.

21   A.   (Reading) "To be very clear, only having the detail on

22   the 'shorter-term' Tyson cost plus and the current void of

23   specifics for Whole Foods does not help restart

24   asset-gathering.  Let's get the specifics on the longer-term

25   Tyson cost plus hammered out.  This would then drive the

1  shorter-term deal and allow me to 'sprinkle in' Whole Foods'

2  potential opportunity, along with getting real serious about

3  the bred heifer opportunity."

4  Q.   Okay.  And it's your testimony today that, as of the

5  date of this e-mail, you had already provided that document

6  (indicating) to Tyson, correct?

7  A.   That is my testimony.  Did you ask me to make a

8  comment on this paragraph somehow?

9  Q.   I did not.  I just asked you if I was reading it

10  correctly?

11  A.   I just wanted to make sure I didn't miss a question.

12  Sorry.

13  Q.   Thank you.

14       Okay.  Had you contacted anybody at Tyson about

15  getting a deal in writing from them?

16  A.   I talked to Mr. Scherer and I told him that we had to

17  have a more formal agreement.  I also --

18  Q.   Mr. Perez, if I may, my question is very simple:  Had

19  you, at the time of this e-mail, contacted anybody at Tyson

20  and asked them for a deal in writing?  "Yes" or "no"?

21  A.   Yes.

22  Q.   Okay.  Thank you.  And when was that?

23  A.   Pardon me?

24  Q.   When was that, that you contacted someone at Tyson

25  asking for a deal in writing?

1   A.   I don't know, but I have the sneaking suspicion that

2   I'm going to be reminded about right now.  I don't remember.

3          MR. FISHER:  Your Honor, at this time, I'd ask to

4   admit Exhibit Number 1...

5          (Reporter interruption for clarification.)

6          MR. FISHER:  124.

7          THE COURT:  What was the number, Mr. Fisher?

8          MR. FISHER:  124.

9          THE COURT:  And from Zia?

10          MR. WORDEN:  No objection.

11          MR. FISHER:  I'm sorry.

12          THE COURT:  All right.  Exhibit 124 is admitted.

13   (Defendant's Exhibit 124 was admitted into evidence.)

14   Q.   (BY MR. FISHER):  And then do you recognize

15   this e-mail string -- I apologize, I'm marking on

16   this incorrectly.

17          COURT CLERK:  I'll clear it.

18   A.   Thank you.  I was wondering what you were circling.

19   Q.   (BY MR. FISHER):  Yeah.  I apologize, I can't

20   get the screen to come -- oh, there, it cleared.

21   Thank you.

22          And then do you remember this e-mail on which you

23   were copied?  I'm happy to give you an opportunity to read

24   it.  It's Exhibit Number 124.  I'll scroll to what I was

25   wanting to ask you about, which is right (indicating)...

1    A.   By and large, I remember this e-mail.

2    Q.   And on this e-mail...

3    A.   Do you mind scrolling up just a little bit so I can...

4    Q.   Certainly.

5    A.   That's great.  Thanks.

6    Q.   And on this e-mail, you -- there is discussion near

7    the bottom of the first page -- I apologize.

8    A.   I'm sorry, when I asked you to scroll up, actually,

9    the circle moved.

10   Q.   Are you able to see it now?

11   A.   Yeah.  I don't know what you want to circle, but the

12   circle is staying stationary and the script is moving

13   around, so...I apologize.

14   Q.   What I wanted to ask you about was down here

15   (indicating).  I apologize that it moves.  I think I've got

16   it back in the place where I intended it to be.

17        Mr. Turnipseed, down at the bottom of the first

18   page, mentions he spoke with you about some updates to the

19   cost plus before submitting to Tyson; is that correct?

20   A.   What I read that you circled is (reading), "Phil,

21   thank you for your help with this project.  I just spoke to

22   Narciso.  Not for us, but for Narciso submitting to Tyson,

23   please update your sheet for High Choice the cattle

24   deposit -- cattle deposit assumption to a flat $200 a head

25   from $30 [sic] equity.  Jason."

1    Q.   Mr. Perez, my question is about exactly what I've got

2    here (indicating).  Am I reading correctly about you

3    submitting to Tyson?  Is that in reference to the cost plus?

4    A.   I'm not sure because this paragraph is about something

5    completely different.

6    Q.   Okay.  But it is your testimony that, as of

7    January 30th of 2019, the date of this e-mail, you had

8    already submitted the cost plus, correct?

9    A.   Submitted it to who?

10   Q.   To Bob Scherer.

11   A.   Yes.

12   Q.   Now, let's look, if we could, to Exhibit Number...

13        MR. FISHER:  At this time, I'd ask to admit

14   Exhibit Number 19.

15        THE COURT:  Give the number again.

16        MR. FISHER:  19.

17        THE COURT:  From Tyson -- from Zia?  What's Zia's

18   position on 19?

19        MR. WORDEN:  No objection.

20        THE COURT:  Exhibit 19 is admitted.

21   (Joint Exhibit 19 was admitted into evidence.)

22   Q.   (BY MR. FISHER):  Okay.  Mr. Perez, you've

23   viewed this e-mail before.  I'll represent to you

24   that it's in a slightly different version.  Are you

25   able to read it there?

1    A.   Do you mind just blowing it up one more, just a tiny

2    bit more.

3    Q.   (Complying.)

4         Does that help?  Let me move it down.

5    A.   Yeah.  Let's see, yes.

6    Q.   This is the February 4th e-mail that you sent to Bob

7    Scherer, correct?

8    A.   Yes, sir.

9    Q.   The subject line on the e-mail is "show list"; is that

10   right?

11   A.   Yes, sir.

12   Q.   And in the e-mail, you told Mr. Scherer -- what did

13   you say to him down there?

14   A.   You want me to read the part that's circled?

15   Q.   If you could read that entire line, starting with

16   "look" to "snowboarding."

17   A.   (Reading) "Look this over and let's talk.  Sorry, I

18   have had a busy day.  It is Tony's birthday and he went

19   snowboarding."

20   Q.   So you represented here to Mr. Scherer you've had a

21   busy day, correct?

22   A.   Yes, sir.

23   Q.   And you represented that it's Tony's birthday,

24   correct?

25   A.   That is correct, sir.

1    Q.   And you represented he went snowboarding; is that

2    right?

3    A.   Tony went snowboarding, yes, sir.

4    Q.   And Exhibit Number 19 is the e-mail you sent, along

5    with what's already been admitted as Exhibit Number 18,

6    which is what's blown up on the board behind you, correct?

7    A.   I'm sorry, so the previous document was Exhibit 19,

8    and this is Exhibit 18?

9    Q.   That's correct.

10   A.   Okay.

11   Q.   Exhibit Number 19, which is this cost plus

12   spreadsheet, was attached to Exhibit Number 18 [sic],

13   correct?

14   A.   So here's my confusion.  I am confused.

15   Q.   Okay.  Let me see what I can do to help.

16   A.   Thank you.  I put a document on the console of the

17   pickup on January the 14th.  And I e-mailed a document on

18   the 4th of February.  And I don't know which one of those

19   is Exhibit 18.  Is this Exhibit 18 that was put on

20   the...console of the pickup, or was this Exhibit 18 that was

21   part of this e-mail?  Do you know?

22   Q.   I don't know, Mr. Perez. I'm asking you.  Which is

23   that?  Was that (indicating) the document that you gave

24   Mr. Scherer?

25   A.   This is the document that I gave Bob Scherer in the

1    pickup.

2    Q.   Okay.  I'll represent to you that your Counsel has

3    represented that that blowup (indicating) was attached to

4    this e-mail we're talking about on February 4th of 2019.

5    Is that incorrect?

6    A.   I think it's correct.

7    Q.   Okay.  Where in this e-mail is there -- we've already

8    established you've set forth you had a busy day.  You talked

9    about Tony's birthday and snowboarding.  You represented in

10   your testimony earlier that this was the e-mail that you

11   sent the contract with, correct?

12   A.   Cost plus contract, yes, sir.

13   Q.   Where in this e-mail does it say anything alerting

14   Mr. Scherer that this was the contract that you have

15   testified to that you talked to him about in Happy, Texas?

16   A.   There sits the contract (indicating).

17   Q.   Mr. Perez, my question is where in this e-mail, where

18   in the body of this e-mail -- you talked about having a busy

19   day, you talked about snowboarding, and Tony's birthday.

20   Where do you mention a contract in this e-mail?

21   A.   Obviously, we both know that there is no text in there

22   that mentions a contract; however --

23   Q.   Did you mention anything about the substance of the

24   attachment to this e-mail there in the body?

25   A.   No, sir.

1    Q.   Did you mention anything about pricing for the cattle

2    in that attachment in the body of this e-mail?

3    A.   In the body of the e-mail?  No, sir.

4    Q.   Did you mention anything about who was responsible for

5    paying the costs in that spreadsheet in this e-mail?

6              MR. WORDEN:  Your Honor.

7              THE COURT:  Yes.

8              MR. WORDEN:  Exhibit 19 is a different version

9    that does not have the attachment.  I would request that

10   Mr. Fisher use Exhibit 17 that's already been admitted and

11   authenticated as the version of the e-mail that did attach

12   the cost plus on February 4th.  I don't think there is any

13   dispute about that.

14             MR. FISHER:  Happy to do that, Your Honor.

15             THE COURT:  Okay.

16   Q.   (BY MR. FISHER):  Mr. Perez, is the language

17   here in Exhibit 17 that your counsel has asked that

18   I use any different than what you saw in Exhibit 19?

19   A.   No, sir.

20   Q.   Okay.  Is there any mention in what -- this body of

21   the e-mail about who is responsible for paying the costs in

22   the cost plus contract that you sent Mr. Scherer?

23   A.   In the body of the e-mail, in text, no, sir.

24   Q.   In this e-mail, you mention nothing about any change

25   in the way that Zia has done business with Tyson over the

1    past 20 years, do you?

2    A.   No, sir.

3    Q.   Thank you.

4         If I may pull up Exhibit 18, which I also have

5    blown up over there, which has been previously admitted.

6    A.   Mr. Fisher, excuse me.

7    Q.   Yes, sir.

8    A.   There's a -- okay.  It's gone, there was a yellow

9    circle in the middle of the document.

10   Q.   Yes.  Thank you for alerting me to that.  It's a

11   little tricky, the technology system.  I apologize for that.

12        Now, are you able to see Exhibit Number 18?

13   A.   I see it.  I'd prefer to step up to the board, if you

14   don't mind, just because it's larger.

15   Q.   Absolutely.  That would be great.  Thank you.

16        THE COURT:  Make sure to take the microphone with

17   you.

18        THE WITNESS:  Yes, ma'am.

19   Q.   (BY MR. FISHER):  Mr. Perez, can you point to

20   where on that spreadsheet the word "contract" can be

21   found.

22   A.   The word "contract" is not written on this document.

23   Q.   But you testified that this document was the document

24   that you sent on February 4th that was the contract,

25   correct?

1    A.   Yes, sir.

2    Q.   But you didn't indicate that on there anywhere,

3    correct?

4    A.   No, sir.

5    Q.   And what you sent Mr. Scherer on February 4th was

6    updated from what you've testified to today that you gave

7    him in Happy, Texas, correct?

8    A.   Yes, sir.

9    Q.   So what was given to him on February 4th was the

10   contract --

11   A.   Yes, sir.

12   Q.   -- to be fair?

13        Was there a signature line somewhere on there

14   anywhere for Mr. Scherer to sign the contract?

15   A.   No, sir.

16   Q.   If we could look at the spreadsheet there in a little

17   more detail, we've established already through your

18   testimony that the first couple of columns are entitled

19   "cattle name" and "source," correct?

20   A.   The first column that's in peach color is the ranch of

21   origin.

22   Q.   All right.  And that identifies the ranch the cattle

23   came from, correct?

24   A.   Yes, sir.

25   Q.   And then Ms. Diamond went through with you the next

1    column titled "location," and you explained that's where the

2    cattle were located; is that right?

3    A.   Yes, sir.  Think of it as chronology.

4    Q.   And I'm blowing this up for the benefit of the jury

5    since the writing is a bit small.  For example, about six

6    down, you've got some Cuervo Creek Ranch cattle, correct?

7    A.   Seven down, Cuervo Creek Ranch.

8    Q.   And what was the location of those cattle at that

9    time?

10   A.   Happy Pasture.

11   Q.   Okay.  Are those some of the cattle that Mr. Scherer

12   drove down to Happy, Texas, to look over with you?

13   A.   Yes, sir.

14   Q.   Okay.  And are those some of the cattle he was asking

15   you to get to a feedyard right away?

16   A.   Yes, sir.

17   Q.   If we could, let's look, going through this, at that

18   first row, under "ranch," it says "Stormy Burch."  Do you

19   see that?

20   A.   Yes, sir.

21   Q.   And according to this spreadsheet, what's the location

22   of those Stormy Burch cattle?

23   A.   Bullinger.

24   Q.   And Bullinger is a feedyard, correct?

25   A.   Bullinger is a feedyard, that's correct.

1    Q.   And you had already placed these cattle with Tyson

2    prior to the creation of this spreadsheet, correct?

3    A.   I had already placed them at Tyson?

4    Q.   With Tyson.  Is that incorrect?

5    A.   On the 14th of January, Mr. Scherer knew about this

6    list of cattle, yes.

7    Q.   Okay.  Your next column after location, you've got the

8    sex of the cattle, correct?

9    A.   The next column is Texas cattle?  I'm sorry.  What did

10   you say?

11   Q.   You've got a column for ranch, correct?

12   A.   Yes, sir.

13   Q.   Column for location?

14   A.   Yes, sir.

15   Q.   Next to that, you've got a column for sex, correct?

16   A.   Correct.  The gender.

17   Q.   And the Stormy Burch cattle are identified as steers,

18   correct?

19   A.   Yes, sir.

20   Q.   And then we get into the column after that.  The

21   estimated remaining, I believe you've testified to, head

22   count, correct?

23   A.   Yes, sir.

24   Q.   And you explained already to the ladies and gentlemen

25   of the jury how you came up with this number, correct?

1    A.   Yes, sir.

2    Q.   Okay.  And it's not an actual number, it's an

3    estimate, right?

4    A.   It's the actual number minus 3 percent.

5    Q.   Okay.  So it's an estimate?  The 3 percent is an

6    estimate, correct?

7    A.   That's correct.

8    Q.   3 percent is an estimated death rate?

9    A.   That's correct.

10   Q.   You don't have anything on the spreadsheet showing the

11   original number of steer in that lot of cattle, do you?

12   A.   No, sir.

13   Q.   There's no way to determine that from this

14   spreadsheet, without knowing your formula, correct?

15   A.   If you ask us for any protracted information, behind

16   each one of these cells are whatever is going on with those

17   cattle.

18   Q.   The spreadsheet, without access to the cells behind

19   them, show 97 cattle estimated, after taking into account

20   that 3 percent death rate, correct?

21   A.   That's correct.

22   Q.   Okay.  If you print off a copy of this, the person

23   reading it doesn't have access to that background

24   information, correct?

25   A.   No, sir.  But Mr. Scherer talks to people in our

1    office --

2    Q.   Mr. Perez --

3    A.   -- all the time.

4    Q.   -- Mr. Perez, if you'd answer my question, I'd

5    appreciate it.   Thank you.

6           And you handed -- you're alleging that, when you

7    were in Happy, Texas, you gave Mr. Scherer a paper copy of

8    this spreadsheet; is that right?

9    A.   Yes, sir.

10   Q.   Thank you.

11          Now, the next three columns after the estimated

12   remaining head count, that has to do with the estimated

13   weight of the cattle; is that correct?

14   A.   Yes.   In June 15, in the middle of June.

15   Q.   That's a target weight, right?

16   A.   Yes, sir.

17   Q.   That's an estimated weight, what the average weight of

18   those cattle will be, as of June 17th; is that correct?

19   A.   Yes, sir.

20   Q.   And, again, this is an estimate, right?

21   A.   Yes, sir.

22   Q.   If you were to go out and weigh the cattle at that

23   time, on February 4th, they wouldn't -- that average

24   weight wouldn't have been 1,179, correct?

25   A.   If they hit the estimate, they would be 1,179.

1    Q.   And had you committed these cattle in any way in June

2    of 2019?

3    A.   June of 2019?

4    Q.   Yes.

5    A.   June of 2019?

6    Q.   Mr. Perez, on the third column, what's the date that

7    you have there at the top?

8    A.   Estimated weight at lean months in June, these cattle

9    were projected to weigh a certain weight.

10   Q.   Okay.  And on that first row of the Stormy Burch Ranch

11   cattle, what is the number that you have there?

12   A.   The head count, remaining head count?

13   Q.   No, the estimated weight.

14   A.   1,179.  1,179 pounds.

15   Q.   Thank you.  And then let's move to the next three

16   columns in light blue.  Do you follow me there?

17   A.   Yes, sir.

18   Q.   And what do these -- these columns are titled "total

19   cost," correct?

20   A.   "Total cost."

21   Q.   And these columns have been broken down by

22   April 15th, May 15th, and June 15th; is that correct?

23   A.   Yes, sir.

24   Q.   And for this lot of Stormy Burch Ranch cattle, you

25   have a number under the June 15th column; is that right?

1    A.   Yes, sir.

2    Q.   Is that when you had these cattle slotted to be ready?

3    A.   We had these cattle projected to June the 15th.   On

4    June the 15th, we're projecting that their weight will be

5    this and their cost will be that.

6    Q.   And those weight projections and those cost

7    projections are estimates, correct?

8    A.   Yes, sir.

9    Q.   They are not definite numbers?

10   A.   No, sir.

11   Q.   They could be lower at the end and they could be

12   higher at the end, right?

13   A.   That's correct.

14   Q.   But the amount you have down for those Stormy Burch

15   Ranch cattle in the first row for June 15th, what is that

16   number?

17   A.   I'm sorry, one more time?

18   Q.   Certainly.  If you'll go back to those blue columns

19   for total cost.

20   A.   Light blue.

21   Q.   The third column, total cost to June 15th, in the

22   first row for the Stormy Burch cattle -- are you following

23   me?

24   A.   Yes, sir.

25   Q.   What is the number that's listed there?

1     A.    Are you talking about -- are you asking the total

2     dollars under 6-15?

3     Q.    I'm asking for -- is the number listed "$198,467.65."

4            Did I read that correctly?

5     A.    That's correct.

6     Q.    Other than that number, there's no breakdown on this

7     spreadsheet of what that number represents, is there?

8     A.    Again, on this spreadsheet, no, but we know that

9     behind these cell --

10    Q.    Thank you, Mr. Perez.

11    A.    -- are all the costs.

12    Q.    Thank you, Mr. Perez.

13           And there was no supporting documentation with

14    this spreadsheet in the February 4th e-mail to Bob Scherer

15    explaining where that number came from, was there?

16    A.    That's an explanation we went over in the pickup in

17    Happy, Texas.

18    Q.    And my question is, in the e-mail of February 4th --

19    you've alleged that that e-mail contained the contract that

20    you were sending to Bob Scherer, correct?

21    A.    That's correct.

22    Q.    And attached to that e-mail is the contract which we

23    are talking about now, correct?

24    A.    Yes, sir.

25    Q.    In the contract, is there any indication in there of

1    where that $198,000 cost came from?

2    A.   On the face, no.  Behind it, yes.

3    Q.   Thank you.  And no supporting documentation was

4    provided in that e-mail along with this spreadsheet

5    explaining where that number came from, was there?

6    A.   No, sir.

7    Q.   And, again, looking at the face of the contract, is

8    there anything on the face of that contract that indicates

9    who is responsible for paying those costs?

10   A.   I'm glad we both think this is a contract.

11          There are final dollars in this box (indicating).

12   And Mr. Scherer knew --

13   Q.   Mr. Perez, that's not my question.

14   A.   -- that these are the heads and these are the dollars.

15   Q.   Mr. Perez, my question is -- you've alleged that this

16   is the contract.  My question is:  Is there anything on the

17   face of that contract that indicates who is responsible for

18   paying those costs?

19   A.   No, sir.

20   Q.   Okay.  And the e-mail that you sent with that

21   spreadsheet -- and, I'm sorry.  I'll use Exhibit 17 at the

22   request of your counsel.  Again, this is the Tony's birthday

23   e-mail.  Makes no indication, doesn't address costs, at all,

24   does it?

25   A.   The body of the e-mail does not.

1    Q.   And if we'll go to the -- if you'll go to the next

2    columns with me, the ones in the dark blue, those state

3    total costs per head; is that correct?

4    A.   Yes, sir.

5    Q.   And you've got the same date breakdown there of April,

6    May, and June, correct?

7    A.   Yes, sir.

8    Q.   And under the per-head cost for June 15th, for those

9    Stormy Burch Ranch cattle in the first row, the number

10   you've got listed is $1,984.68; is that right?

11   A.   Yes, sir.

12   Q.   And, again, this is an estimated cost, it's not an

13   actual cost, right?

14   A.   Yes, sir.

15   Q.   Okay.  And, again, no explanation is provided on the

16   face of this spreadsheet for how that $1,984.68 figure is

17   reached, is there?

18   A.   No, sir.

19   Q.   And it's the same case with those last three columns.

20   Those last three columns are total cost per pound, correct?

21   A.   Yes, sir.

22   Q.   Okay.  And for those Stormy Burch Ranch cattle, under

23   June 15th, we've got a total cost per pound of $1.74,

24   correct?

25   A.   Yes, sir.

1    Q.   And that's not a guaranteed number?

2    A.   This is an exact number because it divides these two

3    numbers -- it takes this number divided by the weight to

4    give you this number.  So this particular number is an exact

5    extrapolation to those two numbers (indicating).

6    Q.   Of the estimated weight number?

7    A.   Correct.

8    Q.   Which is an estimate.  So you're taking a number from

9    an estimate, correct?

10   A.   It is an estimate.

11   Q.   Okay.  Thank you.

12        And for those costs per pound, again, there is no

13   indication on there who is responsible for that, on the face

14   of this contract, correct?

15   A.   No, sir.

16   Q.   And the word "Tyson" appears nowhere on this

17   contract --

18   A.   No, sir.

19   Q.   -- that you're alleging --

20        Because, again, this is the document from

21   February 4th.  It's the contract.  This is the key of why

22   we're here, correct?

23   A.   Yes, sir.

24   Q.   Okay.  And for this to be the contract, there's not

25   one place on there where the word "Tyson" is included?

1    A.   No, sir.

2    Q.   Thank you.

3         Mr. Perez, you're welcome to return to your seat.

4    I'm going to get back to some other exhibits.

5         MR. FISHER:  At this time, I would ask to admit

6    Exhibit Number 129.

7              THE COURT:  From Zia?

8              MR. WORDEN:  No objection.

9              THE COURT:  Exhibit 129 is admitted.

10   (Joint Exhibit 129 was admitted into evidence.)

11             MR. FISHER:  Thank you, Your Honor.

12   Q.   (BY MR. FISHER):  Mr. Perez, if you will give

13   me one moment, I'm going to go to the third page of

14   Exhibit Number 129.  It's going to be down in this

15   area (indicating).

16        Do you recognize or remember this e-mail dated

17   February 4th from Jason Turnipseed to you?

18   A.   Yes, sir.

19   Q.   And this February 4th was the same date that you

20   sent the e-mail to Mr. Scherer with what you're now calling

21   the "cost plus contract," correct?

22   A.   Yes, sir.

23   Q.   And in here, in this e-mail -- let me point you to

24   where exactly I'm looking.  I am looking right here in the

25   beginning (indicating) -- the e-mail indicates that you and

1    Mr. Turnipseed had a conversation on the day before, on

2    February 3rd; is that right?

3    A.   That's correct.

4    Q.   Do you recall that conversation with Mr. Turnipseed?

5    A.   Not really, but --

6    Q.   Okay.

7    A.   -- I don't have a problem imagining that we had one.

8    Q.   Mr. Turnipseed represents in the e-mail, starting at

9    that first line (reading), "I now have the understanding

10   that Tyson will pay us $125 over costs for the GAP and $100

11   over costs for the NHTC and NE3 cattle."

12        Did I read that right?

13   A.   You did a nice job reading it.

14   Q.   Thank you.

15        In reality, you had never had a conversation with

16   Mr. Scherer about these exact $125 or $100, had you?

17   A.   That is not correct.

18   Q.   Okay.  Are you alleging that you had that conversation

19   with Mr. Scherer back in Happy, Texas?

20   A.   Yes, I am.

21   Q.   And nobody else was present for that conversation,

22   correct?

23   A.   No, sir.

24   Q.   Just you and Mr. Scherer?

25   A.   Yes, sir.

1    Q.   And it's your testimony today -- I want to be very

2    clear on this -- that Mr. Scherer indicated to you that he

3    would accept $125 over costs for the GAP cattle and $100

4    over costs for the NHTC and NE3 cattle?  Is that what you're

5    telling the ladies and gentlemen of the jury?

6    A.   I'm telling you that I went through everything that we

7    had to have for these cattle to make it work for us with

8    Mr. Scherer.

9    Q.   Mr. Perez, that wasn't my question.  My question is --

10   and it's a "yes" or "no" question -- is it your testimony

11   today that Mr. Scherer agreed to pay $125 over costs for the

12   GAP cattle and $100 over costs for the NHTC and NE3 cattle

13   when you met with him in Happy, Texas, back on

14   January 14th, I believe it was?

15   A.   When I met with him in Happy, Texas, on January the

16   14th, I had a document that looks like this document that

17   was very close to it, with all those costs baked in.

