```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF NEW MEXICO

 3


 4
     ZIA AGRICULTURAL CONSULTING,  )
 5   LLC.,                         )
                                  )
 6                 Plaintiff,      )
                                  )
 7            vs.                  )  NO: 20-CV-445 MIS-JHR
                                  )
 8   TYSON FRESH MEATS, INC.,      )
                                  )
 9                 Defendant.      )

10

11

12                TRANSCRIPT OF PROCEEDINGS
                        JURY TRIAL
13                    VOLUME III OF IV
           BEFORE THE HONORABLE MARGARET I. STRICKLAND
14              UNITED STATES DISTRICT JUDGE
                 WEDNESDAY, JULY 13, 2022
15                      8:32 A.M.
           LAS CRUCES, DOÑA ANA COUNTY, NEW MEXICO
16

17

18

19

20

21       (Proceedings recorded by machine shorthand and
     transcript produced by Computer-Aided Transcription.)
22
     REPORTED BY:    VANESSA I. ALYCE CHAVEZ, CRR, RPR, NMCCR
23                   Federal Official Court Reporter
                     100 N. Church Street
24                   Las Cruces, NM  88001
                     Phone:  (575) 528-1430
25                   E-mail:  Vanessa_Alyce@nmd.uscourts.gov
```

```
 1    Appearances of Counsel:

 2
          FOR THE PLAINTIFF:
 3
                    VENABLE, LLP
 4                  101 California St., Ste. 3800
                    San Francisco, CA 94111
 5                  (415) 653-3750
                    BY:  JOHN S. WORDEN, ESQ.
 6                       SARAH E. DIAMOND, ESQ.

 7    Also Present:  Sean Perez, Zia Agricultural Consulting
                     Narciso Perez, Zia Agricultural Consulting
 8                   Zoe Gallagher, Venable, LLP, staff

 9
          FOR THE DEFENDANT:
10
                    MAYER, LLP
11                  9400 Holly Ave. NE, Bldg. 3 St.
                    Albuquerque, NM  87122
12                  (505) 483-1840
                    BY:  BRIAN J. FISHER, ESQ.
13
                    and
14
                    TYSON FOODS
15                  Law Department
                    Global Litigation and Investigations
16                  2200 Don Tyson Pkwy.
                    Springdale, AR  72762
17                  (479) 290-4120
                    BY:  DANIEL GOMEZ, ESQ.
18

19    Also Present:  Robert Scherer, Tyson representative
                     Norma Oliver, Mayer, LLP, staff
20

21

22

23

24

25
```

1                          I N D E X

2   WITNESSES FOR THE PLAINTIFF:                        PAGE

3   ROBERT SCHERER

4       Cross-Examination by Mr. Fisher              5
        Redirect Examination by Mr. Worden          62
5       Recross-Examination by Mr. Fisher           91

6   SEAN PEREZ

7       Direct Examination by Ms. Diamond           92
        Cross-Examination by Mr. Gomez             138
8       Redirect Examination by Ms. Diamond        187
        Cross-Examination by Mr. Worden            259
9
    WITNESSES FOR THE DEFENDANT:                        PAGE
10
    KEVIN HUESER
11
        Direct Examination by Mr. Fisher           194
12      Cross-Examination by Mr. Worden            212

13  JUSTIN BENAVIDEZ, PH.D.

14      Direct Examination by Mr. Gomez            230

15

16

17

18

19

20

21

22

23

24

25

1                           E X H I B I T S

2     EXHIBITS FOR THE PLAINTIFF:        IDENTIFIED    RECEIVED

3         1 Demonstrative exhibit           284          --
               (photo of whiteboard)
4
      EXHIBITS FOR THE DEFENDANT:        IDENTIFIED    RECEIVED
5
         50 2019 Tyson's Beef Pricing Sheet, 203         203
6              page 130 only

7     JOINT EXHIBITS:                     IDENTIFIED    RECEIVED

8       113 12-12-18 E-mail from Robert      26           25
               Scherer to Narciso Perez
9       121 1-24-19 E-mail thread from Mike  38           38
               Rogers to Mike Dancey
10      136 3-4-19 E-mail thread from Narciso 210         210
               Perez to Kevin Hueser
11      138 3-8-19 E-mail thread from Kevin  211          210
               Hueser to Narciso Perez
12      141 3-27-19 E-mail thread from Sean  180          180
               Perez to Mike Dancey
13      144 4-4-19 E-mail from Sean Perez to 158          157
               Mike Dancey

14

15

16    (* Reporter's Note: All exhibit identifications listed
      herein have been duplicated from the parties' Joint Exhibit
17    List, Document 102.)

18

19

20

21

22

23

24

25


                        UNITED STATES DISTRICT COURT
              100 N. Church Street, Las Cruces, NM  88001
                            (575) 528-1430

```
 1                      (In Open Court at 8:32 A.M.)

 2                           (Jury not present.)

 3              THE COURT:  Thank you.  You may be seated.

 4    Everybody ready for the jury?

 5              MR. FISHER:  I believe so, Your Honor.

 6              MR. WORDEN:  Yes, ma'am.

 7              THE COURT:  All right.  Bring in the jury,

 8    please.

 9              Sir, do you want to return to the stand and, when

10    the jury comes in, we'll do cross-exam.

11              THE WITNESS:  (Complying.)

12                           (Jury present.)

13              THE COURT:  All right.  Good morning.  You may be

14    seated.

15              Are we ready for cross-exam, Mr. Fisher?

16              MR. FISHER:  Yes, Your Honor.

17                        **ROBERT SCHERER**,

18              After having been previously duly sworn, did make

19    the following answers:

20                        **CROSS-EXAMINATION**

21    Q.  (BY MR. FISHER):  Good morning, Mr. Scherer.

22    A.  Good morning.

23    Q.  Before we get started, you testified a little

24    yesterday about that you're from West Point, Nebraska,

25    correct?
```

1    A.   Yes, sir.

2    Q.   Can you tell the ladies and gentlemen just a little

3    bit more about your upbringing there.

4    A.   So I was born in West Point, Nebraska, the same town,

5    same hospital as all four boys of our family.  I'm the

6    second of four kids.  My mom and dad worked very hard all

7    their lives.  My dad worked at IBP; took a lot of pride in

8    that.  He started there in 1969 and worked up until 2002;

9    had a lengthy career.  He was an hourly.  My mom worked for

10   dentists.  And they instilled a lot of hard labor, a lot of

11   hard work ethics in us, as kids.  And it was --

12   Q.   I apologize.  Go ahead.

13   A.   And it was a great learning experience.

14   Q.   Do you still live in that region?

15   A.   No, sir.  I live about an hour north.

16   Q.   Do you have a family now?

17   A.   I do.  I've been very fortunate to be married close to

18   38 years in the end of July.  We have one daughter, who we

19   adopted from Korea; wouldn't change anything in the world;

20   have two beautiful grandchildren:  A soon-to-be

21   three-year-old on Sunday, and a five-year-old daughter --

22   granddaughter.

23   Q.   Mr. Scherer, how did you get into the cattle business?

24   A.   So I worked -- I got the opportunity, got the

25   employment in 1981 when jobs were tough to get.  I started

1    at IBP as summer help and really got to learn a lot of the

2    aspects of what goes on in a packing facility.  At the end

3    of the summer -- you know, let me go back, at one point

4    during the summer, not only my dad was working there, my

5    older brother and my younger brother were working there, as

6    well.  And so all four of us boys were working at the plant

7    at the same time, and I found that pretty unique.  I know

8    there were some father/sons, but not to the quantity that we

9    were.

10   Q.    Is there a reason you've built a career in that

11   industry?

12   A.    Well, it's a fascinating industry, number one, being

13   able to work hand in hand with cattle feeders, farmers, and

14   everybody in that ag realm out there.  Cumings County, which

15   is where West Point sits, actually had a claim back in the

16   '70s:  Most cattle per capita of any county in the U.S.

17   Q.    And, of course, in that business, are you creating a

18   food product?

19   A.    You bet.  We really strive to deliver a wholesome,

20   high-quality product for our end users, which is the

21   consumers.

22   Q.    Mr. Worden asked you yesterday a little bit about your

23   start in the industry.  I believe you testified you started

24   working in 1981; is that right?

25   A.    Yes, sir.

1    Q.   What was the work like when you started out?

2    A.   It was tough labor, but, you know, you got through it.

3    Q.   Long days?

4    A.   Very long days.  When I hired on, it was six days a

5    week, ten hours a day.

6    Q.   And you stayed on at IBP until -- was it 1986?

7    A.   Yes, well --

8    Q.   As an hourly?

9    A.   As an hourly, yeah.  And then I had the opportunity to

10   get promoted into carcass sales, which is a management

11   position.

12   Q.   And I believe you testified you were there for about

13   20 years or so; is that right?

14   A.   Yeah, pretty close to that.

15   Q.   And then, in 2007, where did you go after carcass?

16   A.   So, in 2007, I was promoted up to grading coordinator

17   for the company.  So I was responsible for all six plants

18   that we operated in, as well as working hand in hand with

19   the USDA.

20   Q.   What does a grading coordinator do?

21   A.   So my responsibilities at that time were to ensure the

22   proper grade was being applied, not only for the company,

23   but also back to that cattle feeder, and making sure they

24   get paid properly.

25   Q.   And when you refer to "grades," can you explain what

1   that means --

2   A.   You bet --

3   Q.   -- for the members of the jury?

4   A.   The category for carcass grading is broke down as

5   prime being your highest quality.  Then you have the choice

6   grade, which is broke down into three separate entities:  A

7   moderate being the high choice, modest being the mid-choice,

8   which a lot of people know today as "CAB," if you've heard

9   of that.  And CAB is upper two-thirds.  Then you have a

10  bottom choice.  Then you have a select grade, and then you

11  have an overall, or ungraded, product.

12  Q.   So is the "prime" grade you're referring to, is that

13  the "prime" you might see on a steak in the grocery store?

14  A.   Most definitely.  It's the highest quality beef out

15  there.

16  Q.   Then, in 2013, your role changed again, correct?

17  A.   Yes.  I had the opportunity to apply for cattle

18  procurement; interviewed against two to three other

19  individuals, who were all doing the same basic capacities or

20  as the plant management-style individual that I was, so...

21  Q.   What is the role of the procurement team that you

22  joined at Tyson?

23  A.   Our job is to buy the best possible animal out there

24  and deliver the highest quality product back to our

25  customers and the consumer.

1    Q.   And today you're still with the procurement team; is

2    that right?

3    A.   Yes, sir.

4    Q.   You talked a little bit about getting into your

5    current position.  Was that a position that you applied for?

6    A.   Yes, it was.

7    Q.   Okay.  Who asked you?  Was there someone that asked

8    you to apply for that position?

9    A.   I was actually asked if -- and inquired by the Vice

10   President of Cattle Procurement, John Gerber.

11   Q.   Do you know why you were asked to apply?

12   A.   I'm hoping it was because of my hard work ethics and

13   my knowledge or my ability to learn.

14   Q.   Do you know whether or not there were any others that

15   applied?

16   A.   Yes, there was two to three other applicants.

17   Q.   And who was responsible at Tyson for making the

18   decision to hire you over those other applicants?

19   A.   So actually I interviewed with two of our former

20   presidents of the company; one being Steve Stouffer and the

21   other one being Noel White and Noel White went on to be the

22   CEO of the company for Tyson, in general.

23   Q.   And, in your current role -- would you remind the

24   ladies and gentlemen of the jury your job title again.

25   A.   My title is Associate Director for Cattle Procurement.

1    Q.    And what do your job responsibilities in that role

2    consist of?

3    A.    My job responsibilities today are to manage inventory

4    for our natural programs, our NHTC programs, our beta-free

5    programs, which a lot of that product goes to China, and

6    still be in the plants and work with the production teams on

7    dressing percentages and how much quality we can bring back

8    to the cattle feeder.

9    Q.    So since you started as an hourly employee back in

10   West Point, Nebraska, with IBP, have you been with IBP/Tyson

11   your entire career?

12   A.    Yeah.  It's actually -- I started my 41st year

13   December 17th.  16th was my anniversary date.

14   Q.    How would you characterize your time with IBP and

15   Tyson?

16   A.    Very energizing.  It's a great company to work for.

17   They believe in, number one, taking care of their employees,

18   safety of their employees, and delivering a wholesome

19   product to the consumer.

20   Q.    I'd like to ask you a little bit about purchasing,

21   Tyson's purchasing of cattle, especially with respect to

22   your role.

23        When did you start purchasing cattle in your

24   role?

25   A.    2015.

1    Q.    Before that, did you -- had you done any purchasing

2    for Tyson?

3    A.    No, sir.

4    Q.    Did anything in your previous almost 35 years before

5    2015, did any of that assist you in moving into your current

6    role?

7    A.    Just knowing what the proper quality and the value is

8    of each animal.

9    Q.    When you moved into your current role back in 2015,

10   did you have anybody to kind of walk you through the steps

11   or mentor you?

12   A.    I did.  I had three very good teachers:  John Gerber,

13   the Vice President of Cattle Procurement; Jay Holmes, who

14   was the Director of Cattle Procurement; and Brad

15   Brandenburg, who was also a Senior Director of Cattle

16   Procurement.

17   Q.    And I believe there was some testimony yesterday,

18   Mr. Brandenburg retired from the company, correct?

19   A.    Yes, he did, in May -- April or May of '15, I believe.

20   Q.    And you moved into Mr. Brandenburg's role; is that

21   right?

22   A.    Yes.  Yes, sir, I took over the role as managing those

23   premium programs for us.

24   Q.    We've heard quite a bit of testimony over the last

25   couple of days about pricing on the premium cattle that

1   Tyson purchases.  Do you recall hearing testimony on that?

2   A.   Yes, sir.

3   Q.   Generally speaking, if you could break it down to

4   those of us who aren't in the industry, how does Tyson set

5   pricing for the premium cattle it wants to buy?

6   A.   On just premium cattle?

7   Q.   Yes, sir.

8   A.   Yes, so there's either the CME contract, a live

9   contract, which is a hedged price based on the board, or a

10  weighted average, okay?

11  Q.   So those are the pricing mechanisms?

12  A.   Those are the two pricing mechanisms, plus a premium

13  per head negotiated.

14  Q.   So you've got, to get this stright, a pricing

15  mechanism and then the second component is a premium per

16  head; is that right?

17  A.   Yes, sir.

18  Q.   Okay.  Let me ask you a little bit about the pricing

19  mechanism, if I could.  You mentioned two different pricing

20  mechanisms; is that right?

21  A.   Yes, sir.

22  Q.   And I think you were asked a little bit about this

23  yesterday.  One is the Nebraska weighted weekly average?

24  A.   Correct.

25  Q.   And the other one was?

1     A.   The CME, or live contract.

2     Q.   And what does "CME" stand for?

3     A.   "Chicago Mercantile Exchange."

4     Q.   So, of the pricing mechanisms, who chooses when Tyson

5     purchases a cattle?  Is it the producer's choice or is it

6     Tyson's choice?

7     A.   No, it is generally the producer's choice.

8     Q.   So we've looked at the blowup of the cost plus

9     spreadsheet that's blown up there behind you.

10    A.   Yeah.

11    Q.   You've had a chance to look at that in detail since

12    you've been here, correct?

13    A.   Yes, sir.

14    Q.   On the cattle that are listed on that cost plus model,

15    who would have been the party who chose the pricing

16    mechanism?

17    A.   Zia.

18    Q.   Now, when you took over for Mr. Brandenburg in 2015,

19    were there additional pricing mechanisms available?

20    A.   Yeah, he was using probably anywhere from 10 to 20

21    different pricing mechanisms.

22    Q.   And when you came into the role, did that change?

23    A.   It did.  Vice president John Gerber asked me to

24    simplify things, bring it down to the two components, either

25    a CME live contract or a weighted average contract.

1    Q.    And so was there an underlying goal or purpose in

2    moving from the 10 to 20 different pricing mechanisms to the

3    two?

4    A.    The entire goal was to simplify the process for

5    everyone, so they knew what their pricing was all the time.

6    Q.    And those two pricing mechanisms are the ones you just

7    discussed?

8    A.    Yes, sir.

9    Q.    Now, the second component you mentioned after the

10   pricing mechanism was the premium?

11   A.    Yes, sir.

12   Q.    And the premium is a -- that's per head of cattle; is

13   that correct?

14   A.    Yes, sir.

15   Q.    Okay.  How often is that -- are those premiums set?

16   A.    The premium is set when we negotiate what we call

17   "slots" or "forward projections" into the following year.

18   We do it every year between March and April; maybe into May,

19   if we're looking for additional numbers.  And what it does

20   is we're allowing and providing opportunity for the

21   feedyards to place cattle out front, procure as they go, or

22   buy them as feeder cattle.  And they have a set premium to

23   those cattle.

24   Q.    And I want to clarify that first component, the

25   pricing mechanisms.  Those are utilized -- are those

1    utilized in both conventional and premium cattle?

2    A.   Yes, sir.

3    Q.   But these premiums per head, are those also utilized

4    with conventional cattle?

5    A.   It depends.

6    Q.   You mentioned that this happens, the premiums are set

7    in the spring of every year?

8    A.   Yes, sir.

9    Q.   And there are different, that we've heard about,

10   categories of premium cattle, correct?

11   A.   Yes, sir.

12   Q.   For example, the GAP cattle is one category?

13   A.   GAP cattle are one segment, verified natural are

14   another, and then NHTC is the third.

15   Q.   And as far as those categories, does the premium per

16   head -- can that vary on those cattle?

17   A.   Oh, most definitely.  Because we work directly with so

18   many finish yards, who their suppliers are primarily

19   northern animals out of the Rockies.  You get to about

20   mid-April and the yearling crop, or the oldest cattle, are

21   finished up being harvested, which means you go into a

22   calf-fed crop then.  And what happens then is your weights

23   generally get smaller in comparison to that yearling.  And

24   those premiums would dictate actual premium over the rest of

25   the year for the April, May, and June time frame.

1    Q.   And we've talked a lot about the GAP cattle.  Would

2    the premium -- a premium would be set in the spring of the

3    year, correct?

4    A.   Yes, sir.

5    Q.   And does that premium generally remain constant

6    throughout the year?

7    A.   It does.  Like I said, for the April, May, June, time

8    frame, it's a set premium.  And then, first quarter, January

9    through March, July through December, is generally the same

10   price.

11   Q.   And how is that communicated to producers such as Zia?

12            MR. WORDEN:  Your Honor?

13            THE COURT:  Yes.

14            MR. WORDEN:  Objection, foundation, relevance.  I

15   can approach, if you'd like.

16            THE COURT:  Yes, please do.

17                 (Bench conference.)

18            MR. WORDEN:  All of this about how it might have

19   been done and how it was communicated to Zia, we heard

20   testimony yesterday none of that happened for this

21   transaction.

22            MR. FISHER:  Your Honor, I'm simply asking him to

23   explain to a jury -- since this is my first opportunity to

24   have anybody on the stand from Tyson, to explain in general

25   how the pricing system works at Tyson.

1          THE COURT:  How is that relevant to this

2    transaction if none of this occurred in the transaction with

3    Zia?

4          MR. FISHER:  He's not -- well, I have -- I'm

5    using this opportunity to give him a chance to explain that,

6    that this actually would have occurred with that

7    communication with Zia.

8          THE COURT:  (Inaudible.)

9          (Reporter interruption for clarification.)

10         THE COURT:  I was just reading something to

11   myself.

12         MR. FISHER:  Okay.

13         THE COURT:  So you expect this witness to testify

14   that this pricing structure is what happened with Zia?

15         MR. FISHER:  I believe he will, Your Honor.

16         THE COURT:  He's going to testify that's what

17   happened with Zia?

18         MR. WORDEN:  We went over that yesterday.  He

19   said this never happened yesterday, and there will be no one

20   here to testify that it did happen.  He's trying to make a

21   suggestion that somehow it happened when the evidence

22   yesterday was precisely to the contrary.  It's irrelevant,

23   misleading, and prejudicial.

24         MR. FISHER:  I think Mr. Worden will have an

25   opportunity to address that on redirect, Your Honor.  We

1    have e-mails that have been out there addressing these

2    prices.

3              We've got that out there -- the testimony

4    yesterday was that he was not -- Mr. Scherer was not there

5    at the time because he was not -- in a different role at the

6    time, but that this is how the system works at Tyson.

7              MR. WORDEN:  There is no e-mails for this

8    transaction.

9              THE COURT:  I don't understand how it's relevant.

10             MR. FISHER:  And that's the basis of the whole

11   litigation, Your Honor, is that there has been a set system.

12   Zia has worked with Tyson for 20 years.  They know how this

13   system works.  I talked about it with Mr. Perez in his --

14   when he was on the stand.  That's the main dispute here.

15   Tyson is contending that Zia was paid based on these prices

16   that are communicated every year to the producers and to the

17   feedyards.

18             THE COURT:  Why don't you do this, Mr. Fisher:

19   If you can get the witness to tie this to this transaction

20   with Zia, you can back into it.  But if he's going to say

21   this wasn't involved in this transaction with Zia, I'm going

22   to sustain the objection --

23             MR. FISHER:  Okay.  Understood --

24             THE COURT:  -- okay?

25             MR. FISHER:  -- thank you.

```
 1            THE COURT:  Uh-huh.
 2            (Bench conference concluded.)
 3    Q.  (BY MR. FISHER):  Mr. Perez -- or, I'm sorry,
 4    Mr. Scherer, if I may, I would like to ask you a
 5    little bit about Tyson's relationship with the
 6    plaintiff, Zia.
 7            In the business of cattle and beef, what role
 8    does Zia Consulting play in Tyson's business there?
 9    A.  Well, they're simply a cattle feeder.
10    Q.  And is that a role as a "producer" --
11    A.  Yes, sir --
12    Q.  -- is the term --
13    A.  -- yes, sir.
14    Q.  -- in the industry?  Is Zia Consulting the only feeder
15    or producer that Tyson works with?
16    A.  No, sir.  We actually work with about 3,500, both
17    conventional, as well as covering the premium programs.
18    Q.  And that is covering all of the producers --
19    A.  All encompassing --
20    Q.  -- about 3,500?
21    A.  -- yes, sir.
22    Q.  What about premium cattle?  Is that a different number
23    of producers you work with?
24    A.  It's about 200.
25    Q.  Okay.  And of those 200 producers you work with at
```

1    Tyson, does the size of those producers vary?

2    A.    You bet it does.  We have producers anywhere from 300

3    of their home farm stock in Nebraska up to 30,000.

4    Q.    And as far as inspecting and looking and purchasing

5    those cattle from all of those producers, is that something

6    that you do, alone?

7    A.    No, no, it would be -- it would be a whole lot of busy

8    time.  Actually, we have 42 buyers in the U.S. that are in

9    the feedyards every week.

10   Q.    And what do those buyers -- what is their role?

11   A.    Their role is to manage the cattle along with the

12   finish yard's manager to get optimal weight on the cattle

13   and quality.

14   Q.    Okay.  So, in addition to Zia, there are approximately

15   199 other producers that Tyson works with for premium

16   cattle?

17   A.    Yes, sir.

18   Q.    Up to the time of this cost plus spreadsheet, how

19   would you describe Tyson's relationship with Zia Consulting?

20   A.    Rocky at best.

21   Q.    What made the relationship rocky?

22   A.    It was mostly due to claiming cattle would deliver at

23   one point in time and, subsequently, those cattle would

24   deliver later, down two, three months.

25   Q.    We've heard a lot of testimony about cattle

1    inventory --

2    A.   Yes, sir.

3    Q.   -- during this trial.  Did Tyson have any issues,

4    inventory issues, with the cattle placed by Zia?

5    A.   You bet.

6    Q.   Can you describe that, please.

7    A.   So there would be months where cattle were supposed to

8    be ready for delivery and they never showed up.

9    Q.   And does that cause problems, when a producer fails to

10   deliver the cattle?

11   A.   You bet.  It puts a stress on those other 199

12   producers that have -- following what they claim is for

13   their outdate cattle.

14   Q.   Does that have an affect on the consumer?

15   A.   Big time.  Big time.  That can disrupt the quality of

16   the cattle, the consistency of the cattle in the products.

17   So you don't want to end up with a 9-pound ribeye and a

18   15-pound ribeye in the same box.

19   Q.   If you may, I'll pull up what's already been admitted

20   as Exhibit 18.  We've also heard quite a bit of testimony

21   about cattle weight since we've been here.  On Exhibit 18,

22   the cost plus model that I've blown up here, we've had

23   discussions, and you were asked about the weight numbers on

24   that cost plus chart; do you recall that?

25   A.   Yes, sir.

1    Q.   Have there been issues, from Tyson's perspective, with

2    the weight of the cattle that have been placed by Zia?

3    A.   Yes, sir.

4    Q.   Okay.

5    A.   There are some that have been extremely heavy and some

6    that have been extremely light for the time frame of finish

7    that those cattle are supposed to come out in those

8    given months.

9    Q.   Cattle that are too light, for example, what kinds of

10   problems does it cause when a producer such as Zia delivers

11   cattle that are too light?

12   A.   When those cattle come in light, like they are, it

13   creates an inconsistency in the box, from a processing side,

14   going to our customers, the retail food service, or chain.

15   But it's also inconsistency back to the consumer because the

16   quality is not quite where it should be.

17   Q.   And does Tyson have any sort of a target weight for

18   the cattle?

19   A.   Yes, sir, we do.

20   Q.   And is there a certain weight for the premium cattle

21   that's expected?

22   A.   Yes, sir.  Knowing that these cattle are going to be

23   fed on an average of six months, we target 13- to 1,400

24   pounds.

25   Q.   And since you've been in your role with Tyson, has

1    that target weight been consistent?

2    A.    Very much.

3    Q.    If I may approach the board, Mr. Scherer, you've been

4    given the opportunity to review this spreadsheet, correct?

5    A.    Yes, sir.

6    Q.    And, specifically, have you looked at these three

7    columns with headings in pink labeled, at the top (reading),

8    "Estimated weight at lean months"?

9    A.    Yes.

10   Q.    And have you reviewed the weights on this list?

11   A.    Very much.

12   Q.    Okay.  Do any of the weights on this list meet the

13   target weight for cattle that are to be placed with Tyson?

14   A.    No, sir.

15   Q.    Mr. Scherer, we've also heard testimony about the

16   dates on which cattle are placed and are ready.  Has Tyson

17   experienced any types of, let's call it, "timing issues"

18   with cattle that have been placed by Zia?

19   A.    Yes, sir.

20   Q.    And can you explain those, please.

21   A.    So, say, we had a targeted outdate of April, and those

22   cattle are weighing 1,175, those cattle actually will get

23   pushed back to the point that they make their quality, make

24   their weight to deliver that consistent product back to our

25   consumer.  That disrupts the other 199 people because now

1    you have to scramble to find finished or ready cattle.

2    Q.   And does that have any effect on the end user?

3    A.   Most definitely.  Most definitely.  It could disrupt

4    the volume harvest, which, in turn, goes back to those

5    customers of ours like a Whole Foods, a Chipotle, a Shake

6    Shack, and others.

7    Q.   You've told us about the inventory issues, the weight

8    issues, and those timing issues.  Are those problems common

9    problems amongst the other 199 or so producers that Tyson

10   works with?

11   A.   Occasionally it is, yes.

12   Q.   Okay.  If you were to put it on a scale of producers

13   from least problematic to most problematic, where would Zia

14   fall on that scale?

15   A.   Over on the most problematic end.

16        MR. FISHER:  If I may, Your Honor, I would like

17   to admit Exhibit 113 at this time.

18        THE COURT:  Zia's position on 113 at this time?

19        MR. WORDEN:  No objection.

20        THE COURT:  113 admitted.

21   (Joint Exhibit 113 was admitted into evidence.)

22   Q.   (BY MR. FISHER):  Mr. Scherer, I've put on the

23   screen what has been admitted as Exhibit Number 19

24   [sic].  Do you recognize this?

25   A.   Yes.

1    Q.   Is this an e-mail from you to Mr. Perez?

2    A.   Yes, it is.

3    Q.   And what is the date on this e-mail?

4    A.   December 12, 2018.

5    Q.   And what have you written in this e-mail to Mr. Perez?

6    A.   (Reading) "Is Mike going to send this?  I don't want

7    any surprises this year."

8    Q.   What did you mean "[you didn't] want any surprises

9    this year"?

10   A.   Cattle that were slotted for a specific month and not

11   being finished on time.

12   Q.   And asking, "Is Mike going to send this?" what is it

13   you were asking for?

14   A.   Feedlot inventory.

15   Q.   And when you're saying, "I don't want any surprises

16   this year," what year were you referring to?

17   A.   2019.

18          THE COURT:  Mr. Fisher, I'm sorry, what's the

19   exhibit number, because I thought you said "113" and then

20   you said "19."

21          MR. FISHER:  Oh, I'm sorry, it's 113.

22          THE COURT:  All right.  Just making sure.

23   Q.   (BY MR. FISHER):  Mr. Scherer, now, I'd like to

24   move to some more questions about the spreadsheet we

25   have up here (indicating).

1          You testified yesterday that you had heard of

2   cost plus once before, correct?

3   A.   Yes, sir.

4   Q.   And where was it exactly that you heard about that

5   cost plus?

6   A.   An entity by the name of "Sky River" contacted us.

7   Q.   And can you tell us -- I'm sorry, one second.

8          And what did they contact you with?

9   A.   They wanted to do business with us on our natural

10   side, both GAP, verified natural, and NHTC.

11   Q.   And that was a cost -- was it titled "cost plus"?

12   A.   Yes, sir, it was.

13   Q.   And did you accept that proposal?

14   A.   Yeah, they actually brought it into the office and

15   presented it to me.

16   Q.   In your role, was that something you, personally, were

17   able to do?

18   A.   Accept it?

19   Q.   Yes.

20   A.   And hand it off to let everybody evaluate it.

21   Q.   And when you received that proposal from Sky River,

22   was the proposal in writing?

23   A.   Yes, it was.  10 to 11 pages, I believe.

24   Q.   And you said you distributed that proposal to others?

25   A.   Yes, sir.

1    Q.   Who did you distribute that proposal to?

2    A.   To our business unit, which includes accounting,

3    procurement, and then legal.

4    Q.   And was there an explanation of the terms of the

5    proposal?

6    A.   Very much so.  Every entity was broke down with a

7    cost, with an associated cost, where we would find the best

8    possible place to feed the cattle.

9    Q.   After you had had an opportunity to review the

10   proposal, distribute it to others, what happened next?

11   A.   Then legal looked at it.  They came back in for a

12   second meeting.  We went all through the questions and...

13   Q.   So you had a meeting with the Sky River producer,

14   correct?

15   A.   Correct.

16   Q.   And, during the meeting, generally what happened at

17   the meeting?

18   A.   So there was questions back and forth from both us and

19   our legal team, as well as they had questions for us as to

20   where the locations of these feedyards would be.

21   Q.   And what was the purpose of asking those questions?

22   A.   Total transparency.

23   Q.   And you said there was a second meeting also, correct?

24   A.   Yes, sir.

25   Q.   And what happened at the second meeting?

1    A.   The second meeting, we came in and tried to work

2    everything out to everybody's best ability.

3    Q.   And, ultimately, was that proposal accepted by Tyson?

4    A.   No, we did not accept that because we felt it was too

5    much risk.  And it just wasn't going to work for them, so we

6    parted ways mutually, and everything was good.

7    Q.   Okay.  Other than that one cost plus proposal, had you

8    ever heard of cost plus before that?

9    A.   No, sir.

10   Q.   Mr. Scherer, I'm putting up on the screen Exhibit 19,

11   which has previously been admitted.

12        Do you recall being asked about this

13   February 4th e-mail by Mr. Worden yesterday?

14   A.   Yes, I do.

15   Q.   And do you...what was your understanding of the

16   purpose of this e-mail?

17        MR. WORDEN:  Your Honor?

18   A.   (Reading) "Look this over" --

19        THE COURT:  Hold on one second.  There's an

20   objection.

21        MR. WORDEN:  We talked about this yesterday.

22   Could we use Exhibit 17?  I'm not sure why 19.  It doesn't

23   have the attachment, it doesn't have the other things that

24   17 does.  It's the same text otherwise.

25        THE COURT:  Mr. Fisher, which exhibit would you

1    like to use?

2            MR. FISHER:  I would prefer 19, but if Counsel

3    insists on using 17, that's fine.

4            THE COURT:  Just wait one second till we get the

5    exhibit up.

6            MR. WORDEN:  Thank you.

7    Q.  (BY MR. FISHER):  Okay.  Mr. Scherer, are you

8    able to -- at Counsel's request, I've switched to

9    Exhibit 17.  Are you able to still recognize this

10   e-mail?

11   A.   Yes, sir.

12   Q.   Okay.  And up here at the top, is there a subject of

13   this e-mail (indicating)?

14   A.   (Reading) "Show list."

15   Q.   And what is a "show list" in the cattle industry?

16   A.   It gives you the feedlot inventory of cattle.

17   Q.   And does your understanding of that term vary in any

18   way?

19   A.   Inventory is the same thing.

20   Q.   Did anybody inform you ahead of time that you would be

21   receiving this e-mail?

22   A.   No, sir.

23   Q.   Did Mr. Perez contact you?

24   A.   I don't believe so, no.

25   Q.   Was there anything about this e-mail, when you

1    received it -- and I'll -- I apologize, let me take my

2    marking off.

3                 Was there an attachment to this e-mail?

4    A.    Yes, sir.

5    Q.    And what was that attachment to you?

6    A.    Cattle inventory.

7    Q.    Otherwise, was there anything out of the ordinary

8    about that February 4th e-mail?

9    A.    Other than it was Tony's birthday and he was going

10   snowboarding.

11   Q.    I'm pulling up Exhibit 18 now, which is, again, the

12   cost plus spreadsheet that we've talked about.  And you

13   recall going over this with Mr. Worden yesterday, correct?

14   A.    Yes, sir.

15   Q.    When you first opened this document, what were you

16   looking for?

17   A.    I was looking for the cattle and where they were

18   located.

19   Q.    Had Zia sent you show lists in the past?

20   A.    Yes, sir.

21   Q.    How often would they send those to you?

22   A.    Oh, monthly.  And they might update them every two

23   weeks.

24   Q.    In the very first column -- I'm going to blow it up

25   for you here -- in red, do you see a number or a pound or

1    hashtag up there?

2    A.   Yes, sir.

3    Q.   And then you see there are certain numbers below that,

4    correct?

5    A.   Yes, sir.

6    Q.   Do you have any idea what those numbers mean?

7    A.   None.  I do not understand it.

8    Q.   And the next two columns Mr. Worden went through with

9    you yesterday.  What is the information contained in these

10   columns?

11   A.   The ranch that the calves, evidently, were purchased

12   from and the location of where they're currently at.

13   Q.   Were you familiar with the cattle that are listed on

14   the show list?

15   A.   Quite a few of them, yes.

16   Q.   And how were you familiar with them?

17   A.   Past business with Zia.

18   Q.   Okay.  And we had discussed and you've been asked

19   about a visit to Happy Pasture.  Do you recall that?

20   A.   Yes, sir.

21   Q.   And that was in January; is that correct?

22   A.   January of '19.

23   Q.   Okay.  And are there cattle on this list that are at

24   Happy Pasture?

25   A.   Yes, sir.

1    Q.   If we could, I'd like to look at that first row there.

2    In the first column, there's a ranch identified in that

3    first row.  What is the name of that?

4    A.   Stormy Burch.

5    Q.   Are you familiar with that ranch, at all?

6    A.   A little.

7    Q.   Do you have any knowledge of how Zia acquired the

8    cattle --

9    A.   No, sir.

10   Q.   -- from Stormy Burch?

11             Okay.   Why not?

12   A.   I was not involved in that negotiation.

13   Q.   Do you know how much Zia paid for those cattle from

14   Stormy Burch?

15   A.   I do not.

16   Q.   Why not?

17   A.   I was not involved in that negotiation.

18   Q.   How does the price that a supplier like Zia pay for

19   cattle factor into the price of those cattle?

20   A.   It has nothing to do with Tyson.  That is all between

21   the ranch and the buyer of the feeder cattle.

22   Q.   If a producer such as Zia makes a good deal on the

23   cattle they bought from Stormy Burch, who gets the benefit

24   of that?

25   A.   Zia.

1    Q.    Does Tyson receive any benefit from that?

2    A.    No, sir.

3    Q.    What is the location of the Stormy Burch Ranch on this

4    spreadsheet?

5    A.    Bullinger.

6    Q.    And I believe you established yesterday Bullinger is a

7    feedyard, correct?

8    A.    Yes, sir.

9    Q.    And to remind the ladies and gentlemen of the jury --

10   you were asked a little bit about this -- what role does the

11   feedyard play in this whole process?

12   A.    So they take delivery of the calves or yearlings, they

13   bring them up on a diet, which is called a "step-up

14   program," to get them to the optimal finish weight for that

15   animal and their genetics to deliver a consistent quality

16   product.

17   Q.    And there are costs associated with that, correct?

18   A.    Most definitely.

19   Q.    And are those costs with the feedyards -- is there

20   room to negotiate those costs?

21   A.    It can be negotiated with the customer of the

22   feedyard.

23   Q.    And if the ranch or the producer putting the cattle on

24   the feedyard doesn't negotiate the best cost, where does

25   that increased price end up, with Tyson or with the

1    producer?

2    A.    With the producer.

3    Q.    And looking at this situation here, we've got Stormy

4    Burch cattle going into Bullinger.  Were you involved, at

5    all, with the negotiation of the costs?

6    A.    No, sir.

7    Q.    Did you direct Zia to send the cattle to Bullinger?

8    A.    No, sir.

9    Q.    Because there are many feedyards out there, correct?

10   A.    Yes, there are multitudes of them.

11   Q.    Did Tyson play a role in the choice of what feedyard

12   was chosen?

13   A.    No, sir.

14   Q.    Were you given the opportunity?

15   A.    No, sir.

16   Q.    Did Zia give you the opportunity to negotiate the

17   costs of the feedlot?

18   A.    No, sir.

19   Q.    But under this cost plus spreadsheet, what is your

20   understanding now of who is expected to pay those costs?

21   A.    Well, it's expected of Tyson now.

22   Q.    But you were not -- or were you asked in any way about

23   the movement of those cattle to Bullinger Feedyard?

24   A.    No, sir.

25   Q.    Were you involved in any negotiations with the

1    feedyard --

2    A.    No, sir.

3    Q.    -- for those cattle?

4          I'm going to move over just a little bit here.

5          You were asked yesterday about the columns in

6    light blue; do you recall that?

7    A.    Yes, sir.

8    Q.    And what do you see the title of those columns in

9    light blue to be?

10   A.    Total cost.

11   Q.    And under the way that you had conducted business

12   prior to this cost plus model, how did costs factor into

13   what Tyson paid for the cattle?

14   A.    Tyson pays for cattle by two methods:  A weekly

15   average, weighted weekly average, or a live price.

16   Q.    In the third column under June 15th -- and, again, I

17   am looking at this first row; we're still talking about the

18   Stormy Burch cattle -- what is the number listed in that

19   third column?

20   A.    $198,467.65.

21   Q.    Do you have any idea, when you look at this

22   spreadsheet, whether that represents an estimation or an

23   actual cost?

24   A.    I have no clue what it meant.

25   Q.    When you look at that number, do you see anything on

1    the spreadsheet that leads you to understand what went into

2    those costs?

3    A.   No, sir.

4    Q.   And did Mr. Perez contact you at any time to explain

5    that number?

6    A.   No, sir.

7    Q.   How was that number calculated?

8    A.   I have no idea.

9    Q.   Was there anything, in looking at this spreadsheet,

10   that indicates to you that that cost is expected to be paid

11   by Tyson?

12   A.   No, sir.

13   Q.   Did Mr. Perez contact you and let you know that he

14   expected Tyson to pay for those costs?

15   A.   No, sir.

16   Q.   Okay.  At this point in time -- this e-mail came on

17   February 4th of 2019, correct?

18   A.   Yes, sir.

19   Q.   How many times had Tyson paid costs for the cattle

20   purchased by Zia?

21   A.   Never.

22   Q.   Now, I'd like to move to Exhibit 121, which has

23   previously been admitted.

24           THE COURT:  I'm sorry, I don't have 121 as being

25   admitted.

1          What's Zia's position on 121?

2          MR. WORDEN:  No objection, Your Honor.

3          THE COURT:  Okay.  121 will be admitted.

4    (Joint Exhibit 121 was admitted into evidence.)

5    Q.  (BY MR. FISHER):  And I'd like to go here

6    (indicating).

7          Do you recall yesterday when I discussed this

8    e-mail with Mr. Perez?

9    A.   Yes, sir.

10   Q.   Okay.  And what is the date of this e-mail that I have

11   here on the screen?

12   A.   January 24, 2019.

13   Q.   Okay.  And getting right here (indicating), starting

14   with "we," can you read at that sentence for us, please.

15   A.   (Reading) "We may not feed -- or we may not need

16   forwards on the cost plus cattle if we get the deal in

17   writing from Tyson."

18   Q.   Okay.  And this was January 24, 2019, correct?

19   A.   Yes, sir.

20   Q.   Okay.  At this point in time, had Mr. Perez asked you

21   for a deal in writing on this cost plus spreadsheet?

22   A.   No, sir.

23         MR. WORDEN:  Objection, Your Honor, asked and

24   answered.

25         THE COURT:  Overruled.


UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1    Q.   (BY MR. FISHER):  And then you received the

2    e-mail on February 4th with that information,

3    correct?

4    A.   Yes, sir.

5    Q.   And during the month of January of 2019, I believe you

6    testified yesterday you met Mr. Perez in Happy, Texas,

7    correct?

8    A.   That is correct.

9    Q.   And I'm putting on the screen Exhibit Number 10, which

10   I believe has been pre-admitted -- or, I'm sorry, admitted

11   yesterday, I believe.

12           Mr. Perez -- or, I'm sorry, Mr. Scherer, do you

13   remember being asked about this text message yesterday by

14   Mr. Worden?

15   A.   Yes, sir.

16   Q.   Okay.  What does that text message say?

17   A.   It says (reading), "Thanks for taking the time Monday

18   to look at all those calves with me.  Let's get the feedlot

19   inventory up to date, get these cattle in for May and June,

20   and we'll go forward again -- forward, thanks, again."

21   Q.   And was there a reason that you initially wanted this

22   meeting with Mr. Perez?

23   A.   I wanted to look at the cattle that were on the Happy

24   Pastures.

25   Q.   Why did you want to look at them?

1    A.    Because it was concerning that they were projecting

2    cattle for April, May, and June, and these cattle were still

3    on wheat pasture.

4    Q.    Why was that concerning to you?

5    A.    Because, again, it usually takes six months to finish

6    a natural animal.

7    Q.    And the fact that the cattle were still grazing and

8    not in a feedyard, why was that specifically concerning?

9    A.    Because they were not going to meet their projected

10   time frame.

11   Q.    And I believe you mentioned earlier that there were

12   cattle on that cost plus spreadsheet that were at Happy

13   Pasture, correct?

14   A.    Yes, sir.

15   Q.    And if I may go over to the demonstrative.

16         Are you able to see this okay?

17   A.    Yeah.

18   Q.    Okay.  We have cattle up here listed as (reading)

19   "Happy Pasture," correct?

20   A.    Yes, sir.

21   Q.    And were the weights of any of these Happy Pasture

22   cattle where they needed to be for the time allotted?

23   A.    No, sir.

24   Q.    What did you discuss with Mr. Perez when you were

25   there in Happy?

1    A.   I was looking at the quality of the calves and how

2    soon we could get them into a feedyard.

3    Q.   And did he indicate to you whether or not he would get

4    them into a feedyard?

5    A.   He said they would come.

6    Q.   And did Mr. Perez go over any sort of a spreadsheet

7    containing cost plus information?

8    A.   No, sir.

9    Q.   When you were in Happy, Texas, did Mr. Perez mention

10   the number "125" per head to you?

11   A.   No, sir.

12   Q.   Did he ever mention "$100 per head" to you?

13   A.   No, sir.

14   Q.   Did he mention any "plus" of this cost plus, any

15   numbers, to you?

16   A.   No, sir.

17   Q.   Okay.  I'm putting up what's already been admitted as

18   Exhibit 16.

19           And do you recall discussing or do you recall

20   this text message?

21   A.   Yes, sir.

22   Q.   And what's the date on this text message?

23   A.   January 28, 2019.

24   Q.   And do you recall, from the last exhibit, the date

25   that you -- the last text, the date being January 16th of

1    that text [sic]?

2    A.   Yes, sir.

3    Q.   And I believe it's been established that you met with

4    Mr. Perez two days before that, on January 14th, correct?

5    A.   Correct.

6    Q.   And the date of this text message in Exhibit Number 16

7    is what?

8    A.   1-28-2019.

9    Q.   So two weeks had passed since the last text message,

10   correct?

11   A.   Yes, sir.

12   Q.   And what did you ask Mr. Perez in this text message?

13   A.   (Reading) "Any movement on the cattle heading north?"

14   Q.   And which cattle were you referring to there?

15   A.   The cattle on the Happy Pastures.

16   Q.   Were those the cattle that you just testified

17   Mr. Perez told you would be going to the feedlots?

18   A.   Yes, sir.

19   Q.   On the date of this text message, had they gone to the

20   feedlots?

21   A.   Excuse me?

22   Q.   As of the date of this text message, had the cattle

23   moved to the feedyards?

24   A.   Not to my knowledge, no.

25   Q.   If we could, let's move back after the date of the

1    e-mail referencing "Tony's birthday" on February 4th.  I

2    would like to pull up now Exhibit 127, which has previously

3    been admitted.

4             THE COURT:  I'm sorry, Mr. Fisher.  That's

5    Exhibit 127?

6             MR. FISHER:  Yes, Your Honor.

7             THE COURT:  I don't have it as admitted.

8             What's Zia's position on the admission of 127?

9             MR. WORDEN:  It's a different version of 17, but

10   an incomplete version.  It doesn't have the attachment or

11   the notation of an attachment.  I'm not sure why we're using

12   this version.

13            MR. FISHER:  I'm happy to use Number 17, if

14   Counsel prefers, Your Honor.

15            THE COURT:  So we don't want to admit 127?

16            MR. FISHER:  No, Your Honor.

17            THE COURT:  Okay.

18    Q.  (BY MR. FISHER):  This e-mail's a little

19   confusing how it's laid out, but I'm wanting to

20   focus with you on this part that I've highlighted

21   (indicating), Mr. Scherer.

22            Do you recall this response e-mail on

23   February 4th of 2019, that I believe you were asked about

24   yesterday?

25    A.   Yes, sir.

1    Q.   And what did you say in this e-mail?

2    A.   I said (reading), "This looks good, get them in the

3    finish yard, ASAP, please."

4    Q.   And "getting them into the finish yard," what were you

5    referring to?

6    A.   The cattle on the Happy Pastures.

7    Q.   And this e-mail is February 4th, correct?

8    A.   Yes, sir.

9    Q.   Okay.  And your meeting, again, in Happy Pastures was

10   January 14th, correct?

11   A.   Yes, sir.

12   Q.   And were the cattle in the feedyard yet?

13   A.   No, sir.

14   Q.   Had Mr. Perez promised you at Happy to get the cattle

15   in the feedyard?

16           MR. WORDEN:  Your Honor, this is all leading.

17   Objection.

18           THE COURT:  It's --

19           MR. FISHER:  I'll --

20           THE COURT:  -- cross --

21           MR. FISHER:  I'll withdraw it.  Already asked it

22   actually.

23   Q.   (BY MR. FISHER):  So these were referring to

24   the cattle you'd already seen in Happy, correct?

25   A.   Yes, sir.

1    Q.   I'd like to move to Exhibit Number 20, which I believe

2    has already been admitted.

3             Any objection?

4             MR. WORDEN:  It's already admitted.

5             THE COURT:  20 has been admitted.

6             MR. FISHER:  Okay.

7    Q.   (BY MR. FISHER):  Mr. Scherer, do you recognize

8    this text message from yesterday?

9    A.   Yes, I do.

10   Q.   Okay.  And can you read this text message to the

11   ladies and gentlemen of the jury.

12   A.   (Reading), "The cattle have got to be placed in the

13   yard or I can't take them.  As of today, May 15th harvest is

14   only 99 days away.  On Bovamine Defend at the finish yard.

15   Please get them placed."

16   Q.   And what cattle are you referring to?

17   A.   The Happy Pasture cattle.

18   Q.   Okay.  Are these the same cattle that we've been going

19   over since that January 14th meeting with Mr. Perez?

20   A.   Yes, sir.

21   Q.   Was this causing a problem at this point?

22   A.   It would downstream very much.

23   Q.   How so, if you could explain, please?

24   A.   Those cattle would not come out at their target

25   weights, they would be short finish weight.

UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1    Q.   I'm going to show you what's been previously admitted

2    as Exhibit 129.  Do you recall seeing this e-mail earlier in

3    the trial of this matter?

4    A.   Yes, sir.

5    Q.   Okay.  Do you see the date on this e-mail?

6    A.   Monday, February 4th.

7    Q.   Okay.  And you see it's from Mr. Turnipseed with the

8    bank.  And it is addressed to who?

9    A.   Narciso Perez.

10    Q.   And you're not copied on this e-mail, are you?

11    A.   No, sir.

12    Q.   Do you see anybody from Tyson copied on the e-mail?

13    A.   No, sir.

14    Q.   And can you read that first sentence from

15    Mr. Turnipseed to Mr. Perez.

16    A.   (Reading) "To summarize our conversation from

17    yesterday, I now have the understanding that Tyson will pay

18    us $125 over costs for the GAP and $100 over costs for the

19    NHTC and NE3 cattle that we deliver to them during April

20    through June."

21    Q.   I believe, earlier, I asked you about your visit with

22    Mr. Perez at Happy, correct?

23    A.   Yes, sir.

24    Q.   And I asked you whether "$125" or "$100" was mentioned

25    during that conversation, correct?

1    A.   Yes, sir.

2    Q.   And what was your response?

3              MR. WORDEN:  Your Honor?

4    A.   No, sir.

5              MR. WORDEN:  Your Honor, it's all leading and

6    it's all been asked and answered.

7              THE COURT:  I'm going to allow leading because

8    we're on cross-exam, but what was your second?

9              MR. WORDEN:  Your Honor, it's cross-exam of a

10   friendly witness.  He cannot lead.

11             MR. FISHER:  I'm moving to the next question --

12   it -- may we approach?

13             THE COURT:  Yes.

14                  (Bench conference.)

15             Mr. Worden, do you have -- the rule says you can

16   lead on cross-exam?

17             MR. WORDEN:  It's his own client.

18             THE COURT:  It doesn't matter.  If you find a

19   rule that says it, bring it to me; otherwise I'm going to

20   allow leading questions on cross --

21             MR. WORDEN:  Technically, when an adverse witness

22   is on the stand, my questioning is cross-examination.  When

23   you're questioning your own witness, it's leading.

24             THE COURT:  Bring me a rule that says that and

25   I'll look at it.

1          MR. FISHER:  I just wanted to say I'm trying to

2    establish that those numbers had not been mentioned in

3    Happy.  I'm not going to reask the question.  I apologize.

4          MR. WORDEN:  All right.  Thank you.

5          THE COURT:  All right.

6          (Bench conference concluded.)

7    Q.   (BY MR. FISHER):  Mr. Scherer, again, the date

8    of this e-mail is February 24, 2019, correct?

9    A.   Yes, sir.

10   Q.   As of the date of this e-mail, had Mr. Perez ever

11   mentioned to you "$125"?

12   A.   No, sir.

13   Q.   Had he ever mentioned to you "$100" over costs per

14   head?

15   A.   No, sir.

16   Q.   Had he ever mentioned to you any number that Tyson was

17   expected to pay over costs per head?

18   A.   No, sir.

19   Q.   And then, if you would, would you please read the next

20   two sentences starting with "Tyson."

21   A.   (Reading) "Tyson will view the cattle, once shipped to

22   High Choice.  Upon viewing the cattle at High Choice, they

23   will write the cost plus contract.  The fallouts" --

24   Q.   Oh, that was it.

25   A.   Oh, I'm sorry.

1     Q.   Thank you, sir.

2            Did you ever offer to write a cost plus contract

3     for Mr. Perez?

4     A.   No, sir.

5     Q.   Did you ever offer to write a cost plus contract for

6     anybody at Zia?

7     A.   No, sir.

8     Q.   Did you ever tell Mr. Perez or anybody at Zia that

9     Tyson would write any kind of a contract?

10    A.   No, sir.

11    Q.   Now, I'd like to pull up Exhibit Number 130, which I

12    believe is admitted.

13            THE COURT:  Did you say "Exhibit 100"?

14            MR. FISHER:  "130," Your Honor.

15            THE COURT:  Okay.

16    Q.  (BY MR. FISHER):  And did you -- do you recall

17    reviewing this e-mail from Mr. Perez to

18    Mr. Turnipseed on February 13th, 2019?

19    A.   Yes.

20    Q.   Okay.  And you were not copied on this e-mail,

21    correct?

22    A.   No, sir.

23    Q.   And do you see anybody from Tyson copied on the

24    e-mail?

25    A.   No, sir.

1    Q.    Can you read that second sentence for us, beginning

2    with -- I apologize, I keep forgetting to clean or clear the

3    screen -- beginning with "Tyson" on that first line.

4    A.    (Reading) "Tyson will go to the yard and look at the

5    cattle, look at the cattle's documentation, and look at the

6    cattle's health.  Their value will be based on the amount

7    that we give the feedlot for the purchase amount on the

8    cattle."

9    Q.    And the date of this e-mail is what?

10   A.    February 13th, 2019.

11   Q.    I believe that's almost a month to the day that you

12   met Mr. Perez in Happy, Texas, correct?

13   A.    Yes, sir.

14   Q.    Between that date and February 13th of 2019, did you

15   ever have a discussion with Mr. Perez about this

16   representation?

17   A.    No, sir.

18   Q.    Now, if I may, I'd like to move to Exhibit 133, which

19   I believe has been admitted.

20          THE COURT:  133 has been admitted.

21   Q.    Do you recall, yesterday, Mr. Worden asking you about

22   this e-mail, Mr. Scherer?

23   A.    Yes, sir.

24   Q.    Okay.  And this e-mail contained an attachment,

25   correct?

1    A.   Yes, sir.

2    Q.   Okay.  Did you view this attachment as a show list?

3    A.   Yes, sir.

4    Q.   Did Mr. Perez, in the body of the e-mail here, include

5    anything seeking confirmation of your acceptance of that

6    cost plus spreadsheet?

7    A.   No, sir.

8    Q.   In this e-mail, what's the date on this e-mail?

9    A.   February 18th, 2019.

10   Q.   And that's two weeks after the original spreadsheet

11   was e-mailed to you, correct?

12   A.   Yes, sir.

13   Q.   And did you view the spreadsheet that was attached to

14   that e-mail?

15   A.   Yes, the highlighted ones.

16   Q.   And what were you looking for when you viewed that

17   spreadsheet?

18   A.   To see what feedyard they went to.

19   Q.   And what changes do you see in this spreadsheet from

20   the spreadsheet from two weeks earlier?  Are there any

21   highlighted changes?

22   A.   Yeah.  The biggest one is the Mogus land and cattle,

23   as well as Cuervo Creek Ranch.

24   Q.   And do you still see any cattle -- and feel free to

25   refer to the other blowup exhibit.  Do you still see cattle

1    from the February 4th e-mail and the February 4th

2    spreadsheet that are still at Happy Pasture?

3    A.    Yes, sir, I do.

4    Q.    Okay.  So those cattle still had not been moved to the

5    feedyard, correct?

6    A.    That is correct.

7    Q.    And, again, you had asked for that a month earlier,

8    right?

9    A.    Yes, sir.

10   Q.    What additions do you see on this spreadsheet that

11   were added by Zia explaining the calculation of the costs

12   that are here in the light blue columns?

13   A.    None.

14   Q.    What additions do you see to the spreadsheet that were

15   included to indicate who was responsible for those costs?

16   A.    None.

17   Q.    Where on this spreadsheet do you see any mention of

18   either $125 per head or $100 per head for GAP cattle that

19   Mr. Perez testified he wanted as a premium?

20   A.    Nowhere.

21   Q.    I'd like to move to Exhibit 135, which I believe is

22   admitted.

23          Mr. Scherer, do you recall this e-mail from

24   March 4th of 2019?

25   A.    I do.

1    Q.   Okay.  And this e-mail is from Mr. Perez to you,

2    correct?

3    A.   Yes, sir.

4    Q.   And what is the subject line?

5    A.   (Reading) "Updated list."

6    Q.   And do you note below, it seems to be a forwarded

7    message from Mike Rogers to Narciso Perez.  Do you see that?

8    A.   Yes.

9    Q.   Are you familiar with who Mike Rogers is?

10   A.   Just from on the phone.

11   Q.   And what was his subject on that e-mail?

12   A.   (Reading) "March 4th, 2019, cost plus update."

13   Q.   A different subject than the e-mail you received,

14   correct?

15   A.   That is correct.

16   Q.   Did you look at the spreadsheet that was attached to

17   this March 4th e-mail?

18   A.   Yes, sir, the highlighted cattle.

19   Q.   And those were changes to that spreadsheet?

20   A.   Somewhat, yes.

21   Q.   What additions were made to this spreadsheet that

22   indicated the calculation of the costs -- I'm sorry, bad

23   question.

24            What changes were made to this spreadsheet

25   indicating how costs were calculated?

1     A.    I don't know.

2     Q.    And what additions were made to the spreadsheet

3     indicating who was responsible for those costs?

4     A.    There was none.

5     Q.    And was there any confirmation in the e-mail body from

6     Mr. Perez seeking confirmation of the cost plus --

7                 MR. WORDEN:  Your Honor, may we approach?

8                 THE COURT:  Yes.

9                     (Bench conference.)

10                MR. WORDEN:  Your Honor, these are the advisory

11    notes 611 about leading questions of a favorable witness

12    (indicating).

13                MR. FISHER:  I can't quite read it.

14                THE COURT:  Go ahead and turn it.

15                MR. FISHER:  Thank you.  I'm sorry, this is from

16    what?

17                THE COURT:  This is the use note from 611.

18                MR. WORDEN:  Advisory notes.

19                MR. FISHER:  So it's not actually in the rule?

20                MR. WORDEN:  It's just the committee that drafted

21    the rule.

22                THE COURT:  Talk into the mic.

23                MR. WORDEN:  It's just the notes of the committee

24    that drafted the rule.

25                THE COURT:  Okay.  I'll sustain it.  No more

1    leading questions.

2              MR. FISHER:  Thank you.

3              THE COURT:  Thank you.

4                   (Bench conference concluded.)

5    Q.  (BY MR. FISHER):  Okay.  Mr. Scherer, I'm going

6    to move to Exhibit 142, which was previously

7    admitted.

8              Do you recall seeing this letter yesterday on Zia

9    letterhead?

10   A.   Yes, sir.

11   Q.   And what's the date of that letter?

12   A.   March 25, 2019.

13   Q.   And what does the second bullet point there read?

14   A.   Second bullet reads (reading), "Tyson has agreed to

15   purchase all these calves under a cost plus model."

16   Q.   And was that representation accurate?

17             MR. WORDEN:  Excuse me, I didn't hear the

18   question.

19             MR. FISHER:  I said, "Was that representation

20   accurate?"

21             MR. WORDEN:  Your Honor?

22             THE COURT:  Yes.

23             MR. WORDEN:  Leading.

24             THE COURT:  Why don't you rephrase it?

25             MR. FISHER:  I'm just asking the witness -- may

1    we approach?

2                THE COURT:  Sure.

3                    (Bench conference.)

4                MR. FISHER:  I'm not asking is the representation

5    accurate, I'm asking him to say "yes" or "no."

6                MR. WORDEN:  That's -- go ahead, Mr. Fisher.

7                MR. FISHER:  That's my position.

8                MR. WORDEN:  Asking a friendly witness to say

9    "yes" or "no" is the definition of a leading question.

10   That's why we have rules against it.

11               THE COURT:  But he's not suggesting -- he's not

12   suggesting the answer, saying that representation was

13   accurate or "I'm correct, this reputation is accurate?"

14               MR. WORDEN:  Your Honor, it is suggesting the

15   answer.  He knows exactly what the script is.  He knows he's

16   supposed to say "no."

17               MR. FISHER:  There's been no suggestion.

18               MR. WORDEN:  Instead of asking him, "What did it

19   mean, what happened?"  Those are the kinds of things you ask

20   a friendly witness.

21               THE COURT:  I'm just looking at the question.

22               MR. WORDEN:  (Indicating.)

23               THE COURT:  I'm just looking at the question.

24               Mr. Fisher, why don't you rephrase it in a more

25   general --

1            MR. WORDEN:  Your Honor, I'll just say, so we

2     don't need to keep coming up here:  Textbook leading

3     questions begin with "did, didn't, was, wasn't, should,

4     shouldn't."  Those were --

5            THE COURT:  All right.  Those questions began

6     with "was."

7            MR. WORDEN:  Correct, that's textbook.

8            MR. FISHER:  I'll rephrase.

9            THE COURT:  All right.  Thank you.

10            (Bench conference concluded.)

11    Q.  (BY MR. FISHER):  Mr. Scherer, going back to

12    that second bullet point that you read, what did

13    that mean to you when you read that?

14    A.  Well, if you read it, it would state that Tyson had

15    agreed to purchase all these calves.

16    Q.  And do you have, now, thoughts on that representation?

17    A.  That is false.

18    Q.  If we can move now to Exhibit Number 149, which has

19    been admitted.

20            Is this e-mail recognizable to you, Mr. Scherer?

21    A.  Yes, sir.

22    Q.  And what is the date on this e-mail?

23    A.  May 10, 2019.

24    Q.  And from whom was this e-mail sent?

25    A.  Narciso Perez.

1    Q.   Okay.  And to whom was it sent?

2    A.   Excuse me?

3    Q.   Who is the recipient of the e-mail?

4    A.   To Robert Scherer and Justin Nelson.

5    Q.   What did this e-mail appear to be to you?

6    A.   Again, the inventory.

7    Q.   And did you have an opportunity -- did you review the

8    spreadsheets attached to the e-mail?

9    A.   Yes, sir.

10   Q.   And did you note any changes to the spreadsheets?

11   A.   No, sir.

12   Q.   Are costs -- were there anything on the spreadsheet

13   indicating costs?

14   A.   No, sir.

15   Q.   Do you see any columns on the spreadsheet indicating

16   costs?

17   A.   No, sir.  Oh, excuse me?

18   Q.   Is there anything on the spreadsheet that says

19   "costs"?

20   A.   That says "costs"?  Yes.

21   Q.   Can you describe any changes that you see to the

22   spreadsheet with an explanation of the costs?

23   A.   No, sir.

24   Q.   Can you describe any changes that you see to the

25   spreadsheet with the responsible party for costs?

 1    A.    No, sir.

 2    Q.    Now, I'd like to show Mr. Scherer Exhibit 151, which I

 3    believe has been previously admitted.

 4             Do you recall going over this e-mail yesterday

 5    with Mr. Worden?

 6    A.    Yes, I do.

 7    Q.    Okay.  What was date on this e-mail?

 8    A.    Saturday, May 25th, 2019.

 9    Q.    And was there anything included with this e-mail?

10    A.    It appears to be invoices.

11    Q.    Tell me what, if anything, you recall about receiving

12    those invoices?

13    A.    It's the first mention of the $125-a-head premium.

14    Q.    Looking at the date, what is the date of this e-mail?

15    A.    Saturday, May 25th, 2019.

16    Q.    And what is the time that you sent this e-mail on

17    Saturday, May 25th?

18    A.    6:37 A.M., Mountain Time.

19    Q.    Looking at the attachment, is there a date on the

20    invoices?

21    A.    5-24-19.

22    Q.    The day before your e-mail, correct?

23    A.    Yes, sir.

24    Q.    Was there a reason you sent this e-mail at 6:37 in the

25    morning on a Saturday to Mr. Perez?

1    A.   Because I got up, went into work and saw it on my

2    e-mail.

3    Q.   Had you received any invoices for the cost of cattle

4    before these invoices from Prewitt?

5    A.   No, sir.

6    Q.   So, Saturday morning.  Had you considered sending it

7    at a later date?

8    A.   No, sir.

9    Q.   Was there a particular reason you sent it on Saturday

10   morning?

11   A.   Simply because it needed urgent attention.

12   Q.   You mentioned, on the attachment, that there was an

13   indication of $125; am I stating that correctly?

14   A.   Yes.

15   Q.   Where on the invoice did you see that?

16   A.   Line 3.

17   Q.   Okay.  And what does that -- does it indicate to you

18   on the invoice what that 125 is associated with?

19   A.   Just premium cattle, 516 head.

20   Q.   Prior to receiving this invoice, tell me about the

21   times you had heard about $125 per head.

22   A.   Zero.

23   Q.   In response to your e-mail, do you recall what

24   communications you received from Mr. Perez?

25   A.   I do not.

1   Q.   And then Exhibit 152 -- which, I'm sorry, I'm pulling

2   up the wrong one -- which I believe has been admitted.

3            What's the date on this e-mail, Mr. Scherer?

4   A.   June 3, 2019.

5   Q.   And do you know Kendall Martens?

6   A.   Yes, sir, I do.

7   Q.   Who is Kendall Martens?

8   A.   He is the feedlot owner of KM Feeders.

9   Q.   And from whom does this e-mail seem to be -- appear to

10  be from?

11  A.   It is from Doug Penner and it is to Kendall Martens,

12  with Zia employees carbon-copied on it.

13  Q.   Is anyone from Tyson copied on this e-mail?

14  A.   No, sir.

15  Q.   And can you read that first sentence there from the

16  e-mail starting with "before"?

17  A.   (Reading) "Before you invoice Tyson for the Reynolds

18  cattle I have been e-mailing you about, we would like you --

19  we would like to have you send us a draft invoice so we can

20  make sure we are all on the same page as to the costs."

21  Q.   From what you can tell, what Tyson people were

22  included on this e-mail?

23  A.   None.

24  Q.   What discussions had you had with Mr. Perez about Zia

25  reaching out to KM Feeders about this?

1    A.    None.

2    Q.    Mr. Scherer, did you hear Mr. Perez yesterday testify

3    about money that Zia lost in 2018?

4    A.    Yes, sir.

5    Q.    Do you recall testimony from Mr. Perez regarding the

6    reason for that loss?

7    A.    Yes, sir.

8    Q.    And do you recall testimony from Mr. Perez about you

9    refusing to take cattle that ended up sitting in feedyards?

10   A.    Yes, sir.

11   Q.    Do you have any kind of response to that testimony

12   from Mr. Perez?

13   A.    I do.  We take animal husbandry very serious, animal

14   well-being.  We would not let cattle stand for 300 days or

15   whatever was mentioned.

16   Q.    Do you deny that allegation?

17   A.    I do.

18         MR. FISHER:  Mr. Scherer, thank you for your

19   time.

20         And I will pass the witness.

21         THE COURT:  Redirect?

22                **<u>REDIRECT EXAMINATION</u>**

23   Q.  (BY MR. WORDEN):  Mr. Scherer, you were

24   specifically demoted at the end of 2017 because of

25   the transaction where the cattle sat there for a

1    year, correct?

2     A.   I was demoted?

3     Q.   Yes.  I asked you that yesterday and I read you your

4    deposition transcript.  Do you remember that?

5     A.   I do.

6     Q.   So now, did you spend time last night meeting with

7    your lawyers?

8     A.   No, sir.

9     Q.   No preparation for today, at all?

10    A.   No, sir.

11    Q.   Because you've answered a few -- you'd agree, several

12   of your answers are a little different than they were

13   yesterday, correct?

14    A.   I got a little bit better night's sleep.

15    Q.   Okay.  That's the only difference?  You had a

16   little --

17    A.   Yes.

18    Q.   -- better night's sleep, so a few answers have

19   changed, correct?

20           MR. FISHER:  Objection, Your Honor --

21    Q.   I asked you yest- --

22           THE COURT:  Hold on, there's an objection.

23           MR. FISHER:  -- it's mischaracterizing testimony,

24   Your Honor.

25           MR. WORDEN:  I'll move on.

1          THE COURT:  Overruled.  Go ahead.

2    Q.  (BY MR. WORDEN):  I asked you yesterday -- and

3    I can get the deposition out -- if you were demoted

4    because of that transaction you had with Zia where

5    Narciso contends you left the cattle for a year.

6    The answer to that is, yes, that's why you were

7    demoted, correct?

8    A.  I was demoted because we had too many cattle

9    purchased.

10   Q.  From Zia, correct?

11   A.  All cattle, in general.

12          MR. WORDEN:  Excuse me just a moment.  I didn't

13   know I would need this page.  Please bear with me

14   momentarily.

15          I'm reading from pages 48 and 49 of Mr. Scherer's

16   deposition transcript 14 months ago, starting with page --

17   line 16.

18          (Reading) "All right" -- question -- "did

19   Mr. Gerber negotiate any prior deals prior to February of

20   2019 directly with Zia, as far as you know?"

21          Mr. Scherer's answer:  "Well, he took it back for

22   a couple of years or about a year, I believe, yes."

23          Question:  "What do you mean he took it back?"

24          Answer:  "I solely ran the NHTC program, and

25   Mr. Gerber and Mr. Holmes did the naturals for approximately

1   a year."

2              Question:  "Why did Mr. Gerber take it back?"

3              Answer:  "Because of the influx and volumes.  We

4   cannot move the product and we were tending to get flooded

5   with inventory."

6              Question:  "There were problems with the prior

7   deal between Zia and Tyson, in that Tyson was not taking

8   cattle on time; that's why Mr. Gerber took it back,

9   correct?"

10             Answer:  "Correct."

11            (Discussion off the record.)

12   Q.   So one other area -- and you can correct me if I

13   misunderstood yesterday -- when you said you looked at this

14   on February 4th, when you said "looked good," you said you

15   meant the inventories looked good, correct?

16   A.   Yes, sir.

17   Q.   All right.  But did I hear you today saying that, on

18   May 4th [sic], your testimony now is when you said "looked

19   good," you meant only the cattle you looked at in Happy,

20   Texas?  Only that inventory looked good?

21   A.   Those were the cattle I went down and laid my eyes on.

22   Q.   Now, your testimony is you didn't mean all these

23   inventories looked good, you didn't mean all of Column 5,

24   you just meant one line of Column 5 that you looked at in

25   Texas, correct?

1    A.    Correct.

2    Q.    How was anyone at Zia supposed to know that you didn't

3    mean the proposal looks good, you didn't mean all the

4    inventory looks good, you just meant the inventory at one of

5    the 30 different locations here?

6    A.    I don't know.

7    Q.    Because, before you just sat here this morning and

8    Mr. Fisher asked you a leading question if you meant what

9    you meant by that, you have never, ever to anyone made the

10   contention that, when you said "looked good," you meant just

11   one line of just one column, that's all you meant, correct?

12   A.    No.   What I meant was the cattle I laid eyes on at

13   Happy Pasture.

14   Q.    My question is:   Have you ever, at any time before you

15   were sitting here this morning and Mr. Fisher asked you some

16   questions, told anyone in the world, when you said "looked

17   good," you meant only the inventory of the cattle you looked

18   at in Happy Pasture looked good?

19   A.    That is correct.

20   Q.    It's correct you've never said that before this

21   morning, correct?

22   A.    I believe so.

23   Q.    All right.   You said you've received other documents

24   like this from Zia for other transactions, correct?

25   A.    Inventories, yes, sir.

1    Q.   Inventories?

2    A.   Yes, sir.

3    Q.   Okay.  Mr. Fisher asked you, so there was nothing

4    unusual about this; you'd seen plenty of these, correct?

5    A.   Yes, the left-hand side of the page.

6    Q.   The left-hand side, the column that has inventory,

7    correct?

8    A.   And projected outdates, yeah.

9    Q.   You've never seen any of this on any prior proposal,

10   document, or otherwise, ever from Zia, correct?

11   A.   Prior to February 4th?

12   Q.   Yes.  Prior to February 4th, these last 12 columns

13   they had never included on a spreadsheet like this for you,

14   in any form, correct?

15   A.   I don't remember.

16   Q.   Can you -- I'll give you a chance to think about it.

17   Because you said earlier you'd seen lots of these, but you

18   had never seen anything that had the last 12 columns on it,

19   ever, from Zia before this, correct?

20   A.   No, sir.

21   Q.   No, you've never seen it, or, no, I'm not correct?

22   A.   No, you're not correct.

23   Q.   What's not correct about what I said?

24   A.   Because I presume these were the same or some of the

25   numbers that I admitted to seeing yesterday with Narciso.

1    Q.   Okay.  In Happy, Texas?

2    A.   Yes, sir.

3    Q.   Okay.  That's a good correction.

4              Prior to Happy, Texas, you had never seen

5    anything like this from Zia with the 12 columns on the

6    right, correct?

7    A.   Prior to Happy, Texas, I had seen inventories which

8    covered the first one, two, three, four, five, and then the

9    outdates.

10   Q.   Okay.  But never anything on --

11   A.   No, sir.

12   Q.   -- all over here (indicating), correct?

13   A.   Correct.

14   Q.   Okay.  The e-mail you sent that we talked about a

15   moment ago, where you got up early in the morning, went to

16   the office on a Saturday; you saw the e-mail with the bills

17   and you said, "I'm not paying the cost of your calves"; do

18   you remember that one?

19   A.   Yes.

20   Q.   The bills were from Valley View, correct?

21   A.   Yes, sir.

22   Q.   How was the quality of the cattle that came out of

23   Valley View referenced in that bill?

24   A.   Could I see it again?

25   Q.   What would you like to see again?

1    A.    The e-mail --

2    Q.    Sure.

3    A.    -- with the invoice.

4              (Discussion off the record.)

5    Q.  (BY MR. WORDEN):  You know, there was a

6    discrepancy in what we had between the parties.  We

7    worked it out this morning, but it's -- I'll get

8    back to that one.  I'll be sure to show you that,

9    and I'll let you answer the question.

10             You were asked the question by Mr. Fisher in

11   response to the document Sean Perez sent to their lender in

12   March.  He asked you, "Had Tyson agreed to purchase all

13   these calves?"  And you said that was false, correct?

14   A.    Yes, sir.

15   Q.    In March, had Tyson agreed to purchase any of these

16   cows?

17   A.    Could you repeat the question, please?

18   Q.    Zia, after you say "looks good," makes a commitment to

19   raise all 9,000 head for you.  What did Tyson commit to when

20   you said it was false that Tyson had agreed to pay for these

21   cows?

22   A.    Cattle were delivered.  Cattle were harvested.  Cattle

23   were paid for.

24   Q.    So, at this point, in March, since the cattle aren't

25   at weight, ready to be delivered, in your mind, Tyson hadn't

1    agreed to do anything yet, correct?

2    A.   We were receiving cattle.

3    Q.   You weren't receiving any of this cattle in March?

4    A.   No, but we were receiving cattle from Zia.

5    Q.   You weren't receiving any of -- let's talk about this

6    cattle that are here in this lawsuit.

7    A.   Sure.

8    Q.   What had Tyson agreed to do, as of March, when you

9    said it was false -- had Tyson agreed to purchase any of

10   this?

11   A.   Not on a cost plus model, no.

12   Q.   Had Tyson agreed to purchase any of this?

13   A.   Not to my knowledge.

14   Q.   All right.  So, in March, it's your opinion Tyson has

15   made no promise to take anything, correct?

16   A.   Yes, sir.

17   Q.   Okay.  So it's going to be like Beef City the year

18   before:  Zia will raise all the cattle and, when they're

19   ready, you'll decide whether or not to take them or not at

20   that time, correct?

21   A.   I will not decide.  If they deliver the cattle --

22   meaning, Zia -- they will decide.

23   Q.   Zia didn't just drive them up to the plant, correct?

24   A.   If they schedule them, they can, yes.

25   Q.   We just went over this.  And I just read your

1    transcript for what happened when you were demoted.

2    A.    Correct.

3    Q.    Unless you sign off on it, Zia didn't deliver the

4    cattle, correct?

5    A.    Unless they've been placed.

6    Q.    And these weren't placed, correct?

7    A.    I do not recall.

8    Q.    We talked about this yesterday.  There's not going to

9    be any evidence for this jury that these were, in any way,

10   committed before February 4th, correct?

11   A.    I don't recall.

12   Q.    So, in your mind, notwithstanding all of this, this

13   would just be like what happened at Beef City, what happened

14   in the prior transactions:  Zia would raise all the cattle,

15   pay all the costs, incur all the risk, and then, when the

16   cattle were ready, if you took them, you would pay them

17   then, correct?

18   A.    Pay what?

19   Q.    You would pay them then, correct?

20   A.    We would pay them upon delivery to the plant.

21   Q.    All right.  And we've already discussed there's not

22   going to be any evidence from anyone describing any

23   agreement for what they would be paid other than what I've

24   got up on the board, correct?

25   A.    Other than past practices, yes.

1    Q.   We've talked about that yesterday.  You're not going

2    to have anything to suggest that you ever negotiated that

3    any past practice would apply to this transaction, correct?

4    A.   I don't recall.

5    Q.   You never mentioned it one time, ever, from December

6    of 2018 until the end of May, that past practices would ever

7    have anything to do with the compensation here?  You never

8    said that once, did you?

9    A.   I don't recall.

10   Q.   I'll give you a minute.  If you want to think about

11   it, let me know if you can think of an instance where you

12   did; we can talk about that.

13                  (Discussion off the record.)

14            All right.  Mr. Scherer, we have that document.

15   I'll have Ms. Gallagher scroll to whatever page you'd like

16   to look at.

17   A.   Go up one page.

18   Q.   Okay.

19   A.   Right there.

20   Q.   So my question, I believe, was what do you know about

21   the quality of the cattle that you received from Valley View

22   invoiced here?

23   A.   What I know is they shipped 489 steers, 27 head of

24   heifers, 516 head of premium natural cattle.

25   Q.   All right.  Do you have any reason to believe they

1    were not quality cattle that you turned around and sold to

2    Whole Foods?

3    A.   I do not recall, but it does not state whether they

4    were GAP or not.

5    Q.   Mr. Fisher asked you some questions about weight.

6    A.   Yes, sir.

7    Q.   And you said you like weight to be in a range of 13 to

8    14, correct?

9    A.   That's correct.

10   Q.   When Mr. Perez gave you this in Happy, Texas, and when

11   you received it again on February 4th, and when you

12   received all the updates, they all told you exactly what the

13   weight projections were, correct?

14   A.   That's what they show.

15   Q.   You could see right there the projections were in the

16   11s, correct?

17   A.   If you like, yes, sir.

18   Q.   You could have said, "These are not going to be heavy

19   enough, no deal," correct?

20   A.   That's why my concern was to get them in a feedyard.

21   Q.   You never told anyone at Zia, when you said "looked

22   good," that the projected weights were not looking good for

23   you, correct?

24   A.   Yes.

25   Q.   This is the proposal.  They didn't propose 13- or

1    1,400 for these natural cattle, correct?

2    A.   It does not show that.

3    Q.   All right.  And you know that natural cattle grow

4    slower, correct?

5    A.   Yes, sir.

6    Q.   And you're going to have -- Dr. Benavidez is going to

7    come in here and talk a great deal about this, about how

8    they're more temperamental.  Not that the other cows are

9    robots -- Mr. Perez says they're all snowflakes -- but the

10   conventional cattle are more predictable, correct?

11   A.   With the use of technology, that is correct.

12   Q.   Thank you.  Mr. Perez testified that, when he walked

13   through this in Happy, Texas, he told you built into it was

14   $125 or $100 per head.  I asked you yesterday what you

15   discussed, and you didn't remember much.  You remembered

16   very vividly this morning, when Mr. Fisher asked you a

17   leading question about that, that Mr. Perez didn't say that,

18   correct?

19   A.   That is correct.

20   Q.   Nobody's asking you to pay 125 or 100 per head on this

21   proposal, correct?  They're asking you to pay the total

22   costs, correct?

23   A.   Yes, sir.

24   Q.   All right.  All of these texts prior to February 4th

25   where you're sending these texts to Narciso, essentially

1    ordering him "get them on feed, you've got to move them,"

2    that was before you had agreed to any proposal for how Zia

3    would be paid for this, correct?

4    A.   I never agreed to the proposal.

5    Q.   So before you ever agreed to anything, correct?

6    Because you haven't agreed to anything, right?

7    A.   Yes.

8    Q.   Your testimony is Tyson never agreed to anything on

9    this transaction?  We're back to that, correct?

10   A.   Correct.

11   Q.   All right.  So when -- remember in your deposition, at

12   that time, Tyson was taking the position...Tyson denies the

13   existence of any contract with Zia.  Do you remember that?

14   A.   No, sir.

15   Q.   Well, you were here on Monday when Her Honor read the

16   joint statement of the case prepared by the parties to the

17   jury, correct?

18   A.   Yes, sir.

19   Q.   And at that time, it said (reading), "Tyson contends

20   that Zia supplied cattle to Tyson.  And that Tyson paid for

21   the cattle in full accordance with the terms of a previous

22   agreement."

23        So you were here when we heard that, correct?

24   A.   Yes.

25   Q.   The position now is there was no agreement, at all, on

1   these cattle, correct?

2   A.   Unless they delivered cattle to the plant.

3   Q.   And that would have been after they'd already been

4   raised, correct?

5   A.   They would be finished, yes.

6   Q.   And there was not going to be an agreement then?  You

7   were just going to pay what you were intending to pay Zia,

8   correct?

9   A.   It's a common practice in the cattle market.

10  Q.   For -- common practice for Tyson to pay producers what

11  Tyson intends to pay for cattle, correct?

12  A.   It is the industry standard.

13  Q.   Tyson is the only GAP-certified industry for Whole

14  Foods cattle, correct?

15  A.   No, sir.  There were other small packers.

16  Q.   For GAP-certified, for Whole Foods?

17  A.   GAP-certified, yes.

18  Q.   What was their practice?

19  A.   I don't know.  I don't talk to my competitors.

20  Q.   So when you say "industry standard," the only

21  standard -- the only industry you know of when you just said

22  that was what Tyson likes to do, correct?

23  A.   How Tyson pays for cattle?

24  Q.   Yes.  When you said "industry standard," the entire

25  industry you were referring to was what Tyson likes to do,

1    correct?

2    A.    Trades on CME or trades in the weighted averages.

3    Q.    That's not what I asked you.  When you said the

4    "industry standard" for how they are paid, that industry

5    that you knew of regarding payment for GAP-certified cattle

6    for Whole Foods was what Tyson's practice was, correct?

7    A.    Yes.

8    Q.    And Mr. Perez told you repeatedly in January, "We're

9    not going to do it the old way, we lost millions of

10   dollars," correct?

11   A.    I do not recall.

12   Q.    So when you sent that e-mail in December saying, "Is

13   so-and-so going to send us numbers?  I don't want any

14   surprises this year," at that point, you didn't have any

15   transaction in place with Zia, correct?

16   A.    I do not recall.  I would assume we did, but I do not

17   know.

18   Q.    And then you talked to Narciso, and you and he talked

19   about how much money they lost on the last transaction which

20   resulted in you being demoted, correct?

21   A.    I do not recall that being...

22   Q.    You do not recall Mr. Perez telling you that they had

23   lost a lot of money on the last couple transactions?

24   A.    That's correct.

25   Q.    You don't recall that, at all?

1    A.   I don't remember.

2    Q.   You are the most knowledgeable person at Tyson

3    regarding this transaction with Zia, correct?

4    A.   To the best of my knowledge.

5    Q.   Well, I asked you that in your depo, straight up, and

6    you told me "yes"; do you remember that?

7    A.   Vaguely.

8         MR. WORDEN:   I'd like to read from page 90 of

9    Mr. Scherer's transcript of the deposition in May of 2021.

10        The question is (reading):  "Interrogatory

11   Number 5 asked Tyson to identify its most knowledgeable

12   person, officer, et cetera, regarding certain things, sale,

13   distribution, and liquidation of cattle sourced from Zia.

14   Do you believe you are the most knowledgeable person

15   regarding the purchase of cattle from Zia?"

16        Answer:  "Yes, sir."

17        What are some of the brands that Tyson Fresh

18   Meats markets its products under?

19   A.   The natural program?  Open Prairie Natural or GAP.

20   Q.   And then how about the conventional products?  Is

21   Jimmy Dean one of those?

22   A.   It is an entity of Tyson Foods.

23   Q.   And how about -- all right.  How about Ballpark

24   Franks?

25   A.   Same thing.

1    Q.    What about Tyson Fresh Meats?  Does it have its own

2    brands?

3    A.    IBP.  IBP beef and pork.

4    Q.    Okay.  With regard to this cattle -- I mean, you gave

5    testimony earlier that you don't recall leaving cattle in

6    the yard, et cetera.  You didn't take all this cattle

7    either, correct?

8    A.    I don't recall, but I'm not sure.  I think we -- we

9    stopped after an agreed-upon time.

10    Q.    Tyson decided to stop taking this cattle when they

11    were ready in 2019, correct?

12    A.    In 2019?

13    Q.    Yes, in the spring, summer months when this cattle

14    became ready, you declined to take some of the cattle,

15    correct?

16    A.    Correct.

17    Q.    And you only started taking it again after someone

18    from the Tyson legal department told you that, if you

19    discriminated or retaliated, it would be a problem and you

20    should start taking it again, correct?

21    A.    What legal told me was we could not discriminate

22    against a feedyard, period -- which we did not -- and their

23    customers are their customers.

24    Q.    So after legal told you that, you stopped

25    discriminating and started taking Zia cattle again, correct?

1    A.   Started working with Beef City, yes.

2    Q.   Which had Zia's cattle, correct?

3    A.   I believe.

4    Q.   So you said, in 2015 when you came on board, there

5    were 10 to 20 different pricing mechanisms, correct?

6    A.   Yes, sir.

7    Q.   And you tried to narrow that to a smaller number,

8    correct?

9    A.   Yes, sir.

10   Q.   How many transactions had you done with Zia before

11   this one since the time you narrowed it from 10 or 20 to

12   some smaller number?

13   A.   From 2015 up through November of '17, and then back on

14   in August, I guess, of '18.

15   Q.   How many separate transactions were there?

16   A.   I have no idea.

17   Q.   Can you remember any of them?

18   A.   By volume, no, but there was numerous.

19   Q.   With Zia?

20   A.   With Zia.

21   Q.   And they weren't all according to even the same

22   mechanism for payment after you narrowed the number,

23   correct?

24   A.   They could have either been CME contracted or they

25   were Nebraska weighted average, dressed, delivered.

1    Q.   And those had some sort of premium, correct?

2    A.   They have a premium per head.

3    Q.   And of the 200 different producers like Zia, they all

4    had different premiums per head, correct?

5    A.   Depended on their volumes.

6    Q.   They all had different premiums, correct?

7    A.   That is correct.

8    Q.   You were asked what Zia is.  And you said they were,

9    quote, simply, end quote, a producer.  Why did you say they

10   were simply a producer?

11   A.   I'm sorry, I could barely hear you.

12   Q.   You were asked what Zia was, and you said they were

13   simply a producer.  Why did you say "simply"?

14   A.   Because they're just in the fold with the other 199

15   producers that provide natural cattle.

16        Every cattle feeder is valued.

17   Q.   Mr. Fisher asked you some questions this morning, and

18   you said there had been some problems with weight with Zia

19   in the past.  But whether that happened or not, you reached

20   out to Narciso about this transaction, correct?

21   A.   About a cost plus deal?

22   Q.   No.  About the cattle you needed for Whole Foods.

23   A.   About the cattle, yes, sir.

24   Q.   He didn't reach out to you?  You called him and said,

25   "I need your help," correct?

1   A.   I said, "I need volumes in these three months right

2   here."

3   Q.   Sky River.  You testified that they came in with a

4   cost plus proposal, correct?

5   A.   That is correct.

6   Q.   And after you reviewed it and reviewed it with people

7   internally, did you tell them, "It looks good, get it done

8   ASAP," or did you tell them something else?

9   A.   No.  They came back in and we talked about it.

10  Q.   And what did you tell them?

11  A.   That, at that time, Tyson is not willing to change the

12  mechanics of how we trade cattle.

13  Q.   You were very clear, when you talked to Sky River, you

14  were not going to do a cost plus agreement with Sky River,

15  correct?

16  A.   That is correct.  In person.

17  Q.   All right.  You met in person with Narciso in Texas,

18  correct?

19  A.   Yes, I did.

20  Q.   You said it was too much risk for Tyson.  Why was that

21  too much risk for Tyson?

22  A.   Because, at that time, we were not very good cattle

23  feeders.

24  Q.   So what was the risk?

25  A.   The risk is hedging the cattle, buying the cattle, not

1    having a feeder cattle buyer out there, input cost, et

2    cetera.

3    Q.   So what happens?  If you didn't calculate it

4    correctly, you could -- Tyson could lose money on the

5    transaction?

6    A.   We would be the sole responsible party for it.

7    Q.   And Tyson did not like to be responsible for risk on

8    these transactions, correct?

9    A.   Not on a cost plus model, no.

10   Q.   Not on any model, correct?

11   A.   I do not have that knowledge.

12   Q.   So Mr. Fisher asked you a leading question:  "Did you

13   expect for anyone to send you this on February 4th or did

14   it just show up out of the blue?"

15        You had been talking to Narciso about this

16   proposal that he gave you in Texas, and you took home with

17   you, correct?

18   A.   I had not been talking about it for weeks on end, no.

19   Q.   Since January 14th to February 4th, you had a copy

20   of a draft of this, correct?

21   A.   What I had was I considered the inventory.

22   Q.   You had that, but it had all the other columns,

23   correct?

24   A.   It might have.

25   Q.   So you're sending Narciso texts saying, "You've got to

1    move it, we need to get these off wheat," et cetera, and

2    he's telling you, "We've got to finalize this agreement,"

3    correct?

4    A.   No, sir.  What I'm telling him is to get the cattle

5    off the wheat, get them in a finish feedyard, because the

6    projected weights are not big enough.

7    Q.   And he's telling you, "I'm not doing a deal, period,

8    unless we agree on this," correct?

9    A.   I don't believe so.

10   Q.   "No"?

11   A.   No, sir.

12   Q.   Are you telling him at that time you're not agreeing

13   to anything until the cattle are all done?

14   A.   No.

15   Q.   You never, ever told him that, ever, until the end of

16   May, correct?

17   A.   That is correct.

18   Q.   So this didn't show up out of blue.  These were the

19   cattle that you'd been discussing, correct?

20   A.   When were we discussing them?

21   Q.   You went to Texas --

22   A.   I went to Texas to look at the cattle on wheat.

23   Q.   You send a number of texts referencing the names of

24   the feedlots and such, and ranchers on that chart, correct?

25   A.   Just the ones on Happy Pastures that I viewed.

1    Q.   If there's a cost plus agreement and Zia gets a better

2    deal on the calves, that benefits the other cost plus

3    partner, too, correct?

4    A.   If there's an agreement on a cost plus.

5    Q.   And if there is, the answer to that question is "yes,"

6    correct?

7    A.   Well, Zia would get the deal, unless the parties had

8    negotiated out that they were paying for all the calves.

9            MR. WORDEN:  That's all I have, Mr. Scherer.

10   Thank you.

11           THE WITNESS:  Thank you.

12           THE COURT:  Mr. Scherer, you can return to

13   counsel table.

14           We're going to take our mid-morning break for

15   about 15 minutes.

16           All rise for the jury.

17                (Jury not present.)

18           All right.  We're in recess for 15 minutes.

19           MR. WORDEN:  Thank you, Your Honor.

20                (A recess was taken.)

21           THE COURT:  Does either party have anything they

22   want to address before we bring in the jury?

23           MS. DIAMOND:  We wanted to use the dry erase

24   board again, so I just wanted to make sure that was okay

25   with Your Honor.

1            THE COURT:  That's okay with me.

2            Mr. Fisher?

3            MR. FISHER:  Yes, Your Honor.  I'd like to seek

4    clarification on the Court's ruling from the Bench during my

5    cross-examination of Mr. Scherer.

6            I was asking Mr. Scherer some questions about

7    Tyson's pricing structure; how Tyson's standard pricing

8    system works.  Mr. Worden objected, we came to the Bench,

9    and I was told that because of testimony from Mr. Scherer

10   yesterday regarding there being no agreement on that system

11   that I was not permitted to get into that.

12           However, the issue here is that we have payments

13   that were made to Tyson -- or to Zia for these cattle that

14   were based on that pricing structure.  And so this is not an

15   issue of Zia not being paid for the cattle.  They were paid

16   for the cattle.  They were paid the Nebraska weighted

17   average, plus the premiums per head.  So, in light of

18   that -- and we're about to hear testimony from Zia on the

19   financial side of things -- I would like to seek

20   clarification and ask the Court to reconsider allowing me to

21   get into that, since Zia did receive payments based on that

22   payment scheme.

23           THE COURT:  If I recall correctly, just to make

24   sure we're at the same spot, you were asking your corporate

25   representative how pricing works at Tyson, and then you

1   asked how that pricing is communicated to producers like

2   Zia.  And that's what drew the objection, right?

3           MR. FISHER:  No, it was getting into the subject

4   of pricing, in general.  Mr. Worden's objection was that

5   Mr. Scherer had testified the previous day that there was no

6   agreement between Tyson and Zia on the pricing structure.

7   And that was what drew the objection.  I'd actually asked my

8   last question on that particular part of it and moved on,

9   based on the ruling from the Court that I was not to get

10  into that any further.

11          THE COURT:  Let me just pull it up really quick,

12  so I can make sure we're talking about the same thing.

13          MR. FISHER:  Sure.

14          THE COURT:  Go ahead, Mr. Worden.

15          MR. WORDEN:  I believe Your Honor's recollection

16  of it is there -- you can correct us -- your recollection is

17  correct.  I did not object when there was testimony about

18  the Nebraska weighted average.  What I objected to is when

19  they asked how that would have been communicated to Zia in

20  2018.  And my objection was the evidence is undisputed:  No

21  such thing was communicated relevant to this transaction.

22  That's my objection.

23          THE COURT:  I think that's right, Mr. Fisher.

24  And so what I meant to communicate was that your witness

25  could testify about that, about those pricing mechanisms, if

1   he first brought forth some evidence that that was

2   communicated to Zia in some way.

3         MR. FISHER:  And the objection, to my

4   understanding, from what -- Mr. Worden, was that

5   Mr. Scherer's testimony yesterday established that there was

6   no communication, which naturally leads to I cannot get into

7   that testimony.

8         THE COURT:  So you -- so your question was

9   generally about how these kinds -- this kind of pricing

10  structure is communicated to producers like Zia.

11        MR. FISHER:  So the subject of my questioning of

12  Mr. Scherer was about the pricing structure and, yes, I did

13  talk about the communication to Zia.  But, based on my

14  understanding of Counsel's objection at the Bench, it was

15  that there was an objection about the communication of the

16  pricing with Zia.  The Court's ruling was that, unless I can

17  establish that communication of the pricing to Zia, that

18  testimony would not come in.  And Mr. Worden's response was

19  that the testimony of Mr. Scherer from yesterday essentially

20  stated that there was no communication, which, if there was

21  no communication, based on the Court's ruling, I would not

22  be allowed to get into that.

23        THE COURT:  Okay.  And so you want to get into it

24  because you just want to talk generally about how pricing

25  works at Tyson?

1          MR. FISHER:  So what my -- I would like to do,

2     Your Honor, is I would like to have the opportunity to ask

3     Mr. Scherer the questions about the price -- how did the

4     pricing structure work at Tyson?  This is how it worked, and

5     then obtain the testimony from Mr. Scherer that Zia was paid

6     based on that pricing structure.  Because they were paid

7     $12 million, based on that pricing structure.

8          THE COURT:  I understand.  And you don't want to

9     ask any questions about that being communicated?

10         MR. FISHER:  Correct, Your Honor.

11         THE COURT:  I'm just looking back at it -- and

12    you're welcome to look at it in some way, but that was the

13    question that drew the objection.

14         Mr. Worden, what's your position on testimony

15    from --

16         MR. WORDEN:  That's a different issue.  They

17    could have asked Mr. Scherer, "How did you figure out how

18    much to pay them?"  In fact, I asked him that yesterday, and

19    he said he didn't know.  And he said he didn't prep last

20    night, so I'm not sure how he's going to answer that today.

21    Either way, both parties have completed their testimony --

22    their questioning.

23         MR. FISHER:  That is not true.  Based on the

24    ruling, I did not ask Mr. Scherer those questions.  All I

25    want to ask Mr. Scherer is, "This is how the standard

1    pricing works?"  Mr. Worden is asking for details and

2    numbers and technical things.  I want to ask Mr. Scherer, in

3    general, "Zia was paid this amount of money.  How was that

4    payment calculated?"  And he can testify to that, that that

5    payment was calculated based on Tyson's standard pricing, as

6    opposed to this cost plus model.

7            And that's the basis of plaintiff's claim, is

8    that they're seeking the difference between the two.

9            THE COURT:  I understand.  I think the jury

10   probably knows, but I do think that would be relevant.

11           Mr. Worden, do you think that that is not

12   relevant?

13           MR. WORDEN:  How they figured out how much to pay

14   is relevant.  I asked him that question yesterday.  And that

15   question was not asked, nor did I object to it.

16           THE COURT:  Okay.  So --

17           MR. FISHER:  Your Honor, if I had had the

18   opportunity and been under the impression that that was

19   something I could get into, I would have asked Mr. Scherer

20   that.

21           THE COURT:  I understand.  Do you want to put him

22   back on the stand to ask literally those three questions?

23           MR. FISHER:  If I may, Your Honor.

24           MR. WORDEN:  That's fine, Your Honor.

25           THE COURT:  Mr. Scherer, I'm sorry.  I told you

1   you were able to go back to counsel table, but you're back

2   up on the witness stand for a minute.

3              Otherwise, are we ready for the jury?

4              MR. FISHER:  Yes, Your Honor.

5              THE COURT:  Okay.

6                  (Discussion off the record.)

7                      (Jury present.)

8              Thank you.  You may be seated.

9              All right.  Mr. Fisher, you may proceed.

10             MR. FISHER:  Thank you, Your Honor.

11                        **RECROSS-EXAMINATION**

12   Q.  (BY MR. FISHER):  Mr. Scherer, do you recall

13   earlier I was asking you some questions about the

14   standard pricing practices at Tyson?

15   A.   Yes, sir.

16   Q.   Okay.  And I believe you testified that there were two

17   components to that, correct?

18   A.   Yes, sir.

19   Q.   And that first component of the pricing mechanism,

20   what was that?

21   A.   It was either Nebraska weighted average or CME

22   contracted cattle.

23   Q.   Okay.  And then, in addition to the pricing mechanism

24   for the premium cattle, what was that component?

25   A.   It's a premium per head.

1    Q.    Okay.  Was Zia paid for the cattle that are involved

2    in this litigation?

3    A.    Yes, sir.

4    Q.    And how?  Under what pricing system were they paid for

5    that cattle?

6    A.    They were priced as Nebraska weighted average, wheat

7    prior, which is standard for Tyson, and the premium per

8    head.

9                MR. FISHER:  Thank you, Mr. Scherer.

10               THE COURT:  All right.  Thank you.

11               Mr. Worden, because it's your witness, if you

12    have a brief --

13               MR. WORDEN:  Nothing further.

14               THE COURT:  All right.  Thank you.

15               Mr. Scherer, you're excused.  Thank you.

16               Zia may call its next witness.

17               MS. DIAMOND:  Your Honor, Zia calls Sean Perez.

18               THE COURT:  All right.  Mr. Perez.

19                             **SEAN PEREZ**,

20               After having been first duly sworn, did make the

21    following answers:

22                        **DIRECT EXAMINATION**

23               THE COURT:  Thank you.  Have a seat and state

24    your name and spell it for the record.

25               THE WITNESS:  My name is Sean Perez, S-E-A-N,


                    UNITED STATES DISTRICT COURT
           100 N. Church Street, Las Cruces, NM  88001
                          (575) 528-1430

 1    P-E-R-E-Z.

 2    Q.   (BY MS. DIAMOND):   Mr. Perez, what city do you

 3    currently live in?

 4    A.   I live in Albuquerque, New Mexico.

 5    Q.   And where did you grow up?

 6    A.   I grew up here in Las Cruces.

 7    Q.   Where did you go to elementary school?

 8    A.   Just around the corner at Alameda Elementary.

 9    Q.   Tell me about your family.

10    A.   I think Narciso did a pretty good job of describing

11    his side of the family on Monday.   My mother's side of the

12    family was also a ranching family.   It's the Cox family.

13    They came to this area in about 1875, started a ranch on the

14    far side of the Organs here on what is now White Sands

15    Missile Range.   They ranched Hereford cattle there until the

16    early 1940s when the United States Government decided they

17    needed a bomb-testing facility and they needed that ranch

18    more than the Cox family needed that ranch.   And so they

19    negotiated a sale, and the Cox family was invited to find

20    another ranch to find [sic].

21              And so, in the early '50s, 1950s, they purchased

22    a ranch on the near side of the Organs now and ranched there

23    till the late '70s or early '80s on the ranch that -- if you

24    go up University Avenue all the way to the base of the

25    Organs, it's now Dripping Springs National Monument, but, at

1    that time, the headquarters where you check in for the

2    monument was the ranch house.

3    Q.   Did you spend a lot of time on your family's ranch

4    growing up?

5    A.   I spent time on both my mother's side of the family's

6    ranch, which, after they left in the '80s, my grandfather

7    purchased a ranch that was over just on the Texas side of

8    the border from Carlsbad, as well as my grandfather's ranch

9    on my father's side.

10   Q.   Did your family teach you about ranching?

11   A.   Absolutely.  The Perez family was a much more

12   ranching-driven business.  They made their welfare, their

13   livelihood, by ranching both cattle and sheep.  My

14   grandfather, in the late '90s, early 2000s, was the New

15   Mexico Sheepman of the Year.

16         On my mother's side of the family, the ranch that

17   he had was not really as high a quality of a ranch for

18   running cattle.  So he really had to make a big piece of his

19   livelihood as a windmiller and welder, as well.  But, yeah,

20   I was very happy to spend time on both ranches.

21   Q.   And after you went to Alameda Elementary School down

22   the street, what did you do next for school?

23   A.   I spent a brief year at Picacho Middle School.  And

24   then, from seventh grade through the graduation of high

25   school, I was here at Mesilla Valley Christian School here

1   in Las Cruces.

2           From there, I went to New Mexico State

3   University.  I studied computer science and graduated in

4   2007 with a bachelor of science in computer science.

5   Q.   And to get a bachelor in computer science, did you

6   have to take a lot of math?

7   A.   Yes, ma'am.  For a while there, I considered perhaps

8   double majoring with mathematics, but after four years and

9   checking off all my credits for computer science, I was

10  ready to get to work and earn some money.

11  Q.   And what did you do after college?

12  A.   I worked here in Las Cruces as a computer scientist

13  software engineer for a few years for a company called

14  VidCAD by Comsyst [phonetic] Design.

15  Q.   How did you begin your career in ranching?

16  A.   So I got that software engineering job in 2007 after I

17  graduated and worked there for a few years; and really

18  enjoyed software engineering, but didn't really enjoy the

19  company I was working for.  It was a family company, and the

20  dynamic was difficult.  And so, about 2009, 2010, I was

21  ready for a change in career.

22          And, at that time, my father's parents really had

23  some grave issues.  In the summer of 2009, my grandmother

24  had a stroke and was hospitalized and in a rehab facility

25  for some time.  And my grandfather spent a lot of time

1    running himself ragged between the ranch and Albuquerque.

2    And, you know, ultimately, my grandmother made a recovery,

3    but the wear and tear that my grandfather took, I'm sure,

4    and stress, ultimately hospitalized him in the fall of 2009,

5    and he passed away just before Thanksgiving.  And so

6    Narciso -- both of his parents had kind of been in and

7    around, living with him, so he was trying to take care of

8    two sick parents and run his business at the same time.  And

9    when I decided to seek a new career, the natural progression

10   for me was to kind of come to town and see how I could help

11   him with our family matters, as well as see if there was a

12   way for us to put our heads together and have a business

13   together.

14   Q.   And how does your family history of ranching and

15   background in computer science and math fit together?

16   A.   It's kind of an odd combination.  Ranching is an

17   industry that, if you just look at the balance sheet and

18   income statement on, doesn't really make sense.  There's no

19   windfall of profit to be made in ranching, but it's a very

20   rewarding life.  You get to experience the animal husbandry

21   and you get wide open skies.  And sometimes you have to deal

22   with inclement weather, but it's part of the experience.

23   Q.   When was Zia Ag founded?

24   A.   I believe that Zia Ag was established in 2011.

25   Q.   And what's your position at Zia Ag?

1    A.   I'm the president and sole owner.

2    Q.   And what are your responsibilities as president of Zia

3    Ag?

4    A.   As president and sole owner, I think, ultimately,

5    everything I'm responsible for, but in terms of my ordinary

6    task in the role I fill, I oversee our employees and

7    administrative functions.  The -- I don't prepare our

8    financials, but I work with our accountants and oversee all

9    of our bookkeeping and financial statement production.

10   Q.   What role does Zia Ag fill in the cattle industry?

11   A.   When we started Zia, the objective was to take

12   Narciso's lifetime of experience in the cattle industry and

13   to be able to offer his experience to customers in the form

14   of consulting services.  But, as well, to become cattle

15   feeders, ourselves, and to develop cattle supply for packers

16   and retailers that had an interest in what we would call

17   "cattle with specificity," but -- not just a conventional

18   animal, you know, where you go try and make as many of them

19   as you can and hope the market brings you what you want, but

20   we were trying to fill a need somewhere.

21   Q.   We heard Mr. Scherer testify that Zia Ag was just a

22   feeder.  How would you respond to that?

23   A.   I imagine, from his perspective, that's probably true.

24   From our perspective, we spend a great deal of time, both

25   working with ranchers, developing our own brood cow herd,

1    developing genetics, working with third-party verifiers, to

2    get our programs in order in our ranch, as well as to get

3    other ranchers involved in the programs that we think

4    there's going to be a market for the animals.  So I feel

5    like we put a lot of work into the cattle that we ultimately

6    bring to market.

7        Q.   And what work does Zia Ag do with genetics and the

8    genetics of cattle?

9        A.   So my father kind of alluded to it in his testimony.

10   We have always been interested in developing cattle that

11   have the best beef characteristics possible.  So, for us,

12   that means we go and we build relationships not only with

13   seed stock producers throughout the Southwest, but as well

14   as pharmaceutical companies like Zoetis that are doing

15   genomic testing and producing what are called "expected

16   progeny differences," and trying to determine what the best

17   type of genetics to use to both create safe and efficient

18   animals, but also animals that will have excellent beef

19   characteristics.

20       Q.   How do you feel about Zia's cattle?

21       A.   I'm proud of them.  We've put a lot of work in, and we

22   try to get a little better every year.  And we've been at it

23   for ten years, so I think we've done a good job.

24       Q.   What feedback have you gotten from -- on Zia's cattle?

25       A.   It's been nothing but great feedback.  You know, all

1    the way from the -- the cowboy that we might hire for a day

2    to help us rope and brand, all the way up to Mr. Scherer,

3    himself.  You know, I've seen several exhibits while we've

4    been here, and I've heard him talk at length that we have

5    excellent cattle.

6    Q.    Does Zia feed natural cattle?

7    A.    Yes, we do.

8    Q.    When did Zia start feeding natural cattle?

9    A.    Very early on.  I would say probably as early as our

10   inception.

11   Q.    And we heard your father, Mr. Perez, speak about the

12   difference between conventional cattle and GAP cattle or

13   NHTC cattle.  How would you describe that difference, as the

14   president of Zia Ag and a numbers guy, yourself?

15   A.    Sure.  From my perspective, raising conventional

16   cattle is kind of a race to the bottom.  The conventional

17   cattle market is so big and so thick that, if you want to

18   make money feeding conventional cattle, you have to cut

19   every corner that is permissible.  In some cases, by law.

20   You're going to use every performance-enhancing substance

21   that you can.  You're going to use hormone injections.

22   You're going to medicate the feed.  Anything you can do to

23   reduce the cost of that animal is going to be the key to

24   having a profitable result at the end.

25            Where, with natural cattle, it's kind of just the

1    opposite.  You want to start with a genetically superior

2    animal, if you can.  And because you don't have the ability

3    to use any of these hormones, steroids, antibiotics, then

4    you are essentially restricted to a very small set of

5    products that you can give the animals to help them perform

6    at their highest ability.  Other than that, it's hoping for

7    good weather and trying to put them on good feed.

8    Q.    How can a company like Zia Ag make a profit feeding

9    natural cattle?

10   A.    We need a partner at the end that recognizes the

11   increased value of the animal and the extra cost it takes to

12   produce it all along the way.

13   Q.    And we also heard Mr. Perez, your father, testify

14   about this earlier, but, again, can you describe what

15   happens when natural cattle stay on a feedyard too long.

16   A.    Yes, ma'am.  It's very dangerous because the animals

17   are already very expensive animals.  They have to be at

18   least 25, 30 percent less efficient than a conventional

19   animal would be with all of its performance enhancements.

20   And so, when you get to the end of the feeding process,

21   you've invested the most dollars that you're ever going to

22   invest into that animal.  And when it gets to that sweet

23   spot, so to speak, where it needs to be harvested, it's

24   eating probably $5 a day in terms of feed.

25             And these cattle that we had fed historically, we

1    were hoping to make $100 a head.  So, if they eat $5 of feed

2    and they stay 20 days too long, all your profit's gone.

3    And, if they stay another 20 days after that, you're losing

4    $100.

5    Q.   How would you describe the market for natural cattle?

6    A.   The market for natural cattle, if you are producing

7    them in any kind of significant volume, is essentially set

8    by Tyson.

9    Q.   And why is that?

10    A.   Because they are the only big packer that will

11    purchase natural, these GAP natural animals.

12    Q.   So what does that mean for Zia, if Zia wants to be in

13    the natural cattle market on a large scale?

14    A.   That we have to have a relationship with Tyson and we

15    have to be able to make commitments to each other.

16    Q.   What happened between Zia and Tyson in 2018?

17    A.   So, as I mentioned, Zia started feeding natural cattle

18    very early on.  I'm going to speculate probably 2011, 2012,

19    but, ultimately, we've continued to feed natural cattle all

20    through our company's lifetime and did very well early on

21    feeding natural cattle.  So we were able to increase the

22    size of our program.  And I think Tyson was happy with that,

23    because they were able to receive more numbers from us.

24    They recognized that we were producing good quality cattle.

25    And that continued essentially until 2018, when we had

1   probably the highest number of natural cattle on feed that

2   we've ever had on feed in a calendar year.  And with the

3   pricing structure that Tyson had given us on those cattle,

4   we took a significant loss.  I don't know if I can overstate

5   how significant the loss was to us.

6   Q.   What was that loss?

7   A.   In excess of $4 million.

8   Q.   And what does a loss of $4 million mean for a company

9   like Zia Ag?

10  A.   It waylaid us.  It was all of our equity.

11  Q.   You mentioned that these cattle were arranged under

12  the prior pricing structure with Tyson.  What was that

13  pricing structure?

14  A.   That was the Nebraska weighted average, plus a

15  per-head premium.

16  Q.   Did you have that memorialized in a written contract?

17  A.   No, ma'am.  The entire time that we've been involved

18  in feeding natural cattle, Tyson has never memorialized

19  anything in a written contract for us.

20  Q.   Why is that?

21  A.   They certainly have never responded to our requests

22  for one.  And my perception was always that it was

23  essentially kind of a big fish/little fish situation.

24  Q.   And so how would you know how you were going to be

25  paid by Tyson?

1    A.    So Narciso has always been the one in our business who

2    has had the relationship with, you know, what was originally

3    IBP, but became Tyson.  So he would work with whatever his

4    contact was at the time to develop our pricing structure for

5    the cattle that we were going to feed.

6    Q.    Can you talk a little bit more about how Zia lost the

7    $4 million in 2018?

8    A.    Yes, ma'am.  So, as I mentioned, we had the most

9    number of head on feed that we'd ever had on feed.  And,

10   although we felt like we had purchased the cattle correctly

11   and fed them correctly, you know, in terms of economics, the

12   cattle did not die when they needed to die.  And so,

13   consequently, our feeding costs engulfed any intention to

14   profit that we would have ever made.  And I would say it was

15   so demoralizing, because it didn't happen all in one car

16   crash on May 1st or something.  It just came week after

17   week, month after month.  The cattle would close out at the

18   incorrect time frames.  And the summary sheets would come to

19   us just showing each one more loss all year long.

20   Q.    What decides when the cattle is harvested?

21   A.    Tyson does.

22   Q.    And, in 2018, do you know who decided whether the

23   cattle was harvested?  Or when the cattle was harvested?

24   A.    I don't know the individual responsible for it in

25   2018.

1    Q.    What kind of leverage does Tyson have in these

2    interactions with Zia?

3    A.    They essentially have all the leverage.  They -- they

4    choose when the cattle are going to be sacrificed.  Which

5    means they ultimately control what the end feed cost is

6    going to be.

7    Q.    So after incurring the $4 million-plus losses in 2018,

8    what did you decide Zia needed to do, as president?  Or what

9    did you, as the president of Zia, decide needed to be done?

10   A.    So as we got to the end of 2018, I spent a lot of time

11   in Narciso's office talking to him about how we were going

12   to move our company forward.  Because, although we had had a

13   very good run of feeding natural cattle over many years, I

14   just -- I told Narciso, straight up, that we couldn't afford

15   to feed natural cattle again; that, you know, we -- we had

16   to consider what else to do with our business.

17   Q.    Can you describe your business and your office for the

18   jury?  What does your office look like?

19   A.    It's a small office warehouse in the northwest valley

20   of Albuquerque.  If you come in the front door, we've got a

21   couple of cubicles to one side where we had our employees.

22   We have another small office to the right where we had our

23   accounting staff.  And then my office and Narciso's office.

24   Q.    How many people currently work in your office?

25   A.    My father, myself, and one other gentleman.

1    Q.   Were there ever more people working in that office?

2    A.   Yes, ma'am.  Our numbers have dwindled since 2019.

3    Q.   And why is that?

4    A.   Because of the loss that we incurred in 2019.

5    Q.   So you were testifying that you spoke with your father

6    about the future of whether or not Zia could continue to

7    feed natural cattle.  Can you describe those discussions in

8    more detail?

9    A.   Yes, ma'am.  So the natural cattle -- excuse me.  We

10   had contracted calves in the spring of 2018 that would

11   deliver in the fall of 2018.  Because to build cattle that

12   are going to be finished in 2019, you have to start in the

13   beginning of 2018.  And so, because we had been feeding

14   natural cattle for many years, we had already been planning

15   to feed more natural cattle.  But when this cataclysm

16   happened, we knew that we had to fulfill our contracts to

17   purchase the calves that we had contracted, but we wanted to

18   stop the vicious cycle -- or I wanted to stop the vicious

19   cycle right there.

20   Q.   And what did you ultimately decide?

21   A.   We spent a lot of time talking about what to do with

22   the cattle.  And we thought that, because all of the cattle

23   we were procuring were from ranchers that we had been

24   working with genetics on for several years already, we knew

25   that we were going to get a high-quality animal.  And we

1  expected if we would implant those animals and put them on a

2  conventional track, with the increased efficiency forwarded

3  us by raising the conventional animals, that the cattle

4  would perform very well and would be profitable at the end

5  of their feeding process.

6          MS. DIAMOND:  I'd like to pull up Exhibit 18.

7  Q.   So, Mr. Perez, you were just stating that the cattle

8  that you had already on the -- you know, kind of in the

9  works in 2018, you were ready to implant them and sell them

10  as conventional cattle; albeit, high-quality conventional

11  cattle?

12  A.   Yes, ma'am.

13  Q.   Did you ultimately decide to do that?

14  A.   No.  My father, near the end of the year in 2018, had

15  an idea to pitch a proposal to Tyson to sell all these

16  cattle as natural cattle on a cost plus agreement.

17  Q.   What's a "cost plus" agreement?

18  A.   "Cost plus," to me represents the cost it takes you to

19  produce something, and then the "plus" would be your margin,

20  your incentive, for doing it.

21  Q.   And why would a cost plus agreement help Zia Ag feed

22  natural cattle for Tyson?

23  A.   It would be great for us because we would not have to

24  worry about the timing issues that we had in 2018 with

25  Tyson.  And Tyson would not have to worry about where they

1    were going to sup- -- source these 9,000 head, excuse me.

2    So it seemed like a very mutually advantageous agreement.

3       Q.    Earlier this morning, you heard Mr. Scherer testify

4    that there was issues with Zia's delivery of its cattle in

5    2018.  How do you respond to that?

6       A.    I agree.  We had timing issues.  We had weather issues

7    on the cattle.  They left some cattle too long in the

8    feedyard and didn't take them when they agreed to.  So I

9    absolutely agree we had timing issues in 2018.

10      Q.    Are natural cattle more difficult to raise than

11   conventional cattle?

12      A.    Certainly more difficult.  And, I would add, more

13   unpredictable.

14      Q.    Are they more expensive?

15      A.    Absolutely.

16      Q.    So going back to your father's idea of a cost plus

17   proposal, what was your initial reaction to this suggestion?

18      A.    The concept of a cost plus agreement seemed great to

19   me.  I was a little skeptical whether Tyson would accept it,

20   because it would mean taking on more risk for them.  And

21   they had been very clear in the past that they were not

22   interested in taking on any risk.

23      Q.    Do you recognize this document, Mr. Perez?

24      A.    Yes, ma'am.

25      Q.    What is this?

1    A.    This was the cost plus proposal that we prepared for

2    Mr. Scherer.

3    Q.    And who prepared it?

4    A.    Really, everybody in our office contributed to it.  It

5    took my inventory manager, Mike Rogers, pulling together all

6    of the past feeding performance, so that we could reference

7    it for the projections.  It took the work of all of our

8    accountants.  It took many, many man-hours just putting the

9    numbers and projections together.  So it was really --

10   nobody -- individual's work, it was the culmination of our

11   team.

12   Q.    How did you fill in all of these amounts and numbers

13   and names?

14   A.    With exhaustive work.  We took every animal that we

15   knew about in our world and had contracted to procure.  We

16   projected the costs and weights and then refined those into

17   the columns and categories you see here.  We reduced the

18   number for death loss, knowing that this was going to be a

19   proposal we presented to Bob.  We didn't want to show him

20   that we were going to have 9,000 head if we were actually

21   going to have 97 percent of 9,000 head.

22   Q.    And you heard Mr. Scherer testify yesterday that Tyson

23   uses a 10 percent death loss percentage.  What death loss

24   percentage did you use in this agreement?

25   A.    3 percent.

1    Q.    Did you ultimately come in at 3 percent on your death
2    loss?
3    A.    Just under, I believe.
4    Q.    So who did Zia prepare this cost plus agreement for?
5    Specifically.
6    A.    Bob Scherer, specifically.
7    Q.    So it wasn't intended to be used for any other entity?
8    A.    No, ma'am.  There would be nobody -- no other entity
9    to send it to.
10   Q.    If Tyson had not accepted this cost plus proposal,
11   what would Zia have done with this 9,000 head of cattle?
12   A.    As I mentioned, we made a plan to put the cattle on a
13   conventional track.
14   Q.    So what was the purpose of putting together this cost
15   plus proposal?
16   A.    It takes so much work to produce a natural animal.
17   And, you know, as I love to tell people in the business,
18   Narciso and I are effectively partners, whether I am the
19   sole owner or not.  And while I am a computer scientist at
20   heart and my mind sees the world that way, Narciso is a
21   cowman at heart.  And we didn't want to take these animals
22   that already had had so much work put into them to create a
23   natural animal with traceability and squander it, if there
24   was a way to maintain and respect the work that had been put
25   into them and produce a product that we know Tyson needs.

1    Q.   But were you -- did you have to continue to feed them

2    as natural cattle?

3    A.   No.  We certainly had no commitment to and had no plan

4    to, if we couldn't build a commitment.

5    Q.   And, in the fall of 2018, January of 2019, what claim,

6    if any, did Tyson have to these natural cattle?

7    A.   None.

8    Q.   What limitation did Zia Ag have with regard to what

9    they could do with these cattle?

10   A.   No limitation.

11   Q.   When did you first hear that Tyson may be willing to

12   accept the cost plus proposal?

13   A.   I know that Narciso and Bob had been talking in the

14   fall of 2018 about natural cattle for the spring and early

15   summer of 2019.  And we started working on this cost plus

16   proposal, I'm going to guess, probably right around

17   Christmastime of 2018.  But it was something that we worked

18   all the way through until his visit with Bob in Happy on the

19   14th of January.

20   Q.   And what happened after your father came back from

21   meeting with Mr. Scherer in Happy on January 14th?

22   A.   He came back and he said that he had gone through this

23   sheet with Bob while they'd been in the pickup, driving

24   around, looking at cattle.  And that Bob had looked it all

25   over, had looked at the cattle, and said, "Looks good, give

1    me the final numbers, and let's get it done."

2    Q.   Did you and your father discuss any doubts that Tyson

3    would be agreeing to a cost plus agreement?

4    A.   No.  The way that I interpreted it is that we had a

5    fundamental agreement already, but we needed to complete our

6    proposal and send it to them and get his acceptance and

7    memorialize it.

8    Q.   And after your father came back from Happy, Texas, on

9    January 14th, what updates did you do in the next

10   two weeks to this document?

11   A.   You know, I don't know what the specific updates were,

12   but I know that our team continued to refine all these

13   numbers and projections, double-checked head counts,

14   double-checked ration costs, and double-checked everything

15   that we thought was going to go into it.  Because my

16   expectation was that if we produced this projection sheet

17   for Bob and then our actual costs came in twice as high that

18   that was going to be an excuse for him to not accept the

19   cattle under the agreement.

20   Q.   How does this cost plus proposal, ultimately, the cost

21   plus agreement, compare with earlier contracts that Zia and

22   Tyson entered into?

23   A.   Oh, gosh.  I mean, earlier agreements with Tyson were

24   no more than whoever was wearing the hat of director of

25   procurement at the time calling Narciso and saying, "I need

1    2,000 head for April" or, you know, whatever their needs may

2    be for a particular time period, "and I think this is what I

3    can give you."  And, you know, whether it was a Nebraska

4    weighted average price or a CME price or a live price, it

5    was -- it was always something that was completely devoid of

6    specificity.  And so I knew that if we were going to try and

7    go a different direction and ask for something special like

8    this that we needed to memorialize it as well as we could.

9    Q.   I'd like to pull up Exhibit 17, please.

10             Mr. Perez, did you ever see this e-mail in

11   February 2019?

12   A.   I would not have seen it until much later, but yes.

13   Q.   Well, in February of 2019, did he show it to you?

14   Your father.

15   A.   Yes, he would have showed it to me after he received

16   it, as his acceptance of our offer.

17   Q.   And can you read the note from your father to

18   Mr. Scherer?

19   A.   (Reading) "Bob, look this over and let's talk.  Sorry,

20   I've had a busy day.  It's Tony's birthday and he went

21   snowboarding."

22   Q.   If only Tony knew how much of a shout-out he got

23   throughout this trial.

24             Is there an attachment visible in this e-mail?

25   A.   Yes, ma'am.  The attachment is entitled "cost plus

1    model."

2    Q.   With a date on it?

3    A.   February 4th, 2019.

4    Q.   And, as the president of Zia Ag, did you know that

5    your father was sending this e-mail to Mr. Scherer?

6    A.   Yes.  We had worked, as I say, for weeks, producing

7    this and refining it.  So it was a big day for us to finally

8    put the product into an e-mail and ship it to Bob and cross

9    our fingers.

10   Q.   And so, as the president of Zia Ag, you signed off

11   that this "cost plus model 2-4-19" was Zia's final cost plus

12   proposal?

13   A.   Yes.

14   Q.   And what was Mr. Scherer's response to this e-mail

15   sending the cost plus model on February 4th?

16   A.   He replied (reading), "This looks good, get them in a

17   finish yard ASAP, please."

18   Q.   Can you describe your father's and your response to

19   seeing what Bob said to your cost plus proposal?

20   A.   We were excited.  We had been in the business of

21   raising and producing natural cattle for many years and

22   didn't want to have to change gears into a conventional

23   cattle feeder and try and run that rat race.

24   Q.   What did Mr. Scherer's response, "This looks good, get

25   them in a finish yard, ASAP, please," mean to you?

1    A.   It meant that we needed to get to performing.  We had

2    made a commitment to them.  They had made a commitment to

3    us.  We had a contract, and it was time for us to get to

4    work on fulfilling that contract.

5    Q.   Why did it mean you had a contract?

6    A.   We had made our proposal for the cost plus cattle that

7    are on that spreadsheet, and Bob had accepted it.

8    Q.   Did you have any doubt that Mr. Scherer accepted when

9    he wrote "this looks good"?

10   A.   No, ma'am.  If we had any doubt, then we would have

11   not worried about it anymore, put the cattle on a

12   conventional track, and moved on.

13   Q.   Did you have any doubt that Mr. Scherer was not

14   responding to the entire proposal when he said, "This looks

15   good, get them in a finish yard, ASAP, please"?

16   A.   I had no reason to believe that.  It took him no more

17   than 45 minutes to rereview it and approve it and respond.

18   Q.   Did you have any doubt that the cost plus proposal was

19   too uncertain to constitute a binding agreement?

20   A.   No.  As a matter of fact, to me, it was the most

21   specific agreement that we had ever had.

22   Q.   Were there any terms missing from the cost plus

23   agreement?

24   A.   No.

25   Q.   Would the fact that the actual costs would change

1    slightly as time went on have made the cost plus proposal

2    any less binding or definitive?

3              MR. GOMEZ:  Objection, calls for a legal

4    conclusion.

5              MS. DIAMOND:  I can rephrase, Your Honor.

6              THE COURT:  Okay.

7    Q.  (BY MS. DIAMOND):  How would the cost plus

8    model have changed, as the projected costs became

9    actual costs?

10   A.   Well, we went on to send Bob a number of updates

11   between February and May.  And that was all in the name of

12   being as clear about what the animals were going to cost and

13   how many of them there was going to be and how big they were

14   going to be.  That was all in the name of trying to

15   communicate as much information to him as possible, so that

16   he knew what was there.

17   Q.   Did the updates for the cost plus model change the

18   fact that the cost plus proposal was a binding agreement?

19   A.   No.

20   Q.   And why not?

21   A.   Because we made our proposal February 4th, and he

22   accepted it.  And that was the point where we felt like we

23   had established a contract.

24   Q.   Did the updates to the cost plus model in the

25   subsequent months -- did those constitute new proposals?

1    A.    No.    They were merely informative updates to the

2    agreement we had already made.

3    Q.    If you could scroll down back on Exhibit 18, to the

4    box at the bottom.

5         Mr. Perez, what are the total costs listed on the

6    February 4th cost plus agreement?

7    A.    The total costs on this proposal are $16,308,996.44.

8    Q.    And what does that number represent?

9    A.    That number represents all of the costs that we had

10   projected for these animals, as well as the margin that we

11   included, the "plus" part of the agreement.

12   Q.    On February 4th, 2019, when you received

13   Mr. Scherer's response to the cost plus proposal, did you

14   have any doubt that Mr. Scherer would not understand what

15   some of these columns meant?

16   A.    Absolutely not.    I mean, Bob has been working for IBP

17   longer than I've been alive, so he is a consummate expert

18   about all of these metrics when it comes to cattle.

19   Q.    And if you could scroll up to the top.    And go to the

20   right.

21        Why did you include the columns for total cost

22   per head, cost per pound?

23   A.    I wanted to include the projected costs in the format

24   that was going to be most palatable for Mr. Scherer.    So I

25   don't know if Mr. Scherer looks at cattle in terms of a lump

1   sum cash, or if he sees dollars per head and finds that

2   reasonable, or if he finds a cost per pound more

3   accommodating for him.  But they all essentially represent

4   the same value.

5   Q.   And what would you have done on February 4th, if

6   Mr. Scherer told you, "Thank you very much, but we don't

7   have an agreement on a cost plus basis"?

8   A.   I would say, "That's okay.  We have got these cattle.

9   They're our cattle.  They're not Tyson's problem.  We'll put

10  them on a conventional track and we'll feed them out."

11  Q.   If Zia Ag had taken that course of action, would Zia

12  Ag have lost money?

13  A.   With the benefit of retrospect, I believe we would

14  have been very profitable.

15  Q.   Well, so it would have been better for Zia Ag, if

16  Mr. Scherer had just simply said, on February 4th, that he

17  does not accept your proposal?

18  A.   Yes, ma'am.

19  Q.   I'd like to see Exhibit 133, please.

20        You testified that as soon as you received

21  Mr. Scherer's accept- -- as soon as he accepted your

22  proposal on February 4th, you went to work under the terms

23  of your cost plus agreement?

24  A.   That's correct.

25  Q.   And what is this e-mail here that is before you?

1   A.   This is a February 18th, 2019, e-mail from Narciso

2   to Bob with an updated cost plus model spreadsheet.

3   Q.   Is the word "cost plus" anywhere in the subject of

4   this e-mail to Mr. Scherer?

5   A.   It is both in the subject, as well as the attachment.

6   Q.   And what was the purpose of sending the corrected cost

7   plus dated February 18th, 2019?

8          MR. GOMEZ:  Objection, foundation.  It was

9   Narciso that sent this.

10          THE COURT:  Go ahead.

11          MS. DIAMOND:  I'm sorry, Your Honor.  Sean Perez

12   is the president of Zia Ag.

13          THE COURT:  Ask him how he would know this.  And

14   if he has a reason for knowing it, you can ask.

15   Q.   (BY MS. DIAMOND):  Mr. Perez, how would you

16   know what this e-mail is?

17   A.   Because our entire team would have worked on updating

18   this model, and we would have directed Narciso to send the

19   update.

20          THE COURT:  That's fine.  Sorry.  Just keep

21   asking questions.  They'll object if they want to.

22   Q.   And why did you send Mr. Scherer a corrected cost plus

23   update dated February 18th, just two weeks after he

24   accepted the February 4th proposal?

25   A.   The Circle B cattle represented a large number of the

1  cattle that were involved in this agreement.  And so,

2  knowing that he was very insistent about getting cattle

3  moved into the feedyard, we wanted to make sure -- excuse

4  me, we wanted to make sure that he understood that we

5  understood his urgency, and we wanted to be as clear and

6  communicative as possible.

7   Q.   Ms. Gallagher, can we see the second page of this

8  exhibit.

9          Now, Mr. Perez if you didn't have an agreement on

10  a cost plus basis with Mr. Scherer, would you have moved

11  your natural cattle into a feedyard?

12  A.   It seems early to me, but I'm not sure at this time.

13  Q.   Would you -- I think we heard your father testify that

14  it's dangerous to feed natural cattle to the point of them

15  being at the finish yard without an agreement in place.

16  What's your response to that?

17  A.   I would say that, if you have GAP natural animals and

18  you are within 100 days of sacrificing them and you don't

19  have a commitment from a packer -- you know, in this

20  respect, we're talking about, in this volume, you'd need a

21  commitment from Tyson, specifically, because nobody else is

22  going to take these cattle in any kind of volume -- it's

23  very dangerous because you're essentially just waiting for

24  Bob to say, "Okay, I can take these cattle and work them

25  in."  And that may be something that he can do the next week

1    if they have a need for the cattle or if he likes you and he

2    can push somebody else's cattle back.  And it may be months

3    if he doesn't have an opportunity for them.

4    Q.    And was that a risk that Zia Ag was willing to take in

5    February 2019?

6    A.    Absolutely not.  It was a risk we couldn't take.

7    Q.    So, in this update, you've now started moving these

8    natural cattle into the feedyard?

9    A.    Yes, ma'am.

10    Q.    Can you zoom in on the highlighted portion on the

11    left-hand side.  A little more.

12          And so what do these highlighted rows represent?

13    A.    My understanding from the e-mail attached was that

14    these are the cattle that specifically had moved from the

15    backgrounding area to High Choice Feedyard, specifically.

16    Q.    Can we see Exhibit 135, please.

17          Did Zia Ag continue to send Mr. Scherer cost plus

18    updates?

19    A.    Yes, we did.

20    Q.    And so what is this e-mail, or would you have known

21    about this e-mail?

22    A.    Yes, ma'am.  This was much the same as the last

23    exhibit.  This was another series of updates that we had

24    made to the spreadsheet updating projections, incorporating

25    actuals.  And so we wanted to get another update to

1    Mr. Scherer before too much time elapsed, so that he

2    understood what the -- what differences were happening in

3    the cattle from --

4    Q.   And what was your involvement in each of these updates

5    to the cost plus model?

6    A.   I worked -- over the shoulder of all of these guys as

7    these spreadsheets were built and updated.

8    Q.   Did you have knowledge of each of the updates before

9    they were sent to Mr. Scherer?

10   A.   I did.

11   Q.   And so can we see the second page and the highlighted

12   portions?

13        Do you have an understanding about what's being

14   represented in these highlighted rows here?

15   A.   I don't have the benefit of recollection, but I expect

16   that these are more cattle that have been moving from forage

17   into the feedyards.

18   Q.   Was Zia continuing to perform under the terms of the

19   cost plus agreement?

20   A.   Yes, ma'am.

21   Q.   Can we see Exhibit 36, please.

22        And what is this e-mail, Mr. Perez?

23   A.   This would be another incremental update on the cost

24   plus model.

25   Q.   And what else was included in the body of the e-mail

1    from Mr. Rogers in the lower part of the e-mail?

2    A.    Oh, it looks like, at this time, cattle had begun to

3    be sacrificed, shipped to Tyson.  And, in addition to the

4    cost plus update, there's also an invoice that was generated

5    that would have incorporated all of the costs and the margin

6    as described in our agreement.

7    Q.    And when did Zia start delivering natural cattle under

8    the terms of the cost plus agreement, approximately?

9    A.    This looks like it might have been the first set, so

10   it would have been the middle of May 2019.

11   Q.    So, February 4th, 2019, you testified Mr. Scherer

12   accepted the cost plus proposal.  And then Zia performs and

13   starts delivering the cattle in May of 2019?

14   A.    Yes, ma'am.

15   Q.    Can we see Exhibit 151, please.

16         Mr. Perez, this is an e-mail from Mr. Scherer to

17   your father, dated May 25th, 2019.  When did you first see

18   this e-mail?

19   A.    It would have been shortly thereafter.  Narciso would

20   have showed it to me within -- if not the same day, within a

21   matter of, you know, probably Monday.

22   Q.    What was your reaction to seeing this e-mail?

23   A.    My stomach just sunk.  We -- I felt like we had done

24   everything in our power to try and memorialize our

25   agreement.  We had produced the cattle that Bob needs.  And

1    I felt like we got all the way to the end here and found out

2    that we didn't have the contract that we thought we had.

3    Bob was just going to pay us however he wanted to pay us.

4    And we had, you know, some-odd-9,000 head that were either

5    ready to sacrifice or within, you know, 100 days of being

6    ready to sacrifice, and we were just in the worst kind of

7    bind you can be in.

8    Q.   And why didn't Zia simply just sell the remaining

9    natural cattle to someone else?

10   A.   Because right at the end of the feeding process is

11   when you have the most dollars invested in these animals

12   that have been less efficient than their conventional

13   counterparts throughout their entire lives.  And so any

14   cattle that Bob did take and pay for, we were still getting

15   paid more than we would if they had to just puke these

16   cattle into the conventional market.

17   Q.   What would you have done if you saw this e-mail on

18   February 4th, 2019?

19   A.   We would have fed all of our cattle conventionally.

20   We didn't have any need to feed natural cattle for the

21   benefit of losing money.

22   Q.   Mr. Perez, what is Larue Capital?

23   A.   Generally, Larue Capital is a fund allocator.  To us,

24   they were essentially a financing partner.  They provided

25   capital to purchase the cattle and feed cattle.

1    Q.   And who is Jason Turnipseed?

2    A.   He's the principal of Larue Road Capital.

3    Q.   And can you describe Zia Ag's relationship with Larue

4    Capital as it relates to this agreement with Tyson?

5    A.   There is essentially a disconnected relationship.  Our

6    agreement with Tyson is not impacted by our relationship

7    with Larue.

8    Q.   I'd like to see Exhibit 142, please.  The second page,

9    please.

10        Did Larue Capital ever ask for information about

11   the cost plus agreement with Tyson?

12   A.   Yes.

13   Q.   And why would they ask for that information?

14   A.   They, as fund allocators, have their own auditors and

15   accounting staff that they have to answer to, and so they

16   asked.

17        MR. GOMEZ:  Objection.  What's the foundation for

18   this?

19        THE COURT:  I'm sorry, the objection is

20   foundation?

21        MR. GOMEZ:  Foundation.

22        MS. DIAMOND:  He's the signatory on the memo.

23        MR. GOMEZ:  Yeah, but he's talking about what

24   this company needs information for.

25        THE COURT:  Ms. Diamond, what was your response?

1          MS. DIAMOND:  My response is that the company is

2    asking him directly for information, and he is responding to

3    that request in a memo that he has signed.

4          THE COURT:  I guess lay a little more foundation

5    for if he knows why that company would ask for this

6    information.  If he does, he can answer.

7          MS. DIAMOND:  Yes, Your Honor.

8    Q.  (BY MS. DIAMOND):  Mr. Perez, did Larue Capital

9    ask Zia for information about the cost plus

10   agreement with Tyson?

11   A.  Yes, they did.

12   Q.  Do you know why they would ask for this information?

13   A.  Because they have got their own auditors and

14   accounting organizations that they have to report to.

15         MR. GOMEZ:  This is the same question that he was

16   asked before.

17         THE COURT:  So your objection is foundation?

18         MR. GOMEZ:  Yes.

19         THE COURT:  Overruled.  Go ahead.

20   Q.  (BY MS. DIAMOND):  Go ahead.

21   A.  Larue has their own auditors and accounting

22   organizations that they have to report to.  And, for the

23   animals that they provided capital for, they asked us to

24   provide a more comprehensive description of our contract

25   with Tyson.

1    Q.   What's your understanding of Larue's knowledge of the
2    cattle industry?
3    A.   Very limited.
4    Q.   How so?
5    A.   They provide capital to any sort of investment that
6    they believe will be advantageous for their investors.
7    Q.   What's your understanding of how Larue Capital or its
8    auditors would view the agreements that Zia and Tyson had
9    entered in the year prior with regard to formality?
10             MR. GOMEZ:   Objection, foundation.
11             THE COURT:   Ms. Diamond, just lay some more
12   foundation as to why he would know why this company -- how
13   they would view these agreements.
14             MS. DIAMOND:   Yes, Your Honor.
15   Q.   (BY MS. DIAMOND):   Mr. Perez, did you ever have
16   discussions with Larue Capital with regard to the
17   types of agreements that Zia and Tyson would enter
18   in this industry?
19   A.   Yes.
20   Q.   And what conclusions did you draw from those
21   conversations?
22   A.   That it was always going to be something complicated
23   for Mr. Turnipseed to digest and account for.  Because we
24   were very clear from the beginning of our relationship that
25   Tyson is not interested in papering any of the agreements

1    that we make.

2    Q.    Did you have any conversations with Larue Capital with

3    regard to what type, if any, of long-term objectives it was

4    seeking between Tyson and Zia?

5    A.    I'm sorry, ma'am.  One more time.

6    Q.    Did you ever discuss with Larue Capital any

7    conversations about long-term arrangements between Zia and

8    Tyson beyond just this cost plus agreement, but going

9    further into the future?

10   A.    Certainly.  We had discussed the cost plus proposal

11   with Jason early on, and he thought it was very attractive

12   because it produced a modest amount of yield, but had a low

13   risk for his investors.  And so he was hoping that we could

14   organize a perhaps five-year version of this agreement.

15   This was essentially a prototype to be able to provide

16   capital to produce natural cattle for Tyson during the

17   period that they need cattle the most annually.

18   Q.    So your understanding is that Larue Capital was

19   looking further into the future than just the three months

20   set forth in the cost plus agreement?

21   A.    Yes, that was really their greater interest.

22   Q.    Can you describe what is happening in Exhibit 142

23   here, both the request and then your memo?

24   A.    Yes.  So Mike Dancey is a gentleman that also works

25   for Larue Road.  He had called me and told me that their

```
 1    auditors would like to see a description of the agreement we
 2    had with Tyson.  And knowing that this cost plus
 3    spreadsheet, which was custom built for Bob Scherer, would
 4    have little meaning to somebody that is not in the cattle
 5    industry, I elected to write a short letter/memo in lieu of.
 6     Q.   If you go zoom in on the memo, itself, please,
 7    Ms. Gallagher.
 8              THE COURT:  Ms. Diamond, how much longer do you
 9    have with the witness?
10              MS. DIAMOND:  Not -- I mean, maybe like
11    20 minutes, 15, 20 minutes.
12              THE COURT:  Let's break now for lunch, and we'll
13    let you finish up with him after lunch.
14              MS. DIAMOND:  Yes, Your Honor.
15              THE COURT:  Ladies and gentlemen, at this time,
16    we'll take about an hour-and-20-minute lunch break.  So I'll
17    see everybody back at 1:20.
18              All rise for the jury.
19                   (Jury not present.)
20              All right.  You may be seated.
21              Is there anything else we should take up before
22    we break for lunch?
23              From Zia?
24              MR. WORDEN:  No, Your Honor.
25              THE COURT:  Tyson?
```

```
 1            MR. FISHER:  No, Your Honor.

 2            THE COURT:  We'll see you back here, then, at

 3    1:20.  Thank you, sir.

 4                    (A recess was taken.)

 5            Thank you.  You may be seated.

 6            Are we ready for the jury?

 7            MS. DIAMOND:  Would you like Mr. Perez to --

 8            THE COURT:  Yes.

 9            Mr. Perez, just kind of have a seat so we're

10    ready to go.

11            Is Zia ready?

12            MS. DIAMOND:  Yes, Your Honor.

13            THE COURT:  Tyson?

14            MR. FISHER:  Yes, Your Honor.

15            THE COURT:  All right.

16                    (Discussion off the record.)

17                        (Jury present.)

18            Thank you.  You may be seated.

19            All right.  Ms. Diamond, it's your witness.

20            MS. DIAMOND:  Thank you, Your Honor.

21    Q.  (BY MS. DIAMOND):  Ms. Gallagher, can we see

22    Exhibit 152 please.

23            Mr. Perez, what is this document?

24    A.  This is an e-mail that was sent June 3$^{rd}$, 2019, from

25    Doug Penner in our office to Kendall Martens, who is the
```

1    feedyard manager of KM Feeders.

2    Q.   And are you copied on it, Mr. Perez?

3    A.   Yes, I am.

4    Q.   Why is no one from Tyson on this e-mail?

5    A.   This was an e-mail that was sent by our comptroller at

6    this time.  We were essentially exchanging internal e-mails

7    to begin to build the invoices for the cattle in the cost

8    plus agreement.

9    Q.   Why would Zia be coordinating with feedyards regarding

10   the invoices that were ultimately going to be sent to Tyson?

11   A.   For one, we were going to need the final feed billing

12   for the animals that were sacrificed, but then, ultimately,

13   we know that Tyson prefers to issue payment on the animals

14   to the finished feedyard that they come from.  So the cash

15   goes to the finish feedyard, the finish feedyard takes out

16   any of their costs, and the resulting revenue trickles back

17   down to the cattle owner.

18   Q.   How is this consistent with the cost plus agreement?

19   A.   This was the only way we were going to submit our

20   costs.  So, you know, these e-mails were exchanged back and

21   forth to get the content correct and the format consistent

22   with, not just KM, but I think all of the feedyards that the

23   cattle were fed at.  And, you know, ultimately, the only way

24   that Tyson would have ever been able to pay us for the cost

25   is for the resulting invoices that we created to go to

1    Tyson.

2    Q.    And how would this process translate into transparency

3    with Tyson with regard to the costs?

4    A.    We pulled together all of the documents that were

5    related to the cost and built packets, and those packets

6    were prepared for submission to Tyson.

7    Q.    And do you recall that -- when Tyson, Mr. Scherer

8    specifically, informed Zia that it was not recognizing the

9    cost plus agreement?

10   A.    Are you asking me when that happened?

11   Q.    Or if you recall that, yes.

12   A.    It would have been right about the beginning of June.

13   Q.    And what did Zia do following that communication from

14   Mr. Scherer?

15   A.    Hoping that it was a misunderstanding, we reached out

16   to Mr. Scherer.  We reached out to Mr. Nelson.  Mr. Gerber.

17   When we didn't have any success contacting our current Tyson

18   contacts, we reached out to Mr. Bass and Mr. Brandenburg,

19   who encouraged us to fulfill our commitments that we made in

20   the contract.

21            And, ultimately, in lack of any other discussion

22   to try and resolve our disagreement, I guess, we were

23   ultimately left with no choice but to consult with our

24   attorney, Mr. Worden, who reached out to Tyson through

25   another contact he had from, I guess, some sort of

1    attorneys' organization, is my understanding.  And that

2    contact told him that Tyson had paid us pursuant to the

3    pricing structure that they felt was correct and that was

4    all they were going to pay.  And, if we didn't like it, then

5    we could sue them.

6    Q.   Has Zia ever brought litigation against a packer

7    before --

8    A.   Never.

9    Q.   -- this case?

10   A.   Never.

11   Q.   Has Zia done business with other packers before?

12   A.   Yes, we've transacted with all the Big Four packers,

13   but smaller packers as well.

14   Q.   And how did Zia comply with the terms of the cost plus

15   agreement, even after Mr. Scherer informed Zia that there

16   was no agreement?

17   A.   We already had fed the cattle natural, so we finished

18   everything that we could.  And everything that Tyson

19   accepted, we delivered.  And the cattle that they did not

20   accept, we salvaged as much value as we could out of them by

21   marketing them as well as we could.

22   Q.   How much natural cattle did Mr. Scherer inform Zia it

23   wanted to source in the beginning of 2019?

24   A.   He communicated that he needed as many animals as we

25   could find for these lean months, April, May, June.

1    Q.   And how many cattle did Zia ultimately find?

2    A.   Our proposal that we produced in February contemplated

3    delivery of approximately 9,000 head.  Ultimately, we

4    delivered 9,153 head.

5    Q.   And did Tyson take all of those cattle?

6    A.   No, they did not.

7    Q.   Mr. Perez, did Tyson -- did Zia provide Tyson with a

8    benefit by providing Tyson with its natural cattle?

9    A.   I believe so.

10   Q.   Why?

11   A.   Bob needed natural cattle for this time period.  He

12   always does.  And we produced it.

13   Q.   Did Tyson pay a fair price for Zia's natural cattle?

14   A.   No.  We had a contract, an agreement, on how the

15   cattle were going to be paid for, and Tyson chose its own

16   arbitrary pricing structure.

17   Q.   Can you describe the arbitrary pricing structure?

18   A.   From my review of the settlements, I would agree that

19   it was a Nebraska weighted average base price.  The premiums

20   that were paid seemed to vary.

21   Q.   So your testimony is there wasn't one premium applied

22   to all the cost plus program cattle?

23   A.   Not that was clear to me.

24   Q.   Has Zia suffered any financial losses because of Tyson

25   in this deal?

1    A.   Yes, ma'am.

2    Q.   What were those losses?

3    A.   Do you mind if I refer to my notes and use the

4    whiteboard?

5    Q.   Sure.   Please.

6              THE COURT:   Mr. Perez, just take that microphone

7    with you while you're doing it.

8              THE WITNESS:   Yes, Your Honor.

9    Q.   (BY MS. DIAMOND):   And, Mr. Perez, before you

10   start, I had one question:   Do you think it's fair

11   that Tyson didn't pay the prices Zia and Bob Scherer

12   agreed to?

13   A.   No, ma'am.

14   Q.   Why not?

15   A.   Because we had an agreement about how the cattle were

16   going to be paid for.   If Bob wanted to pay us a Nebraska

17   weighted average with a premium, all he had to do was say

18   that.

19   Q.   And would Zia have agreed to sell over 9,000 head of

20   natural cattle to Tyson without a cost plus agreement in

21   place?

22   A.   No, ma'am.   It would have fed the cattle

23   conventionally and marketed them conventionally.

24   Q.   Did you ever add up the money that Zia lost for

25   Tyson's failure to pay the agreed-upon prices for the cost

1    plus agreement?

2    A.   Yes, I did.  We started with our actual cost -- bear

3    with me as a try to hold a marker, a microphone, and my

4    notes -- of $15,270,173.90.

5    Q.   And what does that number represent?

6    A.   This represents the cost of the cattle, the cost of

7    the feed, the freight, the interest, and the death loss.

8    Q.   Those were costs paid by Zia?

9    A.   Correct.

10   Q.   And those are in dollars?

11   A.   Yes, ma'am.

12   Q.   So this was Zia's out-of-pocket costs for all these

13   cost plus program cattle?

14   A.   Yes, ma'am.

15   Q.   How much should Tyson have paid Zia under the cost

16   plus agreement?

17   A.   Very straightforwardly, we delivered 6,133 head of GAP

18   cattle, ultimately.  At $125 a head, which was supposed to

19   be our margin on those cattle, that is $766,625.  We

20   delivered 1,834 NHTC cattle.  At $100 a head, that's

21   $183,400.  For a total that Tyson should have paid us of

22   $16,220,198.90.

23   Q.   And what does that $16,220,198.90 represent again?

24   A.   The total that Tyson should have paid us for these

25   cattle.

1    Q.    And what were the initial total costs, as written on

2    the cost plus agreement dated February 4th?

3    A.    Looking down here on this demonstration board, total

4    cost is $16,308,996.44.

5    Q.    How do those two numbers compare?

6    A.    Just under $100,000 under what we estimated it was

7    going to cost to produce these cattle.

8    Q.    So that means that, ultimately, Tyson owed less than

9    was stated on the February 4th, 2019, cost plus model?

10   A.    That's correct.

11   Q.    You testified that Tyson did not purchase all of the

12   natural cattle that Zia sourced under the cost plus program.

13   A.    Yes, ma'am.

14   Q.    How much did Tyson pay Zia for the natural cattle that

15   it accepted?

16   A.    Ultimately, when I went back and added it up, Tyson

17   paid us a total of $12,595,753.12.

18   Q.    And what were Zia's total proceeds for these natural

19   cattle in the cost plus program?

20   A.    Certainly.  In addition to the 12 ½ million that Tyson

21   paid us, we were able to salvage some value from the

22   fallouts of the program cattle and the GAP cattle we were

23   forced to market to another smaller packer for a total of

24   $13,647,028.60.

25   Q.    Can you talk a little bit more about how Zia reached

1    that higher number.  You said -- what are "fallouts" from

2    the program?  What does that mean?

3    A.   One of the important aspects the natural program is

4    that the cattle cannot receive antibiotics.  When cattle get

5    sick along the process and we're concerned about the future

6    performance of the animal or perhaps even the very life of

7    the animal, we'll administer antibiotics to ensure that that

8    animal is able to continue in the feeding process.  That,

9    unfortunately, will disqualify it from GAP natural programs,

10   but it may continue on and be fed as a non-hormone-treated

11   animal, if we are having to treat it early enough.  If it

12   happens late enough, it may just be marketed as a

13   conventional animal.

14   Q.   In addition to the fallouts that you just described,

15   what did you do with the other cattle that Tyson wouldn't

16   accept?

17   A.   We had to find other marketing arrangements for them.

18   Q.   So, based on these calculations, how much was Zia

19   specifically damaged by Tyson in this deal?

20   A.   Pretty straightforward math from here:  We take our

21   16,220,000, subtract our 13,647,000 of revenue that we

22   received, and it comes to a total of $2,573,170.30.

23   Q.   And so, again, what does that number mean?

24   A.   That number is the amount that Tyson should have paid

25   us, minus the 13,647,000, which is the amount of revenue

1  that we actually received from marketing all these cattle.

2  Q.   And what did this loss mean for Zia's balance sheet

3  for 2019?

4  A.   It meant that, despite our greatest efforts to change

5  the situation and the way we did business from 2018, we

6  essentially came back and experienced a very similar loss.

7  Despite our greatest efforts and contrary to the agreement

8  that we felt like we had struck.

9  Q.   Is Zia currently feeding natural cattle?

10  A.   We are.  But in much smaller numbers.

11  Q.   Has the direction of your business changed following

12  the losses from 2018 and 2019?

13  A.   Absolutely.  You know, when you have a couple of years

14  like we had in 2018 and 2019, you're not able to come back

15  and do it again the same way, even if we had wanted to.

16          MS. DIAMOND:  Thank you, Mr. Perez.  No further

17  questions.

18          THE COURT:  Mr. Perez, you can have a seat.

19          Mr. Fisher or Mr. Gomez?

20          MR. GOMEZ:  Thank you, Your Honor.

21                    **CROSS-EXAMINATION**

22  Q.   (BY MR. GOMEZ):  Good afternoon, Mr. Perez.

23  A.   Good afternoon, Mr. Gomez.

24  Q.   So you calculated the damages in this case, I see.

25  A.   Yes, sir.

1    Q.    In order to perform your calculations, you had to

2    calculate the cost component of the alleged cost plus

3    agreement?

4    A.    Yes, sir.

5    Q.    And that would mean what expenses are included and

6    what expenses aren't included?

7    A.    Yes, sir.

8    Q.    But you have not presented to the jury any receipts

9    substantiating these costs, have you?

10   A.    I have not seen any exhibits like that, no.

11   Q.    You also have to figure out the "plus" component of

12   the contract, correct?

13   A.    Yes, sir.

14   Q.    What premium to apply for each specific cattle?

15   A.    Yes, sir.

16   Q.    How many were NHTC and how many were GAP, correct?

17   A.    Yes, sir.

18   Q.    And evidently how many fallouts, as well?

19   A.    Yes, sir.

20   Q.    And you have not presented to the jury any receipts

21   substantiating that Tyson received any cattle?

22   A.    That's correct.

23   Q.    And you've not presented to the jury any receipts

24   substantiating that Tyson -- certainly, that they received

25   on the order of 6,000 GAP cattle, correct?

1    A.   Correct.

2    Q.   You haven't presented any receipts showing that Tyson

3    received on the order of 1,800 NHTC cattle; isn't that

4    right?

5    A.   Correct.

6    Q.   You also had to figure out how many cattle Tyson was

7    obligated to purchase under the alleged cost plus agreement;

8    isn't that correct?

9    A.   The cost plus proposal laid out the sets of cattle

10   that we were contemplating for this agreement.  So, to me,

11   it was not an agreement on a number of head count, but,

12   rather, for those specific sets of cattle.

13   Q.   And the specific sets of cattle were 9,153 cattle?

14   A.   Yes, sir.

15   Q.   And that was in your cost plus proposal?

16   A.   That was the sets of cattle in the cost plus proposal,

17   yes, sir.

18   Q.   Okay.  I would like to take a look at Exhibit

19   Number 18, please.

20          Does this look familiar to you, Mr. Perez?

21   A.   Yes, sir.

22   Q.   And I have it focused on the box, but you understand

23   what this document is?

24   A.   Yes, sir.

25   Q.   And am I reading it correctly that this spreadsheet

1    that you sent on -- that Zia sent on February 4th, 2019,

2    does not say 9,153 cattle, but, instead, says 8,666?

3    A.   That's correct, sir.  This head count was tabulated

4    with an estimated death loss, so we would have taken the

5    number of head that we purchased or had contracted to

6    purchase and adjusted off a number for death loss and

7    fallouts.

8    Q.   A 3 percent death loss; isn't that right?

9    A.   Correct.

10   Q.   If I represented to you that 3 percent of 8,666 is

11   approximately 260 cattle, would you have any reason to doubt

12   that?

13   A.   No.

14   Q.   Would you have any reason to doubt that 8,666 plus 260

15   does not equal 9,153?

16   A.   I believe you.

17   Q.   So, in fact, this cost plus proposal does not show

18   9,153 cattle, isn't that correct, even if you include a

19   3 percent death loss?

20   A.   That sounds correct.

21   Q.   When you were performing your damage calculation, you

22   also had to figure out the amounts that Zia received when it

23   sold the cattle to third parties, correct?

24   A.   Yes, sir.

25   Q.   You have not presented to the jury any receipts

1   substantiating those -- those -- the money that you received

2   in; isn't that right?

3   A.   No, sir.  I've got them all, but they have not been

4   presented.

5   Q.   In fact, in your direct, I believe you did not present

6   a single receipt, did you?

7   A.   No, we did not.

8   Q.   You did not present a single purchase order, did you?

9   A.   No, we did not.

10  Q.   You did not present a single invoice, did you?

11  A.   No, we did not.

12  Q.   You did not present a single account statement, did

13  you?

14  A.   No, we did not.

15  Q.   And all we've seen, not just on your direct, but in

16  other witnesses' testimony, were a handful of invoices;

17  isn't that correct?  On the order of four or five?

18  A.   Yes, I think that's correct.

19  Q.   And only one of those went to Tyson; isn't that

20  correct?

21  A.   I don't think that's accurate, but I've not seen any

22  exhibits to suggest otherwise, so okay.

23  Q.   Thank you.  And for the May 24th invoice, which is

24  the one that I was referring to that Tyson received, the

25  only one that I'm aware of that's been presented to this

1  jury that Tyson received, the very next day, Mr. Scherer

2  responded to Narciso Perez saying, "That's not what we do.

3  We don't pay for calves"; isn't that right?

4  A.   I would have to confirm the dates, but, yes, I think

5  that's approximately accurate.

6  Q.   Thank you.

7           I want to understand a little bit more about how

8  you calculated the damages in this case.  You made your

9  calculations based off of the February 4th spreadsheet?

10  A.   The calculations for what?

11  Q.   The damages in this case.

12  A.   Which part of the damages?

13  Q.   Well, the quantity of cattle that were owed?

14  A.   The 9,153?

15  Q.   Correct.

16  A.   And you're asking me where the number came from?

17  Q.   Uh-huh.

18  A.   I went to all the settlement sheets and checks that we

19  received and tallied the number.

20  Q.   And if you were mistaken about what Tyson and Zia had

21  agreed to, then this number you've come up with, the damages

22  calculation, would be incorrect; isn't that right?

23  A.   If I was mistaken about our cost plus agreement?

24  Q.   Correct.

25  A.   Then yes.

1    Q.   And if the parties had agreed to a different

2    premium -- so, say, they hadn't agreed to -- allegedly

3    agreed to $125 for GAP cattle and $100 for NHTC cattle, then

4    your damages calculation wouldn't be accurate, would it?

5              MR. WORDEN:  Objection, Your Honor, relevance and

6    foundation.

7              MR. GOMEZ:  I think the way he calculated damages

8    is very clearly relevant.  And the foundation is that he's

9    the one who calculated it.

10             THE COURT:  Why don't you approach?

11                  (Bench conference.)

12             THE COURT:  Go ahead, Mr. Worden.

13             MR. WORDEN:  The question asked if the parties

14   had agreed.  There is no evidence, nor will there be, of any

15   other agreement.  That's speculative, there's no foundation,

16   and it's not relevant.

17             THE COURT:  (Reading) "If you paid a different

18   premium..."

19             MR. GOMEZ:  I can word it slightly different and

20   simply say, if they didn't have a cost plus agreement, then

21   the damages calculation wouldn't apply.  That's fine with

22   me.

23             THE COURT:  You've already asked that question

24   and he said you were right.

25             MR. GOMEZ:  Right.

1            THE COURT:  Okay.

2            MR. GOMEZ:  Okay.

3            (Bench conference concluded.)

4   Q.  (BY MR. GOMEZ):  The only person who you spoke

5   to who participated in the alleged negotiations was

6   Narciso Perez; isn't that correct?

7   A.   That's correct, sir.  Narciso always negotiated our

8   agreements.

9   Q.   And Narciso is your father?

10  A.   He is.

11  Q.   Are you two close?

12  A.   We are.

13  Q.   Close enough to work together at Zia?

14  A.   That's right.

15  Q.   How long have you guys worked together?

16  A.   Since 2011.

17  Q.   I want to discuss a little bit the cost component of

18  the alleged cost plus agreement.  And I'm going to go off of

19  the six categories that your father identified in his

20  testimony.

21  A.   Okay.

22  Q.   And you can correct me if I'm incorrect about the

23  categories.

24            So, first, with the original price of the cattle,

25  do you remember Mr. Perez testifying that that was -- or

1    your father testifying that that was an element of the cost

2    component of the cost plus agreement?

3    A.    Our purchase cost, that's right.

4    Q.    And it was Zia's choice about who to purchase the

5    cattle from; isn't that right?

6    A.    Yes, sir.

7    Q.    It was not Tyson's choice?

8    A.    That's correct.

9    Q.    When you were constructing your damages model, did you

10   assume that Tyson was obligated to pay whatever Zia paid for

11   the cattle?

12   A.    I assumed that the cost would be calculated the way we

13   described, yeah.

14   Q.    And that means that whatever you paid for the cattle

15   was included in the cost component of the cost plus

16   arrangement?

17   A.    Yes, sir.

18   Q.    I can see that you said that the costs were 15 -- that

19   you calculated were $15,270,173.90; is that right?

20   A.    Yes, sir.

21   Q.    How much of that was the price of the cattle?

22   A.    I wouldn't know, without looking at the detail.

23   Q.    So if you made a mistake in your calculation, there

24   would be really no way, without receipts, for us to correct

25   that mistake?

 1    A.    That's correct.

 2    Q.    The second component that I have written down is

 3    freight costs.  Do you remember that?

 4    A.    Yes, sir.

 5    Q.    Zia was responsible for picking the freight line that

 6    you used?

 7    A.    For the most part, yes.

 8    Q.    Who else would have been responsible for it?

 9    A.    I think, in some cases, the feedyards organize trucks

10    or the ranchers.

11    Q.    But certainly not Tyson, right?

12    A.    No, sir.

13    Q.    And, under the way you calculated damages, you assumed

14    that Tyson had to pay for whatever Zia decided to pay for

15    freight; isn't that right?

16    A.    That's correct.

17    Q.    How much of the $15.2 million were freight costs?

18    A.    I don't have a breakdown of the costs.

19    Q.    And we have no freight bills for us to check?

20    A.    I had compiled the freight bills, but I don't see them

21    here, no.

22    Q.    You have no reason to believe they're going to be

23    presented at trial then?

24    A.    No, sir.

25              MR. WORDEN:  Your Honor, if I could approach?


                  UNITED STATES DISTRICT COURT
          100 N. Church Street, Las Cruces, NM  88001
                         (575) 528-1430

1          THE COURT:  Sure.

2                    (Bench conference.)

3          MR. WORDEN:  All of this was produced.  And they

4    took his deposition, so they can ask him what he looked at,

5    but the suggestion that somehow they don't exist is contrary

6    to the evidence.  Just because no one has put them all on to

7    bore the jury for a week --

8          MR. GOMEZ:  I'm not trying to imply that they

9    don't exist, but it's their burden to establish these

10   damages.  And they haven't produced a single receipt.  At

11   trial, they haven't produced a single receipt or purchase

12   order.

13         THE COURT:  Well, Mr. Worden, this is your

14   witness -- oh, it's your co-counsel's.  She's welcome to ask

15   if all of this has been produced and if Tyson has copies of

16   all of this.  It's been their choice not to produce it, as

17   well.

18         MR. WORDEN:  Okay.

19         MR. GOMEZ:  Thank you.

20         THE COURT:  Thank you.

21                    (Bench conference concluded.)

22   Q.  (BY MR. GOMEZ):  The next component of cost I

23   have written down is feeding cost.  Do you remember

24   that?

25   A.   Yes, sir.

1    Q.    There are different types of feed that can be used for

2    feeder cattle?

3    A.    Yes.

4    Q.    Some are more expensive than others?

5    A.    I'm sure that's accurate.

6    Q.    And Zia was responsible for picking the feed that you

7    use; isn't that right?

8    A.    Yes.

9    Q.    Tyson wasn't responsible for that?

10   A.    That's correct.

11   Q.    And under the way you calculated damages, you assumed

12   that Tyson would pay whatever Zia decided to pay for feed;

13   isn't that correct?

14   A.    That's correct.

15   Q.    How much of the $15.2 million in costs that you

16   calculated were feed costs?

17   A.    I do not have a breakdown.

18   Q.    The next component that I have were feedyard costs.

19   Do you remember that?

20   A.    Yes, sir.

21   Q.    Feedyards, I assume, have different costs associated

22   with them, right?

23   A.    Yes, sir.

24   Q.    Some of them are farther away from Tyson facilities?

25   A.    Yes, sir.

1     Q.    Some of them are closer to Tyson facilities?

2     A.    Yes, sir.

3     Q.    And that would impact the freight costs, right, for

4     shipping them from the feedyard to Tyson?

5     A.    That's correct.

6     Q.    And it was -- under the way that you calculated

7     damages, Tyson, you believe, was obligated to pay for

8     whatever feedyards Zia chose; is that right?

9     A.    Yes, sir.

10    Q.    How much of the $15.2 million that you calculated

11    today were feedyard costs?

12    A.    I don't have that breakdown.

13    Q.    Another component that I have written down is death

14    loss, and I want to understand.  You calculated damages and

15    you assume that Tyson would pay for dead cattle?

16    A.    When you produce any agricultural product effectively,

17    but specifically with cattle, we would consider that if you

18    buy 100 animals and you sell 97 at the end that you include

19    the costs for all the animals when you're considering the

20    cost of the lot.

21    Q.    Did your damages model assume that Tyson would pay for

22    dead cattle?

23    A.    We assumed that we [sic] would pay the actual cost,

24    plus our margin.

25    Q.    And a component of that cost is dead cattle?

1    A.    Correct.  There's some amount of animals that will

2    have a cost that will not produce any revenue.

3    Q.    Of the $15.2 million in costs that you calculated in

4    this case, how much do you contend Zia was owed for dead

5    cattle?

6    A.    I contend that Tyson owed Zia the entire 16.2 for the

7    entire number of cattle that were delivered.

8    Q.    And -- but can you tell me how much of the

9    $15.2 million in costs were costs that you associated with

10   dead cattle?

11   A.    No, I cannot give you a breakdown.

12   Q.    A final component that I had written down is interest.

13   Do you remember that?

14   A.    Yes, sir.

15   Q.    And your father testified that there was a 6 to

16   7 percent interest rate that you included in the cost

17   component of the cost plus agreement?

18   A.    I believe that the 6 to 7 percent was our margin.

19   Q.    Okay.  So that's -- the 6 to 7 percent is the "plus"?

20   A.    Correct.

21   Q.    I'd like to go to Exhibit 158.

22          And this appears to be an e-mail from Phil Chavez

23   at Zia; is that right?

24   A.    Yes, sir.

25   Q.    And it was to Dannyhermann@hotmail.com?

1    A.    Yes, Danny Hermann is the feedyard manager at Ford
2    County Feeders.
3    Q.    And I believe we've already established Tyson wasn't
4    copied on this?
5    A.    Yes, sir.
6    Q.    And I just want to go down to the second page where
7    there is a line here that says "feed and cattle interest."
8    So my question to you is:  Does this represent a separate
9    interest charge or is this somehow included in the 6 to
10    7 percent interest charge?
11    A.    Again, I think the 6 to 7 percent was our margin, not
12    interest charge.  But this interest charge that you've
13    circled here would be included in the cost to produce the
14    animals, yes.
15    Q.    And which of the six categories would it fit under?
16    A.    It would be interest.
17    Q.    So this is included in the interest calculation?
18    A.    In what interest calculation?
19    Q.    So there's six components of the agreement.  From what
20    I understood your father testifying, there was feed cost --
21    there was feedyard costs, there was the original price of
22    the cattle, there was the death loss, and there was
23    interest.  Is that right?
24    A.    Yes, sir.
25    Q.    So my question is which of the six categories -- and I

1   think there was a backgrounder, as well -- which of the six

2   categories does this interest charge fit under?

3   A.   This is an interest charge.

4   Q.   Okay.  What about for providing for medical care?  So

5   there's a line here for vet and meds.  Which category does

6   that fit under?

7   A.   I don't know which category you'd like to put it

8   under, but we considered it part of the cost, yes.

9   Q.   Which of the six categories did you put it under?

10  A.   I don't know what category it went under.

11  Q.   But it went into the cost plus model?

12  A.   Yes, sir.

13  Q.   And, again, those are all -- would all be things that

14  Zia would have selected, correct?  The vet and the meds?

15  A.   I'm sure that Danny Hermann did not call us for

16  permission on a vet/med, he just would have done it.  But

17  all these direct costs, yes, we would have included as part

18  of our cost.

19  Q.   Zia is the one who selects the vet or is the feedyard

20  the one who selects the vet?

21  A.   The feedyard selects the vet.

22  Q.   And you select the feedyard?

23  A.   Correct.

24  Q.   Can you please tell me how late cattle would be

25  included in your damages calculation?

1    A.    How late...

2    Q.    How late cattle.  So cattle, for example, that moved

3    from a May delivery date on the February 4th spreadsheet

4    to an August or September date.  How did you calculate the

5    costs associated with the late cattle?

6    A.    We didn't consider them differently.  We tallied the

7    costs associated with these sets of cattle that were listed

8    on the cost plus agreement.

9    Q.    When you were doing your damages calculation, when you

10   were adding up all of the documents you had, did you look

11   into whether it was Zia's fault that the cattle were late or

12   Tyson's fault that the cattle were late?

13   A.    I did not.

14   Q.    So that would have no impact, whatsoever, on your

15   damages calculation?

16   A.    No, it did not.

17   Q.    Would there be any offset for business disruption to

18   Tyson for late cattle?  So, for example, if Zia moved 2,000

19   cattle from June to September or August, would there be any

20   offset in the cost plus model for the disruption to Tyson

21   for having to clear slots or move other cattle out of the

22   way for Zia cattle?

23   A.    I'm not aware of any discussion regarding late cattle

24   or anything like that.  If we had issues like that, we would

25   have been happy to discuss it.

1    Q.   Let me go to just very quickly to Document 135.  And I

2    want to just focus on three lines here.  So I'm going to do

3    these two (indicating), the Stormy Burch, 97, and the Boot

4    Ranch, 82.  And then I want to do the Mogus Land and Cattle,

5    377.

6           So I don't want to make it a memory test, but I

7    just want to keep those three lines in mind as I compare it

8    against another exhibit, which I'm going to switch to right

9    now.

10   A.   Okay.

11   Q.   I'm going to compare it to Exhibit 149.  And on --

12   and, I'm sorry, actually, I need to go back.

13          So just to be clear, so the Stormy Burch and the

14   Boot Ranch are both scheduled for June 15th; isn't that

15   right?

16   A.   Tyson would schedule when it wanted to take delivery

17   of this cattle, but that's the weight that we projected they

18   would be on June 15th.

19   Q.   So then the Mogus is projected on May 15th; isn't

20   that correct?  Right here (indicating).  It's a little hard

21   to see.

22   A.   I think that is the Johnson --

23   Q.   I'm sorry, you're right.  It's June 15th.  So

24   they're all for June, right?

25   A.   Yes, sir.

1    Q.   Now I want to go back to 149, where we have the Stormy

2    Burch and Boot Ranch, 82, and the Mogus, 377.  They're all

3    on the same line; isn't that right?

4    A.   They're all on the same line.

5    Q.   I'm sorry, there's all one, two, three right next to

6    each other?

7    A.   Yes, sir, they're all together.

8    Q.   And, in this spreadsheet, they are estimated out at

9    August 15th and September 15th; isn't that correct?

10   A.   They have obviously not been delivered yet.  And so

11   now an animal that weighs 1,100 pounds in June keeps eating

12   and it becomes 1,300 pounds in August.

13   Q.   And does this reflect for you that there are certain

14   cattle that were on the February 4th spreadsheet that were

15   scheduled for June -- or, sorry, that were listed and

16   estimated in June, on a later spreadsheet were estimated in

17   August and September?

18   A.   Again, sir, these weight -- these pink weight columns

19   are what we are projecting the cattle to weigh in

20   those months.  These cattle were offered to Bob.  He could

21   take them whenever he wanted them.  If he wanted them at

22   1,100 pounds in June, that was his choice.  If he wanted

23   them at 1,300 pounds in August, that was also his choice.

24   Q.   What about insurance?  Did Zia take livestock

25   insurance on any of these cattle?

1   A.   We do have livestock insurance, but those costs were

2   not included in this.

3   Q.   Do you have livestock insurance on these specific --

4   on any of these specific cattle; do you know?

5   A.   Do we have livestock insurance --

6   Q.   Did you have livestock insurance on any of the cattle

7   listed in the February 4th, 2019, spreadsheet?

8   A.   The cattle that we had on our own properties, yes,

9   were insured.

10   Q.   And did any of those die?

11   A.   I don't know.  I know we didn't make any claims.

12   Q.   We've gone through a number of components of cost.

13   And separate and apart from the agreement that you claim

14   occurred here, you understand that someone could have a

15   different understanding of the word "cost," correct?

16   A.   Sure.

17   Q.   And that could depend, in this type of circumstance,

18   on what was included and what was excluded?

19   A.   Of course.

20   Q.   I'd like to look at Exhibit 144.

21          THE COURT:  Exhibit 144 has not been admitted.

22          What's Zia's position on Exhibit 144?

23          MR. WORDEN:  No objection, Your Honor.

24          THE COURT:  Exhibit 144 is admitted.

25   (Joint Exhibit 144 was admitted into evidence.)

1    Q.   (BY MR. GOMEZ):  This is an e-mail from you to

2    Mike Dancey at Larue Road, right?

3    A.   Yes, sir.

4    Q.   And your father described them as your "bank," and you

5    described them as a "financing entity"?

6    A.   Right.

7    Q.   And this e-mail says (reading), "The cost plus

8    model" -- I'm starting right here (indicating) -- "The cost

9    plus model that we created is merely an estimation of the

10   number of head and approximate cost to create expectations

11   for Tyson.  There is no practical means to incorporate

12   revenue for cattle sold outside of Tyson into it, nor can we

13   prescribe how Tyson is going to consider cost or calculate

14   payment on these cattle.  The memo I sent describes the best

15   detail I have, but, truthfully, we don't have any idea how

16   Tyson is planning to calculate cost on these cattle."

17              Did I read that correctly?

18   A.   I believe so.

19   Q.   And does this reflect your understanding that the term

20   "cost" is ambiguous and Tyson might calculate it in a

21   different way, and you would have no idea?

22   A.   Yes.  The context of this conversation was Mike Dancey

23   had called me and asked me how death loss was going to be

24   incorporated in the cost of the lots, and I told him.  And I

25   reiterated to him that Tyson prefers to build deals with

1    ambiguity built into to them, so that they can interpret

2    them to their advantage.

3     Q.   And, so as a result, you did not -- you would not be

4    able to prescribe how Tyson is going to consider cost,

5    correct?

6     A.   That's correct.

7     Q.   And you would not, as a result of that, have any idea

8    how Tyson is planning to calculate cost on these cattle; is

9    that right?

10    A.   That's right.  The way that I calculate costs, I

11    expected if I came in with an excessive cost that Bob was

12    going to complain about it.

13    Q.   I'll go to Exhibit 18, which is the February 4th

14    spreadsheet.  I'm happy to zoom in wherever you'd like, but

15    we've talked about several categories of costs, like freight

16    costs, feed, feedyard fees.

17             Do you see anywhere on this spreadsheet where the

18    word "freight costs" appears?

19    A.   No, sir.

20    Q.   Do you see anywhere on this spreadsheet where the word

21    "feed" appears?

22    A.   No, sir.

23    Q.   Do you see anywhere on the spreadsheet where the word

24    "feedyard" appears?

25    A.   No, sir.  "Location" appears, but the word "feedyard"

1    does not.

2    Q.   And if all I had to go on was this spreadsheet,

3    separate and apart from any understanding or any

4    conversations that you may have had or that your father may

5    have had, if all I had to go on was this spreadsheet and

6    looked at it for the first time, I would not know, on the

7    face of this spreadsheet, that feedyard costs were being

8    included in costs; is that correct?  As a layperson.

9    A.   That's what I was going to say.  You probably would

10   not.  Bob would.

11   Q.   While we're looking at this document -- we've

12   discussed this with multiple witnesses, so this will be

13   quick -- this doesn't give any information on premiums;

14   isn't that right?

15   A.   That's correct.

16   Q.   Doesn't give any information on GAP premium?

17   A.   Makes no distinction.

18   Q.   Or NHTC premium?

19   A.   Correct.

20   Q.   And the word "fallout" doesn't appear?

21   A.   Correct.

22   Q.   Now, I believe I understood from your father's

23   testimony that the cost -- I'm sorry, the premium was

24   included in the February 4th spreadsheet within the bucket

25   of costs, total costs; is that right?

1    A.   Yes, sir, this is the cost to Bob.

2    Q.   And the...and his testimony was also that the -- it

3    was that all of these cattle, at the time the February 4th

4    spreadsheet was sent, were GAP; is that correct?

5    A.   Yes, sir.

6    Q.   So taking a look at a later spreadsheet -- I want to

7    look at Exhibit 36, which is from May 22nd, so this is

8    three and a half months later.  And I can scroll wherever

9    you'd like, but I just want to make sure that we understand

10   that, in this spreadsheet, in the later version of this

11   spreadsheet, there is also no distinction between GAP and

12   NHTC or fallouts; is that correct?

13   A.   I believe that's correct.

14   Q.   And, I mean, there must have been some fallouts at

15   that point from the GAP program in the three and a

16   half months from February 4th to May 22nd?

17   A.   I think that any fallouts or, you know, fallouts even

18   from GAP to NHTC that we would have known about would have

19   been incorporated into the head counts here, so Bob didn't

20   expect to get -- whatever the number of head count is here,

21   I can't quite see it, but a lesser amount than he expects to

22   get.

23   Q.   That's true.  But if he had just this spreadsheet, he

24   also wouldn't understand what -- how many NHTC cattle versus

25   GAP versus fallouts there would be, would he?

UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1    A.    Again, if we understood the number of animals that
2    were not GAP, then we would have incorporated that into
3    these cost plus updates.  That was the point of sending
4    updates, is so that Bob would understand how what we were
5    going to be able to deliver was changing from February to
6    May.
7    Q.    I'm sorry.  I want to make sure -- I'm not sure if I
8    heard that correctly.
9            Would you mind re-reading that?
10               (Discussion off the record.)
11       (Whereupon the previous answer was read back.)
12               Okay.  So did you not have an understanding, at
13    the time you made this spreadsheet, how many were GAP and
14    how many cattle were NHTC?
15    A.    This is one of the cost plus updates?
16    Q.    That's correct.
17    A.    I'm sure that any information that was communicated
18    back to our office by these various locations or cowboys on
19    our own facilities, then Mike and our team would have
20    incorporated them into the cost plus updates.
21    Q.    All right.  But you don't know specifically?
22    A.    I don't know.
23    Q.    And it's certainly not on the face of the spreadsheet;
24    isn't that right?
25    A.    That's correct.

1    Q.   And the total NHTC cattle is -- as -- that you

2    calculated is 1,834; isn't that right?

3    A.   Yes, sir.

4    Q.   So if I went to, just as an example, the August

5    total -- excuse me, the August total number of cattle,

6    that's 1,272; is that right?

7    A.   Yes.

8    Q.   For all Tyson knew, those could all have been NHTC?

9    A.   As far as we were aware, they would have all been GAP.

10   Q.   Right, but we don't -- we don't -- we can't tell from

11   this spreadsheet, can we?

12   A.   That's correct.

13   Q.   And you don't know whether you knew at that time

14   whether they were NHTC or GAP?

15   A.   The objective of this whole agreement was to build a

16   GAP cattle supply for Bob, so, yes, this spreadsheet

17   contemplated GAP cattle.

18   Q.   Okay.  And as far -- as you sit here today, as far as

19   your understanding goes, all 1,272 cattle in August could

20   have been NHTC?

21   A.   I don't know about that.  If the cattle were marked as

22   GAP cattle -- and I don't know what the time frame of this

23   update is, but, for all the cattle to be NHTC in August,

24   then something would have had to have happened to the cattle

25   between the time of this update and August that caused them

1    to fall out from being GAP natural.

2    Q.   Do you have anything specific that you can point to,

3    any specific recollection, that would dispute the fact that

4    all 1,272 of those cattle could have been NHTC?

5    A.   Like I say, the -- these spreadsheets were designed

6    around communicating the GAP cattle supply that we had.  I

7    don't know why we would ever represent NHTC as GAP cattle.

8    Q.   Okay.  So this is a little bit of a different

9    understanding than I have.

10            So is it -- if -- am I correct in understanding,

11   then, if you knew that some of these cattle were NHTC, they

12   wouldn't have appeared in the spreadsheet, at all?

13   A.   They would have been removed from the head counts.

14   Q.   I see.  I understand what you're saying.

15            You mentioned today that under the -- your final

16   calculation, there were 6,133 GAP cattle; isn't that right?

17   A.   Yes, sir.

18   Q.   And 1,834 NHTC?

19   A.   Yes, sir.  With the caveat that those numbers were

20   tallied based on the way the cattle were paid.  So if we had

21   GAP animals that we were forced to sell as conventional

22   animals, they would not be included in these counts.

23   Q.   Okay.  I understand what you're saying.

24            And so, if you add those two numbers together,

25   6,133 plus 1,834, there's a difference of 1,186, and that

1   represents the fallouts; is that right?

2   A.   Fallouts and cattle we were forced to market as

3   conventional animals, yes.

4   Q.   And I have searched the transcript from the first

5   two days of trial for the word "fallout," and that is the

6   first time that I've been able to see it.  Do you -- would

7   you -- if I represented that to you, would you have any

8   reason to doubt that we have never before in this trial

9   discussed "fallouts"?

10   A.   I don't have any reason to argue with you.

11   Q.   Have you seen any -- in the memos that you wrote to

12   Larue Road did you ever mention fallouts?

13   A.   I would have to review the memo to say for certain,

14   but I just don't recall.

15   Q.   I'll go to Exhibit 149.  This is the update from

16   5-10-2019.  And they're all -- they're in two different

17   spreadsheets here.  So just to do a little bit of math.

18   2000 -- there's 2,744 that are grouped together, July,

19   August, September; is that right -- I moved it, didn't I?

20   A.   Yes, sir.

21   Q.   Yeah, there we go.  All right.  And, for the other

22   spreadsheet, there are 5,296; is that right?

23   A.   Yes, sir.

24   Q.   And if I add those together, I get 8,040.  Would you

25   have any reason to doubt that number?

1   A.   No, sir.

2   Q.   So that is -- if I subtract the total number of cattle

3   that you're claiming Tyson agreed to purchase, 9,153, from

4   8,040, then the number of cattle is off by 1,100; isn't that

5   right?

6   A.   I mean, I trust your math, first of all.  What is the

7   date on this spreadsheet?

8   Q.   May 10th.

9   A.   So this would have been in consideration of some

10  cattle that had already shipped, I expect.  And the

11  remaining head counts would, again, be reduced by our

12  expected death loss.

13  Q.   And, I mean, I believe that there has been testimony

14  in this case that the very first shipment that Tyson

15  received was May 24th.  At least that's the first bill

16  that Tyson received.  Do you recall that?

17  A.   The invoice you're talking about from May 24th is

18  the Prewitt Land and Livestock invoice?

19  Q.   I don't recall, but you recall that invoice, right?

20  A.   I'm trying to find out if we're talking about the same

21  invoice.

22  Q.   Do you have a specific recollection of any invoice

23  that we've discussed at this trial that Tyson received

24  before May 24th, 2019?

25  A.   I do not.

1    Q.    And this spreadsheet May 10th was created before

2    May 24th, I presume?

3    A.    It must have been, yes.

4    Q.    If I go to Exhibit 36, which is the May 22nd

5    spreadsheet, there is -- again, is broken up into two, but

6    this first spreadsheet has 2,744 cattle.  Did I read that

7    correctly?

8    A.    Yes, sir.

9    Q.    And the second spreadsheet has 5,142.  Did I read that

10    correctly?

11    A.    Yes, sir.

12    Q.    And if I add those together, by my math, I get 7,886.

13    Do you have any reason to doubt that math?

14    A.    No, sir.

15    Q.    And that would be, if I subtracted the total number of

16    cattle that you say Tyson agreed to 9,153 from 7,886 that

17    appeared on this spreadsheet, it would be off by

18    approximately 1,300 cattle; isn't that correct?

19    A.    I trust your math.

20    Q.    You said earlier in your direct that your goal with

21    these spreadsheets was that you didn't want Bob Scherer to

22    get 97 percent of 9,000 cattle.  Do you remember saying

23    that?

24    A.    I didn't want Bob Scherer to get 97 percent of what?

25    I'm sorry.

1    Q.   9,000 cattle.

2    A.   Right.

3    Q.   So, in other words, you didn't want your spreadsheets

4    to be 97 percent accurate, you wanted them to be 100 percent

5    accurate; isn't that right?

6    A.   I wanted the spreadsheets to reflect what we felt like

7    we could deliver to Bob.

8    Q.   And, by that standard, if you add these two cattle

9    together, you get 7,886.  That's a difference of over 1,300

10   cattle from the final number that you say Tyson was owed.

11   Do you think that that meets the 97 percent standard that

12   you were talking about on direct?

13   A.   97 percent standard for what?

14   Q.   Well, I mean, you said that you wanted to make sure

15   that your spreadsheet -- that he wasn't getting 97 percent

16   of the cattle, he was getting 100 percent, right?

17   A.   I'm still not clear, but, again, go to the -- my same

18   representation:  That we created this proposal and

19   spreadsheet to represent what we thought we could deliver to

20   Tyson.

21   Q.   Okay.  I want to go to -- back to the February 4th

22   spreadsheet, Exhibit 18.  And I want to look at one specific

23   column, which is the cattle in June.  And this one says that

24   the cattle, in June, are 4,535; is that right?

25   A.   I'm sorry, where are you looking?

1    Q.   Right here (indicating).  Just in June, 4,535.

2    A.   Yes, sir.

3    Q.   So, if I were looking at this spreadsheet and I

4    believe that there are going to be 4,535 head of cattle, and

5    then I took a look at the February 15th spreadsheet -- so

6    this is just 11 days later -- we have jumped from 4,535 to

7    4,903.  Do you see that?

8    A.   Yes, sir.

9    Q.   So that number has changed by 370 cattle in just

10   11 days.

11   A.   That's correct.

12   Q.   And then, on February 18th, just three days later,

13   on Exhibit 133, we go from February 15th at 4,903 cattle,

14   in June, to 5,552; is that right?

15   A.   Yes, sir.  I'm expecting that the cattle were probably

16   coming off wheat lighter than we expected them to, so,

17   consequently, they would have been pushed back.

18   Q.   So it was your intention, then, to signal to Tyson

19   that these cattle would be ready in June?

20   A.   That they would be at the estimated weights above on

21   June 15th, correct.

22   Q.   So if I went by that and I was going by that estimate,

23   on February 4th, I would have thought that there were

24   4,500 cattle ready.  And then, just 14 days later, there

25   would be an extra thousand cattle ready in June; is that

1   right?

2   A.   Yes, sir.

3   Q.   I'm going to go to the March 4th spreadsheet.  I'm

4   going to keep looking at the June cattle.  And, this time,

5   we're at 4,731; is that right?

6   A.   Yes, sir.

7   Q.   And that was -- the last spreadsheet we looked at,

8   February 18th, was 5,500.  And this is 4,700, so we've

9   gone down 800 cattle in approximately two weeks; is that

10  right?

11  A.   It looks like some of those cattle got pulled back to

12  May.  I want to go back and short-circuit this a little bit.

13  I want to go to the last update that -- from May 22nd, and

14  I want to make sure I understand.

15  Q.   So when you were updating these spreadsheets, you were

16  putting in the actual costs into the spreadsheet as they

17  went along?

18  A.   Yes, sir.

19  Q.   So the May 22nd spreadsheet should be even more

20  accurate than the February 4th spreadsheet because it

21  would have actual data, and the February 4th spreadsheet

22  just has estimates; isn't that right?

23  A.   They both contain estimates, but the later the

24  spreadsheets get, the more actual data they incorporate,

25  yes.

1    Q.   All right.  And if I looked at this May 22nd

2    spreadsheet, which has more actual costs and fewer

3    estimates, there are two costs here (indicating):  One is

4    10,213,000, right?

5    A.   Yes, sir.

6    Q.   And then this one just above it, the only other one in

7    the document, is for 5,297,000?

8    A.   Yes, sir.

9    Q.   If you add those two numbers together, I get

10   approximately 15,400,000.  Do you have any reason to doubt

11   that?

12   A.   No, sir.

13   Q.   And that is $1,800,000 -- I'm sorry, no, $800,000 less

14   than the total value of the cost plus contract that you

15   calculated; isn't that right?

16   A.   The --

17   Q.   According to that diagram.

18   A.   What number are you comparing it to?

19   Q.   I'm comparing the number in this spreadsheet, which

20   has fewer estimates and more actual costs, that lists costs

21   of 15.4 million, to that damages calculation (indicating)

22   that lists your costs at 16.2 million.

23   A.   Yes, sir.

24   Q.   So this calculation, which has fewer estimates than

25   the February 4th spreadsheet, is $800,000 less than you're

1    claiming Tyson owes under the cost plus agreement; isn't

2    that right?

3    A.   Yes, sir.

4    Q.   I want to talk about Larue Road briefly.  And I

5    understand that we've been flipping through documents, so I

6    want to try and consolidate this a little bit, but I'm happy

7    to go through each one, if you'd like.

8         Do you recall in yesterday's cross-examination of

9    your father -- and I believe Mr. Scherer may have seen some

10   of these documents, as well -- there were different e-mails

11   between him, and you were included, as well, and Larue Road

12   that referenced or requested that the cost plus deal be put

13   in writing?

14   A.   Yes, sir.

15   Q.   And, again, just to short-circuit this, if I

16   represented to you that the first one was on January 17th,

17   you wouldn't have any reason to doubt that?

18   A.   I suppose not.

19   Q.   And the second one was on January 24th?

20   A.   Okay.

21   Q.   February -- next one was February 13th, which was

22   bolding something from February 4th?

23   A.   Okay.

24   Q.   And, February 14th, there was another one?  Is that

25   right?

1    A.    I would have to accept your word for it.

2    Q.    And then, March 22nd, I believe, was the last one.

3    And that is one that you testified to on your direct.

4              And I want to understand first, before I get to

5    that, so you were involved in each of these spreadsheet --

6    each of the spreadsheet updates that were sent to Tyson; is

7    that correct?

8    A.    Yes, sir.

9    Q.    And we talked in detail with your father and with you

10   about how much time and effort you put into each of those

11   spreadsheets?

12   A.    Yes, sir.

13   Q.    And that is the basis, according to you, for the cost

14   plus arrangement?

15   A.    Yes, sir.

16   Q.    Now, in the -- in this March e-mail -- I'm going to

17   scroll down a little bit -- Mike Dancey from Larue Road

18   e-mails you and he says (reading), "Hey, Sean, after

19   speaking with CLA, we do need that note outlining the cost

20   plus deal; the sooner the better.  They said it would be

21   better to have it signed off, so please make it a letter

22   with signature."

23              Did I read portions of that e-mail correctly?

24   A.    Yes, sir.

25   Q.    And then you respond by saying, after -- you say

1    (indicating), "I don't mind taking a first stab at it.  Let

2    me get with Narciso and get the bullet points."

3            Is that right?

4    A.   Yes, sir.

5    Q.   Okay.  So my question to you is, if you spent so much

6    time building the cost plus model, why would you need to ask

7    your father for the bullet points about the cost plus deal?

8    A.   Because Narciso is the one that negotiated it.

9    Q.   And -- but it's based off of the spreadsheet that you

10   created February 4th, correct?

11   A.   The cost plus proposal outlines the cattle we thought

12   we would deliver to Tyson for the costs and our margin.  So

13   what are you asking me?

14   Q.   I'm asking you why, if you were the one who put

15   together the February 4th spreadsheet which contained --

16   which is the written -- the alleged written agreement that

17   memorialized the cost plus deal, why would you need to get

18   bullet points from your father about what the cost plus deal

19   contained.

20   A.   I mean, as I mentioned before, Narciso has negotiated

21   all of our deals with Tyson.  If I'm going to create a memo

22   to describe an agreement we have, it's going to be from the

23   words of the man that negotiated it.

24   Q.   So the words of man that negotiated would be more

25   reliable about the cost -- the alleged cost plus agreement

1    than the February 4th spreadsheet?

2    A.   I think they're one in the same.

3    Q.   But if there were differences, then the word of your

4    father would control over the February 4th spreadsheet; is

5    that what you're saying?

6    A.   Yes, sir.

7    Q.   And that's why you had to go to him to get the bullet

8    points?

9    A.   As I just said, I went to Narciso to get the bullet

10   points because he negotiated the deal.

11   Q.   I want to go down to the memo.  And I want to first

12   start off with this phrase right here (indicating).  So the

13   very first one (reading):  "Our understanding of Tyson Fresh

14   Meats' verbal agreement...."  So you wrote that, right?

15   A.   I wrote this memo, yes.

16   Q.   And you also prepared the February 4th spreadsheet?

17   A.   The gentlemen in my office did.  I helped, but the

18   office worked together.

19   Q.   So did you consider that the agreement or was there

20   some other verbal agreement that you're referencing in this

21   memo?

22   A.   I think that Narciso and Bob met in Happy, created a

23   fundamental agreement; and we memorialized it February 4th

24   when we sent our proposal, and Bob accepted it.

25   Q.   And this memorializes the bullet points that you

1    received from Narciso?

2    A.   Yes, sir.

3    Q.   And if the bullet points you received from Narciso

4    were based off of his verbal conversation and the

5    February 4th spreadsheet, then the verbal agreement would

6    control; isn't that right?

7    A.   No, sir.  The contract that we established

8    February 4th would be the end.

9    Q.   Okay.  But that gets back to my earlier question:

10   Again, if you prepared the February 4th spreadsheet and

11   you -- and that's the controlling document, why would you

12   need to get bullets point from Narciso --

13           MR. WORDEN:  Your Honor?

14   Q.   -- and you said it was because --

15           THE COURT:  What's your objection?

16           MR. WORDEN:  Objection, asked and answered.

17           THE COURT:  Sustained.

18   Q.   (BY MR. GOMEZ):  I want to take a look at these

19   bullet points.

20           So the first one says that (reading) "Tyson has

21   knowledge of the approximately 7,800 GAP Level 1 yearling

22   calves that have been backgrounded by Zia Agricultural

23   Consulting or one of our associate vendors."

24           Did I read that correctly?

25   A.   Yes, sir.

1    Q.   And 7,800 is approximately 1,300 less than the 9,156

2    cattle you're claiming in this case?

3    A.   It is.

4    Q.   Was this 7,800 -- was that something that you had --

5    when you discussed that with your father?

6    A.   No.  This 7,800 number would have come from Mike

7    Rogers in our office.  I'm not sure why it's less than the

8    approximately 9,000 on our proposal.

9    Q.   There's no reference on this -- in this memo to the

10   February 4th spreadsheet; isn't that right?

11   A.   That's correct.

12   Q.   I want to look at the most contemporaneous update that

13   Tyson -- that was sent to Tyson that is closest in time to

14   this memo.  So this is March 21st and I'm going to go to

15   the February -- I'm sorry, the March 4th spreadsheet, so

16   that's just three weeks before.  And the total number of GAP

17   cattle was 8,726; isn't that right?

18   A.   Yes, sir.

19   Q.   So that's different than the 7,800 that you mentioned

20   in the memo --

21   A.   Yes, it is.

22   Q.   -- to Larue Road?

23        In this memo, it says that (reading)

24   "Compensation for these calves to their respective owners

25   will be full reimbursement for costs incurred by the animals

1    directly as a result of the feeding process, plus an

2    additional $125-per-calf margin, inclusive of calves which

3    died at the finish feedyard or were disqualified from

4    premium programs as a result of treatment of illness."

5            Is that right?

6    A.   Yes, sir.

7    Q.   And this bullet point doesn't mention NHTC cattle?

8    A.   It does not.

9    Q.   And it doesn't mention fallouts?

10   A.   It does not.

11   Q.   And I want to go back to something real quick.  I just

12   want to make sure I understand.

13           So for all of the updates that you have, they

14   should exclude NHTC and fallouts, right?  Those would not --

15   if you knew about them and knew that they weren't GAP, they

16   wouldn't be on those updates; is that correct?

17   A.   That's correct.

18   Q.   So if someone at Tyson were looking at, say, the

19   May 10th spreadsheet, they would have no idea how many NHTC

20   cattle are out there and no idea how many fallout cattle

21   were out there; is that right?

22   A.   Yes, sir.

23   Q.   There would be no way for me to piece that together

24   with just the spreadsheets?

25   A.   I believe that's accurate.

1   Q.   And you haven't presented any receipts or, you know,

2   shipping orders that would let us know and would be able --

3   for us to be able to confirm that there were, in fact, 1,800

4   NHTC cattle and approximately 1,100 fallouts?

5   A.   No, sir.  I've got them all, but I don't think they've

6   been presented.

7   Q.   Then we'll go to 142, which is a follow-up to the

8   other memo that I just showed you.  And it says (reading),

9   "Attaching an updated memo for you.  I just added in a slash

10  Never Ever 3, per our discussion on that."

11           Did I read that correctly?

12  A.   Yes, sir.

13  Q.   And that's something that you said to Mike Dancey?

14  A.   The previous memo we looked at was a draft.  This was

15  the final copy.

16  Q.   So you didn't put the NHTC portion of the alleged

17  agreement in the original memo; is that right?

18  A.   That's correct.

19  Q.   And then Mike pointed it out to you, correct?

20  A.   Yes.

21  Q.   And then you added it in; is that right?

22  A.   Yes, sir.

23  Q.   So, as of the day before, as of March 26th, you had

24  no idea that there was an agreement on NHTC cattle?

25  A.   That's correct.

1    Q.   And you're the president of Zia; is that right?

2    A.   That's correct.

3    Q.   This is a, allegedly, $16 million deal?

4    A.   Yes, sir.

5    Q.   Sorry.  I want to go to Document -- must be 141.

6    Okay.  Yes.

7              And so this is a predecessor to the last memo I

8    just sent you, right?

9              THE COURT:  141 has not been admitted.

10             What's Zia's position on 141?

11             MR. WORDEN:  No objection, Your Honor.

12             THE COURT:  141 is admitted.

13   (Joint Exhibit 141 was admitted into evidence.)

14   Q.   (BY MR. GOMEZ):  This is just a continuation.

15   You say (reading), "Mike, review this language";

16   it's a continuation of that memo.

17   A.   I believe that's correct.

18   Q.   And Jason Turnipseed responds (reading), "Thank you,

19   Sean.  It's my understanding that the NHTC and the NE3 have

20   been agreed at $100, plus costs.  If this is your

21   understanding, as well, can we please include that in the

22   letter, as well?"

23             Did I read that correctly?

24   A.   Yes.

25   Q.   And then you responded -- it says "from Sean Perez" --

1   you said (reading), "I asked Narciso about this.  He's

2   double-checking his notes and is going to let me know."

3            Did I read that correctly?

4   A.   Yes, sir.

5   Q.   Did Narciso Perez have notes about this agreement?

6   A.   I'm sure he did.  And, again, he was the one that

7   spent the time with Bob.

8   Q.   All right.  And we haven't seen these notes in the

9   trial; is that right?

10  A.   That's correct.

11  Q.   They've never been shown to the jury?

12  A.   That's correct.

13  Q.   And would these be contemporaneous notes?

14  A.   They're his notes.  You'd have to ask him about them.

15  Q.   But you had to go back to him and ask, and he was

16  going to double-check his notes about the NHTC cattle?

17  A.   I did not negotiate the deal, so I did not have the

18  answer.  I had to ask the man who did.

19  Q.   So he didn't know off the top of his head that he had

20  agreed to $100 premium on NHTC cattle?

21  A.   That's what the e-mail says.

22  Q.   So approximately -- and if I'm looking at that

23  correctly, it's $183,000.  And he evidently had to check his

24  notes in order to remember that?

25  A.   That's what the e-mail says.

1    Q.    And you don't remember it, even though you're
2    president of Zia?
3    A.    I do not recall that.
4    Q.    And one more thing about 142.  I just want to make
5    sure.  This memo was signed, right?
6    A.    Yes, sir.
7    Q.    And it was signed at the request of Larue Road; is
8    that right?
9    A.    Yes, sir.
10   Q.    And none of the spreadsheets you sent to Tyson are
11   signed; is that correct?
12   A.    Correct.
13   Q.    By Tyson or Zia; is that right?
14   A.    No agreement we've ever had with Tyson has gotten
15   signed.
16   Q.    We've looked at a lot of documents in this proceeding
17   so far, both during this cross and during your direct and
18   during other testimony which you were here for.  Is there
19   any document that you've seen that Tyson received that
20   stated specifically -- that listed the types of costs that
21   were included in the cost plus agreement?  And, by that, I
22   mean, the six costs that Narciso Perez listed in his
23   testimony.
24   A.    No.  The direct costs were all built into our cost
25   plus proposal, but that is the only place they appear.

1    Q.   Are there any documents or combinations of documents

2    that the jury could look at to check the math that you did

3    in compiling your damages calculation?

4    A.   I have not seen them produced here, no.

5    Q.   I want to go to the premium portion now.  We've looked

6    at documents and heard a lot of testimony.  Is there any

7    document that you've seen that Tyson received that stated

8    that Tyson was obligated to buy cattle at $125 per head for

9    GAP cattle?

10   A.   The cost plus proposal had $125 a head in the costs,

11   and we sent it on February 4th, and Bob accepted it.

12   Q.   But it wasn't specifically separated out in that

13   spreadsheet, was it?

14   A.   No, that cost was the cost to Bob.

15   Q.   And there wasn't -- there's no document that you've

16   seen in the trial that Tyson received that stated that Tyson

17   was obligated to buy cattle at $100 per head for NHTC

18   cattle; is that right?  And that's not even included in the

19   spreadsheets; isn't that right?

20   A.   That's correct.

21   Q.   And, again, you know, I'm going to represent to you

22   that the very first time that I can find that the word

23   "fallout" has appeared in this trial is during your direct

24   testimony.

25   A.   Okay.

1    Q.   And so there certainly wouldn't be any documents or

2    combination of documents that the jury could look at to

3    understand how fallouts were supposed to be calculated under

4    this alleged agreement?

5    A.   No, sir.

6    Q.   There wouldn't be any documents or combination of

7    documents that the jury could look at to confirm that you

8    had ready 6,133 head of GAP cattle?

9              THE COURT:  Mr. Gomez, let me have you approach.

10             (Bench conference.)

11             Are you saying that these documents don't exist,

12    or are you saying they've not produced them to the jury?

13             MR. GOMEZ:  It's a combination.  I think it

14    depends on the topic.  There are some that I don't believe

15    have been produced; especially the notes from Narciso Perez.

16    And, you know, I would have to take a look specifically at

17    some of the other items that I've mentioned.  But,

18    certainly, I don't think that there's any document that has

19    ever been produced that went to Tyson that mentioned the

20    $100 premium, the $125 premium.

21             MR. WORDEN:  We've already seen some that have

22    the $100 premium and -- every document we had on all these

23    costs were sent at the time and produced in discovery.

24    That's why I raised this earlier.  The suggestion that

25    somehow they just don't exist is misleading.

```
 1              THE COURT:  Mr. Gomez, if you want to talk about
 2      what's been shown to the jury, that's fine, but don't -- be
 3      careful that you're not stating documents don't exist when
 4      the documents do, in fact, exist, or we're going to have an
 5      issue.  Do you understand?
 6              MR. GOMEZ:  I understand.  And I certainly don't
 7      mean to imply otherwise.
 8                   (Discussion off the record.)
 9              MR. WORDEN:  That's exactly what is being
10      implied.
11              THE COURT:  Come back up here.
12              MR. WORDEN:  That's exactly what's being implied.
13      That's the point of this:  The suggestion that they just
14      made these numbers up.
15              THE COURT:  That's why I brought you up here
16      because somebody could read that and say that's what you're
17      implying.  Don't do it.
18              MR. GOMEZ:  I apologize, Your Honor.  It won't
19      happen again.
20              THE COURT:  That's fine.
21                   (Bench conference concluded.)
22              MR. GOMEZ:  I have no further questions, Your
23      Honor.
24              THE COURT:  All right.  Thank you.
25              Ms. Diamond, do you want to commence your
```

1    redirect or do you want to take recess, because it's sort of

2    close to when we might do it?

3            MS. DIAMOND:  A recess would be great.

4            THE COURT:  All right.  We're going to take our

5    afternoon recess a little bit early for 15 minutes.  Thank

6    you.

7            Rise for the jury.

8                    (Jury not present.)

9            Thank you.  You may be seated.  We're in recess

10   for 15 minutes.  Mr. Perez, you can take a break.  You don't

11   have to wait here, but come back when the jury comes back.

12           THE WITNESS:  All right.  Thank you.

13                   (A recess was taken.)

14           THE COURT:  Thank you.  You may be seated.

15           Is Zia ready?

16           MS. DIAMOND:  Yes, Your Honor.

17           THE COURT:  Is Tyson ready?

18           MR. GOMEZ:  Yes, Your Honor.

19           THE COURT:  All right.  Let's bring in the jury.

20                   (Jury present.)

21           All right.  You may be seated.

22           All right.  Ms. Diamond, it's your witness.

23           MS. DIAMOND:  Thank you, Your Honor.

24

25

1            **REDIRECT EXAMINATION**

2   Q.  (BY MS. DIAMOND):  Mr. Perez, Mr. Gomez seemed

3   to suggest that there were some missing invoices or

4   backup.  Has Zia produced all of the invoices

5   regarding the cost plus program to Tyson already?

6   A.   Yes, ma'am.  That was the only way I was able to

7   tabulate these costs.  We delivered the original proofs of

8   cost with our original invoices for the cattle.  We produced

9   them again during the discovery phase of this case.  And

10  they questioned me about them in my deposition last year.

11  Q.   So Tyson has all the backup with regards to the costs

12  in the cost plus agreement?

13  A.   Yes, ma'am.

14  Q.   If I could just pull up Exhibit 151, page 2.

15            Mr. Perez, would this be an example of an invoice

16  that would have been sent to Tyson, as well as produced in

17  discovery?

18  A.   Yes, ma'am.

19  Q.   What about Exhibit 36, page 5, please?

20            Would this be another such example?

21  A.   Yes, ma'am.

22  Q.   Thank you.

23            What was the total cost on the cost plus

24  agreement that you sent to Mr. Scherer on February 4th,

25  2019?

1           If you can pull up Exhibit 18 and zoom in on that
2     box, please, Ms. Gallagher.
3           So I'll ask you what were the total costs, the
4     total specific costs, on the cost plus agreement from
5     February 4th, 2019?
6     A.   The total costs are $16,308,996.44 for 8,666 head of
7     cattle.
8     Q.   And you've done your calculations on the board here.
9     What was the final cost to Tyson?
10    A.   The total that they should have paid us was
11    $16,220,198.90, and that would have been for 9,153 head of
12    cattle.
13    Q.   So what does that mean, the reconciliation between
14    those two numbers?
15    A.   It means that, in the end, even with the "plus" part
16    of our cost plus agreement, we still produced almost 500
17    head more cattle for $100,000 less than we projected
18    February 4th.
19    Q.   So more cattle for less money?
20    A.   Yes, ma'am.
21    Q.   The February 4th Exhibit 18, what price is listed
22    for the price per pound?
23    A.   Average per pound, $1.6181.
24    Q.   And what about the price per head?
25    A.   Average per head, 1,881.95.

1    Q.   So, doing that math, arguably, what would these two

2    numbers mean in terms of the reconciliation of the two

3    numbers?

4    A.   It means that the per-head cost came in about $100

5    less than we projected in February.

6    Q.   So the costs were less for more cattle at lower price

7    per head?

8    A.   Yes, ma'am.

9    Q.   Can we look at -- actually, Mr. Perez, Mr. Gomez asked

10   you about the conversation that you had had with your

11   father, Mr. Perez, about needing some bullet points about

12   the cost plus agreement.

13   A.   Yes, ma'am.

14   Q.   Why did you need to speak to your father with regard

15   to the NHTC or the NE3 cattle?

16   A.   We built this spreadsheet to supply GAP natural

17   animals.  And Narciso had had a conversation with Bob about

18   the NHTCs and the NE3s, but he could not recall, when I

19   asked him about it, what premium they were going to mark

20   them at.  Recognizing that they're not GAP natural animals,

21   they're going to be worth less.

22   Q.   And how does that conversation that you had with Larue

23   Capital impact the enforceability of the cost plus agreement

24   that Zia and Tyson entered into on February 4th, 2019?

25              MR. GOMEZ:  Objection, calls for a legal

1    conclusion.

2             THE COURT:  Why don't you phrase this in a way

3    that won't imply that you're asking for a legal conclusion

4    regarding the enforceability of a contract.

5             MS. DIAMOND:  Yes, Your Honor.

6    Q.  (BY MS. DIAMOND):  How does the conversation

7    that you were having with Larue Road Capital, your

8    bank, impact the way that you viewed the cost plus

9    agreement that you entered into with Tyson on

10   February 4th, 2019?

11   A.   Completely distinct relationships.  It would be

12   analogous to drawing a contract to purchase a house, but

13   then having issues with your lender.  You don't break your

14   contract to buy the house because you have trouble getting

15   financing with a lender.  You just have a distinct

16   agreement.

17            MS. DIAMOND:  Thank you, Mr. Perez.

18            No further questions.

19            THE COURT:  All right.  Mr. Perez, thank you for

20   your testimony.  You can return to counsel table.

21            THE WITNESS:  Thank you, Your Honor.

22            THE COURT:  Thank you.

23            Zia can call its next witness.

24            MS. DIAMOND:  Your Honor, we have no further

25   witnesses.

1           THE COURT:  All right.  Let me have counsel

2    approach briefly, then.

3                   (Bench conference.)

4           THE COURT:  Counsel, do you want me to take a

5    recess so we can deal with any motions from Tyson?

6           MR. FISHER:  Please, Your Honor.

7           THE COURT:  Okay.  How long do you think it will

8    take?

9           MR. FISHER:  It should be fairly brief.

10          THE COURT:  Do you want to do it up here or does

11   it need to be --

12          MR. FISHER:  I have no objection to doing it up

13   here.

14          THE COURT:  How long do you think it will take up

15   here?

16          MR. FISHER:  I just have one motion --

17          THE COURT:  Okay.

18          MR. FISHER:  -- to make.  I can make it in

19   about --

20          MR. WORDEN:  What's the motion?

21          MS. DIAMOND:  Yeah, what's the motion?

22          MR. FISHER:  It's not a motion -- it's a motion

23   for directed verdict.

24          THE COURT:  Do you want to get your notes and

25   deal with it up here real quick, so we don't have to let the

1    jury go again?

2              MR. WORDEN:  No, I don't really need notes to

3    respond.

4              MR. FISHER:  At this time, on behalf of Tyson, we

5    would request a directed verdict on plaintiff's claim for

6    quantum meruit.  In the event that a jury determines that a

7    contract did not exist, there would need to be some evidence

8    of reasonable fair market value for the cattle involved

9    here.  We do not believe that the plaintiffs have adduced

10   any testimony to that effect.

11             In addition, case law in New Mexico on the theory

12   of quantum meruit establishes that a void contract, which is

13   what we would have here in the event that the jury does not

14   accept this as a contract, cannot serve as the basis for a

15   reasonable or fair market value.  So in the absence of that,

16   we do not believe that plaintiff is able to move forward

17   with that cause of action.

18             THE COURT:  Are you addressing the other counts

19   or just the quantum meruit?

20             MR. FISHER:  Just the quantum meruit.

21             MR. WORDEN:  So, first, Mr. Perez was asked

22   specifically, "What was the reasonable value of this?"  He

23   provided the costs incurred to provide the reasonable value

24   of this.  There is no other market, other than Tyson, for

25   this -- this cattle.  The determination as to whether there

1   should be a quantum meruit is after they determine there is

2   no contract.  This was briefed and nothing has changed since

3   then.  The reasonable value is a jury question based on the

4   testimony that's come from multiple witnesses.  All three of

5   the witnesses have testified about this.  If they determine

6   there's no contract, they should be able to determine what

7   the reason value is.  There's nothing that says that, if

8   they determine there's no contract, they -- the defendant

9   gets the benefit of removing all contract-related documents.

10   And we just had testimony on that from Mr. Perez.

11          MR. FISHER:  Your Honor, Mr. Perez' testimony is

12   essentially that the cost plus contract is the reasonable

13   basis of value.  And, again, a voided contract cannot be the

14   basis for that.

15          THE COURT:  I'm inclined to deny it, but I'm

16   going to reserve for now and we'll call your first witness,

17   okay?

18          MR. FISHER:  Understood.

19          THE COURT:  Thank you.

20          (Bench conference concluded.)

21          MR. WORDEN:  Your Honor, so, with that, we would

22   like to reserve some housekeeping issues, making sure the

23   exhibits got in, that kind of thing.  And I don't want the

24   jury to have to sit there and be bored through all that.

25   But, with that caveat, the plaintiffs rest.

```
1              THE COURT:  We'll do that at the end of the day
2      once the jury is gone.
3              And then Tyson may call its first witness.
4                   (Discussion off the record.)
5              MR. FISHER:  Thank you.
6              Your Honor, at this time, the defense would call
7      Kevin Hueser.
8              THE COURT:  All right.  Mr. Hueser, please
9      approach the witness stand and I'll swear you in.
10                          KEVIN HUESER,
11         After having been first duly sworn, did make the
12     following answers:
13                     DIRECT EXAMINATION
14             THE COURT:  All right.  Thank you.  Have a seat.
15     State your name and spell it for the record.
16             THE WITNESS:  And spell it?
17             THE COURT:  Have a seat.  State your name and
18     spell it for the record.
19             THE WITNESS:  Okay.  Hello, my name is Kevin
20     Hueser.  K-E-V-I-N; last name H-U-E-S-E-R.
21      Q.  (BY MR. FISHER):  Good afternoon, Mr. Hueser.
22     Before we begin, would you mind telling the ladies
23     and gentlemen of the jury just a little bit about
24     yourself.
25      A.   So I was born and raised in northwest Iowa, in a small
```

1    town, on a family farm; diverse farming operation:

2    Grow-crop, cattle operation, cow-calf, as well as cattle

3    finishing; a feral-to-finish hog operation, as well as a few

4    sheep, so a pretty diversified family farm in northwest

5    Iowa.

6    Q.    And could you tell us a little bit about your

7    educational background, please.

8    A.    Graduated from Marcus Community High School.  And then

9    completed my bachelor's degree in business administration

10   from High Point University.  I believe it was 1995 at this

11   point.  I got my college degree while working full-time with

12   IBP.

13   Q.    Could you tell us about where you live now.

14   A.    I live in Elk Point, South Dakota, which is the very

15   southeast corner, just north of our Fresh Meats headquarters

16   in Dakota Dunes.  It's very near where my wife grew up.

17   Q.    How did you end up getting into the business of

18   cattle?

19   A.    So, as I said, I grew up on a diverse family farming

20   operation.  The farm crisis in the late '70s and early '80s

21   presented to be a pretty tough time.  My father was still

22   trying to manage the farm, but obviously going through some

23   of the hardships that all of the farmers were during that

24   time period.  I took it upon myself to look for employment

25   outside of the farm.  And, in 1984, a friend of mine and I

1  drove down to Sioux City and applied at a number of

2  employers.  And the folks at IBP followed us to the car and

3  hired us that afternoon.

4  Q.   And what's made you stay with that industry?

5  A.   You know, it's -- one, it was still being a part of

6  agriculture for me and part of the agriculture business, the

7  cattle, which I really enjoyed, but it also provided me with

8  a lot of opportunities to improve my own standard of living,

9  as well as my family's quality of life.

10  Q.   You alluded to it a little bit in answering one of my

11  other questions, but when was it you started with the beef

12  industry?

13  A.   I started with IBP in July of 1984.

14  Q.   And what was your first role with IBP?

15  A.   Hourly production employee.

16  Q.   What did you do in your role as an hourly production

17  employee?

18  A.   The majority of that time, I was running a strip saw

19  on the processing floor, cutting New York strips to length

20  and trimming the bones down far enough that they could be

21  removed from the pieces of product.

22  Q.   How long did you do that job?

23  A.   About a year.

24  Q.   And where did you go from there?

25  A.   From there, I was offered a production supervisor job,

1    being a supervisor on the production floor.  And I held that

2    job for three, three and a half years.

3    Q.   What were your job duties as production supervisor?

4    A.   I would manage between 20 and 40 hourly employees on a

5    particular line.  I moved around to an assortment of

6    different areas on the production floor, but basically

7    managing 30 to 40 individuals in a diverse workforce.

8    Q.   And then where did you go from there?

9    A.   In 1988, I believe it was, I was offered an

10   opportunity to join our human resource group in training and

11   development where I would travel out to our facilities and

12   present management classes to new supervision.

13   Q.   And this is still with IBP?

14   A.   Still with IBP, yes.

15   Q.   How long were you in that role?

16   A.   Again, probably almost three years; at which point, I

17   looked at other opportunities to -- for -- to expand my

18   knowledge and hopefully advance.  So I joined the sales

19   organization.  And right at the end of my time in human

20   resources is when I met and married my wife.  So, after a

21   few months of marriage, her and I moved to Greensboro, North

22   Carolina, where I was part of the mid-Atlantic service

23   center, selling boxed beef into the East Coast.

24   Q.   And then, after that, where did you end up?

25   A.   After a few years, I came back to -- at that

1     particular time, it was still Dakota City, our corporate

2     office was next to the plant in Dakota City.  When I came

3     back into that role, they were just getting ready to

4     transition to the new office in Dakota Dunes.  And I came

5     back into a role then as a sales trainer, working, again, in

6     teaching salespeople the arts and skills of being

7     salespeople.  But that quickly morphed into on-boarding some

8     of our recent acquisitions of cow plants -- which, today, we

9     harvest fed-only, and at that time, we had acquired a number

10    of plants that harvested mature animals, cows, as well as an

11    operation in Brooks, Alberta, Canada, called Lakeside

12    Packers that was originally bought as a harvest facility,

13    and we quickly added on a processing facility -- so a team

14    of us, including accountants, procurement people,

15    salespeople went around and helped bring them on board onto

16    our systems.

17    Q.    And what is your current role with Tyson?

18    A.    Currently, I am -- well, I guess I really have to be

19    careful.  My business card today says "Vice President of

20    Cattle Procurement," but I really am not in that role today.

21    Chad Martin is the Vice President of Cattle Procurement.  I

22    gave my intent to retire on October 12th of last year,

23    with the intent for that to take effect December 1st of

24    this year.  So I have been in an advisory role pretty much

25    since the end of November.

1    Q.    And was that decision to retire, was that a decision

2    of yours?

3    A.    Yes, it was.

4    Q.    How many years, overall, have you been with IBP Tyson?

5    A.    38 years.

6    Q.    And how would you characterize your time with them?

7    A.    You know, it's -- like I said, it's provided me and my

8    family with a lot of opportunities, so it's been good.  I

9    mean, they still call them "jobs," so I don't get to go to

10   vacation every day, but it's been very good to me.

11   Q.    When did you first have a role within Tyson where you

12   were involved with the purchase of cattle?

13   A.    So in -- after -- after my time in working in the

14   training and development, I took a role as an advisor

15   consultant to our Lakeside Packers operation during startup.

16   And up in Canada, I was responsible for managing the sales

17   organization, structuring.  Basically, they had never sold

18   boxed beef before, so my role was to go up there and help

19   build and develop a boxed beef program for them.  My family

20   moved to Canada for about a year.

21          After that year, I moved back.  And I still

22   maintained those responsibilities, but I also assumed U.S.

23   responsibilities for boxed beef operations.  So I worked

24   with the sales organization on a domestic marketing, pricing

25   boxed beef for the salespeople; spent about, oh, goodness,

1   12 years in that role, probably, or in that department.  A

2   big share of that, though, was as either an assistant vice

3   president or, for a number of years, I believe almost

4   ten years, vice president of boxed beef pricing.

5        Because of my past experience, it provided me an

6   opportunity to be selected to be the senior vice president

7   of beef margin management in 2014.  And, in that role, I was

8   responsible for boxed beef pricing, trim and ground beef, as

9   well as carcass merchandising, and our cattle procurement

10  team.

11  Q.   Generally speaking, when we heard testimony about

12  Tyson's pricing of premium cattle that they want to buy, can

13  you describe, in general, how that pricing is set up.

14  A.   Really, there's two mechanisms of pricing:  One is

15  Nebraska weighted average, which is a reported market of the

16  cattle traded.  That price can be stated easier as a live

17  price or a dressed price.  The other alternative is to

18  contract cattle with us against the Chicago Mercantile

19  Exchange.  Both of those then have a per-head premium

20  associated with them, depending on the attributes that are

21  being delivered with the specific animals.  We have a GAP

22  program, a natural program, as well as an NHTC program.

23        MR. FISHER:  Your Honor, at this time, I'd like

24  to admit Exhibit Number 50; specifically, page 26 from that

25  exhibit.

```
 1                    THE COURT:  Do you want to admit the whole

 2      exhibit or just one page of it?

 3                    MR. FISHER:  It's about 29 pages along.  If I may

 4      just admit the whole exhibit, that would be fine, Your

 5      Honor.

 6                    THE COURT:  What's Zia's position on the entirety

 7      of Exhibit 50?

 8                    MR. WORDEN:  Your Honor, I'd like to approach.

 9                    THE COURT:  Okay.

10                         (Bench conference.)

11                    MR. WORDEN:  So here's this document which we

12      later found out was the chart that Mr. Scherer used to keep

13      track of his various agreements.  Unless there's going to be

14      some testimony -- which I don't think there is, based on

15      what Mr. Scherer said -- that any of this was ever

16      communicated to Zia for this, it's irrelevant.

17                    MR. FISHER:  Your Honor, that's not the document,

18      actually.

19                    MR. WORDEN:  "Exhibit 50"; is that what you said?

20                    MR. FISHER:  "Exhibit 50."

21                    MR. WORDEN:  Well, there it is (indicating).

22                    THE COURT:  Mr. Fisher, here's mine.  Exhibit 50

23      isn't in here.  Find what you want me to notice.

24                    MR. FISHER:  If I may respond -- well, let me

25      show the Court first, if I may.
```

1                    It's page 29.  May I go get the Bates number?

2                    THE COURT:  Sure.

3                    MR. FISHER:  This is the actual document that I'd

4       like to discuss with Mr. Hueser (indicating).  And the

5       reason that it's relevant, Your Honor --

6                    MR. WORDEN:  Mr. Fisher, which page are you

7       looking at?

8                    MR. FISHER:  I'm sorry.  It's the one that's

9       labeled Tyson 130.

10                   MR. WORDEN:  Very good.

11                   MR. FISHER:  The reason I want to go over this

12      with Mr. Hueser is it specifically refers to Zia cattle.

13      And this gives an explanation for how Zia was paid for this

14      set of cattle, because the testimony out there is Zia has

15      been paid for the cattle, and this is the explanation of how

16      that payment was made.

17                   MR. WORDEN:  I'm sorry.  So this is just offered

18      to ask him if Zia was paid this way, not to ask him if there

19      was some sort of agreement or anything like that?

20                   MR. FISHER:  That's correct.

21                   MR. WORDEN:  Okay.  Very good.

22                   THE COURT:  Okay.  Hold on, Mr. Worden.

23                   So do you want all of Exhibit 50 or just page

24      130?

25                   MR. WORDEN:  130 is fine.

1          MR. FISHER:  That's fine with me.

2          THE COURT:  Okay.  Thank you.

3               (Bench conference concluded.)

4          THE COURT:  Bates Stamp Tyson 130 of Exhibit 50

5     is admitted.

6     (Joint Exhibit 50 was partially admitted into evidence.)

7          MR. FISHER:  Thank you, Your Honor.

8     Q.  (BY MR. FISHER):  Mr. Hueser, I've put a

9     document, Exhibit 50, on the screen here.

10              Do you recognize what this document is?

11    A.  Yes, I do.

12    Q.  And what is this document?

13    A.  This is a schedule or list of deliveries for a

14    particular harvest, harvest date, with suppliers and

15    quantities of head to be delivered.

16    Q.  And is there something on here that indicates the time

17    frame of this document?

18    A.  Yeah.  You can see here in the middle of the page this

19    is July 15th, 2019.

20    Q.  Okay.

21    A.  Which would be a harvest date.

22    Q.  And I apologize if you -- if this was in response to

23    my last question, but what is this document?  What does this

24    document show?

25    A.  It tells us who is going to deliver how many cattle

1    for this harvest date of July 15th, 2019, as well as the

2    type of cattle that are going to be delivered, whether they

3    are GAP, whether they are natural, and -- as well as the

4    base price and the premium that will be paid over and above

5    the base price.

6    Q.    I'd like to ask you some questions about some parts of

7    the document.

8          Over here on the left side, do you see this

9    column in green (indicating)?

10   A.    Yes.

11   Q.    Okay.  And what are these names in the column in

12   green?

13   A.    Feedyards, producers.

14   Q.    And do you see a producer on here associated with the

15   plaintiff?

16   A.    Yes.  Fourth from the bottom (reading), "Zia/Prewitt

17   L&C."  "Jacob Bach," that's our buyer.

18   Q.    Is that the one in the darker green there

19   (indicating)?

20   A.    Yes, it is.

21   Q.    As we're looking at the sheet here, we've got up here

22   on the top, in green, what is that date there?

23   A.    Friday, July 19th.

24   Q.    Okay.  And if we go back down here to the line of

25   Zia/Prewitt, there's a number right there in yellow.  Do you

1    see that number?

2    A.    Yep, "200."

3    Q.    What does that number indicate?

4    A.    The number of head to be delivered.

5    Q.    And if we move over a little bit to the next two

6    columns, it appears there's a yellow row and then a green

7    row; is that right?

8    A.    Correct.

9    Q.    And what do those rows signify?

10   A.    To identify the volume of GAP and/or non-GAP cattle in

11   that 200 head to be delivered.

12   Q.    And of this 200 head to be delivered of the Zia cattle

13   at Prewitt, how many of those were GAP and how many non-GAP?

14   A.    All 200 were GAP cattle.

15   Q.    And then there is some writing in the column next to

16   that, next to the GAP and non-GAP.  Do you see that writing

17   there?

18   A.    Yes, I do.

19   Q.    Okay.  Can you explain for us what that writing

20   indicates?

21   A.    So, at the top of that column, it's labeled "specs" or

22   "details."  So it would tell you whether there were any

23   specification requirements that might result in either a

24   premium and, most likely, any discounts that might be

25   associated, if they were out of spec, if there's any prior

1    agreement.

2    Q.    And then we see...

3    A.    There were no specs associated with these 200 head of

4    cattle.  It says (reading), "No docs on fours, fives,

5    heavies, or lights, effective on January 1st, 2019."

6    Q.    Thank you.  And then, in the next column, it states

7    "base" at the top.  Can you explain what that indicates.

8    A.    That's the Nebraska weighted average.  That's the base

9    price for those cattle, either dressed -- the larger numbers

10   are the dressed price; for example, the first one at 183.19,

11   that would be a base price and a per-hundred weight on a

12   dressed carcass.  The number in light blue at 113.44 would

13   be the live cost per hundred weight.  So a producer can sell

14   us on a live basis or a dressed basis.

15   Q.    Going back with the Zia/Prewitt, following this

16   across, do you have an understanding -- the "183.19" next to

17   the "Zia cattle," where is that number derived from?

18   A.    The Nebraska weighted average, dressed cost.

19   Q.    And then next to that "183.19," do you see there's a

20   column with another number in there?

21   A.    Yes.

22   Q.    Okay.  And what is that in the column next to it,

23   "plus 275/head GAP"?  What is that?

24   A.    That's the premium that we agreed to pay upon delivery

25   for those cattle, for those natural cattle.

1    Q.   Okay.  And, again, this is from -- I apologize...

2    A.   At the bottom, it said "7-15," but it would be the

3    lineup for the harvest of 7-19.

4    Q.   Okay.  And does this reflect the pricing structure you

5    were indicating?

6    A.   Yes, it does.

7

8    Q.   As far as talking about the simplest terms, putting it

9    in the simplest terms, how this purchasing process works by

10   which Tyson purchases cattle, can you explain kind of what

11   happens in that process?

12   A.   So we identify what our needs are going to be during

13   specific time periods.  And an example of these types of

14   cattle -- because they really are identified at a very young

15   age, actually at birth, to fall into the program -- we

16   identify our needs on a well out-front basis; in fact, a

17   year in advance.  So we look at what our projected needs

18   are.  And then Bob and his team, which would include Craig

19   Latrell [phonetic] today, would go out and begin to work

20   with our current supply chain and, I guess, potentially new

21   suppliers to fill those quantities that are going to be

22   necessary to meet our customers' needs.

23   Q.   And then, after that occurs, there's a process by

24   which the cattle end up at the plant; is that correct?

25   A.   Yes.  So Bob identifies the needs.  The suppliers then

1     make sure the cattle are identified for a specific time

2     period, so they enter the feedlot in a timely manner in

3     which to be properly finished to meet our specifications for

4     the program.  And then, when the cattle meet that need and

5     they are ready to be harvested with the proper finish, then

6     they are delivered to our plant, and then paid on the

7     formula, which was determined by Bob; either, again,

8     Nebraska weighted average and/or the CME, if they're

9     contracting against the board.

10    Q.   And at what point are the cattle accepted by Tyson?

11    A.   When they are delivered with the proper attributes and

12    documentation.

13    Q.   And going back to Exhibit Number 50, you went through

14    with us how the calculation is made for the payment of the

15    cattle.  But I didn't ask you, where does that payment go

16    for the cattle?

17    A.   We pay the feedyard that delivers the cattle.

18    Q.   So, in this instance, that would be Prewitt; is that

19    correct?

20    A.   That's correct.

21    Q.   And then would Tyson have -- what kind of record would

22    Tyson have of what was ultimately paid to Zia?

23    A.   We wouldn't.  We would not.  We pay the feedyard.

24    Some feedyards are commercial feedyards.  They work with

25    their customer who is feeding cattle there.  And they

1   deliver the cattle and they distribute the funds to the

2   owner.  In many cases in this type of a feedyard, we do not

3   know who the owner is.

4   Q.   If I could -- are you familiar with Zia?

5   A.   Yes, I am.

6   Q.   When did you first meet Narciso Perez?

7   A.   Oh, it was a few months prior to China opening up, so

8   I'm going to say I believe it was in late '17, maybe early

9   '18.

10  Q.   And under what circumstances did you-all meet?

11  A.   He came up and visited our corporate office and our

12  procurement team, at the time led by John Gerber, who was

13  vice president of cattle procurement, to try to solicit

14  opportunities in which he could supply cattle that could

15  potentially fit the new market that was going to be opening

16  up to U.S. beef, and that is China.

17  Q.   Back in 2018, early 2019, do you have any recollection

18  of how the relationship was between Tyson and Zia?

19  A.   Problematic.  I mean, the procurement team was dealing

20  with a number of issues.

21          MR. FISHER:  Your Honor, at this time, I would

22  ask to admit Exhibit Number 136.

23          THE COURT:  "146"?

24          MR. FISHER:  "136," Your Honor.

25          THE COURT:  I'm sorry, "136."

1              What's Zia's position on 136?

2              MR. WORDEN:  Just a moment, Your Honor, please.

3              No objection.

4              THE COURT:  Exhibit 136 is admitted.

5     (Joint Exhibit 136 was admitted into evidence.)

6              MR. FISHER:  Thank you.

7     Q.  (BY MR. FISHER):  Mr. Hueser, have you -- do

8     you recall this e-mail dated March 4th of 2019?

9     A.  Yes, I do.

10    Q.  Okay.  And do you have any recollection of the

11    circumstances around this initial e-mail?

12    A.  Yeah.  Narci wanted to have a few minutes of a

13    telephone call to discuss a document that he was going to

14    ask me to send to review.

15    Q.  And did you set up a time to speak with him about

16    that?

17    A.  Yes.  I asked him -- you can see here in the e-mail I

18    was pretty tied up at the time and asked if we could do it

19    the next day, to which he agreed.

20             MR. FISHER:  And, Your Honor, at this time, I

21    would ask to admit Exhibit 138.

22             THE COURT:  Zia's position on 138?

23             MR. WORDEN:  No objection, Your Honor.

24             THE COURT:  Exhibit 138 is admitted.

25    (Joint Exhibit 138 was admitted into evidence.)

1    Q.   (BY MR. FISHER):  And you set up a time to

2    speak with Mr. Perez, correct?

3    A.   Yes.

4    Q.   Okay.  And do you recognize this e-mail from

5    March 8th?

6    A.   Yes, I do.

7    Q.   The below e-mail here that I'm going to blow up a

8    little bit for you (indicating), what does this represent?

9    A.   He is asking myself, as an officer of Tyson Fresh

10   Meats, to sign this letter stating a relationship that he's

11   trying to convey to his suppliers, to his customers.

12   Q.   What did you do upon receiving that e-mail?

13   A.   First, I read it and I pondered it.  I discussed it

14   briefly with our sales team, including our -- I'm sorry,

15   with our procurement team, including Bob and John.  At that

16   particular time -- I guess it would have been Justin Nelson

17   at that time -- discussed it.  And then I contacted one of

18   our in-house legal counsel and told them that I had received

19   this and I wanted them to be aware.  And we concluded that

20   we were not comfortable signing this document.

21   Q.   And was that the end of that exchange?

22   A.   Yes, it was.

23            MR. FISHER:  I don't have any further questions

24   for you.  Thank you.

25            THE COURT:  All right.

1          Mr. Worden.

2          MR. WORDEN:  Thank you, Your Honor.

3                    **CROSS-EXAMINATION**

4    Q.  (BY MR. WORDEN):  Good afternoon, Mr. Hueser.

5    What involvement, if any, did you have with the Zia

6    transaction with Tyson that's the subject of this

7    lawsuit?

8    A.   None.  I was not aware of it until it was brought to

9    my attention after Bob received an e-mail with invoices.

10   Q.   Right.  You didn't have any involvement, whatsoever,

11   until after everything had gone downhill, shall we say,

12   correct?

13   A.   It was not brought to my attention by my procurement

14   team or anyone else.

15   Q.   Ms. Gallagher, can we bring 138 back up.  And please

16   get 130, as well.

17          So I'm going to ask you about this one we just

18   looked at.  Narciso asked you to sign -- and we'll put it up

19   here in a minute.  He told you what he needed this for?

20   A.   He said that he had a letter that he wanted to be able

21   to present to some of his customers and suppliers that would

22   validate our commitment.  And I viewed it as a perceived

23   partnership so that he could tie the two companies together.

24   Q.   His customers or his lender?

25   A.   I viewed it -- it was presented to me as being able to

UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1    present to his customers.

2     Q.   So do you have it there on the screen?

3     A.   Yes.

4     Q.   At the time, first of all, this is the entirety of

5    what he was asking you to sign, right?  This one paragraph

6    with two sentences, correct?  Three sentences.

7     A.   Correct.

8     Q.   All right.  At the time he sent this to you, were you

9    aware that Bob Scherer had called, texted, and e-mailed him

10   20 or 30 times in December and January to get cattle from

11   Zia directly?

12    A.   I would not have been aware of the number of e-mails,

13   but it would not surprise me.  That's Bob's job, to line up

14   cattle.

15    Q.   So when it says here (reading), "This is to

16   acknowledge our working relationship with Zia Ag Consulting.

17   Zia has been helping to create and source cattle for our

18   company" -- at that time you saw this, were you aware that

19   Bob Scherer had flown to Texas to meet with Narciso to

20   discuss Zia "helping to create and source cattle for our

21   company"?

22    A.   I don't recall, no.

23    Q.   All right.  Did Bob Scherer tell you at the time you

24   wrote this that he had received a cost plus proposal from

25   Narciso?

214

1    A.   I found out after I received this e-mail that that was

2    pending, as well.

3    Q.   Okay.  You found out after -- you found out later in

4    the summer, correct?

5    A.   Yes.

6    Q.   After everything had hit the fan, shall we say,

7    correct?

8    A.   Correct.

9    Q.   You were Bob Scherer's boss' boss at the time,

10   correct?

11   A.   Correct.

12   Q.   Bob Scherer never shared it with you, at all, until

13   everything hit the fan, correct?

14   A.   Correct.

15   Q.   Did he ever show it to you?

16   A.   No.

17   Q.   Did he ever show you the proposal he received and his

18   e-mail responding to it, at all?

19   A.   Prior to the notification, no.

20   Q.   Did he ever tell you that he had responded to the

21   proposal saying, "It looks good, let's get them in the yard

22   ASAP"?

23   A.   No.

24   Q.   Did he ever tell you he had talked to Narciso about

25   sourcing 9,000 natural cattle?

1    A.   I know he was consulting with Narci about getting

2    supply, but quantity, no.  Detail, I would not have

3    necessarily been aware of.

4    Q.   You might characterize 138 as a letter of reference;

5    would that be fair?  A letter of recommendation?

6    A.   I viewed it as a -- I and our legal team viewed it as

7    a statement of a relationship.

8    Q.   Nobody considered this to be some sort of a contract

9    he was asking you to sign, did they?

10   A.   You can see by my response, if you'll scroll down,

11   that also said (reading), "We would want to know

12   specifically each recipient thereof," because it was not

13   presented to me to be exclusive to one group, it was to be

14   presented to customers and suppliers of his.

15   Q.   He wasn't asking you to sign some sort of contract

16   between Zia and Tyson, correct?

17   A.   I viewed it as a statement of relationship that, in my

18   mind, did not exist.

19   Q.   Okay.  He wasn't asking you to sign something

20   confirming a contractual agreement for the purchase or sale

21   of cattle, correct?

22            MR. FISHER:  Objection, Your Honor, asked and

23   answered, and it seeks a legal conclusion.

24            THE COURT:  Overruled.

25   A.   Can you restate the question, please?

1    Q.   (BY MR. WORDEN):   He wasn't asking you to

2   confirm contractual terms for some agreement between

3   Tyson and Zia to sell cattle, was he?

4    A.   I was concerned about what my signature might imply;

5   that it might imply more than what might be stated here.

6    Q.   Were you ever listening in on any phone calls anyone

7   had with Narciso after everything hit the fan?

8    A.   No.   I should say I don't recall, but I'm pretty

9   confident no.

10   Q.   Very well.

11        Ms. Gallagher, can you pull up 150.   I'll get to

12   that in a moment.

13        So did you have a nephew that interned at Zia?

14   A.   I had a cousin's son.

15   Q.   Okay.

16   A.   Not a nephew.

17   Q.   And what did the cousin's son do at Zia?

18   A.   Honestly, I don't know.

19   Q.   Did you ask Narciso to make that arrangement for you?

20   A.   No.

21   Q.   Who did?

22   A.   He met my cousin on the tour of the confinement

23   systems in northwest Iowa, at which time, he had an

24   opportunity to meet the young man, as well.   That

25   arrangement was purely between those two.

UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1    Q.   Did you invite Narciso to the 2018 National

2    Cattlemen's Convention in Deadwood, South Dakota?

3    A.   He invited me to attend the cattlemen's meeting held

4    at the lodge in Deadwood to speak to a group of his cow-calf

5    suppliers.

6    Q.   And while you were there, did you, Narciso, and John

7    Gerber have a few drinks together?

8    A.   John Gerber wasn't there.

9    Q.   Did you have a few drinks with Narciso?

10   A.   Yes, I did.

11   Q.   Did he show you some pictures on his phone, one of

12   which happened to be a picture of Bob Scherer?

13   A.   I don't recall.

14   Q.   Had you had a few drinks that night?

15   A.   Yes, I did.

16   Q.   Do you remember telling him you were considering

17   relieving Mr. Scherer of his duties?

18   A.   I do not.

19   Q.   In the spring of 20 -- let me ask you, has Narciso

20   ever stayed at your home?

21   A.   He stayed at our hunting lodge.

22   Q.   Okay.  And where is that?

23   A.   Outside of Spink, South Dakota.

24   Q.   And when was that?

25   A.   It would have been late summer, I believe, of '18 --

1    '18 or '19.  It's been awhile.

2    Q.   Your job currently involves just working exclusively

3    on one particular contractual situation, I'll just call it

4    that for right now.  Would that be fair to say?

5    A.   Can you restate that?

6    Q.   There is a business based in a feed -- there is a

7    cattle company based in Pasco, Washington, correct?

8    A.   Yes, there's a number of cattle feeding operations in

9    Pasco, Washington.

10   Q.   You know the one I'm talking about that you're working

11   on, correct?

12   A.   No.  I need more -- to be specific, please.

13   Q.   Does the word "Cody" ring a bell?

14   A.   We no longer do business with Cody Easterday or

15   Easterday Farms.  They don't exist any longer.

16   Q.   But you did do business with them previously?

17   A.   Yes.

18   Q.   And, currently, your job is focused on resolving

19   issues relating to a business relationship you had with --

20   I'll just call them "the Pasco company," correct?

21   A.   My current role is that of an advisor to Chad Martin,

22   who is replacing me as the vice president of cattle

23   procurement.  I have been an integral part of replacing that

24   supply chain in the Northwest.  In the absence of having

25   Easterday Ranches there, we have gone out and found other

1    feedlots and other means of getting a supply of raw material

2    for our plant.

3    Q.   You were involved, before that entity ceased to exist,

4    correct, with the arrangement with that Pasco company,

5    correct?

6    A.   The arrangement with that particular organization

7    existed well before my time in my previous role.

8    Q.   Did you sign off on the execution of checks that were

9    written to the Pasco company when the relationship took

10   place?

11   A.   No.

12   Q.   "No"?  That didn't happen?

13   A.   I did not sign off on those checks, no, I did not.

14   Q.   The arrangement with that company, was that a cost

15   plus agreement?

16   A.   No.

17   Q.   It was an agreement where Tyson covered all the costs

18   of obtaining the calves, feeding them, and their care; is

19   that correct?

20   A.   I would view it a little differently than that, but we

21   were his financing.

22   Q.   You provided the financing to purchase the cattle, to

23   begin with, and then to fatten them, feed them, and care for

24   them, correct?

25   A.   We financed all of that, that's correct.

1    Q.   That's right.

2              And that was approximately 200,000 head, correct?

3    A.   Well, that was part of the reason why --

4              MR. FISHER:  Your Honor, may we approach?

5              MR. WORDEN:  Yeah.  Let me just rephrase it.

6    Q.   (BY MR. WORDEN):  Whatever happened, we do need

7    to talk about.  In the time you were financing it,

8    it was your understanding it was about 200,000 head?

9              MR. FISHER:  Your Honor, may we approach?

10             THE COURT:  Do you have an objection to that?

11             MR. FISHER:  Relevance.

12             THE COURT:  Okay.  Let's talk about it.

13             MR. WORDEN:  Pardon?

14             THE COURT:  Come up so we can talk about it.

15                  (Bench conference.)

16             MR. FISHER:  Your Honor, Mr. Worden is skirting

17   on this motion in limine issue related to this Easterday

18   litigation.  He's going all around it.  I did not ask

19   Mr. Scherer -- or, I'm sorry, I did not ask Mr. Hueser about

20   the cost plus arrangement one time.  He's not here to

21   testify about cost plus.  This is outside the scope of my

22   direct examination.  It's absolutely irrelevant.

23             MR. WORDEN:  First of all, the last point:

24   Absolutely not.  I'm not limited by what they asked him

25   about.  They agreed to produce him here.  I can ask anything

1    related to the case.  I'm not asking about the litigation.

2    I've gone out of my way to carefully craft my questions.  It

3    was a cost plus where they financed the purchase, care,

4    feeding, et cetera, for this company.  It didn't go well.

5    I'm not getting into that --

6              THE COURT:  Is there an agreement between the

7    parties that Tyson's witnesses are not bound -- or the

8    cross-examination is not limited to the direct testimony?

9              MR. FISHER:  Your Honor, the rule of evidence

10   Mr. Worden --

11             THE COURT:  No, I understand, but is there an

12   agreement between the parties that they can ask each other's

13   witnesses questions outside the scope of direct?

14             MR. FISHER:  No, there is not, Your Honor.

15             MR. WORDEN:  There is an instruction by Your

16   Honor to try to finish everything, so I don't have to call a

17   rebuttal witness.  And that's what I'm trying to do.

18             THE COURT:  Okay.  As to the second point, the

19   meeting has to do with the fact of litigation, itself; the

20   underlying facts might still be relevant.  So if there was a

21   cost plus model, which Tyson has denied having, I think I

22   can see how it would be relevant to this case.

23             MR. FISHER:  My reading of Rule 611 is that it's

24   the subject of the direct examination.  And my subject of my

25   direct examination did not -- I did not say the word "cost

```
1    plus."  I didn't suggest it.  All I asked him about was how
2    Tyson's standard pricing -- how that worked.
3              THE COURT:  I understand.  I understand, but as
4    to relevance --
5              MR. FISHER:  Oh.
6              THE COURT:  -- if we're taking scope out of it,
7    as to relevance, isn't it relevant that Tyson did have a
8    cost plus or supposed cost-plus-type model?
9              MR. FISHER:  As to relevance, I would concede
10   that.
11             THE COURT:  I appreciate you bringing it to my
12   attention, but I'm going to overrule it.  Thank you.
13                  (Bench conference concluded.)
14             THE COURT:  Also.  Mr. Worden, Exhibit 150 has
15   not been admitted.  Do you want to move for its admission?
16   One-five-zero.
17             MR. WORDEN:  I was going to talk about 50.
18             THE COURT:  Which one?
19             MR. WORDEN:  50, the one that Mr. Fisher asked
20   about.
21             THE COURT:  I thought it was 1-5-0.  Okay.  1-5-0
22   is what was up, just so you know.
23             MR. WORDEN:  Thank you.
24             THE COURT:  That's okay.
25   Q.  (BY MR. WORDEN):  Okay.  So I was asking you, I
```

 1   just want to know, how many head were assumed to be

 2   there at the time the financing was sent for the

 3   purchase of the calves, their care, and feeding?

 4   A.   It was in the vicinity of 225,000 head of cattle.

 5   Q.   Thank you.  Okay.

 6        Ms. Gallagher, can we get Exhibit 50?  And at

 7   some point, I'll ask questions about that.

 8        While we're working on that, after things hit the

 9   fan, Narciso called you to talk about it, correct?

10   A.   We had a number of conversations, so likely, yes.

11   Q.   Okay.  Did he -- did you return his calls about how to

12   resolve the -- at that point, I'll just say apparent

13   misunderstanding?

14   A.   I returned every phone call or e-mail I received from

15   Narci.

16   Q.   Did you have any proposals for how to resolve it?

17   A.   Honestly?  I don't recall having any discussion with

18   him about the topic of contention here.

19   Q.   Very well.  Thank you.

20        The cattle that were involved here --

21        (Discussion off the record.)

22        Okay.  Good.  Good.  So, Mr. Hueser, the cattle

23   involved here -- I'm sorry, we need to go to page 130 at the

24   bottom, Tyson 130.  The one that Mr. Fisher had up.

25        So I'll just ask you this, Mr. Hueser:  The

1    cattle who were involved here, we talked about -- and we'll

2    get this up in a minute -- how much Tyson was paying for the

3    cattle to various dinner producers, shall we say, correct?

4    A.    Attributes, yes.

5    Q.    And some of them were based on live weight, correct?

6    A.    Some are based on live price; some are based on a

7    dressed price.

8    Q.    What does a "dressed price" mean?

9    A.    Carcass weight.

10   Q.    So we have the live price, the dressed price; we also

11   have the CME, correct?

12   A.    Correct.

13   Q.    All right.  And that could be live or dressed, as

14   well, correct?

15   A.    Correct.

16   Q.    And none of those Nebraska weighted average or CME was

17   an average based on premium cattle; that's an average of

18   prices for conventional cattle, correct?

19   A.    That's correct.

20   Q.    All right.  And the numbers that were paid here --

21   now, this isn't all of them, nor do I want to look through

22   all of them that were purchased.  We just have a couple

23   hundred head -- that was the price paid in July after

24   everything had hit the fan, correct?

25   A.    Correct.

1    Q.   All right.  And Zia didn't agree to this number in

2    July; that's just what Mr. Scherer signed off on paying,

3    correct?

4    A.   These cattle were committed with a formula attached to

5    them, to include a GAP premium.

6    Q.   And you testified earlier the formula was determined

7    by Bob, correct?

8    A.   The weighted average is determined by the conventional

9    trade in the State of Nebraska.  The premium is something

10   that would be determined by Bob in part of the negotiation

11   process.

12   Q.   If there had been any negotiation process on the

13   Nebraska weighted average for this transaction, correct?

14   A.   The Nebraska weighted average is the standard for all

15   of our natural programs, with the exception of CME cattle.

16   Q.   But you're not here to testify that Mr. Scherer ever

17   had any such conversation with Narciso about this cattle,

18   are you?

19   A.   I don't have any knowledge of that, no.

20   Q.   And the cattle that came through here, of the 200,

21   every single one of them was GAP-certified, correct?

22   A.   Yes.

23   Q.   So I'll just take the top one, Wolf.  Wolf gets paid a

24   different number, a higher number than Zia, correct?

25   A.   Correct.

226

1     Q.   All right.  Now, Wolf, let's just take any of them,

2     Wolf or any of the other ones, after you pay that amount for

3     the GAP-certified cattle sold to Whole Foods -- first of

4     all, GAP is only sold to Whole Foods, correct?

5     A.   Yes.

6     Q.   All right.  Now, what is the markup from what is paid

7     to these producers when it is sold to Whole Foods?

8     A.   It -- oh.  It's almost impossible to determine.  Whole

9     Foods does not buy the entire carcass.  This animal is

10    broken up into primals and subprimals and trimmings.  Some

11    of it is sold to Whole Foods and some of it is sold to other

12    natural customers, and some of it gets downgraded into

13    conventional product because particular muscle may not be

14    able to be merchandised through a natural point of sale.

15    Q.   If a GAP-certified animal comes in and you pay -- I'll

16    just use the top line for Wolf.  They got Nebraska weighted

17    average.  Is that dressed or live?

18    A.   That's a dressed price.

19    Q.   Dressed price.  And they get plus 300 in the first

20    line, correct?

21    A.   That would be correct.

22    Q.   Now, can we calculate what the markup would be for the

23    total revenue Tyson receives from selling this animal to

24    Whole Foods, plus the other parts you said might have gone

25    elsewhere?

1    A.    It -- it -- it would vary day to day, week to week,

2    seasonal to seasonality [sic].  I mean, certain times of the

3    year, certain primals are in higher demand than others and

4    command a better premium than others.  And, again, not all

5    of this product -- well, only parts of this animal actually

6    end up at Whole Foods.  The animal pieces get spread out

7    amongst other natural customers and, in some cases,

8    internationally and, in some cases, downgraded to

9    conventional product.

10   Q.    So if I'm reading this correctly, Wolf gets 183 plus

11   300?

12   A.    It's 183.19 per hundred weight --

13   Q.    Okay.

14   A.    -- on a carcass weight.  And he gets a $300 premium

15   for GAP, and a $265 head premium for verified natural.

16   Q.    All right.  In 2019, was there any rule of thumb what

17   the revenue would be to Tyson, based on an animal you paid

18   this amount to Wolf?

19   A.    The premiums that we determined to be paid to the

20   producer are based on the incremental costs to bring that

21   animal to market versus a conventional animal.  In other

22   words, in a conventional animal, you're able to use

23   technology, such as beta agonist or implants.  In these,

24   you're not, so you lose some of the efficiency.  In which

25   case, to get that animal to the same market weight, you're

1   going to feed it a longer period of time and you're going to

2   feed it more corn.  So the value which is agreed upon or

3   that premium that Bob is targeting is trying to provide

4   people the opportunity to take an animal -- to take an

5   animal that is going to be natural -- fed in a natural

6   standpoint versus conventional and cover their incremental

7   costs.

8   Q.    I'm asking at the other end.  Bob or someone pays Wolf

9   the amount you've just described.

10  A.    That's correct.

11  Q.    And then how much, from Whole Foods or others, does

12  Tyson receive in 2019, as a general rule, in return for

13  selling the parts out the other end?

14  A.    It varies.  There are weeks where the natural actually

15  generates more revenue.  And then there are weeks where the

16  natural actually generates less than the premium paid.

17  Q.    Do you have any idea what it was in 2019?

18  A.    I don't recall.

19  Q.    We would assume that, the majority of the time, it

20  generates more than the amount paid; otherwise, you wouldn't

21  keep doing it, correct?

22  A.    We would certainly hope the investment of time and

23  effort would generate some type of a margin, yes.

24  Q.    And do you know who Dr. Benavidez is?

25  A.    Yeah.

1    Q.   Did you meet him?

2    A.   Yes.

3    Q.   Have you read his transcript or talked to him about

4    his opinions?

5    A.   I did not read his transcript.

6    Q.   Do you know what his opinions are about margins in

7    2019 for the Tysons of the world?

8    A.   I did not read his transcript.

9    Q.   Okay.  The margin -- and we saw some promotional

10   material from Tyson Fresh Meats yesterday.  The margin in

11   2019 for selling the natural animal from Tyson to the Whole

12   Foods or whoever is purchasing the component parts was

13   substantially higher than it was five years before that,

14   correct?

15   A.   That's probably logical.  The customer base has grown

16   and demand for the product has expanded, but so have our

17   premiums.

18             MR. WORDEN:  Thank you, Mr. Hueser.

19             THE COURT:  Any redirect, Mr. Fisher?

20             MR. FISHER:  No redirect, Your Honor.

21             THE COURT:  All right.  Thank you, sir.  You may

22   be excused.

23             THE WITNESS:  Thank you.

24             THE COURT:  Tyson may call its next witness.

25             MR. GOMEZ:  Tyson...

```
 1                    (Discussion off the record.)

 2                    We're going to call Dr. Justin Benavidez.  And I

 3       was just going to go get him --

 4                    THE COURT:  Okay.  Thank you.

 5                    (Discussion off the record.)

 6                    All right.  Mr. Benavidez, come forward to the

 7       witness stand and I'll swear you in.

 8                    JUSTIN BENAVIDEZ, PH.D.,

 9                    After having been first duly sworn, did make the

10       following answers:

11                    DIRECT EXAMINATION

12                    THE COURT:  All right.  Thank you, sir.  Have a

13       seat.  State your name and spell it for the reporter.

14                    THE WITNESS:  My name is Justin Benavidez.  It's

15       spelled J-U-S-T-I-N, B-E-N-A-V-I-D-E-Z.

16                    THE COURT:  Go ahead, Mr. Gomez.

17       Q.  (BY MR. GOMEZ):  Good afternoon, Dr. Benavidez.

18       Would you please tell us your occupation.

19       A.   I'm an assistant professor for Texas A&M AgriLife

20       Extension.

21       Q.   In just a very brief sentence or two, would you mind

22       explaining what you're here for today.

23       A.   To testify as an expert witness to the standard model

24       of production in the cattle industry and standard pricing of

25       fed cattle in the cattle industry.
```

1    Q.    Before we get to the substance of your opinion, I'd
2    like to go over a little bit of your background.
3              Where did you go to college?
4    A.    I've got a bachelor's degree in agricultural economics
5    at Texas A&M, and a master's degree in agricultural
6    economics at Texas A&M, and a Ph.D. in agricultural
7    economics at Texas A&M.
8    Q.    Going through those, what was your major in college?
9    A.    Agricultural economics.
10   Q.    And then, in master's -- for your master's, did you
11   have a concentration?
12   A.    I concentrated on agricultural policy and agricultural
13   production.
14   Q.    Did you write a thesis for your master's?
15   A.    I did.
16   Q.    Would you mind telling us briefly the subject of your
17   thesis.
18   A.    My master's thesis was a CRP, so Conservation Reserve
19   Program, decision-aid tool.  We developed a spreadsheet
20   analysis tool that allows producers to analyze their choices
21   when deciding whether or not to enroll in a government
22   program that's a land set-aside program.
23   Q.    And you mentioned you have a Ph.D., I believe.  What
24   was your concentration for your Ph.D.?
25   A.    Livestock economics and agricultural policy.

1    Q.   Did you complete a dissertation for your Ph.D.?

2    A.   I did.

3    Q.   What was the subject of the dissertation?

4    A.   I did a three-paper dissertation that was focused on

5    three subject matter areas; the first being a livestock

6    disease outbreak in South Texas.  That had to do with a

7    vector of ticks that comes over from Mexico into the United

8    States.  I developed a bio-economic model that evaluates the

9    costs of different eradication strategies for the public and

10   for an individual rancher.

11            And then the second paper was evaluating

12   different grazing strategies under changing rainfall in

13   eastern Texas.  We had about 30 years of data that had been

14   collected in a reference station in Overton, Texas.  We

15   analyzed that data to evaluate what some of the best

16   strategies were for adapting to changing rainfall, so when

17   the rain is coming as opposed to how much.

18            And the third paper was analyzing two of the crop

19   safety nets that are in the Farm Bill and deciding --

20   helping producers decide whether or not one of those

21   programs is a better fit or if the Federal Government, in

22   the next Farm Bill, should decide to come up with a combined

23   program that factored in both of the risks in those safety

24   net programs and put them together to establish a better

25   program.

1    Q.    What was your first job after you got your Ph.D.?

2    A.    The job I have now is assistant professor for AgriLife

3    Extension.

4    Q.    Where do you currently work?

5    A.    I work in Amarillo, Texas.

6    Q.    What are your job responsibilities?

7    A.    I have a wide range of responsibilities.  They apply

8    to the 24 northernmost counties of the state of Texas.

9    They're in the Panhandle.  But the overarching mission of

10   Texas AgriLife Extension is to take publicly funded research

11   and provide the results of that research to the public.

12          Within that, day to day, I'll do a number of

13   things, whether it's speaking to ranchers or producer

14   groups, or farmers and farmer producer groups; I work with

15   the Federal Government on establishing policy programs;

16   occasionally will guest lecture at different universities;

17   do a variety of other things that are tangential to the

18   agricultural industry.

19   Q.    How many people would you say, in the United States,

20   do the type of thing that you do with agricultural

21   economics?

22   A.    For livestock and cattle pricing, there's probably

23   about a dozen people that do what I do.

24   Q.    You mentioned that, as part of your job

25   responsibilities, you speak -- you speak to researchers,

1    farmers, and policy groups; is that right?

2    A.    That's right.

3    Q.    And how many -- if you had to -- you know, I know it's

4    hard to count, but if you had to estimate, how many

5    presentations would you say you've given over the course of

6    your career?

7    A.    We're probably in the neighborhood of 2- to 300 at

8    this point, in the last three and a half years.

9    Q.    How many of those would you say relate to beef

10   economics?

11   A.    Anywhere from a third to a half.  Probably -- yeah,

12   probably a third to a half.

13   Q.    So anywhere between, say, 100 and 150?

14   A.    Yes.

15   Q.    I won't make you go through all of those, but, I mean,

16   you understand sort of the general substance of the case and

17   the substance of your opinion, so would you mind discussing

18   maybe, you know, a couple of presentations that you've given

19   that relate directly to the substance of this case?

20   A.    Sure.  So I'll talk about cattle pricing and the way

21   that ranchers can attain profitability all the way down to

22   the rancher level, where I will speak to a group of anywhere

23   from 10 to, at one point, 2,500 ranchers in a room.  And we

24   talk about different ways that they can manage risk or, you

25   know, like I said, improve their profitability by taking

1    different pricing approaches, where they're available, or by

2    taking different management strategies.  So that's kind of

3    one end of the spectrum.

4           I have given presentations to other researchers

5    on this particular type of fed cattle pricing.  Like I said,

6    there's not a whole lot of people that do that.  There's a

7    lot of livestock economists, but we tend to focus in one

8    area, and fed cattle pricing is a very small subset.  And so

9    we'll talk to a larger group of researchers about different

10   methods of fed cattle pricing, how they're changing, how

11   they're staying the same, what the impacts of those changes

12   are, what impacts of policies affecting those pricing

13   structures are.

14          And then I've also given more than one

15   presentation to the House Committee on Agriculture for the

16   United States, as well as subsets of the U.S. Senate

17   Committee on Agriculture, discussing, again, policies that

18   are being proposed that would impact the way that fed cattle

19   are priced in the United States.

20          So all the way from the producer level up to the

21   policy-making level and -- yeah, but the idea is educating

22   the public on what different pricing structures are and how

23   they impact the fed cattle industry at many different levels

24   of the entire industry.

25   Q.   Have you had any media appearances?

1    A.   Yes.

2    Q.   How many would you say?

3    A.   That's a lot, too.  We're probably over a hundred at

4    this point.

5    Q.   What type of media do you appear in?

6    A.   It's mostly local media.  So there's four news outlets

7    in Amarillo.  And I'm on the local news a lot just talking

8    about what's going on in agriculture.  I'm in larger outlets

9    in written print -- well, I guess it wouldn't be print

10   anymore.  I'm online pretty frequently, all the way from,

11   you know, *Ft. Worth Star Telegram.*  I was in *The Houston*

12   *Chronicle* last month.  I believe it might have been

13   published earlier this month.  So a variety of different

14   outlets all the way from print to me being on camera in a

15   variety of different things.

16   Q.   As far as publications, not just in periodicals, but

17   also papers that you've written or books that you've

18   written -- well, actually, let me break it down a little

19   bit.  How many papers would you say that you've written in

20   the course of your career?

21   A.   I have four published papers; two forthcoming at this

22   point.

23   Q.   And do any of them relate to beef?

24   A.   Yes.

25   Q.   Beef economics?

1    A.    Yes.

2    Q.    And what about do you have any -- have you written any

3    books or parts of any books?

4    A.    I actually have one coming out, we sent it to print

5    this week, on direct marketing beef from producers to

6    consumers.   So that's the largest section of a book that

7    I've written.

8    Q.    I want to go back to something that you mentioned

9    before:   You said you give presentations to ranchers.   How

10   many ranchers would you say -- how many presentations -- how

11   many rancher presentations would you say that you've given

12   over the course of your career?

13   A.    I would say in the neighborhood of anywhere from 75 to

14   100.

15   Q.    How many ranchers attend on average these

16   presentations?

17   A.    Those are relatively small, so I would say the average

18   crowd is probably 25, with a couple sticking out in being --

19   you know, there's been a couple that are 500.   There's been

20   one that was 2,500.   There's been some that are in the

21   100-to-150 range.   But I were to pick a random one out and

22   not do the math, on average, it's going to be 25 people.

23   Q.    Do you have any affiliations that you have?

24   A.    I'm a member of the Agricultural and Applied Economics

25   Association in the United States.   I'm a member of the

1    Southern Agricultural Economics Association and the Western

2    Agricultural Economics Association.

3    Q.   Is there any important relevant training or experience

4    that I haven't discussed yet?

5    A.   I don't believe so.

6    Q.   Were you paid for your appearance today?

7    A.   I was.

8    Q.   And for your role as an expert?

9    A.   I was.

10   Q.   What would you say went into preparing for your expert

11   testimony and your -- as your role as an expert?  Let me

12   start over again.

13          What would you say -- could you please describe

14   what went into your preparation for being an expert?

15   A.   In preparation for being an expert?

16   Q.   Uh-huh.

17   A.   All the education I just listed, I'd like to add to

18   that, but, in addition, you know, for this case in

19   particular --

20   Q.   Yes.

21   A.   -- it was document review that you-all provided;

22   discussions with your parties on, I believe, two occasions

23   at this point; a deposition about 11 months ago, 10 or

24   11 months ago; and then writing a report, which I believe

25   everyone has access to a copy of.

1    Q.   And just to clarify one of those questions, you said

2    "meetings with your parties."  Do you mean Tyson or do you

3    mean Zia?

4    A.   Tyson.

5    Q.   How many documents would you say you've reviewed in

6    preparation for your deposition and in preparation for your

7    testimony today?

8    A.   It was hundreds, if not thousands, of pages.  I don't

9    know the number of individual documents, specifically, but

10   it was upper hundreds, if not thousands, of pages of

11   documents.

12   Q.   So with all of that put together, how much have you

13   charged for so far for your role as an expert?

14   A.   So far?  I have charged $21,000.

15   Q.   And then what is your hourly rate?

16   A.   400 an hour.

17   Q.   And is there any additional time that you haven't

18   billed for yet?

19   A.   This week here at the trial.

20   Q.   Okay.  So if you'd do a ballpark estimate, how much

21   would you say, as an hourly rate -- with your hourly rate,

22   how much would you say this trial would add to the $21,000?

23   A.   It's going to be in the neighborhood of 11- or 12,000

24   for the week.

25   Q.   Do you believe that your testimony will be helpful in

1    assisting the jury understand the facts in this case?

2    A.   I believe so.

3         MR. GOMEZ:  Your Honor, I would like to tender

4    Dr. Benavidez as an expert in cattle and beef economics.

5         MR. WORDEN:  No objection.

6         THE COURT:  Okay.  I'll -- Mr. Benavidez will be

7    recognized as an expert in cattle and beef economics.

8         Go ahead.

9    Q.   (BY MR. GOMEZ):  We asked for you to prepare an

10   opinion in this case; is that right?

11   A.   Yes, sir.

12   Q.   Did you provide an opinion?

13   A.   I did.

14   Q.   And, in a couple sentences, would you mind summarizing

15   what your -- the topics of what your opinion was about?

16   A.   So the first large subset was the structure of the

17   cattle industry in the United States, the second one being

18   the methods through which fed cattle are priced in the

19   United States, and the third being the two different pricing

20   models discussed in this case; the one being the standard

21   for the industry and the other being the pricing model

22   proposed by Zia.

23   Q.   So taking the first one first, would you mind

24   describing -- again, just as a general overview and then

25   we'll get in a little bit more detail -- the basic structure

1    of the beef supply chain?

2    A.   Sure thing.  You know, we start at the cow-calf

3    sector, which is widely distributed around the United

4    States.  Cow-calf herds in the United States average around

5    45 head per owner and vary all the way from one up to much

6    larger herds.  But their main goal, the structure of how

7    they conduct business, is to have the asset that generates

8    value, being the cow, and through her birth of the calf and

9    then the sale of that calf.  And so the productive engine is

10   the cow.  The revenue that comes out of the cow is the calf.

11   Eventually, you'll cull that cow and make money off of her,

12   too.  But the goal being to add pounds to that calf through

13   forage that you own or lease in the form of grass, and then

14   sell that calf.

15           And then the next stage would be the feedlot

16   sector.

17   Q.   Before we leave the cow-calf sector, can you please

18   generally describe for me the business model for the

19   cow-calf sector, as you understand it.

20   A.   The sector -- the model for the cow-calf sector is

21   to -- again, you have the cow as the productive engine of

22   that part of the business.  You own that asset.  And she

23   generates revenue by birthing a calf, hopefully, on an

24   annual basis.  And then you sell the calf to generate

25   revenue.  You will sell the cow eventually as a cull, or as

1    a replacement to another ranch, and she'll generate revenue

2    in that method, as well.  And you'll repopulate, either with

3    your own heifers or with other cows that you purchase, and

4    continue raising calves and selling them, either through an

5    arrangement with a buyer or at a local auction barn.  And

6    that's where we exit that stage and go on to the feeders.

7     Q.   So moving on to the feeders, would you mind describing

8    generally what the feeder or the feedlot sector is.

9     A.   So the feedlot sector is a margin business, right?

10   The goal is to buy low and sell as high as possible.  So

11   looking for calves that they can add weight to on a

12   high-grain diet.  There are some adjustments in the diet

13   throughout the life of the animal being placed on feed, but

14   the goal there is to add pounds to lighter-weight calves and

15   selling heavier calves.  And so you can have a calf leave

16   the cow-calf sector and go directly to the feeder; or they

17   may go through what we call a "stocker" or a "backgrounder"

18   operation, which is a different place where they'll eat more

19   forage before going to the feedlot; or they may go directly

20   from the cow-calf sector into the feedyard.

21          There's a variety of ways.  And it's one of the

22   complicated things about the cattle industry is that it's so

23   variable across the country.  But you take calves --

24   typically, we see the average weight where they enter the

25   feedyard being anywhere from 600 to 800 pounds and then

1  being marketed or sold out of the feedyard to the packer

2  anywhere from, you know, 1,300 to 1,500 pounds is pretty

3  typical.

4  Q.   You mentioned "packers."  Is that another part of the

5  beef supply chain?

6  A.   That would be the next stage.

7  Q.   Can you please describe generally what packers are and

8  what they do?

9  A.   Again, that is a margin business.  A packer's business

10  model is to take live animals and convert them into beef and

11  beef products.  There's byproducts, as well, but the goal

12  being to take that live animal, harvest it as humanely and

13  efficiently as possible to develop beef and beef products.

14  So, again, the goal there is to purchase, turn around and

15  sell a product, and to have that margin compensate for, you

16  know, expenses and have some profit left over at the end.

17        And then they would sell on into what would be

18  where most of us come in contact with the cattle and beef

19  industry, which is the grocery store.

20  Q.   How important is it for a packer to have reliable

21  inventory?

22  A.   It's a critical component of the business model.

23  Q.   And how does that impact the supply chain, if there

24  are problems with inventory?

25  A.   So the supply chain, if there's a delay, you know, we

1    see a lower amount of beef on the shelves at the grocery

2    store, for one.  But in terms of profitability for the

3    packer, you know, if we have a delay in delivery on a number

4    of animals -- so let's say that a large plant harvests 5,000

5    head a day and, for whatever reason, only 4,000 show up that

6    day, they still had to pay everyone who showed up to work

7    and pay for all of the fuel to keep the lights on and run

8    the machinery that harvested the animals, plus insurance,

9    all those overhead expenses, but now they're only able to

10   allocate that cost over 4,000 head rather than 5,000 head.

11   But given that the plant was built for 5,000 head, there's

12   some additional expenditures that are allocated over only

13   4,000 head; meaning, their profit margin per animal was

14   lower and expenses per head were essentially higher per

15   head.  So it does shrink their margins when animals don't

16   show up on time.

17   Q.   You mentioned that the average or the typical weight

18   for cattle when it's ready for the packer is 1,400 to 1,500;

19   is that right?

20   A.   It varies by region, but, yeah, you can see the

21   regional average range from 1,300 up to 1,500, depending on

22   what region you're in.

23   Q.   And if I represented to you that at least some of the

24   cattle at issue were harvested in Nebraska, do you have an

25   understanding of the average weight for Nebraska cattle?

1    A.    So pretty typical average weight for Nebraska is about

2    1,400 pounds for -- at delivery.

3    Q.    If cattle were at 1,150 or 1,200, is that -- I mean,

4    that would be under that average, but what's the problem

5    with harvesting cattle at that weight?

6    A.    So it's a similar concept to what I previously

7    discussed except, now, we're talking about a lower number of

8    pounds, right?  So if the goal is to sell pounds of beef,

9    well, it takes the same infrastructure to harvest an animal

10   whether it's 1,200 pounds or 1,400 pounds.  And so, if

11   you've got animals that are much lighter weight, even if

12   they all show up -- so let's take that example plant again

13   that we said was rated for 5,000 head a day.  Now, if we get

14   5,000 that show up, but they are all 1,200 pounds rather

15   than 1,400 or if some of them are 1,200 and some of them are

16   1,400, those 1,200-pound calves are generating fewer pounds

17   of beef to be sold out of the other end of that sector.  And

18   so, again, all those costs have to be allocated over a

19   smaller pool of revenue that was generated from the sale of

20   calves, because there was just less beef going out the door.

21   And so, again, it will shrink the packer's margins when

22   cattle show up at a lighter weight than what the target

23   weight was.

24   Q.    I'll represent to you that some of the cattle at issue

25   here is natural or GAP cattle.  Would your answer to that

1  question change, depending on whether or not we're talking

2  about a GAP cattle or a natural cattle versus a conventional

3  cattle?

4  A.   Could you -- the answer to which question?

5  Q.   Sure.  Your answer to the question about the average

6  weight for cattle to be harvested, would it change depending

7  on whether or not the cattle we're talking about is GAP or

8  natural?

9  A.   It would not.

10  Q.   Do you have an understanding of where Zia fits in this

11  supply chain we have just been talking about?

12  A.   I do.

13  Q.   What sector would you say that they're in?

14  A.   My understanding is they typically source cattle from

15  the cow-calf sector, some of which, I believe, they have an

16  ownership stake in, and contract to have those cattle fed in

17  a feedyard, which we would call "custom feeding," right?

18  They are hiring a feedlot to feed for them, not necessarily

19  having to own the infrastructure of the feedyard,

20  themselves.  And then the goal of that type of business

21  being to sell those heavier calves at terminal weight to the

22  packing sector for harvest.

23  Q.   And what about Tyson?  Where does Tyson fit in the

24  supply chain?

25  A.   They would be the packer.

1    Q.    Can you briefly talk to me about the relative profits

2    of the three sectors you are talking about:  The cow-calf

3    sector, the feedlot sector, and the packer sector.

4    A.    Over time or...

5    Q.    Let's say for the past 20 years or so.

6    A.    Okay.  So we started getting pretty concise data out

7    of what's called "LMR," so "Livestock Mandatory Reporting,"

8    in 2000-and, yeah, -2, so it would be exactly 20 years.  And

9    we had normal parts of the year when packers are making

10   money and parts of those years -- excuse me, there were

11   some years when packers had positive margins, so profits,

12   and there were some years when the cow-calf sector had

13   positive profits, with feedlots kind of being in the middle

14   and balancing out the profits of the other two sectors.

15            Again, they're a very margined business, so they

16   don't usually get a very outsized chunk.

17            So specifically over the last ten years, you

18   know, in the early 2010s, we saw record-breaking

19   profitability on the cow-calf sector on a per-head basis.

20   And then, kind of in the middle 2010s, when we made it to

21   about 2015 all the way out to about 2019 or 2020, we saw

22   record-breaking packer margins.  And now that we're moving

23   back into a different part of the cattle cycle, we are

24   seeing those margins begin to even out.  Calf prices are

25   going up.  Profitability of the cow-calf sector is going up,

1    and now packer margins are beginning to shrink fairly

2    steadily and fairly quickly over the last six months.

3    Q.    So would it be fair to say, then, that the cow-calf

4    sector and the packer sector, sometimes one makes more

5    money, sometimes the other makes more money, over the past

6    20 years or so?

7    A.    That's exactly right.  So it's a function of the

8    cattle cycle.  If we have a lot of cattle, you know, we go

9    back to our economic fundamentals of supply and demand.  If

10   we have a lot of cattle, then each number -- each of those

11   calves is going to be relatively less valuable because, if

12   I'm being overcharged as a buyer, I'll go to someone else

13   who has a similar animal, an animal that was similar in

14   target weight and, you know, characteristics that I'm

15   looking for.  So there's a large supply and there's the same

16   number of processing capacity that we've always had.

17        Now, on the flip side of that, if there's few

18   animals and we need to keep those hooks running, like I said

19   earlier, as our measure of profitability for the packer, we

20   have to complete more -- you know, the packing sector has to

21   complete more for each individual animal.  And so that's

22   when we see prices rise for the cow-calf sector, increasing

23   profitability and increasing margins.  And it is very rare

24   that they're both making money at the same time.  And it's a

25   natural cyclical event that's just a function of biology:

1    How long it takes to grow a calf and how long it takes price

2    information to go from the packing sector and the grocery

3    sector back to the cow-calf sector.

4    Q.   I want to move on now to how fed cattle are marketed.

5    Would you mind briefly describing how fed cattle are

6    marketed?

7    A.   When we say "fed cattle," what we mean is feeder

8    cattle leaving the feedlot and going to the packing sector.

9    Those would be "fed" or "live" or "fats" or "fattened."  And

10   those animals are typically marketed in one of two ways:  We

11   have a negotiated bucket of transactions, and then we have

12   an alternative marketing arrangement bucket of transactions.

13   Q.   So do you have an understanding of the -- whether the

14   cattle at issue are negotiated trade or AMAs?

15   A.   They would qualify as AMAs.

16   Q.   All right.  So I would just like to focus on AMAs for

17   today.

18             How is the price typically established on cattle

19   subject to AMAs?

20   A.   There's different types of AMAs; the formula being the

21   biggest one that we'd focus on.  And a formula price is

22   typically established with a base price and then a premium.

23   And so -- or a discount.  So it can be a premium or

24   discount.  There are kind of each of those types -- those

25   two things are established differently.  The base price

1    being some price agreed upon at a given date for a delivery

2    in the future.

3            And so we could say I've got this pen of animals

4    and I want them delivered in June.  We're going to agree to

5    deliver, let's say, next June, but we don't know what the

6    value of cattle is going to be at that point in time.  So

7    what we're going to do is we're going to agree to some

8    pricing series, some data point in the future, to establish

9    a base price.  And so a very common one is, if I'm

10   delivering on June 1st, let's look at what the price of

11   cattle was on, you know, May 21st or the week of

12   May 21st, and we're going to use that average from that

13   week as our base price.  And the premiums vary from

14   transaction to packer to, you know -- it depends on the

15   arrangement between each individual in that sector.  But a

16   common set of premiums is for quality, for yield on the

17   carcass, for characteristics, like whether they qualify for

18   a specific programs.  And a variety of other things can go

19   into the formula, but the premium is generally independent

20   of the base price.

21   Q.   All right.  So I'd like to focus just very briefly on

22   the base price.  How would one go about looking up a price

23   for how cattle were paid for a week ago?

24   A.   That's all publicly available.  And so I mentioned

25   LMR, the Livestock market [sic] reporting that's been

1    enforced since 2002.  All those transactions are publicly

2    available online at USDA's Data Mart database.  Anyone can

3    look that up and see for themselves what the average price

4    paid was in a region last week.  And they actually have

5    daily reports.  So I believe at this point already we can

6    see what the afternoon's average was for Nebraska today.

7    Q.    So you mentioned Nebraska, so -- and there's been some

8    testimony in this case about the Nebraska weighted average.

9    Would that be considered a base price?

10   A.    Yes.

11   Q.    If I asked you -- if I told you that the Nebraska

12   weighted average is based off of the price of conventional

13   cattle, would you agree with that statement?

14   A.    No, not exactly, because that Nebraska weighted

15   average takes into account all cattle sold.  And, again,

16   when we talked earlier about conventional versus cattle that

17   qualify for some premium, those premiums are set

18   independently.  So the base price is what is applied across

19   all animals that are marketed in that region by packers that

20   are required to report -- which is about 84 percent of the

21   packing capacity in the United States is required to report

22   to that.  And so it's -- "conventional" is not the exact

23   right way to do it.  It would be all cattle marketed in that

24   region.

25   Q.    And then I want to go -- so you have mentioned the

1    base price and then there's a premium that can be added to

2    that.  How is the premium determined?

3    A.    That varies widely, depending on the arrangement

4    between the packer or the buyer and the seller, whoever it

5    is.  But going about determining that, you would quote a

6    value for, you know, this is what we think prime cattle will

7    be worth at that point in time, this is what we think choice

8    cattle will be worth at that point in time.  And if we look

9    at a pen of animals and we see that, you know, 60 or

10   75 percent of them qualify as choice and we're going to give

11   some premium for choice animals, then we would apply that

12   premium accordingly, based on about how many we think

13   qualified for that premium.

14          So that's quality.  You can also apply yield

15   grade premiums.  You can apply program premiums for things

16   like natural, for certified Angus beef, and a variety of

17   other premiums.  And there's some instances where other

18   factors can apply, but, in general, it's quality, program

19   qualification, and yield.

20   Q.    Would there be anything unusual, in your opinion,

21   about GAP cattle or natural cattle being priced based off of

22   the Nebraska weighted average with a premium?

23   A.    With Nebraska weighted average functioning as the base

24   price?

25   Q.    Correct.

1    A.    No, there's nothing out of the question there.

2    Q.    You mentioned that you had an opinion about the

3    standard pricing model in the industry.  Would you mind

4    discussing that further?

5    A.    Sure.  So, again, you know, if we're thinking in

6    general about there being two buckets, but we're going to

7    focus on the alternative marketing arrangement bucket, that

8    represents about 75 to 80 percent of the transactions in the

9    United States now.  So I think it's pretty representative of

10   how fed cattle are sold, but it is that formulaic basis that

11   we just talked about.  You know, most of them have some base

12   price established well in advance of delivery.  And when I

13   say a "base price," I mean a data point.  And so that's like

14   if we said, if I'm sitting here today in July of 2022 and

15   I'm going to deliver calves in June of 2023, we're going to

16   agree that the late May price at that time will be our base.

17   And then whatever we agree to as the premiums will be

18   allocated as a payment per head or it could be a payment per

19   pound.  It could be, you know, a payment per pen.  It

20   depends on how the agreement is reached between the two

21   parties.  But we essentially will agree on a data point that

22   will serve as our base price in the future, and we're also

23   going to agree on how we are going to determine the premiums

24   in advance.

25          Now, again, those premiums could be decided

1    today, the actual value could be decided today, or we could,

2    again, look at the premiums from late May in 2023 and say

3    that "I'm going to give you, you know, whatever the going

4    rate was for high-quality beef for prime or choice or

5    certified Angus beef in late May when you deliver those

6    cattle next June."

7    Q.    Do you have an understanding of Tyson's standard

8    pricing model?

9    A.    I do.

10   Q.    And how does that compare to the general industry

11   standard?

12   A.    It is well within the range of normal.  That's exactly

13   what we would expect whenever we see a formula-based pricing

14   model.

15   Q.    What are the benefits of the standard industry model?

16   A.    There's a lot.  And they don't just accrue to the

17   packer, right?  The formula trade allows for producers and

18   packers to schedule well in advance.  And we've already

19   discussed how important scheduling is for a packing entity.

20   It also provides the feeding sector with additional

21   leverage.  Because, if we think about the fact that I know,

22   within reason, about what my cattle are going to be worth

23   next year, I can look at the futures market today and see

24   what cattle are going to be worth sometime next, you know,

25   June, and I know then about how much money I'm going to

1    make.  Give or take the premiums, give or take some ability

2    to put on pounds, I've got a rough idea how much I'm going

3    to make.  That allows me to secure better financing, right?

4    If I go to my banker and say, "This is exactly what I'm

5    going to make," he's more apt to give me a better line of

6    credit, possibly at a lower interest rate.  That allows

7    feeders to expand the size of their herd.  So rather than

8    running at 80 percent capacity, they may be able to run at

9    85 percent capacity.  Again, feedlots being a capacity gain

10   where we want to make sure we're feeding as many as possible

11   at as low a cost as possible.  But really what we see is

12   that scheduling provides a lot of value, and it allows you

13   to see a year or a year and a half in advance, both on the

14   packing side and the feeding side, "what are my expected

15   revenues," and help people to plan and, therefore, make

16   better financial decisions all along the way.

17    Q.   I think you already answered this, but I just want to

18   make sure:  Does this type of standard pricing arrangement,

19   does it just benefit packers?

20    A.   No, no.  It impacts -- it benefits the feeding sector,

21   as well as the packing sector.  And if you look at the

22   ability to feed more animals as a derived demand for the

23   cow-calf sector -- right? -- if I'm feeding more cattle in

24   the feedlots, then I'm going to want to buy more calves off

25   the cow-calf ranch, and so we would inevitably see an

1    increase in the price for calves at the cow-calf sector, as

2    well.  So the ability to schedule and use these formula

3    trades really benefits the entire industry.

4    Q.   How long would you say this has been the standard in

5    the industry?

6    A.   The formula trade really took off starting in 2008 as

7    a large percentage of total trades, and it has become the

8    majority ever since, I would say, around 2012.  So anywhere

9    in the early 2010s is when it became the dominant type of

10   trade in the United States.

11   Q.   And, if I recall your earlier testimony correctly,

12   there were times during that time frame where the packer

13   sector was making less money, sometimes where it was making

14   more money; and then sometimes where the feeder sector was

15   making less money and the feeder sector making more money;

16   is that right?

17   A.   That's accurate.

18   Q.   And then how does that change the standard pricing

19   arrangement?

20   A.   Our research would suggest that they're not related.

21   Q.   I next want to talk about a cost plus arrangement.  Do

22   you have an understanding of what the term "cost plus"

23   means?

24   A.   I do.

25   Q.   Is it industry standard -- can you describe what "cost

1    plus" is, in your understanding?

2     A.    That would be an arrangement in any business where I

3    set my price based on how much my costs were and then I want

4    to build in a guaranteed profit margin for myself.  Every

5    customer I sell my goods to is giving me a guaranteed

6    profit, based on how much I'm charging them.  So you've got

7    your costs, plus whatever your profits are.

8     Q.    And I want to go back, just one second, to the

9    standard industry model because I wanted to make sure.  How

10   does -- if you had to describe what the risk, the economic

11   risk, that the feeders are taking versus the cow-calf sector

12   versus the packers under the standard arrangement, how is

13   risk distributed?

14    A.    No, it depends, again, on the cycle.  We've talked

15   about the cycle a lot.  But, over time, risk is shared by

16   the entire industry.  Again, if you think about the fact

17   that we're setting a price -- a data point for price

18   today -- we're agreeing today that whatever the price is

19   next May, that's going to be our base.  The price could go

20   up or down, right?  We don't know what's going to happen in

21   the next 11 months.  And, if anything, over the last

22   two years we've seen in the cattle market, we don't know

23   what's going to happen.  So price could go up, price could

24   go down, but we've agreed that our base price is going to be

25   whatever that data point is at the end of May next year.

1    And so that means to both parties you may get a bump where

2    prices go up and so we're going to pay more for the cattle,

3    and that's better for the feeder; or price may go down and

4    that's going to be better for the packer because they're

5    going to pay less.  And so the formula base and then those

6    additional premiums -- the premiums are providing an

7    incentive for the producer to increase the quality of their

8    animal, and so that's an industry flow-through.  And the

9    formula base inherently shares risk among the packer and the

10   feeder in a, over time, fairly fair fashion.

11   Q.   And then how would that compare with the distribution

12   of risk in a cost plus hypothetical arrangement?

13   A.   So, you know, a cost plus model puts the risk entirely

14   on the buyer because the seller is saying, "My costs are

15   this, and then I'm going to guarantee myself a profit

16   margin."  And so, if we think about that in the context of

17   our example so far, if prices go up or prices go down

18   between now and next May, you know, our kind of theoretical

19   example, it doesn't really matter to the feeder because

20   they're going to charge whatever their costs were and then

21   they've built in a profit margin for themselves.  So, in

22   that case, there's really not any risk of loss to the feeder

23   whenever you're looking at total risk shared by the two

24   entities.

25            Now, I'm not suggesting that the feeder can't

1    still lose money there, but it's going to be very difficult

2    to lose money because they're charging the packer all of

3    their costs, plus a built-in profit margin.  So a cost plus

4    model shifts all the risk from the seller onto the buyer

5    and, in this case, from the feeder onto the packer.

6    Q.   And how common would you say a cost plus arrangement

7    is in the cattle industry?

8    A.   I have never seen a cost plus model applied in the fed

9    cattle industry.

10              MR. GOMEZ:  No further questions, Your Honor.

11              THE COURT:  How long is your cross going to be?

12              MR. WORDEN:  It's going to be more than

13   ten minutes.

14              THE COURT:  All right.

15              MR. WORDEN:  I'll do whatever Your Honor prefers.

16              THE COURT:  Let's get into it as much as we can.

17              Go ahead, Mr. Worden.

18              MR. WORDEN:  Thank you, Your Honor.

19                     **CROSS-EXAMINATION**

20   Q.   (BY MR. WORDEN):  Nice to see you again,

21   Dr. Benavidez.

22   A.   Yes, sir, you, too.

23   Q.   So you remember I took your deposition in September of

24   last year, correct?

25   A.   Yes, sir.

1    Q.    So this is the only time someone has paid you to be a

2    witness in a case, correct?

3    A.    Yes, sir.

4    Q.    All right.  You'd never heard of Zia before you got a

5    call from Tyson's lawyers, correct?

6    A.    No, sir.

7    Q.    Your agreement to testify in this case, who was it

8    with, Tyson, its lawyers, or otherwise?

9    A.    It would have been with the lawyers, I suppose.

10   Q.    Okay.  Tyson's lawyers called you last summer,

11   correct?

12   A.    Yes, sir.

13   Q.    Who called you?

14   A.    I believe it was a person from an office in New Mexico

15   named Nick.

16   Q.    Nick is a lawyer, correct?

17   A.    I believe so.

18   Q.    And you've been on calls with Nick, correct?

19   A.    Yes, sir.

20   Q.    And you've been on calls with Mr. Fisher, correct?

21   A.    Yes, sir.

22   Q.    And you've been on calls with Mr. Gomez, correct?

23   A.    I believe one or two, including the deposition.

24   Q.    Have you been on calls with any other lawyers for

25   Tyson?

1    A.    No, sir, I don't believe so.

2    Q.    Has anyone other than lawyers been on -- first of all,

3    were they telephone calls or Zooms?

4    A.    They're -- they have mostly been phone calls.  There

5    was one Zoom, but the Zoom was a non-video call; it was all

6    black screens.

7    Q.    You know, you've met Bob Scherer, correct?

8    A.    In the last 48 hours.

9    Q.    Okay.  Have you ever been on a call with him, ever?

10    A.    Once.

11    Q.    Okay.  I asked him that yesterday, and he did not

12    recall being on any calls with you.

13    A.    Okay.

14    Q.    Are you sure he was, or you just could be mistaken?

15    A.    No, I'm sure he was.

16    Q.    Okay.  What call was that about?

17    A.    That call was when we were discussing the pricing

18    model for Tyson.  And that would have been late July, early

19    August of last year.

20    Q.    Okay.  And you were talking about Tyson's pricing

21    model, in general, not what was agreed to here, correct?

22    A.    That's accurate.

23    Q.    In fact, you're not here to testify, at all, about

24    what was agreed to in this case, correct?

25    A.    I am not testifying to a contract.

1    Q.   Yes, you were not -- you're being paid $32,000 to

2    testify, but you're not being paid -- they have never asked

3    you to offer an opinion in this case about what contract

4    applied between Zia and Tyson here, correct?

5    A.   That is correct, sir.

6    Q.   Thank you.

7              How many -- so you said Mr. Scherer was on one of

8    the calls.  How many calls did you have with one or more of

9    the three lawyers?

10   A.   Probably, to date, we're in the neighborhood of ten.

11   Q.   Okay.  Ten calls with lawyers.  And Mr. Scherer was on

12   one call for how long?

13   A.   Mr. Scherer was on one call that lasted anywhere from

14   an hour to two hours.

15   Q.   Did he do any talking during the call?

16   A.   Yes, sir.

17   Q.   What did he talk about?

18   A.   We discussed, again, Tyson's standard pricing model

19   for fed cattle.

20   Q.   Did he talk about anything else other than Tyson's

21   standard pricing model for fed cattle?

22   A.   Not to my recollection.

23   Q.   So other than lawyers helping you prepare for your

24   testimony, has anyone, other than a lawyer, ever talked to

25   you about anything else relating to this case?

1    A.   Other than us just discussing with Mr. Scherer and the

2    conversation we had on that two-hour call, no, sir.

3    Q.   Thank you.  So just to be clear, Narciso Perez, Sean

4    Perez, and Bob Scherer, they all were involved in some way,

5    shape, or form with this transaction; you understand that,

6    correct?

7    A.   Yes, sir.

8    Q.   You had no involvement until the lawyers called you,

9    after the lawsuit was filed, asking you to be a hired

10   witness in the case, correct?

11   A.   That's accurate.

12   Q.   Okay.  Thank you.  And you've never talked to anyone

13   at Zia about their side of the story, correct?

14   A.   No, sir.

15   Q.   Now, since I took your deposition -- now, in your

16   deposition, you prepared a report, and we went over that,

17   correct?

18   A.   Yes, sir.

19   Q.   And then I asked you some questions, as well.  And you

20   gave me full and complete responses to the best of your

21   ability, correct?

22   A.   Yes, sir.

23   Q.   So you have not developed any new opinions since I

24   took your deposition about ten months ago, correct?

25   A.   No, sir.

1    Q.   What happens if a steer is at 13- to 1,500 pounds, but

2    the packer does not pick them up from the feedlot and they

3    are continued to be fed for weeks or months thereafter?

4    A.   Can you specify what you mean by "what happens"?

5    Q.   Yes.  For example, you have various options:  You

6    can't stop feeding them, correct?

7    A.   Correct.

8    Q.   So you do keep feeding them, correct?

9    A.   Correct.

10   Q.   And they reach a point where they become -- they have

11   too high a fat content, correct?

12   A.   Too high fat content for what?

13   Q.   The fat content goes up, if you keep feeding a steer

14   that's at 13- to 1,500, correct?

15   A.   It does go up, yes, sir.

16   Q.   And that's not good for the consumers because the

17   product tastes lousy, correct?

18   A.   No, that's not necessarily accurate, no, sir.

19   Q.   What is the accurate response, sir?

20   A.   Well, there's a lot of variables that go into that

21   type of question that you're asking, you know.  But if --

22   the weight, on its own, does not dictate what the percent of

23   fat is going to be.  And just because they go from 1,300

24   pounds to 1,500 pounds doesn't mean that their fat content

25   or their grading is actually getting worse.  It could, in

1  theory, be getting better.

2  Q.   What if it's 15 and they're left on the feedlot, let's

3  say, for eight extra months?  What's going to happen to the

4  fat content of the animal?

5  A.   Yeah, over time, that would not be, certainly,

6  profitable.  There's maintenance rations that you can put an

7  animal on to manage its fat gain, so it's not going to be as

8  costly and it's not going to put on the same amount of fat

9  as it would in a normal operational setting.

10  Q.   But the packer isn't paying the costs per day for that

11  steer to stay on the lot for another eight months, the

12  producer is, correct?  In the normal situation.

13  A.   In the normal situation, that is probably accurate,

14  yes.

15  Q.   And the producer has a margin of sometimes $100 a

16  head, correct?

17  A.   At times.

18  Q.   All right.  So if they're paying, would you agree, $5

19  a day, is that a reasonable feed and water bill?

20  A.   Sorry, I need to think through it.  That's probably --

21  that's not out of the question, no.

22  Q.   Is there a rule of thumb for what it costs to feed a

23  conventional animal on a feedlot per day?

24  A.   There's a conventional formula, there's not a

25  conventional rule of thumb.

1    Q.   What's the formula, sir?

2    A.   The formula would be the daily gain.  So pounds of

3    gain per pound of feed, which we typically say, is

4    6.1 pounds so 7 pounds of gain -- sorry, of feed per pound

5    of gain, multiplied by the cost of corn or the cost of feed

6    per pound.  And that is usually pegged to the price of corn.

7    So, really, it varies, depending on how fast the cattle are

8    gaining weight and how much corn costs.

9    Q.   And I have the calculation you gave me in your depo,

10   but we jumped ahead a little bit.  So let me see if I can

11   find that.  I might have to get back to that.

12                    (Discussion off the record.)

13            So you gave a range of 13- to 1,500 for a

14   desirable range for a cow, correct?

15   A.   Yes.

16   Q.   That's a conventional range, correct?

17   A.   Do you mean a range for conventional cattle?

18   Q.   Correct.

19   A.   It's a range for all cattle.

20   Q.   If the parties -- you would agree that, regardless of

21   what the -- well, let me just ask you this:  So I believe

22   you said that the standard in the industry of pricing -- did

23   I hear you correctly say that's done 75 percent of the time?

24   A.   The alternative marketing arrangement represents about

25   75 percent of the transactions in the industry.

1    Q.   What do you mean "alternative"?  To what?

2    A.   To negotiated.

3    Q.   So that 25 percent is negotiated, correct?

4    A.   That's accurate.

5    Q.   All right.  So even though you may say it's -- the

6    standard is 75 percent, there's still a quarter of all the

7    other arrangements that are negotiated somehow, correct?  If

8    my math adds up.

9    A.   You're correct, but I want to be clear what

10   "negotiated" means versus what "alternative marketing

11   arrangement" means.  These are qualifications and categories

12   defined by USDA, with "negotiated" being a within-two-weeks'

13   delivery date for fed cattle.  So it's more about the timing

14   and "negotiated" being immediate.  You can still -- I mean,

15   if a feeder does not agree to what the terms are from the

16   packer for an arrangement that is a formula, those can

17   certainly be negotiated, the terms of that can be

18   negotiated.

19   Q.   The producer and the packer are free to negotiate any

20   arrangement they want, correct?

21   A.   Yes, sir.

22   Q.   They certainly are well within their rights to

23   negotiate, if both parties agree.  The producer is well

24   within their rights to make a proposal to provide the cattle

25   at a certain price or under certain terms, correct?

1    A.   Say that one more time.  I'm sorry.

2    Q.   Yes.  The producer of the cattle is well within their

3    rights to propose an arrangement for the payment and terms

4    of the cattle, correct?

5    A.   Yes, sir.

6    Q.   And the packer is well within their rights to say

7    "yes" or "no," correct?

8    A.   Yes, sir.

9    Q.   And they can have a proposal that has a different

10   weight than you suggested, and they're well within their

11   rights to make that proposal, too, correct?

12   A.   Yes, sir, that's accurate.

13   Q.   And the packer is well within their rights to say,

14   "Looks good, I agree," or "I don't agree," correct?

15   A.   Yes, sir.

16   Q.   So, Dr. Benavidez, you're -- you're not a traditional

17   professor that some of us know who teaches in a classroom,

18   correct?

19   A.   That's correct.

20   Q.   You work directly with farmers and ranchers in the

21   panhandle, correct?

22   A.   That's correct.

23   Q.   We talked at your deposition about, from your ages ten

24   to eight [sic], you did live -- you had a ranch in Tulia,

25   correct?

1   A.   Probably ought to say "10 to 18," yeah.

2   Q.   Oh, I'm sorry, you're right, you're correct.  And

3   Tulia is near Happy, Texas, correct?

4   A.   Right south.

5   Q.   And you had 20 to 30 head of cows and calves on that

6   property when you were there until 18, correct?

7   A.   Yes, sir.

8   Q.   And when you were 18, did you leave or did the cattle

9   leave?

10   A.   I graduated and went to college.

11   Q.   Okay.  And you've never gone -- you've never worked on

12   a ranch since?

13   A.   No, sir.

14   Q.   Okay.  So you've never fed cattle other than the 20 or

15   30 head when you were a teenager, correct?

16   A.   Yes, sir.

17   Q.   And you've never bought or sold cattle, ever, correct?

18   A.   Correct.

19   Q.   Have you ever fed any natural cattle?

20   A.   No, sir.

21   Q.   And you've not ever bought or sold natural cattle,

22   correct?

23   A.   No, sir.

24           THE COURT:  Mr. Worden, is this a good stopping

25   place for you?

1           MR. WORDEN:  Whatever Your Honor would like.

2           THE COURT:  If you're on a roll, I don't want

3    to --

4           MR. WORDEN:  I'm not really rolling.

5           THE COURT:  Okay.  All right.  Then we will break

6    for the night.  Let me give the night instruction again.

7           MR. WORDEN:  Okay.  Well, just for planning

8    purposes, I have, I don't know...

9           THE COURT:  For planning purposes, what?

10          MR. WORDEN:  Just for Dr. Benavidez and everyone

11   else, half an hour more tomorrow.

12          THE COURT:  Okay.  We'll do that in the morning.

13          Ladies and gentlemen, again, when you leave here,

14   friends or family may ask you about your day of jury duty.

15   As I mentioned earlier today, you may not discuss any of the

16   evidence in this case with anyone until the trial is

17   concluded and I dismiss you as jurors.  This includes family

18   and friends.  Also, you must not hear or read about this

19   trial or do any sort of your own research.  The reason for

20   this is your decision in the case must be based solely on

21   the evidence presented at trial.

22          With that, I'll dismiss you for the night, and

23   we'll see you at 8:30 in the morning.

24          All rise for the jury.

25                     (Jury not present.)

1           All right.  You may be seated.

2           Mr. Benavidez you're dismissed as a witness for

3     the day.  We'll see you again tomorrow morning.

4           All right.  We've been working on filling in the

5     missing jury instructions in this case.  And I want to make

6     sure I understand from Tyson -- I know Tyson's case in chief

7     is not done at this point, but what affirmative defenses

8     Tyson believes it's going to establish.

9           So the list I have on the proposed instructions,

10    Document 112, starts on page 33.  So the first defense is

11    waiver and waiver by estoppel.  Does the defense believe

12    it's going to request an instruction on this?  And, if so, I

13    want to understand the supporting facts for that.

14                    (Discussion off the record.)

15           MR. FISHER:  We are fine with waiving the waiver.

16           THE COURT:  The second is course of dealing,

17    which I don't actually think is an affirmative defense, it's

18    just a manner of interpreting a contract.

19           MR. FISHER:  Agreed, Your Honor.

20           THE COURT:  Okay.  I do think we're giving an

21    instruction on course of dealing, just so you know.

22           The third is ratification.  What's Tyson's

23    position on ratification at this point?

24           MR. FISHER:  I think our position on

25    ratification, Your Honor, would be that that would deal with

1    Zia's ultimate acceptance of payment of the cattle that
2    they're now claiming were not paid under any sort of
3    agreement; however, am I missing...
4            THE COURT:  No.  You tell me what your basis is.
5            MR. FISHER:  I thought maybe I was off on
6    something else.  Our defense, I mean, on the ratification
7    issue is that Zia's actions have been actually consistent
8    with a contract being in place, not with repudiation of a
9    contract.  And the main action there is acceptance of the
10   payments for the cattle in the amount of $12.5 million.
11           THE COURT:  Because they still sold cattle to
12   Tyson, even after Tyson told them that was not the deal?
13           MR. FISHER:  Yes, that's correct, Your Honor.
14           THE COURT:  Okay.
15           Does Zia want to respond to that at all?
16           MR. WORDEN:  Ratification requires a clear and
17   direct relinquishment of other rights.  We asked them for
18   16 million, they sent us a check for a portion of that, and
19   we cashed it.  Otherwise, we would have owed 16 million to
20   people instead of 12 million.  And we continued to try to
21   negotiate, clearly, continuing to try to pursue the rest of
22   the payment.  No one has ever said, "We'll take this and
23   walk away."
24           THE COURT:  Okay.  I tend to agree, but I'll give
25   a final ruling on it tomorrow.


                    UNITED STATES DISTRICT COURT
           100 N. Church Street, Las Cruces, NM  88001
                         (575) 528-1430

273

1              The next affirmative defense is modification.

2      Does Zia have -- I mean, I know you just put every

3      affirmative defense in.  I just wanted to see for actual

4      final instructions, does Zia [sic] have a theory under which

5      there was a modification of the contract in this case?

6              MR. WORDEN:  Does Tyson have a theory?

7              THE COURT:  I'm sorry.  That's what I meant.

8              Does Tyson have one?

9              MR. WORDEN:  Thank you.

10             MR. FISHER:  We'll remove that.

11             THE COURT:  Okay.  And then, finally, the last

12     one, impossibility of or impracticability of performance.

13             MR. FISHER:  We'll waive that one.

14             THE COURT:  Okay.  Then I'll give a final ruling

15     on ratification, but I'm inclined to agree with Zia

16     regarding ratification.

17             Also, I've looked at the verdict form.  There was

18     no line for punitive damages, but I assume we should just

19     modify that.

20             For Zia?

21             MR. WORDEN:  I don't think that there needs to be

22     a separate line.  There's an instruction for it, and they

23     can put the amount they want to put there.

24             THE COURT:  You want me to just give a line for

25     just the amount awarded and not break it down by

1   compensatory and punitive?

2          MR. WORDEN:  Yes, that's fine.  That's what the

3   standard jury instruction that we, both sides, signed off on

4   was, and that's fine.  I'm willing to hear, you know, other

5   considerations.

6          THE COURT:  Okay.

7          MR. FISHER:  Your Honor, I mean, we would

8   disagree as to any instruction as to punitive damages.  We

9   don't believe that the evidence has been established to

10  establish willful, wanton, reckless type of conduct here.

11  However, if there is going to be a space for punitive

12  damages, if the Court disagrees with that, we would ask for

13  that separate space to be there for it.

14         THE COURT:  Okay.  I'll make a decision about

15  punitive, but I think, if it does go there, there needs to

16  be a separate line for punitive damages and compensatory;

17  especially for appellate reasons.  In case there's a request

18  to do something with the awards or if somebody is saying the

19  punitive damages are too high, we need to have those broken

20  down into separate damage sections.

21         Is that okay with Zia?

22         MR. WORDEN:  That's fine.  If Your Honor is

23  contemplating not allowing punitive damages, I would like to

24  be heard.

25         THE COURT:  I understand.  I'm not making any

1    decision on that now.  I'm just looking at the verdict form

2    and making sure we have a line for everything that we're

3    supposed to have.

4           I'm going to meet with my clerk.  We've made some

5    other small edits that I want to give everybody to look at.

6    We've red-lined them, so everybody has a chance to look at

7    them and prepare to look at them, if they're going to use

8    them in closing tomorrow, so we have as final of a draft as

9    we can for you-all to use in closing.

10           So I'm going to take a quick recess to speak with

11   her.  You-all are welcome to go outside.  I'll be back in

12   about 10, 15 minutes, okay?

13           MR. FISHER:  Thank you.

14                (A recess was taken.)

15           THE COURT:  All right.  Counsel, let's look at

16   the -- if you look at the special verdict form, we've edited

17   it a little bit for clarity.  And then what I anticipate

18   doing is adding in -- at the end, after the italicized

19   language regarding compensatory damages, adding Question

20   Number 7 regarding the amount for punitive damages.  So it

21   would say, along the lines of the other questions, "Only

22   answer Question 7 if you did award damages in Question

23   Number 6 and you find punitive damages are appropriate."

24           We'll make that change and e-mail it to you both,

25   so you have a copy in case you want to use it for closing.

1          Does that sound acceptable?

2          MR. WORDEN:  Yes, Your Honor.  Thank you.

3          MR. FISHER:  It does.

4          THE COURT:  Okay.  As to the jury instructions,

5    we made a few changes.  The first change is regarding the

6    contract offer.

7          MR. WORDEN:  Your Honor, can I first just ask

8    will this be e-mailed to us, as well?

9          THE COURT:  Yeah, I'll e-mail it to you.

10          MR. WORDEN:  Thank you.

11          THE COURT:  Sure.  The only change I made was the

12    last line.  It says (reading), "A material term is any term

13    without which Tyson" -- we added in "or Zia" -- "would not

14    have entered into the contract."

15          MR. WORDEN:  Certainly.

16          THE COURT:  Does anybody have an opposition to

17    that change?

18          MR. WORDEN:  No problem, Your Honor.

19          THE COURT:  Okay.  Tyson?

20          MR. FISHER:  No opposition.

21          THE COURT:  Okay.  The next one is consideration.

22    We added in "Tyson."  It said (reading), "Consideration is

23    any bargain for, benefit, or advantage to Zia" -- we added

24    in "Tyson or Zia" -- "which is a reason why Tyson or Zia

25    wanted to enter into the contract."  And then we deleted the

```
 1    second sentence, or the second portion of that sentence,

 2    which, just for the parties' information, sends it right

 3    back to the way you-all sent it to us originally.  It

 4    originally didn't have that line.

 5            MR. WORDEN:  It's fine, Your Honor.

 6            THE COURT:  Tyson?

 7            MR. FISHER:  No objection, Your Honor.

 8            THE COURT:  All right.  The next one is mutual

 9    assent.  Again, we just added in "Tyson or Zia."  (Reading)

10    "A material term is any term about which Tyson or Zia would

11    not have entered into the contract."

12            From Zia?

13            MR. WORDEN:  No problem.

14            THE COURT:  From Tyson?

15            MR. FISHER:  No problem.

16            THE COURT:  And then two more instructions over,

17    or three maybe, fraudulent misrepresentation.  I believe New

18    Mexico requires us not to use the word "proximately."  So

19    (reading) "A party is liable for damages caused by its

20    fraudulent misrepresentation."

21            Any concerns from Zia?

22            MR. WORDEN:  No objection.

23            THE COURT:  From Tyson?

24            MR. FISHER:  No objection.

25            THE COURT:  Okay.  And then, finally, as to the
```

1   nominal damages instruction, I'm not sure this case is

2   really a nominal damage case, but it was a proposed

3   instruction, so I'll give it, if that's what the parties

4   want.  The second paragraph starts (reading), "The award of

5   a nominal sum on account of" -- we edited that to say "in

6   place of."

7                 MR. WORDEN:  That's fine, Your Honor.

8                 THE COURT:  Okay.  And from Tyson?

9                 MR. FISHER:  No objection, Your Honor.

10                THE COURT:  All right.  We will e-mail you a copy

11  of these instructions.

12                As to the motion for the judgment as a matter of

13  law on quantum meruit, I'm going to deny that.  Tyson argued

14  that Zia gave insufficient evidence of the reasonable market

15  value of the cattle to support its quantum meruit claim.

16  But, under New Mexico law, the reasonable value of goods or

17  services in a quantum meruit is a fact-specific

18  determination and a number of factors may be considered.

19  Tyson, obviously, is free to argue that the amount it

20  actually paid was the reasonable value.

21                However, after considering all of the testimony

22  and evidence, I find Zia has presented enough evidence that

23  a reasonable jury would have a legally sufficient basis to

24  determine in Zia's favor on the issue and that Judgment

25  under Rule 50 would be inappropriate.  So the motion is

1   denied.

2           Would you like to be heard further, Mr. Fisher,

3   on punitive damages before I rule on that?

4           MR. FISHER:  Yes, Your Honor.

5           THE COURT:  Go ahead.

6           MR. FISHER:  One moment.

7           Yes, Your Honor.  Tyson's position is, after a

8   showing of the evidence that's come in now, knowing that

9   Dr. Benavidez is the last witness that's going to be called,

10  that there has not been sufficient evidence of malicious

11  conduct, reckless conduct, wanton conduct, oppressive

12  conduct, or fraudulent conduct that has been developed fully

13  enough by plaintiff to sustain a punitive damages award, as

14  those are the requirements that must be present, under New

15  Mexico law, for punitive damages to be awarded in cases

16  involving breaches of contract.

17          THE COURT:  Thank you.

18          And from Zia?

19          MR. WORDEN:  Your Honor, there was the direct

20  evidence from Mr. Scherer, himself, that he made a promise,

21  which he testified, when he said, "Looks good, get it done

22  ASAP," he testified a reasonable person could interpret as

23  meaning he was agreeing to the proposal.  And he then

24  testified that, when he agreed to the proposal, he never

25  intended to pay the costs.  And he did so for the purpose of

1    inducing Zia into going into a transaction they never would

2    have entered into, knowing full well that, if Zia did not

3    produce their cattle, Mr. Scherer could not do his deal with

4    Whole Foods.  So notwithstanding the original agreement, six

5    subsequent cost plus updates, all called "cost plus updates"

6    were responded to, encouraging Zia to continue.  So I'm

7    judging by body language I need not continue much more, but

8    I could.

9              Thank you.

10             THE COURT:  Okay.  Thank you.  I'm going to give

11   the punitive damage instruction.  I do think there is

12   sufficient evidence in this case that a jury could find

13   fraudulent conduct, bad faith, and intentional conduct on

14   behalf of Tyson.  So I'll give that instruction.

15             Is there anything else I can do for either of the

16   parties before we leave today?

17             MR. FISHER:  Your Honor, I apologize if I missed

18   it, but I was curious about the thought of the opening and

19   the length of time allowed for the closing statements

20   tomorrow?

21             THE COURT:  How long do you want?

22             MR. FISHER:  I would think similar amount of time

23   as the opening.

24             THE COURT:  I think you asked for 45 minutes for

25   opening.  That seems reasonable.  I mean, more than

1    reasonable.

2              From Zia?

3              MR. WORDEN:  I'd like a little more, an hour.

4              THE COURT:  How do you want to split it up?

5              MR. WORDEN:  You mean for closing then rebuttal?

6              THE COURT:  Yeah.

7              MR. WORDEN:  How about if I decide as I'm going?

8    And, candidly, I have to spend the whole evening going

9    through this.  We haven't even finished witnesses yet, but

10   60 minutes total.  I understand I can't use 60 and then

11   rebuttal --

12             THE COURT:  Right.

13             MR. WORDEN:  -- I'm assuming that.

14             THE COURT:  All right.  We'll do around an hour

15   for each side.  I don't want to cut anybody off.  If you're

16   at an hour and five minutes and you're not saying the same

17   thing over and over again, I'll let you go.

18             Do y'all each want five-minute warnings?

19             MR. FISHER:  I don't believe I'll need one, Your

20   Honor.

21             MR. WORDEN:  I'll have a timer.

22             MS. DIAMOND:  Lastly, Your Honor, we'd like to

23   preserve the damages calculation that Mr. Perez testified to

24   during his direct exam.

25             THE COURT:  How do you want to do that?

1          MS. DIAMOND:  Can we admit that as an exhibit?

2          THE COURT:  I mean, it's written on a whiteboard.

3     How do you want to do it logistically?

4          MS. DIAMOND:  Logistically, we could have it go

5     into the jury room; however, if Your Honor would prefer,

6     it's right here, we can take a photograph of it or move it

7     into the jury room, whatever your preference is.  We would

8     just like to preserve that for the jury.

9          THE COURT:  I don't...for sending something -- if

10    we're sending something back to the jury, I certainly -- it

11    needs to not just be on a whiteboard, it needs to be

12    preserved some way for the record.  But, I mean, I thought

13    it was a demonstrative exhibit.

14         What's Tyson's position?

15         MR. FISHER:  We were under the impression that

16    was a demonstrative.

17         MS. DIAMOND:  We do have it as a demonstrative,

18    as well.  The same numbers are also a demonstrative.

19         THE COURT:  Okay.  Well, demonstrative exhibits

20    don't normally go back -- or don't go back to the jury.  If

21    you want to preserve it, I'm open to ideas about photographs

22    with phones that people stipulate to or I don't know...

23         MS. DIAMOND:  That's fine.

24         THE COURT:  Is that what you y'all want to do?

25         MR. FISHER:  And are you seeking to preserve it

1    and keep it as an exhibit?

2              MS. DIAMOND:  Yes.

3              MR. FISHER:  I mean, I don't think we have a -- I

4    don't have a problem with that, Your Honor.

5              THE COURT:  If somebody asks to preserve an

6    exhibit, I'm never going to say "no" to that.  So why don't

7    you both take pictures of it or whatever you want to do.  We

8    can stipulate to -- it's your -- Zia, your burden to bring

9    it in tomorrow in some way I can preserve it and mark it as

10   Zia's Demonstrative Number 1.

11             MS. DIAMOND:  If Mr. Fisher would agree, we can

12   take a photo and add an exhibit stamp to it.  You know, we

13   can use the next number sequentially.  And we'll provide you

14   a copy and -- you know, a paper copy, and then provide -- we

15   can e-mail like a version --

16             THE COURT:  That's fine.

17             MS. DIAMOND:  -- or hard copy?

18             THE COURT:  Obviously, don't erase it until we

19   get something in the record that everybody's stipulated to

20   is an accurate representation of the demonstrative exhibit.

21             COURT CLERK:  Is it going to be a demonstrative?

22             THE COURT:  It's going to be a demonstrative

23   exhibit.

24             MS. DIAMOND:  Would you like a different

25   exhibit --

284

1          THE COURT:  It will say "Demonstrative Zia 1."

2          MS. DIAMOND:  Yes, Your Honor.

3          THE COURT:  Is that acceptable to Tyson?

4          MR. FISHER:  It is, Your Honor.

5          THE COURT:  Anything else I can do for either

6   side?

7          MS. DIAMOND:  No, Your Honor.

8             (Discussion off the record.)

9          THE COURT:  Anything else from anyone?

10         MS. DIAMOND:  Nothing else, Your Honor.

11         THE COURT:  All right.  We'll get you the

12  instructions e-mailed tonight.  We'll finish cross and

13  redirect, if there is any, and then we will do -- we'll take

14  a short recess to go over instructions, if there's any

15  issues.  Then we'll instruct and close.  Okay?

16         MS. DIAMOND:  Thank you, Your Honor.

17         THE COURT:  All right.  Thank you-all.

18         MR. FISHER:  Thank you, Your Honor.

19    (The proceedings adjourned at 5:39 P.M. and reconvened on

20         Thursday, July 14, 2020, at 8:33 A.M.)

21

22

23

24

25

1                    UNITED STATES OF AMERICA

2                    DISTRICT OF NEW MEXICO

3

4            CERTIFICATE OF OFFICIAL REPORTER

5        I, Vanessa I. Alyce Chavez, CRR, RPR, NMCCR, and

6    Federal Official Court Reporter in and for the United States

7    District Court for the District of New Mexico, do hereby

8    certify that pursuant to Section 753, Title 28, United

9    States Code, that I did report in stenographic shorthand to

10   the best of my skill and ability the foregoing pages 1-22 of

11   the proceedings set forth herein, that the foregoing is a

12   true and correct transcript of the stenographically recorded

13   proceedings held in the above-entitled matter and that the

14   transcript page format is in conformance with the

15   regulations of the Judicial Conference of the United States.

16

17   Dated this 24th day of February 2022.

18

19   S/Electronically Filed
     Vanessa I. Alyce Chavez, CRR, RPR, NMCCR
20   Federal Official Court Reporter
     100 N. Church Street
21   Las Cruces, NM 88001
     Phone: (575) 528-1430
22   Email:  Vanessa_Alyce@nmd.uscourts.gov

23

24

25


                    UNITED STATES DISTRICT COURT
          100 N. Church Street, Las Cruces, NM  88001
                        (575) 528-1430