**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ZIA AGRICULTURAL CONSULTING, LLC,

    Plaintiff,

v.                                                        No. 1:20-cv-00445-MIS-JHR

TYSON FRESH MEATS, INC.,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on Defendant Tyson Fresh Meats, Inc.'s ("Tyson's") Motion for New Trial, or, in the Alternative, Vacatur or Remittitur of Punitive Damages. ECF No. 153. Plaintiff, Zia Agricultural Consulting, LLC ("Zia"), filed a Response, and Tyson filed a Reply. ECF Nos. 158, 160. Having considered the parties' arguments, the record, and the relevant law, the Court will deny the Motion.

**BACKGROUND**

After hearing approximately 2.5 days of testimony, as well as opening statements and closing arguments, the jury in this case returned a verdict finding that Zia had suffered $2,573,171.00 in actual damages; further, based on Tyson's conduct, the jury awarded an additional $8,000,000.00 to Zia for punitive damages.

In the present Motion, Tyson argues that (I) the jury's verdict was against the clear weight of the evidence because there was no agreement on contract terms and no evidence of fraud; (II) Tyson was prejudiced by the Court's exclusion of certain evidence at trial; and (III) the punitive damages award of $8 million is excessive, based on various

legal and evidentiary doctrines, as well as alleged error by the Court. The Court will address each of Defendant's arguments, in turn.

## DISCUSSION

**I.  Sufficient evidence exists to support the jury's verdict.**

The Court hereby incorporates the facts stated in Zia's Response, ECF No. 158 at 10–12, which are contained in Volumes II–III of the trial record. *See* ECF No. 158 at 10–12 (citing ECF Nos. 146–147). Based on these facts, the Court concludes that substantial evidence exists to support the jury's verdict,[1] including its fraud finding, breach of the covenant of good faith and fair dealing finding, and punitive damages award.

Specifically, the trial record shows that Zia's representative, Narciso Perez, communicated Zia's cost-plus pricing proposal (i.e., the basis for Zia's contact claim in this case) to Tyson, and that Zia specifically created this proposal in order to eliminate problems Zia had with Tyson's pricing in the past. ECF No. 146 at 25:24 to 26:3. This change in the parties' posture was communicated by Zia to Tyson in January 2019, before the cost-plus pricing proposal was accepted by Tyson: Mr. Perez told Tyson's representative, Robert Scherer, that the parties' previous deal, in which the parties used the Nebraska weighted average to calculate per-head cattle prices, "would not work for [Zia]." *Id.* Mr. Scherer admitted that Mr. Perez had told him, "[W]e're not doing the old deal, we lost 4 million [last time]." *Id.* at 253:2–5. After reviewing a hardcopy draft Zia's new cost-plus pricing proposal, Mr. Scherer took the draft and stated that he would "look

---

[1] Tyson urges the Court to depart from the Tenth Circuit's substantial evidence standard. ECF No. 153 at 10 (citing *Payne v. Tri-State Careflight, LLC*, 322 F.R.D. 647, 667 n.10 (D.N.M. 2017) (stating that "the Tenth Circuit's position regarding the standard for viewing the evidence when determining a rule 59 motion for new trial is in tension with the weight of modern authority")). The Court declines to depart from the Tenth Circuit standard.

it over and either give [Mr. Perez] a 'yes' or 'no.'" *Id.* at 25:11 to 26:8, 29:24 to 30:1. If Tyson did not want to enter into the cost-plus pricing agreement to purchase Zia's natural cattle, then Zia planned to sell the cattle to another company as "implanted," or conventional, cattle. *Id.* at 26:8–15, 45:2–13.

Prior to entering into the cost-plus pricing agreement, Zia did not need to sell Tyson its natural cattle because it already had a backup plan in place to implant them and feed them as conventional cattle. *Id.* at 44:24 to 45:2. However, once it committed to feeding the cattle as natural (as opposed to conventional) cattle, essentially, Zia could only sell its natural cattle to one supplier in the United States, namely Tyson. ECF No. 146 at 63:17 to 64:13; *see also id.* at 66:14 to 67:1 (a conventional company would be happy to buy the natural cattle, but they would pay several hundred dollars less per head). Therefore, after Zia committed to raising natural cattle at the quantity specified in the agreement, Tyson had monopsony power over the natural cattle market, with respect to Zia.