18   Q.   Mr. Perez, I'm going to ask you for a third time,

19   "yes" or "no":  Is it your representation to the ladies and

20   gentlemen of the jury today that Mr. Scherer agreed to $125

21   over costs for the GAP cattle and $100 over costs for the

22   NHTC and NE3 cattle?  Those exact numbers.

23   A.   It is my testimony that I created a cost plus model.

24   And down in that square --

25   Q.   Mr. Perez --

UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1          MR. FISHER:  Your Honor --

2      A.   -- it has all of our costs.

3          MR. FISHER:  I asked him a very direct question.

4      I'm asking him the exact numbers, if -- that's a "yes" or

5      "no" question.

6          THE COURT:  Why don't you break it down into

7      smaller questions, because you're asking several things at

8      one time.

9          MR. FISHER:  Of course.

10     Q.  (BY MR. FISHER):  Mr. Perez, is it your

11     testimony that Bob Scherer agreed to pay Zia $125

12     over costs for GAP cattle when you met with him in

13     Happy, Texas?

14     A.   Baked into this number, yes.

15     Q.   Mr. Perez, no.  My question is:  Did you and

16     Mr. Scherer have a conversation where you told Mr. Scherer,

17     "I want $125 over costs for GAP cattle," and Mr. Scherer

18     told you, "I will pay that"?

19     A.   It is my testimony that, in this document, there are

20     six things --

21     Q.   Mr. Perez, that's not my question.  I think I've asked

22     six times now.  It's very simple.

23          Did you tell Mr. Scherer you wanted $125 over

24     costs for GAP cattle?

25     A.   Yes, sir.

114

1    Q.   You told him that in Happy, Texas?

2    A.   Yes, sir.

3    Q.   That exact number?

4    A.   I told Mr. Scherer that our margin was baked in.

5    Q.   Mr. Perez, this is a very simple question.  I'm going

6    to ask one more time:  Did you tell Mr. Scherer you wanted

7    $125 per head for the GAP cattle, over costs?

8    A.   Plus costs, yes, sir.

9    Q.   You said $125?

10   A.   Yes, sir.

11   Q.   And did you tell Mr. Scherer in Happy, Texas, that Zia

12   wanted $100 over costs for the NHTC and NE3 cattle?

13   A.   We would take less money, yes, $100.

14   Q.   $100 is what you said?

15   A.   Over cost.

16   Q.   And Mr. Scherer agreed to that?  Is that your

17   testimony today?

18   A.   In Happy, Texas, Mr. Scherer agreed in principle to

19   what I showed him, but he told me --

20   Q.   Mr. Perez, I'm not asking about "in principle."  I'm

21   asking about specific numbers.  We have an e-mail here, do

22   you understand, from Jason Turnipseed, your "banker," as you

23   have referred to him, to you in which he references a

24   conversation you had the day before -- again,

25   February 3rd -- which was the day before you sent over

 1   what you're calling the "cost plus contract," correct?

 2   A.   Yes, sir.

 3        MR. WORDEN:  Your Honor -- Your Honor, Mr. Perez

 4   was in the middle of answering the question before that.

 5   Mr. Fisher didn't like the answer, so he interrupted and

 6   started a new question.  That's not permissible.  We should

 7   let the witness finish that question.  And then Mr. Fisher

 8   has options.  He can move to strike, he can ask a new one,

 9   but the time to do that is after the answer.

10        THE COURT:  Mr. Fisher is trying to get Mr. Perez

11   to answer a very discrete question and is having trouble

12   doing that, so he's interrupting to try to get that done.

13        So, Mr. Fisher, I understand what's going on.

14   Please try to limit the interruptions.

15        Mr. Perez, please try to listen carefully and

16   answer the question.

17        MR. FISHER:  And my interruptions are no sign of

18   disrespect in any way.

19   Q.   (BY MR. FISHER):  My question is just about the

20   GAP cattle.  Is it your testimony today that you

21   told Mr. Scherer you wanted $125 over costs for the

22   GAP cattle when you were in Happy, Texas, with him?

23   A.   Yes, sir.

24   Q.   And is it your testimony today that, when you were in

25   Happy, Texas, with Mr. Scherer, he told you, "I will accept

1    $125 over costs for those GAP cattle"?

2    A.   What Mr. Scherer told me is to send the final

3    document.   I told him we were still putting numbers

4    together, and he said, "Let me look at it, and I'll let you

5    know if I can do it, 'yes' or 'no.'"

6    Q.   So the answer is "no"; is that accurate?   He did not

7    agree to that in Happy, Texas?

8    A.   In Happy, Texas, he agreed in principle, and he wanted

9    to see the final document.   And I told him that these were

10   not -- this was not the final document, when we were in

11   Happy, Texas.

12   Q.   Where is the $125 over cost reflected on the final

13   document?

14   A.   You don't see it unless you get in the cells behind

15   the face numbers.

16   Q.   Okay.   Because nowhere on this claimed contract is the

17   number "$125," is it?

18   A.   You won't see it unless you drill down into those

19   numbers.

20   Q.   If I go over there and look, am I going to see the

21   number "125"?

22   A.   No.   But you'll see it when you get --

23   Q.   Thank you.

24   A.   -- an invoice for the cattle, though.

25   Q.   It's not on the face of the contract, is it?

1    A.    It's not.  We already discussed it.

2    Q.    And the number "100," it's your testimony that you

3    told Mr. Scherer you wanted $100 over costs for the NHTC and

4    NE3 cattle, correct?

5    A.    That is correct.

6    Q.    That $100 is not anywhere on the face of your claimed

7    contract, is it?

8    A.    It is not, no.

9    Q.    Thank you.  And at Happy, Texas, Mr. Scherer never

10   agreed specifically to pay $125 over cost for the GAP, did

11   he?

12   A.    Mr. Scherer understood what the document I had handed

13   him meant.  And he also knew that he was coming --

14   Mr. Scherer agreed that he understood what the bottom box

15   had.  It had all the costs in it.

16   Q.    Where is the $125 number in that box?

17   A.    It's not on the face of the document.

18   Q.    And where's the $100 in that box?

19   A.    It's not on the face of the document.

20   Q.    Thank you, Mr. Perez.

21         Then if we can go -- let me clear this up a

22   little bit.  I apologize, I keep marking on this

23   inadvertently.

24         THE COURT:  Mr. Fisher, we're going to break for

25   lunch in about ten minutes, so keep that in mind for a good

1    breaking place for your cross.

2              MR. FISHER:  Thank you, Your Honor.

3    Q.   (BY MR. FISHER):  And this section of the

4    e-mail -- and this is the e-mail from Mr. Turnipseed

5    to you dated February 4, 2019, correct?

6    A.   Yes, sir.

7    Q.   And in that e-mail, Mr. Turnipseed says to you

8    (reading), "Tyson will view the cattle once shipped to High

9    Choice.  Upon viewing the cattle at High Choice, they will

10   write the cost plus contract."

11             Did I read that correctly?

12   A.   That is correct.

13   Q.   Do you have any idea where Mr. Turnipseed might have

14   gotten the idea that Tyson would be writing a cost plus

15   contract?

16   A.   No, sir.  He knew that we weren't going to get any

17   more than what we had.

18   Q.   And then, at the end of the e-mail, he asks you

19   (reading), "Please let me know if I'm missing any other

20   important detail or if any of the above is not correct"; is

21   that right?

22   A.   He did write that, yes.

23   Q.   Okay.  And you did not send Mr. Turnipseed any

24   response correcting him on any of that; is that right?

25   A.   I don't know if I did or I didn't.

1    Q.    Okay.

2    A.    We might have talked about it on the phone.

3    Q.    But there's nothing in that e-mail indicating that,

4    correct?

5    A.    As a part of this chain, it doesn't look like it to

6    me.

7              MR. FISHER:  Your Honor, would this be a good

8    point?

9              THE COURT:  It's good for me, if it's good for

10   you.  I just didn't want to interrupt.

11             Ladies and gentlemen, we're going to break, then,

12   for lunch.  We'll be back here right about noon to get

13   started.

14             MR. WORDEN:  One o'clock, you mean, Your Honor?

15             THE COURT:  Yeah.  I keep saying that.  One

16   o'clock.  Thank you.

17                      (Jury not present.)

18             All right.  Thank you.  You can return to your

19   counsel's table, if you'd like.

20             Is there anything either party would like to

21   bring up before we break for lunch?

22             From Zia?

23             MR. WORDEN:  No, Your Honor.  Thank you.

24             THE COURT:  From Tyson?

25             MR. FISHER:  I don't believe so, Your Honor.

 1             THE COURT:  All right.  Then we'll see everybody

 2     back here at 1:00.  Thank you.

 3                    (A recess was taken.)

 4             Thank you.  You may be seated.  Before we bring

 5     the jury out, I wanted to discuss briefly Tyson's objection

 6     to Mr. Perez' testimony regarding the net worth of the

 7     company.

 8             So, looking back at the testimony, Mr. Perez

 9     testified that he's a shareholder in Tyson Foods and then

10     discusses the income or the net worth of Tyson.  Now, the

11     parties have stipulated that "Tyson" can be used without

12     differentiating between "Tyson Fresh Meats" and "Tyson

13     Foods."  So I think that I was unclear exactly what

14     Mr. Perez was testifying about, but, looking back on it, I

15     think he was testifying about "Tyson Foods," even though I

16     thought he was testifying about "Tyson," pursuant to the

17     stipulation.

18             So I want to tell the parties that, either way, I

19     would not allow any argument in closing that any punitive

20     damages should be based on the net worth of Tyson Foods or

21     any -- or net income or share prices or anything.  But if

22     Tyson wants some kind of other instruction or wants me to go

23     back and strike some of the testimony, I would consider

24     doing that.  And I'll just let Tyson decide what it wants to

25     do by the close of the case.  And, of course, consult with

 1    Zia regarding any remedy that you want.  And I apologize.  I
 2    was confused about to whom or to which entity Mr. Perez was
 3    referring to when he said "Tyson," not realizing earlier he
 4    had said "Tyson Foods" earlier.
 5              MR. FISHER:  Okay.  That's completely fair, Your
 6    Honor.
 7              THE COURT:  And I apologize.
 8              Ms. Diamond, do you have any questions about
 9    that?
10              MS. DIAMOND:  No, that's fine.  We won't use
11    that --
12              THE COURT:  I'll let you discuss it.  And I know
13    you have the stipulation, which maybe confuses things more,
14    so I don't know if you want a remedy, at all.  But, if you
15    do, think about it and let me know.  Either way, I'm not
16    going to allow any information about Tyson Foods' financial
17    resources or finances to be used as damage -- or as argument
18    in punitive damage requests.
19              Any questions from Tyson?
20              MR. FISHER:  I don't believe so, Your Honor.
21              THE COURT:  Everybody ready for the jury?
22              MS. DIAMOND:  Yes, Your Honor.
23              THE COURT:  Okay.
24                    (A recess was taken.)
25              Mr. Fisher, you let me know if you want anything,

1    any instructions or any striking of that testimony, by the

2    end of your case in chief; is that fair?

3              MR. FISHER:  Fair enough, Your Honor.

4              THE COURT:  Okay.

5                   (Discussion off the record.)

6                        (Jury present.)

7              Thank you.  You may be seated.

8              Mr. Fisher, you may continue your

9    cross-examination.

10             MR. FISHER:  Thank you, Your Honor.

11    Q.   (BY MR. FISHER):  Mr. Perez, before we broke

12    for lunch, I was asking you some questions about

13    some e-mails related to the cost plus spreadsheet.

14    Do you recall that?

15    A.   Yes, sir.  Yes, Mr. Fisher.

16    Q.   Thank you, sir.

17             MR. FISHER:  If I could, at this point, I'd like

18    to admit Exhibit Number 125.

19             THE COURT:  Zia's position?

20             MR. WORDEN:  No objection, Your Honor.

21             THE COURT:  Exhibit 125 is admitted.

22    (Joint Exhibit 125 was admitted into evidence.)

23    Q.   (BY MR. FISHER):  Mr. Perez, do you remember

24    this e-mail -- I'll be happy to go to the second

25    page of it -- from Phil Chavez to you on

1    February 1st of 2019, with a cost plus model

2    attachment?  And I'd be happy to scroll to the

3    attachment, if that's helpful to you.

4    A.   Please, Mr. Fisher.

5    Q.   Certainly.  And please let me know if I can blow this

6    up for you.

7    A.   That would be much appreciated.

8    Q.   Just let me know if I need to move to a side or

9    anything.

10          Okay.  Do you recall receiving this e-mail from

11   Phil Chavez on February 1st of 2019?

12   A.   I don't.

13   Q.   Do you know what -- do you see the title of the

14   attachment is "cost plus model 2-1-19"?  Am I reading that

15   correct?  And --

16   A.   Yes, sir --

17   Q.   -- does --

18   A.   -- I see that.

19   Q.   -- that attachment appear to be an Excel spreadsheet

20   to you?

21   A.   Yes, sir.

22   Q.   But you don't recall receiving this from Mr. Chavez?

23   A.   No, Mr. Fisher, I don't.

24   Q.   Thank you.  This e-mail was sent to you three days

25   before your e-mail to Bob Scherer with what you are now

1    contending was the contract; is that correct?

2    A.   I agree with that.

3    Q.   But will you also agree with me that the spreadsheet

4    in this e-mail is different than the spreadsheet that we've

5    got blown up there behind you?

6    A.   I do agree with that.

7    Q.   Specifically looking here at the total cost -- and let

8    me back up, if I may.

9              On this spreadsheet in Exhibit Number 125, the

10   first ranch on it is the Stormy Burch Ranch cattle located

11   in Bullinger; is that right?

12   A.   That is correct, sir.

13   Q.   Is that -- and I believe there's 97 head estimated

14   remaining after the death loss on this attachment to

15   Exhibit 125, correct?

16   A.   97 head?  Yes, sir, Mr. Fisher.

17   Q.   And does that appear -- and if you need to stand up,

18   please feel free.  Does that appear to match the cattle from

19   Stormy Burch Ranch at the top of the claimed cost plus

20   contract?

21   A.   The specific question is the head count?

22   Q.   My specific question is:  Are the cattle -- are there

23   97 head of estimated cattle from Stormy Burch Ranch located

24   with Bullinger Feedyard on the top of that --

25   A.   Yes, Mr. Fisher.

1    Q.   -- on the spreadsheet?

2              Okay.  And if you'll -- excuse me.  I'm sorry.

3    If -- back on Exhibit Number 125.  I apologize for having

4    you get up and down -- the first row of total costs on this

5    February 1st spreadsheet, there appears to be three

6    different total costs in those columns; do you see that?

7    A.   Yes.

8    Q.   Costs for April, May, and June of 2015 [sic]?

9    A.   Yes, sir.

10   Q.   Or, I'm sorry, April 15th, May 15th, and June 15th?

11   A.   Yes, Mr. Fisher.

12   Q.   As opposed to Exhibit 18 there, which is the claimed

13   cost plus contract, where there's only a number in the

14   June 15th column; is that right?

15   A.   That is correct.

16   Q.   So this spreadsheet differs from that spreadsheet,

17   correct?

18   A.   They're not the same spreadsheets.

19              MR. FISHER:  Now, if I may, Your Honor, I'd like

20   to admit Exhibit 130.

21              THE COURT:  From Zia?

22              MR. WORDEN:  No objection.

23              THE COURT:  Exhibit 130 is admitted.

24   (Joint Exhibit 130 was admitted into evidence.)

25   Q.   (BY MR. FISHER):  Okay.  Mr. Perez, I want to


UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1     ask you a couple of questions about Exhibit 130,

2     which is an e-mail -- let's see if I've got this

3     down finally.  Bear with me one moment.

4              The date on this e-mail is February 13th of

5     2019; is that correct?

6     A.   Yes, sir.

7     Q.   And this e-mail is from you to Jason Turnipseed at

8     Larue Road; is that correct?

9     A.   Yes, Mr. Fisher.

10    Q.   Well, I thought I had this down.  Apparently not.  My

11    apologies.

12             And in this e-mail, going down -- bear with me

13    one moment -- do you see where Mr. Turnipseed is asking you

14    (reading), "CLA is asking about a valuation of the cost plus

15    cattle.  Is the e-mail I wrote and sent on September 4th

16    [sic] highlighted in bold correct?"

17             Do you see that?

18    A.   Yes, Mr. Fisher.

19    Q.   And does it appear that Mr. Turnipseed is seeking

20    clarification from you on this issue?

21    A.   It appears to me that CLA is asking him for things,

22    and he's asking, in turn, us for things.

23    Q.   And what is CLA?

24    A.   I'm not sure.

25    Q.   But he refers to "the e-mail below from February 4th

1   highlighted in bold" and is asking you if the bolded

2   language is correct, isn't he?

3   A.   He's inquiring -- yes, Mr. Fisher, he's inquiring

4   regarding the previous e-mail.

5   Q.   And in that previous e-mail, the bolded language is

6   (reading), "Upon viewing the cattle at High Choice, they

7   will write the cost plus contract."

8          Did I read that correctly?

9   A.   That's what he is asking, correct?

10  Q.   Okay [sic].  And was it your understanding that "they"

11  referred to Tyson?

12  A.   It's an assumption of mine, but I would assume yes.

13  Q.   And you responded in your 10:06 e-mail here with -- I

14  apologize.  I've got -- a question about valuation; is that

15  right?

16  A.   I responded (reading), "The valuation, meaning how do

17  they value them?  Tyson will go to the yard, look at the

18  cattle, look at the cattle's documentation, and look at the

19  cattle's health.  Their value will be based on the amount

20  that we give the feedlot for the purchase amount on the

21  cattle."

22  Q.   Thank you, Mr. Perez.

23          But down here in this e-mail, he's asking for

24  confirmation if the language highlighted in bold is correct.

25  And that language highlighted in bold is (reading), "Upon

1    viewing the cattle at High Choice, they will write the cost

2    plus contract."  Did you confirm in your e-mail response to

3    him that his understanding was correct?

4    A.   I did not confirm that.

5    Q.   You didn't address it, one way or the other, did you?

6    A.   I did not confirm that, because that's not what I

7    thought.

8    Q.   And you didn't tell Mr. Turnipseed in your e-mail to

9    him that that representation was incorrect, did you?

10   A.   Not in this e-mail, no.

11           MR. FISHER:  Next, if I may, I would like to

12   admit Exhibit 132, please.

13           THE COURT:  And from Zia?

14           MR. WORDEN:  No objection, Your Honor.

15           THE COURT:  132 is admitted.

16   (Joint Exhibit 132 was admitted into evidence.)

17   Q.   (BY MR. FISHER):  Now, Mr. Perez, I'm showing

18   you what's been marked as Trial Exhibit Number 132.

19   I would like to ask you a couple of questions about

20   it.

21           On the second page here, do you recognize this as

22   an e-mail from Jason Turnipseed on which you were copied on

23   February 14th, 10 days after you sent the cost plus

24   spreadsheet to Mr. Scherer?

25   A.   It is an e-mail from Jason to Mike Rogers.

1    Q.   And you're copied on that e-mail, correct?

2    A.   Yes, sir.

3    Q.   And going down to page 2 in this e-mail, here at point

4    three, there is (reading), "Number 3, once the Happy cattle

5    are financed, at a feedlot, and Narciso gets Tyson to either

6    put on paper our cost plus deal" -- this reference to

7    putting it on the cost plus deal -- "or gets Tyson to

8    communicate some other way, that can be submitted to our

9    admin."

10        Had you represented to Mr. Turnipseed that you

11   were going to Tyson to put the cost plus deal on paper?

12   A.   Mr. Fisher, I represented to Tyson [sic] that they

13   don't like to document things very much and that we had what

14   we had and that's all we had.  We had a contract with a cost

15   plus document, and I didn't expect to receive any other

16   documents from them.

17   Q.   And at this point, you had forwarded Mr. Scherer's

18   response to your February 4th e-mail about getting the

19   cattle into the yard to Mr. Turnipseed, correct?

20   A.   I don't know if I did or not.

21   Q.   Well, that is your understanding based on your earlier

22   testimony of Mr. Scherer's acceptance of the contract that

23   you're claiming, correct?

24   A.   Mr. Scherer's acceptance of the contract --

25   Q.   Yes --

1    A.   -- yes.

2    Q.   -- let me go back --

3    A.   What did I send to Jason Turnipseed?  I don't recall.

4    Q.   And I'll use your counsel's preferred version of this.

5         Did you not testify with Ms. Diamond that, when

6    you received this e-mail, "Looks good, get them in the

7    finish yard ASAP, please," that you considered that the

8    acceptance of the cost plus spreadsheet?

9    A.   Yes, sir.  Yes, Mr. Fisher.

10   Q.   And you sent that to Jason Turnipseed, correct?

11   A.   I don't know if I did or not.

12   Q.   Because they're seeking confirmation of some sort of

13   acceptance of this contract from Tyson, aren't they?

14   A.   They're asking if we will get anything further in

15   writing from them.  And I'm telling him that we will not.

16   Q.   And you can't remember whether or not you sent that

17   e-mail to Mr. Jason Turnipseed; is that correct?

18   A.   I don't know if we sent that to Jason Turnipseed or

19   not.

20   Q.   Okay.  Going back to Exhibit 132 -- again, I apologize

21   for jumping back and forth here -- going back up in the

22   e-mail, do you see that Mr. Turnipseed confirmed that

23   (reading) "...the 300,000 wire has now been sent to

24   Prewitt"?

25        Do you see that?

1    A.   Yes.

2    Q.   And Prewitt is a feedyard in which you had cattle,

3    correct?

4    A.   Yes, sir.

5    Q.   And your response on learning of the $300,000 wire

6    sent to Prewitt was (reading), "Check"; is that right?

7    A.   Yes, sir.

8         MR. FISHER:  Now, if I may, I would like to --

9    I'm sorry, this has already been admitted.

10   Q.   (BY MR. FISHER):  Exhibit Number 133.  And do

11   you recall Ms. Diamond asking you about this e-mail

12   from you to Bob Scherer on February 18th of 2019?

13   A.   Yes, Mr. Fisher.

14   Q.   And the subject on this e-mail -- well, first of all,

15   this appears to be an e-mail string, it looks like, on --

16   earlier that day, about 30 minutes prior, Phil Chavez with

17   Zia sent you an e-mail with a corrected cost plus

18   attachment.

19        Do you recall that?  I'm looking down here

20   (indicating).

21   A.   I don't recall that.

22   Q.   Do you recall the February 18th corrected cost plus

23   that I believe you went over with Ms. Diamond?

24   A.   What exhibit is this spreadsheet supposed to be?

25   Q.   It is Exhibit Number 132.

1    A.    May I ask if this exhibit is used somewhere else, like

2    Number 17 or 18?  I realize the e-mail's Exhibit 133.  I'm

3    just asking if this exhibit that's attached has its own

4    number --

5    Q.    I'll represent to you I don't believe it's

6    anywhere else in the exhibits.  Your counsel's free to

7    correct me, but this is an attachment to Exhibit 133.  And I

8    believe you went over this with Ms. Diamond.  This was

9    February 18th of 2019.  Am I reading that right?

10   A.    That's what I see.

11   Q.    Okay.  And it's an e-mail from you to Bob Scherer at

12   Tyson, correct?

13   A.    That is correct, sir.

14   Q.    This is two weeks after that February 4th

15   spreadsheet that you contend constitutes the contract,

16   correct?

17   A.    Yes, Mr. Fisher.

18   Q.    And was this an update -- was this an update, as it's

19   indicated, of the February 4th e-mail -- February 4th

20   spreadsheet?

21   A.    I believe it is.

22   Q.    Okay.  In between February 4th and February 18th

23   with this spreadsheet that you sent over -- and before I ask

24   the question, it looks like, on this spreadsheet, you've

25   highlighted three ranches here, correct?

1                And let me blow that up for you a little bit.

2     A.    (Indicating.)

3     Q.    And those three lots of cattle are not highlighted on

4     the spreadsheet we've got blown up here (indicating),

5     correct?

6     A.    I don't believe so.  You have Cuervo Creek, but we

7     have a couple of different sets of Cuervo Creek.

8     Q.    So this is an update that was sent by you to

9     Mr. Scherer; is that an accurate representation?

10    A.    I'm not a hundred percent sure about these Cuervo

11    Creek.  There's two sets here, but the Mogus cattle are not

12    in here.

13    Q.    And I apologize if my question wasn't clear.  I just

14    wanted to clarify that what I've just shown you attached to

15    Exhibit Number 132 -- or, I'm sorry, 133, that spreadsheet

16    is an update of that spreadsheet (indicating); is that

17    accurate?

18    A.    Without putting a pencil to it, I really don't know.

19    Q.    Okay.

20    A.    But what I can testify to is that there's at least one

21    set of cattle on this spreadsheet that's not on that

22    spreadsheet, and that that would be the Mogus cattle.

23    Q.    Were there any other changes -- and, again, I'm happy

24    to scroll in on this for you --

25    A.    I do not know.

1    Q.    On this spreadsheet sent two weeks after the

2    February 4th spreadsheet, had you added the word "Tyson"

3    anywhere to the spreadsheet?

4              And, again, I'm happy to blow up any part of it

5    for you.

6    A.    No, Mr. Fisher.

7    Q.    Had you added any clarification as to who was

8    responsible for the costs listed on this spreadsheet

9    two weeks later?

10   A.    No, Mr. Fisher.

11   Q.    Any additional calculations showing how these cost

12   numbers were reached on this spreadsheet sent two weeks

13   later?

14   A.    May I ask that we expand that little box at the

15   bottom --

16   Q.    Certainly.

17   A.    -- please?

18              Thank you.

19   Q.    Of course.

20   A.    The biggest difference I see in those two

21   spreadsheets, these two cost plus models, is that there's a

22   few more cattle on this one.  That one has 8,666.  This one

23   has 8,892.