On February 4, 2019, Mr. Perez emailed Mr. Scherer his final, written cost-plus pricing proposal, in which Tyson was to pay Zia an expected $16,308.996.44. *Id.* at 174:1–17. Approximately 45 minutes later, Mr. Scherer responded to the email, stating, "This looks good, get them in a finish yard ASAP, please." *Id.* at 37:21 to 38:4. Ultimately, Zia delivered a portion of the cattle at issue, but Tyson never paid Zia the full amount owed under the contract. *Id.*; *id.* at 67:19 to 68:4.

According to Mr. Scherer,[2] Zia is one of about 200 similar suppliers that Tyson engages. ECF No. 146 at 259:13–19. Mr. Scherer testified at the trial regarding Tyson's contention as to what its contract was with Zia, specifically that Tyson contended that the

---

[2] Mr. Scherer was offered by Tyson as "the most knowledgeable person at Tyson" regarding its transaction with Zia in this case. ECF No. 147 at 78:2–4.

3

"contract or agreement Tyson has on the cattle are Nebraska weighted average, dressed, delivered to Lexington, with a per-head premium." *Id.* at 180:6–13. He admitted that no writing memorializes this alleged pricing arrangement. *Id.* at 180:14–20. Mr. Scherer also admitted that, even if a verbal offer was made to use the above pricing arrangement, there is no evidence that Zia accepted this offer. *Id.* at 182:3–8.

The evidence presented at trial supports Zia's contention that Tyson intended to take advantage of the lack of a written agreement for the benefit of Tyson, then use the lack of a written agreement to pay Zia a lower amount. For instance, Mr. Perez testified that in their past deals, the parties had only exchanged "[c]ryptic pieces of information" and that whenever Zia had tried to enter into a formal contract with Tyson in the past, it ran into fierce resistance. *Id.* at 39:7–21. According to Mr. Perez, Tyson benefited from lack of formality by turning informal agreements into courtroom fights involving "he said and she said" arguments disputing the terms of a contract. *Id.* at 39:19 to 40:17. Essentially, based on Zia's theory of the case, this is precisely what happened, with Tyson acting willfully to disclaim its obligations under the contract, knowing that Zia had relied on Tyson's representations to its detriment.

Based on the above facts, it was reasonable for the jury to conclude that there was a contractual agreement to use the cost-plus pricing method, that Tyson breached its contract with Zia based on this pricing method, and that Tyson's breach of the contract was malicious, willful, reckless, wanton, fraudulent, or in bad faith.[3] With regard to the fraud claim specifically, the Court finds that Zia presented clear and convincing evidence that Tyson intentionally lured Zia into a situation where Zia had no choice but to accept a

---

[3] See ECF No. 137 at 11, 18, 20, 25 (jury instructions discussing conduct that is malicious, willful, reckless, wanton, fraudulent, or in bad faith); ECF No. 141 (redacted special verdict form).

non-agreed-upon price, and that Tyson knew in advance that it would not pay this price. Rather than giving Zia notice that it did not intend to perform, Tyson agreed to the deal and willfully allowed Zia to raise natural cattle, at a price and quantity that essentially only Tyson could purchase within the United States. Then, when Tyson refused to pay for the cattle at the agreed-upon price, Zia could not sell the cattle to anyone else, thus forcing Zia to incur even greater losses unless it sold the cattle to Tyson for less than the agreed-upon price.

The jury was presented with the above facts and was instructed on the elements of Zia's claims, including the "clear and convincing" standard for proving fraud (ECF No. 137 at 20) and the standard for proving breach of the covenant of good faith and fair dealing (ECF No. 137 at 18). The jury found in favor of Zia based on the facts outlined above. Therefore, the Court cannot find that the jury's verdict was against the clear weight of the evidence.