24   Q.    And I appreciate that clarification, but that wasn't

25   my question, Mr. Perez.  My question was -- and let me

1    actually ask a different question.

2              Before we broke for lunch, we were talking about

3    the $125 per head over costs for GAP cattle.  Do you recall

4    that conversation we had?

5    A.    Yes, Mr. Fisher.

6    Q.    Is that $125 for costs, has that been added to this

7    spreadsheet anywhere?

8    A.    It is baked into this number, yes, sir.

9    Q.    But we're not going to find the $125 per head cost,

10   itself, anywhere on the face of this spreadsheet?

11   A.    No.  No, Mr. Fisher.

12   Q.    And we're not going to find the $100 per head over

13   costs for NE3 and NHTC cattle on the face of the

14   spreadsheet, are we?

15   A.    NHTC, no, sir.

16   Q.    Thank you.

17             Now, I'm going to -- if we could turn our

18   attention to this exhibit, which has already been admitted.

19   This is Exhibit 135.  And now we're moving into March of

20   2019 here.  Do you recall sending this e-mail, subject line

21   "updated list," to Mr. Scherer on March 4th of 2019?

22   A.    Yes, Mr. Fisher, I do remember sending it.

23   Q.    And what -- you've got an attachment to this e-mail.

24   What is this attachment?

25   A.    It is a cost plus model update.

1    Q.   All right.  And up on the top here, you have put in

2    the subject line "updated list," correct?

3    A.   (Reading) "Subject, updated list for 2019-3-4 cost

4    plus update."

5    Q.   Well, in this update, was anything added indicating

6    who is responsible for the costs?

7    A.   I would ask, if you don't mind, just expand it a

8    little more, please.

9    Q.   Certainly.  Any part, in particular?

10   A.   Well, if you want to expand the highlighted --

11   high-lit boxes, that helps.

12   Q.   Does that help (indicating)?

13   A.   You bet.  And, if you don't mind, if you go down and

14   let me see the high-lit boxes at the bottom, please.

15   Q.   Certainly.  Does that help (indicating)?

16   A.   Yes, sir.

17   Q.   Okay.  Has any addition been made to this spreadsheet

18   indicating who is responsible for the costs in these

19   columns?

20   A.   No, Mr. Fisher.

21   Q.   Okay.  And, again, we're not going to find any

22   reference to the $125 per head over costs for GAP cattle or

23   the $100 per head over costs for the NHTC or the NE3 cattle

24   on the spreadsheet, are we?

25   A.   No, Mr. Fisher.

1    Q.   And also, you had mentioned that...

2              MR. FISHER:  Now, I would like to admit Exhibit

3    Number 140, Your Honor.

4              THE COURT:  From Zia?

5              MR. WORDEN:  No objection, Your Honor.

6              THE COURT:  Exhibit 140 is admitted.

7    (Joint Exhibit 140 was admitted into evidence.)

8              MR. FISHER:  Thank you.

9    Q.   (BY MR. FISHER):  I've got several questions to

10   ask you on this one, Mr. Perez.  And I'm going to

11   move down and work our way back up chronologically

12   here, hopefully, for a little bit of ease.

13             Okay.  Do you recall this e-mail from Jason

14   Turnipseed of Larue Road to you dated March 13th of 2019?

15   A.   I believe I've seen this e-mail before, Mr. Fisher.

16   Q.   And the e-mail indicates that you and Mr. Turnipseed

17   had a conversation that day.  Do you recall that

18   conversation you had with Mr. Turnipseed?

19   A.   I don't.

20   Q.   Okay.  And just below that, in Number 1,

21   Mr. Turnipseed writes (reading), "If Tyson is not going to

22   put on paper the cost plus deal, please send Mike and I an

23   e-mail that outlines the cost plus deal that you have

24   verbalized with them."

25             Did I read that correctly?

1    A.   Of course you did --

2    Q.   Okay.

3    A.   -- Mr. Fisher.

4    Q.   Thank you, Mr. Perez.

5              Based on that, had you -- at this point,

6    March 13, 2019, more than a month after you had sent the

7    February 4th e-mail to Mr. Scherer, had you informed

8    Mr. Turnipseed by this time that the cost plus deal wasn't

9    going to be on paper?

10   A.   I informed Mr. Turnipseed -- again, he's our bank.  I

11   informed Mr. Turnipseed that Tyson does not like to fill out

12   contracts at different feedlots, that we had the

13   confirmation on the cost plus contract at February 4th,

14   and that's what we had.

15   Q.   But Mr. Turnipseed didn't consider that a cost plus

16   deal on paper, did he?

17   A.   I think Mr. Turnipseed says (reading), "This is

18   strictly for CLA, the fund's accountants" --

19   Q.   Mr. Perez, I'm --

20   A.   -- "and not all the cattle go onto our books at a

21   loss."

22   Q.   Mr. Turnipseed, did you not -- how did you interpret

23   this?  Did you interpret it as an understanding of

24   Mr. Turnipseed that he wasn't going to be getting a cost

25   plus deal on paper?

1    A.    No.    What I interpret this as is that this fund

2    allocates their accounting different ways.    And CLA, it

3    looks like that's the fund's accountants.    And it seems to

4    me like what Mr. Turnipseed is trying to accomplish here is

5    he's trying to get a higher book value for the cattle than

6    what CLA is allowing him to get to close his quarterly

7    statements out, or monthly statements or something.

8    Q.    Thank you, Mr. Perez.

9          And then immediately above that, do you see --

10   again, is an e-mail response from Mike Dancey, who is also

11   with Larue Road, correct?

12   A.    At that time, he was with Larue.    I don't know if he

13   is now.

14   Q.    At the time, Mr. Dancey states (reading), "If Tyson

15   won't write up the overall deal, will they write cost plus

16   contracts for the cattle that are in the feedlots that are

17   scheduled to be delivered in two to three months?"

18         Did I read that correctly?

19   A.    That's what he says, yes.

20   Q.    And reading these e-mails, is it your understanding

21   that Mr. Dancey is under the impression also that Tyson will

22   not be writing up the cost plus deal?

23         MR. WORDEN:  Objection, Your Honor, relevance.

24         THE COURT:  Do you have a response to what the

25   relevance is?

1           MR. FISHER:  I do, Your Honor.  This is all --

2    and I'm almost through with this -- a disconnect in

3    communications, is what I'm trying to establish here,

4    between the bank and Mr. Perez on --

5           THE COURT:  Why don't you approach so we can

6    talk.

7           MR. FISHER:  Certainly.

8                (Bench conference.)

9           THE COURT:  If you have longer explanation, just

10   in general, just ask to approach.

11          MR. FISHER:  I apologize.

12          THE COURT:  You're fine.  Go ahead and explain --

13          MR. FISHER:  What I'm trying to establish here is

14   we've got a communication -- we've got Mr. Perez' testimony,

15   but the e-mails tell a different story of his "bank," we'll

16   call it, again and again, asking for written confirmation of

17   things, and either not answering or e-mails suggesting that

18   they're coming.  I've got maybe two more to go over, but

19   it's a --

20          THE COURT:  I understand --

21          MR. FISHER:  -- pattern of showing --

22          THE COURT:  -- I understand --

23          MR. WORDEN:  Here's the problem, Your Honor.

24          THE COURT:  Go ahead.

25          MR. WORDEN:  Mike Dancey is an employee of,

1    basically, the mortgage lender.  His understanding is

2    completely irrelevant to anything else here.  And, by the

3    way, he's answered it.  He said, "I told them they're not

4    going to get any more."  It's been asked and answered and

5    it's irrelevant, what Mike Dancey thought of anything.

6              THE COURT:  I'm going to agree it's irrelevant,

7    what other people thought about things, so it's sustained.

8              MR. FISHER:  Okay.  Thank you.

9              MR. WORDEN:  Thank you.

10             (Bench conference concluded.)

11   Q.   (BY MR. FISHER):  Okay.  Mr. Perez, moving up,

12   Mr. Dancey requested an e-mail outlining the deal

13   from you, is that correct, where I've underlined

14   there?

15   A.   Yes, sir.

16   Q.   And then you responded to that e-mail, correct?

17   A.   Yes, I did.

18   Q.   Okay.  And you asked Mr. Dancey to write up an outline

19   to help you with that; is that right?

20   A.   I said in the e-mail (reading), "Again, please write

21   up an outline that will help and we will work on it."

22   Q.   You asked Mr. Dancey to write up an outline to assist

23   you in complying with his request?

24   A.   That is correct.

25   Q.   Thank you.  And then, on March 21st, a week later,

1   we have an e-mail, again, you're copied on, from Sean Perez

2   to Mike Dancey offering to take a first stab at that

3   outline; is that right?

4   A.   That is correct.

5   Q.   So, at this point, instead of you working on the

6   outline, Sean Perez is going to work on the outline; is my

7   understanding correct?

8   A.   I asked Mr. Dancey if he would write an outline and

9   send it to us.

10  Q.   Correct.  And then Mr. Dancey responded on

11  March 21st.  And then Sean Perez responded (indicating),

12  "I don't mind taking a first stab at it.  Let me get with

13  Narciso and get the bullet points."

14          Did I read that correctly?

15  A.   Yes, Mr. Fisher.

16  Q.   Thank you.  And then on the top of that e-mail, is

17  this a letter on Zia Agricultural Consulting letterhead?

18  A.   I'm sorry, did you ask if it was?

19  Q.   Yes, is this Zia Agricultural Consulting --

20  A.   Yes --

21  Q.   -- letterhead?

22  A.   -- yes, Mr. Fisher, it is on Zia Ag Consulting

23  letterhead.

24  Q.   And the date on that is March 21st, 2019?

25  A.   Correct.

1    Q.   And the name down here is Sean Perez, Manager; is that

2    correct?

3    A.   That is correct.

4    Q.   Do you recall, was this something that Sean drafted in

5    response to this e-mail chain?

6    A.   I'm pretty certain he did draft it, but I don't

7    remember him drafting it.

8    Q.   Fair enough.  Thank you.

9         Oh, I apologize.  I shut that down too fast.  I

10   had one more question for you.

11        And in his letter, Sean states (reading), "Tyson

12   has agreed to purchase all of the calves under a cost plus

13   model."

14        Am I reading that correct?

15   A.   That is correct.

16   Q.   And what is that agreement -- or when did that

17   agreement occur?

18   A.   The only agreement that Zia had with Tyson is the

19   agreement that took place on the 4th of February with the

20   cost plus contract.

21   Q.   And I believe you've testified that certain components

22   of that agreement were discussed with Mr. Scherer in Happy,

23   Texas, back in January; is that correct?

24   A.   Yes, sir.

25   Q.   But Sean was not there for those conversations, was

1   he?

2   A.   He was not in the vehicle, no, sir.

3   Q.   Thank you.

4            MR. FISHER:  At this time, I'd like to admit

5   Exhibit 142, Your Honor.

6            THE COURT:  From Zia?

7            MR. WORDEN:  No objection, Your Honor.

8            THE COURT:  Objection admit- -- Exhibit 142 is

9   admitted.

10            MR. WORDEN:  Your Honor, I'll -- with the

11   understanding we discussed?

12            MR. FISHER:  Yes, absolutely.

13            MR. WORDEN:  No problem, Your Honor.  Thank you.

14   (Joint Exhibit 142 was admitted into evidence.)

15   Q.   (BY MR. FISHER):  And, Mr. Perez, do you

16   recognize this e-mail from March 27, 2019, on which

17   you were copied from Sean Perez to Mr. Turnipseed at

18   Larue Road?

19   A.   I do remember this e-mail.

20   Q.   And attached to this e-mail, again, this is Zia Ag

21   Consulting letterhead, correct?

22   A.   Yes, Mr. Fisher.

23   Q.   This letter is dated a few days later than the last

24   one we looked at.  This is March 25th, 2019; is that

25   right?

1    A.    Yes, Mr. Fisher.

2    Q.    And it appears to have the signature of Sean Perez on

3    this letter.  Does that appear to be his signature?

4    A.    Yes, Mr. Fisher.

5    Q.    Okay.  And this letter was again created to send to

6    Larue Road, your bank; is that right?

7    A.    Yes.  At their request, we're creating this document

8    so that CLA can put a different valuation on these cattle,

9    as per Jason Turnipseed's request.

10   Q.    But the title of it is "cost plus purchase

11   arrangement," right?

12   A.    Yes, sir.

13   Q.    This letter was confirming for your bank essentially

14   the terms of what was going on with the cost plus agreement,

15   correct?

16   A.    A simple "yes" or "no" I don't believe depicts what is

17   going on here.

18   Q.    Does this letter, confirm, even if in part, what

19   you're contending are the terms of the cost plus agreement?

20   A.    This document was created so that CLA could value the

21   cattle a different way than however they were going to value

22   them -- of which, you need to understand, Mr. Fisher, we are

23   not privy to what those guys are doing, at all.  The way

24   they report to whoever they report to is not something we

25   know anything about.

1    Q.   We've gone through several e-mails now that I've asked

2    you about where Jason Turnipseed, Mike Dancey, the people at

3    Larue Road are asking for -- talking about the cost plus

4    contract in writing, talking about the cost plus

5    confirmation.  During this entire time, did you ever just

6    call Bob and say, "Bob, can you send me an e-mail confirming

7    that we have this -- this cost plus contract"?

8    A.   I think that it would be very hard to accuse Zia of

9    not communicating because we were communicating consistently

10   through e-mail.

11   Q.   Mr. Perez, I'm not accusing Zia of anything with

12   respect to communication.  My question to you was, did you

13   not, up to this point, between February 4th and

14   March 25th of 2019 -- you know, instead of having Sean

15   Perez write this letter, at this point, had you not simply

16   reached out to Bob Scherer and asked, "Bob, can you send me

17   a letter confirming we have a deal, confirming this

18   contract"?

19   A.   Mr. Fisher, Bob Scherer and I talked periodically.

20   Not only did I talk with Mr. Scherer, I also talked to

21   Mr. Hueser.  And I tried to talk to Mr. Nelson as well, but

22   I didn't have a lot of conversations with Mr. Nelson.

23   Q.   So your answer is, no, you had not reached out and

24   simply asked Mr. Scherer to send a letter confirming this

25   plus contract?

1    A.    My answer is not "no."  And it's not "yes," either.

2    I'm saying that I was talking to Mr. Scherer all the time,

3    trying get as much verification about our deal on the cost

4    plus contract.

5    Q.    You didn't have -- you had your son -- or I'm sorry,

6    let me back up.

7             Your son put together this letter explaining the

8    effect of this cost plus arrangement, correct?

9    A.    He did put this letter together for a very specific

10   reason:  Not having anything to do with anything else, but

11   the way they value the cattle.

12   Q.    You didn't ask Mr. Scherer for a letter confirming the

13   cost plus deal, correct?

14   A.    Mr. Scherer doesn't like to put things in writing.

15   Q.    Mr. Perez -- Mr. Perez, I've asked you this several

16   times.  It's a "yes" or "no" question:  Did you or did you

17   not ask Mr. Scherer to put a letter together confirming the

18   cost plus arrangement?

19             MR. WORDEN:  It's been asked and answered.

20             MR. FISHER:  It hasn't been answered, Your Honor.

21             THE COURT:  Okay.  Answer the question.

22   A.    I spoke to Mr. Scherer several times.  I asked

23   Mr. Scherer if we could document things more, and

24   Mr. Scherer would always say that he would see what he could

25   do.

1    Q.   (BY MR. FISHER):  And my question is:  Did you

2    ever ask Mr. Scherer to write a letter, one

3    sentence, "we have a deal on this cost plus

4    proposal"?  "Yes" or "no"?

5    A.   He already sent an e-mail confirming that.

6    Q.   Okay.  And that is what you consider the confirmation?

7    A.   Yes.  Yes, Mr. Fisher, that's what I consider the

8    confirmation.

9    Q.   And had you requested a letter from anyone else at

10   Tyson?  You mentioned Mr. Hueser, Mr. Nelson?

11   A.   I e-mailed Mr. Hueser.  I've called Mr. Hueser.  I

12   asked if there was a way to memorialize, further memorialize

13   for our bank, our relationship, and Mr. Hueser gave me some

14   response like "the wording is too vague."

15            But this whole time, what Larue Capital is trying

16   to do is they're trying to structure out a multiyear

17   business arrangement whereby Zia/Tyson does a multiyear

18   contract.  So they have intentions that they're trying to

19   set forth that aren't clearly stated here so well.

20   Q.   You represented several times today that you have

21   e-mailed Mr. Scherer, Mr. Hueser, requesting papering or

22   documentation of the agreement.  I don't recall seeing any

23   such e-mail.  Is there an e-mail that you can recollect that

24   you could point us to --

25   A.   Mr. Fisher --

1   Q.   -- when that request was made?

2   A.   -- I sent an e-mail to Mr. Scherer with a contract.

3   He responded that he accepted the contract, and that's what

4   we have.

5   Q.   Other than that February 4th e-mail that we've gone

6   over several times now, are there any other e-mails you

7   recall sending?

8   A.   No, Mr. Fisher.

9   Q.   Thank you.  Mr. Perez, I'm putting up what's already

10   been admitted as Exhibit Number 149 for you to review.

11   Ms. Diamond went through this e-mail with you briefly.  Do

12   you recall that?  This February 10th [sic] e-mail from you

13   to Bob Scherer?

14   A.   Yes, Mr. Fisher.

15   Q.   And there was an attachment to this e-mail.  And what

16   does this attachment represent?

17   A.   Can you blow it up a little bit, please?

18   Q.   Certainly.  That's as far as I can blow it up and get

19   it all in.  If there's something, in particular...

20   A.   Why don't -- if you don't mind, why don't we work on

21   the left side of the spreadsheet and the box at the bottom.

22   Q.   I'll just go over here to the left with that

23   information.  Okay.  There we go.

24   A.   Can we scroll back up to the top of the e-mail one

25   more time, please?

1    Q.   Certainly.

2    A.   And then, if you don't mind, go back down to the

3    spreadsheet.  I'll just...

4    Q.   Certainly.  Is there anything you need to see on the

5    right side?

6    A.   No, I think we're good.

7    Q.   Okay.  All right.  Is this another update?

8    A.   Would you just -- can you scroll it up just a little

9    bit more, please.

10   Q.   Certainly.  You want me to go back to the e-mail?

11   A.   That's plenty good right there.  Thanks.

12   Q.   Okay.  Sure.  And on this update, again, now we're

13   into May 10th -- I'm still looking -- is there any

14   indication or any reference to Tyson anywhere on this

15   spreadsheet?

16   A.   No, Mr. Fisher.

17            MR. WORDEN:  Excuse me, Your Honor.  If I could

18   just ask Mr. Fisher -- there's more to the spreadsheet

19   below.  Could we just see all of the spreadsheet?

20            THE COURT:  Mr. Fisher, just make sure you scroll

21   all the way down.  And, Mr. Perez, just feel free to ask,

22   like you're doing, just ask him to show all of it in case

23   there's places you need to look at.

24   A.   I apologize, I did not know --

25   Q.   (BY MR. FISHER):  I apologize for that,

1    Mr. Perez --

2    A.   -- there was more to this spreadsheet.  I apologize.

3    Q.   It's my fault.  I'm sorry.

4    A.   No way I could have -- I didn't know.

5    Q.   You want me to blow up the left side for you again?

6    A.   No, that's enough.  If you could go down to the box

7    again, I'd appreciate it.

8    Q.   Sure.

9    A.   And then can we go to the box on the other one that

10   was previous?

11   Q.   Of course.

12   A.   Okay.  And can we go right back to that other one, so

13   that we end kind of at the end of the document.  Please.

14   Q.   Your wish is my command.  There we are.  Is that good?

15   A.   Thank you, Mr. Fisher.

16   Q.   Certainly.  Okay.  On this May 10th spreadsheet, any

17   reference to Tyson on this spreadsheet anywhere on the face

18   of it?

19   A.   No, Mr. Fisher.

20   Q.   And this is May, so we're looking at three months

21   since that February 4th e-mail to Mr. Scherer, correct?

22   A.   Yes, Mr. Fisher.

23   Q.   And in that three months, has any clarification been

24   added as to who's responsible for these costs that are on

25   the right side of this spreadsheet?

1    A.   No, Mr. Fisher.

2    Q.   And no direct reference has been -- we're not going to

3    find that $125 or $100 per head over costs, no reference to

4    those numbers, on the face of this spreadsheet, correct?

5    A.   No, Mr. Fisher.

6    Q.   Thank you.  I'm going to pull up the

7    May 25th e-mail.  You've already been asked about this

8    e-mail this morning.  Do you recall that?

9    A.   Yes, Mr. Fisher.

10   Q.   Is it your understanding on this e-mail that this was

11   sent after Mr. Scherer got the first set of invoices and

12   cattle costs from Prewitt Land and Livestock?

13   A.   Yes, Mr. Fisher, that's what it looks like to me.

14   Q.   Did this e-mail really come as a surprise to you,

15   Mr. Perez?

16   A.   Yes, it did.

17   Q.   I don't --

18   A.   Could we --

19   Q.   I'm sorry.  Go ahead.

20   A.   Sorry.  Since there is a few pages on this e-mail, can

21   we just kind of look at each page, so that -- please?

22   Q.   Of course.  Of course.  Please just let me know when

23   you're ready for me to scroll or zoom.  It's a little

24   difficult to get the whole page on the screen to where it's

25   legible, so I apologize.

1    A.   That's okay.  After what just happened, I just want to

2    see what's all in the e-mail.  Please.

3    Q.   Do you need to see the next page?

4    A.   Is there another page?

5    Q.   There is.  There are two more pages.

6    A.   Okay.  Hold on one second, please.  I had no idea.  I

7    have no way of knowing.  Okie-doke.

8           MR. WORDEN:  There's still another page.

9           MR. FISHER:  Yeah, I apologize.  Did I get it?

10   A.   That's page 1, 2, and then 3.

11   Q.   (BY MR. FISHER):  Oh, I'm sorry.  I thought I

12   showed you 3.  I apologize, I didn't mean to do

13   that.

14   A.   Okie-doke.  Can you stop right there, please?

15   Q.   Yes.

16   A.   Right there.  Thanks.  Is there any way to, like, blow

17   it up one more time?

18   Q.   Of course.

19   A.   Okay.  That's perfect.  Thank you.

20           I'm sorry, the question was?

21   Q.   I haven't asked a question yet, but I will get to that

22   right now.

23           Now that you've had a chance to look back over

24   this exhibit, this was May 25th of 2019, correct?

25   A.   Yes, it was.

1    Q.   And you first sent what you are now contending is the

2    cost plus contract to Mr. Scherer on February 4th,

3    correct?

4    A.   Yes, sir.

5    Q.   Okay.  So in the span of that almost four months, can

6    you point us to an e-mail where you ever informed

7    Mr. Scherer that he would be receiving invoices for the cost

8    of the cattle?

9    A.   No, sir.

10   Q.   Did you respond to this e-mail?

11   A.   I think I called him on the phone.

12   Q.   But we don't have any kind of e-mail response that you

13   recall?

14   A.   I don't recall.

15   Q.   Was it clear to you when you saw "what are you trying

16   to do here?" that there obviously was disconnect?

17   A.   Can we scroll down to the first document?  Please.

18   Q.   Okay.  Sure.  Is there a certain part?

19   A.   If you can scroll down just a little bit more.  That's

20   good.  Thanks.

21        When I look at this invoice and I look at what we

22   said the cattle were going to cost (indicating), I see no

23   disconnect.

24   Q.   And you're pointing to the spreadsheet here?

25   A.   Correct.  We said the cattle were going to cost about


UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1   1,800-and-something dollars.  And, sure enough, this is an

2   invoice for about $1,900, so no.

3   Q.   And what you're calling -- this is the contract, right

4   (indicating)?

5   A.   Correct.

6   Q.   And, again, there is nothing on the contract

7   indicating who is responsible for those costs, is there?

8   A.   I testified to that.

9   Q.   Okay.  I wanted to confirm that.

10  A.   But you're asking me if there's a big disconnect.  And

11  I'm saying there's very little disconnect from what I've

12  said for five or six months.  And now it's verified on this

13  invoice:  Plus the $125.  Now the $125 is blatantly obvious

14  in the invoice.

15  Q.   How is the $125 blatantly obvious?

16  A.   Scroll down to the invoice, please.  It says right

17  there (reading), "Premium natural cattle, $125."

18  Q.   But, again, that's not anywhere in the spreadsheet, is

19  it?

20  A.   I testified that it was not, sir.  Not on that --

21  Q.   Okay.

22  A.   Again, imagine that spreadsheet having quite a few

23  layers behind it that has all the detail.  This verifies

24  that the destination we were headed to financially, we were

25  going to arrive at perfectly.

1    Q.    So that 125 is obvious right here (indicating),

2    correct?

3    A.    Yes, sir.

4    Q.    Okay.  On this invoice dated May 24th --

5    A.    Yes, sir.

6    Q.    -- four months after you sent the February 4th

7    e-mail?

8    A.    That's correct.

9    Q.    That's the first time we see the number "$125," isn't

10   it?

11   A.    That's $125.  It's on the invoice.  It's absolutely

12   correct.

13   Q.    Thank you, sir.

14   A.    We're just following through with what we said we were

15   going to do.

16            MR. FISHER:  And, now, I'd like to admit Exhibit

17   Number 152, please, Your Honor.

18            THE COURT:  From Tyson -- or from Zia?

19            MR. WORDEN:  No objection, Your Honor.

20            THE COURT:  Exhibit 152 is admitted.

21   (Joint Exhibit 152 was admitted into evidence.)