II. **The Court did not exclude relevant evidence of Tyson's standard contracting practices. Additionally, the Court permitted Tyson to reopen testimony, and Tyson was also permitted to make closing arguments to the jury, on this issue.**

Regarding Tyson's next argument, i.e., that the Court improperly excluded relevant evidence regarding Tyson's standard pricing models, the Court does not agree. In the Motion, Tyson argues that the Court improperly prohibited it from "introduc[ing] evidence as to Tyson's standard contracting practices," which it contends to be relevant under the Uniform Commercial Code.[4] *See* ECF No. 153 at 19–24. However, when the Court

---

[4] *See, e.g.*, N.M. Stat. Ann. § 55-1-303 (1978) (course of performance, course of dealing and usage of trade). Because the Court ultimately allowed the line of questioning sought by Tyson, and because Tyson was permitted to make its argument to the jury on this issue, an analysis of the UCC's applicability is unnecessary.

reviews the actual exchanges in the trial record, it is apparent that the Court did not deny Tyson the ability to ask questions about the pricing models; instead, the Court *agreed* with Tyson that the requested information could be relevant. The Court instructed Tyson's counsel that Tyson could ask questions about the pricing models if the witness could tie these pricing models to the specific transaction at issue in this case. ECF No. 147 at 19. In other words, Tyson was permitted to ask questions about its normal pricing models, as long as the questions were relevant to the parties' transaction in this case. *Id.*[5] *See* ECF No. 147 at 17–19 (questioning of Mr. Scherer by Tyson's counsel, Mr. Fisher):

> Q. And how is that [Nebraska weighted average pricing structure] communicated to producers such as Zia?
>
> MR. WORDEN[, Zia's counsel]: Your Honor?
>
> THE COURT: Yes.
>
> MR. WORDEN: Objection, foundation, relevance. I can approach, if you'd like.
>
> . . . .
>
> MR. FISHER: Your Honor, I'm simply asking him to explain to a jury -- since this is my first opportunity to have anybody on the stand from Tyson, to explain in general how the pricing system works at Tyson.
>
> THE COURT: How is that relevant to this transaction if none of this occurred in the transaction with Zia?
>
> MR. FISHER: He's not -- well, I have -- I'm using this opportunity to give him a chance to explain that, that this

---

[5] In attempting to call into question the Court's evidentiary rulings, Tyson's counsel states that the Court made evidentiary "ruling[s]" to its detriment on the issue of Tyson's pricing structure. ECF No. 153 at 20. This is an inaccurate representation of the record cited (i.e., Trial Transcript, Vol. III, ECF No. 147 at 17–19). The Court *questioned* the relevance of this information (i.e., the relevance of how pricing works at Tyson, without sufficient foundation) outside of the presence of the jury, but ultimately the Court allowed this information to be admitted as long as the witness could tie the standard pricing structure to the specific transaction at issue in this case. ECF No. 147 at 19. In other words, if the Court made an evidentiary "ruling" at all, it was in Tyson's favor, provided that Tyson met its obligation of laying proper foundation, which could have been prior course of dealing or any other allowable theory. *Id.*

actually would have occurred with that communication with Zia.

THE COURT: So you expect this witness to testify that this pricing structure is what happened with Zia?

MR. FISHER: I believe he will, Your Honor.

THE COURT: He's going to testify that's what happened with Zia?

MR. WORDEN: We went over that yesterday. He said this never happened yesterday, and there will be no one here to testify that it did happen. He's trying to make a suggestion that somehow it happened when the evidence yesterday was precisely to the contrary. It's irrelevant, misleading, and prejudicial.

MR. FISHER: I think Mr. Worden will have an opportunity to address that on redirect, Your Honor. We have e-mails that have been out there addressing these prices. We've got that out there -- the testimony yesterday was that he was not -- Mr. Scherer was not there at the time because he was not -- in a different role at the time, but that this is how the system works at Tyson.

MR. WORDEN: There is no e-mails for this transaction.

THE COURT: I don't understand how it's relevant.