22   Q.    (BY MR. FISHER):  Okay.  Mr. Perez, instead of

23   trying to work out something here, we have an e-mail

24   from Doug Penner with Zia, correct, dated June 3rd

25   of 2019?

1    A.   That's correct.

2    Q.   And that is to Kendall Martens.  Who is Kendall

3    Martens?

4    A.   He's the owner of a feedlot called K&M [sic].

5    Q.   And you're the first person copied on the e-mail,

6    right?

7    A.   That's correct.

8    Q.   And in this e-mail -- and, again, June 3rd, about a

9    week after Mr. Scherer's e-mail we just discussed, correct?

10   A.   I'm sorry.  The question was what?

11   Q.   Certainly.  I apologize.  June 3rd is about a week

12   after the May 25th e-mail --

13   A.   The May 25th e-mail --

14   Q.   Yes.

15   A.   -- approximately?  Yes.

16   Q.   And you asked Mr. Martens, "We would like" -- I'm

17   sorry, I just blocked it out.  In that first sentence

18   (reading), "We would like to have you send us a draft

19   invoice so we can make sure we're all on the same page as to

20   the costs."

21        Did I read that right?

22   A.   Yes, Mr. Fisher.

23   Q.   I think we've established that Mr. Martens is the

24   owner of KM Feedyards?

25   A.   Yes, Mr. Fisher.

1    Q.   And the Zia team is "looking to make sure we're all on

2    the same page as to costs" with this e-mail, correct?

3    A.   That is 100 percent correct.

4    Q.   I don't see Bob Scherer's name anywhere copied on this

5    e-mail, do you?

6    A.   No, he's not copied on this e-mail.

7    Q.   I don't see anybody from Tyson copied on this e-mail,

8    do you?

9    A.   No, sir.

10   Q.   So you're looking to make sure everybody's on the same

11   page, but you don't include anybody from Tyson --

12   A.   Well --

13   Q.   -- is that right?

14   A.   -- Tyson is about to get all these invoices.

15   Q.   It's not exactly transparent, is it, Mr. Perez?

16   A.   Mr. Fisher, this -- Doug Penner was our chief

17   financial officer back then.  And he spent most of his time

18   when he was with Zia working on reconciling numbers and

19   dollars with feedlots.  He never spoke to Tyson, so I'm sure

20   he felt that his duty was to get the numbers reconciled so

21   we got the right cost, freight, feed, et cetera, on the

22   cattle.  So that's what he's attempting to do here.

23   Q.   That's your speculation on what he's attempting to do,

24   correct?

25   A.   He works for us, so I don't have to speculate.  He's

```
 1   giving instruction to the feedlot how we're going to report

 2   these costs to Tyson so that they are accurate.

 3   Q.   Zia selected K&M Feeders [sic] as the feedyard for

 4   these cattle?

 5   A.   One of the feeders.  As you can see, there's a list of

 6   feeders here on the left side of the cost plus model.

 7   Q.   But Zia chose not to include anybody from Tyson on

 8   trying to get on the same page, did you?

 9   A.   Doug Penner chose to not send the e-mail to Tyson.

10   Q.   And as you said, Doug Penner is on the Zia team,

11   right?

12   A.   He is.  But Doug Penner doesn't talk to Zia [sic]

13   ever.  About anything.

14   Q.   Thank you, Mr. Perez.

15          MR. FISHER:  I'd like to admit Exhibit 153,

16   please, Your Honor.

17          THE COURT:  Zia's position?

18          MR. WORDEN:  There's no objection, Your Honor.

19   Q.   (BY MR. FISHER):  And I wanted to know before I

20   move to Exhibit 153, Mr. Perez, this was sent at --

21   I apologize, that's a little difficult trying to

22   make a circle here -- 12:03 P.M.; is that correct.

23   A.   Yes, sir.  I can't see the date, but that's correct on

24   the time.

25   Q.   And that's my fault.  Let me clear that out.
```

1    June 3rd, 2019.  June 3rd, 2019, 12:03 P.M., correct?

2    A.   Yes, sir.

3              THE COURT:  Okay.  Exhibit 153 is admitted.

4    (Joint Exhibit 153 was admitted into evidence.)

5    Q.  (BY MR. FISHER):  Exhibit 153, another e-mail

6    from Doug Penner, June 3rd, 12:16 P.M.  This is

7    just a matter of minutes later, correct?

8    A.   It seems that way, yes.

9    Q.   And this e-mail is also from Doug Penner, but this

10   time to Ty Rumford, correct?

11   A.   Yes, Mr. Fisher.

12   Q.   And Mr. Rumford is another feedyard owner, isn't he?

13   A.   Yes, Mr. Fisher.

14   Q.   And it was represented in this e-mail that (reading)

15   "The prime cattle that shipped on 5-24" -- I'm going to skip

16   over the lot numbers -- "are part of a cost plus deal with

17   Tyson."

18              Did I read that right?

19   A.   Yes, Mr. Fisher.

20   Q.   And you were copied on this e-mail, weren't you?

21   A.   Yes, Mr. Fisher.

22   Q.   As well as three other members of the Zia team, right?

23   A.   Yes, Mr. Fisher.

24   Q.   But, again, Bob Scherer is not copied on this e-mail,

25   is he?

1    A.   No, Mr. Fisher.

2    Q.   Nobody from Tyson is copied on this e-mail?

3    A.   No, Mr. Fisher.

4    Q.   Okay.  And, by this time, a week had passed.  And,

5    during that week, you were made aware that Mr. Scherer

6    wasn't on the same page with you on this -- these invoices,

7    weren't you?

8    A.   We had a deal.  Zia was going to fulfill the deal.

9    Q.   With or without Tyson?

10   A.   Mr. Scherer had ample chance to talk to me because I

11   called him and Mr. Hueser and Mr. Nelson.

12   Q.   Of course there aren't any records reflecting that,

13   correct?

14   A.   Why would I not want to talk to them?

15   Q.   There aren't any e-mails reflecting that?

16   A.   Why would I not want to talk to them?

17   Q.   But you didn't bother to copy them, correct?

18   A.   They're not copied on this e-mail, but they're about

19   to get the invoice for all these cattle.

20   Q.   Thanks, Mr. Perez.

21        MR. FISHER:  And, Your Honor, I'd next like to

22   admit Exhibit 154.

23        THE COURT:  From Zia?

24        MR. WORDEN:  No objection, Your Honor.

25        THE COURT:  Exhibit 154 is admitted.

1           MR. FISHER:  Thank you, Your Honor.

2   (Joint Exhibit 154 was admitted into evidence.)

3    Q.   (BY MR. FISHER):  And then you followed up.

4   This is Exhibit 154, June 3rd, 2019, an e-mail

5   from you to Doug Penner and Ty Rumford and three

6   others on the Zia team, correct?

7    A.   Yes, Mr. Fisher.

8    Q.   And these are your words (reading):  "Please make sure

9   we are all on the same page before sending anything to

10   Tyson," correct?

11    A.   That is correct.  We didn't want to overcharge Tyson.

12   We want --

13    Q.   You also didn't want to include Tyson on the e-mail,

14   did you?

15    A.   Tyson is about to receive all these invoices.

16    Q.   And you're not going to include them in the

17   communications regarding those invoices, are you?

18    A.   They were not included on this document, no, sir.

19           MR. FISHER:  Your Honor, I'd like, at this time,

20   to admit Exhibit 155.

21           THE COURT:  From Zia?

22           MR. WORDEN:  No objection, Your Honor.

23           THE COURT:  Document 155 is admitted.

24   (Joint Exhibit 155 was admitted into evidence.)

25           MR. FISHER:  Thank you, Your Honor.


UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1    Q.   (BY MR. FISHER):  Now, we're looking at another

2    e-mail from the Zia team to Diana Garcia dated

3    June 5th, a couple of days later; is that correct?

4    A.   Yes, Mr. Fisher.

5    Q.   And it looks like there are some invoices being

6    requested.  And I apologize, let me back up.  Diana Garcia

7    is with High Choice Feeders, another feedyard; is that

8    right?

9    A.   That's a High Choice Feeders e-mail address, so I'm

10   assuming yes.  I don't know who she is.

11   Q.   Okay.  And some information related to some bills,

12   some feed bills, are being requested from her; is that

13   right?

14   A.   Mr. Chavez is requesting the end-of-month feed bills

15   from the feedlot.

16   Q.   It says (reading), "We need to gather up -- gather

17   costs up for the cattle that shipped two weeks ago to bill

18   to Tyson, and time is of the essence."

19          Did I read that right?

20   A.   You did, yes, sir.

21   Q.   And, again, Tyson's not copied on this e-mail, right?

22   A.   They're not.  We feed a lot of cattle and we usually

23   don't copy Tyson on our requests for bills.

24          MR. FISHER:  Your Honor, at this time, I'd ask to

25   admit Exhibit 158.

1          THE COURT:  What's Zia as position on 158?

2          MR. WORDEN:  No objection, Your Honor.

3          THE COURT:  158 is admitted.

4  (Joint Exhibit 158 was admitted into evidence.)

5  Q.  (BY MR. FISHER):  Okay.  Mr. Perez, do you

6  recognize this June 7th e-mail from Phil Chavez

7  with the Zia team to Danny Hermann?

8  A.   Yes, Mr. Fisher.

9  Q.   And Danny Hermann is with Ford County Feeders,

10  correct?

11  A.   Yes, Mr. Fisher.

12  Q.   It says here (reading), "Hello, Danny, I've been

13  instructed to send you a sample invoice on how to invoice

14  Tyson for the 5-31-19 shipment."

15          Did I read that correctly?

16  A.   Yes, Mr. Fisher.

17  Q.   And on the next page is a document.  What is that --

18  do you recognize what that document is?

19  A.   It's a -- it's a list of expenses.  Again, cattle

20  cost; freight; vet and med tags; the Ford feed bill; cattle

21  interest, for interest and feed; and a premium.

22  Q.   Okay.  There -- these are costs feedyard costs,

23  correct?

24  A.   Well, cattle cost is not the feedyard cost.

25  Q.   You are correct.

1   A.   The Ford feed bill is definitely a feed bill cost,

2   yes.

3   Q.   These are costs in a sample invoice that you-all

4   prepared for Ford County Feeders to send to Tyson, correct?

5   A.   Yes, Mr. Fisher.

6   Q.   And these are costs that Zia contends are owed by

7   Tyson due to the cost plus spreadsheet, correct?

8   A.   Yes, Mr. Fisher.

9   Q.   Okay.  So I've asked you with the original spreadsheet

10   we've got there, as well as several that have followed, if

11   there's any kind of calculation or explanation of the cost

12   numbers.  And, specifically, I'll refer to --

13          MR. FISHER:  If I may approach the whiteboard,

14   Your Honor?

15          THE COURT:  Yes.

16   Q.   (BY MR. FISHER):  Can you see this all right,

17   Mr. Perez?

18   A.   Yes, sir.

19   Q.   I asked you about this first row.  This --

20          (Reporter interruption for clarification.)

21          Mr. Perez, do you recall that I asked you about

22   this figure, the $198,467.65 in costs?

23   A.   Yes, Mr. Fisher.

24   Q.   And I asked you if there's a breakdown of these costs

25   anywhere on this spreadsheet, and you told me there weren't,

1    correct?

2    A.    Not on the face of this spreadsheet, no, sir.

3    Q.    Thank you.

4          But now we go back to Exhibit 158, June 7th,

5    2019; we've got an explanation.  And I realize these aren't

6    the Burch Ranch cattle, but we've got a breakdown of these

7    costs, correct?

8    A.    Yes, Mr. Fisher.

9    Q.    And this invoice was prepared by Zia for Ford County

10   Feeders to use in invoicing Tyson, correct?

11   A.    Yes, Mr. Fisher.

12   Q.    So over four months later, an invoice is going to be

13   sent to Tyson that finally has an explanation of costs,

14   right?

15   A.    Would you mind scrolling down?  It looks like there's

16   another piece of paper there.

17   Q.    (Complying.)

18   A.    Thank you.

19   Q.    Certainly.

20          Is that accurate, Mr. Perez?

21   A.    Yes.  Yes, Mr. Fisher.

22   Q.    Thank you.

23          MR. FISHER:  And then, if I may admit

24   Exhibit 159, Your Honor?

25          THE COURT:  What's the plaintiff's position on

1    159?

2              MR. WORDEN:  No, no objection.

3              THE COURT:  Exhibit 159 is admitted.

4    (Joint Exhibit 159 was admitted into evidence.)

5              MR. FISHER:  Thank you, Your Honor.

6    Q.  (BY MR. FISHER):  And then we have this e-mail,

7    Mr. Perez, in Exhibit 159 from a few minutes later

8    on June 7th of 2019, to High Choice Feeders.  To

9    Ty Rumford, correct?

10   A.  Yes, Mr. Fisher.

11   Q.  And here we have a similar body to the e-mail

12   (reading), "Hello, Ty, I've been instructed to send you a

13   sample invoice on how to invoice Tyson for the 5-24-19

14   shipment."

15             Did I read that correctly?

16   A.  Yes, Mr. Fisher.

17   Q.  Again, nobody from Tyson is copied on this e-mail, are

18   they?

19   A.  No, Mr. Fisher.

20   Q.  And, on the next two pages -- I'll give you a chance

21   to look at both of them.  Let me know when you're ready for

22   me to scroll to the next, please.

23   A.  Okie-doke.  Thank you, sir.

24   Q.  There is another example of invoices prepared by Zia

25   for feeders to use to bill Tyson under the cost plus

1    spreadsheet, correct?

2    A.   That is correct, Mr. Fisher.

3            Would you mind scrolling down to the last

4    page one more time?

5    Q.   Certainly.

6    A.   Is that it?  Is that the last page?

7    Q.   Yes, it is.

8    A.   Thanks.

9    Q.   Okay.  You testified a couple of different times this

10   morning that one of the reasons you created the cost plus

11   spreadsheet was not only for Zia's benefit, but to help

12   Tyson out.  Do you recall that?

13   A.   Yes, Mr. Fisher.

14   Q.   But in putting these invoices together, you didn't

15   include Tyson on that, did you?

16   A.   No, Mr. Fisher.

17           MR. FISHER:  Okay.  Your Honor, at this time I'd

18   ask to admit Exhibit 156.

19           THE COURT:  What's Zia's position on Exhibit 156?

20           MR. WORDEN:  No objection, Your Honor.

21           THE COURT:  156 is admitted.

22   (Joint Exhibit 156 was admitted into evidence.)

23           MR. FISHER:  Thank you, Your Honor.

24   Q.   (BY MR. FISHER):  Mr. Perez, do you remember

25   this e-mail from Mike Rogers on June 6th on which

1    you were copied?

2    A.   I do remember this e-mail.

3    Q.   Okay.  And the e-mail is addressed to Mike Dancey with

4    Larue Road, correct?

5    A.   Yes, sir.

6    Q.   And, in the second sentence of that e-mail, it states

7    (reading), "Tyson has not been settling up correctly to this

8    point."

9              Did I read that correct?

10   A.   That is correct.

11   Q.   And then, in the next sentence, it says (reading),

12   "Narciso and Sean are working on getting this straightened

13   out."

14             Did I read that right?

15   A.   Yes, it is [sic].

16   Q.   And you were trying to straighten out some

17   discrepancies in the settlements, it says in that last full

18   line; is that correct?

19   A.   That's correct.

20   Q.   So you could (reading) "...show Tyson what is

21   happening"?

22             Am I reading that right?

23   A.   If I could show Tyson what is happening?  I'm sorry.

24   Q.   Yes, I'm sorry.  (Reading) "...to show Tyson what is

25   happening" (indicating).

1    A.   That's what it says, yes, Mr. Fisher.

2    Q.   Okay.  And Mike Rogers appears to be communicating to

3    the bank, trying to straighten out something of a

4    misunderstanding.  Is that how you read that?

5    A.   Mike Rogers is clearly communicating to Mike Dancey

6    that we're working on figuring out how to sort these numbers

7    out, because we're not on the same page with Tyson.

8    Q.   Had it been communicated to Larue Road that Tyson

9    completely contested the existence of any cost plus

10   agreement, at all?

11   A.   Absolutely.

12   Q.   It had, okay.  Even with this e-mail, that had already

13   been communicated to Larue Road?

14   A.   Yes.

15           MR. FISHER:  Okay.  Mr. Perez, I think that's all

16   the questions I have at this time.

17           THE WITNESS:  Thank you, Mr. Fisher.

18           THE COURT:  Can I have counsel approach before

19   the redirect?

20                (Bench conference.)

21           How long do you anticipate the redirect will

22   take?

23           MS. DIAMOND:  Very brief.

24           THE COURT:  How brief is --

25           MS. DIAMOND:  I'd say 15 minutes, no more.

1          THE COURT:  If it takes more than 20 minutes, I'm

2     going to call you back up and we're going to see what's

3     going on.

4          MS. DIAMOND:  Okay.  Thank you.

5          THE COURT:  Okay.

6          (Bench conference concluded.)

7          All right.  Ms. Diamond, you may commence with

8     redirect whenever you're ready.

9          MS. DIAMOND:  Thank you, Your Honor.

10                    **REDIRECT EXAMINATION**

11    Q.   (BY MS. DIAMOND):  Good afternoon, Mr. Perez.

12    I'd like to pull up Exhibit 17 that's already been

13    admitted.  I'm just going to ask a few questions for

14    redirect.

15          Mr. Perez, what does the attachment on this

16    document say?

17    A.   (Reading) "Cost plus model."

18    Q.   And this is the document where you sent Mr. Scherer

19    the final proposal, the cost plus proposal?

20    A.   Yes, ma'am, that's correct.

21    Q.   And you've just testified that this says "cost plus

22    model" on the face of the e-mail?

23    A.   Yes, Ms. Diamond.

24    Q.   What did you do -- what did you ask Mr. Scherer to do

25    with regard to this cost plus model attachment in this

1    e-mail?

2    A.   Mr. Scherer had been pressing me to get him a final

3    version of the cost plus proposal.  Him and I both

4    understood that the guys in Zia, the team at Zia, were

5    working to put together the documents and all the numbers so

6    that they could reflect the most accurate portrayal of what

7    the cost plus contract was going to look like.  And we tried

8    to hurry up and get that done.  It took us a few weeks.

9    And, as soon as it was done, we shipped it off to him.  And

10   I told him that I had to have confirmation from him before

11   we started shipping cattle to the feedyard.

12   Q.   And in this e-mail, specifically what did you ask

13   Mr. Scherer to do with regard to the cost plus model

14   attachment?

15   A.   I told him to either accept it, deny it, or let us

16   know if there was any problems with it, of any kind.

17   Q.   What does the text say?  What did you actually write

18   on the e-mail?

19   A.   I wrote (reading), "Look this over and let's talk.

20   Sorry, I've had a busy day" -- because he had been calling

21   me already that day, like pestering me for this document.

22   And I told him that -- again, I told him that if we didn't

23   agree to it, then I couldn't ship the cattle to the

24   feedyard.

25   Q.   Why does the cost plus agreement not say "Tyson" on

1    it?

2    A.    Because I'm discussing this with one person on the

3    planet, and that's Bob Scherer.

4    Q.    Was it made for anyone else besides Mr. Scherer?

5    A.    It was made -- this contract was created specifically

6    for Mr. Scherer.

7    Q.    Was there any doubt regarding which company would be

8    paying for the cost of the cattle, freight, feed, interest,

9    premium?

10           MR. FISHER:  Objection, Your Honor.  That calls

11   for speculation.

12           MS. DIAMOND:  I'm asking him to --

13           THE COURT:  I'll overrule.  Go ahead.

14   A.    There was no doubt it was for Tyson.  It was for Bob

15   Scherer.

16   Q.    (BY MS. DIAMOND):  Can we pull up Exhibit 18,

17   please, Ms. Gallagher.  And zoom in on the bottom.

18           The February 4th, 2019, cost plus agreement

19   that we have blown up has an estimated cost to Tyson

20   specifically of 16,308 --

21           (Discussion off the record.)

22           16,308,900 --

23           (Discussion off the record.)

24           THE COURT:  We're just waiting for it to be

25   pulled up.  One second.

1    Q.   (BY MS. DIAMOND):  So Mr. Fisher asked you

2    several times, multiple times, where the $125

3    premium, where the $100 premium was on this Exhibit

4    18 that's blown up before us.  So maybe you could

5    walk over to this blowup, and I'll ask you a

6    question about what specific total cost is

7    represented on this cost plus proposal that was sent

8    to Mr. Scherer on February 4th, 2019, as we've

9    already discussed prior.

10   A.   Yes, ma'am.

11   Q.   What is the total specific cost that is written on

12   Exhibit 18, February 4th, 2019, cost plus proposal?

13   A.   $16,308,996.44.

14   Q.   And so that was the amount that the proposal that you

15   presented to Mr. Scherer on February 4th, 2019, was

16   intended to be owed by Tyson?

17   A.   Yes, ma'am.

18   Q.   And at the end of the performance under this contract

19   when everything was settled out, what was the total cost to

20   Tyson?

21   A.   I think we need to pull up one of the exhibits in the

22   end.  But my recollection tells me that at the end of this

23   whole journey that the total cost was $16,200,000.  So five

24   or six months later, we came in $100,000 under budget on all

25   these cattle.

1   Q.   So the total cost was less than it was even projected?

2   A.   Not only did we tell them that we were going to do

3   this, we arrived, and the cattle were cheaper.  So most of

4   the day, we've been talking about "what if, what if, what

5   if."  This is not "what if" anymore.  The final cost was

6   $16,200,000.

7   Q.   Because the cost plus agreement you sent to

8   Mr. Scherer on February 4th doesn't tell Tyson that it has

9   to pay $125, correct?  It tells them Tyson has to pay

10  $16,308,996.44?

11  A.   Yes, Ms. Diamond.

12  Q.   And just to confirm, Mr. Perez, before February 4th,

13  2019, did Tyson have any claim or own any of the GAP cattle

14  listed in this cost plus proposal?

15  A.   Until Bob Scherer sent the e-mail back accepting our

16  cost plus contract on February the 4th, we did not have a

17  deal.  We may have spoken about cattle, we might have talked

18  in generalities, but we did not have a deal until that day.

19  I was not authorized to make a deal with Bob, if it wasn't

20  this deal.

21  Q.   You testified that you printed out a copy of the cost

22  plus proposal and brought it to hand to Mr. Scherer in

23  person on January 14th, 2019, in Happy, Texas.  Was that

24  the final version of the cost plus proposal that you sent to

25  him on February 4th?

1    A.   No, ma'am.  The one that I took with me on January the

2    14th was one that was going to be very, very close.  And I

3    told him that I had to get back to the team.  The team would

4    fine-tune all these details, and we would send him a final

5    version of this cost plus proposal, meant-to-be contract, at

6    that time.

7    Q.   And when did you send Mr. Scherer the final cost plus

8    proposal?

9    A.   I sent him a final cost plus proposal on February the

10   4th, 2019.

11   Q.   And, in your view, after Mr. Scherer responded on

12   February 4th, 2019, "This looks good, get them in a finish

13   yard ASAP, please," what was your view of what the proposal

14   became at that point?

15   A.   The proposal, in my mind, we made him an offer, he

16   accepted it.  He accepted it through e-mail, in writing, and

17   we consummated a deal on these cattle.

18   Q.   You testified about the prior deals and transactions

19   you entered into with Tyson in the last 20 years.  In those

20   last 20 years, have you ever had a document for the sale of

21   cattle where Tyson and Zia signed it or where Tyson and you

22   signed it?

23   A.   No, ma'am.  I had something better.

24   Q.   What was that?

25   A.   I had the word of Bruce Bass and Brad Brandenburg,

UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1    because, when they bought something, they never backed out.

2    And there was never any confusion because they know what

3    they're up to.

4    Q.   And when you were dealing with Mr. Scherer,

5    specifically with regard to this transaction, would Tyson or

6    Mr. Scherer ever have sent you a written document that looks

7    like a formal contract that might satisfy an auditor?

8    A.   No, ma'am.

9    Q.   And why is that?

10   A.   Because Tyson doesn't do things like that with me.

11   Q.   Did you ever sign a written contract with Tyson saying

12   that you would sell Tyson Zia's GAP cattle at the Nebraska

13   weighted average?

14   A.   No, ma'am.  In fact, I would have never sold them the

15   cattle like that.  Because I think you can tell that we know

16   how to run numbers.  We know how to break down the numbers.

17   We can stand by our numbers and we're -- we're a hundred

18   percent spot on, on our numbers.

19           So there's -- this is like any other business.

20   We know our business well and we know that you can't do that

21   with a premium like they offer.

22   Q.   Did your discussions with Larue Road Capital, which

23   you've called your "bank," have any bearing between the

24   contract between Zia and Tyson?

25   A.   None, whatsoever.

1    Q.   And why is that?

2    A.   Because Larue Capital is a company that is looking for

3    projects to invest in.  And, in this case, Larue Capital

4    and, again, this was a proven concept for Larue Capital.

5    They wanted to get involved because they were looking to

6    build out a 60-month deal.  Because, for Larue Capital, if

7    they can park a bunch of money for five years and have a

8    smooth and silky return on investment, then they're excited

9    about doing it.

10            And that's one of the things that Zia does, is

11   they marry funding together with cow-calf operators together

12   with Tyson, together with backgrounders, together with

13   finishers.  We orchestrate putting a concert of all these

14   people together, so that we can create long-term solutions

15   to short-term problems.

16   Q.   And what would be some short-term deals or short-term

17   problems that you might discuss with regard to Tyson?