MR. FISHER: And that's the basis of the whole litigation, Your Honor, is that there has been a set system. Zia has worked with Tyson for 20 years. They know how this system works. I talked about it with Mr. Perez in his -- when he was on the stand. That's the main dispute here. Tyson is contending that Zia was paid based on these prices that are communicated every year to the producers and to the feedyards.

THE COURT: Why don't you do this, Mr. Fisher: If you can get the witness to tie this to this transaction with Zia, you can back into it. But if he's going to say this [pricing structure] wasn't involved in this transaction with Zia, I'm going to sustain the objection --

MR. FISHER: Okay. Understood –

7

Tyson's counsel thus represented that the witness would tie Tyson's standard pricing structure to its transaction with Zia. *Id.* The Court assumed that Tyson's counsel would elicit such testimony, but instead, counsel moved on to other lines of questioning. *See id.* at 20–26 (going into Tyson's longstanding and at-times tumultuous relationship with Zia but failing to tie Tyson's standard pricing structure to its specific transaction with Zia).

Later in the trial, after Tyson's counsel objected that the Court had improperly prohibited him from asking questions about Tyson's "standard pricing," the Court permitted Tyson's counsel to call the witness back onto the stand to testify how Tyson's "standard pricing system works." *Id.* at 86. Tyson's counsel told the Court,

> I want to ask Mr. Scherer, in general, "Zia was paid this amount of money. How was that payment calculated?" And he can testify to that, that that payment was calculated based on Tyson's standard pricing, as opposed to this cost plus model. And that's the basis of plaintiff's claim, is that they're seeking the difference between the two.

*Id.* at 90. The Court then stated, "I understand. I think the jury probably knows, but I do think that would be relevant." *Id.* The Court then permitted Tyson's counsel to call the witness back onto the stand to ask the specific questions (above) that Tyson's counsel requested to ask. *Id.* Tyson's counsel did not object that the Court was restricting it to a certain number of questions, nor did Tyson's counsel request to go into further lines of questioning. *Id.* Instead, it was clear that the above questions were the only additional questions that Tyson's counsel wished to ask, and counsel was not prohibited from asking these questions. *Id.* Tyson's counsel also argued its standard pricing models to the jury during closing argument. ECF No. 148 at 82–84 (describing the Nebraska weighted average pricing model, which Tyson's counsel claimed that "Mr. Perez, Mr. Narciso Perez, and Zia have worked under for two decades").

8

Having reviewed the record cited by Tyson, the Court disagrees with the premise of Tyson's argument, namely that the Court limited Tyson's representative's testimony on the parties' prior course of dealing at all. Instead, it appears that the Court permitted Tyson to introduce evidence regarding its standard pricing models at least twice, and Tyson was permitted to (and did) argue this evidence to the jury at some length during closing argument. Although Tyson disagrees with the jury's verdict, the Court cannot find that Tyson was prevented from presenting evidence of the parties' prior course of dealing to the jury, insofar as Tyson's standard pricing models were concerned. As a result, the Court cannot find that Tyson "was substantially prejudiced by the improper exclusion of relevant testimony about history, course of dealing, and context regarding Tyson's contracting practices." ECF No. 153 at 19.

### III. The punitive damages award was not excessive, in light of the facts of the case and the law governing punitive damages.

Tyson also calls into question the jury's punitive damages award of $8,000,000.00, which was 3.109 times the amount of the jury's compensatory damages award of $2,573,171.00. Tyson makes at least four separate arguments, which the Court will address below:

#### A. Substantial evidence supported the jury's punitive damages award.

First, Tyson argues that "[t]here was not sufficient evidence to support any punitive damages, award, much less $8 million." With regard to this argument, the Court finds that substantial evidence exists to support the jury's verdict, based on the same evidence cited in Section I above (showing that Tyson's conduct was malicious, willful, reckless, wanton, fraudulent, or in bad faith), which is incorporated herein by reference. Because

the Court has already addressed this argument in detail in a separate section, it will not do so again here.