18   A.   Tyson needs cattle.  And if you can offer something to

19   Tyson that is difficult for other people to provide in

20   quantities that are relevant to them, then, all of a sudden,

21   instead of being a little rancher in between two points on a

22   map that barely gets any rain, you can harness those

23   ranchers together and give those people an opportunity to

24   present themselves at a much more value-added level to

25   someone like Tyson.

1   Q.   But then, even though Zia has sold Tyson, as you've

2   testified, millions of dollars of cattle in the last

3   20 years, you did this all without a written formal

4   contract?

5   A.   That's correct.

6            MS. DIAMOND:  Thank you, Mr. Perez.  No further

7   questions.

8            THE COURT:  All right.  Thank you for your

9   testimony, sir.  You can return to your counsel's table.

10            Zia may call its next witness.

11            MR. WORDEN:  Thank you, Your Honor.  I'd like to

12   call Bob Scherer, please.

13            THE COURT:  All right.

14                    **ROBERT SCHERER**,

15            After having been first duly sworn, did make the

16   following answers:

17                    **DIRECT EXAMINATION**

18            THE COURT:  Thank you.  Have a seat.  State your

19   name and please spell it for the record.

20            THE WITNESS:  My name is Robert Scherer,

21   S-C-H-E-R-E-R.

22   Q.   (BY MR. WORDEN):  Good afternoon, Mr. Scherer.

23   A.   Good afternoon.

24   Q.   You remember me?  We met about 14 months ago in May of

25   2021 when I came up to Dakota Dunes and took your

1   deposition.

2   A.   Correct.

3   Q.   So I take it your testimony today is that on the board

4   (indicating), that's not the contract, correct?

5   A.   Correct.

6   Q.   What is the contract, in your opinion, between Zia and

7   Tyson for the cattle we've been discussing the last

8   two days?

9   A.   As I look at this, the left -- draw a line right down

10  the middle from the pink back to the left side:  This is an

11  inventory.  The contract or agreement Tyson has on the

12  cattle are Nebraska weighted average, dressed, delivered to

13  Lexington, with a per-head premium.

14  Q.   Where do I go to find that contract?

15  A.   It was probably verbal on a phone.

16  Q.   There is no writing anywhere in the universe

17  memorializing the contract you just told the jury is the

18  applicable contract for these 9,000 head of cattle, correct?

19  A.   To the best of my knowledge, that's the way the job

20  was done.

21  Q.   So Nebraska weighted average --

22  A.   Yes.

23  Q.   -- dressed and delivered to Lexington, correct?

24  A.   Correct.

25  Q.   So did you make a proposal to Zia for this cattle?

1    A.    On these cattle?

2    Q.    Yes.

3    A.    No, sir.

4    Q.    Did you have any discussions with Zia, in your mind,

5    as to how you would pay for these cattle?

6    A.    If you go back to 2018, which we have done year over

7    year over year, these cattle did not grow on a tree like

8    conventional cattle.  So we book these cattle March and

9    April the year prior and provide a slot or a number per

10   month.

11   Q.    If the jury wanted to review the terms of your

12   proposal to Zia, where would they look to find that?

13   A.    Have to go back and see if we had the records for the

14   pricing.

15   Q.    But you recall you told Mr. Perez that in a telephone

16   call that was verbal, correct?

17   A.    When I -- when I had the natural program taken away

18   from me in 2017, to take some burden off my plate, I came

19   back into it in August of 2018.  So I would not have priced

20   these cattle or made the agreement for 2019 with him.

21   Q.    So you're --

22   A.    John Gerber would have.

23   Q.    Pardon?

24   A.    John Gerber would have, the vice president.

25   Q.    Is he going to come and testify what the verbal

1    agreement is with Zia?

2    A.   I don't think so.

3    Q.   Are you aware of anywhere where Zia accepted this

4    discussed verbal offer in April or spring of 2018?

5    A.   I don't have any knowledge of that.

6    Q.   All right.  So the contract you say exists is not in

7    writing, and nowhere would we go to find that it was ever

8    accepted; fair enough?

9    A.   Fair enough.

10   Q.   All right.  And Nebraska weighted average -- so what's

11   the "Nebraska weighted average"?

12   A.   As Mr. Perez described it yesterday, it is the

13   culmination of trade on dressed beef in the state of

14   Nebraska, delivered.

15   Q.   So, if John Gerber had a conversation with Zia now,

16   would that conversation have stated -- well, first of all,

17   do you know anything about what he told Zia?

18   A.   I was not part of the conversation.

19   Q.   You have no idea, whatsoever, about the verbal

20   discussion anyone had with Zia in the spring of 2018,

21   correct?

22   A.   Correct.

23   Q.   As you sit here today, you don't have any evidence,

24   documents, or specifics about verbal contracts, whatsoever,

25   related to the cattle Zia delivered pursuant to that model

1   right there (indicating), correct?

2   A.   Correct.

3   Q.   All right.  Let's start back at the beginning,

4   Mr. Scherer.

5           So, first of all, what is your title?

6   A.   Associate Director of Cattle Procurement.

7   Q.   Yeah, so I noticed Mr. Fisher called you "Associate

8   Director."  What do you put on your own LinkedIn page as

9   your position?

10   A.   When I originally started it, I was the director of

11   procurement.

12   Q.   Okay.  So I'm looking at LinkedIn.  It says (reading)

13   "Director of Cattle Procurement from May 2015 to the

14   present."

15   A.   I've never gone in and changed it.

16   Q.   Okay.  What has changed since then?

17   A.   Job class.  Reorganization within the company.

18   Q.   So who is the director of cattle procurement today?

19   A.   Kevin Bennett and Jacob Bach.

20   Q.   When did you cease acting as the director of cattle

21   procurement for Tyson?

22   A.   I believe the grade change came into effect in 2015.

23   Q.   Meaning you were no longer director in 2019?

24   A.   No.  Because they were promoting others in other

25   divisions and they realigned all the job classes.  So we

1  went from a director back to an associate director.

2  Q.   So your LinkedIn says you started in May of 2015.

3  When did you cease being director?

4  A.   I believe it was November of that year.

5  Q.   All right.  You had authority, nonetheless, to

6  negotiate the buy -- the purchase and sale of cattle for

7  Tyson, correct?

8  A.   Correct.

9  Q.   All right.  So whether you were director or associate

10  director, it doesn't really -- there's no question you had

11  the authority to make a deal if you wanted to, correct?

12  A.   Correct.

13  Q.   Thank you.

14          So where did you grow up?

15  A.   I grew up in West Point, Nebraska.

16  Q.   All right.

17  A.   Cuming County.

18  Q.   Did you go to high school there?

19  A.   I did.

20  Q.   And then what happened next?

21  A.   Then I went that summer and worked for IBP.

22  Q.   Iowa Beef Processors, correct?

23  A.   Yes, sir.

24  Q.   Did you have any education after high school?

25  A.   I went to Wayne State College for a semester.

1    Q.    Okay.  And then what was your position when you came

2    to Iowa Beef Processors?

3    A.    Hourly.

4    Q.    Doing what?

5    A.    Pushing beef, sawing cattle, ribbing cattle, loading

6    trucks.

7    Q.    What does "pushing beef" mean?

8    A.    So you push them.  The cattle come into the hot box

9    after harvest; you push them up a rail.

10   Q.    What's a "hot box"?

11   A.    It's where they chill the cattle.

12   Q.    All right.

13   A.    24 hours.

14   Q.    So are the cattle alive at that point?

15   A.    No, sir, they've been euthanized.

16   Q.    Okay.  Where did you begin -- in what city did you

17   begin that role?

18   A.    West Point, Nebraska.

19   Q.    And how long did you stay in West Point, Nebraska?

20   A.    Till November of '86.

21   Q.    And then what happened?

22   A.    Then I went into carcass sales, merchandising.

23   Q.    What does "carcass sales" mean?

24   A.    So we value the carcasses by grade and by yield.  Post

25   USDA grader.

1    Q.   And did you at that time also have responsibility for
2    selling it to supermarkets, restaurants?
3    A.   Outside -- outside cattle, at that point in time, the
4    company only put a Yield Grade 3 or better in a box.
5    Q.   Did your job change at some point after that?
6    A.   Yeah, I was promoted in 1990 to Lexington, Nebraska,
7    as assistant sales manager.
8    Q.   You're still on the --
9    A.   Carcass sales.
10   Q.   -- carcass side?
11        Okay.  Very good.
12   A.   Yes.
13   Q.   How long were you on the carcass side?
14   A.   Till 2000 -- well, actually, in 2007, I moved up out
15   of the plants into the corporate office as the grading
16   coordinator for the company.
17   Q.   What kind of coordinator, sir?
18   A.   Grading.
19   Q.   What does that mean?
20   A.   So I'm responsible for a team of individuals at every
21   plant and how they relate to the USDA and get the cattle
22   graded properly.
23   Q.   How many plants does Tyson Fresh Meats have?
24   A.   Six, today.
25   Q.   Where are they located?

1    A.   Pasco, Washington; Lexington, Nebraska; Garden City,

2   Kansas; Amarillo, Texas; Dakota City, Nebraska; and Joslin,

3   Illinois.

4    Q.   And how many people work in those plants?

5    A.   Depends on the size.  Amarillo, Finney County, Dakota

6   City, probably 3,500.  Lexington, probably 3,000.  It's a

7   little bit smaller plant.  Pasco and Joslin, probably about

8   28- to 3,000.

9    Q.   Where do you live?

10    A.   Currently?

11    Q.   Yeah.  I don't need your home address, but what city?

12    A.   Dakota Dunes, South Dakota.

13    Q.   Thank you.

14         When did you move over to the procurement side?

15    A.   2013.

16    Q.   And you heard me describe that in opening statement,

17   that procurement differs from the carcass side because

18   you're out looking at the live cattle on the range.  Am I

19   correct so far?

20    A.   So far.

21    Q.   All right.  What else did your responsibilities entail

22   in 2013 when you went to the procurement side?

23    A.   When I took over the -- all the scale house

24   coordinators and was being mentored by John Gerber, Brad

25   Brandenburg, and Jay Holmes.

1    Q.    All right.  How long -- when Tyson takes physical

2    possession of the live animal, how long does Tyson have the

3    animal or beef until it is sent off to the supermarket or

4    someone else?

5    A.    From the time it's delivered to the plant?

6    Q.    Yes.

7    A.    So, generally, cattle are delivered; we try to harvest

8    them within a reasonable amount of time, which is generally

9    six to eight hours, because you have to wait for the USDA to

10   come in and do an antemortem, to check the health of the

11   cattle, the mobility of the cattle.

12          From that point, they're harvested, generally 20

13   to 30 hours in a chilling cooler or "hot box."  Then, from

14   there, they go to processing, depending on the quality of

15   the cattle as to what run they go into, where -- or what the

16   temperature is in the rounds, and then eventually into a

17   box.  And then they might sit in material handling three to

18   five days; shipped to a forward warehouse.  And, from there,

19   to a customer.

20   Q.    So less than a week, probably, Tyson has physical

21   possession of the animal from the time it's turned in by the

22   rancher or whatnot?

23   A.    0 to 14 days.

24   Q.    Okay.  Thank you.

25          You're familiar with the term "cost plus

1   agreement," correct?

2   A.   I am.

3   Q.   And you were familiar with it in 2019, correct?

4   A.   I was.

5   Q.   All right.  Have you ever been involved with any cost

6   plus agreement Tyson's ever had with anyone?

7   A.   We have never done a cost plus agreement.  The only

8   time it was brought to my attention was late '18, by another

9   entity.  We reviewed it.  The production and procurement

10   team reviewed it and legal reviewed it.  It was about a 10-

11   or 11-page document.

12   Q.   All right. And what happened?  You decided not to do

13   it?

14   A.   We decided it was not in our best interest.

15   Q.   Okay.  Has Tyson had a cost plus agreement with

16   anyone?

17   A.   Not to my knowledge.

18   Q.   And what have you done to find out whether Tyson had a

19   cost plus agreement with anyone else?

20   A.   I asked my bosses.

21   Q.   And who is your bosses?

22   A.   Today, it's Chad Martin.

23   Q.   All right.

24   A.   2019, it was Justin Nelson.

25   Q.   Okay.  When did you ask Justin Nelson?

1    A.   When did I ask him?

2    Q.   Yes.

3    A.   When the guys from the other entity brought it to us.

4    Q.   And what did Mr. Nelson tell you?

5    A.   Send it up to legal.

6    Q.   And you asked Mr. Nelson then, "Do we ever do a cost

7    plus"?

8    A.   Had we ever done one, yes, and his response was "no."

9    Q.   Where is Mr. Nelson now?

10   A.   Unemployed with Tyson, but he is a feeder cattle

11   buyer.

12   Q.   Okay.  Why did he leave; do you know?

13   A.   Circumstances that transpired from business.

14   Q.   From this transaction, correct?

15   A.   No, sir.

16   Q.   "No"?  What transaction?

17   A.   There were issues that came up in the Northwest.

18   Q.   What issues?

19        MR. FISHER:  Your Honor, we've got an objection.

20   May we approach?

21        THE COURT:  Sure.

22             (Bench conference.)

23        MR. FISHER:  Your Honor, we had a motion in

24   limine on this.  And I am fairly certain of what Counsel is

25   getting into is what's known as the "Easterday litigation,"

1    which is a previous lawsuit involving Tyson that resulted in

2    Mr. -- I'll let you...

3            THE COURT:  I'm sorry.  Does Mr. Gomez want to

4    address the Court?  Come over to the microphone.

5            MR. GOMEZ:  So this has to do with a totally

6    separate litigation.  The facts aren't, at all, relevant to

7    this case.

8            THE COURT:  Mr. Worden isn't asking about the

9    litigation, he's asking about the facts --

10           MR. GOMEZ:  Yes.

11           THE COURT:  -- of what happened; why did this

12   guy --

13           MR. GOMEZ:  I think the only way he can answer

14   the question is by referencing this other litigation.

15           THE COURT:  Because he only knows about the

16   litigation, not about the fact underlying the litigation?

17           MR. GOMEZ:  No, Mr. Scherer does know the facts

18   underlying the litigation, but I believe, in order to

19   respond to the question, he's going to have to reference

20   this other litigation that this person was involved in.

21           THE COURT:  Do you want to advise your client to

22   not discuss the litigation and just discuss the facts of the

23   underlying event that caused this man's termination?

24           MR. GOMEZ:  I'm sorry, just one second.

25           THE COURT:  That's all right.


                    UNITED STATES DISTRICT COURT
            100 N. Church Street, Las Cruces, NM  88001
                          (575) 528-1430

1                    (Discussion off the record.)

2              MR. FISHER:  Your Honor, if we may remind

3    Mr. Scherer about the motion in limine about discussing

4    other litigation?  And then Mr. Worden --

5              THE COURT:  Okay.

6              MR. FISHER:  -- under the motion in limine

7    understanding, will not address --

8              MR. WORDEN:  I'm not going to ask about the

9    litigation --

10             THE COURT:  Don't talk both at once.

11             MR. WORDEN:  I am going to ask about the

12   transaction, which was a cost plus agreement.

13             THE COURT:  That's fine.  It's three o'clock.  I

14   was going to take an afternoon break at 3:30.  Why don't we

15   take a break now for 15 minutes.  And you-all can talk to

16   the witness -- you about exactly what you're going to ask

17   and, you, about any other potential things that resulted in

18   a lawsuit you want to ask, you can go over that during the

19   break.  And you can advise your witness, and everybody can

20   agree, and we'll come back from break, okay?

21             MR. WORDEN:  I'm not going to ask anything about

22   the litigation.

23             THE COURT:  Any other facts that resulted in

24   litigation, we'll want to have this same talk with the

25   witness while we're on break.

```
 1                    MR. WORDEN:  Very well.

 2                    THE COURT:  All right.  Thank you both.

 3                    MR. FISHER:  Thank you.

 4                         (Bench conference concluded.)

 5                    THE COURT:  All right.  Ladies and gentlemen,

 6      we're going to take our mid-afternoon break now for

 7      15 minutes.  We'll be back in 15 minutes.

 8                    All rise for the jury.

 9                         (Jury not present.)

10                    All right.  You may be seated.  Mr. Scherer, you

11      can return to counsel table during the break.  Just be back

12      in the stand when the jury comes back, so everybody is ready

13      to go, all right?

14                    Thanks, everyone.

15                         (A recess was taken.)

16                    THE COURT:  Thank you.  You may be seated.

17                    Mr. Scherer, you can return to the witness stand.

18                    Are we ready for the jury?

19                    MR. WORDEN:  Yes, Your Honor.

20                    MR. FISHER:  Yes, ma'am.

21                    THE COURT:  Okay.

22                         (Jury present.)

23                    Thank you.  You may be seated.

24                    Mr. Worden, you may continue your direct.

25                    MR. WORDEN:  Thank you, Your Honor.
```

1    Q.   (BY MR. WORDEN):  Mr. Scherer, before we broke,

2    I asked you what happened to your old boss,

3    Mr. Nelson.  You said there were issues in the

4    northwest.  I said, "What issues?"  And then there

5    was an objection.

6              What were the issues?

7    A.   The issue was we had an entity that committed fraud

8    against Tyson under Justin Nelson's watch.

9    Q.   And that was in Washington State, correct?

10   A.   Yes, sir.

11   Q.   And the contract Tyson had with that entity was a cost

12   plus agreement, correct?

13   A.   No, sir.

14   Q.   In that arrangement, Tyson fronted the costs to raise

15   the cattle, correct?

16   A.   Not to my knowledge.

17   Q.   What was the contract with that company?

18   A.   I don't price cattle out there, sir.

19   Q.   Do you have any idea what the arrangement was?

20   A.   No, sir.

21   Q.   Do you have any idea what the contract was -- first,

22   was it in writing?

23   A.   I don't know.

24   Q.   So I said a moment ago it was a cost plus agreement,

25   and you said no.  And then I asked if you knew anything

195

1   about it, and you said you didn't, correct?

2   A.   Correct.

3   Q.   So you don't know whether it was a cost plus agreement

4   or not, correct?

5   A.   Correct.

6   Q.   If someone else comes in here and testifies that, in

7   that agreement, Tyson fronted all the costs to raise the

8   calves, you're not going to be here to testify, either way,

9   if that's true or not, correct?

10  A.   Correct.

11  Q.   Why did you say a minute ago, when I said that it was

12  a cost plus agreement, that it wasn't?

13  A.   I'd never heard of a cost plus with Tyson.

14  Q.   All right.  You started with IBP.  IBP was acquired by

15  Tyson, correct?

16  A.   2001, yes.

17  Q.   Okay.  Thank you.  Tyson is one of the four largest

18  meat packers in the world, correct?

19  A.   Correct.

20  Q.   All right.  And, in 2019, Tyson was the only entity

21  buying GAP cattle for Whole Foods, correct?

22  A.   Not to my knowledge.

23  Q.   Why do you say that?

24  A.   Because I was -- had heard rumors of other packers

25  doing it, as well.

1    Q.   Other than rumors you may have heard, do you have any

2    basis to believe Tyson was not --

3    A.   I did know that Country Natural was doing GAP cattle

4    with Whole Foods, yes.

5    Q.   How large is Country National?

6    A.   It's a grass-fed program.

7    Q.   They're not one of the Big Four, are they?

8    A.   No, sir.

9    Q.   Okay.  So Tyson Fresh Meats -- when you were associate

10   director of procurement, you purchased cattle throughout the

11   West, correct?

12   A.   Yes, sir.

13   Q.   Okay.  Some of those cattle were in New Mexico,

14   correct?

15   A.   Yes, sir.

16   Q.   And in several other western states?

17   A.   Correct.

18   Q.   You said -- a moment ago, you mentioned the word

19   "demotion."  What did you mean by that?

20   A.   So when they took our job classes and dropped them, I

21   went from a director to an associate director.

22   Q.   But there was another demotion that you experienced a

23   couple years later, correct?

24   A.   Yeah, yeah.  They -- they took away the natural

25   program from me.  I ran the NHTC program; still managed all

1    the scale houses.  According to John Gerber, it was to

2    lighten the load on my plate.

3    Q.    They took away the natural cattle program from you

4    because of mismanagement of cattle inventory, correct?

5    A.    They said I bought too many cattle, yes.

6    Q.    When they told you you were being demoted, they told

7    you, you had mismanaged cattle inventory, correct?

8    A.    That was not part of the demotion.  The demotion was

9    in job class.  That was due to the company's standards.

10   Q.    When they took away the naturals from you -- first of

11   all, before that you had been handling the naturals for a

12   couple of years, correct?

13   A.    Yes, sir.

14   Q.    And then they took away the naturals because they told

15   you you had mismanaged naturals numbers, correct?

16   A.    Yes, sir.

17   Q.    And part of the -- in fact, the reason you were

18   demoted was because of mismanagement of the transaction you

19   had with Zia a year before where you left the cattle sitting

20   at Beef City for 12 months when they were ready in

21   four months, correct?

22   A.    No, sir.

23   Q.    So you remember when I went to Dakota City and I took

24   your deposition?

25   A.    Yes, sir.

1    Q.    We were in a conference room, correct?

2    A.    Uh-huh.

3    Q.    You had two lawyers there, correct?

4    A.    Yes.

5    Q.    Mr. Fisher was there and an in-house lawyer from

6    Tyson, correct?

7    A.    (Indicating.)

8    Q.    All right.  And you remember, at the beginning of it,

9    you were asked to tell the truth, the whole truth, and

10   nothing but the truth, correct?

11   A.    Correct.

12   Q.    And you tried to do that, correct?

13   A.    Yes, to the best of my knowledge.

14   Q.    And in your deposition, I asked you (reading), "Why

15   did Mr. Gerber take it back?"

16          Your answer was, "Because the influx" -- I'm

17   reading from page 49, by the way -- "because of influx in

18   volumes.  We cannot move the product and we were tending to

19   get flooded with inventory."

20          Question:  "There were problems with the prior

21   deal between Zia and Tyson, in that Tyson was not taking the

22   cattle on time; that's why Mr. Gerber took it back,

23   correct?"

24          And your answer was, "Correct."

25          Do you remember that testimony?

1   A.   Vaguely, but I guess so.

2   Q.   And you were telling the truth at the time, correct?

3   A.   Yes, sir.

4   Q.   And that was over a year ago, much closer to the time

5   of this transaction?

6   A.   Evidently.

7   Q.   Do you have any plans to leave Tyson at the conclusion

8   of this lawsuit?

9   A.   No, sir.  Not since the stock market has taken a hit.

10   Q.   What does that mean?

11   A.   Means my 401K got beat up pretty good.

12   Q.   All right.  So Tyson's history with Zia.  So you

13   understand that Zia and Narciso worked with Tyson for

14   approximately 20 years, correct?

15   A.   That's...

16   Q.   Do you know -- you know who Brad Brandenburg is?

17   A.   You bet.

18   Q.   How do you know him?

19   A.   He was my mentor.  He was my boss in 2013, when I got

20   into procurement.

21   Q.   And are you aware that he worked with Zia?

22   A.   By 2015, I was.

23   Q.   Okay.  Brad Brandenburg ever tell you about problems

24   with Zia?

25   A.   Not really.

1    Q.   Okay.  In fact, Brad and Narciso became close friends

2    over the years, correct?

3    A.   Yes, sir.

4    Q.   And the same with Bruce Bass.  Do you know Bruce Bass?

5    A.   Yes, I did.

6    Q.   And how do you know him?

7    A.   He was the vice president of cattle procurement when I

8    was in the Dakota City plant.

9    Q.   And did you talk to him about his relationship over

10   the last two decades with Zia?

11   A.   He just told me him and Narci were buddies.

12   Q.   You first met Narciso Perez in 2011, correct?

13   A.   Yes, sir.

14   Q.   You reached out to him about lining up some land for

15   you to go elk hunting in New Mexico; am I correct so far?

16   A.   No, sir.  It was his brother.

17   Q.   Oh, I'm sorry.  You reached out to Narciso's brother?

18   A.   I did not reach out.  Brad reached out.  His brother

19   lined it up.

20   Q.   Okay.  You were going on this trip, correct?

21   A.   Yes, sir.

22   Q.   Very well.  Have you ever been to Zia's offices in New

23   Mexico?

24   A.   No, sir.

25   Q.   Have you ever met Sean Perez?

1    A.   Yes, sir.

2    Q.   And where have you met Sean?

3    A.   When I picked him up in Montana.

4    Q.   Whereabouts in Montana?

5    A.   Billings.

6    Q.   What were you and Sean doing in Montana?

7    A.   It was actually Sean, Narci, myself, and Jay Holmes

8    talking to cattle feeders --

9    Q.   When was that --

10   A.   -- ranchers --

11   Q.   Oh --

12   A.   -- excuse me.

13   Q.   -- sorry to interrupt.

14             When was that, sir?

15   A.   2016, I think.

16   Q.   Have you ever had any issues where -- that you were

17   aware of anyone at Tyson felt that Zia was trying to be paid

18   an amount to which they were not entitled?

19   A.   Not to my knowledge.

20   Q.   So you understand this lawsuit involves natural

21   cattle, correct?

22   A.   Yes, sir.

23   Q.   Okay.  And just so we're all on the same page, what is

24   "conventional cattle"?  What are "conventional cattle"?

25   A.   "Conventional cattle" are animals that come through

1   the system, may have medicated feed, may have implants, are

2   allowed to be fed beta agonists, and are traded weekly on

3   the open market.

4   Q.   The Nebraska weighted average that you talked about,

5   that's an average calculating the costs of conventional

6   cattle, correct?

7   A.   That's correct.

8   Q.   Not natural cattle, correct?

9   A.   No.

10          (Reporter interruption for clarification.)

11          THE WITNESS:  That was a "no."

12   Q.   Correct, it's not --

13   A.   Yes, sir.

14   Q.   -- natural -- I just want to make sure we're on the

15   same page.  Thank you.