### B. The punitive damages award does not violate Tyson's due process rights.

Second, regarding Tyson's constitutional argument (i.e., that the jury's punitive damages award violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution), the Court disagrees. In deciding whether the punitive damages award comports with due process, the Court considers the three guideposts set forth in *BMW of North America Inc. v. Gore* and its progeny: "(1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *Gore*, 517 U.S. 559, 575 (1996)); *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1063 (10th Cir. 2016). Of the three guideposts, the degree of reprehensibility is "perhaps the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. Applying the three guideposts, the Court cannot conclude that the punitive damages award violates Tyson's due process rights. Instead, the punitive damages award appears consistent with Tyson's due process rights, particularly in light of the jury's apparent finding as to the reprehensibility of Tyson's conduct.

The evidence cited in Section I above supports Zia's claim that Tyson's conduct was sufficiently reprehensible to support an award of punitive damages in the ratio of approximately 3:1. Specifically, Zia showed that Tyson was aware of Zia's precarious

financial position from prior deals and that Tyson intentionally took advantage of its monopsony power over the natural cattle market in order to force Zia to accept a lower price than the parties bargained for in the cost-plus pricing agreement, resulting in potential economic ruin to Zia. Although Tyson claims that there was no evidence that there was a risk of potential harm to other suppliers in the future (which, of course, is difficult to prove given that the harm has not yet occurred), Zia nevertheless presented evidence that Tyson employed these types of tactics as its regular business practice.

For instance, Zia presented evidence that Tyson regularly took advantage of its lack of a written agreement in its dealings with all of its suppliers,[6] so that it could make representations that were false and then disavow these representations later. Zia also showed that Tyson intended to cause Zia to rely on its false promise because it needed Zia's natural cattle and wanted to induce Zia into thinking that Tyson intended to fulfill its payment obligations, solely in order to induce Zia to perform. Based on these facts, the Court finds that Zia has established the significant reprehensibility of Tyson's conduct, sufficient to support a punitive damages award of an approximately 3:1 ratio. The Court further determines that the goal of deterring future similar conduct against other New Mexico suppliers is met by a punitive damages award of this ratio, given Tyson's potential monopsony power in some instances.

Regarding the second *Gore* guidepost, the ratio itself, the Court also finds that the approximately 3:1 ratio between punitive and compensatory is reasonable under a due

---

[6] Tyson did not discuss the issue outlined in *Gore* regarding whether a state may "impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other [s]tates." 517 U.S. at 572. Given that Tyson has not argued that New Mexico law on punitive damages is somehow being used to change its lawful conduct in other states, or that Tyson's unlawful conduct in New Mexico would be lawful in other states to begin with, the Court need not (and therefore will not) address it.

11

process analysis. *See, e.g., State Farm*, 538 U.S. at 425 (referencing a "long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish") (citing *Gore*, 517 U.S. at 581). Although the Tenth Circuit has, in the past, limited punitive damages awards, it has made clear that an overall ratio of 3:1 is not *per se* unlawful. *See, e.g., Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1207–08 (10th Cir. 2012) (approximately 3:1 ratio was excessive based on the "substantial compensatory damage award" in light of the injuries plaintiff suffered, but overall ratio, in and of itself, did not "push the boundaries of due process requirements"). The jury found that the conduct of Tyson was malicious, willful, reckless, wanton, fraudulent, or in bad faith. The Court finds that a 3:1 damages ratio is reasonable in this particular case.

Regarding the third *Gore* guidepost, an analysis of comparable cases also weighs in favor of upholding the jury's punitive damage award.[7] Although Tyson is perhaps correct that some recent appellate court decisions have recognized a lower ratio of punitive to compensatory damages, these cases are not entirely applicable to the present case, either because a jury found that a lower punitive damages award was appropriate