16          When did you first become involved, in any

17   capacity, with natural cattle of any kind?

18   A.   2015.

19   Q.   All right.  Can you describe your job responsibilities

20   for us in 2015.

21   A.   I was managing all the scale houses, their manager.  I

22   was responsible for yields in the plants.  I was also

23   responsible for getting out and meeting the finish feeders.

24   Q.   The scale house?

25   A.   Yes.

1    Q.   What's a "scale house"?

2    A.   A "scale house" is where we bring the cattle to unload

3    at the plant.  They have a log of delivery times for each

4    truck, what producer, how many head.  They line them up on a

5    sheet for the next day's harvest or that day's harvest, and

6    that's how they keep track of the cattle.

7    Q.   All right.  So in 2015, when you first started working

8    with the natural cattle, what percentage of your time was

9    spent out on ranches, looking at live cattle?

10   A.   Probably 20.

11   Q.   So --

12   A.   Excuse me.  Not ranches.  Feedyards.

13   Q.   Feedyards.  All right.  Did you ever go look at the

14   cattle on ranches or pastureland.

15   A.   Sure.

16   Q.   All right.  In 2015?

17   A.   Yes, sir.

18   Q.   What percentage of your time was that?

19   A.   Maybe five.

20   Q.   All right.  What is a "GAP cattle"?  What is "GAP

21   cattle"?  What are "GAP cattle"?

22   A.   Global Animal Partnership for Whole Foods.

23   Q.   And just for Whole Foods, correct?

24   A.   Yes, sir.

25   Q.   All right.  So you can't get GAP -- you're not selling

1    GAP to Albertson's or Sprouts, just Whole Foods, right?

2    A.   That's totally not correct.  We may downgrade cattle

3    into -- since they're all 100 percent verified, they cover

4    every base that we sell.

5    Q.   Okay.  You're not selling them as GAP, though,

6    correct?

7    A.   No.

8    Q.   All right.  What makes a GAP animal a GAP animal

9    compared to a conventional animal?

10   A.   Well, you would go through an audit process that

11   starts at the ranch.  You have to meet their standards.

12   It's on animal welfare.  It's on environmental, it's on

13   animal husbandry, predator control.  There's a long list of

14   audit questions.

15   Q.   Okay.  What is "NHTC"?

16   A.   "Non-Hormone Treated Cattle."

17   Q.   So all GAP cattle are NHTC, but all NHTC cattle are

18   not GAP cattle, correct?

19   A.   That's correct.

20   Q.   All right.  And NHTC, is that mostly a European issue?

21   A.   It is.  It is.  If the GAP cattle get treated, or

22   verified natural get treated with an antibiotic, they drop

23   down into NHTC.  We get all three certifications to retain

24   some value of the animal for the supplier.

25   Q.   Thank you.  In the beginning of 2019, Tyson had

1   approximately -- that year, Tyson took approximately

2   6.5 million head of cattle, correct?

3   A.   I believe.

4   Q.   What percentage of that cattle was part of any natural

5   program, whether it be GAP or NHTC or otherwise?

6   A.   From a percentage basis, I'd say probably around

7   three.

8   Q.   So, in your deposition, I believe you told me 1.5 to

9   2.  So has it changed or just --

10   A.   No, it's just a wild guess.  But one and a half to two

11   is fine.

12   Q.   Still just a very small part --

13   A.   Very small part --

14   Q.   -- correct?

15   A.   -- yes.

16   Q.   All right.  Is that all you deal with, is the natural

17   cattle, or did you also deal with conventional in 2019?

18   A.   No, primarily just natural, NHTC.

19   Q.   And, as a general rule, though, you would agree the

20   reason that Tyson is involved in the natural cattle program

21   is because you can sell it to Whole Foods and others for a

22   higher price, correct?

23   A.   It's generally a higher-priced calf at the beginning.

24   And so that cost just keeps building as you go through the

25   process.

1    Q.   So, in preparation for your testimony in this case at

2    least a year ago, you went through and searched for all your

3    e-mails, correct?

4    A.   I did.

5    Q.   And you searched for all your phone records, correct?

6    A.   I did.

7    Q.   And all your text messages, correct?

8    A.   I did.

9    Q.   And all your notes, correct?

10   A.   Correct.

11   Q.   So if there was a note or a phone call or an e-mail or

12   a text, you produced it in this case, correct?

13   A.   To the best of my knowledge.

14   Q.   You didn't destroy any or leave any out, correct?

15   A.   Not that I'm aware of.

16   Q.   Everything relating to Zia, correct?

17   A.   Everything relating.

18   Q.   Do you remember going with Narciso to see cattle on

19   January 14th of 2019 in Happy, Texas?

20   A.   Most definitely.

21   Q.   All right.  I don't see any notes, in the notes you

22   produced, of your visit that day.  Is that -- does that

23   square with your recollection?

24   A.   I am [sic].

25   Q.   Okay.  Did you take notes while you were there?

1    A.   Just talking and looking at calves.

2    Q.   You had a notebook with you, didn't you?

3    A.   I probably had my backpack with me.

4    Q.   Did you not have some sort of a day-timer where you

5    took notes?

6    A.   No.  It might have been my black CAB binder.

7    Q.   And you took notes in that binder, correct?

8    A.   If I did not produce them, I did not take notes that

9    day.

10   Q.   The transaction with Zia that Mr. Perez talked about

11   that resulted in your demotion, he told you they had lost

12   millions of dollars in that transaction, correct?

13   A.   I don't remember.

14   Q.   He testified that he told you they lost about

15   $4 million.  You just can't remember, either way?

16   A.   I don't remember any cattle.

17   Q.   All right.  It is accurate that, in that transaction,

18   the feedlot in question was Beef City, correct?

19   A.   To the best of my knowledge.

20   Q.   Right.  And do you agree that you -- that Mr. Perez

21   and Zia put those cattle in the feedlot for what was

22   projected to be four months, but you left them there for a

23   year?

24   A.   I don't have any recollection of that.

25   Q.   Either way?

1    A.   Either way.

2    Q.   You did get demoted as a result of that transaction,

3    correct?

4    A.   I had the natural program taken away from me, yes.

5    Q.   As a result of that transaction.

6    A.   Might have been that.  Might have been too many.

7    Q.   Do you recall anything about the transaction with Zia

8    where you left the cattle longer, and Zia lost millions of

9    dollars?

10    A.   I don't -- I don't remember.  I don't remember leaving

11    any cattle for an additional 12 months.  Because that's not

12    what we do.

13    Q.   So I just want to be clear, you have no recollection

14    of it or you're confident you didn't leave them there for

15    12 months, which --

16    A.   I'm telling you -- excuse me.  I didn't mean to

17    interrupt you.  I'm telling you that I do not remember the

18    cattle sticking around for an additional time frame that you

19    mentioned.

20    Q.   In late 2018, you reached out to Narciso Perez to help

21    you fill a need for natural cattle for Whole Foods, correct?

22    A.   Yes, sir.

23    Q.   All right.  You reached out to him.  He didn't reach

24    out to you to sell it to you, correct?

25    A.   That's correct.

1    Q.   All right.  And so we heard earlier in opening

2    statement by Mr. Fisher that these cattle were already

3    committed to Tyson before the trip to Happy, Texas, in

4    January of 2019, correct?

5    A.   That is the best of my knowledge.

6    Q.   Where do I go to find anything that shows that all

7    these cattle were committed to Tyson?

8    A.   We would have a record of that.  Verna Bennett, who

9    does the scheduling for the cattle...

10   Q.   Are you going to testify about it today?  This week?

11   A.   Is she?

12   Q.   Are you.  Have you seen this record?

13   A.   I actually have seen that record.

14   Q.   Okay.  Now, have you seen any record where Zia says,

15   "We agree these are all your cattle"?

16   A.   No.  The only thing I've seen is the head counts by

17   month or the slots available.

18   Q.   An internal document between you and Ms. Bennett?

19   A.   Well, we just wouldn't make up the numbers.

20   Q.   John Gerber, you told us earlier --

21   A.   Correct.

22   Q.   -- I think had some phone calls in the spring of 2018,

23   but we don't know anything about it because no one is going

24   to testify about it, correct?

25   A.   Correct.

1    Q.    During that phone call, is that where Zia agreed that

2    all of this cattle, 8,000 head, were committed to Tyson?

3    A.    I wasn't in on the phone call.

4    Q.    During -- in that phone call or any document that

5    Tyson -- that Zia is on, is there anywhere where Zia says,

6    "These are your cattle; no matter what the price, no matter

7    when you take them, these are yours"?

8    A.    Not to my knowledge.

9    Q.    And we don't have any documents anywhere in the

10   universe to support this contention that somehow you had an

11   agreement with Zia that all those cattle were committed to

12   you in 2018, correct?

13   A.    Correct.

14   Q.    So you wouldn't have been calling him at the end of

15   2018 saying "I need help with Whole Foods," if you already

16   had all the cattle committed, correct?

17   A.    My concern was cattle in the finish yards.

18   Q.    We're going to scroll through your texts and such when

19   you reach out to Mr. Perez at the end of the year in early

20   2019.

21   A.    No problem.

22   Q.    And you've been here, looking at them, correct?

23   A.    Correct.

24   Q.    And I went through them at your deposition?

25            Have you seen anything since you've been here

1   this week where you tell -- remind Mr. Perez, "These are

2   already our cattle"?

3   A.   No, sir.

4   Q.   All right.  You told Mr. Perez at the end of 2018 and

5   early 2019 that you could not do the Whole Foods transaction

6   unless you had cattle from Zia, correct?

7   A.   Correct.

8   Q.   And Mr. Perez, during those conversations, told you

9   that Zia was very dissatisfied with how much money they had

10  lost in the last transaction and they wanted to talk about a

11  new way of doing it, correct?

12  A.   To the best of my knowledge, yes.

13  Q.   And he told you, "We'll prepare a proposal for you,"

14  correct?

15  A.   To the best of my knowledge.

16  Q.   Thank you.  And he did send a proposal, correct?

17  A.   He sent a proposal.

18  Q.   And he gave you a copy of it when you were in his

19  truck in Happy, Texas, correct?

20  A.   At that time, yes.

21  Q.   And it was not exactly the same, there was a finer

22  point on the board in front of us, but he gave you an almost

23  final version, correct?

24  A.   What he gave me is what they had sent monthly in the

25  past two years or whatever.  An inventory.

1    Q.   He gave you a version in January, in Texas, that had

2    all these costs on this, correct?

3    A.   I believe he did.

4    Q.   And down here at the bottom, it said total costs -- I

5    don't know what it said in the prior version, but a total

6    cost of 16 million, approximately, correct?

7    A.   It might have been.

8    Q.   When he gave you this in February and e-mailed it to

9    you and said, "Take a look at this," you remember getting

10   that, correct?

11   A.   I do.

12   Q.   And you did take a look at it, correct?

13   A.   I did.

14   Q.   You e-mailed back, "Looks good, get them in the finish

15   yard ASAP," correct?

16   A.   That's correct.

17   Q.   All right.  Now, when you read this, and it says

18   "total costs, 16.3 million," was there any question in your

19   mind as to who Zia was expecting to pay these costs?

20   A.   Yes.

21   Q.   Did you think, when Zia sent this to you, they meant

22   Zia is paying these cost?

23   A.   I had no clue because, like I said earlier, I strictly

24   looked at the inventory.  The numbers were irrelevant to us.

25   Q.   You know their accounting staff spent weeks preparing

1   all these numbers, correct?

2   A.   I've heard that today.

3   Q.   He told you that in Texas, correct?

4   A.   Not the multiple people in multiple weeks, no.

5   Q.   They have a small business, correct?

6   A.   Yeah.

7   Q.   Smaller now than it used to be, right?

8   A.   That's what I've heard.

9   Q.   Okay.  There are 17 columns and about 25 rows?

10   A.   Uh-huh.

11   Q.   The last nine columns are all about cost, correct?

12   A.   That's what I've been described [sic].

13   Q.   And when you got the proposal on February 4th of

14   2019, and you responded "looks good," you read all these

15   costs, correct?

16   A.   No, sir.

17   Q.   How do you do that?  How do you just look -- please, I

18   don't want to make you act this out, but show me how you

19   looked at the document and only looked at the columns on the

20   left and nothing on the right.

21   A.   Because I base everything on an inventory; where

22   they're at in the feedyards, what the projected outdates

23   are.

24   Q.   Narciso told you in Texas they needed to do something

25   where you had a cost plus agreement to help them pay the

1    costs of raising these cattle, correct?

2    A.   He might have.

3    Q.   All right.  You don't recall, either way?

4    A.   No, sir.

5    Q.   You spent the day driving around with that

6    (indicating) on your lap, correct?

7    A.   Yeah.

8    Q.   You brought it in to lunch, correct?

9    A.   I might have.

10   Q.   All right.  You took notes at lunch when you're

11   talking to Narciso about that chart, correct?

12   A.   I believe I ate my lunch.  I did not go through notes.

13   To the best of my knowledge.

14   Q.   Did you go to the best chicken fried steak place in

15   the Texas Panhandle?

16   A.   In Canyon, yeah.  It was really good; however, the

17   main goal was to get out, look at the calves, look at the

18   weight of the calves, and figure out -- on a typical

19   natural, they take six months to get to maturity, top grade,

20   and quality.

21   Q.   So he tells you, before you go to Happy, Texas, "We

22   have to do things differently, and I'm going to give you a

23   proposal."  And then he gives you one when you get into the

24   pickup in Happy, correct?

25   A.   Yes.

1    Q.   All right.  So he's telling you, "We're doing

2    something different; I have a proposal and here it is."  And

3    your testimony is in Happy, Texas, you ignore the nine

4    columns on the right?

5    A.   That is correct.

6    Q.   And your testimony is, when you responded, "Looks

7    good," you meant "the inventory numbers look good; nothing

8    else looks good"?

9    A.   Correct.

10   Q.   Did you ever say that until you responded the day

11   after you got the first bill in late May that you -- that

12   nothing looked good expect the one column out of 17?

13   A.   Excuse me.  Can you repeat that question?

14   Q.   Did you ever, between February 4th when you said

15   "looks good," when this cost plus agreement labeled a "cost

16   plus agreement" was attached to the e-mail -- did you ever,

17   from that day, until May 25th, the day after you get the

18   first bill and the day after the cattle are ready to be

19   sacrificed, did you ever tell anyone at Zia when you said

20   "looks good," you meant Column 5 and nothing else looks

21   good?

22   A.   No.  What I meant when I said "looks good" is getting

23   the cattle in the feedyards.  Because, if they have an

24   outdate of June and it is January, those cattle are not

25   going to be finished properly.

1    Q.   So you could see why, when someone sends you a

2    proposal and you say "looks good," they might logically

3    assume you mean the proposal looks good, correct?

4    A.   He could have assumed that, yes.

5    Q.   And it would be logical for someone to assume that,

6    correct?

7    A.   Possibly.

8    Q.   All right.  And you responded to this proposal, as

9    associate director at Tyson Foods in charge of the natural

10   program, correct?

11   A.   Correct.

12   Q.   When you saw this chart in Happy, in the pickup, how

13   long were you in the pickup with him?

14   A.   I think we were there for, like, three hours driving

15   around the wheat pasture.

16   Q.   It was the first thing he gave you when you got in,

17   correct?

18   A.   I don't recall.

19   Q.   It was the only thing he gave you when you got in the

20   truck, correct?

21   A.   It was.

22   Q.   And you took it back with you, correct?

23   A.   I believe.

24   Q.   Do you still have it in your files?

25   A.   Probably not.

1     Q.   Why not?

2     A.   It was irrelevant to me.  It was an inventory.

3     Q.   Their accounting department spent weeks working on

4     that, and their work was irrelevant to you, correct?

5     A.   It was.

6     Q.   Because you're the director of cattle for Tyson;

7     you're going to pay the amount you want to pay when you take

8     the cattle, regardless of whatever promises or proposals

9     came before that, correct?

10    A.   When I pay for cattle, it's an agreed-upon premium per

11    head.

12    Q.   Where is that agreement, I asked you that earlier.

13    There's not one?

14    A.   I understand.

15    Q.   All right.  So you can see how we have one proposal,

16    you say "looks good," and that's the only agreement anywhere

17    on the planet, correct?

18    A.   Could be.

19    Q.   So you see how it's logical for the people who

20    received your e-mail saying "looks good" to assume that's

21    the contract because it's the only one that exists on the

22    planet, correct?

23    A.   It's the only cost plus that he sent.

24    Q.   It's the only proposal that he sent, correct?

25    A.   Yes.

1    Q.   And you say "looks good" to the only proposal, and

2    there was none other, correct?

3    A.   The "looks good" was referring to inventory.

4    Q.   How were they supposed to know that?  You didn't tell

5    anyone that until you got the cattle in late May, correct?

6    A.   Correct.

7    Q.   Why didn't you say -- why don't you say in Happy,

8    Texas, "Column 5 looks good; the rest of it doesn't look

9    good"?

10   A.   Because I'm strictly looking at inventory.

11   Q.   Because you know if you say, "This proposal doesn't

12   look good," you're not getting any of that cattle, correct?

13   A.   If it would have been put out to me that I was paying

14   for everything, I would definitely have said "no" right

15   there and then.

16   Q.   You knew if you told Narciso, "I don't agree with this

17   proposal," you would not get any of that cattle and you

18   couldn't do your deal with Whole Foods, correct?

19   A.   Oh, not necessarily.  We had plenty of cattle that

20   year.  It would have helped.  It would have helped by month,

21   yes.

22   Q.   So, five minutes ago, you told me you told Narciso,

23   "We need your cattle to do the deal" --

24   A.   Sure, sure.

25   Q.   Let me just go back and make sure I got the answer.

1   You knew, if you told him "I do not agree with that

2   proposal," you're not getting any of that cattle, correct?

3   A.   Correct.

4   Q.   At the end of the day in Happy, after you've had your

5   lunch, you've driven around for a few hours, Narciso took

6   you back to your truck, correct?

7   A.   Yes, sir.

8   Q.   All right.  And Narciso reaches out his hand and says,

9   "Do we have a deal," correct?

10  A.   I don't recall.  We shake hands every time, though.

11  Q.   He says he reached out his hand and said, "Do we have

12  a deal?" and you said, "We have a deal."  Do you recall

13  that?

14  A.   I do not recall saying that.

15  Q.   Don't recall, either way?

16  A.   No, sir.

17  Q.   You discussed with him in Happy that they could have

18  implanted those cattle and sold them as natural -- sold them

19  as conventional, correct?

20  A.   I don't remember.

21  Q.   But you knew that already.  They could have taken

22  those cattle that you said "looks good, get it done ASAP,"

23  they could have implanted them, raised them as conventional,

24  and sold them to any of the Big Four, correct?

25  A.   If that's what they chose to do, yeah.

1    Q.   And you knew that when they committed those cattle to

2    you, as the only company of the Big Four packers, that there

3    would be no place else to sell those cattle as GAP when they

4    came ready for sacrifice in May or June, correct?

5    A.   If you're talking strictly the Big Four, correct.  If

6    you're talking other mid-size packers, then you have

7    Creekstone and you have Meyer Angus.

8    Q.   You told me you heard rumors about those two, correct?

9    A.   Correct.

10   Q.   They're obviously not much competition for you, or

11   you'd have a lot more than rumors, correct?

12   A.   Oh, they're good competition.

13   Q.   In 2019?

14   A.   Yes, sir.

15   Q.   Ms. Gallagher, please put Exhibit 10 on.

16        Mr. Scherer, please look at Exhibit 10 and tell

17   me if you recognize it.

18   A.   Yeah, I do.

19   Q.   Okay.  And this is a couple days after you met with

20   Narciso in Happy, Texas, correct?

21   A.   Correct.

22   Q.   And you thank him for taking the time Monday to look

23   at those calves (reading) "...and let's get the feedlot

24   inventory up to date and get these cattle in for May and

25   June and we'll go forward, thanks, again."  Correct?  You

1   sent that to him?

2   A.   Yes, sir.

3   Q.   Okay.  Ms. Gallagher, please put Exhibit 12 up.

4           And, Mr. Scherer, you sent this a week later

5   (reading):  "Did start [sic] moving calves off wheat?  Need

6   them in a feedlot," correct?

7   A.   That's correct.

8   Q.   But Narciso, you had phone calls with him during that

9   week, too, correct?

10   A.   Would you repeat the question?

11   Q.   Yes.  During the week between the e-mail where you

12   said -- thanking him for taking you to look at the cows in

13   Happy and this e-mail, seven days later, nine days after the

14   Happy visit, you had phone calls with Narciso, correct?

15   A.   He might have called, yes.

16   Q.   You might have called him?  You called him insistently

17   during the three weeks from when you got that in Happy,

18   Texas, and February 4th, correct?

19   A.   Possibly.

20   Q.   You called him repeatedly wanting to make certain you

21   could lock in the natural cattle in the three weeks between

22   Happy, Texas, and February 4th; isn't that correct?

23   A.   To the feedyard, yes, sir.

24   Q.   Ms. Gallagher, Exhibit 13, please.

25           And that is later the same day (reading):  "Let

1    me know when they start delivering."

2                Do you remember that one?

3    A.   I do.

4    Q.   Why did you have to e-mail and text him twice in the

5    same day?

6    A.   I just wanted to make sure that he read the text.

7    Q.   And then, later that same day -- Ms. Gallagher,

8    Exhibit 14, please -- you say (reading), "I would agree,

9    just need them in the yard to put them on the books,"

10   correct?

11   A.   That is correct.  To figure out an outdate.

12   Q.   You would agree to what?

13   A.   I'd like to know what the other text was.

14   Q.   I don't know if we have the other text.

15   A.   I don't, either.

16   Q.   All right.  Did you have a phone call with Narciso

17   between these texts?

18   A.   I don't recall.

19   Q.   Is there any other proposal on the table that you

20   would have been discussing with Narciso that you might agree

21   to, other than this cost plus proposal on January 23 when

22   you wrote this text?

23   A.   Nebraska weighted average with a premium per head.

24   Q.   Who made that proposal in January?

25   A.   That's just the way we do business.

1    Q.   Nobody -- nobody in January made any proposal to do

2    anything according to the Nebraska weighted average for

3    these cows; isn't that correct?

4    A.   I don't recall.

5    Q.   No one made a proposal to do anything according to the

6    Nebraska weighted average for these cattle in January; isn't

7    that correct?

8    A.   To the best of my knowledge.

9    Q.   Thank you.

10             Let's look at Exhibit 14, please.

11             I'm sorry, that was 14.  All right.  Let's look

12   at Exhibit 16, please.

13             And this is five days later (reading):  "Any

14   movement on the cattle heading north?"

15   A.   Correct.

16   Q.   You would agree you have a certain urgency in getting

17   these cattle moving, so you can contemplate the Whole Foods

18   transaction?

19   A.   No.  What concerns me is the cattle being finished

20   with a projected outdate.

21   Q.   And the cattle in question here, though, you needed to

22   be finished by a certain date to consummate the transaction

23   with Whole Foods, correct?

24   A.   They would help.

25   Q.   How much of a markup did you receive from Whole Foods

1    for the cattle you purchased from Zia?

2    A.   I don't deal with the boxed beef pricing.

3    Q.   This lawsuit has been going for three years, correct?

4    A.   Correct.

5    Q.   I asked you this same question a year ago in your

6    deposition, correct?

7    A.   I believe you did.

8    Q.   You've made no attempt to find out the answer to the

9    question you knew I was going to ask you today, which is

10   exactly what I asked in your deposition -- how much of a

11   markup from Whole Foods -- correct?

12   A.   Correct, I don't know.

13   Q.   It was profitable, correct?

14   A.   It was a good year.

15   Q.   Ms. Gallagher, please put up Exhibit 17.

16        So, six days after that last text, Narciso sends

17   you this e-mail, correct?

18   A.   Yeah.

19   Q.   And had you spoken with Narciso in those six days?

20   A.   I don't recall.

21   Q.   And we can all see, first of all, he says (reading),

22   "Look this over," correct?

23   A.   Yes.

24   Q.   Obviously, there's an attachment to look over,

25   correct?

1    A.   Correct.

2    Q.   And the attachment is the cost plus model, correct?

3    A.   I looked at the top where it says (reading), "show

4    list."  But it does state that right there, yes.

5    Q.   You opened the attachment, correct?

6    A.   Yes, but I always look at the heading before I open an

7    e-mail.  The subject matter.

8    Q.   You opened the attachment entitled "cost plus model,"

9    correct?

10    A.   Correct.

11    Q.   And you see the 17 columns, correct?

12    A.   Correct.

13    Q.   Nine of those columns relate to price, correct?

14    A.   That's what I've been led to understand.

15    Q.   "Been led to understand"?  You've had this document

16    for three years, correct?  You've read these costs at some

17    point, correct?

18    A.   I don't pay attention to them.

19    Q.   When you opened it, this attachment --

20    A.   Correct.

21    Q.   -- on February 4th, you must have seen nine headings

22    about costs, correct?

23    A.   Oh, I did.

24    Q.   Okay.  And are you saying, after all the work Zia put

25    in, you didn't read them, at all?

1    A.   I didn't pay any attention to them.

2    Q.   At the bottom, there's a number, total costs, of

3    16.3 million, correct?

4    A.   Correct.

5    Q.   Narciso went over that box with you, correct, in your

6    Happy, Texas, visit?

7    A.   I don't recall.

8    Q.   All right.  And, again, I don't want to beat this to

9    death, your only response (reading), "This looks good, get

10   them in a finish yard ASAP, please," correct?