---

[7] With respect to the third *Gore* guidepost, although the parties presented several comparable court cases, the parties did not address the issue of whether any comparable civil or criminal statutory penalties applied. *See generally* ECF Nos. 153, 158, 160. A review of the case law reflects some confusion by courts over how to apply the third guidepost, as well as hesitation to rely heavily on the third guidepost. *See, e.g. Grassie v. Roswell Hosp. Corp.*, 258 P.3d 1075, 1089–90 (N.M. Ct. App. 2010) (noting that New Mexico courts have found the third *Gore* guidepost "ineffective and very difficult to employ") (internal quotation marks omitted). The Court finds that the failure of any party to address the issue of comparable civil or criminal statutory penalties would not affect the ultimate outcome of the pending Motion. This is especially true in light of *Gore's* holding that the first guidepost, i.e., the reprehensibility of the defendant's conduct, is most important. 517 U.S. at 575. Regardless of the above, the parties have presented several comparable court cases, which is helpful to the Court's analysis of the third *Gore* guidepost. Finally, in conducting its own review of "comparable civil or criminal penalties," the Court notes in passing that the only statutory claim brought in the Complaint, under the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-10-10(B) (1978), *does* allow private remedies including treble damages, although this statute did not form the basis for the punitive damages award in this case, given that the Unfair Practices Act claim was terminated on summary judgment before trial. ECF No. 1 at 10; ECF No. 82 at 20; ECF No. 141.

or because the conduct was not as reprehensible as in the present case. *See* ECF No. 153 at 31–32 (citing *Osterhout v. Bd. of Cnty. Comm'rs of LeFlore Cnty., Okla.*, 10 F.4th 978, 1003 (10th Cir. 2021) (upholding punitive damages of $1 million relative to compensatory damages of $3 million)); *Jones*, 674 F.23d at 1207–08 (retaliatory discharge case finding that although defendant's conduct in preventing plaintiff from returning to work in retaliation for filing a workers' compensation was "both willful and improper," it was not so reprehensible to warrant a 3:1 punitive damages award in the amount of $2 million); *Lompe*, 818 F.3d at 1063 (reducing punitive damages against one defendant from $22,500,000 to $1,950,000 on a total compensatory damages award of $1,950,000 for that specific defendant, where "intentional malice, trickery, or deceit" was not present).

Given that the jury in the present case specifically found that Tyson committed both fraud and breach of the covenant of good faith and fair dealing, and given that the evidence presented at trial showed the culpable nature of Tyson's conduct, the Court finds that the cases presented by Tyson are inapposite and that the cases cited by Zia, as well as similar previously decided cases, were sufficient, for due process purposes, to put Tyson on notice that it could be subject to a damages award of at least $8 million and an approximately 3:1 ratio of punitive to compensatory damages for acting in bad faith or with fraudulent intent. *See* ECF No. 158 at 26 n.10 (citing *Allsup's Convenience Stores, Inc. v. North River Ins. Co.*, 976 P.2d 1, 18 (N.M. 1999) (7.4 to 1 ratio and $4,000,000 punitive damages award where defendant acted in bad faith); *Grassie v. Roswell Hosp. Corp.*, 258 P.3d 1075, 1087–89 (N.M. Ct. App. 2010) (slightly over 10 to 1 ratio and

$10,000,000 punitive damages award where defendant's conduct was notably reprehensible)).[8]

### C. The Court does not find that the punitive damages award is so excessive as to shock the conscience under New Mexico law.

Tyson next argues that the "punitive damages award is so excessive as to shock the conscience under New Mexico common law." ECF No. 153 at 32. Other than the amount of the award itself, Tyson presents no explanation as to how or why the jury's damages award is contrary to law. *Id.* at 32–33. Although bias, prejudice or passion can be inferred from excessiveness of the award itself, a verdict will not be set aside on this basis unless it is so plainly excessive as to suggest that it was the product of such passion or prejudice on the part of the jury. *Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981) (ordering remittitur under Colorado law where non-economic damages were "134 times the amount of the actual financial loss" of $30,000 and punitive damages alone were 100 times this amount) (internal quotation marks omitted). The Court finds that, in light of the specific facts presented at trial combined with the jury's verdict, a punitive damages award of $8 million is not so excessive as to "shock the judicial conscience" or to "raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." *See Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1122 (10th Cir. 2004). Based on the evidence supporting punitive damages, the Court further finds that it is possible, if not likely, that