11   A.   From an inventory standpoint, yes.

12   Q.   That's not what it says.

13   A.   No, I know.  It says --

14   Q.   I know you want to add this "inventory" part, but you

15   didn't say anything about "inventory" here, correct?

16   A.   Correct.

17   Q.   You never said anything about "this proposal looks

18   good only from an inventory standpoint" until you started

19   getting the bills and the cattle in late May, correct?

20   A.   Yes.

21   Q.   When you're looking at the inventory -- and

22   Ms. Gallagher, can you please put Exhibit 18 on the board.

23        Mr. Scherer, you looked at the first column, the

24   ranch column, correct?

25   A.   Correct.

1     Q.   And you were able to read that pretty clearly,

2   correct?

3     A.   Yeah, Stormy Burch.

4     Q.   You recognized a lot of these, correct?

5     A.   Yes, sir.

6     Q.   In fact, you later went and visited some, correct?

7     A.   Oh, I probably have, yes.

8     Q.   And in every one of these ranches, every one of these

9   locations, after you sent the "looks good" e-mail, either

10  you, personally, or one of your colleagues went and looked

11  at the cattle, correct?

12    A.   Actually, the very next day, I had an invite from a

13  mutual friend to sit down and talk with them.

14    Q.   What does that mean?

15    A.   This gentleman had been bugging me to come to

16  Amarillo, Texas, to meet with a friend of his.

17    Q.   So what does that friend have to do with these

18  ranches?

19    A.   Well, it was the owners of Cuervo Creek.

20    Q.   Cuervo Creek is near Happy, Texas, correct?

21    A.   No, it is not.

22    Q.   Where is Cuervo Creek?

23    A.   North and west of Tucumcari, New Mexico.

24    Q.   So my question was, for every one of these ranches,

25  the cattle described on this chart, after February 4th,

1   either you, personally, or someone under your direction went

2   and looked at every single location, correct?

3   A.   We have 42 buyers in all the United States.  So it's

4   their obligation, if they're in a feedyard, to look at the

5   cattle.

6   Q.   You told them to go look at every one of those,

7   correct?

8   A.   Yes, I did.

9   Q.   And when you got the proposal, either in January or in

10  February 4th, it's got the sex -- steer, heifer --

11  correct?

12  A.   Correct.

13  Q.   You read that, correct?

14  A.   Oh, yeah.

15  Q.   And the estimated remaining head count; you read

16  those, correct?

17  A.   Correct.

18  Q.   Now, Narciso said that three -- they assumed a

19  3 percent death loss rate.  Do you make that same assumption

20  when you're procuring cattle?

21  A.   I use 10 percent.

22  Q.   10 percent?

23  A.   Yes, sir.

24  Q.   All right.  Why do you use 10?

25  A.   Simply because natural cattle do not get all the

1    antibiotics or the medicated feed as a calf.

2    Q.   Okay.  And the next three columns, estimated weight in

3    lean months.  Now, the lean months -- April, May, and

4    June -- those are the months where you need more cattle,

5    correct?

6    A.   That is considered grilling season.

7    Q.   Okay.  Summer barbecues are coming --

8    A.   Yep.

9    Q.   -- 4th of July and all that, correct?

10   A.   Generally get past Easter and away it goes.

11   Q.   So you read the part about the estimated weight in

12   each of those months, correct?

13   A.   Yes.

14   Q.   And you understood what it said, correct?

15   A.   What was the question?

16   Q.   You understood what was conveyed there, correct?

17   A.   I did.

18   Q.   And the next column we have in blue (reading), "Total

19   cost, April 15, May 15, June 15," you saw this on

20   February 4th, correct?

21   A.   Yes.

22   Q.   And you could read this clearly, that the total costs

23   for the first one would be $198,000, correct?

24   A.   Correct.

25   Q.   And then you read total cost per head, same thing,

1    April, May, June, you saw that on February 4th, correct?

2    A.   Yes, sir.

3    Q.   And you understood what that meant, correct?

4    A.   Yeah.

5    Q.   And then you saw, in the green (reading), "Total cost

6    per pound April, May, June," and you could read that

7    clearly, correct?

8    A.   Correct.

9    Q.   You've been buying cattle as director of procurement

10   for several years.  You don't need someone to interpret the

11   weight or price per pound for you, right?

12   A.   Correct.

13   Q.   There's nothing on this chart that you couldn't

14   understand when you read it in February, correct?

15   A.   If I know who was paying the costs.

16   Q.   I know you want to say you're not paying it, but other

17   than that?

18   A.   Sure.

19   Q.   All right.  You understood all -- you didn't need a

20   bunch of backup to understand what "price per pound" is,

21   correct?

22   A.   I would have liked to have known what the cost of the

23   ration was, other integral costs, yardage, stuff like that.

24   Q.   So did you ask for that information?

25   A.   No.

1   Q.   All right.  Tell me the first one.  So, tell me, you

2   would have liked to have known what, now?  Tell me what the

3   two are now.

4   A.   Excuse me?

5   Q.   So you said you would have liked to have known a

6   couple things.  And you said it kind of quickly, and I

7   didn't quite know what you said.  Can you tell me what those

8   are?

9   A.   Corn basis.  Roughage cost.  Total ration cost.

10   Yardage.

11   Q.   What is "corn basis"?  What does that mean?

12   A.   That's corn delivered to your area.

13   Q.   Into a feedlot?

14   A.   To a feedyard.

15   Q.   Why did you need to know that?

16   A.   Because I always like to go to the best finish yards.

17   Q.   Okay.  Now, your testimony is that you didn't intend

18   to pay for the cost of raising the cattle, correct?

19   A.   That's correct.

20   Q.   So the -- you would have liked to have known the corn

21   basis, but, according to your testimony, you weren't going

22   to pay it, either way, correct?

23   A.   That is correct.

24   Q.   All right.  How about "roughage cost"?  What does that

25   mean?

1    A.   Hay.  Corn stalks --

2    Q.   Okay.

3    A.   -- distillers, whatever you find.

4    Q.   Same thing, to feed the animals, correct?

5    A.   Correct.

6    Q.   And under your interpretation of the contract, you

7    weren't supposed to pay for raising them, anyway, so you

8    didn't need to know that either, correct?

9    A.   Nope.

10   Q.   All right.  "Total ration," what does that mean?

11   A.   Total ration costs?

12   Q.   Total ration costs, yes.

13   A.   All the inputs in for a pound of gain.

14   Q.   And, again, under your interpretation, you weren't

15   going to pay those things, either way, correct?

16   A.   Yeah.

17   Q.   And what does "yardage" mean?

18   A.   What the feedyard charges to a customer for bringing

19   calves in to finish them.

20   Q.   So when you received this on February 4th, you

21   understood what all these columns meant, correct?

22   A.   For the most part, yes, sir.

23   Q.   All right.  And you looked down here and you could

24   understand what those costs are, too, correct?

25   A.   Just the totals, yeah.

1    Q.   All right.  Anything ambiguous about any of these to

2    someone like you that's been in the cattle industry for

3    30 years?

4    A.   No.

5    Q.   All right.  And when you said, "Looks good, get them

6    in the finish yard ASAP, please," you never had any

7    intention of paying Zia any of these costs in the final nine

8    columns of the proposal you responded to on February 4th?

9    A.   That is correct.

10   Q.   And you never told Zia until the end of May that you

11   personally never had any intention of paying any of the

12   costs in the final nine columns of Exhibit 18, correct?

13   A.   I never agreed to the contract alleged.

14   Q.   You never told Zia you never had any intention of

15   paying any of the costs of raising these cattle until you

16   started getting the cattle at the end of May, correct?

17   A.   Yes, that's correct.

18   Q.   Well, let me go back over here to the total cost

19   projected for these cattle at the time you received this to

20   raise the cattle, pay the cost associated, was 16,300,000,

21   correct?

22   A.   That's what it says, yes.

23   Q.   You saw this document February 4th, correct?

24   A.   Yes, sir.

25   Q.   All right.  Do you know what the total costs were of

1    raising the cattle when it was all said and done?

2    A.    No, sir.

3    Q.    Do you have any idea?

4    A.    No, sir.

5    Q.    Do you know how much you paid?

6    A.    I'd have to go back and look.

7    Q.    Where would you go look for that, as you're sitting on

8    the witness stand in a trial now?

9    A.    Yeah, I can't right here.

10   Q.    Pardon?

11   A.    I can't from right here.

12   Q.    You're surprised I might ask you in the middle of this

13   trial how much you paid for the cattle?

14   A.    Not at all.

15   Q.    So it...I asked you these same questions a year ago?

16   A.    Correct.

17   Q.    But you didn't think in that time it would be in your

18   interest to look up how much you got from Whole Foods or how

19   much you paid Zia for the cattle you sold to Whole Foods,

20   correct?

21   A.    I might have, but I don't remember.

22   Q.    And the reason you don't remember it now is because

23   it's not going to make Tyson look very good when the jury

24   finds out how much profit Tyson made on this transaction for

25   which it did not pay the costs associated in that proposal

1   you said looks good; is that correct?

2   A.   I don't know.

3   Q.   Pardon?

4   A.   I don't know.

5   Q.   We heard during Mr. Fisher's opening statement that

6   this proposal was missing ingredients, that it was uncertain

7   because it was missing some things that needed to be

8   included, correct?

9   A.   Correct.

10  Q.   Now, you remember, though, that I asked you this

11  question in your deposition:  "What was missing for you to

12  understand how the transaction worked?"  Do you remember

13  that?

14  A.   Vaguely.

15  Q.   You were not able to identify anything about this that

16  was uncertain to you, correct?

17  A.   To the best of my knowledge, yes.

18  Q.   If you wanted to know how much -- just humor me for a

19  moment.  If Tyson is going to pay this, everything is there

20  to tell you how much money you would have to pay for these

21  cattle, 16.3 million, correct?

22  A.   If everything was listed out, yes.

23  Q.   Okay.  Everything is listed out, correct?

24  A.   By entity.

25  Q.   Pardon?

1     A.   By entity.

2     Q.   What do you mean by that?

3     A.   Again, yardage, feed costs, corn basis, roughage

4   costs.

5     Q.   I asked you that in your deposition.  I asked you to

6   tell me what was missing; you didn't name corn basis,

7   roughage cost, total ration costs, or yardage when I asked

8   you that exact question 14 months ago, correct?

9     A.   That is correct.

10    Q.   All right.  And when you were there, represented by

11   two lawyers, you swore to tell the whole truth and nothing

12   but the truth?

13    A.   Correct.

14    Q.   And you didn't come up with corn basis, roughage cost,

15   ration cost, or yardage until you're here testifying in

16   front of the jury, correct?

17    A.   To the best of my knowledge, yes.

18    Q.   Thank you.

19          Which cattle did you personally visit that's set

20   forth in the Exhibit 18?

21    A.   Can you scroll that down a little bit?

22    Q.   Yes.

23    A.   The High Choice cattle.

24    Q.   That's the Cuervo Creek, correct?

25    A.   That would include some Cuervo Creek, yes.

1    Q.   When you visited that cattle, did you have any

2    complaints about how they looked?

3    A.   No.  I said they -- really good genetics.  I've always

4    told Narci he's had genetics.

5    Q.   All right.  Ms. Gallagher, please put Exhibit 21.

6                So in Exhibit 21, you say you need Prewitt's --

7                THE COURT:  Mr. Worden, I don't have that as

8    admitted.

9                MR. WORDEN:  Oh, I'm sorry.

10               THE COURT:  What's Tyson's position on admitting

11   Exhibit 21?

12               MR. FISHER:  We're unopposed, Your Honor.

13               THE COURT:  Okay.  Exhibit 21 is admitted.

14   (Joint Exhibit 21 was admitted into evidence.)

15               MR. WORDEN:  Thank you.

16               THE COURT:  Go ahead.

17   Q.   (BY MR. WORDEN):  Who is Prewitt?

18   A.   I believe he's a partner of Narci's.

19   Q.   It's a feedlot in Montana, correct?

20   A.   Sidney, I believe, yes.

21   Q.   What did you say?  Sidney?

22   A.   Sidney, Montana.

23   Q.   And what is KM?

24   A.   Kendall Martin Feedyard.

25   Q.   Where are they located?

1    A.   Mid-central Kansas.

2    Q.   And both of those are listed on the proposal right

3    here, correct?

4    A.   Yes.

5    Q.   And you obviously read it very carefully in order to

6    tell Narciso you needed some numbers, correct?

7    A.   Yes.

8    Q.   And did Narciso get you the numbers?

9    A.   Yeah.  I was more worried about where the Happy

10   Pasture cattle were going.

11   Q.   Let's please put up Exhibit 133.

12                 (Discussion off the record.)

13            Mr. Scherer, please tell me if you've seen this

14   e-mail before.

15   A.   Yeah.

16   Q.   And you received it on February 18, 2019, two weeks

17   after the "looks good" e-mail, correct?

18   A.   Yes, sir.

19   Q.   All right.  And the title is (reading) "cost plus

20   model corrected," correct?

21   A.   Yeah, the attachment.

22   Q.   Okay.  And then let's look at the attachment, please.

23            And this attachment was there, correct?

24   A.   Yeah.

25   Q.   So now you've received it for the third time, correct?

1    A.   Yes, sir.

2    Q.   And the title of the e-mail is (reading) "cost plus

3    update," correct?

4    A.   I believe that's how the attachment was titled.

5    Q.   So you saw another attachment entitled "cost plus

6    update," so you obviously immediately called Narciso and

7    said, "There's been a big misunderstanding, we never agreed

8    to a cost plus."  You called him and told him that, correct?

9    A.   No, sir.

10    Q.   You texted him and told him that, correct?

11    A.   No.

12    Q.   You e-mailed him and told him, "There is a

13    misunderstanding, we did not agree to a cost plus," correct?

14    A.   No.

15    Q.   You didn't say what you said in the end of May, "I'm

16    not paying for the cost of your calves," when you received

17    yet another cost plus update, correct?

18    A.   No.

19    Q.   Please put Exhibit 134 up.

20         THE COURT:  Counsel, I don't have this as

21    admitted, either.

22         What's Tyson's position on Exhibit 134?

23         MR. FISHER:  Unopposed, Your Honor.

24         THE COURT:  134 is admitted.

25    (Joint Exhibit 134 was admitted into evidence.)

1             MR. WORDEN:  Thank you.

2     Q.  (BY MR. WORDEN):  So this is a response to the

3   corrected cost plus.  And you asked (reading),

4   "What's Valley View?  Why aren't all these cattle in

5   the finish yard?  I'm hearing a lot of stuff going

6   on.  I need assurance these cattle will be ready and

7   available," correct?

8     A.   Correct.

9     Q.   Valley View, is that Rod Prewitt's ranch?

10    A.   That's what I found out, yes.

11    Q.   You already knew who Rod Prewitt was before this?

12    A.   I did.  We had met in Billings.

13    Q.   He's got a big operation in Sidney, as you mentioned?

14    A.   Correct.

15    Q.   All right.  So you clearly read the attachment on

16   February 18th, the cost plus update, because you responded

17   with a question about it, correct?

18    A.   I read the inventory, yes, sir.  And location.

19    Q.   So how do you do that?  I mean, I'm not trying to make

20   fun here.  Do you shield your eyes from the other nine

21   columns?  How do you not read two-thirds of a page?

22    A.   Because I never had an agreement.

23    Q.   But you didn't have an agreement for anything

24   regarding this cattle other than this one, correct?

25    A.   I don't remember.

1   Q.   Where is your e-mail saying, "Narci, we really need to

2   talk about how we're going to pay for this cattle because we

3   don't have anything in place"?  You never did that, did you?

4   A.   No, sir.

5   Q.   Please put up Exhibit 135.  And let's see the next

6   page, please.  Let's go back to the first page.

7          Mr. Scherer, you received this e-mail on

8   March 4th, 2019, attaching an updated cost plus model,

9   correct?

10  A.   Yes, sir.

11  Q.   And you reviewed the attachment, correct?

12  A.   Yes, sir.

13  Q.   And you did not respond in any way to this suggesting

14  you did not agree to the cost plus model for payment,

15  correct?

16  A.   To the best of my knowledge, correct.

17  Q.   Please put up Exhibit 26.

18          THE COURT:  That's not admitted.

19          What's Tyson's position on Exhibit 26?

20          MR. FISHER:  We are -- no objection, Your Honor.

21          THE COURT:  Exhibit 26 is admitted.

22  (Joint Exhibit 26 was admitted into evidence.)

23          MR. WORDEN:  Thank you.

24  Q.   (BY MR. WORDEN):  So you send this e-mail --

25  Hold on.  Let's get it up there.

1            Okay.  Here we go.  So this is later the same

2    day.  You receive the cost plus update and you respond to

3    it...

4            And you respond to it saying you (reading),

5    "...needed inventories tomorrow morning for Beef City, KM,

6    High Choice, and Prewitt," correct?

7    A.   That's what it says, yes.

8    Q.   That's what you wrote, correct?

9    A.   Yeah.

10   Q.   So, obviously, you received the March 4th cost plus

11   update and you obviously reviewed it because you responded

12   to it, correct?

13   A.   I did.

14   Q.   Let's please put Exhibit 27 up, Ms. Gallagher.

15           THE COURT:  That's not admitted.

16           What's Tyson's position on Exhibit 27?

17           MR. FISHER:  No objection, Your Honor.

18           THE COURT:  Objection -- Exhibit 27 admitted.

19   (Joint Exhibit 27 was admitted into evidence.)

20           MR. WORDEN:  Thank you, Your Honor.

21               (Discussion off the record.)

22   Q.  (BY MR. WORDEN):  Now, this is a text from

23   Narciso to you a few days later, correct?

24   A.   Yes.

25   Q.   It says (reading), "Ty said you were happy with his

1    cattle."  Do you understand who Ty is by reading this?

2    A.    You bet I do.

3    Q.    Who is Ty?

4    A.    Ty Rumford, manager at High Choice at the time.

5    Q.    So this is in March.  Had you just visited the High

6    Choice ranch?

7    A.    High Choice ranch or feedyard?

8    Q.    Feedyard, I'm sorry.

9    A.    Yeah, we drove through the feedyard on our way back

10   from New Mexico.

11   Q.    But this is in March, this is March 14.

12   A.    That is correct.

13   Q.    This is about six weeks later, then, when you -- you

14   drove back from where?

15   A.    I said "New Mexico."

16   Q.    Okay.  But were you in New Mexico looking at some of

17   these cattle?

18   A.    We were meeting with a rancher.

19   Q.    Was this rancher involved with this transaction?

20   A.    I believe some of his cattle were in there.

21   Q.    Who is that?

22   A.    Cuervo Creek.

23   Q.    So maybe I misunderstood.  I thought you had visited

24   Cuervo Creek when you were down in Happy, Texas?

25   A.    We met with them and another cattle feeder who was a

244

1    mutual friend of theirs.

2    Q.   All right.  Let's please put up Exhibit 28.

3          And you respond (reading), "Damn good-looking

4    cattle, even on a rainy, crappy day."  That was after you

5    look at Cuervo Creek, correct?

6    A.   That is correct.  I drove in the rain all the way from

7    Amarillo, Texas.

8    Q.   And this was part of the cattle in the cost plus

9    proposal, correct?

10   A.   I believe they're listed in there, yes.

11   Q.   All right.  Please put Exhibit 146 up.

12          THE COURT:  146 hasn't been admitted.

13          What's Tyson's position on Exhibit 146?

14          MR. FISHER:  No objection, Your Honor.

15          THE COURT:  Exhibit 146 is admitted.

16   (Joint Exhibit 146 was admitted into evidence.)

17   Q.   (BY MR. WORDEN):  In April, were you still

18   trying to get Zia to add more cattle to this

19   transaction or event?

20   A.   I don't remember.

21   Q.   Do you remember, after you sent the "looks good"

22   e-mail on February 4th, you continued to call Narciso

23   saying you'd take more cattle if he could get it?

24   A.   I don't remember.

25   Q.   Just no recollection, either way?

1    A.   I simply don't remember.

2    Q.   Justin Nelson is on this e-mail.  Do you see that,

3    sir?

4    A.   Yes, sir.

5    Q.   I didn't see him on the prior e-mails.  Do you have a

6    recollection of why he was starting to be included now

7    or...an explanation for that?

8    A.   Well, to the best of my knowledge, right up prior to

9    this date this e-mail was sent, I was in Italy for

10   two weeks, so that's maybe why he contacted Justin.

11   Q.   Okay.  That's a good explanation.

12             Please put Exhibit 29 up.

13             THE COURT:  Exhibit 29 has not been admitted.

14             What's Tyson's position on Exhibit 29?

15             MR. FISHER:  No objection.

16             THE COURT:  Exhibit 29 is admitted.

17   (Joint Exhibit 29 was admitted into evidence.)

18   Q.   (BY MR. WORDEN):  Now, this is an e-mail from

19   Narciso to Justin Nelson, you, and Sean.  Do you

20   remember getting this e-mail?

21   A.   Yeah, I do.

22   Q.   Okay.  Was this when you might have still been in

23   Italy and Mr. Nelson was covering the desk or...

24   A.   I would have been back by now.

25   Q.   All right.

1              Mr. Perez says (reading), "I hope you are all

2    well.  Cattle in question:  The Myers Ranch cattle.  I

3    showed these cattle to Bob in Happy, Texas, when they were

4    on wheat.  I am sure he remembers these beautiful red cattle

5    that he and I discussed would fit November and December."

6              Do you see that?

7    A.   I do.

8    Q.   Do you remember this discussion about additional

9    cattle for November and December?

10   A.   Just the numbers, in general, for the months.

11   Q.   Because, Myers cattle, they're not included in

12   Exhibit 18, the chart over in the corner, correct?

13   A.   I don't believe so.

14   Q.   You were starting to talk about getting cattle from

15   Zia to do a different transaction later in the year; is that

16   accurate?

17   A.   Yeah.

18   Q.   All right.  Please look at Exhibit 31.

19             THE COURT:  Exhibit 31 has not been admitted.

20             What's Tyson's position on Exhibit 31?

21             MR. FISHER:  No objection, Your Honor.

22             THE COURT:  Exhibit 31 is admitted.

23   (Joint Exhibit 31 was admitted into evidence.)

24             MR. WORDEN:  Thank you.

25   Q.   (BY MR. WORDEN):  Okay.  Exhibit 31 is an

UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1    e-mail dated May 10, 2019.  At the top, it's Mike to

2    Narciso; attached is the updated cost plus model.

3    And am I correct he then forwarded that to you?

4    A.   Yes.

5    Q.   All right.  And it's attaching two cost plus models,

6    correct?

7    A.   Yes.

8    Q.   One that you've already discussed and one for some

9    additional cattle later, correct?

10   A.   I believe so.

11   Q.   All right.  So now this is about the sixth document

12   you've received that says "cost plus" on it with an

13   attachment entitled "cost plus."  So, at that point, did it

14   occur to you that perhaps Zia was acting under the

15   impression that when you said "looks good," you meant "looks

16   good" to the cost plus agreement?

17   A.   I have no idea.

18   Q.   You still didn't have any cattle yet, though, correct?

19   A.   Oh, we had cattle.

20   Q.   From Zia.

21   A.   Oh, I don't recall.

22   Q.   All right.  Most of the cattle came a little later,

23   though, correct?

24   A.   I don't remember.

25   Q.   Why didn't you respond to this e-mail and say, "I know

1    you've sent me six cost plus updates, but I'm not agreeing

2    to a cost plus; let's be clear about this"?

3    A.    I don't know.

4    Q.    Please put Exhibit 36 up.

5          So, Mr. Scherer, this is a document from Mike

6    Rogers to Narciso; attached is the updated cost plus model

7    and the Prewitt invoice for the 83 head sacrificed on

8    May 18, 2019.

9          Do you remember receiving this e-mail forwarded

10   to you by Narciso later that day on April 22nd?

11   A.    I'm sure I do.

12   Q.    This is the first e-mail that I'm aware of discussing

13   any cattle being ready for sacrifice.  Do you believe that

14   to be true or do you know otherwise?

15   A.    To the best of my knowledge, yes.

16   Q.    All right.  And then Zia started sending you bills,

17   correct?

18   A.    To the best of my knowledge.

19   Q.    They started sending you bills for the care and

20   feeding, et cetera, of the calves for Tyson to pay, correct?

21   A.    I believe that's what their intent was, yes.

22   Q.    All right.  Please put Exhibit 151 up.

23         Please tell me if you recognize this e-mail.

24   A.    Yes, sir.

25   Q.    All right.  And there were invoices attached, correct?

1      A.   I believe.

2      Q.   February 23, you get the first e-mail mentioning

3   cattle being ready for sacrifice.  February 24, you get

4   invoices.  I'm sorry, I'm sorry.  Not February.  May 23, you

5   get the e-mail saying the cattle are ready to be sacrificed.

6   May 24 you get the cattle invoices are starting to come.

7   And then you respond on May 25.  Do I have the chronology

8   correct?

9      A.   I believe so.

10     Q.   (Reading) "I'm not paying for the cost of calves.

11   That's not what we do.  What are you trying to do here?"

12   You sent this to Narciso very early in the morning of

13   May 25, correct?

14     A.   Correct.

15     Q.   At this point, the cattle are either already being

16   sacrificed or are very close, correct?

17     A.   The first group, yeah.

18     Q.   Zia has been locked in on this deal with you for

19   roughly 9,000 head for basically four months -- February,

20   March, April, May -- correct?

21     A.   I believe so.

22     Q.   When you received the seven different, seven separate

23   e-mails giving the cost plus costs, you could have said in

24   response to any one of them, "I'm not paying for the cost of

25   the calves, that's not what we do, what are you trying to do

1   here," correct?