---

[8] Although the cases cited by Zia were decided in the New Mexico state court system, these cases were sufficient to put Tyson on minimum notice of a potential $8 million punitive damages award for fraudulent or bad-faith conduct, particularly given that the present case is a diversity jurisdiction case that involves causes of action based solely on New Mexico law, and therefore the case likely could have been filed against the same defendant in New Mexico state court. *See generally* ECF No. 1. Also, the third *Gore* guidepost is far from the most important, especially in light of the jury's apparent determination that the conduct of Tyson was malicious, willful, reckless, wanton, fraudulent, or in bad faith. *See* ECF No. 137 at 25; ECF No. 141.

the jury awarded punitive damages in order to punish what occurred and to deter its repetition. *See id.* at 1123 (citing *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1309 (10th Cir. 2003)). The Court finds that the award of punitive damages is consistent with the evidence presented at trial; therefore, the Court will not reduce or otherwise disturb the jury's punitive damages award on that basis.

### D. Tyson failed to preserve its specific arguments regarding the punitive damages instruction given to the jury.

Finally, Tyson argues that the jury instructions "erroneously permitted multiple punitive damage awards for the same conduct, which likely explains the excessive award." ECF No. 153 at 33. Having reviewed the trial record, and even assuming that the award was excessive to begin with (which the Court does not find),[9] the Court finds that Tyson waived its objection to the jury instructions by jointly proposing and agreeing to them. *See* ECF No. 112 at 44 (jointly submitted requested instruction No. 22, stating, "With respect to punitive damages, you may make separate awards on each claim that Plaintiff has proven.")); ECF No. 22 (final instruction given by Court); *U.S. v. Cornelius*, 696 F.3d 1307, 1319–21 (10th Cir. 2012) (explaining that under the "invited error" doctrine, *waived* rights generally may not be challenged, even though *forfeited* rights may be reviewed for plain error).[10]

---

[9] The Court has already determined that the award was not excessive, under due process or common-law principles, and therefore the Court disagrees with the premise of Tyson's argument (i.e., that the punitive damages award was excessive), for reasons already stated.

[10] Because the Court has determined that a waiver occurred, the Court need not (and therefore will not) conduct an analysis of whether a forfeiture, subject to plain error review, occurred. To the extent that a plain error analysis is necessary, the Court notes that the punitive damages award does not appear inconsistent with the facts of the case, whether on a theory of a single count of fraud, a single count of willful breach of contract, or otherwise. Therefore, based on the punitive damages award itself, the Court cannot find sufficient evidence in the record to suggest that the jury made multiple awards of punitive damages for the same claims.

## CONCLUSION

For the foregoing reasons, Tyson's Motion for New Trial, or, in the Alternative, Vacatur or Remittitur of Punitive Damages is hereby **DENIED**.

**IT IS SO ORDERED.**

*[signature: Margaret Strickland]*

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE

---

Further, Tyson did not object to the content of the jury instructions at trial; instead, it objected to the use of *any* punitive damages instruction because, in its view, Tyson "[didn't] believe that the evidence has been established to establish willful, wanton, reckless type of conduct here." ECF No. 147 at 274:7–13. Tyson's only other request was that separate spaces be made for punitive and compensatory damages, which the Court granted. *Id.* at 274:11–13, 275:15–23. At trial, the Court found that "there is sufficient evidence in this case that a jury could find fraudulent conduct, bad faith, and intentional conduct on behalf of Tyson," and therefore the Court denied Tyson's request that a punitive damages instruction not be given. *Id.* at 280:10–14. Tyson did not request that the content of the punitive damages instruction be changed.

Also, In its Reply, Tyson cited to unsworn testimony from a post-trial interview conducted with one or more members of the jury. Because this argument was raised for the first time in Tyson's Reply, and because Tyson does not cite to admissible evidence, the Court will disregard any arguments regarding information Tyson gained from jury members after the trial.