2    A.   Yeah, I guess I could have, yeah.

3    Q.   But you didn't send this until the calves -- the cows

4   were ready to be sacrificed and you started getting bills,

5   correct?

6    A.   That is correct.

7    Q.   Because you knew all along that, if you made a fuss

8   about the cost plus agreement, Zia wouldn't send you the

9   cattle for your Whole Foods deal, correct?

10   A.   I don't recall.

11   Q.   Is there any other explanation for the fact that, as

12   you've already testified, you never intended, on

13   February 4th, to pay any of the costs on the latter nine

14   columns; between February 4 and May 25, the better part of

15   four months -- why you never, during any of that period,

16   said "I'm not paying the cost of the calves" other than you

17   wanted Zia to continue sending you the cattle which you

18   needed for your deal and you knew, if you rocked the boat,

19   you wouldn't get them?

20   A.   I don't agree.

21   Q.   Where is the other e-mail?  Where is any objection,

22   ever, to any of these costs?

23   A.   I never agreed to a deal.

24   Q.   So you get the cattle now.  There's no other deal on

25   the table, correct?

1    A.   To my knowledge.

2    Q.   All right.  So now that you get cattle, you're going

3    to pay what you want to pay, correct?

4    A.   I paid whatever was negotiated.

5    Q.   There was nothing negotiated here, ever -- we covered

6    that -- except for the February 4th cost plus agreement,

7    correct?

8    A.   Whatever was in the pricing is how they were paid.

9    Q.   There's nothing in the pricing that was negotiated,

10   Mr. Scherer.  You told me that an hour ago, correct?

11   A.   I probably did, yeah.

12   Q.   All right.  So there's nothing else negotiated.  So

13   you decide how to pay Zia based on what you wanted to pay

14   all along, correct?

15   A.   Can you rephrase the question?

16   Q.   The total costs here were 16.3 million.  You paid

17   12.5.  Do you have any reason to disagree with that?

18   A.   No, I believe that's what you showed.

19   Q.   Okay.  And you knew I was going to ask you that

20   question for the last year.  You didn't look that up,

21   correct?

22   A.   No, I did not.

23   Q.   Okay.  How did you determine to pay the 12.5 million

24   and not 16.3 or some other number?

25   A.   I never looked at a total head number.  I just -- I

1    looked at it by lot, by cattle, by day.  And if Verna had

2    the pricing, that's what she entered to the accountant

3    group.

4     Q.   Verna wasn't on any of these cost plus e-mails,

5    correct?

6     A.   That is correct.

7     Q.   Did you ever tell Verna you received seven different

8    e-mails with a cost plus agreement attached to it and, in

9    one of them, you said "looks good, get it done ASAP"?  Did

10   you ever tell anyone until after this?

11    A.   I just shared it with Verna as inventory.

12    Q.   You didn't share the cost plus agreement with Verna,

13   did you?

14    A.   I printed it off and showed her, yes.

15    Q.   So Verna saw the costs, as well?

16    A.   She saw the inventory that we looked at.

17    Q.   What's Verna's position?

18    A.   She's hedging manager, slash, scheduler.

19    Q.   So you and the hedging manager, Verna Barrett [sic],

20   both have the costs, and yet she puts down some other

21   number?

22    A.   Whatever Narci and John agreed to the year prior.

23    Q.   We've talked about that, Mr. Scherer.  There's not

24   going to be any evidence before this jury about whatever

25   John and Narci agreed to, correct?

1    A.   I guess so.

2    Q.   And, if they had agreed to it, Narciso told you

3    for weeks, "We're not doing the old deal, we lost

4    4 million," correct?

5    A.   I believe he said that, yeah.

6    Q.   So you know that's not going to be the deal here,

7    correct?

8    A.   Yeah.

9    Q.   But you put it in the book to pay that amount anyway,

10   even though you knew, the whole time, he had rejected that

11   and forwarded you a different proposal that you approved,

12   correct?

13   A.   That what?

14   Q.   That you approved, correct?

15   A.   That I approved?

16   Q.   You knew, the whole time, you were going to pay the

17   number you thought somebody proposed a year earlier,

18   regardless of any proposal, correct?

19   A.   Because I did not have a cost plus deal.

20   Q.   At some point, did you discuss this situation with

21   Mr. Nelson, that you received a bill that Zia expected to be

22   paid according to a cost plus agreement?

23   A.   Correct.

24   Q.   How did that conversation come about?

25   A.   Same way I've described it.  I told him I was looking

254

1    at it as an inventory, and here's what we got.

2    Q.    Did he call you into his office?  What happened?

3    A.    Oh, we talked at the desk and then we went into the

4    conference room.

5    Q.    Did you share with him all of the cost plus e-mails?

6    A.    I told him there's been multiple numbers.

7    Q.    Did you share with him all of the cost plus update

8    e-mails?

9    A.    Not all of them, no.

10   Q.    Did you share any of them with him?

11   A.    Shared one, yeah.

12   Q.    Which one?

13   A.    The very last one we received.

14   Q.    How about the first one where you responded "looks

15   good"?  Did you share that with your boss when he asked

16   about this?

17   A.    He didn't ask about it until then.

18   Q.    When he asked about it, did you tell him, "By the way,

19   they sent me this proposal in February, and I responded,

20   'looks good'"?  Did you share that e-mail with him?

21   A.    I told him that I approved the inventory, yes.

22   Q.    Did you share that February 4th e-mail with

23   Mr. Nelson?

24   A.    I don't recall.

25   Q.    Were you nervous, after being demoted the year before

1    for inventory mismanagement, that -- with Zia, that this

2    might create some issues for you?

3    A.   No, sir.

4    Q.   Do you now know, from any source, what Zia's

5    out-of-pocket costs -- just the out-of-pocket costs, not

6    talking about any premium, the out-of-pocket costs were to

7    raise the cattle that you took and sold to Whole Foods?

8    A.   I believe he listed that on the bottom here, doesn't

9    he?

10   Q.   Well, it --

11   A.   Out-of-pocket, I don't know.

12   Q.   Okay.  So I said in opening statement -- and we're

13   going to hear a witness on this, but I said 13,647- --

14   excuse me.  I said $15,270,000 were Zia's actual just plain

15   old out-of-pocket costs for the cattle that were involved in

16   this -- on this proposal Exhibit 18.  Do you have any reason

17   to believe that, either way?

18   A.   You said it.  I believe you.

19   Q.   Were you, at all, concerned that you paid Zia

20   $15,595,000 for cattle that cost in feed, freight,

21   out-of-pocket, $15,270,000?  Make any difference to you that

22   they're 2.7 million under their cost because of what you

23   paid?

24   A.   How do you -- can you repeat what you would like me to

25   say here?

1    Q.    I'd like to know whether, when you sent the "I'm not

2    paying for your calves" e-mail and you talked to Mr. Nelson,

3    did it concern you that the amount you and, apparently,

4    Verna had decided to pay was 2.7 million less than Zia's

5    costs, not counting any markup or premium?

6    A.    I did not realize any difference.

7    Q.    Narciso called you several times to talk about it,

8    correct?

9    A.    He called.

10   Q.    You didn't answer, correct?

11   A.    I might not have been in the office.

12   Q.    He left you voicemails, and you never responded to

13   them, correct?

14   A.    I don't recall.

15   Q.    So he called Kevin Hueser; do you know that?

16   A.    I don't recall.

17   Q.    Do you know if he called Justin Nelson?

18   A.    I have no clue.

19   Q.    All right.  Why didn't you call him back and say,

20   "Let's talk about this"?

21   A.    All depends on where I was at.  I'm out of the office

22   quite a bit.  If it was a voice message on my office phone,

23   I probably wasn't there to get it.

24   Q.    Where did Mr. Perez usually call you?  On your cell

25   phone, correct?

1    A.   At times, but he would also call me in the office

2    quite a bit.

3    Q.   And you never got back to the office to return that

4    call?

5    A.   At times, I would.  At times, I didn't.

6    Q.   Why at this time did you not return any of his calls?

7    A.   I don't recall.

8    Q.   You know, giving you the benefit of every doubt

9    there's been a huge misunderstanding, you know they're

10   upset, you know they lost 4 million the last year in a

11   transaction, don't you think that's something you might want

12   to return that call?

13   A.   Yeah, it's a bad deal.

14   Q.   Bad deal for Zia, correct?

15   A.   Bad deal how you buy the calves and what the market is

16   at trade.

17   Q.   Worked out very well for Tyson, correct?

18   A.   I cannot "yea" or "nay" to that.

19   Q.   We're going to hear testimony, I'm assuming tomorrow,

20   from Dr. Justin Benavidez from Texas A&M; are you aware of

21   that?

22   A.   Yes.

23   Q.   Do you know him?

24   A.   Met him last night.

25   Q.   You had a Zoom with him, though, a year ago, correct?

258

1    A.   I don't believe I did.

2    Q.   Were you ever on a call or Zoom with him ever before

3    last night?

4    A.   I don't believe so.  I don't recall.

5    Q.   All right.  You know he's -- he had nothing to do with

6    this transaction, correct?

7    A.   Correct.

8    Q.   You know Tyson's paying his way, paying his expenses,

9    paying an hourly rate of -- I'm going to guess, 20,000;

10   we'll find out tomorrow -- to come in here and testify,

11   correct?

12   A.   All I know is he's coming here.

13   Q.   He never -- you never talked to him to give him your

14   side of the story?

15   A.   No, sir.

16   Q.   All right.  I'm going to try to wrap this up soon.

17          The -- you remember I asked you in your

18   deposition if you have contracts with any of the people who

19   supply you beef, correct?

20   A.   Contract, be it CME or what?

21   Q.   Anything.  I mean, do you have any contract with them?

22   A.   No.

23   Q.   Okay.  You don't have CME contracts with any of them,

24   either, right?  You don't have a written contract with

25   anyone?

1    A.   We might have a written CME contract with cattle

2    feeders, yes.

3    Q.   Okay.  The -- what is "CME"?

4    A.   "Chicago Mercantile Exchange."

5    Q.   How does that differ from the Nebraska weighted

6    average?

7    A.   It's based on the board price.  Chicago Board of

8    Trade.

9    Q.   Why would one look at the CME as opposed to the NWA?

10   A.   Well, it depends on their preference.  It depends on

11   their lending institution, I believe, and having a contract

12   with a packer or a hook.

13   Q.   So I asked you in your deposition how many different

14   Zias do you do business with?  And I believe you said there

15   were about 200?

16   A.   200 suppliers, yes, sir.

17   Q.   Okay.  And the vast majority, then, you don't have any

18   contract with, correct?  Not a written contract.

19   A.   No.  What we installed in 2018 when I took the program

20   back over was called a..."cattle commitment form" that we

21   directly work with the feedyards.  And they line out the

22   cattle by month, what the quality of the cattle is, whether

23   it's GAP, verified natural, NHTC, and they put a price per

24   head, premium.

25   Q.   So I asked you in your deposition how many of those

1    suppliers there are.  And do you recall saying about 200?

2    A.   Yes, sir.

3    Q.   And I also asked you, "You can't possibly remember

4    these numbers," so you -- I believe you told me you'd tell

5    Verna; she'd put it down somewhere, correct?

6    A.   What number?

7    Q.   You couldn't remember the arrangement with all 200.

8    And I asked you how did you remember them all, since they're

9    not in writing.  And you told me you told Verna, and she'd

10   mark it down somewhere, correct?

11   A.   Yes, sir.

12   Q.   All right.

13            Please pull up Exhibit 39.

14            While we're pulling that up, let me just ask you

15   some names.  So there's an e-mail we're about to see written

16   to some people.  One is Richard Hoff.  Who is that?

17   A.   Cattle buyer.

18   Q.   Where is he located?

19   A.   He lives in -- just north of Scott City, Kansas.

20   Q.   You said he's a cattle what?  I'm sorry.

21   A.   Cattle buyer.

22   Q.   Okay.

23   A.   He covers that area for High Choice.

24   Q.   What is High Choice?

25   A.   Feedyard, finish feedyard.

1    Q.   Does he work for High Choice Tyson or otherwise?

2    A.   He works for Tyson.

3    Q.   And then Jacob Bach, who is he?

4    A.   Cattle buyer.

5    Q.   For Tyson?

6    A.   For Tyson.

7    Q.   Kevin Allison, who is he?

8    A.   Cattle buyer, Tyson.

9    Q.   Mike Wier, cattle buyer for Tyson?

10   A.   Cattle buyer for Tyson.

11   Q.   Melvin Bishop, cattle buyer for Tyson?

12   A.   Correct.

13   Q.   And then Justin Nelson, your former boss, correct?

14   A.   Yes, sir.

15   Q.   Ms. Gallagher, if we could blow it up just a little

16   bit, please.

17          So this is the e-mail you sent to a number of

18   Tyson employees, correct?

19   A.   Yes, sir.

20   Q.   You said (reading), "Yesterday, I received an e-mail

21   from one of our suppliers who finish cattle for Zia Ag

22   stating, 'Send all of the feed bills, cost of cattle, and

23   all incremental to Tyson in an invoice form.'"

24          Who was the supplier that sent that?

25   A.   Excuse me?

1    Q.   Who was the supplier that you heard from?  You said,

2    "Yesterday, I received an e-mail from one of our suppliers."

3    Do you remember who?

4    A.   I don't remember which one it was.

5    Q.   You wrote back (reading), "We do not have any such

6    agreement with Zia Ag.  Let me repeat this:  We do not have

7    any such agreement.  We will continue to pay for the cattle

8    as we always have using the Nebraska weighted average and

9    agreed-upon premiums."

10            Do you see that, sir?

11   A.   Yes, sir.

12   Q.   But it's not correct that you had always paid Zia

13   according to the Nebraska weighted average, correct?

14   A.   Had I paid them?

15   Q.   The times prior to this...

16   A.   It depended if they had a contract with the CME or --

17   that went through us and Mark Lytle or we paid them on

18   Nebraska weighted average, dressed, delivered.

19   Q.   So sometimes it was Nebraska weighted average, plus a

20   certain premium, correct?

21   A.   Yeah.

22   Q.   And then sometimes it was Nebraska weighted average

23   and a different premium, correct?

24   A.   It depended on what classification of cattle they are.

25   Q.   And then sometimes, with Zia, it was CME --

1    A.    Plus.

2    Q.    -- for a certain premium?

3    A.    Plus the premium.

4    Q.    And then sometimes CME for a different premium,

5    correct?

6    A.    Depending on the cattle type, yes.

7    Q.    All right.  So when you say (reading), "We will

8    continue to pay for the cattle as we always have, using the

9    Nebraska weighted average," you hadn't always paid with the

10   Nebraska weighted average, correct?

11   A.    Correct.

12   Q.    In fact, you'd only had one transaction, ever, where

13   you paid Zia according to the manual, correct?

14   A.    I don't recall.

15   Q.    And that was the transaction where you left the cattle

16   in the yard for 12 months correct?

17   A.    I don't recall.

18   Q.    So when you say "and the agreed-upon premiums," there

19   were no agreed-upon premiums, at all, in this case, correct?

20   A.    I don't recall.

21   Q.    Do I understand that Mr. Kevin Hueser is going to

22   testify here in this trial?

23   A.    That is correct, to my knowledge.

24   Q.    Okay.  Did he have any involvement, whatsoever, in

25   this transaction?

1    A.   I don't believe so.

2    Q.   What does Mr. Hueser do as a job responsibility right

3    now?

4    A.   Currently today?

5    Q.   Yes, currently today.

6    A.   Today, he is waiting to retire.

7    Q.   Is he working on a particular project?

8    A.   He does some stuff; proof feed bills, stuff like that.

9    Q.   He's working on one particular project, correct?

10   A.   That is correct.

11   Q.   He works from home and spends his whole time on the

12   one particular project we talked about in Washington that

13   got Mr. Nelson -- that resulted in his change of employment,

14   correct?

15   A.   That is correct.

16   Q.   All right.

17   A.   But not from home.  He's actually in the office now.

18   Q.   Okay.  But, I'm sorry, maybe you answered this, and I

19   missed it:  Did he have anything to do with this

20   transaction?

21   A.   Zia?

22   Q.   This Zia transaction.

23   A.   No, sir.

24   Q.   Ms. Gallagher, please put up Exhibit 60.

25           THE COURT:  Did you say "61," Mr. Worden?

1                    MR. WORDEN:  6-0.

2                    THE COURT:  6-0 has not been admitted.

3                    What's Tyson's position on 60?

4                    MR. FISHER:  No objection, Your Honor.

5                    THE COURT:  Exhibit 60 is admitted.

6      (Joint Exhibit 60 was admitted into evidence.)

7                    MR. WORDEN:  Thank you.

8                    THE COURT:  Also, Mr. Worden, just so you know,

9      we're going to break in about five minutes.  So if you want

10     to let me know when is a good time for you, that's fine.

11                   MR. WORDEN:  I'm trying to speed up.

12                   THE COURT:  If you want to go a little over,

13     that's okay, too, but just give me a good breaking point

14     here soon.

15                   MR. WORDEN:  I'm trying to finish with the

16     witness for the day.

17                   THE COURT:  If you don't have that much to finish

18     with the witness, that's fine, we'll finish the witness.  So

19     go ahead.

20                        (Discussion off the record.)

21      Q.  (BY MR. WORDEN):  And then, Ms. Gallagher, can

22     you just scroll through it slowly, so Mr. Scherer

23     can eyeball it.

24                   And, Mr. Scherer, as she does this, can you tell

25     me whether you recognize it.

1   A.   Yeah.   These are off our website for Open Prairie

2   natural cattle.

3   Q.   What is Open Prairie natural cattle?

4   A.   Verified natural beef.

5   Q.   Now, is "Open Prairie" a particular brand name of

6   Tyson Fresh Meats?

7   A.   Yes, sir.

8   Q.   Okay.   And then where is Open Prairie verified natural

9   meat sold?

10   A.   It goes all over the place.   We do a lot with

11   Chipotle.   We do some business, with the grinds and

12   trimmings, with Shake Shack, kind of a gourmet burger on the

13   East Coast; various restaurants and other retailers.

14   Q.   And supermarkets, too?

15   A.   They're starting to pick up more and more, yes, sir.

16   Q.   Please turn to page -- the second page, Ms. Gallagher.

17   There is a section entitled "Improving Your Margins."

18        So while we're getting that, who is the audience

19   for this?

20   A.   Consumer.

21   Q.   Okay.   Technical difficulties.   We'll get it here in a

22   moment.

23   A.   It happens.

24   Q.   Yeah.   Thank you.

25             (Discussion off the record.)

1          MR. WORDEN:  Your Honor, while we are getting the

2     document, I promise I have a couple questions on this and

3     then I'm done with Mr. Scherer.

4          THE COURT:  That's fine.

5          MR. WORDEN:  We can probably break a

6     couple minutes early.

7          THE COURT:  That's fine.

8          MR. WORDEN:  Okay.

9     Q.   (BY MR. WORDEN):  So, Mr. Scherer, you said,

10    "the consumer," but it says (reading), "improving

11    your margins."  Who is Tyson Fresh Meats talking to

12    here?

13    A.   Probably retail.

14    Q.   So it says -- and I realize this is a little dated --

15    it says (reading), "The natural fresh beef category has

16    shown consistent and significant growth."

17          Is that true, though, today?  The last few years,

18    has there been consistent and significant growth?

19    A.   It has been.

20    Q.   Okay.  And, at least during this period (reading),

21    "There was a 250 percent total increase in dollar sales over

22    the five-year period from 2004 to 2008."

23          Has there been consistent exponential growth in

24    this market?

25    A.   Yeah.  We've hit price points a couple times during

1    that.

2    Q.   All right.  The prices you're able to sell this cattle

3    have consistently gone up the last several years, correct?

4    A.   It's had to because the cost of the cattle have gone

5    up.

6    Q.   So the last -- in the five years before 2019 when this

7    transaction came along, the amount Tyson Fresh Meats was

8    able to receive for the finished cattle from restaurants,

9    supermarkets had gone up a great deal during that five-year

10    period, correct?

11    A.   I know it went up.  I just don't know how much.

12    Q.   Conversely, the amount, during that five-year period,

13    you were paying to the Zias of the world who were providing

14    the cattle had gone down compared to the five years before

15    that, correct?

16    A.   I don't recall.

17    Q.   When you met Dr. Benavidez last night, how did you

18    meet him?

19    A.   Shook his hand.

20    Q.   Pardon me?

21    A.   Shook his hand.

22    Q.   Did you --

23    A.   At our hotel.

24    Q.   All right.  And was he present as you were preparing

25    to give your testimony today?

1    A.    No, sir.

2    Q.    Okay.  Did you have preparation to give your testimony

3    today?

4    A.    Back couple days ago.

5    Q.    You met with lawyers, correct?

6    A.    I did.

7    Q.    Okay.  Do you know anything about Dr. Benavidez'

8    testimony?

9    A.    Like I said, I met him last night for the first time.

10    Q.    Did anyone give you his transcript from the deposition

11    I took of him last year where he describes what his opinions

12    are?

13    A.    No, sir.

14              MR. WORDEN:  That's all I have.  Thank you,

15    Mr. Scherer.

16              THE WITNESS:  Thank you.

17              THE COURT:  All right.  Thank you.  We're going

18    to go ahead and break for the day.  It's five o'clock.

19    We'll see you back here at 8:30 in the morning to continue.

20              All rise for the jury.

21              I'm sorry, I didn't give my night warning.  Hold

22    on one second.  I'm sorry.

23              When you leave here, your friends or family may

24    ask you about your day of jury duty.  As I mentioned

25    yesterday, you may not discuss any of the evidence with

1    anyone until the trial is concluded and I dismiss you.

2    Again, this includes family and close friends.  You must not

3    hear or read about the trial or do any sort of research on

4    your own.  The reason is that your decision in this case

5    must be made solely on the evidence presented in trial.

6            Thank you.  We'll see you tomorrow.

7                    (Jury not present.)

8            All right.  You may be seated.

9            And, sir, you can return to counsel table.

10           Counsel, besides the cross and potential redirect

11   of this witness, I count three remaining witnesses:  The

12   second Mr. Perez, the expert Benavidez, and Mr. Hueser.  Any

13   other witnesses that I'm missing from Zia?

14           MS. DIAMOND:  No, Your Honor.

15           THE COURT:  From Tyson?

16           MR. FISHER:  No, Your Honor.

17           THE COURT:  So the representations about

18   potentially concluding tomorrow, do you think that can

19   happen with this many witnesses, or what do the parties

20   think?

21           MR. WORDEN:  I think -- well, I guess --

22           THE COURT:  Come up to the mic.

23           MR. WORDEN:  -- (inaudible) Mr. Fisher, but I

24   think these three will be substantially shorter than the two

25   we've had.

1            (Reporter attempted interruption for clarification.)

2                    THE COURT:  Okay.  So you think maybe tomorrow,

3     still, then?

4                    MR. WORDEN:  Pardon me?

5                    THE COURT:  You think maybe we'll still end

6     tomorrow, do instructions and closings?

7                    MR. WORDEN:  That's ambitious, but maybe.

8                    THE COURT:  Okay.

9            What do you think?

10                    MR. FISHER:  I think there would be no difficulty

11     getting through all the witnesses tomorrow.  Closing may be

12     a bit longer than that.

13                    THE COURT:  Okay.  So maybe do all the witnesses

14     tomorrow and then potentially do instructions and closings

15     Thursday morning and give it to the jury then?

16                    MR. WORDEN:  That's -- I think that's very

17     doable.  And, certainly, I suspect I speak for Mr. Fisher as

18     well, I would prefer to have some time to digest the

19     testimony --

20                    THE COURT:  I understand --

21                    MR. WORDEN:  -- and organize a little bit.

22                    THE COURT:  -- I understand.

23                    MR. FISHER:  I agree, Your Honor.

24                    THE COURT:  Okay.  That will be an outline of our

25     game plan, is to get through everybody else tomorrow, which

1    will give you-all the advantage of having overnight to

2    prepare closings and PowerPoints and whatever y'all are

3    doing for closings.  And we'll give instructions and close

4    in the morning.

5              Okay.  Anything else I can help either side with?

6              Zia?

7              MR. WORDEN:  No, thank you, Your Honor.

8              THE COURT:  Tyson?

9              MR. FISHER:  I don't believe so, Your Honor.

10             THE COURT:  All right.  We'll see you at 8:30 in

11   the morning.  Thank you both.

12    (The proceedings adjourned at 5:02 P.M. and reconvened on

13             Wednesday, July 13, 2022, at 8:32 A.M.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 UNITED STATES OF AMERICA

 2                 DISTRICT OF NEW MEXICO

 3

 4            CERTIFICATE OF OFFICIAL REPORTER

 5      I, Vanessa I. Alyce Chavez, CRR, RPR, NMCCR, and

 6 Federal Official Court Reporter in and for the United States

 7 District Court for the District of New Mexico, do hereby

 8 certify that pursuant to Section 753, Title 28, United

 9 States Code, that I did report in stenographic shorthand to

10 the best of my skill and ability the foregoing pages 1-272

11 of Volume II of IV of the proceedings set forth herein, that

12 the foregoing is a true and correct transcript of the

13 stenographically recorded proceedings held in the

14 above-entitled matter and that the transcript page format is

15 in conformance with the regulations of the Judicial

16 Conference of the United States.

17

18 Dated this 3$^{rd}$ day of August 2022.

19

20 S/Electronically Filed_____
   Vanessa I. Alyce Chavez, CRR, RPR, NMCCR
21 Federal Official Court Reporter
   100 N. Church Street
22 Las Cruces, NM 88001
   Phone: (575) 528-1430
23 E-mail:  Vanessa_Alyce@nmd.uscourts.gov

24

25
```